1                United States District Court

2            For the Southern District of California

3

4   RYAN MOORE,                        )
                                       )   No. 15-CV-75-LAB
5        Plaintiff,                    )
                                       )   February 28, 2017
6             v.                       )
                                       )   San Diego, California
7   UNITED STATES OF AMERICA and       )
    DOES 1 THROUGH 25, INCLUSIVE,      )
8                                      )
         Defendants.                   )
9

10                       Volume 1
                      Transcript of Trial
11           BEFORE THE HONORABLE LARRY ALAN BURNS
                 United States District Judge
12

    APPEARANCES:
13
    For the Plaintiff:      GOMEZ TRIAL ATTORNEYS
14                          ROBERT J. CHAMBERS
                            BEN WOHLFEIL
15                              655 West Broadway, Suite 1700
                                San Diego, CA  92101
16
    For the Defendants:     TIM L. LASKE
17                          GARRETT J. COYLE
                            ASSISTANT UNITED STATES ATTORNEYS
18                              Federal Building, Suite 7516
                                300 North Los Angeles Street
19                              Los Angeles, CA  90012

20

21

22  Court Reporter:         DANA PEABODY, RDR, CRR
                            CYNTHIA R. OTT, RDR, CRR
23                          District Court Clerk's Office
                            333 West Broadway, Suite 420
24                          San Diego, California, 92101

25

```
 1   Case:  Moore v. USA
     Date:  February 28, 2017
 2

 3
                         INDEX OF WITNESSES
 4
     FOR THE PLAINTIFF:
 5                                     E X A M I N A T I O N
                                DIRECT   CROSS REDIRECT RECROSS
 6
     Daniel Basinger
 7     Mr. Wohlfeil             27
       Mr. Laske                        36
 8
     David Rondinone
 9     Mr. Chambers             40                  112
       Mr. Laske                        88
10
     Kambiz Kohani
11     Mr. Chambers            114
       Mr. Laske                       166
12
     Debra Halbman
13     Mr. Chambers            191

14   Ryan Moore
       Mr. Chambers            228
15

16

17

18

19

20

21

22

23

24

25
```

Case:   Moore v. USA
Date:   February 28, 2017

## INDEX OF EXHIBITS

| EXHIBIT | EVIDENCE |
|---|---|
| 37 | 227 |
| 50 | 49 |
| 69 | 166 |
| 76 | 166 |
| 78 | 166 |
| 82 | 166 |
| 83 | 166 |
| 86 | 166 |
| 95 | 166 |
| 96 | 166 |
| 97 | 166 |
| 98 | 166 |
| 100 | 166 |
| 104 | 166 |
| 105 | 166 |
| 106 | 166 |
| 147 | 36 |
| 308 | 36 |
| 9688 | 49 |
| 9724 | 49 |
| 9838 | 49 |

1              San Diego, California, February 28, 2017

2                            *   *   *

3          THE CLERK:  Calling number 1 on the calendar,

4     15-CV-75, Moore versus United States of America.  If counsel

09:09   5     could please state your appearances for the record.

6              MR. CHAMBERS:  Good morning, Your Honor.  Rob Chambers

7     and Ben Wohlfeil on behalf of Mr. Moore.

8              THE COURT:  All right.  Good morning.

9              MR. LASKE:  Good morning, Your Honor.  Assistant U.S.

09:09   10     Attorney Tim Laske and my co-counsel, Assistant U.S. Attorney

11     Garrett Coyle on behalf of the government.

12              THE COURT:  Good morning.  All right.  We are

13     scheduled for trial in the matter of Ryan Moore versus the

14     United States.  Two motions in limine were pending.  The

09:09   15     Court's prepared to rule on those.

16          Also, I was informed by the law clerk that there may be an

17     additional issue about the elements of the premises liability

18     claim, but let me deal with first things first.

19          Do plaintiffs have anything else on the government's

09:10   20     argument that training evidence should be excluded under the

21     discretionary function rule?

22              MR. CHAMBERS:  I think we actually argued this a month

23     or two ago on a conference call, Your Honor.  I don't know if

24     the Court took it under submission or not.  Basically whether

09:10   25     or not it comes in for evidence of liability against the

1   government I think -- I agree with them, I don't think that's

2   permissible.

3        THE COURT:  What relevance would it have then?  As I

4   understand the proffer, he's going to talk about training, and

09:10   5   if that's not a basis for liability, why waste time having a

6   guy testify about something not relevant?

7        MR. CHAMBERS:  Because one of the issues in the case

8   is what sort of training and expertise Mr. Moore had in filling

9   tires.

09:10   10        THE COURT:  He can testify to that, though.

11        MR. CHAMBERS:  And the training he's received, right,

12   that would be the purpose for presenting evidence to that.

13        THE COURT:  Well, as I understand the gist of the in

14   limine motion, it's not directed at Mr. Moore talking about his

09:11   15   background and training.  Instead -- forgive me.  I've

16   forgotten the expert witness' name.

17        MR. LASKE:  It's Mr. Jennings, and actually --

18        THE COURT:  It's directed at Mr. Jennings in

19   preventing him.  As I understand it, one of his opinions was

09:11   20   that people should have been trained on how to use this and

21   because they weren't, that supports a negligence theory.  And I

22   think that runs right up against the discretionary function

23   exception.

24        MR. CHAMBERS:  And Mr. Jennings won't be testifying at

09:11   25   trial, Your Honor.

1    THE COURT:   Okay.   Does that moot the issue as far as

2  you're concerned?

3    MR. LASKE:   I believe so, Your Honor.   I think the

4  only other witness that may mention training, but I'd have to

09:11    5  look back, is we're submitting a transcript relating to Ronald

6  Zermeno because he lives in Arkansas, and he's a former border

7  patrol employee.

8    THE COURT:   I agree with the government that

9  discretionary function exception applies under these

09:12   10  circumstances.   I think how they allocate training dollars and

11  resources is a matter within the government's discretion for

12  which they can't be liable.

13    That said, I'm not going to preclude the plaintiff from

14  talking about his background and putting him in the setting

09:12   15  that he was in at the time that the accident occurred.

16    So I'll -- you know, whatever he says about his training,

17  of course, will be considered for proper purpose, not for an

18  improper purpose forbidden by the discretionary function

19  exception.

09:12   20    The second motion in limine had to do with spoliation

21  inference, and I'm inclined to reserve on that.   It doesn't

22  matter here as it would in a jury trial where you might need to

23  put on some additional evidence to warrant an instruction.   I

24  am wondering what the theory is of the plaintiffs.   I

09:13   25  understand the plaintiffs believe that this equipment -- it's a

```
 1   gauge of some type.  Does the gauge, as you understand it -- I
 2   know you never got it, but did the gauge have numbers on it?  I
 3   mean, was it -- for example, I have a small inflation device at
 4   my house that I use on my tires.  It does not have a gauge on
 5   it, but I have a little magnetic gauge that I put a little air
 6   in it, and then I test it.  Did this gauge -- or did this piece
 7   of equipment have one of those gauges that showed the numbers
 8   and the pounds per square inch?

 9        MR. CHAMBERS:  It did, Your Honor.  The whole -- the
10   inflater itself where you'd actually pull the trigger to push
11   the air out was built in with a gauge on it, so it was one
12   unit.

13        THE COURT:  Was it a numerical gauge or the
14   old-fashioned ones used to slide out?  You'd get to a certain
15   point of pressure and it would show on a slide.  What kind of
16   gauge was it?

17        MR. CHAMBERS:  It wasn't the ones that pop out.  It's
18   what they call a bubble gauge, so there would have been lines
19   designating certain pressures as you reach those.

20        THE COURT:  It was not one of those --

21        MR. CHAMBERS:  It was one of those, but it doesn't pop
22   out.  It would just slide -- there's a little glass bubble that
23   you look into, and you can see the lines as they start to go
24   out.

25        THE COURT:  All right.  And what's your theory with
```

09:13
09:13
09:13
09:14
09:14

1  respect to that; that it wasn't functioning, it wasn't showing

2  the proper PSI?

3          MR. CHAMBERS:  Yes.

4          THE COURT:  It wasn't functioning at all or it was

09:14   5  partially functioning or malfunctioning or what?

6          MR. CHAMBERS:  It could have been any combination of

7  those, whether it was nonfunctional or reading improper or

8  incorrect pressures inside the tire.

9          THE COURT:  Well, okay.

09:14  10          MR. CHAMBERS:  We do have some evidence to put on in

11  that regard.

12          THE COURT:  All right.  I'm prepared to reserve on

13  that.  I mean, it just strikes me it might be a two-edged

14  sword.  I'm sure you have thought about this, but, you know,

09:14  15  somebody using a gauge that's obviously not working and

16  continuing to pump air in when the user of the gauge is aware

17  that it's not working I suppose conceivably -- this is -- I

18  mean, I was thinking about this after I read the motion in

19  limine, but conceivably it could be a basis for ascribing

09:15  20  comparative fault, right?  I don't know how much air is going

21  in, but I'm going to keep pumping, keep pumping, keep pumping?

22  So I'm not exactly sure what inference I'm to draw.  I suppose

23  the most inference I could draw is that the investigators

24  appreciated that there was some problem with this gauge that

09:15  25  might lead to liability and so they deep sixed it, right?

1        MR. CHAMBERS:  Yes.

2        THE COURT:  Well, we'll see where the evidence goes on

3   that.  I'm open to it.  I understand that this is a -- this is

4   something that I think is material, should have been preserved,

09:15   5   but where we go with what inferences to be drawn I think will

6   depend on exactly what the evidence is, so I'll reserve on

7   that.

8      There was a final issue regarding premises liability.  My

9   law clerk told me that there might have been an issue on the

09:15   10   elements of that claim; that the government's taken the

11   position that in all respects it's just like a general

12   negligence claim?  Michael, did I get that right?

13        LAW CLERK:  I thought so, Judge.  In the pretrial

14   order, page 2, it notes that defendants do not agree to this

09:16   15   third element of premises liability, but maybe you guys have

16   reached a different position.

17        THE COURT:  If it's not on your radar screens now, we

18   can wait until the break, and you can take a look at it, and we

19   can revisit it.  It doesn't sound like it's anything essential

09:16   20   for me to rule on.

21        MR. CHAMBERS:  That would be great, and I can chat

22   with Mr. Laske.

23        MR. LASKE:  We'll take a look, Your Honor.  I don't

24   think it was one of the issues on the top of our list.

09:16   25        THE COURT:  Okay.  Does either side wish to make an

```
 1   opening statement?

 2              MR. CHAMBERS:  Yes.

 3              MR. LASKE:  Yes.

 4              THE COURT:  Mr. Chambers, are you going to speak for

 5   plaintiff?

 6              MR. CHAMBERS:  Mr. Wohlfeil will.

 7              THE COURT:  Remind me again.  This is a ten-hour case

 8   per side?

 9              LAW CLERK:  12 hours.

10              THE COURT:  Okay.  You're on the clock, Mr. Wohlfeil.

11              MR. WOHLFEIL:  Thank you, Your Honor.

12         A property owner must not expose people to needless danger

13   or preventible harm.  It's a basic but important principle that

14   applies to this case.  It applies to all property owners,

15   including the border patrol.  I'd like to introduce my client,

16   Ryan Moore, who's sitting with us at plaintiff's table.

17              THE COURT:  Agent Moore, good morning.

18              THE PLAINTIFF:  Good morning, Your Honor.

19              MR. WOHLFEIL:  So, Your Honor, what happened in this

20   case, on the left of your screen you see Ryan Moore with --

21   today is a ten-plus year agent of the border patrol, obviously

22   smiling, chin up, looking proud, obviously on duty with his

23   badge on, his belt, but in the blink of an eye becomes the

24   mangled medical patient that you see on the right of the

25   screen.
```

09:16
09:16
09:17
09:17
09:17

09:18

1    How does that happen?  Your Honor, even though Ryan himself
2    has no memory of the incident, and even though there are no
3    witnesses to this incident, we don't anticipate a lot of
4    dispute that what happened was on June 24, 2013, Ryan was
5    inflating his wheelbarrow tire at the Chula Vista border patrol
6    station when it exploded in his face and caused the injuries
7    that you see on the right of your screen.

8    Your Honor, this is the scene the night of the tire
9    explosion with Mr. Moore.  What you see is a photo taken later
10   that night by the CIIT team, the Critical Incident
11   Investigative Team, which is a team of the border patrol of
12   investigators who investigate incidents just like these.

13   In purple there you see the metal rim that was contained
14   within Ryan Moore's wheelbarrow tire, in green the tire and the
15   inner tube, in blue, Your Honor, the piece of very important
16   evidence that we were just talking about a moment ago, the hose
17   and the inflater that Mr. Moore used to inflate his wheelbarrow
18   tire.  In yellow you see the hose reel that holds the hose and
19   inflater.  To the right there is Ryan's SUV, and then in the
20   back behind the barbed-wire fence is a shed that contains two
21   industrial air compressors that powered that inflater, in
22   addition to other tools, pneumatic tools, at the border patrol
23   station.

24   Your Honor, to understand where everything happened in
25   this case, you need to know a little bit about the Chula Vista

1   border patrol station.  As you can see, it's surrounded

2   in -- with a green line by a perimeter -- secured perimeter

3   fence.  In the blue near the top of the page is the scene that

4   I just showed you in the previous photo that basically is the

09:19   5   barbed-wire fence surrounding the shed that contains the two

6   air compressors.  In yellow is the hose reel that contains the

7   inflater that Ryan used to inflate his wheelbarrow tire.  Just

8   across the parking lot there, in the orange rectangle, is the

9   garage.  This was an industrial garage with nine bays that

09:20   10   basically worked to take care of all the vehicles at the border

11   patrol facility.

12       And connected to the garage is the VCO, Vehicle Control

13   Officer, office.

14       Your Honor, the take-away point from this is there's

09:20   15   no doubt that the border patrol owned and controlled this

16   facility.

17       Returning to the scene, Your Honor, I wanted to point out

18   that this is -- in blue you see the locked barbed-wire fence.

19   And, again, Your Honor, this is an interior fence.  People who

09:20   20   have already made it past the secured perimeter are themselves

21   allowed to be inside, but yet are still subject to

22   the -- obviously, the barbed-wire fence.  Again, you see the

23   inflater and the hose reel in yellow and the two industrial air

24   compressors stored in the shed behind the barbed-wire fence.

09:21   25       This is a subsequent photo that shows the same fence

1   obviously with an gate open.  Note, Your Honor, the padlock to

2   the left kept on the gate, and in the rear the shed, which is

3   now open, with the two industrial air compressors.

4   Your Honor, this is a close-up of the air compressor shop,

09:21   5   or shed, showing the two industrial air compressors.  Again,

6   note the third layer of security in the form of the padlocked

7   shed.

8   Your Honor, the basic take-away point from this is that

9   Ryan did not know, and he had no way of knowing, the power, the

09:22   10   air pressure, that were coming out of these two air compressors

11   the night that he used it.

12   I'm going to talk a little bit about the air compressors

13   themselves, Your Honor.  There were obviously two of them, and

14   they were arranged in what's called a master/slave

09:22   15   relationship.  At the time of the incident, the compressor on

16   your right, the Ingersoll-Rand brand compressor, was in the

17   master position while the one on the left, the Stewart Warner,

18   was in the slave position.  Essentially that meant that the

19   settings on the Ingersoll-Rand compressor controlled when the

09:22   20   air kicked on or off.  And a couple of terms that you need to

21   know is the cut in and cut out of these compressors.

22   You'll note item number 3 is 175 PSI cut out, 175 pounds

23   per square inch cut out.  What that meant was that the large

24   motors that you see on top of the tanks would stop pumping air

09:22   25   into those 80-gallon tanks once the internal settings of the

1  compressor had reached 175.

2       Likewise or similarly when the air pressure in the tank

3  dropped below 145, the cut-in pressure, those engines would

4  kick on and begin pumping air back into that tank, that

09:23  5  80-gallon tank.  Your Honor, these are 200 PSI capacity, so

6  they're set very close to the actual capacity of these

7  machines.

8            Your Honor, in very basic terms, what you need to know

9  is that the pressure, the air pressure, coming out of these

09:23  10  tanks and going to pneumatic tools was constantly between 145

11  and 175 PSI.

12       One of the uses or one of the air-supplied parts of the

13  border patrol station was that garage that's just across the

14  parking lot that I mentioned earlier.  Your Honor, as I said,

09:23  15  this is a nine-bay industrial garage that had a variety of

16  industrial uses.  I've got several of them here.  Oil machines,

17  air station, vehicle lifts, which, Your Honor, were capable of

18  getting a Chevy Tahoe off the ground, grease guns, tire

19  changers.  These are all running throughout the day by several

09:24  20  mechanics who worked in the garage at the time.  Basically this

21  garage, as I said earlier, was in charge of maintaining the

22  entire fleet of border patrol vehicles, and the power that was

23  coming out of these compressors was way more than necessary

24  even to do each of these uses.

09:24  25            Your Honor, the piece of evidence that we were just

09:24

1  talking about, the important piece of evidence in this case is
2  the inflater.  It's a fairly intuitive device.  Circled in red
3  you see the trigger that you press or squeeze to get air to
4  come out of the inflater.  On the end circled in blue is what's
5  called a chuck.  In this case it's a nonlocking chuck.  That
6  means that the chuck itself cannot be locked onto the nozzle
7  from the tire.  And you see in green, the gauge, which would
8  indicate the PSI of a tire actually connected to the chuck.

9      Your Honor, what's important to know is a couple of things.
10  First by squeezing the trigger in one hand and holding the
11  nonlocking chuck to a tire nozzle, both hands are occupied.  In
12  addition, Your Honor, it's important to know that this inflater
13  was used exclusively for filling up tires at the border patrol
14  station.  It wasn't connected, for example, to a vehicle lift.

15      So, Your Honor, what kind of tires did the border patrol
16  use this inflater to inflate?  A variety, large and small,
17  including SUV tires, ATV tires, and van tires.

18      Your Honor, for the larger tires, the PSI, the maximum PSI,
19  was around 80 PSI.  For the smaller tires, such as an ATV tire,
20  it was 7.

21          THE COURT:  I'm sorry?

22          MR. WOHLFEIL:  7 PSI.  Your Honor, another point where
23  there's not much or any dispute is the experts agree that the
24  maximum PSI of the wheelbarrow tire, which is 30 PSI, using
25  this inflater, would have been reached in a second.

09:25

09:25

09:26

09:26

1          THE COURT:  One second?

2          MR. WOHLFEIL:  One second.  That's squeeze, fill, that

3     quickly.

4          Your Honor, the defense own expert testing shows that in

09:26   5     approximately 26 seconds, a similar tire exploded.

6          Given the uses with this inflater and the extreme power,

7     what restrictions, if any, did the border patrol put on this

8     tire?  The answer is none.

9          As you can see, the parties have stipulated the border

09:27  10     patrol did not have any policy or regulation limiting federal

11     employees from using the tire inflater at issue, and thus Ryan

12     Moore was not violating any workplace policy or regulation

13     regarding use of the air compressor on June 24, 2013.

14          THE COURT:  Go ahead.

09:27  15          MR. WOHLFEIL:  Given the power that was coming out of

16     the compressors, the variety of tires that were used to inflate

17     with this inflater, and the lack of any restrictions, what

18     warnings did the border patrol put on this inflater?  And the

19     answer, again, is none.

09:27  20          The parties have stipulated on June 24, 2013, there were no

21     posted signs warning about any potential risk of injury from

22     using the air compressors.

23          Your Honor, how could this have all have been avoided?  I

24     need to tell you about regulators.  Regulators are a very

09:28  25     simple, fairly cheap device that can be installed essentially

1    along any air line.  You can see the two knobs on exemplar

2    regulators.  Basically they decrease the air pressure

3    downstream once the air pressure hits the regulator.

4         Again, another point of agreement is the experts in this

09:28    5    case agree that had a regulator been installed on this inflater

6    and reduced to 80 PSI, for example, it would have been

7    sufficient to inflate any of the tires that the border patrol

8    inflated with this inflater, and yet this incident would not

9    have happened.

09:29   10         How do we know the border patrol appreciates the value of

11   regulators?  Well, Your Honor, they installed one, and they

12   installed one just a few feet away from this line.

13         In the top left corner you recognize the shop to the right

14   of that photo was where the two air compressors were stored.

09:29   15   Attached to that shop is an additional shop where there were

16   additional tools, and there was at least one regulator inside

17   that shop.  Inexplicably, 20 feet away, the inflater that Ryan

18   Moore used did not have a regulator.

19         You've indicated that you read our brief on spoliation of

09:30   20   evidence, so I won't belabor this point, but we anticipate the

21   argument from the defense that, as you were noting, Ryan should

22   have been looking at the gauge.

23         Well, Your Honor we'd love to look at the gauge now.  We've

24   been wanting to look at the gauge for months, but we can't.

09:30   25   The border patrol has admitted in discovery that they disposed

1    of it.

2        Your Honor, as we noted in our brief, the law only requires

3    willful destruction, and here we have this admission from the

4    border patrol that they destroyed it.

09:30   5        THE COURT:  It's a permissible inference, though.

6    It's not a mandatory inference.

7        MR. WOHLFEIL:  I believe that's correct.

8        Your Honor, in addition to the simple disposal of the

9    critical evidence in this case, there were multiple

09:30   10   investigations going on, as we noted in our brief, and

11   essentially several different versions of the border patrol

12   wanted to know precisely what happened with Ryan and where

13   this -- where this key piece of evidence ended up.

14       We think it's more than enough to support the adverse

09:30   15   inference at the end of trial, and it's supported by our

16   expert, Dr. Rondinone, our expert, in engineering.

17       THE COURT:  On the issue of spoliation, I mean I've

18   dealt with it in the past.  I said it's a permissive inference.

19   I think it's kind of a sliding scale.  If I find this was an

09:31   20   intentional bad faith effort to hide evidence that might have

21   been unfavorable, then the strength of the inference increases,

22   that they did this in order to hurt your case and help theirs,

23   right?

24       MR. WOHLFEIL:  Yes.

09:31   25       THE COURT:  But the more -- the closer it is to

1    negligence or just overlooking something, the more the scale

2    slides back down, I can still draw an inference, I can still

3    say this was very sloppy, but, you know, the skullduggery

4    element is missing, and the logic of the inference decreases a

09:31    5    little bit, I think, if it's negligent as opposed to

6    intentional.  Do you agree with that?

7         MR. WOHLFEIL:  I think it's a fair summary of the law

8    yes, Your Honor.

9         Your Honor, next I'm going to touch on Ryan's injures.

09:31   10    Obviously, the photo largely speaks for itself.  I'll point

11    out, though, that mostly there's not a dispute that the tire

12    explosion in this case injured Ryan's face terribly.  There's

13    largely no dispute regarding even the severity of his injuries.

14    There's some dispute regarding the future care and, of course,

09:32   15    the cost of that future care for Ryan, but we'll let the

16    experts address that issue.

17         Finally, Your Honor, I'll address damages.  This is a photo

18    of Ryan after the incident obviously showing his scar.

19         Your Honor, before this incident, Ryan was a man who just

09:32   20    enjoyed life.  He enjoyed going out, he enjoyed spending time

21    with family and friends, and now he just doesn't.  He's

22    exhausted, he trusts nobody, he's embarrassed, he isolates

23    himself.  It may not be the perfect way to handle it, but

24    that's what he does because he's hurt, Your Honor, and yes,

09:32   25    we'll hear the argument that he's back at work, and yes, he is,

1   he's been working for some time now, but he does it to cope.

2   He does it because he needs it.

3       Your Honor, he had a nickname growing up.  Still does.

4   It was Chuckles, for his big smile, big laugh, and it's

09:33   5   something that people closest to him, including his brother,

6   his mother, who are going to testify -- they miss about him.

7   They don't see Chuckles anymore.  They see somebody completely

8   different.

9       Your Honor, under the circumstances of this case, it

09:33   10   merits a multimillion dollar award, and that's what we'll be

11   asking for.

12       THE COURT:  All right.  Thank you, Mr. Wohlfeil.

13    Does the government wish to make an opening statement at

14   this time?

09:33   15       MR. LASKE:  Yes, Your Honor.

16       THE COURT:  All right.

17       MR. LASKE:  Good morning, Your Honor, and counsel.

18       THE COURT:  Good morning.

19       MR. LASKE:  As I've stated earlier, my name is

09:33   20   Assistant U.S. Attorney Tim Laske, and I'm here with my

21   co-counsel, Garrett Coyle.  Also at counsel's table is our

22   client representative.  It's the patrol agent in charge, Daniel

23   Parks.  Essentially this is his station, so whatever happens in

24   the next few days, it's discussing the place where he is the

09:34   25   ultimate authority.

1      Now, this is a simple case, and it's simple because you

2  will not hear any evidence that this border patrol did anything

3  wrong.  You will not hear any evidence of plaintiff suffering

4  lifelong injuries.  You just saw the photo.  He does have a

09:34    5  scar, but it's nowhere near what the scar looked like after the

6  initial injuries.

7      Because also you'll hear that in the last 20 months, he has

8  been on a cross border task force, and since the fall of last

9  year, he's been on an FBI task force, and on those task forces,

09:34   10  he drives, conducts surveillance, he carries a weapon, he goes

11  on raids where they're there to capture suspected criminals or

12  do searches of target locations for money, drugs, or whatever

13  evidence they're looking for.

14      The evidence will show that the border patrol regularly

09:35   15  maintained the tire inflater, the air hose, and the air

16  compressors.

17      You will hear testimony that no one else had ever been

18  injured using the tire inflater and air hose at the location of

19  this accident.

09:35   20      You'll also hear evidence that, to the extent the plaintiff

21  remembers, he had also used that same station.  Maybe not the

22  same tire inflater, but the same filling station, and he had

23  never been injured before when he used it for vehicle tires.

24      Most importantly, there will be no evidence that plaintiff

09:35   25  or anyone else expressed any concerns or problems with the

1   subject tire inflater or air hose prior to the accident.

2       Plaintiff may make a big deal that the tire inflater and

3   air hose is gone, and what you will not hear is any evidence of

4   any willful attempts to destroy evidence.

09:35   5       What you may hear is a timeline of events that included

6   when the accident happened in June of 2013 that Mr. Moore filed

7   a claim with workers' compensation, which was ultimately denied

8   in the fall of 2013.  That he ultimately filed an untimely

9   appeal, but somewhere in there, the union filed a grievance not

09:36   10  on behalf of Ryan Moore, but on behalf of all the agents.  And

11  when the agency was asked to look for the tire inflater and the

12  air hose, at that time, they looked, and they couldn't find it,

13  which was around December of 2013.  And, of course, the

14  government wished that it had these tools.  It would simplify

09:36   15  our defense.

16      More importantly, you'll hear testimony from at least two

17  border patrol agents who use the same tire inflater that day of

18  the accident, June 24, 2013.  They used the tire inflater

19  properly and in the way it was intended to be used without any

09:36   20  problems.

21      The United States anticipates that the plaintiff may

22  introduce testimony about his character, and the government

23  does not doubt Agent Moore's character.  What matters, however,

24  is what he did or didn't do on that particular day.

09:37   25      The evidence will show that plaintiff had ample time during

1   daylight hours to inflate his tire, but, for whatever reason,

2   he chose to do that at night in the dark without anyone around.

3       The Court will hear testimony that on Monday, plaintiff

4   arrived to work about 14 minutes early for his shift, and we

09:37   5   know that because he checked out the government keys and the

6   taser at 11:46 a.m.  And yet instead of inflating the tire,

7   which their own expert estimated would take four to 12 seconds,

8   he chose to start work 14 minutes early.

9       The garage where the tire inflater was located was open

09:37   10  till 3:30 p.m. that day, Monday through Friday.  Plaintiff's

11  work schedule that week happened to be Sunday to Thursday.  So

12  he would be back to work the very next day around noon.  The

13  tire had a maximum pressure rating of 30 PSIs.  The plaintiff's

14  attorneys have admitted that.  The testing results of the

09:38   15  manufacturer of the tire, Ames True Temper, their information,

16  which is submitted as part of their deposition, show that the

17  tire does not explode until the pressure gets over 120 PSIs,

18  which is over four times its recommended maximum pressure.

19      Both experts have conducted tests that show the subject

09:38   20  tire likely exploded at a pressure over 120 PSIs.  And, in

21  fact, one of the plaintiff's tests shows that it exploded at

22  136 PSIs.

23      What you will not hear is any evidence about the accident

24  itself.  The plaintiff doesn't remember.  And there are no

09:38   25  witnesses.

1    The only evidence the plaintiff can present is his theory

2  that the tire inflater and air hose were somehow defective and

3  that such purported defect led to an accident or that there was

4  a failure to regulate down the pressure to the tire inflater.

09:38    5    Despite what counsel said, you actually will not hear any

6  evidence directly of what the PSI settings were that day.  The

7  company that conducted maintenance for their three quarterly

8  maintenance inspections before the accident, they didn't record

9  any of the PSIs for either machine.

09:39   10    What the best that could be derived is that the machine

11  admittedly does have a maximum tank pressure of 200, but it's

12  factory set -- and that's also said in one of the depositions

13  that's being submitted to the Court of a witness who's not

14  available -- that it's factory set to 175 PSIs and that if it

09:39   15  even got close to 200, that's when one of the three safety

16  valves goes off, so it will never exceed 200.

17    The United States will show the plaintiff's theory doesn't

18  establish causation or is not otherwise supported by the

19  evidence.

09:39   20    The Court will hear from Eric Deyerl, an accident

21  reconstruction expert, who will explain the testing done to

22  show that the tire likely failed.

23    And he'll point out that there would have been clear red

24  flags that the tire would explode.  The plaintiff either

09:40   25  ignored or failed to pay attention to them.

1    Ultimately the evidence will show that the only reasonable
2    inference to draw is that plaintiff's inattention or operator
3    error led to the unfortunate accident.

4    You will not hear any evidence about why plaintiff took his
09:40  5    tire to work that day.  He doesn't remember.  Yet -- and,
6    unfortunately, we may never know why he inflated a small tire
7    using an industrial air compressor.  We will never know why he
8    didn't inflate it during daylight hours.  We may never know why
9    he didn't, when he got to work early that day, stop and talk to
09:40  10   the garage mechanics who could have told him whether or not it
11   was a good idea to use an industrial compressor.  We may never
12   know why he chose to take his tire to work, which was roughly
13   50 miles away, when he had previously inflated the same tire at
14   a 7-Eleven minutes from his house.

09:40  15   The United States stipulated to most of plaintiff's prior
16   medical bills as being related to the accident because it
17   acknowledges plaintiff suffered a significant injury.

18   Yet plaintiff is still seeking almost a million dollars in
19   future care, most of which relate to future dental care,
09:41  20   despite the fact that he has already had over $100,000, maybe
21   close to $150,000, of dental care already.

22   Plaintiff, through his experts' expected testimony, is also
23   claiming cognitive impairment.  But as I noted earlier, the
24   testimony in this case will establish he lives by himself.  He
09:41  25   drives.  And he's been back to work on two different task force

1    assignments over the last 20 months.

2      This is a simple case based on the evidence, and based on

3    the evidence presented in the case, the facts will show that

4    the border patrol did not create a dangerous condition and was

09:41   5    not negligent.

6      The lack of any evidence of any prior complaints or

7    injuries will establish that the border patrol kept its

8    property in reasonably safe condition.

9      Ultimately there will be insufficient evidence for

09:41   10    plaintiff to meet his burden to show that it was the border

11    patrol's negligence rather than his actions or inactions that

12    day, and, therefore, at the end of this trial, we will ask

13    Your Honor to find in favor of the defendant.

14        THE COURT:  All right.  Thank you, Mr. Laske.

09:42   15      Plaintiff may call their first witness.

16        MR. WOHLFEIL:  We call Agent Daniel Basinger.

17                **DANIEL BASINGER,**

18            PLAINTIFF'S WITNESS, SWORN

19        THE CLERK:  Would you state and spell your full name

09:42   20    for the record.

21        THE WITNESS:  My name is Daniel Basinger.  Last name

22    is B-A-S-I-N-G-E-R.

23        THE CLERK:  D-A-N-I-E-L?

24        THE WITNESS:  That's correct.

09:43   25        THE COURT:  Agent Basinger, move the mike up.  Keep

```
 1    your voice up.  You've got a soft voice.  You've got to speak
 2    loudly.  Project toward the back wall.
 3        Go ahead.
 4            MR. WOHLFEIL:  Thank you.
 5                        DIRECT EXAMINATION
 6    BY MR. WOHLFEIL:
 7    Q.  Good morning.
 8    A.  Good morning.
 9    Q.  You work for the border patrol?
10    A.  That's correct.
11    Q.  Is that true since 2011?
12    A.  That's correct.
13    Q.  What station do you work at?
14    A.  Chula Vista station.
15    Q.  Were you working June 24, 2013, at the Chula Vista border
16    patrol?
17    A.  Yes, I was.
18    Q.  That night were you working with Agent Membreno?
19    A.  Yes, I was.
20    Q.  At some point that night, did you see Ryan Moore?
21    A.  Yes.
22    Q.  Was that a little bit after 9:00?
23    A.  That's correct.
24    Q.  Approximately 9:20?
25    A.  Yes.
```

09:43 (lines 5)
09:43 (line 10)
09:43 (line 15)
09:43 (line 20)
09:43 (line 25)

|   |   |
|---|---|
| 1 | Q.   Where did you see Ryan Moore? |
| 2 | A.   That was behind the service garage at Chula Vista station, |
| 3 | about the northeast corner. |
| 4 | Q.   What were you doing at the time? |
| 5 | A.   Me and my partner, Membreno, were parking our |
| 6 | government-issued vehicle for the night. |
| 7 | Q.   And when did you first see Ryan Moore? |
| 8 | A.   It was approximately just after 9:20, and he was in that |
| 9 | corner just kind of doing small circles. |
| 10 | Q.   At first you saw a man that you didn't recognize doing |
| 11 | small circles in that area? |
| 12 | A.   That's correct. |
| 13 | Q.   What did you do in response? |
| 14 | A.   Me and Agent Membreno got out of our vehicle and ran up to |
| 15 | Agent Moore and to assess the situation. |
| 16 | Q.   How did Ryan respond to that? |
| 17 | A.   He was not really responsive, didn't -- kind of seemed like |
| 18 | he didn't know what was going on at the time. |
| 19 | Q.   Did he begin walking away in another direction at some |
| 20 | point? |
| 21 | A.   Yes. |
| 22 | Q.   Which direction did he go? |
| 23 | A.   He started walking south. |
| 24 | Q.   At that point, though, he was unrecognizable to you? |
| 25 | A.   Yes. |

09:44 (line 5)
09:44 (line 10)
09:44 (line 15)
09:44 (line 20)
09:45 (line 25)

```
 1   Q.   Why was that?

 2   A.   His face was -- had lacerations on it that I could see, and

 3   he was just unrecognizable.  I didn't know exactly who it was

 4   at first.  I just -- it appeared to be an individual.

 5   Q.   Would you describe his injuries as very severe?

 6   A.   Yes.

 7   Q.   What did you notice -- did you notice any blood on his

 8   face?

 9   A.   Yes.

10   Q.   How much?

11   A.   It was a substantial amount.

12   Q.   Okay.  What about his jaw?  Did you notice that was

13   injured?

14   A.   It appeared broken.

15   Q.   And was he doing anything with his mouth, with his hands?

16   A.   It appeared he was digging in his mouth.

17   Q.   For what?

18   A.   Possibly teeth.  I wasn't really sure.

19   Q.   Did you see teeth lying around the scene?

20   A.   I don't recall.

21   Q.   The blood was actually running down his face.  Is that

22   right?

23   A.   Yes.

24   Q.   It appeared like dark spots?

25   A.   I recall seeing a dark spot of blood.
```

09:45
09:45
09:45
09:45
09:46

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | Q.  How many large cuts did you see on his face?             |
| 2   | A.  I don't recall.                                          |
| 3   | Q.  More than one, right?                                    |
| 4   | A.  I don't really recall.                                   |
| 5   | Q.  Was he talking at all?                                   |
| 6   | A.  No.                                                      |
| 7   | Q.  Did he seem to be able to speak?                         |
| 8   | A.  No.                                                      |
| 9   | Q.  Could he move his jaw at all?                            |
| 10  | A.  I don't recall.                                          |
| 11  | Q.  Did you call dispatch?                                   |
| 12  | A.  Yes.                                                     |
| 13  | Q.  What did you report to dispatch?                         |
| 14  | A.  That there was an injured agent behind the service garage |
| 15  | and we needed assistance.                                    |
| 16  | Q.  From an ambulance?                                       |
| 17  | A.  Yes.                                                     |
| 18  | Q.  At some point did other agents arrive?                   |
| 19  | A.  Yes.                                                     |
| 20  | Q.  Who arrived?                                             |
| 21  | A.  Border patrol Agent Rolan Leon, supervisory Border Patrol |
| 22  | Agent Halulos.  I don't recall his first name.  And also Watch |
| 23  | Commander Jeff Melke.                                        |
| 24  | Q.  They arrived within minutes of your call to dispatch?    |
| 25  | A.  I don't recall exact timing.                            |

09:46 (lines 5)
09:46 (line 10)
09:46 (line 15)
09:46 (line 20)
09:47 (line 25)

| | | |
|---|---|---|
| | 1 | Q. At some point did the fire department arrive? |
| | 2 | A. Yes. |
| | 3 | Q. Was that within minutes of the call to dispatch? |
| | 4 | A. Can you repeat that? |
| 09:47 | 5 | Q. Did the fire department arrive at the scene within minutes |
| | 6 | of your call to dispatch? |
| | 7 | A. I don't recall exact timing of it all. |
| | 8 | Q. When they arrived, did they start treating Mr. Moore? |
| | 9 | A. Yes. |
| 09:47 | 10 | Q. What did they do for him that you saw? |
| | 11 | A. From what I recall, they were bandaging his head. |
| | 12 | Q. At some point, paramedics arrived.  Is that right? |
| | 13 | A. That's correct. |
| | 14 | Q. Was that soon after the fire department arrived? |
| 09:47 | 15 | A. I would assume so. |
| | 16 | Q. And did they take Mr. Moore off the base, off the station? |
| | 17 | A. Yes. |
| | 18 | Q. To the hospital? |
| | 19 | A. I would assume so. |
| 09:47 | 20 | Q. At some point you actually helped secure the scene.  Is |
| | 21 | that right? |
| | 22 | A. Yes. |
| | 23 | Q. How did you do that? |
| | 24 | A. I put up crime scene tape from the parking lot originally |
| 09:48 | 25 | where I found Mr. Moore, and then approximately the other side |

```
 1  to kind of tape off where I believe he was at.
 2  Q.   Okay.  Who asked you to do that?
 3  A.   I don't recall.
 4  Q.   The supervisor?
 5  A.   I don't recall.
 6  Q.   At some point did you talk to any members of the Critical
 7  Incident Investigative Team, the CIIT team?
 8  A.   Yes.
 9  Q.   Who did you talk to?
10  A.   Border Patrol Agent Lynsy Dornan.
11  Q.   Was that that same night?
12  A.   Yes.
13  Q.   Okay.  And what did you tell her?
14  A.   From what I recall, I just told her what I found with
15  Agent Moore and where he was at and kind of a briefing.
16  Q.   You also told her what you thought happened?
17  A.   That's correct.
18  Q.   What did you think happened?
19          MR. LASKE:  Objection.  Calls for speculation.
20          THE COURT:  Sustained.
21  BY MR. WOHLFEIL:
22  Q.   Agent Basinger, I'm sorry, you actually wrote a memo after
23  this.  Is that right?
24  A.   That's correct.
25  Q.   Regarding what happened with Ryan Moore?
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | A.  That's correct.                                          |
|       | 2  | Q.  Who did you address that memo to?                       |
|       | 3  | A.  I don't recall exactly.  I believe it was Daniel Parks. |
|       | 4  | Q.  Okay.  Why did you address it to Daniel Parks?          |
| 09:49 | 5  | A.  Because he's the patrol agent in charge of my station.  |
|       | 6  | Q.  He's management at the border patrol?                   |
|       | 7  | A.  Yes.                                                     |
|       | 8  | Q.  When did you write the memo?                            |
|       | 9  | A.  Can you repeat that?                                     |
| 09:49 | 10 | Q.  When did you write the memo?                            |
|       | 11 | A.  That same night.                                        |

12  Q.  Agent Basinger, there's some binders behind you.  Can you
13  pull out the one that contains Exhibit 308?  308.  Do you have
14  308 in front of you?

09:50  15  A.  Yes, I do.

16  Q.  That's an aerial photograph of the Chula Vista border
17  patrol station, isn't it?

18  A.  That's correct.

19         MR. WOHLFEIL:  May I approach, Your Honor?

09:50  20         THE COURT:  Yes.

21         MR. WOHLFEIL:  308.

22  BY MR. WOHLFEIL:

23  Q.  Can you see on your screen Exhibit 308?

24  A.  I do.

09:51  25  Q.  Okay.  I'll point with my finger.

1    So there's a perimeter fence that surrounds the entire

2    Chula Vista border patrol station, at least this part of it.

3    Is that correct?

4    A.   That's correct.

09:51   5    Q.   Did I just trace it with my finger?

6    A.   Pretty close, yes.

7    Q.   Okay.  The red circle there, that's the VCO office

8    building.  Is that right?

9    A.   That's the service garage.

09:51   10   Q.   The garage is basically the other half of that building.

11   Is that right?

12   A.   That's correct.

13   Q.   Where my finger is now?

14   A.   That's correct.

09:51   15   Q.   And up here in the corner is the shop compressors.  Is that

16   right?

17   A.   There is one located there.

18   Q.   And the area where Ryan's SUV was parked that night is

19   where my finger is now.  Is that right?

09:52   20   A.   That's correct.

21   Q.   That's also near where the inflater on the reel is made

22   available for filling up tires?

23   A.   That's where one of the hose reels are.

24   Q.   Okay.  And, Agent Basinger, so you found Ryan -- what

09:52   25   turned out to be Ryan -- circling in this area.  Is that right?

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | A.  No.                                                            |
|       | 2  | Q.  Where did you find him?                                        |
|       | 3  | A.  The northeast corner, so about there, just to the right.      |
|       | 4  | Q.  Right about there?                                             |
| 09:52 | 5  | A.  That's correct, in that corner.                               |
|       | 6  | Q.  Okay.  And when you say he went south, he went down this      |
|       | 7  | way?                                                               |
|       | 8  | A.  No, he went towards the right.                                |
|       | 9  | Q.  Gotcha.  That way?                                             |
| 09:52 | 10 | A.  That's correct.                                               |
|       | 11 | Q.  Okay.  But he -- even though he's on his feet, he was         |
|       | 12 | totally unresponsive.  Is that right?                             |
|       | 13 | A.  That's correct.                                               |
|       | 14 | Q.  Okay.  Were you guys asking him to sit?                       |
| 09:52 | 15 | A.  Yes.                                                          |
|       | 16 | Q.  And did he sit when you asked him?                            |
|       | 17 | A.  No.                                                           |
|       | 18 | Q.  Agent Basinger, would you grab Exhibit 147 behind you?       |
|       | 19 | Tell you what, Agent Basinger.  Why don't you just look at the    |
| 09:53 | 20 | screen.                                                           |
|       | 21 | Do you recognize the scene that's in 147?                         |
|       | 22 | A.  Yes, I do.                                                    |
|       | 23 | Q.  That's the scene where Ryan Moore was inflating his           |
|       | 24 | wheelbarrow tires.  Is that right?                                |
| 09:53 | 25 | A.  It appears to be, yes.                                        |

1  Q.   And that's police border patrol tape that you helped put
2  up?
3  A.   I don't recall if I put that exact strand up, but yes.
4          MR. WOHLFEIL:  Judge, I'll move into evidence 308 and
5  147-035.

09:54

6          THE COURT:  Any objection to those?
7          MR. LASKE:  Just for the record, counsel and I
8  stipulated to this in the pretrial order, so he doesn't have to
9  go through that process.  All of 147 is in the record, should
10  be in the record.

09:54

11         THE COURT:  All right 308, 147, in its entirety,
12  received.
13     (Exhibit 308 admitted.)
14     (Exhibit 147 admitted.)
15         MR. WOHLFEIL:  No more questions.

09:54

16         THE COURT:  Cross-exam.
17         MR. LASKE:  Yes, Your Honor.
18                   CROSS-EXAMINATION
19  BY MR. LASKE:
20  Q.   Good afternoon -- or good morning, Agent Basinger.

09:54

21  A.   Good morning.
22  Q.   What were the conditions like when you arrived at the
23  accident scene?
24  A.   It was late at night, so it was dark out, but the lights in
25  the parking lot were on.

09:54

1   Q.   And did they actually have a couple flood lights around the

2   tire-filling station?

3   A.   The compound is generally lit, yes.

4   Q.   I'd like to direct your attention to Exhibit 147, page 48,

09:55   5   and it will show up on your screen in a second.

6        So is this photograph a true and accurate depiction of the

7   Toyota 4Runner that evening?

8   A.   Yes.

9   Q.   And you can see in this photo there's actually two flood

09:55   10   lights that are on.  Were they on that evening?

11   A.   Yes.

12   Q.   And was the Toyota 4Runner there when you arrived at the

13   scene, or did someone move it there?

14   A.   It was there when I arrived.

09:55   15   Q.   I now would like to direct your attention to Exhibit 147,

16   page 52.  And, again, it will show up on the screen.

17        Was the rear driver's side door open?

18   A.   Yes.

19   Q.   And is this photograph a true and accurate depiction of

09:56   20   what you saw?

21   A.   Yes.

22   Q.   Where was the rim when you first saw it?

23   A.   It appears to be right where it is in the picture.

24   Q.   So it was at least several feet from his vehicle?

09:56   25   A.   Yes.

1  Q.   And where was the tire and the inner tubing when you first

2  saw that?

3  A.   It looks to be right where it is in the picture, close to

4  the hose reel.

09:56  5  Q.   Were the tire and inner tubing closer to the car than the

6  wheel was?

7  A.   Yes.

8  Q.   I'd like to -- I'd like to direct your attention to Exhibit

9  147, page 36.

09:56  10      Is this photograph a true and accurate depiction of the

11  location of the wheel that evening?

12  A.   Yes.

13  Q.   And of the tire and inner tubing?

14  A.   Yes.

09:57  15  Q.   And is this a pretty clear picture of the distance between

16  the two, at least that there is a distance between the two?

17  A.   From what I recall, yes.

18  Q.   And while you were at the scene, did anyone move these

19  items around?

09:57  20  A.   Not that I saw.

21  Q.   And is -- I'd like to now direct your attention to Exhibit

22  147, page 9.  And is the tire and tube that evening -- was that

23  the condition it was in when you saw it?

24  A.   From what I recall, yes.

09:57  25  Q.   And then I would like to direct your attention to Exhibit

1    147, page 26.

2        And was the wheel in this condition when you saw it?

3    A.   Yes.

4    Q.   Are the items depicted in the photographs that I've just

09:58    5    shown you -- are they in the same places as when you first saw

6    them?

7    A.   Yes.

8    Q.   And have you ever seen a tire explode at the Chula Vista

9    station?

09:58    10   A.   No.

11              MR. LASKE:   Nothing further, Your Honor.

12              THE COURT:   Any redirect?

13              MR. WOHLFEIL:   No, Your Honor.

14              THE COURT:   All right.   May Agent Basinger be excused

09:58    15   as a witness?

16              MR. WOHLFEIL:   Yes, Your Honor.

17              THE COURT:   Thank you.   You may stand down.   You're

18   excused as a witness.

19       Next witness.

09:58    20              MR. CHAMBERS:   Just for planning purposes, does the

21   Court intend to take a mid-morning break or not?

22              THE COURT:   I do, but not for a while.

23

24

25

|  |  |  |
|--|--|--|
|  | 1 | MR. CHAMBERS:  We'd like to call David Rondinone. |
|  | 2 | **DAVID RONDINONE**, |
|  | 3 | PLAINTIFF'S WITNESS, SWORN |
|  | 4 | THE CLERK:  Would you state and spell your full name |
| 09:59 | 5 | for the record. |
|  | 6 | THE WITNESS:  David Rondinone, D-A-V-I-D |
|  | 7 | R-O-N-D-I-N-O-N-E. |
|  | 8 | DIRECT EXAMINATION |
|  | 9 | BY MR. CHAMBERS: |
| 09:59 | 10 | Q.  Good morning, Dr. Rondinone. |
|  | 11 | You are a mechanical engineer.  Is that correct? |
|  | 12 | A.  That is correct. |
|  | 13 | Q.  Can you give us a brief rundown of your education? |
|  | 14 | A.  Let's see.  I have a Bachelor of Arts in astrophysics, I |
| 10:00 | 15 | have a Bachelor of Science in engineering physics, I have a |
|  | 16 | Masters in mechanical engineering, and a Ph.D. in mechanical |
|  | 17 | engineering. |
|  | 18 | Q.  And you're a registered engineer in the state of |
|  | 19 | California? |
| 10:00 | 20 | A.  Yes, I'm a Professional Engineer. |
|  | 21 | Q.  How long have you maintained that license? |
|  | 22 | A.  That license has been approximately 20 years, give or take. |
|  | 23 | Q.  Do you maintain any other professional licenses? |
|  | 24 | A.  No, just that. |
| 10:00 | 25 | Q.  And you currently work for an outfit called BEAR? |

1    A.    Yes, Berkeley Engineering and Research.

2    Q.    And what is your title with them?

3    A.    I am -- I guess a senior mechanical engineer.  I'm also a

4    principal in the company.

10:00    5    Q.    And how long have you been with BEAR?

6    A.    Over 20 years, maybe 23 and a half.

7    Q.    And what sorts of things do you do as a senior mechanical

8    engineer?

9    A.    I perform mechanical engineering analyses both for

10:01    10    litigation-related failures and concerns as well as for design,

11    inspection, research, design review, and other projects that

12    don't involve litigation.

13    Q.    And part of what you do also is failure analysis?

14    A.    Yes.

10:01    15    Q.    Is that a large part of what you do?

16    A.    Yes.

17    Q.    And how many years would you say you've been doing failure

18    analysis?

19    A.    The whole time.

10:01    20    Q.    All 20 years?

21    A.    Yes.

22    Q.    And have you ever worked on systems like we're talking

23    about here today, compressed air or pressurized systems?

24    A.    Yes.

10:01    25    Q.    Can you tell us a little bit about your experience with

 1    those?

 2    A.    Sure.   I've worked on a large number of vehicle cases that

 3    have involved tires and wheels and those pressurized systems.

 4    I've worked on other compressed air or compressed gas systems

10:02   5    in refineries and power plants, on heavy equipment, and

 6    probably a number of other places as well.   I've worked on

 7    compressed gas and liquid systems where you've got both phases

 8    in there.   I've worked on pressurized fluid systems.   And they

 9    all basically work on the same principle, that you take a

10:02   10    fluid, whether it be a liquid or a gas, and you pressurize it

11    in order to get it to perform work.

12    Q.    So it sounds like you've got a fair amount of experience in

13    this realm?

14    A.    Yes.

10:02   15    Q.    Have you worked on tire cases where there's allegations or

16    instances where tires have exploded?

17    A.    Yes, I've worked on a number of different tire failures

18    under various different types of failures.

19    Q.    And has that been true for your entire time with BEAR?

10:02   20    A.    Yes.

21    Q.    And you've been published fairly extensively also, haven't

22    you?

23    A.    Yes, I have a couple of peer-reviewed publications and a

24    number of published reports and whatnot, a couple of patents.

10:03   25    Q.    And you were hired by my law firm in this case.   Is that

```
 1  right?
 2  A.  Yes.
 3  Q.  And you've been paid by my law firm for your work in this
 4  case?
 5  A.  I assume so.  I don't really keep track of that.
 6  Q.  I assume so too.
 7      What were you asked to do in this case?
 8  A.  I was asked to investigate an event where a wheelbarrow
 9  tire -- I should say a tire assembly failed and caused an
10  injury.
11  Q.  And what did you do to accomplish the scope of work that
12  you were provided?
13  A.  I looked at the subject wheel assembly, which included the
14  wheel and the tube and the tire.  I reviewed the documents that
15  were provided that were related to the event, either witnesses
16  or people with information pertinent.  I think I reviewed a
17  report that was performed or provided that was an investigation
18  that was done before I was part of the case.  I also looked at
19  some exemplar wheel assemblies and tested a few of them as
20  well.
21  Q.  So you performed some testing in the case as well?
22  A.  Yes.
23  Q.  What was the purpose of performing testing in your mind?
24  A.  The purpose of the testing was to evaluate the failure
25  mechanism primarily for basically how this thing failed.  It
```

10:03
10:03
10:04
10:04
10:04

1  was to look at the deformations of an exemplar under a

2  particular loading to verify the mechanism of failure.

3  Q.   And do you recall whether that testing was performed?

4  A.   It was about a year ago, but I don't recall the exact date.

10:05   5  Q.   Okay.  And did you have an opportunity to review any of the

6  defense experts reports and materials?

7  A.   Yes, I did.

8  Q.   That was part of the documents you reviewed in the case?

9  A.   Yes.

10:05   10  Q.   And did you also conduct a visit out to the border patrol

11  facility where this occurred?

12  A.   I did.

13  Q.   Do you recall when that was?

14  A.   I don't recall the date on that.  I believe it was about a

10:05   15  year ago as well.

16  Q.   I'm going to show you just a couple of photos.  Actually,

17  I'll take that back.  I'll show it to you on the ELMO.  This is

18  Exhibit 390, which is a thumb drive, and the picture is 9688.

19       And do you recognize this photo?

10:06   20  A.   Yes, this looks like the hose reel at the facility.

21  Q.   And was this a photo that you took during one of your

22  inspections?

23  A.   It certainly looks like it, yes.

24  Q.   And the sort of red thing in the center of the picture,

10:06   25  that's where the hose reel would have been located that

1    Mr. Moore was using?

2    A.   Yes.

3    Q.   I'm going to show you Exhibit 390, photo 9724.

4         Do you recognize this?

10:06   5    A.   Yes.

6    Q.   And what is it?

7    A.   This is the -- I would call it basically the compressor

8    room, if you will, the compressor location where the air

9    compressors were located at the facility.

10:06   10   Q.   And is it your understanding that what we're looking at

11   here in Exhibit 390 was the same setup as the night that

12   Mr. Moore was injured?

13   A.   No, it was my understanding that it is different.

14   Q.   How so?

10:06   15   A.   The compressor on the left, which I believe is a NAPA

16   compressor at the time of my inspection was the primary

17   compressor providing compressed air to the facility.  That

18   compressor was not present at the time of the event.  There was

19   another compressor in its place.  The compressor to the right

10:07   20   in this photograph -- I believe is an Ingersoll-Rand

21   compressor -- it was at the time of my inspection appeared to

22   be set up as a secondary compressor or a backup.  I believe

23   that was present at the time and was operating as the primary

24   compressor.

10:07   25   Q.   Now, when you talk about primary and secondary, what do you

1    mean by that?

2    A.   The system has two different compressors that are tied

3    together through the air piping system.  One compressor

4    performs nearly all the work.  When it's not capable of

10:07   5    performing the work, for whatever reason, it can't keep up with

6    the load or it fails for some reason, it stops working, then

7    the secondary compressor can be used to maintain operation of

8    the compressed air system.

9    Q.   And it's your understanding that the white or cream-colored

10:08   10   one on the right-hand side of Exhibit 390, that would have been

11   the primary compressor on the evening Mr. Moore was injured?

12   A.   That's my understanding, yes.

13   Q.   And during your site visit, did you endeavor to find out

14   what the pressures involved from that compressor were?

10:08   15   A.   Well, at the time of the -- at the site inspection, we

16   could see gauges on both compressors.  I believe the gauge on

17   the Ingersoll-Rand compressor was reading 180 PSI, which was

18   slightly higher than somewhere in the 160s where I believe the

19   NAPA was reading.  And so the day of my inspection, I would say

10:08   20   it was certainly in the 160 to 180 range at least,

21   approximately.

22   Q.   And that's PSI?

23   A.   PSI, correct.

24   Q.   And we've heard in reference -- in opening statement to a

10:08   25   cut-in and cut-out pressure.  Can you explain that for us?

1  A.   Sure.  A cut-in pressure is the pressure in which the

2  compressor cuts in or starts to compress air.  And that's a low

3  bound where during the use of the system, the pressure will

4  decrease as the air is used.  When it reaches a low point, the

10:09  5  system determines that that point has reached, and then it

6  starts the compressor.  The compressor then runs continuously

7  until a high point is reached, or the cut-out point, or the

8  cut-off point.  And then it stops.

9  Q.   So this may be a dumb question, but is it fair to say if

10:09  10  you have a cut-in pressure of 160 and a cut-out pressure of 180

11  that you're going to be dealing with pressures somewhere

12  between those two numbers in terms of output?

13  A.   Yes, you're always running between your cut-in and your

14  cut-out pressures, at least ideally.  I suppose it's possible

10:09  15  that, you know, you have this huge air leak in the system and

16  the compressor simply can't keep up, so it could be lower, but

17  that would probably require complete failure of the system.

18  Q.   And you didn't observe any air leaks or anything during

19  your inspection, did you?

10:10  20  A.   No, no, it was functioning properly when I was there.

21  Q.   All right.  I'm going to show you Exhibit 390, photograph

22  9838.

23       Do you recognize this photo?

24  A.   Yes.

10:10  25  Q.   What is it?

A.   That appears to be the compressor that was represented as

being the old secondary compressor that used to be in that

picture that we saw just a moment ago.  This was the one that

was replaced by the NAPA compressor, at least that's what was

10:10   represented to me.

Q.   And was this plugged in and functional during your

inspection?

A.   No, it was not.

Q.   Were you able to test it or ascertain any information from

10:10   it?

A.   No.

Q.   One last one, which is Exhibit 50.  And it looks to be just

a closer-up version of the two compressors that you observed at

the border patrol facility during your inspection?

10:11   A.   That is what it appears to be, yes.

Q.   Does that fairly and accurately show what you observed out

there that day?

A.   It appears to.

        MR. CHAMBERS:  I'd like to offer Exhibit 390,

10:11   photographs 9838, 9688, 9724, and Exhibit 50 into evidence.

        THE COURT:  Any objection to those photos?

        MR. LASKE:  Sorry.  Did you say 9724?

        MR. CHAMBERS:  Exhibit 390, which is a thumb drive, so

there's identified photos there.  We can pull it out later.

10:11   MR. LASKE:  No objection.

```
         1              THE COURT:  All three exhibits are admitted.
         2          (Exhibit 9838 admitted.)
         3          (Exhibit 9688 admitted.)
         4          (Exhibit 9724 admitted.)
10:11    5          (Exhibit 50 admitted.)
         6     BY MR. LASKE:
         7     Q.  After you performed your testing and you conducted this
         8     site visit and you looked at all the materials that have been
         9     provided to you, did you form any opinions in this case?
10:11   10     A.  I did.
        11     Q.  Did you prepare any written version of those opinions?
        12     A.  I did.
        13     Q.  Can I take a look at Exhibit 137, please?
        14          Is this the report that you prepared?
10:12   15     A.  That does appear to be it, yes.
        16     Q.  All right.  Why don't we walk through this, and you can
        17     kind of help me along and explain what it is you're talking
        18     about here.
        19          It looks like the first section here is just your
10:12   20     background and qualifications?
        21     A.  Yes.
        22     Q.  Let's not belabor that.  If we could go to page 2, please.
        23          If you look at item G, it says that you've designed
        24     pressurized systems.
10:12   25     A.  Yes, I have.
```

1    Q.   What sorts of pressurized systems have you designed?

2    A.   Let's see.  The systems that I've designed, the ones that I

3    recall are compressed natural gas systems where you have

4    pressurized natural gas being piped usually through either a

10:13    5    refinery or some type of transmission from source to use.  I've

6    designed other pressurized systems that are lower pressure

7    systems that are intended to operate in very large vessels at

8    high temperatures.  Let's see.  In terms of design, I know

9    there have been others, but those are the ones that come to

10:13    10    mind.

11    Q.   Fair enough.

12        The case background portion of your report here, what is

13    that?

14    A.   That's just a brief summary of the information that I was

10:13    15    able to glean from the documents that basically collects on to

16    a single page, sort of the basic -- the basic information about

17    time and date and what -- what basically happened.  It's not

18    intended to be a detailed description, only sort of a basic

19    collection and overview.

10:14    20    Q.   Okay.  If you look at subsection F, you're talking about

21    what we talked about before, that it was powered by an

22    Ingersoll-Rand compressor.  Is that right?

23    A.   Yes.

24    Q.   And you mentioned that the line to the tire filling hose

10:14    25    was unregulated.  What do you mean by that?

A.   Well, when you have a compressed air system, the compressor generates a certain amount of pressure, and it tries to maintain that pressure.  That's what the cut-in and cut-out pressures are for.

10:14   That air is then piped around a facility using typically hard pipes, steel pipe, although you can use other materials as well.

When it gets near to its points of use, you have the opportunity to control the pressure to a lower -- a lower value 10:14 so you can regulate the pressure down.

For example, in this case, the system pressure is about 175 at its peak probably, and if you have a device that's intended for only 90 PSI operation, you would need to put a regulator in the piping before you reach that device so that you only supply 10:15 90 PSI or 95 PSI.

This is done at numerous places at the facility.  I personally saw a regulator with a gauge on it that read a little bit under a hundred branching off of the piping that went to the subject tire inflation station.  And it was 10:15 regulated to a pressure that, in my opinion, is consistent with using power tools, power pneumatic tools.

The gentleman who --

MR. LASKE:  Objection.  I move to strike that there's no foundation for his assumption that it's hooked up to power 10:16 tools unless he can say he saw that.

|    |    |
|----|----|
| 1  | THE COURT:  I think he said in his experience the |
| 2  | regulator was set to a PSI that would correspond to use of |
| 3  | those tools. |
| 4  | Is that what you testified to? |
| 5  | THE WITNESS:  Yes, correct. |
| 6  | THE COURT:  The objection is overruled. |
| 7  | THE WITNESS:  And then there was -- I believe one of |
| 8  | the gentleman who worked at the facility stated that there were |
| 9  | numerous other devices that ran off of compressed air that were |
| 10 | regulated down to something in the neighborhood of 90 to 100 |
| 11 | PSI depending on the device. |
| 12 | So we know from both the documentation and from my |
| 13 | inspection that the facility is aware of pressure regulation |
| 14 | and, in fact, performs pressure regulation at numerous |
| 15 | locations. |
| 16 | BY MR. CHAMBERS: |
| 17 | Q.  If I understand what you said a moment ago, did you see a |
| 18 | regulator on the line coming from these compressors to the |
| 19 | tire-filling station that Mr. Moore was using that evening? |
| 20 | A.  No, the line to the tire-filling station was unregulated. |
| 21 | There was no regulator between the pressure assembly and the |
| 22 | tire-filling station. |
| 23 | Q.  Does that mean that whatever pressures are being put out by |
| 24 | the compressor would be fed through the inflater itself? |
| 25 | A.  That's correct. |

10:16
10:16
10:16
10:16
10:17

1  Q.   Can you turn to page 3 of your report, please?  Why don't

2  you walk us through your analysis and methodology, if you

3  would, please.

4  A.   Sure.  Basically what I'm describing in this section of the

10:17  5  report is what was done, what approach that I used, and what

6  did I do.

7       The first thing mentioned is that the actual inflater

8  assembly, the valve and gauge and little hose section, wasn't

9  available for inspection.  We didn't have that.  It's my

10:17  10  understanding that it was kept for a long period of time, I

11  think is how it was described, but then discarded or lost or

12  thrown away.  I don't know where it is.  It was never available

13  for inspection.

14      Then I'm also mentioning here that there were some photos

10:18  15  taken of the location shortly after the event which do show the

16  inflating device, they show the hose, they show a couple of

17  other things.  I was able to look at the subject wheel

18  assembly, the wheel and inner tube and tire.  That's also

19  listed here.  I was able to test those and also compare the

10:18  20  testing values that I had with True Temper's documentation of

21  their internal testing.

22  Q.   And True Temper is who?

23  A.   True Temper is the -- I believe -- I would call them the

24  manufacturer of the wheel assembly, but they actually

10:18  25  outsource, I believe, the manufacturing of the component parts.

1          And then there's just a quick mention that the True Temper

2     testing and my testing of an exemplar are about the same in

3     terms of their resulting pressures about 135 PSI.  I think True

4     Temper actually had quite a range.  They did a large range of

10:19  5     testing, and they went, I think, all the way up to 180 PSI.  I

6     think they had a few failures in their documents below 120, but

7     not much.  I think 120 is pretty much the low point.

8          But they're consistent with the testing that I did, which

9     was basically the purpose of the testing was to validate that

10:19  10    as well as to determine the mechanism of failure.

11         Then I have a quick mention that the subject tire, which is

12    the rubber part that you see going around the metal wheel, and

13    that's the part that actually touches the ground.  Although it

14    did show signs of age, it didn't show any signs of failure, and

10:19  15    it didn't really contribute to this failure.  I talk a little

16    bit more about why that is in terms of how the tire gets its

17    strength and how the inspection of the tire revealed that it

18    still maintained its strength and really didn't fail in this

19    incident.  The rubber itself did not.

10:20  20         Then we go on.  I mention a little bit what we've already

21    talked about with the compressors that were available onsite at

22    the time of my inspection.  There was the NAPA compressor,

23    which was the primary compressor at the time of my inspection,

24    and it was running at about 160 PSI.  And the secondary

10:20  25    compressor, the Ingersoll-Rand, at the time of my inspect was

1    reading 180 PSI, although it didn't -- because it was the

2    secondary, it wasn't functioning to bring the pressure up and

3    down.  So that wasn't functioning at the time of my inspection.

4        And then we talk a little bit about the regulators.

10:21   5    There's a mention here of the regulator that I just discussed,

6    the one that wasn't present in this piping that was heading and

7    branched off of the piping that goes to the tire inflation

8    assembly.  That, in my opinion, is consistent with a power tool

9    that was a little less than a hundred PSI.

10:21   10       And then there's a quick note on the reference to the

11   actual tanks that store the air on the compressors.  They're

12   the large cylindrical tanks.  They're rated at 200 PSI, which

13   doesn't tell you specifically what the compressors run at, but

14   it does tell you that the compressors were never intended

10:21   15   to -- by design to run higher than that because that would be

16   unsafe for the compressor itself.

17   Q.   I'm sorry to interrupt you.  These compressors and the

18   amount of PSI that they're putting out, are these

19   industrial-type compressors?

10:21   20   A.   Yes, yes, they are.

21   Q.   So this is a lot different than you get, you know, at your

22   typical Home Depot or something?

23   A.   Yeah, this isn't the kind of small compressor that you put

24   in your garage and carry around.  This is sort of a permanent

10:22   25   mounted, heavy-duty compressor.

 1        And then I think we go to the next page.  That pretty much
 2   covers that page.

 3   Q.   Why don't we go to page 4.  I think now we're diving into
 4   your opinions.  Is that right?

10:22
 5   A.   Well, there's just one more mention of the analysis and
 6   methodology section, which is that there is a California Code
 7   of Regulations regulation that specifies what the recommended
 8   operation of a tire inflation station should be, meaning they
 9   say something about how you should be able to open and close
10:22
10   the valve a little bit, meaning it has to be at least 24 inches
11   from the actual filling point of the tire, that it should have
12   a clip-on gauge --

13        MR. LASKE:  I'm sorry, but we object to this.  It's
14   irrelevant.  We're a federal facility on federal land with
10:22
15   federal employees, and he's talking about a California
16   regulation without setting any foundation for him to be able to
17   offer that opinion.

18        MR. CHAMBERS:  I think there's a difference in opinion
19   between the experts, Your Honor, that we're going to hear about
10:23
20   in just a moment.

21        THE COURT:  That may be.  The point of the objection
22   is that they're not subject to this California regulation.  I'm
23   not sure that it's not relevant.  You know, the fact that there
24   is some regulation of these devices by someone, you know, in
10:23
25   the great scheme of things, that may be relevant.

1    You're not suggesting that the federal government's bound

2  by this California regulation?

3         THE WITNESS:  No.

4         THE COURT:  All right.  The objection is overruled.

10:23   5    You may finish your answer.

6         THE WITNESS:  Yes, so the California regulation, which

7  is intended for California workplaces and is intended to ensure

8  a safe workplace, or at least as close as they can because

9  nothing is ever perfect, but they actually recommend a

10:23  10  particular way that a filling station should operate that fills

11  tires.  It should have a clip-on device so that you don't have

12  to hold the device to the stem of the tire while you're filling

13  it.  You can clip it and then move back.  Also requires two

14  feet of hose so that you can move back to a safe distance.  And

10:24  15  then an alternative.

16         THE COURT:  You say "requires."  Are these

17  requirements or are they suggestions?

18         THE WITNESS:  These are -- so I'm not -- I don't

19  pretend to be a lawyer.  I don't know what the legal

10:24  20  enforceability of the California Code of Regulations are.

21         THE COURT:  Does the state, for example, impose this

22  requirement on public gas stations?

23         THE WITNESS:  I believe they impose it on workplaces,

24  and I'm not certain that a public gas station would be included

10:24  25  there.

1    The purpose of it is to lay out a series of rules that

2   ensure a safe workplace, and the only reason I'm using it as a

3   reference is because it's a well-established set of

4   recommendations, if you will, or rules that have been set

10:24   5   forth, at least for workplaces, to ensure that that workplace

6   is safe.  Exactly where you could legally enforce it, I'm not

7   going to speak to.

8           THE COURT:  Okay.  All you're saying is it's a set of

9   standards.  You believe the purpose of these standards is

10:25  10   to -- is to promote workplace safety when it comes to using

11   inflaters?

12           THE WITNESS:  Correct.

13           THE COURT:  You mentioned one of the standards was

14   that there should be a two-foot section that's a clip-on, not a

10:25  15   hold on.

16           THE WITNESS:  Yes.

17           THE COURT:  What are the other standards?

18           THE WITNESS:  And the other recommendation -- and this

19   is sort of an and/or, you could do one or the other I believe

10:25  20   by the way that it's phrased -- is that you limit the pressure

21   at the tire-filling station, and the recommendation they give,

22   for example, for passenger vehicle tires is 40 PSI limit, so a

23   regulation at 40 PSI.  And that's the example they give for

24   passenger car tires.  It would be different for different types

10:25  25   of tires, but that's a good ballpark.

1          THE COURT:  Okay.  What about industrial vehicles?  Is

2     there a standard particular to larger-type vehicles?  In this

3     case, this is a border patrol station.  They have ATVs.

4     Presumably they have vehicles that are capable of carrying

10:26   5     people in the back, capable of being on nonpaved roads.  My

6     impression would be probably thicker, bigger tires.

7          THE WITNESS:  Yeah, so most of those vehicles would

8     probably still fall under the 40 PSI range.  The ATVs -- I

9     believe someone at the border patrol testified in deposition

10:26  10     that it was less than 10 PSI for what they used there.

11          THE COURT:  My question is regarding the standards

12     that you've referenced, the California standards, did they

13     differentiate between a public gas station or a place where it

14     would be likely that only passenger cars would use the

10:26  15     inflation device to increase the air pressure in tires?  They

16     differentiate between a place like that and a place where

17     larger, more industrial use type vehicles are having tires

18     inflated?

19          THE WITNESS:  They do, and there's a different

10:27  20     regulation for very heavy load, like 18-wheeler tires intended

21     to hold a hundred thousand pound loud in the trailer.

22          THE COURT:  Does the regulation different in terms of

23     the recommendation for PSI?

24          THE WITNESS:  Yes, the pressure would be higher for a

10:27  25     heavily loaded trailer tire.

1        THE COURT:  A tractor-trailer, what would it be as an

2   example under the regulation?

3        THE WITNESS:  I don't know what the regulation says

4   specifically for that.  Based on my experience with those types

10:27   5   of tires, 80 PSI is common.  Very heavy, heavily loaded

6   trailers may be as high as 105 PSI at the very outside, but

7   that's -- I think that's something well beyond what we're

8   talking about you would see at a facility like this.  That's

9   like a long haul, a very heavy-load trailer.

10:28  10        THE COURT:  All right.  Go ahead.

11   BY MR. CHAMBERS:

12   Q.   And on that point, Dr. Rondinone, did you see any reference

13   in the record to this particular tire-filling station being

14   used to fill heavy load equipment or 18-wheelers or anything

10:28  15   like that?

16   A.   No, the reference that I saw in the deposition testimony

17   was that it was used to fill passenger vehicle tires, and by

18   that I mean pickup trucks and other types of light-utility

19   vehicles.  It's also used to fill ATVs, which we mentioned had

10:28  20   much lower tire pressure.  I believe it's used to fill mountain

21   bike tires.

22        My experience with mountain bike tires is a typical

23   pressure could be as high as 65, 70 I think on the top end.

24   Although for tires that are used in an off-road environment,

10:28  25   you typically set the pressure lower so that the tire can form

1   around objects that are sharp and chunky.  So, actually, that

2   would give you a lower pressure intended.

3   Q.   Let's go ahead and dive into your opinions, which are a

4   little further down on page 4.  And we'll start with A.  If you

10:29   5   could kind of describe that for me, and then I'll have some

6   questions for you.

7   A.   Sure.  Basically the opinion A is that we don't -- we'll

8   never really know exactly what pressure was involved at the

9   time of the accident because it wasn't recorded.  But what we

10:29   10   do know is that the Ingersoll-Rand compressor that was used has

11   sort of a default value of 175 PSI, which I believe is

12   consistent with the testimony of the Ingersoll-Rand

13   representative as well as the representative who did work at

14   the facility.  But whether the regulated pressure at the

10:29   15   compressor is set to 160 or 180 or 140 doesn't really matter

16   because all of those pressures are far too high for the safe

17   operation of a tire-filling station.  And that's all that we've

18   got in the first section there.

19           THE COURT:  Did you assume that the Ingersoll-Rand

10:30   20   compressor had anything to do with this incident?  I thought it

21   was the secondary or the backup.

22           THE WITNESS:  It was the secondary at the time I did

23   my inspection, but things had been changed between the day of

24   the incident and my inspection.

10:30   25           THE COURT:  Did you talk to anyone about which was the

1    primary between the one that was apparently setting off to the

2    side when you visited?

3              THE WITNESS:  So the one that was completely

4    disconnected, that was in a completely different location on

10:30    5    the facility.  It was nowhere near.

6              THE COURT:  Did anyone with a historical connection to

7    the incident tell you which one was primary on the day of the

8    incident?

9              THE WITNESS:  I gathered from the deposition testimony

10:30    10    that the one that I saw stored in some back space was the

11    secondary and the Ingersoll-Rand was the primary at the time of

12    the incident, but nobody told me that, I don't think,

13    personally.  I think I just got that from the documentation.

14              THE COURT:  All right.  So you think that the primary

10:31    15    one, the one that fed the air hose that the plaintiff used, was

16    the Ingersoll-Rand?  That's what your understanding?

17              THE WITNESS:  That's my understanding, yes.

18              THE COURT:  All right.  Go ahead.

19    BY MR. CHAMBERS:

10:31    20    Q.  And on that particular compressor, what you're saying is

21    that it comes from the factory with cut-in and cut-out

22    pressures between 145 and 175 PSI?  Am I hearing you right?

23    A.  I don't recall what the cut-in pressure is on the low side.

24    145 is certainly reasonable, but I believe the cut-out pressure

10:31    25    was set at 175 at its peak.

1   Q.   And you're saying during your site inspection and your

2   visit there, when you looked at the Ingersoll-Rand, it was 160

3   to 180?

4   A.   Yeah, the gauge on the Ingersoll-Rand, I believe, was

10:31   5   reading 180.

6   Q.   Irrespective of which one of those settings we're going

7   with, you're saying that was much more than was necessary to

8   safely fill vehicle tires?

9   A.   Exactly.

10:32   10   Q.   And this particularly -- particular filling station that

11   Mr. Moore was using, it's your understanding that that was used

12   exclusively to fill tires?

13   A.   That is my understanding.

14   Q.   So this wasn't an outfit where they would plug in other

10:32   15   pneumatic tools or other machinery to that.  Is that right?

16   A.   That's correct.  That's my understanding.

17   Q.   Do you have an opinion as to whether or not compressors

18   with that sort of output are safe to fill small-volume tires

19   like Mr. Moore was filling that evening?

10:32   20   A.   They are if the pressure was regulated after the compressor

21   but before the filling station.

22   Q.   How about if it's unregulated like the condition that

23   existed throughout?  Is it safe?

24   A.   If it's unregulated, it's unsafe.  You're clearly capable

10:32   25   of applying pressures that far exceed what's required and can

1    certainly exceed even the failure pressures of the system.

2    Q.   And I presume then it would impose a risk of harm to

3    whoever was using it?

4    A.   That's correct.

10:32    5    Q.   Let's go ahead and move to your second opinion, which is B.

6    A.   Sure.  The second opinion talks about the actual failure of

7    the wheel assembly itself.  And basically what the failure of

8    the wheel assembly tells us is that the tire did not fail.  The

9    inner tube didn't fail first.  It tore open once the metal

10:33   10    wheel deformed.  And the metal wheel deformed because it was

11    exposed to an excessive pressure, a pressure well beyond its

12    intended use.

13         I've got three pictures here that basically show the

14    subject wheel on the left, it shows a wheel that I tested in

10:33   15    the middle, and a wheel that True Temper tested on the right.

16    And what's important in this comparison is that they all buckle

17    in essentially the same way.  They all buckle inwards towards

18    the axle, and that's -- when I say "inwards," I mean towards

19    the axle.  Obviously, it's outwards as regards the internal

10:34   20    pressure of the tire that would have been on there, but they

21    all look the same, and that's how we can come to the conclusion

22    that this wheel failed because it was exposed to excessive

23    pressure because of the mechanism of failure.

24    Q.   And just so I'm clear, you're saying the actual metal

10:34   25    portion, the rim, is the part that failed, correct?

1    A.   That's correct.

2    Q.   Now, let's talk for a moment about the testing that you

3    conducted to come to this conclusion that we see in number B

4    here.

10:34    5        What was the purpose of the testing that you performed?

6    A.   So the purpose of the testing was to essentially evaluate

7    the mechanism of failure, to determine why it is that this

8    particular wheel failed.  And so I needed -- to do that, I

9    needed to run a test to a pressure that the wheel could have

10:34   10   seen in the field at the facility and determine whether or not

11   that pressure would lead to a failure that looks like the

12   failure that we have, and the answer is yes, it does.

13   Q.   So the purpose of your testing was simply to confirm the

14   failure mechanism that we see in those pictures?

10:35   15   A.   That was the purpose, yes.

16   Q.   In other words, that the rim itself folds down as opposed

17   to some other mechanism?

18   A.   Correct.

19   Q.   And how many tests did you run?

10:35   20   A.   Just two of that kind of test.

21   Q.   And what sorts of -- I assume they were exemplar tires?

22   A.   They were exemplar tire and wheel assemblies that were

23   bought new.

24   Q.   So you purchased some new exemplars.  Were they the same as

10:35   25   the one that Mr. Moore was using that evening?

         1    A.   They were similar.  They were a slightly newer design where

         2    the lip of the bead or the flange where the tire meets the

         3    wheel has been rolled over, so, if anything, they might be

         4    slightly stronger than the subject, although they're, in my

10:35    5    opinion, substantially similar and would give results that are

         6    similar.

         7    Q.   But the folding over of the rim is like a reinforcement, or

         8    how would you describe it?

         9    A.   Yeah, the reason you would fold the steel over at that

10:36   10    location is to make it stronger, basically.

        11    Q.   So your testing wasn't intended to be a recreation or

        12    reconstruction of exactly what happened to Mr. Moore that

        13    evening?

        14    A.   That's correct.

10:36   15    Q.   And in the two tests that you performed, can you kind of

        16    describe the setup for us?

        17    A.   Sure.  Basically I took a tire and wheel assembly, and I

        18    placed it inside of a steel box with a very thick polycarbonate

        19    window.  I attached a hose through the steel at the side of the

10:36   20    steel box to connect to it the assembly, and then outside of

        21    that box, I guess that box was placed inside of a steel

        22    container, which was then closed, and outside of everything, I

        23    used a source of compressed air which was simply the compressor

        24    at my own laboratory.  And I opened and closed a valve to allow

10:37   25    air into the tire wheel assembly, and I did it in a stop-and-go

```
          1    process so that we could run it, add air, stop it, check the
          2    pressures, add some more air, so it wasn't like I was trying to
          3    replicate just holding the valve and filling as fast as I
          4    could.  It was a stop-and-go process.  And then it just, you
10:37     5    know, repeat until failure.
          6    Q.  And when they failed, did you record what the pressure
          7    inside the tire was?
          8    A.  Yes, it was approximately 135 PSI.
          9    Q.  And did you record how long it took from the time that you
10:37    10    started applying air until the tire failed?
         11    A.  Not directly because I was doing a start stop.  That time
         12    obviously doesn't correspond to the fill time, but if you look
         13    at the actual starting and stopping in my testing, it was
         14    about, I would say, a little less than a minute of filling time
10:37    15    on average to reach a failure.
         16    Q.  And, again, this is with the reinforced wheels, the new
         17    design?
         18    A.  That's correct.
         19    Q.  So would you expect them to take a little longer perhaps
10:38    20    than Mr. Moore's?
         21    A.  They could.  If anything, it would be conservative.
         22         THE COURT:  What was the starting PSI?
         23         THE WITNESS:  I started at zero.
         24    BY MR. CHAMBERS:
10:38    25    Q.  And that raises a good question.  Assuming that the tire
```

1    wasn't at zero, if you started at some number above zero, would

2    you also see a corresponding reduction in the time that it took

3    to fail?

4    A.  Yes, if you start at a number above zero, the time would be

10:38    5    shorter.

6    Q.  So it sounds like your tests were -- I don't want to put

7    words in your mouth, but fairly conservative.  Is that

8    accurate?

9    A.  They were.  That's exactly correct.

10:38    10    Q.  And did you have an opportunity to review the defense

11    mechanical engineer's testing?

12    A.  I did.

13    Q.  And what was the general synopsis, the CliffsNotes version?

14    A.  My understanding of his testing was that he did a

10:38    15    continuous fill.  It wasn't a stop and go.  He was able to fill

16    the tire to failure I think in about half a minute, so faster

17    than my testing.  And he got failure pressures that were

18    similar to what I got.  I think he had a range of numbers.  The

19    one that's coming to mind is in the mid-120s, but I believe he

10:39    20    had a range as well.  And I think that the -- I think that

21    otherwise they were -- the testing was very similar.  He also

22    used a remote filling assembly like I did so that he didn't

23    have to hold the gauge on either.

24    Q.  All right.  Anything else about number B there that we

10:39    25    haven't discussed?

```
 1   A.   No, I think we've covered it.
 2   Q.   All right.  Let's move on to C.  And this one sounds to be
 3   like you're just saying that there was a tremendous amount of
 4   energy that would have come about when the tire failed?
```
10:39
```
 5   A.   Yes, so basically what I'm saying here is that when you
 6   compress air or any gas, you store a great deal of energy into
 7   that compressed gas.  And when you get a rapid failure, which
 8   we get here, you release that energy all at once.  And I'm
 9   simply stating here that it's a violent release of energy and
```
10:40
```
10   that -- and that it could be dangerous to somebody, you know,
11   right over it.
12   Q.   So this isn't a situation where a person might hear air
13   start to leak out of the tire or rim or something before it
14   failed?
```
10:40
```
15   A.   No, this would just be a pop and it's done.
16   Q.   Okay.  Did you endeavor to try and figure out how much
17   energy would be released?
18   A.   I did not try to calculate that, no.
19   Q.   Fair enough.  Let's move on to D then.
```
10:40
```
20            THE COURT:  What happened on your test failure?  Did
21   the rim pop up and hit the inside of the box?
22            THE WITNESS:  Oh, yes, yes.  It made a loud noise, and
23   it did smash inside the box, yes.
24   BY MR. CHAMBERS:
```
10:40
```
25   Q.   And just to be clear, you put this -- it was a metal
```

1   container?

2   A.   Yeah, I put it inside of a steel box.

3   Q.   And that's for safety purposes?

4   A.   Absolutely.

10:40   5   Q.   So that none of you or your other cohorts could be

6   injured --

7   A.   Exactly.

8   Q.   -- during testing?

9   A.   Yes, exactly.

10:41   10   Q.   All right.   Number D?

11   A.   So D we're simply talking about the regulation of pressure

12   here, and it's my opinion that if this pressure had been

13   regulated between the compressor and the tire-filling station,

14   then this accident could not have happened.   If it had been

10:41   15   regulated to any reasonable pressure -- one of the references

16   we used for passenger vehicles was 40 PSI.   If you want to play

17   it safe and use 80 PSI because you fill heavier vehicle tires

18   as well as mountain bikes, it would still guarantee you would

19   not get this failure.   This failure cannot occur at those

10:41   20   pressures.   I guess you go as high as a hundred, but I think

21   that if it is regulated reasonably, you could have prevented

22   this event entirely.

23   Q.   You said a moment ago that this could not have occurred.

24   Why not?

10:41   25   A.   Because we know that this failure occurred due to an

1   overpressure of the system, of the tire wheel system.  And that

2   overpressure really requires something in excess of a hundred

3   PSI, probably 120 to 140, maybe even more.  So we know if we

4   can keep it well below that, then we're safe.  No matter what,

10:42    5   you won't get this failure.

6   Q.   So a regulator acts to basically set the top end of

7   whatever PSI would be going into whatever item you're filling?

8   A.   Exactly.

9   Q.   So if I have a regulator that's set to 80 PSI, there's no

10:42   10   way I get more than 80 PSI into that tire?

11   A.   That's correct.

12   Q.   And you mentioned a moment ago mountain bike tires, which I

13   think you said were 75 or 65?

14   A.   Yeah, 65, give or take.

10:42   15   Q.   Was that the highest PSI value that you saw in the record

16   about stuff that was filled at this particular filling station?

17   A.   Well, I don't know that anybody ever referenced the 65 PSI

18   in the record, but it is the tire -- of the devices and tires

19   that were referenced as being filled, that would be the highest

10:43   20   one I saw.

21        MR. LASKE:  Objection, Your Honor.  There's no

22   foundation.  He hasn't even mentioned a single witness' name

23   whoever said anything about bike tires, and I'm not aware of

24   any through any deposition where anyone said a bike tire was

10:43   25   ever filled up using that station.

1          THE COURT:  You made reference.  The question presumed

2   that there was some record that you'd reviewed.

3          THE WITNESS:  I can look at my notes if you like, but

4   if you wanted to disregard bicycle tires and mountain bike

10:43   5   tires, the pressure would be even lower.  So by including them,

6   it's being conservative.

7          THE COURT:  What's your basis for knowledge?  How do

8   you know what was -- what tires or what inflation pressures

9   were commonly used at that filling area?

10:43   10          THE WITNESS:  If you like, I can look at my notes for

11   a moment and try to find where I'm referencing if you like.

12          MR. LASKE:  Sure, and the government will concede it

13   was used for ATV and vehicle tires, but what we're questioning

14   is we haven't heard any evidence from bike tires.

10:43   15   BY MR. CHAMBERS:

16   Q.   Let me -- I'll rephrase the question.  Let me ask you a

17   different question.

18        What was the maximum PSI that you saw in the record that

19   this filling station was used to inflate irrespective of what

10:44   20   kind of tire it was?

21   A.   I don't think that anybody documented what it should have

22   been.  Right.  They only documented that well, it was probably

23   about 175 being fed into it, which was way higher than any tire

24   you pick.

10:44   25          THE COURT:  Counsel referred to a record.  Did you

1   have a record of what tires were being filled or what the

2   inflater was being used for?

3           THE WITNESS:  There is deposition testimony describing

4   what the device is used for, and that's what I'm referring to.

10:44   5   If you like, I can try to dig --

6           THE COURT:  This is anecdotal from witnesses?

7           THE WITNESS:  Yes.

8           THE COURT:  Not a record per se?

9           THE WITNESS:  Correct.  I don't think they ever kept

10:44   10   track of those kinds of records.

11          THE COURT:  Okay.  Go ahead.

12   BY MR. CHAMBERS:

13   Q.   In fact, in addition to witness testimony, you've reviewed

14   defense expert witness Schroeder's report?

10:44   15   A.   Yes.

16   Q.   And you recall where he referenced the different PSIs of

17   different sorts of tires that were filled out there?

18   A.   You know, I do recall that happening.  I don't recall the

19   numbers, but I do recall he did that.

10:45   20   Q.   But fair to say, had you had a regulator that was set to 80

21   or even a hundred PSI, this incident never happens?

22   A.   That's absolutely true.

23   Q.   Okay.  Let's go to your next one, which is E on page 5.

24   A.   So E is related to the regulator again, and all I'm saying

10:45   25   here is that the type of regulator that I would use in my

1    facility to perform this would cost in the neighborhood of 25

2    to 50 dollars, and that's actually a fairly high end regulator.

3    You can get one quite a bit cheaper if you really wanted to,

4    but, really, the device that I'm recommending should have been

10:45    5    used in this place, I would say, would cost between 25 and $50.

6    That's all it says.

7         THE COURT:  Can you -- maybe it's self-evident.  I'm

8    assuming that the air traveled from the inflation devices, the

9    pressure devices underground in some type of pipe, and then

10:46    10    came up at the area where there was a -- connected to the hose

11    device?

12         THE WITNESS:  I believe this was all aboveground from

13    the compressor to this location.

14         THE COURT:  Okay.  In the pictures, I didn't see any

10:46    15    piping, but steel piping from the devices to the area where the

16    hose was?

17         THE WITNESS:  Yeah, you know, my recollection is that

18    there's steel piping aboveground that leaves the compressor,

19    goes through a building up, I believe, near the ceiling of the

10:46    20    building, comes out of the building, and I just -- I don't

21    recall if that last 20 feet -- whether it ducked under and came

22    back up or whether it came up along the fence or the roof, the

23    overhang.  I'm not -- that's what I don't recall, whether that

24    last 20 feet was above or below ground.  You could have

10:46    25    regulated it right where it came out of the ground.  That would

```
 1   be the easiest place to do it.  Or you could have regulated it
 2   back at the building as well because it's only a single line
 3   going to a single location.
 4            THE COURT:  Okay.  So these inflaters, the Ingersoll
 5   and the other one, the Ingersoll was dedicated only to this
 6   station, it didn't have, for example, a device that would allow
 7   it to flow to other locations.
 8            THE WITNESS:  No, so the compressor, the big
 9   compressor fed the whole facility.
10            THE COURT:  Okay.
11            THE WITNESS:  Well beyond this one location.  One of
12   the pipes that came out of that manifold went to this location.
13   You would only regulate it on that one pipe.  You wouldn't
14   regulate the whole thing down.
15            THE COURT:  Where would one expect a regulator to be,
16   closer to the manifold or closer to the end?  I know you said
17   they could have put one at the end.
18            THE WITNESS:  Typically they're put closer to the end.
19            THE COURT:  Okay.  Go ahead.
20   BY MR. CHAMBERS:
21   Q.  I think we were still working on E, and I just want to
22   point out here and make sure that I'm clear, they were -- and
23   you saw regulators in use at other places at the border patrol
24   facility?
25   A.  I saw one regulator in use in the building that the piping
```

10:47
10:47
10:47
10:47
10:47

 1  ran through, and, in fact, it branched off of the same piping.

 2  And then we know of a few others from the deposition testimony

 3  of the border patrol personnel.

 4  Q.  And, again, just so I'm clear, to Your Honor's point,

 5  they're -- coming from these compressors, there are multiple

 6  hard lines, so to speak, that feed all sorts of end uses.  Is

 7  that right?

 8  A.  That's correct.

 9  Q.  And that's what we talked about earlier with the vehicle

10  lifts and pneumatic tools and so on?

11  A.  Correct, yeah, the line branches out in many ways.

12         THE COURT:  The regulator you saw is the one that you

13  opined was -- you believe was probably for pneumatic tools?

14         THE WITNESS:  Yes.

15         THE COURT:  That was the one that was set at what, a

16  hundred?

17         THE WITNESS:  Just under, yes.

18         THE COURT:  All right.

19  BY MR. CHAMBERS:

20  Q.  And then the 25 to 50, how did you get to that number?  I

21  know you said you could find it more cheaply than that.

22  A.  I think at this time I looked at Grainer's website.

23  Grainger is an industrial supplier.  I know that in the past

24  I've seen regulators for much, much cheaper.  If you look at

25  them say, for example, on Amazon where you can get lots of

10:48

10:48

10:48

10:48

10:49

1    stuff made cheaply.  I know that you can get them for quite a

2    bit cheaper, but I didn't bother recording those because I

3    wouldn't have used one of those.  I would have used one of the

4    higher-quality ones.

10:49   5    Q.   What's the installation process like for putting a

6    regulator on a line?

7    A.   Well, you simply screw it onto the end of the line, and

8    then you screw the next piece into it.  It's a two-screw

9    connections, you know, threads.  It takes, I don't know, a

10:49   10   minute.

11   Q.   So it's a fairly easy and inexpensive fix?

12   A.   Yes.

13   Q.   All right.  Let's move on to F, which I think we've already

14   touched on, and basically what you're saying is it wasn't the

10:49   15   rubber portion of the tire that failed.  Is that right?

16   A.   Yeah, that's all we're saying there is that the rubber

17   portion of the tire itself didn't contribute at all to this.

18   Q.   Okay.  Why don't we take G and H further down on page 5

19   there together.  And why don't you tell me what your opinion is

10:49   20   with respect to the gauge.

21   A.   Sure.  So G and H together basically say that it's my

22   opinion that the inflater at the time of the incident wasn't

23   functioning properly, meaning that it's my opinion that more

24   likely than not, the pressure-reading gauge on the inflater was

10:50   25   not working properly, and the reason I say that is because we

1   have a few pieces of evidence that tell us, in my opinion, that

2   this is the case.

3       The first piece of evidence we have is shown on the picture

4   on the left, and it shows that there is a heavy kink in the

10:50   5   high-pressure hose that is -- that's hanging from the reel, and

6   that kink basically tells us -- by the way, this is a picture

7   that was taken not by me, but by somebody else shortly after

8   the event is my understanding.  And the kink tells us simply

9   that this hose has been -- has just seen very heavy use, right,

10:51   10  this was not babied, probably got run over by a vehicle or

11  something similar heavily loading because these hoses

12  themselves are very strong.

13          MR. LASKE:  Objection.  Calls for speculation.  Ask

14  for it to be stricken.

10:51   15          THE COURT:  Yeah, there's no foundation for it.

16  Sustained.

17          THE WITNESS:  Okay.

18          THE COURT:  At this point.  Next question.

19  BY MR. CHAMBERS:

10:51   20  Q.  Fair enough.

21      So you noticed that there was a kink in the hose.

22  A.  There is, yes.

23  Q.  And that was one basis for you determining and concluding

24  that the gauge was not functioning properly.  What other bases

10:51   25  did you consider?

1  A.   Another important feature is that there was an alternate

2  pressure-measuring device hanging right next to the hose reel

3  that's shown in the picture on the right.  That's just a

4  handheld manual pressure gauge, the kind you would use on a

10:51  5  tire.  It's a tire-pressure gauge.  And what that tells me from

6  my experience is that, one, we know that an alternate measure

7  of pressure -- an alternate method of pressure measurement is

8  being provided at this location.  So without a doubt, it's

9  being provided.

10:52  10      And, in my opinion, the reason you would provide that is

11  because the pressure gauge on the handheld device that fills it

12  isn't working because if it were working, you wouldn't need an

13  alternate method.  So that's what this tells me.

14      But at the very least, it tells us that they did provide an

10:52  15  alternate method for measuring pressure, and they felt it was

16  important to do so, otherwise they wouldn't have done it.

17  Q.   Any other bases as to why you feel that the gauge wasn't

18  functioning correctly?

19  A.   Yes, so we also know from the deposition testimony of the

10:52  20  border patrol personnel that this gauge had been repeatedly

21  replaced.  And by "gauge," I mean the whole inflater assembly.

22  I believe it was replaced five times in five years, but I mean,

23  the testimony will speak for itself, but it's very clear it was

24  regularly replaced, and I believe he even described hard use as

10:52  25  the reason.

1      But clearly it was replaced on a regular basis. And you

2  wouldn't do that, in my opinion, unless it needed to be

3  replaced, unless there was something wrong with it.

4      So when you put all of these pieces together -- I guess

10:53   5  there's actually two more things that I would add to this

6  collection. One is that nobody ever tested whether or not the

7  gauge on this inflater worked after the event. All they did

8  was put air through the valve and say hey, air still goes

9  through, it must be okay, but nobody actually connected it to

10:53  10  anything and determined whether or not the pressure gauge

11  worked.

12      Also, we know for a fact that this piece of evidence was

13  discarded for whatever reason. It was thrown away or lost, and

14  there's no way for anybody to prove one way or another whether

10:53  15  that pressure gauge on that device worked.

16      So ideally, I mean, in a perfect world, the evidence, which

17  was saved for an extended period of time, if it had been saved

18  an additional amount of time, we could have all looked at it

19  and tested it and determined whether or not the

10:54  20  pressure-reading device was working, but there's no evidence

21  that it was.

22      And we have a lot of these pieces of evidence that indicate

23  that it could not have been working, and because we have no

24  evidence that it was working, but we have numerous pieces that

10:54  25  suggest that it was not, in my opinion, it was likely that it

 1  was not.

 2  Q.  All right.  And you referenced there some testing -- or I

 3  forgot how you put it, putting air through the valve.  What are

 4  you talking about?

10:54   5  A.  Yeah, so there was a reference in one of the depositions

 6  that referred to after the event happening, and I don't know if

 7  it was a day or a week later, but they hooked up the inflater

 8  to the compressed air and actuated the valve, and I believe

 9  they described the pressure gauge as moving or jumping and the

10:55  10  air passing through, but that's all they did.  They didn't try

11  to determine whether or not that gauge was reading anything

12  accurate or reasonable.  They simply plugged it in and pushed

13  the valve.

14  Q.  So you're saying somebody came out and -- you know, maybe

10:55  15  I'm exaggerating, but kind of squirted air up into the air?

16  A.  That's my understanding.

17  Q.  Okay.  And you're saying that wouldn't be an accurate way

18  to test whether or not the gauge was functioning?

19  A.  No, you cannot test the way the gauge is functioning by

10:55  20  doing that.

21  Q.  Why not?

22  A.  Because you need to have the device connected to a closed

23  volume, if you will, so you can back pressure up to the gauge,

24  and just by spraying it into the air, all you're doing is

10:55  25  getting a dynamic flip of the gauge at most.  It doesn't tell

```
        1   you anything about whether it's reading a good number or not.
        2   Q.   So what you're saying is that might say the valve is
        3   working and air is being released, but it's not going to tell
        4   you whether or not the gauge is functioning?
10:55   5   A.   That's correct.
        6   Q.   All right.  Anything more about G or H?
        7   A.   No, I think we've covered it.
        8   Q.   All right.  Let's finish up with I.
        9   A.   So I is basically a very simple statement that this
10:56  10   assembly did not meet the recommendations from the state
       11   regulations.  So I'm not saying that it had to have met those
       12   legally, but I am saying that it clearly did not meet those.
       13       There are two ways you can design the inflater station to
       14   meet that.  You could use a clip-on with a two-foot hose or you
10:56  15   can use a regulated pressure source.  And neither one was
       16   chosen to be used here, and that's all that says there is that
       17   this setup that was done there didn't meet what those
       18   recommendations were, and had those recommendations been met,
       19   in my opinion, this wouldn't have happened because you could
10:56  20   have regulated to a safe pressure.
       21            THE COURT:   How would the clip-on have made any
       22   difference?
       23            THE WITNESS:   Well, if you were to use a clip-on and
       24   then remotely operate the valve, then your body won't be
10:56  25   sitting basically immediately adjacent to the assembly.
```

1        THE COURT:  I thought the clip-on was only two feet?

2        THE WITNESS:  Well, two feet is that far, so --

3        THE COURT:  Wouldn't you still be above it if you're

4   trying to inflate a wheelbarrow tire that's off of the

10:57   5   wheelbarrow?

6        THE WITNESS:  I guess you could be, but I don't think

7   you would be, but you could be.

8        THE COURT:  I mean, I understand the opinion about

9   unregulated air pressure coming through.  I'm not so sure I see

10:57   10   that there's any relationship between the clip-on device not

11   being used.

12        THE WITNESS:  Well, it's my opinion -- I actually

13   agree with you.  When you read the report and you look at what

14   I said in my deposition, it's my opinion that the regulator is

10:57   15   really the way to go.  That's what I would have done.  That's

16   the safe way to operate it.

17      However, had a clip-on with a two-foot hose have been used,

18   in my opinion, it's certainly much less likely that this would

19   have occurred, although, like you said, it is possible to hang

10:57   20   it straight under you.

21        THE COURT:  I mean, do you have any idea of where or

22   how Agent Moore was positioned vis-a-vis the tire at the time

23   that the wheel exploded?

24        THE WITNESS:  Only that he had to have been using his

10:58   25   hand to hold it on, but beyond that, I don't have any opinions.

1   THE COURT:  There wasn't a table out there or

2   something to set it on.  I mean, presumably it was on the

3   ground and --

4   THE WITNESS:  That is my understanding.

10:58   5   THE COURT:  Okay.  Anything else of this gentleman?

6   MR. CHAMBERS:  I've got just a couple more,

7   Your Honor.

8   BY MR. CHAMBERS:

9   Q.  Two final questions or series of questions, I suppose.

10:58   10   Did you happen to take a look at Mr. Moore's responsibility

11   for this in your evaluation of everything?

12   A.  I did.

13   Q.  And did you form any opinions as to whether or not you felt

14   Mr. Moore was responsible for what happened?

10:58   15   A.  I did form opinions on that.

16   Q.  Why don't you tell us what those are.

17   A.  It's my opinion that a layperson who was filling a tire and

18   is relying on a pressure gauge that is most likely not

19   functioning properly may not be aware of the dangers of

10:58   20   continually applying the pressure and inflating the tire more

21   and more, and so, in my opinion, a layperson wouldn't

22   necessarily be aware of the dangers involved with that.

23   Q.  And do you have any knowledge one way or the other as to

24   whether Mr. Moore was experienced in filling small-volume tires

10:59   25   like wheelbarrow tires?

1    A.   It's my understanding that that wasn't the bulk of his

2    tire-filling experience, yeah.

3    Q.   And in terms of other cues aside from the gauge that might

4    have been available to Mr. Moore, do you have any opinions

10:59    5    about those?

6    A.   Well, the -- it's not a leaking, hissing air sound as it's

7    filling, which that doesn't really tell you that it's about to

8    break because once it pops, it makes the noise, it's done, so

9    there's really no warning there.  The tire does expand as you

10:59    10    fill it.  And that is something that may be noticed by a person

11    filling the tire.  But as a layperson, in my opinion, simply

12    seeing a tire expand doesn't necessarily mean that you would

13    expect it to explode.

14         You know, a good example is a lot of these modern mountain

11:00    15    bike tires are quite, you know, bulbous, if you will, and

16    that's just normal.  And so I wouldn't say that just the

17    ballooning of the tire by itself would necessarily indicate to

18    a layperson that there is a danger involved.

19    Q.   All right.  And you had an opportunity to inspect the

11:00    20    actual tire that was involved, correct?

21    A.   I did.

22    Q.   And did you see any markings on the tire sidewall?

23    A.   There were some markings, yes.

24    Q.   And one of those markings was a warning of sorts.  Is that

11:00    25    right?

1    A.   That's correct.

2         MR. CHAMBERS:  Can I please have Exhibit 271, page 2?

3    BY MR. CHAMBERS:

4    Q.   Is this the warning -- I know it's kind of hard to read

11:01  5    there.  It's scrubbed off and whatnot, but is this the warning

6    that you saw on the side of the tire that Mr. Moore was

7    filling?

8    A.   Yes.

9    Q.   And what does this mean to you?

11:01  10   A.   It means that the manufacturer of the tire is warning that

11   tire inflation can be dangerous and should only be done by

12   trained --

13        MR. LASKE:  Objection, Your Honor.  Has the witness

14   been qualified to offer any opinion regarding warnings?

11:01  15        THE COURT:  I think he's -- yeah, the way it was

16   phrased is what does it mean.  You can have him read what it

17   says, and, you know, it's for the trier of fact ultimately to

18   glean what the meaning is.

19        So with that in mind, what -- what did you read there?

11:01  20   What did you see on the tire?

21        THE WITNESS:  Basically what it says is that tire

22   changing or inflation can be dangerous and should be done by

23   trained personnel with, I believe, proper tools, although it's

24   difficult to read the last couple of words.

25

1  BY MR. CHAMBERS:

2  Q.  And, in your opinion, was Mr. Moore a trained person?

3  A.  No, I don't think anybody trained him for this.

4  Q.  Okay.  Did you read the manufacturer depositions about what

11:02  5  the warning's intended purpose was?

6  A.  I did read their -- the deposition of the representative of

7  the manufacturer, and they said in that deposition that they

8  expected regular people to fill these tires.  They didn't

9  expect, you know, a trained expert to be called out to fill the

11:02  10  wheelbarrow tire.

11  Q.  And are you aware of this warning or something similar to

12  this being stamped on the sides of other tires?

13  A.  I've seen similar -- I've seen warnings similar to this on

14  many, many tires.

11:02  15         MR. CHAMBERS:  All right.  I don't have anything

16  further.  Thank you, Doctor.

17         THE COURT:  We'll take our recess at this time until

18  11:15.  We'll resume at 11:15.

19     My intention would be to finish with the doctor this

11:02  20  morning, however long that takes.  If that takes us into the

21  noon hour, then so be it.

22     Okay.  We're in recess.

23     (Recess.)

24         THE COURT:  I apologize for starting a little bit

11:21  25  late.  Cross-examination.

CROSS EXAMINATION

MR. LASKE:  Thank you, Your Honor.

BY MR. LASKE:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  And you mentioned some of your background earlier and you mentioned you worked on tires before, but have you ever previously worked on a case involving a wheelbarrow tire?

A.  Not that I recall.

Q.  And you said earlier you conducted two tests with two exemplar wheel assemblies; is that correct?

A.  Yes.

Q.  And you believed they were similar enough to conduct tests, right?

A.  Yes.

Q.  And I believe you said in your deposition you want to be as accurate as you can be in conducting your test, correct?

A.  That's correct.

Q.  You testified in deposition that we have evidence that the line to the tire inflator was being supplied with 175 PSI, isn't that correct?

A.  I think that's approximately correct, yes.

Q.  And at the time you conducted your site visit, that actually was September 15th, 2015, isn't that correct?

A.  That sounds right.

1   Q.   That was over two years ago at this point?

2   A.   I don't think it's been two years.

3   Q.   Actually, that was over two years from the accident, which

4   was June 2013?

11:22   5   A.   That would be correct.

6   Q.   When you performed your tire failure testing for this case,

7   you did not use a calibrated pressure gauge, did you?

8   A.   No.   I actually calibrated the gauges digitally after the

9   fact.

11:23   10   Q.   And during your first of the two tests, one of the pressure

11   gauges was as much as 20 percent off of being calibrated,

12   correct?

13   A.   The raw data was, but the corrected data was accurate.

14   Q.   But the tool you were using actually was over 20 percent

11:23   15   off?

16   A.   No.   The tool was reading values that were about 20 percent

17   off, but they were easy to correct for.

18   Q.   But the tool was misreading so you had to manually correct

19   it?

11:23   20   A.   It was done digitally actually on a computer.

21   Q.   And between tests number one and number two you had to

22   replace one of the pressure gauges because, in your own words,

23   it was less accurate and required a bigger correction?

24   A.   That's true.

11:23   25   Q.   You know that the proper digital pressure data

1   acquisition -- you know what a proper digital data acquisition

2   system is, correct?

3   A.   Well, you'll have to define proper, but I know what a

4   digital data acquisition system is.

11:24   5   Q.   And in the past you have used such a data acquisition

6   system?

7   A.   I have used those acquisition systems.

8   Q.   But here you simply used a pair of mechanical pressure

9   gauges which you videotaped and later read the pressure off of;

11:24   10   is that correct?

11   A.   That's correct.

12   Q.   You did not document the manufacturer of the air

13   compressor, did you, that you used for the testing?

14   A.   That's correct.

11:24   15   Q.   And, in fact, at the deposition when I asked you the name

16   of the manufacturer you didn't know?

17   A.   That's also correct.

18   Q.   You didn't take any photographs of the air compressor you

19   used during your testing to produce with your expert report,

11:24   20   did you?

21   A.   That's correct.

22   Q.   And you did not know the cut in or cut out pressure of the

23   compressor used during your testing?

24   A.   I believe that I said I used 165 PSI for my testing, and as

11:24   25   you can see in the video the inlet pressure never reduced

1 significantly to the point where it would have to cut in but,

2 no, I didn't record the cut in and cut out pressures.

3 Q.  So you're saying the cut out pressure was 165?

4 A.  No, I'm saying that that was the approximate test pressure.

5 The test pressure was recorded in the analog gauges and so the

6 cut in and cut out pressures really don't matter.  What matters

7 is the pressure being inlet into the test.

8 Q.  Which was 165?

9 A.  Approximately.  That's my recollection at least.

10 Q.  And you didn't know the volume of the tank of the

11 compressor you used during your testing, did you?

12 A.  No, I don't know the exact volume.

13 Q.  And you didn't document the outlet pressure of the air

14 compressor you used during the testing -- or did you, is that

15 what the 165 is?

16 A.  You know I don't know if I documented that or not.  But

17 like I said that actually doesn't matter, what matters is the

18 inlet pressure into the test.

19 Q.  You didn't take any photographs of your test setup to

20 produce with your report, did you?

21 A.  I don't think so.  I think it was documented only on the

22 video for the setup.

23 Q.  And you actually didn't use a tire inflator in any part of

24 your test setup?

25 A.  No, I used something that I could affix to the tire to

11:25

11:25

11:25

11:25

11:26

1   guarantee that it wouldn't separate because I wasn't holding on

2   to it by my own hands.

3   Q.   And the other expert in the case, Mr. Deyerl, figured a way

4   to use the tire inflator?

11:26   5   A.   I believe he actually modified a tire inflator to make it

6   work, that's my recollection, but he's certainly welcome to use

7   one.

8   Q.   But for your test you didn't use one?

9   A.   That's correct.

11:26   10   Q.   And your test setup did not allow you to record the

11   pressure at the time of failure only just before the tire

12   exploded, correct?

13   A.   That's correct, yeah.  So my pressures are actually

14   slightly conservative, that's correct.

11:26   15   Q.   And for test number one you didn't take any photographs of

16   the first wheel you pressure-tested correct?

17   A.   I don't think I did.

18   Q.   How long did it take for the tire to fail in test number

19   one?

11:26   20   A.   You know, I don't recall.  I believe it was a little under

21   a minute, but I don't recall the number.

22   Q.   Isn't it true that with your report you produced some

23   information on a flash drive, is that correct?

24   A.   I did.

11:27   25   Q.   And one of those things was a -- an Excel spreadsheet that

1    I think had the title, more wheelbarrow tire testing, had some

2    figures in it?

3    A.   That sounds correct.

4    Q.   And you -- let me show you on the document camera.  This

5    would be from Exhibit 390, but it didn't have a page number,

6    it's just the flash drive.

7           Do you recognize that information, sir?

8    A.   Yes, that appears to be from the spreadsheet or at least a

9    portion of it.

10   Q.   And, sorry, in the far left column it says fill time, what

11   does fill time mean?

12   A.   That's the approximate elapsed time of filling.

13   Q.   So that's the amount of time where air is being put into

14   the tire?

15   A.   Approximately, yes.

16   Q.   And action, we see fill and stop, can you explain to us

17   what that means?

18   A.   Yes.  So the test was run by opening the valve and filling

19   and then closing the valve and stopping the fill to get the

20   pressure reading.

21   Q.   And then the time in seconds on the third column to the

22   left, that's -- what is that showing us?

23   A.   Well, that's just sort of calendar time, if you will.  Not

24   the amount of time filling but just the amount of time

25   elapsing.

1  Q.   Okay.  So third column, amount of time elapsing, the first

2  column, fill time, that's the amount of time filling the actual

3  tire?

4  A.   Yes.

11:28  5  Q.   And so if I switch to this last page, I believe you

6  actually total it up and you have 56.65 seconds for the fill

7  time before it bursts?

8  A.   Yes, that's what it looks like.

9  Q.   And was that how long the first test took to fail?

11:28  10  A.   In terms of fill time, that's approximately correct, yes.

11  Q.   And for the second test, isn't it true that the videocamera

12  you used to document the second test ran out of batteries and

13  shut off?

14  A.   That does sound familiar, yeah.

11:29  15  Q.   So that's why in your report you didn't know exactly the

16  timing of your test, you said approximately a minute?

17  A.   Correct, it was similar.

18  Q.   So you basically estimated the time for the second one?

19  A.   Oh yeah, no, these are all rough estimates.  These weren't

11:29  20  intended to reconstruct the accident, so the approximation

21  there to me isn't important.

22  Q.   And when you obtained the wheels, and we asked you at

23  deposition, you didn't remember where you actually acquired the

24  two wheel assemblies you used, did you?

11:29  25  A.   That's correct.

1    Q.   And you conducted six to 10 tests to inflate the tire to

2    approximately 30 PSIs, correct?

3    A.   I don't recall the number, but that sounds reasonable.

4    Q.   But you didn't document any of these tests with video or

11:29    5    photographs?

6    A.   That's correct.

7    Q.   And how long did it take you to inflate the tires to reach

8    30 PSIs in these tests?

9    A.   I think it varied upon the inlet pressure from I think a

11:30    10    few seconds up to, I don't recall the high end, maybe 10

11    seconds, I don't recall.

12    Q.   In your deposition you said four to 12 seconds?

13    A.   That sounds reasonable.

14    Q.   And despite the lack of any eyewitness accounts, you

11:30    15    believed that plaintiff would have applied pressure to the

16    subject tire in one continuous application?

17    A.   I think that's a reasonable assumption.  I don't know how

18    he applied it exactly, it could have been stop and go.

19    Q.   During your testing, though, you did apply it stop and go

11:30    20    at stages?

21    A.   Oh, yes, yeah.  No, I wasn't trying to replicate what he

22    did.

23    Q.   And although you could have continuously applied the

24    pressure to the test wheel assemblies, you didn't do that?

11:30    25    A.   No, no, I wasn't trying to do that.

1    Q.   Regarding the subject, tire inflator gauge, you testified

2    that -- in deposition that you know the pressure gauge was not

3    working because of the evidence that's available to you,

4    correct?

11:31    5    A.   Well, it's my opinion that more likely than not it wasn't

6    working based upon all of the evidence that we've already

7    talked about, yeah.  Like I said, if it was actually retained,

8    we could test it, then we would really know whether it worked

9    or not but, unfortunately, it's gone.

11:31    10            THE COURT:  That's not an expert opinion, you're just

11    making that as a logical deduction from the fact that there was

12    an alternative device to test pressure?

13            THE WITNESS:  That's correct.

14    BY MR. LASKE:

11:31    15    Q.   I think there's some binders behind you and we're going to

16    try to pull it up on the screen, but can I direct your

17    attention to Exhibit 141.  And actually I think it's up on the

18    screen now.

19    A.   Okay.

11:31    20    Q.   So it might have been a slightly different photo, but you

21    can see in this photo I think there was a kink highlighted in a

22    different photograph, but you can see it on this one?

23    A.   Yes, you can see it in this one as well.

24    Q.   Okay.  You can't say that the force which damaged the air

11:32    25    hose as seen in the photo caused any damage to the pressure

1    gauge, correct?

2    A.   Oh, that's correct.  The force that damaged the hose, all

3    you can say from this picture is that there was a significant

4    force applied to the hose, but I wouldn't say that that's

5    necessarily the same force that would have damaged the gauge.

6    Q.   And you don't know if the gauge was damaged one way or the

7    other?

8    A.   No, I can only deduce from the evidence provided, right, I

9    don't think anybody knows one way or the other.

10   Q.   And you opined that the need for prior replacement of

11   different tire inflators is the evidence that the pressure

12   gauge on the subject tire inflator was nonfunctional?

13   A.   That's one of the pieces of evidence that support my

14   opinion.

15   Q.   But wouldn't replacement of a gauge that wasn't on at the

16   time of the accident be just evidence that the other gauges

17   weren't working not that the newer gauge was working or not?

18   A.   I didn't follow that.

19   Q.   So you're saying in the past there were four times or five

20   times it was replaced?

21   A.   Yes.

22   Q.   And those past tools obviously maybe they warranted

23   replacement, but the fifth newer tool, how do you know that

24   that warranted replacement?

25   A.   I'm simply stating that we know that this same tool was

1    replaced approximately five times in five years, and,

2    therefore, we know that it requires replacement on a periodic

3    basis.  That's the deduction that you make from that

4    information.

11:33    5    Q.  But it's completely possible that tool had been recently

6    replaced?

7    A.  It's possible if they actually documented that.  I haven't

8    seen any evidence whatsoever that that was the case.  I haven't

9    seen any evidence whatsoever that it actually did work.

11:33   10            THE COURT:  What portion was replaced, the hose or the

11   fitting on the end of the hose, or both?

12            THE WITNESS:  My understanding is that the fitting

13   that goes on the end of the hose that has the valve, the gauge,

14   and the connection to the tire, that's the part that was

11:33   15   replaced.

16            THE COURT:  Not the hose itself?

17            THE WITNESS:  Well, when I went out there, there was

18   no hose, so I don't know what happened to that.

19            THE COURT:  The basis for your understanding is what?

11:33   20            THE WITNESS:  For the understanding of what?

21            THE COURT:  Of the ratio of replacement of some part

22   of this or all of it.

23            THE WITNESS:  Oh, that was from deposition testimony.

24            THE COURT:  Okay.  And it was specific as to which

11:34   25   part had been replaced?  It said the end as opposed to the

1    whole hose or?

2         THE WITNESS:  I believe that they referred to the

3    inflator assembly in the deposition.

4         THE COURT:  Okay, all right.

11:34    5         THE WITNESS:  We can look at that if we need to.

6    BY MR. LASKE:

7    Q.  But in the deposition there was actually no specific

8    evidence as to which part of it they needed to replace?

9    A.  Well, when I read it I understood it to mean the inflator

11:34   10    assembly.

11   Q.  Okay.  But there was no specific part that they pointed out

12   as the reason for replacing the whole thing?

13   A.  Oh, why, you mean the reason for why?

14   Q.  Yeah, they replaced the whole thing, but they didn't say

11:34   15    this part didn't work, this part didn't work?

16   A.  Yeah, I don't think there's any documentation for that.

17   Q.  And you rely heavily on the manual gauge that's shown in

18   this photo that's circled, I think it's Exhibit 141 or 142?

19   A.  That's certainly part of it, yes.

11:34   20   Q.  And you testified that the only reason that a manual tire

21   gauge was present on a nearby fence was that the gauge in the

22   inflator was nonfunctional?

23   A.  Right, that's my opinion, correct.

24   Q.  But isn't it true that there may have been more convenient

11:35   25   ways to use the manual gauge so that they can evaluate whether

1    the tires needed to be inflated at all before rolling out the

2    entire hose and then trying to check it that way?

3    A.   Well, I mean in that hypothetical I suppose it's possible.

4    Q.   So someone might decide to do that rather than unravel this

11:35    5    long hose, find out their tires are fine and then have to ravel

6    it back up?

7    A.   Well, when you look at this picture this hose already has

8    at least some distance already unravelled, and so I don't even

9    know how much unravelling would have to happen in that

11:35    10    hypothetical, maybe none.

11    Q.   To reach --

12              THE COURT:  Is the gauge on the hose -- will the gauge

13    on the hose function as counsel suggests?  In other words,

14    assuming that the bubble gauge is working and before depressing

11:35    15    the hose to insert air into a tire, if you just plug it on to

16    the hose will the bubble show the current PSI of the tire?

17              THE WITNESS:  It depends on the device, but it should

18    in general.  In general, it should.

19              THE COURT:  I mean, do we know about this one?

11:36    20              THE WITNESS:  Well, no, they threw this one way away.

21    We have no idea what this particular design is.

22              THE COURT:  Do you know from your experience with the

23    ends, what do they call the ends of these inflation devices --

24              THE WITNESS:  I think they just --

11:36    25              THE COURT:  -- gauge?

1        THE WITNESS:  -- call it inflator tool.

2        THE COURT:  Okay, inflator tool.  Do you know from

3   your experience, do most of them work that way?  In other words

4   if I roll into a gas station and I stick it on my tire, before

11:36    5   I depress anything to put air in, will it -- will it give me a

6   read of what the current air pressure is in the tire?

7        THE WITNESS:  Yes, many of them will do that.

8        THE COURT:  All right.  Go ahead.

9   BY MR. LASKE:

11:36   10   Q.  But isn't it common for people also before they go through

11   that process to take out a handheld gauge like this one and

12   check whether or not they even have to do any of that?

13   A.  In my experience the only time I would use a handheld gauge

14   or I've known anybody to use a handheld gauge is when there is

11:36   15   no gauge on the inflation tool itself, which also used to be

16   very common.  It used to be that a lot of the inflation devices

17   didn't have gauges and they were simply a valve with a hose.

18        And then, in which case I would use an external tool.

19   Q.  So you've never seen anyone use a manual gauge to check

11:37   20   before deciding whether or not they even had to go through the

21   process of inflating any of their tires even if the inflator

22   had a gauge on it?

23   A.  Not when they're right next to an inflator.  I mean if I

24   was, say, at home and not at the gas station, I could possibly

11:37   25   use a tool.  That would make sense.

1   Q.   But even at gas stations people usually have to pay for the

2   machine, isn't it possible someone would check all four tires

3   before they go through that process?

4        THE WITNESS:   I mean, well, anything is possible.   I

11:37   5   haven't seen that.

6   BY MR. LASKE:

7   Q.   You've never seen that?

8   A.   Not when there's a functioning gauge right there.   I

9   personally have used pressure gauges to check the pressure on

11:37   10   tires when I'm away from a filling station or filling device to

11   check it.   I've done that many, many times.

12   Q.   And you read several depositions but in this case I think

13   there were more than 10 border patrol agents deposed, none of

14   them said they had ever seen this before, this gauge on this

11:37   15   picture, on this fence.   Are you aware of that?

16   A.   I guess I don't recall those specifics, but that could be.

17   Q.   And are you aware the lead garage mechanic who's

18   responsible for changing this out, the tire inflator and the

19   air hose, had never seen that gauge?

11:38   20   A.   That could be, I don't recall.

21   Q.   But you draw the presumption that someone put that up there

22   for the express purpose of checking tires because the gauge

23   wasn't working?

24   A.   That to me is the most likely purpose for the gauge being

11:38   25   there, yes.

103

| | |
|---|---|
| 1 | Q.  Isn't that more of an assumption? |
| 2 | A.  No, that's a deduction. |
| 3 | Q.  Based on no witness saying they've ever seen that before? |
| 4 | A.  Based upon my experience. |
| 11:38   5 | Q.  If it turned out that the pressure gauge was actually |
| 6 | functional at the time of the accident, would you have any |
| 7 | criticisms of Mr. Moore's actions at that time? |
| 8 | A.  If it was proved that it was functional, then I would say |
| 9 | he should track its function and that should dictate how far he |
| 11:38   10 | fills it. |
| 11 | Q.  According to your presumption regarding the tire inflator |
| 12 | gauge being defective, it's your opinion that plaintiff did not |
| 13 | notice there was an issue with the tire inflator gauge while he |
| 14 | inflated the tire, correct? |
| 11:39   15 | A.  Certainly he didn't recognize that it was not functioning |
| 16 | properly. |
| 17 | Q.  And if the gauge, for example, was stuck on a number, |
| 18 | plaintiff according to your testing would have had-- would have |
| 19 | been able to observe this within 50 seconds, correct? |
| 11:39   20 | A.  Yes, but it would depend what number it was stuck on in |
| 21 | that hypothetical.  For example, if it was stuck on the number |
| 22 | 22 then he may continue to fill and fill thinking well, I |
| 23 | haven't reached it yet.  I haven't hit my target, in which case |
| 24 | he's clearly following the instruction of the pressure gauge. |
| 11:39   25 | Q.  And if the gauge did not provide any reading, he'd be able |

1    to observe that within 50 seconds, correct?

2    A.   If it provided no reading at all, he probably could.

3    Q.   And if the gauge was not otherwise working, he would at

4    least have 50 seconds to observe something?

11:39   5    A.   Well, I think that's true regardless.

6    Q.   As an engineer you conduct tests to determine if a tool

7    like a tire inflator works, correct?

8    A.   You certainly can, yes.

9    Q.   And isn't it true that you cannot scientifically determine

11:40   10   whether the tire inflator was malfunctioning because it's not

11   available to test?

12   A.   Well, if it's not available to test then you can't test it.

13   I mean, that's by definition.  What you can do is look at the

14   body of evidence and determine how much evidence supports

11:40   15   whether it was likely working or not.  And in my opinion the

16   evidence in this case supports that it was not.

17   Q.   But scientifically, which is the point of why you're on the

18   stand and not the attorneys arguing the point is scientifically

19   you couldn't test the tool though, right?

11:40   20   A.   Well, no, by definition we can't test the tool because it's

21   been thrown away, I mean that's the definition.

22   Q.   So you're looking at the evidence and trying to draw a

23   reasonable inference of what you believe it means?

24   A.   A reasonable conclusion.

11:40   25   Q.   You opine that the border patrol should have installed a

1    pressure regulator to prevent this accident?

2    A.   Yes.

3    Q.   And isn't it true that none of the border patrol employees

4    deposed in this case, including the plaintiff, had ever seen

11:41    5    anyone take a wheelbarrow tire to work?

6    A.   I don't recall anybody saying they did see that.

7    Q.   Isn't it true that no one ever said they saw that?

8    A.   I'm not aware of anybody seeing that.

9    Q.   And isn't it true that plaintiff had successfully filled

11:41    10    this tire once at a 7-Eleven?

11    A.   The wheelbarrow tire?

12    Q.   Yes.

13    A.   That's possible.  I don't recall specifically.

14    Q.   So you didn't read his deposition?

11:41    15    A.   I just don't recall whether he said that or not.

16    Q.   Did you read his deposition?

17    A.   I'd have to look at my notes.  I believe that I did.  But

18    I'll have to look at my notes.

19    Q.   And isn't it true that plaintiff could have applied

11:41    20    pressure to this small volume tire for longer than a minute?

21    A.   That seems very, very unlikely.

22    Q.   Your tests were very close to a minute though, correct?

23    A.   Yes, but my tests are not replicating the exact or a very,

24    you know, the tightest or closest representation of the wheel

11:42    25    and tire.  I believe that your expert stated in his deposition

1   that he found what he believed to be a very good representation

2   of exactly what was there and it took him less than half a

3   minute to reach the explosive rupture of the rim.

4   Q.   Isn't it true that plaintiff could have kept the wheel on

11:42   5   the wheelbarrow, turned the wheelbarrow upside down and

6   inflated the tire?

7   A.   I'm sure that's true.

8   Q.   You conducted your tests during daylight hours?

9   A.   Yes.

11:42   10   Q.   And in this -- in this case plaintiff actually inflated his

11   tire at night?

12   A.   Yes.

13   Q.   And I'd like to direct your attention to a 12-second

14   excerpt from the first test you conducted.

11:42   15   A.   Okay.

16   Q.   Which, for the record, is Exhibit 143C-1.  And we're going

17   to run 12 seconds starting at 53 seconds to one minute and five

18   seconds.

19        But first I want to ask you a couple questions.  Isn't

11:43   20   it true that test one was conducted by you filling the tire in

21   intervals as opposed to continuously filling the tire?

22   A.   That's still true, yes.

23   Q.   And as we discussed earlier, the data kind of showed fill

24   time versus actual just running time?

11:43   25   A.   Correct.

1   Q.  And the video that I'm showing you, based on the data,

2   which is Exhibit 3 to your deposition, but I think we

3   identified it earlier as part of Exhibit 390, so let's

4   see -- can I approach the witness, Your Honor?

11:43   5        THE COURT:  Sure.

6   BY MR. LASKE:

7   Q.  Let me know if you need more time looking at it.

8   A.  No, go ahead.

9   Q.  Okay.  So according to your data on the Excel spreadsheet,

11:44   10   at about 53 seconds on the video you've actually filled the

11   tire with approximately 32 seconds of air, correct?

12   A.  Yes, that's to approximately, what, about 122 PSI, yes.

13   Q.  Okay.  And according to the 32 seconds of fill time, isn't

14   it closer to 101 PSIs?

11:44   15   A.  Why are you saying that?

16   Q.  Well, what do you have it as?

17   A.  It says 122 on the spreadsheet I'm looking at.

18        MR. LASKE:  Can I approach, Your Honor, for a second?

19        THE COURT:  Yeah, all counsel may approach without

11:44   20   asking permission.

21        THE WITNESS:  Oh, you're right.  I'm sorry, you are

22   correct.  No, no, you're right it is 101, that is correct.  I

23   was -- I was looking at the other column, yes.

24   BY MR. LASKE:

11:44   25   Q.  I deduced that from filling out -- looking at your

          1   information and I realized that your test shows it exploding at

          2   I think almost 137 PSIs, so I kind of looked at that column.

          3   A.   Yes, that's correct.  And that's the correct deduction.

          4   Q.   And that's the fifth or sixth column to the heading from

 11:45    5   the left to right?

          6   A.   Sixth, yes.

          7   Q.   Okay.  So at 32 seconds of fill time we're at 101 PSIs?

          8   A.   Yes.

          9   Q.   And we're obviously above the maximum suggested pressure?

 11:45   10   A.   Yes.

         11   Q.   According to your data sheet at one minute and five seconds

         12   in the video we've actually filled the tire approximately 43

         13   seconds?

         14   A.   Let's see, either 40 or 43 depending on whether we're at 65

 11:45   15   or 69 seconds.

         16   Q.   And at around 43 seconds of fill time the tire pressure was

         17   117.7 PSIs?

         18   A.   At 43 I have 123.5.  At 40 I've got 117.7.

         19   Q.   Okay.

 11:46   20          MR. LASKE:  Now, Your Honor, I'd like to play the

         21   12-second clip at this time.

         22          THE COURT:  Sure, you may.

         23      (Video played.)

         24   BY MR. LASKE:

 11:46   25   Q.   And in this clip that stops at 43 seconds of fill time or

1    approximately 43 seconds of fill time which is about 13.65

2    seconds before it explodes, we already see some warning signs

3    that the tire will explode if given more air, correct?

4    A.   No, what we see is the tire expanding, but that doesn't

11:46    5    tell a layperson that it's going to explode.  There's no

6    implication there at all.  I mean as an engineer I can see

7    where this may be going, but I wouldn't expect a layperson to

8    know that.

9    Q.   But you admit we see the tire expand?

11:47   10    A.   The tire is expanding.

11    Q.   And you admit at approximately one minute or at least by

12    the time we stop this clip the wheel in the center starts

13    pushing against the tire?  And we can play the clip again if

14    you want.

11:47   15    A.   The wheel -- well, the tire and the wheel are pushing

16    against each other the entire time.

17    Q.   But it becomes more pronounced?

18    A.   Well, there's certainly expansion, right?  That's what

19    you're referring to.

11:47   20    Q.   There's a gap when we started the clip and now there's no

21    more gap between the tire and the wheel?

22    A.   Go ahead and play it again if you like.

23    Q.   We'll play it again.

24           (Video played.)

11:47   25           THE WITNESS:  No, the shadow is still present.  I

1    wouldn't say that that gap changes, I would say that the tire

2    is expanding.

3    BY MR. LASKE:

4    Q.   At one minute your data shows that it's a little under 40

11:48   5    seconds of fill time, correct?

6    A.   Yes.

7    Q.   And at a little under 40 seconds of fill time the data

8    shows the pressure is around 113.5 PSIs?

9    A.   Yes.

11:48   10   Q.   And isn't it true that at one minute three seconds into the

11   video or at least by one minute five seconds in the video the

12   stem orientation changes?

13   A.   The whole orientation of the tire changes as it's coming up

14   on the tire.  I don't see a stem orientation change.  If you'd

11:48   15   like to play it again where you think you're showing that I can

16   have a look.

17   Q.   Sure, it's around one minute three seconds, it goes -- it

18   stiffens up.

19   A.   No, that's the entire system is moving.  So what you're

11:48   20   looking at here is as the tire is expanding, it's actually

21   pushing up and tilting the whole assembly, which is causing

22   that hose to move, but the relative position of the stem in the

23   wheel to me does not appear to change, at least in the example

24   you're showing here.

11:48   25   Q.   So -- but the hose is moving?

1    A.   Yes, because the whole assembly is moving up, right.  The

2    whole tire and wheel assembly is moving as you expand the tire.

3    Q.   And that would have been the case before the tire that Ryan

4    Moore was filling exploded?

11:49   5              MR. CHAMBERS:  Objection, calls for speculation.

6              THE COURT:  No, it's within the scope of the opinions

7    he's offered.  Overruled.

8              THE WITNESS:  Yes, I believe that the tire that

9    Mr. Moore was filling would also expand.

11:49   10   BY MR. LASKE:

11   Q.   And if we watch the video to the end, in your first test

12   the tire exploded at approximately 56.65 seconds?

13   A.   Yes.

14   Q.   And the data from test one shows the tire exploded at 136.9

11:49   15   PSIs?

16   A.   Yes.

17              THE COURT:  What was the first figure you gave, 56?

18              MR. LASKE:  56.65 seconds.

19              THE COURT:  And that was fill time?

11:49   20              THE WITNESS:  Yes.

21              THE COURT:  Not actual time, because you were doing

22   this incrementally, on and off?

23              THE WITNESS:  Yes.

24              THE COURT:  And I'm sorry, the PSI at 56.65 was what?

11:49   25              MR. LASKE:  136.9 PSIs.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | THE COURT:  All right.  Thank you.                                    |
|       | 2  | MR. LASKE:  I have nothing further, Your Honor.                       |
|       | 3  | THE COURT:  Redirect.                                                 |
|       | 4  | REDIRECT EXAMINATION                                                  |
| 11:50 | 5  | BY MR. CHAMBERS:                                                      |
|       | 6  | Q.  Dr. Rondinone, are you aware of any restrictions that were        |
|       | 7  | placed on border patrol agents in terms of what sorts of tires        |
|       | 8  | they could and could not fill at this particular station?            |
|       | 9  | A.  No, I'm not aware of any restrictions.                            |
| 11:50 | 10 | Q.  Any evidence that you reviewed that said, hey guys, you can       |
|       | 11 | fill anything you want, just don't fill a wheelbarrow tire?          |
|       | 12 | A.  No, I didn't see anything like that.                             |
|       | 13 | Q.  And, again, just to make sure I'm clear, the testing that         |
|       | 14 | you performed, you're not trying to recreate what Mr. Moore          |
| 11:50 | 15 | would have seen that evening, correct?                                |
|       | 16 | A.  No.                                                               |
|       | 17 | Q.  All right.  Thank you.  Nothing further.                         |
|       | 18 | THE COURT:  Any other questions?                                      |
|       | 19 | MR. LASKE:  Your Honor, actually we would move to                     |
| 11:50 | 20 | strike any opinions about warnings.  This witness hasn't been         |
|       | 21 | qualified or offered for warnings.  He was just offered to do         |
|       | 22 | testing.                                                              |
|       | 23 | THE COURT:  You're talking about warnings by border                   |
|       | 24 | patrol to employees?                                                  |
| 11:51 | 25 | MR. LASKE:  To employees not to use the equipment.                    |

|   |   |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 11:51 | 5 |

1    THE COURT:  Well, okay.  I don't know that he's

2    offering opinions.  He's asked -- I think he was asked in the

3    course of preparing opinions, I think the question was, did you

4    become aware of any restrictions and I think his answer is no.

5        Is that the -- was that the gist of the question that

6    you answered?

7        THE WITNESS:  Yes, that's correct.

8        MR. LASKE:  I understand, Your Honor.

9        THE COURT:  He's not opining on that, I don't think.

10   Okay.

11       Any reason why this gentleman can't be excused as a

12   witness at this time?

13       MR. LASKE:  No, Your Honor, I don't have any more

14   questions.

15       MR. CHAMBERS:  No, Your Honor.

16       THE COURT:  Thank you.  You may stand down.  You're

17   excused.  Do plaintiffs have a short witness now?  Otherwise we

18   can recess and come back at 10 minutes to 1.

19       MR. CHAMBERS:  I think it would make more sense to

20   break and start fresh at 1.

21       THE COURT:  All right.  Well, 10 to 1.

22       MR. CHAMBERS:  10 to 1, excuse me.  Tried to slip one

23   past you.

24       THE COURT:  Yeah.  11:50 we'll reconvene and

25   plaintiffs will call their next witness -- I'm sorry, 11:50,

|  | 1 | 12:50, and plaintiffs may call their next witness at that time. |
|  | 2 | (Whereupon, a recess was taken from 11:51 a.m. to 12:52 p.m.) |
|  | 3 | THE COURT:  Next witness, Mr. Chambers. |
|  | 4 | MR. CHAMBERS:  We'd like to call Dr. Kohani, please. |
| 12:52 | 5 | **KAMBIZ KOHANI**, |
|  | 6 | PLAINTIFF'S WITNESS, SWORN |
|  | 7 | THE CLERK:  Would you state and spell your full name |
|  | 8 | for the record. |
|  | 9 | THE WITNESS:  Kambiz Kohani, K-A-M-B-I-Z-K-O-H-A-N-I. |
| 12:52 | 10 | THE CLERK:  Thank you. |
|  | 11 | DIRECT EXAMINATION |
|  | 12 | BY MR. CHAMBERS: |
|  | 13 | Q.  Good afternoon, sir. |
|  | 14 | A.  Good afternoon. |
| 12:52 | 15 | Q.  You are a dentist.  Is that correct? |
|  | 16 | A.  Yes. |
|  | 17 | Q.  Any specialty? |
|  | 18 | A.  No specialties, but I have a fellowship in implantology. |
|  | 19 | Q.  What's implantology? |
| 12:53 | 20 | A.  Implantology is the art and science of placing dental |
|  | 21 | implants. |
|  | 22 | Q.  Okay.  So you assist people with lost teeth effectively? |
|  | 23 | A.  I've been placing implants since 1992, so being a general |
|  | 24 | dentist, my license allows me to place implants as long as we |
| 12:53 | 25 | have proper training and certification and whatnot.  So I got |

1    started in '92, and I've been placing implants since then, and

2    recently, a couple years ago, I got my fellowship.

3    Q.   What did getting your fellowship entail?

4    A.   Submitting probably close to 50 cases or so of implants

12:53    5    that you've done and taking an exam, a national exam, and

6    meeting with the board, and it's a pretty rigorous

7    qualification process.

8    Q.   You've got roughly 25 years working with people's mouths

9    and doing implants.  Is that right?

12:54    10    A.   Yes, yes, I have.

11    Q.   Tell me a little bit about your background with respect to

12    lecturing and teaching.

13    A.   Okay.  I've been director at UCLA Center For Aesthetic

14    Dentistry up until two years ago when I resigned, and I've been

12:54    15    teaching and educating doctors from all around the world in the

16    art of aesthetic dentistry and cosmetic dentistry, and recently

17    I started a lecturing symposium with Henry Schein, and we're

18    lecturing throughout the country and internationally 17 times

19    this year.  It's a program that I started myself back in 2002.

12:54    20    I invented several products in my field.  I've been pretty much

21    doing full-time general dentistry in my office about four days

22    a week and lecturing about maybe once or twice a month.

23    Q.   And the lecturing you're doing, is that primarily in the

24    field of implantology or is it more broad than that?

12:54    25    A.   It's mostly in the area of cosmetic dentistry and

1    orthodontics, and implantology has become a big part of what we

2    do as general dentists in our practices, creating spaces for

3    implants, moving teeth in the proper position so we don't have

4    to do certain things.  So implantology has become probably one

12:55   5    of the biggest adjuncts to a general dentist's practice, so

6    probably within the last ten years or so.

7    Q.   And how has implantology changed since when you started in

8    1992 to today?

9    A.   Where do I start?  First of all, all the procedures are

12:55   10   done using guides, surgical guides, which are manufactured and

11   made prior to the surgery.  So with the advent of, you know,

12   making really inexpensive, high quality CT cone beams where

13   most offices now can afford to get one of those, you can pretty

14   much preplan the position of the implants, know where all the

12:55   15   vital structures are, avoid certain types of vital structures

16   if you don't need to, and be able to place your implants with

17   almost perfect accuracy, within a fraction of a millimeter to

18   where you need to go.

19       And most everything is now done digitized, so all the

12:56   20   planning and preplanning is done using a computer program, and

21   then the guides are made before even the patient's operated on.

22   Q.   And I assume you take it upon yourself to sort of stay at

23   the forefront of all the advances in implant technology?

24   A.   You have to, yeah.  If you want to practice in today's

12:56   25   environment, you have to, you have to keep up with the

1    technology, yeah.

2    Q.   And why is that important, to keep up with current

3    technology?

4    A.   To be able to deliver better services to your clients and

12:56   5    avoid disaster and, you know, have a more productive, efficient

6    lifestyle, it really is.  I mean, you -- normally it would take

7    us two weeks to two and a half weeks to have a crown made.  I

8    basically just made three this morning before I went to the

9    trial, and it takes me about ten minutes to scan and mill a

12:56   10   crown right in my office.  The patient can leave in the same

11   hour, doesn't have to come back for a second appointment to get

12   injected again and have temporary provisionals falling out of

13   their mouths.

14        So you're delivering a much better, higher quality of

12:57   15   precision actually dentistry in a more efficient time.  So it's

16   the only way to practice.

17   Q.   And you also have a private practice.  Is that correct?

18   A.   Yes, I do.  Yeah, I've been in the same location for about

19   25 years in San Diego.

12:57   20   Q.   And approximately how many patients do you see in a given

21   month?

22   A.   I would say maybe eight to ten a day.  I usually see one

23   patient on Fridays.  I'd say, I don't know, maybe 30, 40 a

24   week.

12:57   25   Q.   Is there a term of art that dentists use amongst each other

1   where you've got somebody who's actually working on somebody?

2   A.   Wet-hand dentist, wet hand.  Those are the ones, we're in

3   the trenches, we're in there doing the work, and we're

4   preaching what we do every day, and there's some guys that just

5   lecture.  So they're more the -- in the background.  They do

6   the scientific research, they go and talk about it.  Most of

7   us, the ones in my group of colleagues that I work with, we

8   actually do it every day.  We're in our office delivering these

9   types of things that we're talking about so --

10  Q.   You consider yourself to be a wet-hand dentist?

11  A.   I have to be.  I can't imagine not doing dentistry.  It's

12  what gets me up every morning.

13  Q.   You're here testifying as an expert witness.  How much of

14  your practice is devoted to doing that?

15  A.   Less than 1 percent, if even that.

16  Q.   So the vast majority of what you do, you're hands-on with

17  patients day in and day out?

18  A.   That's probably 99 percent of what I do.

19  Q.   We're here today obviously to talk about Ryan Moore.  And I

20  understand he's a patient of yours?

21  A.   Yes.

22  Q.   So you're here both as an expert to testify in this case,

23  but you've also been treating Ryan.  Is that right?

24  A.   That's correct.

25  Q.   Do you remember the first time that he came to see you?

1   A.   Yes, I do.

2   Q.   Can you tell me a little bit about what that was like

3   or --

4   A.   Yeah.  I received a phone call from a colleague of mine and

12:59   5   asked me if I would be willing to see Ryan for a consultation,

6   and they explained to me what happened and the extent of his

7   injuries, and they pretty much told me that he'd already had

8   the implants placed by another surgeon in town whom I know, and

9   they said it would be a pretty straightforward case of just

12:59   10   placing some crowns and whatnot, and, you know, would you be

11   willing to do this and help him out.

12        So I initially said let me meet him first.  So I met with

13   him, and immediately I thought he was a great guy, and I said I

14   accepted -- I agreed to work on him and get him started.

12:59   15        So as soon as we took our initial diagnostic records, I

16   realized that it's not an easy, simple case.  His case was very

17   complicated.  He was missing quite a bit of tissue and not soft

18   tissue, hard tissue as well, and later on we found out that

19   this case is a lot more challenging because those implants were

12:59   20   all placed in different angles, in different positions, which

21   made it almost impossible for me to be able to restore his

22   mouth with individual crowns.  So we had to devise a

23   substructure that I can explain to you if you want me to get to

24   that point through the photographs and the things that I've

01:00   25   done with the models.  So it turned out to be a much more

1   challenging case than we anticipated, but yes, we decided to go

2   ahead and get him finished up.

3   Q.   When Ryan first came to you, what did you understand his

4   injuries to be?

01:00   5   A.   I knew that he was involved in an accident where something

6   had exploded in his face, a tire, that was placing air in the

7   tire, and I guess there was no way of regulating it, and it

8   exploded in his face and took out seven teeth on the bottom and

9   five on the top.  It left him with paresthesia, numbness on the

01:00   10  left side of his face, and he'd lost a considerable amount of

11  bone and tissue on that side from the injury.  He had fractured

12  the mandible on the right side.  We had to place a few fixation

13  pins, and screws were still there when I first met him.  He

14  also had a small perforation on the left mandible from the

01:01   15  impact, which was kind of left alone to heal on its own.

16       And so that was the extent of his injuries, and I was

17  really concerned about mostly about his lip because he had no

18  sensation or feeling, so I couldn't use -- we used a lot of

19  phonetics to try to determine where the teeth end up in the

01:01   20  patient's face and mouth.  The length of your incisors really

21  play an important role in to saying the word F.  So we try to

22  have patients say "fifty," "fifty-five," and counts, and use

23  that as a way of knowing where the incisal S should be.  We use

24  the word S as knowing exactly how close the teeth -- Ryan was

01:01   25  missing all his front teeth, so there was no way for me to tell

1   where his teeth were and what angulation or inclination to

2   really put him in.

3        So those were all the challenges that had to overcome, and

4   we were able to end up with a pretty decent result.

01:01   5   Q.   When Ryan first came to you, how would you describe his

6   case or condition?

7   A.   Pretty severe.  Pretty severe.  Definitely not something

8   that I would let any of my residents handle.

9   Q.   Was it among the worst you'd seen?

01:02   10   A.   It was probably among the top three worst cases I've seen.

11   The other one was a gunshot wound, shotgun to the face, so that

12   one topped him.

13   Q.   And do you recall when Ryan first came to see you

14   approximately?

01:02   15   A.   I believe it was in March, April, March, of 2015.  I don't

16   remember the exact date, but it was right in the springtime.

17   Q.   It's been a couple years roughly?

18   A.   A couple years, yeah.

19   Q.   And since that time, have you treated him consistently over

01:02   20   the past roughly two years?

21   A.   Yes, I have.  He just recently came in for a checkup.  I

22   can't remember, maybe a month or so ago.

23   Q.   Okay.  I've got some models here.  I'd like, if you could,

24   to show us what the condition of Ryan's mouth was like when you

01:02   25   first saw him.

1    A.   Please.  May I also have those photographs?

2    Q.   Sure.

3    A.   That might help kind of tie these things together.

4    Q.   Why don't we pull them up on the screen.  Let's take a look

01:03    5    at Exhibit 69.

6    A.   All right.  So let's see.  Do you have the photo that shows

7    those healing caps from the top view?

8    Q.   Sure.  Can I see Exhibit 76, page 1, please?

9    A.   Do you remember all of that?

01:04   10    Q.   I've got it memorized.

11    A.   Okay.  So the first time I saw Ryan, he walked into my

12    office looking like that.

13    Q.   What are we looking at in Exhibit 76?

14    A.   What you're looking at are seven implants that are placed

01:04   15    pretty much right on top of each other, and if you take a

16    look -- I don't know if I can point and show something.

17    Q.   You can notate on that screen.  Can you orient us?  Are we

18    looking at the uppers or the bottom?

19    A.   These are the lower jaw, the lower teeth, if you're looking

01:04   20    from the top view.  So imagine if I'm standing over the patient

21    looking straight down.

22         So the one round circular thing that says "C/X" on it,

23    right in the center, if you take a look just slightly above it,

24    you see a white area.  It looks like a white lesion.  Okay.

01:04   25    And that is what really concerned me more than anything else,

 1   and I'll tell you what that is.

 2        That told me that Ryan, if you take a look at this model,

 3   Your Honor, has absolutely no vestibule in his lower mouth,

 4   meaning when you pull the lip down, you have teeth.  There's a

01:05   5   ridge.  There's a nice area that comes up.  When he lost all

 6   that bone, he has no ridge, and he has no vestibule, so his lip

 7   is actually connected directly to his mandible and to the floor

 8   of his mouth.

 9        If you look at the picture, that white area is actually

01:05   10   where the lip -- when I don't pull the lip, when I'm not

 11   retracting it, the lip is actually folding over that metal

 12   healing cap, hence ripped a little gash through it, and that's

 13   what he was complaining about, that I can't even hold my lip

 14   because if I let my lip go, it's digging into this attachment,

01:05   15   and he broke my heart because those are one of the most painful

 16   things you ever deal with as a dentist.  When patients have

 17   dentures and they have no vestibule, the edge of the denture

 18   rips into the lip, and every time you move your lip, it's like

 19   somebody is cutting a knife through your lip.

01:05   20        So one of the first things I decided to do, I told Ryan, I

 21   said we need to take care of this right away because I can't

 22   put any appliances, no prosthetics, nothing that's going to

 23   interfere with your lips.

 24        So we need to go back and recreate a vestibule.

01:06   25        So this model that I'm looking at here dated on 3-12-15 is

1  in March is when I first -- I believe when I first saw him, the

2  record was taken.

3      If you take a look, if I put his teeth together, and you

4  take a look at his mouth, you'll see that the entire front area

01:06  5  is missing, and he's got two teeth on this side that have

6  completely dropped down by several millimeters because there

7  was nothing opposing to stop those teeth from super erupting.

8      So that was going to create another major issue for me

9  because I have no room down here to put any teeth for him.

01:06  10  So --

11  Q.  Let me just stop you for a moment and make sure I

12  understand.

13      So I think I counted that he was missing 12 teeth total

14  when you first saw him?

01:06  15  A.  That's right, seven on the bottom, and five on the top.

16  Q.  And it was your understanding that those were lost as a

17  result of the incident and intervening treatment?

18  A.  That's right.

19  Q.  And then in addition to that, he had no vestibule?

01:06  20  A.  He has no ridge, no vestibule, and if you take a look those

21  implants, those are called healing caps.  Those are what we put

22  on top of the implants after the implants are placed in so the

23  tissue starts to heal around it.

24      If you take a look at those, there is a lot of red tissue

01:07  25  right next to the implant.  That's called mucosal tissue, and

1    what we need around implants are -- that little white tissue,

2    the band, is called keratinized tissue.

3        So what happened is the keratinized tissue was gone when he

4    lost those teeth, and the only other area in the mouth where we

01:07  5    know where keratinized tissue exists is on the palate.

6        So that was the only other area that we had to go and

7    borrow some to come back and graft around all these implants

8    just to give us a shot of being able to even put something in

9    there.

01:07  10   Q.   Let me back you up for one second because I think we're

11   missing something important.

12       These implants that you're talking about, what is that, and

13   how does it work?

14   A.   Okay.  Pardon me.  I should have explained that originally.

01:07  15       So the implants were titanium fixtures that are placed into

16   his jaw.

17   Q.   How?

18   A.   Basically drilled in there.  We call that osteotomy.  So we

19   basically start from a small drill, and we work our up to

01:08  20   whatever diameter that we're going to end up with.  I believe

21   his implants were four millimeter in diameter.  Most of them

22   were four millimeter.  And the length of the implants is going

23   to be determined by how much bone you have from the top, and

24   also if there's a vital structure, like a nerve on the bottom,

01:08  25   so it's going to limit you to how long.

```
 1       So obviously the wider, the longer implant, the better, and
 2   if you can't put it in there, then you're compromising.
 3       One of the reasons why I believe Ryan ended up with having
 4   so many implants put in was because of the fact that they
 5   weren't able to put longer implants in there for him.
 6   Q.  Can we go back briefly to Exhibit 69, please?
 7       Do you recognize this?
 8   A.  Yes.
 9   Q.  What are we looking at?
10   A.  We're looking at all those implants that I was talking
11   about.
12   Q.  So the white things I'm looking at in the middle there,
13   those look like screws?
14   A.  That's right.  They're really screws.  They're titanium
15   screws that we put in people's jaws.
16   Q.  They're drilled into the jaw?
17   A.  They're drilled into the jaw, and the bone is what keeps
18   them in place, and hopefully if the bone stays healthy and
19   there's enough blood supply, it maintains these.  If it doesn't
20   and you start having problems and you start to lose bone, hence
21   you're going to lose the implant.
22   Q.  So once the implants are screwed in and into the jaw,
23   drilled and screwed in, these healing caps that you're talking
24   about, what's the purpose of those?
25   A.  The healing cap basically allows the tissue to heal because
```

01:08
01:08
01:08
01:09
01:09

1   those implants are submerged underneath the gum for a period of

2   four to six months.  So that was all done by Dr. Berger's

3   office.

4        So then the second-stage surgery is when we go inside and

01:09   5   you remove the screws on top of the implants, and you place in

6   healing caps that now extend from the top of the implant

7   through the tissue.

8   Q.   And were you the one who placed the healing caps?

9   A.   The healing caps on the top were placed by me because those

01:09   10   implants were not exposed when he came to my office.  They were

11   still submerged under the gum.

12        The lower implants had already been through the tissue, so

13   we didn't have to really place those healing caps in there.

14        We just replaced the ones that he had with new ones because

01:10   15   of the amount of plaque and buildup that he had accumulated

16   over the top of those.

17   Q.   Let me make sure I understand how this works.  You drill in

18   place the implants, and you leave them alone and let the tissue

19   grow back over the top of them?

01:10   20   A.   That's right.

21   Q.   And that's takes four to six months?

22   A.   Four to six months, that's right.

23   Q.   And then once that's completed, you go back in and take the

24   tissue out again?

01:10   25   A.   Then you have to cut him open again and expose all those

1    implants and then put the healing caps and suture him back up.

2    So that's pretty much another surgery.  And he's going to have

3    to wait a few weeks or maybe a couple of months for that to

4    heal.

01:10   5    Q.   And can we go back to Exhibit 76, please?

6         So, again, these are the healing caps, so we're past the

7    implants, we're past the tissue growing over, we're past the

8    cutting into him, and now the healing caps have been placed?

9    A.   That's right.  When he presented to me, he'd already been

01:10   10   through the second stage with Dr. Berger's office, I believe,

11   and that's what he showed up in my office with.

12            THE COURT:  Is it Joel Berger?

13            THE WITNESS:  Yes.

14   BY MR. CHAMBERS:

01:11   15   Q.   And the uppers were still not healing capped?

16   A.   No, they were submerged, yeah, and I guess Ryan was

17   supposed to go back and have the second-stage healing cap

18   recovery done, but they decided since he's coming to me, if I

19   was willing to just take care of everything for him, and I did.

01:11   20   Q.   Fair enough.

21        Is Exhibit 76 -- is this a photo that you took?

22   A.   Yes.

23   Q.   And it's a fair and accurate depiction of what we're

24   looking at there?

01:11   25   A.   Yes.

1  Q.  So it sounds to me like the first real procedure, hands-on

2  procedure, that you performed with Ryan would be to expose the

3  upper implants?

4  A.  That's correct.

01:11  5  Q.  Okay.  And do you recall about when that was done?

6  A.  I don't remember the date, but I want to say within a month

7  after I saw him.

8  Q.  Okay.  June 2015 sound about right?

9  A.  Probably.  Yeah, I don't really recall.

01:11  10  Q.  Tell me what that procedure entailed.

11  A.  The procedure, we basically numbed him up on the upper arch

12  and made an incision -- I can get detailed if you want.  This

13  is called the crestal incision -- just to reflect the tissue

14  back, and he had a lot of scar tissue in there just from the

01:12  15  way everything had healed.  So we were careful not to really

16  take any tissue away, so I reflected the tissue and pushed all

17  the keratinized tissue up around the implants to try to avoid

18  or minimize the second-stage grafting for him, and that was

19  successful, so we didn't need to do that.  And placed the

01:12  20  healing caps in.  And then my goal was just to try to get some

21  teeth in there, and I wanted this guy -- he'd been walking

22  around with no teeth for a long time, and I know it was

23  bothering him, so my goal was just to get something in there

24  and put some teeth in there for him.  So we did some -- tried

01:12  25  to do some provisionals for him, and, unfortunately, it didn't

 1  work out very well because of the vestibule problem we had on

 2  the bottom.  So the next big thing I told Ryan we have to do is

 3  go see Dr. Machado and have him do the vestibuloplasty, which

 4  is what I was explaining before.

01:12  5  Q.  So before I rudely interrupted you.

 6  A.  No, you didn't.

 7  Q.  I'm also going to hand you a stack of photos, and I want to

 8  run through the treatment chronology, but I think you're

 9  probably better able to guide me through that than I would be.

01:12  10  A.  Okay.  So if I may, first let me explain.  First let me

11  explain what happened with the vestibuloplasty procedure.  I

12  was actually there in the office with Dr. Machado when he did

13  the procedure.

14  Q.  This was in roughly September of 2015?

01:13  15  A.  Yeah, I believe your memory is better than me.

16  Q.  So placing these implants and going through this process

17  sounds like it's a relatively lengthy ordeal?

18  A.  Usually start to finish would take about a year.  Four to

19  six months healing.  Lower arch, maybe four months, upper arch,

01:13  20  six months, and then in his situation, maybe a little bit more

21  because of the lack of tissue, things that he had around there.

22  Q.  Okay.

23  A.  Yeah, so if you look at -- I may have to refer to this

24  picture again, but if you look at this picture here.

01:13  25  Q.  If there's a little pink sticker in the bottom, it should

 1   give us a number, and I'll pull it up on everyone's screens.

 2   A.   I'm sorry.  Again?

 3   Q.   There should be a little pink number in the corner of the

 4   picture.

01:13  5   A.   Pink number?  Show me where that is.  Is it 96?

 6   Q.   There you go.

 7   A.   Okay.

 8   Q.   Take a look at 96, please.

 9   A.   96, please.

01:14  10       Okay.  So if you take a look at this picture, we went in

 11   there, and we made an incision right about here.  You can see

 12   where the attached gingiva is where the white gingiva is, and

 13   the rest of that, where the lip is attached, you can see the

 14   capillaries.  That's called mucosal tissue.  So made an

01:14  15   incision and basically cut him open from here and down to here

 16   and reflected all that back and then went to the roof of his

 17   mouth and took out two big pieces of tissue, one from the

 18   right, one from the left.  Those were the keratinized donor

 19   site, and we brought those back, and we grafted those area over

01:14  20   the top of his ridge.

 21   Q.   And the purpose of this procedure is to build up tissue to

 22   allow for implants?

 23   A.   To build up tissue and move the lip away from where the

 24   prosthesis is going to be so it's not going to dig into his lip

01:14  25   and cause the nasty sore that he had before.

1       So, luckily, that procedure worked the first time.  Usually

2   we have to do that at least a couple of times to get enough

3   height and width, but that worked out the first time.  So that

4   turned out really nice.

01:15   5       And after that, it allowed me to move forward to the next

6   phase, which is to start to design the prosthesis for him, and

7   when you're ready for that, I'll show you that.

8   Q.   Okay.  Please.

9   A.   Okay.  So one of the things that made Ryan's case more

01:15  10  challenging was the fact that -- let's see where those are.

11  Okay.  So one of the things that made his case very challenging

12  was the fact that those implants were all placed in not so

13  ideal positions.

14      So -- and I believe the reason for that -- Dr. Berger is a

01:16  15  good surgeon, and I have no doubt that he took every measure of

16  precaution to do what he really had to do, but those implants

17  were placed in -- one was placed more buckled than the other

18  one, so in order for me to come in and individually treat those

19  teeth, his teeth would be all over the place.  One would be

01:16  20  more to the face, one would be slightly to the lingual.

21      So in order to avoid that, we decided to make him a

22  structure, a titanium structure, that fits over on top of the

23  implants, and so if you please look at -- this one doesn't have

24  a pink number in there, but do you remember what --

01:16  25  Q.   No, I don't.  Can we see Exhibit 105?  Actually, sorry,

1    106.  Let's go old-fashioned.

2         THE COURT:  Tish, do you have to switch over?

3         MR. CHAMBERS:  He's on it.  I'll just put it on the

4    ELMO.

01:17   5    THE WITNESS:  You might want to take this one too

6    because that's going to be the next thing I'm going to talk

7    about.  I have two more pictures.  I'm going to come to these

8    in a few minutes.

9    BY MR. CHAMBERS:

01:19   10   Q.  There we go.  We're looking at Exhibit 106, page 7.

11   A.  Okay.  So if you look at this picture, you'll see that on

12   the top, you'll see these gold cylinders that are sticking out

13   of his gum.  Those were all custom gold abutments that we made

14   on the top, and we had to make those -- they're not all in the

01:19   15   same plane.  They're all in different planes.  So then what we

16   did was we designed -- we designed a bridge.  You have a

17   picture that shows the upper bridge that slides over that.

18   It's like a -- no, that's the lower one.  Sorry.  It's the

19   other one.  Just a ceramic -- there you go.  Sorry, these

01:19   20   pictures don't really do justice, but when you take a look, now

21   that bridge, it's like a telescopic type of system, so it goes

22   over those abutments that we've designed, and it gets cemented

23   in there, right.

24   Q.  So the gold posts that we saw in the last photo, this would

01:20   25   fit right over the top of those?

```
 1   A.   Exactly.  Would you go back to the gold posts again?  So if
 2   you look at the gold posts, if you take a look right here,
 3   there is a little access hole.  Each one of them have an access
 4   hole.  There's a screw that goes through the access hole and
 5   holds that abutment to the implant.  Okay.  So then the bridge
 6   gets cemented over that so, and they're all connected together.
 7              THE COURT:  The screw comes in from behind?
 8              THE WITNESS:  No, in this situation, the screw is
 9   going to be covered with the bridge.  So you won't have access
10   to the screw until the bridge comes out.  If I was going to
11   design this individually, the access hole would come out
12   through the face of the front teeth.  So when he would smile,
13   you can see a round circle in the center of all of his teeth
14   where I would have to close it up with composite.  Sometimes we
15   do that, but that doesn't look good because if he drinks any
16   coffee or wine, within a matter of a few months, it's going to
17   have a dark circle halo around it.
18       So what we decided to do was put the screws in on the
19   facial, put the abutments in, torque everything down, and then
20   cement a bridge over on top of those.
21       And initially I was going to use a temporary cement for one
22   reason only.  It allows me to be able to remove the bridge and
23   go back inside and do whatever I need to do without damaging
24   it.  So I have access.  It's retrievable.  And it's something
25   that I would be able to go back every once in a while, maybe
```

1   once a year.  I told him, I said you need to -- he can't clean

2   that because those teeth, he has no access to them.  They're

3   all covered with the bridge.  So it's not like you and I having

4   a crown where we can floss around it and clean around it.  That

01:21   5   implant is hidden with the substructure, and it's covered with

6   the bridge.

7       So I told him once a year or maybe once every year and a

8   half or so, depending on how well his hygiene is, he needs to

9   have that bridge removed and take the abutments off, clean

01:21   10   everything, and put it back in together again.  It's not a big

11   thing, but that's just part of his regular, normal hygiene

12   protocol from now on in order to be able to get the most life

13   out of these implants.

14   BY MR. CHAMBERS:

01:21   15   Q.   Is it typically your preference when you place implants to

16   do them one at a time?

17   A.   Absolutely.

18   Q.   So one implant would fit over one -- or excuse me,

19   one -- what do you call the white teeth?

01:22   20   A.   The abutment.

21   Q.   The abutment fit over each implant?

22   A.   That's right.  That's the idea is to restore him somewhat

23   to what he used to be before.  Except those teeth are

24   not -- they don't have nerves or periodontal ligament.  They're

01:22   25   dead titanium posts in there, but still if you restore them

1    independently, it's better because you can clean them better,

2    it functions better.  If one of them breaks, you don't have to

3    replace the whole thing.  And that's one of the hardest things.

4    I work with a team of ceramists not only from UCLA but from our

01:22   5    implants, the International Academy of Implantology.  These

6    guys do nothing but restore implants.  I brought four of them

7    together.  He was in the office.  Two showed up.  The other two

8    we met before.  And I said let's design this case in a way that

9    he can get the most out of this.  And that was the best system

01:22   10   that we could come up with on the upper, and on the lower, the

11   picture that you have right there, this picture is actually the

12   lower teeth, and on the lower arch, I was able to design a

13   bridge.  Can you please put this picture on for me, please?

14   Q.   I don't have that one.  What's the number at the bottom?

01:23   15   A.   It doesn't have one.  It's 106-002.  So we had better luck

16   actually -- yeah, if you can show me the previous picture just

17   for one second again, the one you just covered up.

18   Q.   These are all photos you took?

19   A.   These are all pictures I took, yes.

01:23   20       When you look at that picture, that one is showing the

21   access to the screws right through the chewing surface of the

22   teeth.  Okay.  So that on the lower arch, it worked out nice

23   because I was able to put the access holes right through the

24   center of the teeth, and those are not an area that you can

01:23   25   normally see, and then I covered them up with a temporary

 1   adhesive.  And can you put the next picture, please?

 2        And that's a picture of that bridge from the front, and you

 3   see this whole area here is all in pink porcelain because he

 4   doesn't have any tissue there.  He has no bone there.  He lost

 5   all of that vertical height.  So we had to restore that with

 6   pink porcelain.  So I made that instead of him going and having

 7   another surgery done where this is usually what they do, they

 8   take ribs and they take hip bone, and they add to bring up the

 9   amount of ridge to where the rest of the teeth should be, so

10   the teeth that he has are going to be the proper size.

11        In his situation, his implants were put all the way to the

12   base of the mandible because that's the only bone he had

13   available.

14        So when you look at -- if you want to show the X-ray,

15   please, the one CT that I had -- I'm sorry, you know, I'm going

16   back and forth, but I'm trying to make sense of all this stuff.

17             THE COURT:  That's all right.  I'm following.

18             THE WITNESS:  Perfect.  So if I was going to draw a

19   line where the bone and the teeth used to be, they're right

20   here.

21        So if you take a look at his implants, the head of these

22   implants are down here, which means he's going to have teeth

23   that are going to be that long.  And now you're getting into

24   this whole thing.  It's called the crown to root ratio where

25   the amount of post that he has under the ground is much shorter

1    than the building that you're going to build on top of it.

2        So we had to go back and redesign this whole case and come

3    up with a way that he's able to function because that's -- he

4    doesn't have any feeling in that area, there's no nerve endings

01:25   5    in there anymore.  So he doesn't really know how hard he's

6    biting his food.

7        So I wanted to make sure he's not going to keep breaking

8    it, so we designed -- can you go back to the bridge picture?

9    Thank you.

01:25   10       So we had to go back and design this entire structure right

11    here that's now held in place with those implants, and I

12    actually had to even bury a couple of them because there wasn't

13    enough space for me to engage those, so I think we buried one

14    of his implants, we said we can't use that, in order to be able

01:26   15    to come up with something like this.

16    BY MR. CHAMBERS:

17    Q.  So Ryan's case sounds like it was fairly complex?

18    A.  It was definitely something that -- yeah, you definitely

19    have to know what you're doing with this stuff, yeah.  It's not

01:26   20    just replacing teeth.  You have to put his bite back together,

21    and there was so many different variations and complications

22    that we had to go through, but, luckily, it all worked out.

23    Q.  And I think you saw Ryan in December of 2015.  You

24    mentioned a few minutes ago about -- I think you said super

01:26   25    erupted.  Tell us a little bit about what you meant by that.

1    A.   Well, the super eruption was if you go back to -- well, I

2    can actually show you the models here.  This is probably the

3    best thing that explains.  When Ryan came into my office back

4    in March of 2015, his upper left teeth, because they were

01:26    5    unopposed for a long time after the injury, had started to grow

6    down and erupt into the bottom space.

7         So my recommendation to him was to go ahead and remove

8    those teeth, but do not place any implants because he doesn't

9    need anymore implants.  I didn't want him to go through more

01:27    10   treatment.  There's no reason.  He's got plenty of implants on

11   the other side that we can restore, and I decided to what's

12   called a cantilever.

13        So rather than putting implants in the place of those teeth

14   that were removed, I said just leave it alone, just graft it,

01:27    15   and then we'll basically design a fake -- couple of fake teeth

16   that are hanging on this big bridge on the other side and save

17   him from having more surgery and more work.  And that's -- that

18   was the super eruption.

19        So that's one of the things that I did before we moved

01:27    20   forward with the restorative part of his face.

21   Q.   And what teeth had to be extracted for super eruption?

22   A.   It was number 10 and number 11.  Number 12 I was able to

23   fix it, just with shaving it, recontouring it.  We were able to

24   fit that one.  We didn't have to touch it.

01:27    25   Q.   Why couldn't you do the same thing for 10 and 11, just

1   shave them down?

2   A.   No, because -- that's a good question.  Because if you take

3   a look at where the reduction would have to go, you would be

4   halving the tooth.  You'd have to take the nerve out, and then

01:28   5   you have to do a gum surgery to lift the tooth up.  There's no

6   reason to do that.  There's no rationale to do that.

7   Q.   So it was easier just to remove those two teeth that had

8   grown down?

9   A.   The only other option that we considered was orthodontics

01:28   10   to be able to move those teeth back up orthodontically.  That

11   means he'd have to go through braces for another year.  So we

12   made a decision to just remove those and include that as part

13   of the bridge.  It will be easier, a lot less work, and he'll

14   be done, and he'd been dentureless for quite a long time by

01:28   15   then, and I honestly didn't want to put him through any more

16   treatment if he didn't need it.

17   Q.   How long was it from the time you first saw Ryan until he

18   actually had the bridge, the white part of the teeth, ready to

19   go?

01:28   20   A.   Well, I want to say probably less -- maybe a year, Ryan.

21   Do you remember?  I don't remember, to be honest with you.

22   Maybe a year.

23   Q.   About a year.  What was going on with his mouth during that

24   year?  Did he have temporary teeth or anything?

01:28   25   A.   No, we tried to put temporaries in there, and,

1   unfortunately -- first of all, for the first part of the

2   treatment he didn't have the vestibule, so until he went and

3   had the vestibuloplasty done by Dr. Machado, and we had to wait

4   almost two, three months for that to heal, and then we started

01:29  5   the work.  I believe it was right after Dr. Machado gave me the

6   thumbs up and said go ahead, we started to do the insertion in

7   his mouth.

8   Q.   So is it your understanding that from the time that Ryan

9   was injured up until about a year ago that he was without

01:29  10  teeth?

11  A.   That's absolutely correct.

12  Q.   These surgeries and various -- the vestibuloplasty you

13  mentioned, are these painful procedures?

14  A.   Probably the most painful procedures you'd ever do in

01:29  15  dentistry.  Root canal has a bad rap.  I think this is way, way

16  more severe, taking a piece of your -- you have a pizza burn in

17  your mouth, burn a little tissue on the roof of your mouth.

18  Imagine taking a big chunk out of the roof of your mouth on

19  both sides at the same time.  I mean, that's about as bad as it

01:30  20  gets.

21  Q.   And the disfigurement, obviously Ryan didn't have any sort

22  of teeth for quite sometime?

23  A.   You know, it was funny.  We became friends after awhile.  I

24  mean, you can't help but to like this guy.  So I asked him, I

01:30  25  said how are you dealing with this?  He just smiled.  And I

```
       1   said are you going out at all?  I could tell it was hitting him
       2   pretty hard, not only the lack of teeth, but his smile, his
       3   face on the left side looks uneven, and he has no feeling on
       4   that side of his mouth either, so he can't really tell.  It's
01:30  5   the feeling of when you come from the dentist and your face is
       6   numb and you can't wait for that feeling to go away except it's
       7   there all the time.
       8   Q.  You keep mentioning that.  Paresthesia?
       9   A.  Paresthesia.
01:30  10  Q.  And where is that exactly in Ryan?
       11  A.  Well, if you want to go back to this picture here, I'll
       12  show you what happened here, this one.  There's no
       13  number -- it's 105-553.
       14  Q.  Let's see if we can go back to -- what's the number,
01:30  15  Dr. Kohani?
       16  A.  105-003.  That's fine.  Right there.  Before.  There you
       17  go.
       18     So if you look at that circle here, that little hole.
       19  Q.  Uh-huh.
01:31  20  A.  That's called the mental nerve, the mental foramen.  So the
       21  nerve actually comes out of that area, and it starts to go on
       22  the surface, and it starts to cover up and protect, actually
       23  enervates all your lip and the area around your chin.  And from
       24  his injury, I believe he -- that nerve was cut.  Because when
01:31  25  he came to my office, it was a long time after the procedure
```

1   was done, and he still had -- usually you expect that numbness

2   to go away within a few weeks, sometimes a few months, but if

3   the feeling hasn't come back after a year or two, you're not

4   going to get that back again.

01:31   5   So that's -- so somewhere after the injury, that nerve or a

6   branch of that nerve was damaged.  And that's what caused him

7   to have numbness in that side of his face.

8   Q.   And the numbness is on the left portion of his mouth?

9   A.   The left side of his face, yes.

01:31   10   Q.   The prosthetic that you built, the bridge portion, how long

11   did that take?  You mentioned the planning process.  How long

12   did it take to design this thing and actually get it built?

13   A.   We actually brought the team to the office, and we started

14   the work in the office.  Took us pretty much the whole morning

01:32   15   just to get the framework and everything dialed in, and then

16   they took it back to the lab, and it took him probably several

17   weeks, three to four weeks, to design the substructure, and

18   then he came back.  We tried it in, to verify the bite, make

19   sure everything is done, and then he went back to the

01:32   20   laboratory.  It was a Zirconium substructure, and they put

21   porcelain on top of it, and I believe Ryan made a trip there a

22   couple of times for them to help him decide what kind of color

23   and shape and things like that.

24   Q.   So there was some test fittings that took place?

01:32   25   A.   Definitely some test fittings, some trials to make sure

1    things are fitting right, and then to his satisfaction too.

2    Q.   And I think you mentioned the last time you saw Ryan was a

3    couple of -- a month or so ago?

4    A.   Yeah, I believe -- well, he came in twice.  The first time

01:33   5    he came in, he had fractured a piece of the bridge.  It was

6    literally after a few weeks or a month of putting it in, and,

7    again, it was part of him trying to figure out where those

8    teeth are.  You and I when we bite down, as soon as our lower

9    front teeth touch the back of the upper front teeth, it's

01:33   10   giving us a sensation of knowing.  It's called -- the reflex

11   system, so we know where the teeth are, we know where the jaw

12   is.  When you lose that area, you lose that sensation.  It took

13   him a while.  I think we told him it was going to take a while

14   to learn how to find out where his teeth are.  So he's not just

01:33   15   banging into his teeth when he's biting, and so within the

16   first few months -- was it a few months?  I don't remember, but

17   he came in he fractured off a piece, so then we had to take the

18   bridge off, send it back to the laboratory, and then they went

19   ahead and repaired it and sent it back within a couple of days,

01:33   20   and we were able to get it back.

21   Q.   So he's already just in the few months that he's had the

22   prosthetic bridge been back to you because it broke?

23   A.   Yeah, that's correct.

24   Q.   And you're saying because he can't really tell how hard

01:34   25   he's biting down?

A.   It definitely takes some time to get used to that.  It's

hard for me to guess what he's going through, but that's my

best guess was when you don't have nerve endings in the front

and you don't have any feeling of where those teeth are, you're

01:34   probably going to end up biting or forcing those teeth together

a lot more than you would if you had nerves and ligaments

around the teeth.

Q.   Okay.  The cleaning that Ryan was in for about a month ago,

how is his oral hygiene and dentist visits different than mine

01:34   or yours?

A.   Oh, well, it's different because you've got to work around

the prosthetics.  And the picture.  Can you please put that

picture up for me of the lower bridge with the lips retracted?

Right there.  That's in your hand.  I see it.

01:34   Q.   I think it's 106-2.

A.   There you go.  If you take a look here, you'll see that

there's only several areas right there, right there, that

there's a little access that he can go underneath those areas

to try to keep that bridge clean.

01:35   Q.   With what?

A.   With a little small little Proxabrush, a water jet, using a

floss threader.  It's pretty difficult, but it can be done.

     So we went through that with him, and I said you've really

got to get in there and try to manage your way around and try

01:35   to keep these things as clean as you can.  You have to come

1    back two, three times, maybe minimum three times a year, to

2    have your professional cleaning, and we can actually remove the

3    bridge, get everything cleaned up, and put it back in there for

4    you.  And he -- he was trying to do his best, but it's hard,

01:35    5    it's challenging.  These restorations are very challenging.

6    Q.   And his restoration in particular because it was a bridge

7    of multiple teeth put together as opposed to individuals?

8    A.   That's correct.

9    Q.   If he were to just have individual implants, would he be

01:36    10    able to floss and whatnot in between?

11    A.   I would say at least ten times easier, ten times easier.

12    Q.   Okay.  Have we now covered your course of treatment with

13    Ryan over the past couple of years?

14    A.   I think so.  I believe so.

01:36    15    Q.   Can I have Exhibit 104, please?

16        You obviously expect to be paid for the work that you've

17    done in Ryan's mouth?

18    A.   Hopefully.

19            MR. LASKE:  We would object to this exhibit.  Even

01:36    20    though it's dated December 1st, which I believe was 12 days

21    before the initial trial, we got that on February 21st of this

22    year.  I don't know why it took so long, and I noticed the last

23    entry on it is from May 4th of 2016, but, again, we got it

24    seven days ago.

01:36    25            THE COURT:  I thought that the two of you told me to

1    begin with that there really wasn't a dispute over bills, that

2    the government was stipulating to the --

3         MR. LASKE:  For this doctor.  This is the only one we

4    didn't stipulate to.  The other bills --

01:37    5         THE COURT:  Why wasn't this?

6         MR. CHAMBERS:  This was exchanged.

7       You've had this for ages.

8         MR. LASKE:  On the 21st.  That's when I -- unless you

9    have a different date.

01:37   10         MR. CHAMBERS:  I don't have a date in front of me, but

11   you've had it for ages.

12         MR. LASKE:  The date that I'm aware of, we got an

13   email seven days ago saying this is 104.

14         MR. CHAMBERS:  That may be.  You've had this document

01:37   15   forever.  Maybe it wasn't included in our initial witness list

16   and that's what we were sending over.

17         MR. LASKE:  The document that we have is three pages,

18   and it's from Mr. Kohani -- or Dr. Kohani's deposition, and

19   it's different --

01:37   20         THE COURT:  What was the amount at the time of the

21   deposition?

22         MR. LASKE:  The amount at the time of the deposition

23   was I think like 111, but there were different charges on it,

24   and even though you say it's three pages, I think it's only

01:37   25   two.

         1          MR. CHAMBERS:  There was one that was omitted.  I

         2    apologize.  When we scanned it in, there's a second page that

         3    didn't get scanned.

         4          MR. LASKE:  We don't even have that or at least in the

01:37    5    binder?

         6          THE COURT:  You were given -- you were given notice of

         7    111,000 in bills?

         8          MR. LASKE:  Yes, but my understanding is what's been

         9    produced more recently, some of these charges have been

01:38   10    changed, some have been taken away, I think some additional

        11    ones have been added potentially.

        12          THE COURT:  Is this different from the first bill?

        13          MR. CHAMBERS:  No, there was -- at his deposition,

        14    Ryan hadn't yet had his full porcelain portion put in, so that

01:38   15    was yet to be done at the time that Dr. Kohani was deposed.  We

        16    provided them with a statement following that showing the full

        17    amount of the charges.  There was a prior version of this.

        18          THE COURT:  When was that statement provided?

        19          MR. CHAMBERS:  I can go back and look, Your Honor, and

01:38   20    get that for you.  I don't recall offhand.

        21          THE COURT:  It seems like there's a misunderstanding.

        22    Plaintiffs were saying that they provided this, and then have

        23    re-provided it recently again, but if I'm following what

        24    counsel says, Mr. Laske, he says he gave it once before.

01:38   25      Mr. Chambers, is that this particular document that lists a

1    total of 119,000?

2          MR. CHAMBERS:  He's been provided several iterations.

3    There was one at the deposition.  There was one shortly after

4    the deposition.  There was one shortly before the last trial.

01:39    5    And then this one was included with our exhibits in this one.

6          THE COURT:  So here's a problem I'm having, Mr. Laske.

7    If it was apparent that there was going to be ongoing

8    treatment, then obviously, you know, they have a duty to

9    supplement their disclosures to you and show you that the

01:39    10   amount has gone up, not just freeze everything in time and not

11   continue on the treatment.

12         MR. LASKE:  I understand, Your Honor.  I just -- maybe

13   my recollection is a little off, but I just recall that the

14   bill that we've been working off of and we've been discussing

01:39    15   with our experts, when we showed them 104, they had never seen

16   it.  So but --

17         THE COURT:  What is different on this bill from the

18   one that was produced to you that said -- I mean, there's --

19         MR. LASKE:  There were some post-op checks that were

01:39    20   charged.  There were four or five.  Now they're not on this

21   bill, at least --

22         MR. CHAMBERS:  There could be --

23         MR. LASKE:  There could be page 2.

24      There was a charge for a legal report.  There were a couple

01:39    25   charges for calls between Dr. Kohani and the life care planner,

1    which I don't think is medical care, and then I think there

2    were some other things, but --

3              MR. CHAMBERS:  Your Honor, I can explain.

4              MR. LASKE:  I can tell you the bill I've seen last was

01:40   5    around 111, but it didn't include the last two charges which by

6    themselves total almost 5,000, so --

7              THE COURT:  Wait.  The last two charges on this

8    page -- oh, I see.

9              MR. LASKE:  The last version I saw for May 4th, 2016,

01:40   10   they were blank because I don't know that he had performed the

11   work yet.

12             MR. CHAMBERS:  That's right, he hadn't.

13             THE COURT:  So the porcelain ceramic crowns had not

14   been put in yet?

01:40   15             MR. CHAMBERS:  That's correct.  He'd done all the

16   other work.  It was just a matter of actually fitting him with

17   the prosthetic.

18             THE COURT:  Did you ask the doctor at the deposition

19   whether there was -- it was contemplated there'd be additional

01:40   20   dental work going forward?

21             MR. LASKE:  He mentioned he was about to do that.

22             THE COURT:  Yeah, okay.  The objection is overruled.

23   Check your notes and check what you gave him.  Make sure that

24   you did.  I'm not trying to blow this off.  It's important that

01:41   25   these disclosures be made and they be supplemented when things

1  change, but we're not very far apart on what you were last told

2  and what we're being told today, and in light of the fact that

3  the doctor testified at his deposition, which was -- when was

4  the deposition?

01:41  5        MR. CHAMBERS:  Almost a year ago.

6        THE COURT:  Yeah, that it was contemplated that

7  there'd be additional procedures.  This is not prejudicial to

8  the defendants.  Overruled.

9     Go ahead.

01:41  10       MR. CHAMBERS:  Thank you, Your Honor.

11  BY MR. CHAMBERS:

12  Q.  I think I left off, you expect to be paid for your work on

13  Ryan?

14  A.  Yes.

01:41  15  Q.  And the work that you performed to date over the past

16  two-plus years, has that been reasonable and necessary as a

17  result of the injuries that Ryan sustained?

18  A.  Absolutely.

19  Q.  And the charges that you've charged are reasonable?

01:41  20  A.  Yes.

21  Q.  And customary?

22  A.  Yes.

23  Q.  Can I see page 2 of Exhibit 104, please?  Page 3, I'm

24  sorry.

01:42  25     So if we're looking on the screen here, and I'm happy to go

1    back if you want to look at any individual item, but it looks

2    to me like there's a total outstanding balance of $113,105.

3    A.   Okay.

4    Q.   Does that sound right to you?

01:42    5    A.   Yeah.

6    Q.   And that's the amount that's current and outstanding that

7    you expect to be paid?

8    A.   That's correct.

9    Q.   For all the work that you performed?

01:42    10    A.   That's correct.

11    Q.   And then, in addition, if you go up above that, it looks

12    like Ryan made a payment of $6,000?

13    A.   I had him pay part of the lab fee when the lab technicians

14    came into the office, so this was back in -- I think it was

01:42    15    pre-delivery of the upper appliance.  He made a payment of

16    $6,000 to cover the hard cost of all the materials, the

17    abutments, and all the gold pieces that we had to get for the

18    upper ridges and whatnot.

19    Q.   So the total, it looks like, between the two of these, you

01:42    20    would simply add the 6,000 to the 1 -- or, excuse me, 113,000

21    for a total between Ryan's out of pocket and the amount that

22    you're owed is $119,105?

23    A.   That's correct.

24    Q.   And you mentioned earlier that you agreed to treat Ryan on

01:43    25    a lien?

|  |  |  |
|---|---|---|
|  | 1 | A.   Yes, I did. |
|  | 2 | Q.   Does that at all affect the treatment that you provide? |
|  | 3 | A.   No, it doesn't. |
|  | 4 | Q.   Does it influence at all any of the recommendations that |
| 01:43 | 5 | you've made in his case? |
|  | 6 | A.   Not at all. |
|  | 7 | Q.   How come? |
|  | 8 | A.   It shouldn't.  He's still a patient, he's still deserves to |
|  | 9 | be treated just like everybody else does.  If I decide to |
| 01:43 | 10 | accept a lien, that shouldn't affect the outcome of his |
|  | 11 | treatment or what I decide to do.  I mean, I try to keep |
|  | 12 | everything conservative.  I recommended what was necessary.  I |
|  | 13 | told him not to put the implants on the upper left after those |
|  | 14 | teeth were removed.  So I -- not only -- I had his best |
| 01:43 | 15 | interest at heart the whole time, I did. |
|  | 16 | Q.   And in addition the past treatment that you provided, |
|  | 17 | you've also made some recommendations to our life care planner |
|  | 18 | about what future dental work Ryan may need? |
|  | 19 | A.   That's correct. |
| 01:43 | 20 | Q.   All right.  I'd like to walk through that with you, if I |
|  | 21 | could.  Can I get Exhibit 66 up just for reference?  If we can |
|  | 22 | go to page 2. |
|  | 23 |      All right.  I'm just going to walk through some of these |
|  | 24 | and make sure that we're on the same page. |
| 01:44 | 25 |      If you look down about two-thirds of the way, there's an |

1  item on the left under the "Care Need" column entitled

2  "Dentist"?

3  A.   Uh-huh, yes.

4  Q.   And it looks like there's a recommendation here for an

01:44  5  additional visit a year --

6  A.   That's --

7  Q.   -- for dental cleanings?

8  A.   That's correct.

9  Q.   And then this periodontal cleaning with removal and

01:44  10  replacement of the prosthetic bridge, what's that?

11  A.   Basically unlike you and I -- I haven't looked into your

12  mouth, but most people that come in, they have their dentition

13  intact.  It's a normal procedure where the hygienist will go

14  through the mouth and cleans everything and scales and polishes

01:44  15  everything, and you're done.

16      In his case, you can't.  You have to remove the

17  restoration, remove the prosthetic, remove the abutments, and

18  then replace the abutments, torque everything down to the

19  proper torque, and then cover it back up, and put the bridge

01:45  20  in, and clean up the cement.

21      So, actually, I mean, you think about the work that goes

22  into it.  We try to come up with something that's reasonable.

23  I wasn't assuming that he was going to have the work done in my

24  office because all along, he'd been telling me he wants to move

01:45  25  to Wisconsin, so I figured, you know, somewhere along the line,

1    he's going to have to find someone out there that's going to do

2    these services, and that's typically the fee that most people

3    charge for a procedure like that.

4    Q.   And that's 800 to $1200 everything 18 to 24 months to have

01:45    5    this full cleaning?

6    A.   That's correct.

7    Q.   Down at the very bottom of this, there's a recommendation

8    for a polish of the veneer every seven to ten years?

9    A.   Yes.

01:45   10    Q.   What is that?

11    A.   Porcelain veneers, just like a nice car, after a while, the

12    varnish on the paint goes away, you've got to take it in to

13    have them detail it.  And that's what we're going to do, have

14    him come in and basically polish and go through the entire

01:46   15    series of polishing in sequence and get all those restorations

16    polished up so he doesn't lose his luster.  After a while it

17    gets rough and sticks to your lips when you talk, and it

18    doesn't have that nice shine that it first has when it comes

19    out of the laboratory.

01:46   20    Q.   And that's a recommendation every seven to ten years?

21    A.   It's an estimate depending on his lifestyle and depending

22    on -- you know, it could be more or it could be less, but

23    that's just a guesstimate.

24    Q.   Okay.  Can we go to the next page, please?

01:46   25        So up at the top here, the first two categories, the future

 1   replacement of implants and the future replacement of abutment

 2   crowns, before I even dive into what that is, can you just

 3   describe to me what the difference between an implant and

 4   abutment or crown is?

01:46   5   A.   Well, the implant is the titanium screw that we're talking

 6   about, so that's the fixture that goes into the bone.  The

 7   abutment is the interface between the implant and the

 8   restoration, which could be a crown or a bridge.  So if you

 9   lose a crown, as long as the abutment and the implant are okay,

01:47  10   you just replace the crown.  If you lose an implant, everything

 11   has to go because they're all inner linked and inner connected.

 12       So let's say if you lose the upper left implant, because

 13   the structure -- I'm sorry, lower one.  Sorry.  Let's say if

 14   you lose one of the implants on the lower.  Because that

01:47  15   substructure is connected to all the implants, that

 16   substructure has to be redone.  If you redo the substructure,

 17   the bridge has to be redone.  Unfortunately, that's the nature

 18   of the beast.  If those teeth were replaced individually and he

 19   had -- then depending on if any of them had a problem, you'd

01:47  20   take care of the one that has a problem.  You'd leave the rest

 21   of them alone.  That's how I practice in my office.  Let's not

 22   leave things interdependent of each other, so if something goes

 23   wrong here, the other stuff is still okay, you leave that

 24   alone.

01:47  25       But in his situation with the lower bridge, it's a

1    one-piece prosthetic that goes over, and if any of those

2    abutments go -- again, depending if the rest of them are good,

3    I don't know, if it's the end one that goes, makes a big

4    difference.  If it's the middle one that goes, it may not make

01:48  5    a big difference.  So when I came up with this recommendation,

6    I actually did spend some time looking.  I called a few of my

7    colleagues.  I called the president of the International

8    Academy of Dental Implantology, Dr. Lee, and I asked him, and I

9    said give me some ideas of the longevity of these things in

01:48  10   your hands.  And somewhere along the line, even between that

11   and what I've seen just from research, you talking anywhere

12   from 50 to 67 percent of these implants will develop some type

13   of a peri-implantitis or mucositis within five years.  And

14   these studies are all done with implants that are individually

01:48  15   placed, not with implants that are connected together with

16   substructure which makes it almost impossible for him to keep

17   it clean.

18        And in one of the studies, if you take a look, they even

19   talk about issues as having lost two to three millimeters of

01:48  20   bone around an implant, and they would consider that an issue.

21   Well, two to three millimeters of bone around his implant is

22   almost 30 percent of the height of the implant.  That implant

23   is pretty much on its way out.

24        So I try to come up with a number that I thought was --

01:49  25   given the fact that he's young, if -- God willing, he lives to

01:49

1    be in his 70s or 80s, you're talking another 50 years of life

2    to spend to get out of these, 60 years of life to get out of

3    these, realistically speaking.  Do I think it needs to be

4    replaced?  I think every ten or 15 years, I bet you some of

5    them are going to go, and so that was really not just a guess.

6    It was more of an educated guess after speaking with a few

7    other people that do nothing but implants for a living.

8    Q.  Let me make sure I understand what you're recommending

9    here.  There's 12 implants in Ryan's mouth total?

01:49

10   A.  Correct.

11   Q.  And you're saying of those 12, approximately half or six

12   over the course of the next ten or 15 years are going to

13   develop some issues that will likely require their replacement?

14   A.  Maybe not replacement, maybe just some repair.  I put in

01:50

15   here if it's possible to remove an implant or you may have to

16   repair an implant, depending on how bad it is and how fast we

17   caught it.  There's a lot of things that play an important role

18   into that.  I mean, his oral hygiene and smoking.  I understand

19   Ryan's smoking now.  He wasn't smoking before.  And I told him

01:50

20   this last time I saw him, I said I'm telling you, you want

21   these implants to last.  And he's dealing with a lot of stress.

22      And I can't imagine.  I mean, so I told him, I said look,

23   whatever you need to do, make sure you take care of that

24   because if this stuff keeps up, you will start to lose more

01:50

25   attachment of the bone.  One of the number one causes of

1    implant loss is hygiene and smoking.  And then you're talking

2    diabetes and things like that.  So if he can control that.

3    Q.   So you're saying because it's difficult for Ryan to

4    maintain oral hygiene given the prosthetics that he's got, he's

01:50   5    more likely to get peri-implantitis or mucositis or some other

6    oral diseases?

7    A.   That's right.

8    Q.   And then those diseases in turn can lead to degradation of

9    the implant?

01:50   10    A.   That's right.  One of the reasons why implants became so

11    popular was because we didn't want to do bridges anymore.

12    Because we knew that once I do a bridge, you pretty much are

13    done with the other two teeth.  It's just a matter of time

14    because you can't clean them.  It's impossible to clean them.

01:51   15    So they're just going to get bigger and bigger.  So, again,

16    doing everything we could, trying to keep his mouth --

17    individually restoring the teeth, unfortunately, that wasn't an

18    option, so the next best option was this design, and this

19    design is inherently -- has a lot of challenges.  One of the

01:51   20    biggest ones is for him to be able to get in there and get it

21    clean.

22        So that's why I recommended an extra cleaning a year, and

23    maybe once every so often take the whole thing off, clean it,

24    put it back in.  I said I know it's an extra expense, I know

01:51   25    it's extra work, but if you do this, you can probably expect

1   these implants to last you longer.  If you don't do these, and

2   based on everything that I've seen, you're talking probably in

3   the ten or 15 years, you're going to have some mucositis or

4   peri-implantitis around these implants.

01:51   5   Q.   How does the numbness and paresthesia -- I can't say that

6   word.

7   A.   Paraesthesia.

8   Q.   Thank you.  How does that factor into Ryan's potential

9   susceptibility to peri-implantitis and other oral issues?

01:52   10   A.   Not having the ability to have any feedback is bad.  You

11   and I, when we have pain or we have sensation or something

12   going on, it tells us that you're aware, and I don't really

13   know how much you'd probably need to talk to a neurologist to

14   really get to the level of how much does he really feel.

01:52   15       From my understanding, he has no feeling.  As a matter of

16   fact, when you talk to him and look at him, you can see the lip

17   is much higher on that side of the face.  It actually shows in

18   one of the photos that I've given you, so he doesn't have

19   sensation in that side of his face, so how important is that in

01:52   20   his inability to know if the teeth are -- you know, if there's

21   infection in there, if the infection has to get to a level

22   before he knows that the infection is there, so that's -- that

23   was probably an important factor to consider into when I came

24   up with the frequency of the replacement for the implants.

01:52   25   Q.   And then the prosthetic bridge that we see in the third

 1  line there, what's that?

 2  A.   The bridge is that one-piece ceramic bridge that you had in

 3  your exhibit that goes over the gold post.  No, that's on the

 4  lower.  It's the upper one that's just a white bunch of teeth

01:53  5  stuck together.  That one.  Right.

 6  Q.   106?

 7  A.   That's right.

 8       So the problem with that is that because it's a one-piece

 9  bridge, if anything ever happens to any of those teeth again,

01:53 10  if it's something that can be repaired, obviously, you repair

11  it first.  If he breaks through the center of that

12  substructure, you have no choice but to replace the whole thing

13  because it can't be welded back on.  Zirconia can't be mended.

14  So, unfortunately, that's the nature.  So we use Zirconia

01:53 15  because we know that on the lower arch, it has a lot of

16  implants, and those implants can generate a tremendous amount

17  of force.  The upper arch is more flexible, more soft, so we

18  knew that what's going to win is the lower arch is going to win

19  when it comes to the forces and fight between the two arches.

01:54 20       So we decided to use Zirconia on the upper arch to give him

21  a little better strength to he doesn't have to replace it as

22  frequently.  But, then again, you look at the literature,

23  national average in this country for replacing a crown is 5.2

24  years.  That's when insurance companies allow you to change a

01:54 25  crown after five years because they know that -- I'm not saying

1    that I change my crowns after five years.  I'd probably look

2    for another profession if that happened, but that's the

3    national average.  If you have a crown done in my office today,

4    in five years your insurance company will authorize me to put

01:54   5    another crown because they know they probably should be

6    changed.  So if that's the national average, you know, who am I

7    to tell you he's going to be less or more than that?  I'm just

8    going by what research or statistics are put in front of me.

9    Q.  So you're simply saying over the next 40 or 50 years of

01:54   10   Ryan's life that both the top and bottom will have to be

11   replaced two times?

12   A.  In 50 years, I believe that's a pretty fair number, a

13   couple of times.  He'll probably have to get them replaced a

14   couple times.  Yeah, that's a pretty conservative number.

01:55   15   Q.  That can be a result of the loss of implant due to oral

16   disease that we talked about a few minutes ago?

17   A.  That's the developing infections around those abutments,

18   having tissue loss, you may have to go back and add some more

19   tissue around those areas because there's no keratinization

01:55   20   left in that area, and with that blood supply and everything is

21   compromised.  So those are some of the things that we have to

22   constantly monitor to make sure it doesn't get into the

23   infection state.

24   Q.  Let me ask you, if an implant has to go, for whatever

01:55   25   reason, and you have to replace the implant, can I still use

1   the same prosthetic bridge that I used before?

2   A.   Good question.  Depending on which implant it is.  If it's

3   the -- if it's the end implants, then now you're talking about

4   having a greater cantilever, which is me standing here with my

01:55   5   arm out, and somebody's going to sit on my arm.  How long can I

6   hold this weight?  Now, if I have an implant close to that

7   site, I might be able to leave it alone and not touch the crown

8   or the bridge part and just -- maybe just bury the implant and

9   don't even touch it, right?  If it's an implant in the middle

01:56   10   of -- which is the one that supports most of the force, now you

11   have to remove the bridge, graft the area, wait for it to heal,

12   come back, put another implant in there, and make him another

13   substructure, and start all over again.  So it really depends

14   on which implants fail and where they are with respect to his

01:56   15   occlusion.

16   Q.   And then certainly another reason for the bridge to fail

17   would be if, you know, like what happened before, if a tooth

18   gets chipped or knocked out or anything like that?

19   A.   That's correct.

01:56   20   Q.   Okay.  And the costs that are listed there on the future

21   replacement of implants and the future replacement of abutments

22   and crowns as well as the prosthetic bridge, those are all

23   reasonable in your opinion?

24   A.   They are reasonable.  Again, I'm not sure where he's going

01:56   25   to end up in 50 years or hopefully I'm not going to be around

1   practicing anymore, but that's a reasonable number.   I'm

2   looking at my colleagues, and the ones that are doing implants,

3   and these types of implants, not just single implants, and ask

4   them what type of fees they're charging.   I'm pretty much right

01:57   5   there with these guys, so --

6   Q.   And the diagnostics down at the bottom of the page there.

7   A.   Yeah.

8   Q.   What's that about?

9   A.   That would be -- that would include a CT cone beam.   I

01:57   10   would recommend that done every two years or so.   Again, it's

11   not -- there's no major radiation concern in that area.   It's a

12   CT cone beam, so the radiation is confined to a very small

13   area, but the amount of information we get is priceless.   You

14   can look at the implant 360 degrees around and be able to tell

01:57   15   if he's starting any bone loss, where they are, and be able to

16   maybe jump in there and intervene before it gets too bad.

17       So that's really, really important as part of his checkup.

18   Every couple of years, every two, three years, he should have

19   it done.

01:57   20   Q.   And then speaking of maintenance, if we go to the next

21   page, it looks halfway or three-quarters of the way down there,

22   "Miscellaneous Equipment."   This looks like just various

23   hygiene products to make sure he can maintain things at home?

24   A.   I recommended a water pick to him, and then there's a

01:58   25   couple of different electric toothbrushes that I like that

1   helps him.  I don't know where that electric razor came in.  I

2   don't think -- but yeah, he should shave probably.  I'm not

3   sure where that electric razor thing --

4   Q.  But at least with respect to the dental-related things?

01:58   5   A.  Yeah.

6   Q.  The water pick and the toothbrush and whatnot?

7   A.  That's correct.

8   Q.  And the cost and frequency.  Okay.

9   A.  Yeah, that seems fair.

01:58   10   Q.  I've shown Dr. Kohani a number of pictures I'd like to

11   offer in evidence.  We can do it now or later.

12          THE COURT:  Have you shown them to counsel?

13       You don't oppose admission of these photos?

14          MR. LASKE:  There's only one really I have a question

01:59   15   about just because I don't recall.

16       Was this produced in discovery?

17          MR. CHAMBERS:  It was produced at his depo.

18          MR. LASKE:  Okay.  It's fine, Your Honor.

19          THE COURT:  All right.  Without objection.  What

01:59   20   numbers on the exhibits?

21          MR. CHAMBERS:  There's a series.  82, 83, 86, 100, 97,

22   96, 76, 69, 98, 106, 105, 104, which is the billing, 95, and

23   78.

24          THE COURT:  Without objection, those exhibits are

02:00   25   admitted.

```
 1    (Exhibit 82 admitted.)

 2    (Exhibit 83 admitted.)

 3    (Exhibit 86 admitted.)

 4    (Exhibit 100 admitted.)

 5    (Exhibit 97 admitted.)

 6    (Exhibit 96 admitted.)

 7    (Exhibit 76 admitted.)

 8    (Exhibit 69 admitted.)

 9    (Exhibit 98 admitted.)

10    (Exhibit 106 admitted.)

11    (Exhibit 105 admitted.)

12    (Exhibit 104 admitted.)

13    (Exhibit 95 admitted.)

14    (Exhibit 78 admitted.)
```

02:00  15         MR. CHAMBERS:   Thank you.

16    I don't have any further questions.

17         THE COURT:   Cross-examination.

18                    CROSS-EXAMINATION

19  BY MR. LASKE:

02:00  20  Q.   Good afternoon, Dr. Kohani.

21  A.   Good afternoon.

22  Q.   So you opined in your report that teeth number 10 and 11

23  were super erupted and they were basically rendered useless?

24  A.   That's correct.

02:00  25  Q.   And super erupt is another way of saying the teeth have

 1  dropped down out of the bone?

 2  A.   Yeah, there was nothing to stop them from growing, so they

 3  super erupted into the mouth toward the opposite arch.

 4  Q.   And as a result, you removed teeth number 10 and 11,

 5  correct?

 6  A.   That's correct.

 7  Q.   You stated when it came to pulling a third tooth

 8  potentially, tooth 12, I think in your depo you said,

 9  "Honestly, I didn't want to remove anymore teeth from this

10  guy"?

11  A.   That's correct.

12  Q.   But you never looked at the dental records of Dr. Jon

13  Cassell, the dentist who treated plaintiff about six months or

14  so before his accident, did you?

15  A.   I don't think I had that record, no.

16  Q.   So you never saw the X-rays taken by Dr. Cassell in

17  November of 2012, correct?

18  A.   I don't believe I did.

19  Q.   And if a tooth drops down out of the bone, will the tooth's

20  contact be tight and resist floss?

21  A.   It really depends.  It depends on the tooth, it depends how

22  much bone you have around it and whatnot.  Contact is usually

23  not something that we consider when it comes to evaluating the

24  amount of super eruption in the tooth.

25  Q.   Did you attempt to inspect that when you were treating

1    Ryan?

2    A.   Inspect the contact between the teeth?

3    Q.   Yes.

4    A.   I honestly don't see the significance of evaluating the

02:02    5    contact between two teeth when there's eight millimeters --

6    Q.   It's just a yes-no question.  I was wondering if you did

7    it.

8    A.   No, I didn't, no.

9    Q.   And plaintiff's teeth at number 10 and 11, were they

02:02    10    touching each other normally?

11    A.   They were touching each other normally?  No, they were not.

12    Q.   And the teeth at number 11 and 12, were they touching each

13    other normally?  I asked about 10 and 11.  Now I'm asking about

14    11 and 12.

02:02    15    A.   They're touching each other, but what's normal for his

16    mouth normal or -- I really don't understand your question.

17    Q.   Normally for any patient.

18    A.   Okay.

19         THE WITNESS:  If -- may I explain this, Your Honor?

02:02    20         THE COURT:  You may.

21         THE WITNESS:  If you take a look at what's called the

22    marginal ridges of the teeth, you take a look at the marginal

23    ridge between tooth number 12 and number 13, that's the center

24    of the tooth.  You draw a line.  You can see that tooth number

02:02    25    13, the marginal ridge is below tooth number 12 by at least

two, two and a half, to three millimeters.  You take a look at

the marginal ridge between tooth number 13 and 14, they're

perfectly even.  You look at the marginal ridge between 14 and

15, they're perfectly even.  That's the marginal ridge right

02:03   here.  When you come up between number 12 and 13, there's a

huge step up, and then you follow that with number 11.  You can

see that number 11 and 12 are almost at the same height.  And

then you can see number 10 is also super erupted about six

millimeters into the arch.

02:03       So to answer your question, do the contacts are normal,

normal in respect to each other, yes, but normal with respect

to the adjacent teeth, no.

BY MR. LASKE:

Q.   Okay.  For the record, I'd like to direct your attention,

02:03   which we'll pop up on the screen in a second, Exhibit 471, page

1.  And these are the X-rays that were taken by Dr. Cassell in

November 2012.  I think that's roughly seven months before

Ryan's accident.

    Can you please identify teeth 10 and 11?  And I'd like to

02:04   now direct your attention to Exhibit 443, page 3.  Can you, for

the record -- or can you circle teeth 10 and 11?

        MR. LASKE:  For the record, I'm directing the witness

to a side-by-side enlarged view of both teeth number 10 and 11

showing the pre-accident and the post-accident X-rays.

02:04   BY MR. LASKE:

1   Q.   Isn't it true that teeth number 10 and 11 are identical
2   positions?
3   A.   Absolutely not true at all.  You're comparing a panoramic
4   view which is taken on a radius versus a PA, which is taken on
02:04   5   a flat level.  If you know physics, you know you cannot compare
6   those two images because they're not on the same space.  When
7   you take a panoramic view, the X-ray is going around the
8   patient's head almost in a 360 degrees, which causes
9   distortion.  You don't have the same exact level of
02:05   10   measurement.  That's why these X-rays are never used to place
11   implants because you're almost always wrong.  A periapical is
12   just a two-dimensional image of a tooth that's taken
13   perpendicular to the film.  So there's no way you can compare a
14   periapical with a panoramic view unless that panoramic view is
02:05   15   taken in a CT which allows you to compare millimeter by
16   millimeter in all different dimensions.  So I can't answer your
17   question because this is not -- you can't draw --
18   Q.   So you're saying we can't compare these two?
19   A.   You can't because those images are taken at two
02:05   20   different -- in two different ways, and you can't compare a PA
21   versus a panoramic view of a tooth and make conclusions from
22   that.  You can't do that.
23   Q.   And you know that the -- which image was the panoramic?
24   A.   The one on the left side is a panoramic -- on the right
02:05   25   side is a panoramic.  The one on the left side is your PA.

1    Q.   You didn't take either one of these images?

2    A.   I don't have to.  I know enough about physics and

3    radiography to know that a panoramic view is never, ever

4    diagnostic enough to be used when it comes to knowing exactly

02:05   5    where teeth are in space because it's taken as the film goes

6    around your head.

7    Q.   I was just asking a simpler question.  Yes or no; did you

8    take these images?

9    A.   I did not take these images, no.

02:06   10    Q.   Did you subsequently take any images?

11    A.   Yes, I have.  The ones that Mr. Chambers was showing you.

12    Q.   And what is a CEJ?

13    A.   Cement to enamel junction.

14    Q.   What is that in --

02:06   15    A.   That's where the enamel and cement with the root meet

16    together.

17    Q.   And could you on Exhibit 471, page 1 -- can you point that

18    out, where that would be?

19    A.   On which picture?

02:06   20    Q.   On the one that's depicting teeth 10 and 11, where is the

21    CEJ?

22    A.   If you can make that bigger.  Well, I can tell you -- oops.

23    Can you erase that, please?  This would be the CEJ, and on the

24    canine, yeah, the CEJ would be right about there, so right

02:07   25    there, right there.

1   Q.   And between the two images, was there a change in the CEJ?

2   A.   Between the two images?

3   Q.   Yeah.

4   A.   Which two images?

02:07   5   Q.   The pre and post-accident images.

6   A.   Can you put the other one up so I can see it?

7   Q.   We can put the other one up.

8   A.   Again, it would be impossible for me to determine that

9   because I don't know what I'm comparing it to.  When a tooth

02:07   10   superior erupts, the bone comes with it, so you're trying to

11   measure something that's not constant.  You see the position

12   of -- when the tooth super erupts, the entire osseous area with

13   the tissue drops down with it, so --

14   Q.   Again, I think I'm asking something -- I am trying to ask

02:07   15   it a little simpler.

16        Can you point out in the other image, 443-3, where the CEJ

17   is?

18   A.   I guess your guess would be as good as mine in that image.

19   I can't tell you, but if I was going to guess, I'd say it would

02:08   20   be about here.

21   Q.   Okay.  So you're saying in this image, you can't tell?

22   A.   I mean, you can't compare.

23   Q.   I'm not asking you to guess.

24   A.   I can't, no, I can't, I honestly can't, no.

02:08   25   Q.   At this time, when is the last time you saw Ryan Moore?

1  A.   A few months ago, I believe.

2  Q.   Do we have any bills or records of that?  Have you produced

3  them?

4  A.   I think that was something that he just took care of his

02:08  5  own, right, Ryan?  It was not related to the accident.  He just

6  came in for a routine cleaning and maintenance, and that was --

7  I think he took care of that on his own.

8  Q.   But have you provided any records of that?

9  A.   You ask Mr. Chambers.  I don't really remember or have any

02:08  10  recollection of my records.

11  Q.   Because I don't have those records, so can you tell me the

12  date?

13  A.   I honestly don't remember.

14  Q.   Is it this year?

02:08  15  A.   Was it this year?  I don't think it was this year, no.

16  Q.   Was it fall of last year, summer?

17  A.   I believe it was around that time.  But, again, I honestly

18  can't remember my schedule.

19  Q.   And when you saw Ryan last, did he have any infections in

02:09  20  his mouth?

21  A.   He did not have any infections, but he had a lot of

22  irritation around the implants.

23  Q.   Does he currently have any broken teeth?

24  A.   Not that I'm aware of.

02:09  25  Q.   And when you saw him last, did he have any broken teeth?

1    A.   Not the last time he came for his hygiene visit, you mean?

2    No, otherwise I would have been informed.

3    Q.   Again, I don't have any records of it, so I don't know what

4    it was.

02:09    5    A.   From what I remember, Counsel, he came in once the tooth

6    was broken off, we repaired it, and then he came back for

7    follow-up visit, and then he came back for just a regular

8    cleaning hygiene visit.  That's all I remember from the last

9    maybe ten months.

02:09   10    Q.   I'm not trying to be vague or trip you up.  It's just

11    without any records, I kind of have to ask.

12    A.   Honestly, I don't recall exact specifics, but I can provide

13    it to you.

14    Q.   When the last time you saw Ryan, did you have to make any

02:09   15    adjustments for his bite?

16    A.   I can't recall.

17    Q.   After you originally put the crowns and bridge work in, did

18    you have to make any adjustments?

19    A.   Yes, we do, yes, we do.  We almost always have a few visits

02:10   20    of checking up unless, again, we took a lot of time to dial

21    everything in, so sometime --

22    Q.   Do you recall with Ryan if you had to do that?

23    A.   I don't remember.  If I did, it would be in my notes.  I

24    can't really remember.

02:10   25    Q.   Notes.  We're talking about medical records?

 1   A.   Yeah, my medical records, notes, progress notes.

 2   Q.   And so you don't remember how many adjustments you would

 3   have had to make or you had to make?

 4   A.   How many visits of adjustments, you mean?

 5   Q.   Yes, for the bite.

 6   A.   I honestly can't remember.  It's usually no more than a

 7   few.   Until he gets comfortable where he bites on, everything

 8   meets at the same time and the same consistency and the same

 9   amount of pressure.

10   Q.   How much did you charge for that?

11   A.   For the --

12   Q.   Any adjustments you had to make.

13   A.   I can't remember.  It's all written up in my chart.

14   Everything is documented.

15   Q.   So the exhibit we have is 104.  That isn't your current

16   bill then?

17   A.   I don't have that on my screen.

18   Q.   If it goes to May 4th -- if it goes to May 4th, 2016.  It

19   mentions, "Crown, porcelain, ceramic."  It doesn't mention

20   anything about adjustments after that.

21   A.   Okay.

22   Q.   So is there another bill out there?

23   A.   I have no idea.

24   Q.   Did you make any adjustments for cosmetic reasons after you

25   put in the crowns and the bridge work?

1   A.   I don't understand your question.

2   Q.   So potentially you can make an adjustment for the bite,

3   right?

4   A.   That's correct.

02:11   5   Q.   And potentially you can make an adjustment if the patient

6   doesn't like the way it looks?  Is there a way to adjust that?

7   A.   I mean, if the tooth are too long, it can make it shorter,

8   but once the teeth are done, it comes out, it's pretty much

9   done.

02:11   10   Q.   And all I'm asking again, I think these are simpler

11   questions.  Did you have to do it?

12   A.   I honestly don't remember if he did, but when the bridge

13   was delivered, we took enough time to make sure the bite is

14   comfortable, his speech is comfortable, and it's not

02:11   15   interfering with anything, and he may have come back once or

16   twice after that to check things up to make sure things are

17   holding up, no screws are getting loose, and then once we

18   realized things are stable and he's fine, there's no reason to

19   keep dragging him back to the office, but I honestly don't

02:12   20   remember when I saw him and specifically what I did, but it

21   should all be in my notes.

22   Q.   You don't remember one way or the other if you made

23   adjustments, or you remember adjustments, but you don't

24   remember when?

02:12   25   A.   Exactly.  I remember making adjustments.  I just don't

1    remember when it was.

2    Q.   Do you remember how many adjustments you had to make?  Was

3    it one?

4    A.   I don't recall.  I don't recall.

02:12    5    Q.   As of your last exam, did the plaintiff take good care of

6    his natural teeth?

7    A.   Yes.

8    Q.   And as of your last exam, did plaintiff take good care of

9    his porcelain teeth?

02:12    10    A.   He's doing the best that he could, yeah.

11    Q.   What is that?

12    A.   The best that he can.  I mean, he presented with plaque and

13    buildup and irritation and some, you know, gingivitis around

14    the implant crowns, but, again, that's expected.  I didn't

02:12    15    expect to see him and have meticulous home care all of the

16    sudden.  I expected to see some things.  That's why I told him

17    he should come in more frequently just to help himself stay on

18    top of this stuff.

19    Q.   Without the medical records, that's why I'm asking for a

02:13    20    little more explanation than just -- anything else that you

21    noticed?  Was there something that you saw that concerned you

22    at the time that you had to talk to him about his oral health?

23    A.   Not necessarily about his oral health, but I know I kept

24    talking about his lip and his numbness and whether he still has

02:13    25    any feelings that's coming back.  Those were the only things

1  that we discussed outside of, you know, how's the bite and

2  how's the teeth and are you getting out much?  Just small talk,

3  but no, I don't think I did much of anything after the case was

4  delivered.

02:13   5  Q.   And as of your last exam, was the plaintiff pretty

6  comfortable with his new porcelain teeth?

7  A.   He seems to be comfortable, yes.  You'll have to ask him

8  that.

9  Q.   In your deposition which was taken in April of last year,

02:14   10  you opined the plaintiff will need bridge work removed every 18

11  to 24 months for cleaning?

12  A.   That's correct.

13  Q.   But in your report I believe you put it would have to be

14  removed annually to be cleaned and properly maintained?

02:14   15  A.   Which one is it?

16  Q.   Yeah, which one?

17  A.   If you asked me if it was my mouth, I would remove it every

18  six months.  I'll be honest with you.  But logistics, and it's

19  not -- it doesn't make sense for him to go in and have

02:14   20  everything taken out because, again, if you want to make sure

21  that things are going to do what they do and he's not going to

22  end up developing any problems, you should visit that area more

23  frequently than let it go for maybe 18 months or two years, but

24  when I was questioned by that lady from the life, I understood

02:14   25  what they're trying ask me to do.  So I was trying to be very

1   fair about my guesstimates.  I didn't just throw numbers out

2   and say oh, yeah, he needs to have it every six months.  I said

3   probably if he's doing everything he should and if everything

4   goes well, I think once every 18 months to two years is a good

02:15   5   amount of time to remove something, clean it up, and put it

6   back together.  You're asking me what's better for him?  I

7   would say every six months, if he could.  If he was my family,

8   I would make him come to the office every six months, take

9   everything out, clean everything up, and put it back in because

02:15   10   it wouldn't cost him anything.  It's expensive.  It takes time

11   to do that stuff.

12   Q.   And you opined that plaintiff will need new implants every

13   10 to 15 years, correct?

14   A.   Not all new implants.  I said that there's probably a

02:15   15   chance that maybe half of his implants would have to be

16   replaced over his lifetime a couple of times.

17   Q.   Okay.  Isn't it true if the tissue is healthy and there's

18   no infection, there's really no reason to remove the implants?

19   A.   Absolutely true, if the tissue is healthy and there's no

02:15   20   infection, there's no reason to touch the implant.

21   Q.   When the plaintiff first saw you back in March of 2015, did

22   he have insurance?

23   A.   I don't recall.

24   Q.   Did your office ask if he had insurance?

02:16   25   A.   I assume they do, but when I saw him, I knew this was not

1    an insurance-related injury because his insurance would only

2    pay for one tooth to get fixed and he would be maxed out.  So

3    this was an accident-related case where I would have to kind of

4    postpone my fee, my payments, until this case was taken care

02:16    5    of.

6    Q.   Did you make any attempt to bill his insurance?

7    A.   I don't remember if I did.  I can look into the chart and

8    see if my office did or not, but, again, I don't recall.

9    Q.   And, in fact, Joel Berger, who preceded you, who was

02:16   10    originally going to do a lot of the work that you ultimately

11    performed, he did bill Ryan's insurance.  Did you know that?

12    A.   I knew that he billed some medical insurance or something,

13    but that has nothing to do with -- I'm doing the restorative

14    part of it, and Dr. Berger does the surgical part of it.

02:16   15    Dr. Berger does not restore teeth.  He just places the

16    implants.  I happen to place implants and restore implants, but

17    he did the surgical aspect, and then the only thing that I did

18    which is with regard to the surgery was uncover of the upper

19    implants and putting the healing caps in.  And even

02:17   20    though -- even though Berger should have probably done it the

21    first time around, but, again, I don't understand why he

22    didn't.  I'm sure he had his own reasons.  He's a very good

23    surgeon.  So when he came to my office, the lowers were already

24    exposed.  The uppers were not exposed, so I had to expose them

02:17   25    and put the healing caps in.

1    Q.   So your understanding is Dr. Berger wasn't going to play

2    any role in restoring the teeth?

3    A.   That's correct.

4    Q.   Who told you that?

02:17   5    A.   I've been working with Dr. Berger for several years in this

6    community, so I know Joel Berger is a maxillo, maxillofacial

7    surgeon, and he does not restore teeth.  He places implants in,

8    and he usually refers them to me or someone like me.

9    Q.   So you didn't bill any medical insurance at any time in

02:17   10   this case?

11   A.   I don't think so.  As a matter of fact, I'm almost positive

12   I didn't.

13   Q.   Is it your customary practice to not bill insurance if a

14   patient has insurance?

02:17   15        MR. CHAMBERS:  Your Honor, can I just object?  I don't

16   know that the presence or absence of insurance, even in a bench

17   trial, is something that's relevant.

18        THE COURT:  I'm not sure of the relevance either.

19        MR. LASKE:  I'll move on to something else.

02:18   20   BY MR. LASKE:

21   Q.   I'd like to direct your attention to Exhibit 371, page 5.

22   Actually, you know, we'll use 104 because these are your

23   current bills, right?  At least the current bills we have.

24   You'll see -- I think it's the fourth column.  It says

02:18   25   "Transaction."

1    A.   Okay.

2    Q.   And, actually, is there a way to enhance this?

3              THE CLERK:   There is.   There's a little knob there to

4    zoom in.

02:18   5              THE WITNESS:   The other way.   A little more.

6    BY MR. LASKE:

7    Q.   Okay.   Well, the first entry has the -- it says "D2740,"

8    and it says, "Crown, all porcelain, ceramic."   What does the

9    "D2740" mean?

02:19   10   A.   Those are dental codes that are used to identify

11   every -- in my office, if you put in a crown, it automatically

12   pops a code, which is a code that's used in this country by

13   everyone, so we know exactly what type of a crown it is, what

14   material we're using, and whatnot.

02:19   15   Q.   Is that a CPT code or a different --

16   A.   This is probably a CPT code because our computer -- again,

17   all of our computer programs operate on a CPT code.

18   Q.   And did you use your usual and customary charges for the

19   CPT codes?

02:19   20   A.   Depending on CPT code for what procedure, for what type of

21   a case, regular single implant crown or --

22   Q.   In other words, when you enter in the CPT code, does it

23   give you a number, or do you fill in your own number?

24   A.   Again, depends on the case, depends on what type of a

02:19   25   patient you're working on.   If it's a straightforward single

1    crown, are you matching a single tooth to another six crowns or

2    veneers in the mouth?  A crown is not a crown is not a crown,

3    so you can't do a crown on the last tooth and one on the front

4    and expect to have the same fee.  Some people do.

02:20  5    Q.   But you're billing for each item separately.  Isn't that

6    correct?

7    A.   That's right.

8    Q.   And so is there a reason why if there's more crowns you

9    have to put in than less that the charges would change based on

02:20  10   the fact that you're separately billing different crowns?

11   A.   What do you mean, "separately billing"?

12   Q.   Don't you have different entries for each crown?

13   A.   Well, yeah, every tooth has a procedure code, and every

14   procedure that we do has a fee associated with it.

02:20  15   Q.   And I'm just asking is the fee standard?  Is this fee for a

16   crown going to be the same every time?  I know the more you put

17   in, the more it will cost.

18   A.   Again, I don't understand your question.  Is it the same

19   for Ryan, or is it the same for all my other patients in the

02:20  20   office?

21   Q.   All your other patients.

22   A.   No, because the other parents in my office didn't have the

23   same type of restoration that Ryan had.

24   Q.   So because of that, the numbers went up, down?

02:21  25   A.   The fees changed because of the complexity of his case and

1   how much time we had to spend with the lab technician and

2   ceramist and whatnot.

3   Q.   How did the fees change?

4   A.   The fees were probably slightly higher.

02:21   5   Q.   Doubled, tripled?  Were they doubled, tripled?

6   A.   No, that's not doubled at all.

7   Q.   Are they higher than normal or --

8   A.   They're higher than -- they're higher than probably a

9   typical crown patient.

02:21   10   Q.   So you went through this then.  It gives you a number, and

11   then you increased the number?

12   A.   You adjust the number.  Whether it's increased or adjusted

13   or lowered, yeah, and that's all done in the front office.

14   Q.   Do you know how much it was increased?

02:21   15   A.   I have no idea.

16   Q.   Did the fact that you were billing on a lien affect the

17   numbers at all?

18   A.   No, it doesn't.

19   Q.   Is an implant replacement the same thing as a root form

02:21   20   fixture to the jaw?

21   A.   Implant replacement?

22   Q.   Yes.

23   A.   No.  An implant could be considered a root form to the jaw,

24   but an implant replacement is replacing a prior fixture.

02:22   25   Q.   An implant.  An implant.

```
 1  A.   Is an implant --

 2  Q.   How would you describe an implant?

 3  A.   An implant is a fixture that you place in the jaw to be

 4  able to restore with crowns or whatnot later on to secure a

 5  prosthetic.

 6  Q.   Okay.  And it's to the root of the jaw, right?

 7  A.   To the bone.

 8  Q.   Yeah?

 9  A.   There's no root in the jaw.  It's the bone.

10  Q.   And did the cost for the implant replacement you performed

11  on the plaintiff include replacing the abutment or just the

12  crown?

13  A.   Which -- I didn't perform any implant replacement on him.

14  I'm not sure what you're asking.

15  Q.   The implants you performed, did it include replacing the

16  abutment or just the crown?

17  A.   I didn't replace any implants on him.

18  Q.   Okay.

19  A.   Yeah.

20  Q.   On page -- so do you typically bill for postoperative

21  checks?

22  A.   Yes, there's a small fee for post-op check depending on

23  what we do.

24  Q.   Those are not included as part of the overall procedure?

25  A.   Sometimes they are.  Sometimes they're not.  That's really
```

1  something that I discuss with our billing department in our

2  office.

3  Q.  Why sometimes yes and why sometimes no?

4  A.  Because not every post-op is the same.  Sometimes you have

02:23  5  to come in and debride the area, irrigate the area, take out

6  sutures, place more medicament inside, and sometimes just to

7  take a look to make sure everything's healing properly.

8  Q.  For Ryan Moore, what was the post-op checks for?

9  A.  For his post-op checks, we had to remove all the healing

02:23  10  caps, clean everything up, and put all -- and irrigate the area

11  and put all the healing caps back in.  We did that almost every

12  time he came into the office.

13  Q.  And does Exhibit 104 -- are these your bills?  Because,

14  again, it sounds like you may have done some procedures after

02:23  15  this.

16  A.  Yeah, these are the bills.  I don't think we did anything

17  after this.  This was the last thing that we did on him was the

18  crowns and the -- it was the crown at number 13, and that was

19  it.

02:23  20  Q.  Okay.  Because a little bit -- a little while ago you

21  mentioned you'd seen him more recently.

22  A.  That was not included in his -- with his trial fee that he

23  paid out of that appointment out of his own pocket.

24  Q.  Okay.  And are you saying those bills are separate from

02:24  25  this case or --

         1   A.   I believe so because he would have to have a cleaning done

         2   regardless of the accident, so I didn't think that was

         3   something that I could put on the bill.

         4   Q.   The amount for the procedures performed after your initial

02:24    5   expert report, which was around November 30th, 2015, is it

         6   1 -- and this is page 3 of Exhibit 104.  Is the total -- I

         7   think there's a subtotal of 119,105?

         8   A.   That was including the hard cost for the lab material,

         9   which Ryan took care of, so the balance was 113,105.

02:24   10   Q.   Taking into account that he paid you $6,000, the charge

        11   before he paid you was --

        12   A.   Was 119, that's correct.

        13   Q.   And you currently have a lien of how much is it, 113 --

        14   A.   I believe so.

02:25   15   Q.   -- 105?

        16        And he hasn't paid anymore since then?

        17   A.   I don't think so, no.

        18   Q.   And in your expert report from November 30, 2015, you

        19   mentioned follow-up care would be about 98,340.  I think

02:25   20   because of the passage of time, your past care -- or your

        21   future care became your past care.  Does that sound about

        22   right?

        23   A.   I'm not quite sure if I understand.

        24   Q.   In 2015 you did the work in 2016.  So did the past -- the

02:25   25   future become the past?  You projected out six months before

1  you did the work it would cost this much amount, and you said

2  $98,000?

3  A.   I see.

4  Q.   And then ultimately it looks like it was 119, or are those

02:25  5  two different charges should we add those together?

6  A.   I understand your question.  I stuck to the plan.  We made

7  a plan for him, and based on the plan that I devised for him, I

8  guesstimated the cost is going to be that much, and we stayed

9  within that limit.

02:26  10      The only thing that we did differently was what I think I

11  believe I mentioned to you removing of the other two teeth.  I

12  anticipated that we had to do that.  We had several discussions

13  with the lab to make sure if I can leave them alone or whether

14  it would affect the entire outcome of our case, and they said

02:26  15  you can't leave those teeth alone because they've dropped down

16  so much, there's no room for any teeth on the bottom for him to

17  even chew on.

18  Q.   From your initial report where you estimated 98,000, the

19  reason why we're at 119 is because of the two extra teeth?

02:26  20  A.   I believe there was a couple of extra teeth that we had to

21  remove, and then there was a couple of extra teeth that we had

22  to add to the upper partial, the implant bridge that we put in

23  there.  Then we had to put some bone-grafting material in the

24  area that we pull the teeth out of.

02:26  25  Q.   So, again, based on the fact that the report was November

1    2015, that 98,000, that's kind of subsumed into this 119,

2    right?

3    A.   That's correct.

4    Q.   It's not a different number?

02:27   5    A.   No, it's not.

6    Q.   And I think earlier counsel showed you some of the numbers

7    from Nurse Casuto's life care plan?

8    A.   Yes.

9    Q.   And you spoke to Nurse Casuto?

02:27   10   A.   Yes.

11   Q.   And you gave her the information for those numbers?

12   A.   That's correct.

13   Q.   And if we were to total those up, I believe they come out

14   to a little over $652,000?

02:27   15   A.   Okay.

16   Q.   Have you ever totaled it up?  Was it totaled up for you?

17   A.   It was done all by her.  She asked me questions, and I

18   tried to answer her as honestly as I could.

19   Q.   Okay.  So you claim now that he needs 652,000 of dental

02:27   20   care beyond the 119,000 of care you've provided to date?

21   A.   For his lifetime.

22   Q.   For his lifetime?

23   A.   Yes.

24   Q.   Did you ever supplement your report after your initial

02:27   25   report of November 30, 2015, to add that information?

```
 1   A.   I'm not sure if I did.   I can ask counsel if I reported
 2   another -- if I sent another report in after that one or not.
 3   I don't recall, but we had numerous phone conversations with
 4   the nurse and numerous phone conversations, and I don't really
 5   recall if I sat down and wrote another report.   But --
 6   Q.   So you don't know one way or the another?
 7   A.   I honestly don't know, yeah.
 8            MR. LASKE:   Nothing further, Your Honor.
 9            THE COURT:   The life care plan made reference to a
10   brain MRI.   Did you recommend that?
11            THE WITNESS:   No, I didn't.
12            THE COURT:   Okay.   Any other questions of the doctor?
13            MR. CHAMBERS:   Nothing, Your Honor.
14            THE COURT:   May this gentleman be excused?
15            MR. CHAMBERS:   As far as I'm concerned.
16            MR. LASKE:   Yes.
17            THE COURT:   Thank you.   You may stand down.   You're
18   excused.
19            THE WITNESS:   May I take these?
20            THE COURT:   Sure.
21      Next witness.
22            MR. CHAMBERS:   I'd like to call Debbie Halbman.
23                          DEBRA HALBMAN,
24                   PLAINTIFF'S WITNESS, SWORN
25            THE CLERK:   Would you state and spell your full name
```

02:28 (line 5)
02:28 (line 10)
02:28 (line 15)
02:28 (line 20)
02:29 (line 25)

1    for the record.

2            THE WITNESS:  My full first name is Debra, D-E-B-R-A,

3    H-A-L-B-M-A-N.

4            THE CLERK:  Thank you.

02:29  5                    DIRECT EXAMINATION

6    BY MR. CHAMBERS:

7    Q.   Good afternoon, Mrs. Halbman.

8    A.   Hi.

9    Q.   How do you know this good-looking gentleman to my left?

02:29  10   A.   He's my oldest son, my second child.  I have three.  So

11   I've known him all his life.

12   Q.   And you're not from California?

13   A.   No, I'm not.  I'm from a suburb of Milwaukee, Wisconsin.

14   Q.   And that's where you currently live?

02:30  15   A.   Yes.

16   Q.   And is that where Ryan also grew up?

17   A.   Yes.  In fact -- well, actually, when he was growing up, we

18   lived in Wauwatosa.  I now live in Menomonee Falls, but they're

19   both suburbs.

02:30  20   Q.   Are you currently employed?

21   A.   I am.

22   Q.   What do you do for a living?

23   A.   I'm center director for KinderCare Learning Centers, and

24   I've been there for 28 years.

02:30  25   Q.   So you're dealing with toddlers and young children?

1    A.   Well, we have children from six weeks to 12 years of age,

2    and prior to doing that, I taught junior high and high school,

3    so, you know, I've had the whole gamut from birth on up to

4    adulthood I guess you'd say.

02:30   5    Q.   Lucky you.

6        Well, I wanted to, if we could chat a little bit about

7    Ryan.   And I'm interested early on anyways about his formative

8    years growing up.

9        When he was a young man, I assume he lived with you?

02:30   10   A.   Yes, yes.

11   Q.   For how long?

12   A.   He lived with me for about 20 years.  I think it was when

13   he was around 20 that he moved out.   I am divorced from Ryan's

14   father, but Ryan and his brother and sister lived with me.   I

02:31   15   had placement.

16   Q.   So Ryan lived with you along with his brother and sister

17   through high school?

18   A.   Correct.

19   Q.   And elementary school and so on?

02:31   20   A.   Correct.

21   Q.   How would you describe Ryan as a young man?

22   A.   Well, Ryan is a very hard-worker.  He's one of the -- he

23   always was one of the youngest kids in his class.  His birthday

24   is in August.  And many of our neighbors would hold their

02:31   25   children back a year, but I didn't, so Ryan always had to kind

1    of work a little harder to keep up with his friends, both

2    athletically, physically, as well as academically, but he

3    always did.  He's always been a real hard-worker.

4        Ryan has always been a happy -- very well balanced, from a

02:32    5    mother's point of view, person.  He's always had a lot of

6    friends, both male and female, and he was a great athlete, he

7    played softball, he played soccer.  For a very short period of

8    time, he was the place kicker for the football team, so he was

9    involved in things.  He and his brother started working.  Ryan

02:32    10    was ten, Adam was eight when they started their paper route.

11    That was right after I got divorced, and there were several

12    things they wanted, like shoes that I couldn't afford, so I'd

13    basically told them they were going to have to start earning

14    some money.  Neither one of them were old enough to sign up for

02:33    15    the paper route, so my daughter, Carrie, who was 12, did, so it

16    was in her name, but it was Ryan and Adam that did the delivery

17    every day.  Sundays I used to have to get up and take them, but

18    they would do that then too.

19    Q.   In the wintertime?

02:33    20    A.   Yes.

21    Q.   In Wisconsin?

22    A.   Yes.

23    Q.   Sounds like fun.

24        So it sounds like Ryan had a strong work ethic from a

02:33    25    relatively young age.

A.   He did.  He was also a Cub Scout.  He quit right after.  He
did not become a Boy Scout.  He was just a Cub Scout.  So he
also went out and, you know, did the Cub Scout candy sales and
things like that too.  So I made sure that even as a single mom
that my kids didn't suffer.  I could have moved some place that
would have been a lot cheaper, but they were well-grounded in
the neighborhood.  Like I said, they all had great friends,
they were great schools, and Ryan was a -- you know, was a good
student.  He wasn't a straight A student, but he was a good
student.
Q.   Did you ever have any problems with Ryan during high school
or junior high?
A.   Well, every mother has problems with their children at one
time or another, but nothing out of the ordinary.  I mean, I
can't remember a lot of different -- you know, it was just
mostly coming home a little bit late or maybe not always going
exactly where they said they were going to go, but by and
large, he was good.  And if I did catch him doing something,
the one thing I can tell you about Ryan, one of the things I
told all three of my kids is I can accept almost anything, but
I can't accept you lying to me, and Ryan never did.  Ryan
always would tell the truth, and if there was punishment, my
other philosophy was if you do the crime, you do the time, and
he would also accept, you know, any punishment that he would
get too.

 1   Q.   So he graduates high school, I presume?

 2   A.   Yes.

 3   Q.   And during his high school years, you mentioned he was

 4   involved in sports, and he had a bunch of friends.  Would the

02:35   5   friends come in and out of the house?  Would he go over there?

 6   Tell us a little bit about that.

 7   A.   He had friends over.  In fact, he has two friends that live

 8   here in California, and one of them I always said was my third

 9   son.  He would go to his friend's house to -- you know, one of

02:35   10   the things -- that's one of the things about Ryan, no matter

 11   where he went, he could make friends.

 12        Several summers he worked at -- I don't know if you've all

 13   heard about the Summerfest that we have on the Milwaukee

 14   lakefront.  It's one of the biggest music festivals in the

02:35   15   world, and Ryan worked there through high school and well as

 16   through college, so he was just somebody who could go and make

 17   friends anywhere.  He's a likeable guy.

 18        You know, you'd mentioned in your opening about the fact

 19   that they did call him Chucky, and that came from Chuckles

02:36   20   because he always had a great sense of humor.  He laughed a

 21   lot.  He smiled a lot.  He was just, you know, a nice kid.

 22   Q.   Once he graduated from high school, did he go off to

 23   college?

 24   A.   He did go to college.  He still lived at home.  He went to

02:36   25   the University of Wisconsin in Milwaukee, and he started there,

1    but then he dropped out for a while, got a full-time job, and

2    finally decided to go back to school and finish his degree.  He

3    initially chose his major to be education, and I think that

4    just part of it was he was -- he wasn't really ready to make

02:36   5    that kind of a choice, and so, like I said, he dropped out of

6    college, got a full-time job, and then when he went back to

7    school is when he went -- he had a criminal justice major, and

8    he really enjoyed that, and the reason I know that that was

9    really his passion was because he made the dean's list every

02:37   10   year, every semester, after he went back to school, so

11   he -- he'd matured enough to develop some really good study

12   habits, but I really felt that this was something that, you

13   know, it was truly his passion.

14   Q.   How long did he attend University of Wisconsin before he

02:37   15   dropped out?

16   A.   I think he went for a year, possibly a year and a half.

17   Q.   And then decided to go to work, you said, a full-time job?

18   A.   Uh-huh.

19   Q.   What sorts of jobs was Ryan doing back then?

02:37   20   A.   Well, like I told you, he worked at Summerfest.  He worked

21   for Leff's Lucky Town.  He was the bar manager.  He also was a

22   painter.  A friend of his owned a painting company, and he

23   worked for Bill for quite a long time.  In fact, I think he

24   even worked for him once he went back to school because that's

02:38   25   something he could do in the summers or on the weekends when he

02:38

1    wasn't in school.  So, you know, he had several different jobs

2    that he worked at.  I know that he did -- the other thing is

3    when he -- when he did move out, he moved into a duplex that a

4    friend of his had bought and kind of traded off rent to begin

5    with helping to remodel the duplex.  So whether that was really

6    a job or not, but it was something that he did to kind of

7    support himself.

8    Q.   So are you telling us that Ryan, from the time he was ten

9    or so, was working pretty consistently up into and through

10   college?

11   A.   Exactly.  In fact, he -- he had the paper route all the way

12   until he was -- I think he graduated from high school.  He also

13   worked at a grocery -- a local grocery store as stocker and a

14   bagger.  So he was always -- he always had a job doing

15   something because while I could give my kids the necessities,

16   you know, teenagers, if somebody else has a pair of $150 shoes,

17   you have to have them too.  So that was my rule.  It was my

18   rule when it came to driving a car too.  You had to be able to

19   pay for driver's ed, and you had to be able to pay for your

20   insurance because I couldn't afford my insurance and three

21   kids' insurance too, so that was just -- that was just our way

22   of life.

23   Q.   And during those years, his teenage years and early 20s,

24   did you get the impression that Ryan enjoyed working?

25   A.   He never complained about it, so I would say he did.  When

1    I compare him to, you know, other kids his age and some of his

2    friends, they'd worked for a while, and then they quit, and

3    then they'd go find another job, but, you know, Ryan stayed

4    with his jobs, and, like I said, he didn't complain.  If it was

02:40   5    time for him to go to work, he went to work, so, you know,

6    knowing teenagers, if they're not complaining a lot, they're

7    probably pretty happy.

8    Q.   And then you said Ryan found his passion in criminal

9    justice during college when he went back the second time?

02:40   10   A.   Uh-huh, yes.

11   Q.   Is that the degree that he graduated with?

12   A.   Yes.

13   Q.   And you mentioned he was on the dean's list, you think, for

14   the duration of that?

02:40   15   A.   Yes.

16   Q.   What did that indicate to you as a mom, the fact that he

17   was back to school and seemingly passionate about his future?

18   A.   Well, the first thing that it indicated to me was that, you

19   know, he was maturing because I really, even to this day, I'm

02:40   20   not sure that I think that all 17 or 18-year-olds are ready to

21   plan the rest of their lives, and he graduated from high school

22   at 17, and I definitely think he just didn't know what path he

23   really wanted to follow, and once he decided on what that path

24   was, he worked really hard at it.  And the reason I knew that

02:41   25   he was passionate about it was because of the fact that, you

1    know, he moved back home, for one thing.  I know that's not

2    real unusual these days, but yet, on the other hand, it's still

3    hard for a guy to move back home and live at home and go to

4    school.

02:41   5        And then, like I said, the fact that he did so well and

6    even would share things that he was learning in school that we

7    could talk about at the dinner table or that -- and prior to

8    that, the first time he was in school, I don't really know for

9    sure if he went to school every day because he really didn't

02:41   10   tell me anything.  So if you're going to share that with your

11   family, there has to be a little bit of passion behind it.

12   Q.   Were you proud?

13   A.   Of course.

14   Q.   Can you describe for us what your relationship with Ryan

02:41   15   was like during his college years?

16   A.   Well, you know, when I got divorced, Ryan was about ten

17   years old, and during those years and his high school years, he

18   kind of took on the father role, even though he was young.  He

19   was kind of my protector, he was his brother and his sister's

02:42   20   protector, and we had our moments, as all moms and sons do, but

21   I always felt -- I always respected Ryan, and I always felt

22   that he respected me.  We could sit down -- we had the

23   relationship where we could sit down and we could talk for

24   hours or we could sit down and not say anything for hours, and

02:42   25   either one was okay.

200

1    Q.   And at some point, he obviously graduates college.  Did he

2    get a job after that?

3    A.   He did.  He was a parole and probation officer for the

4    state of Wisconsin.

02:42   5    Q.   How long did he do that for?

6    A.   I think he did that for a year or two.

7    Q.   And then at some point, he applied for the border patrol?

8    A.   He did.  His younger brother joined the Marines when Ryan

9    was not in college.  And then I remember when we went -- Adam

02:43   10   graduated from Marine security guard school and became an

11   embassy guard, and we went to his graduation, and I remember

12   Ryan told me at that time that he was a little bit jealous of

13   his brother, and so I think that's one of the things that

14   helped motivate him in trying to look for a career rather than

02:43   15   a job, and then, you know, being a parole and probation officer

16   is a little bit depressing.  I know it wasn't what he really

17   wanted to do with his background and his knowledge and his

18   degree, and so he started looking into federal agencies that

19   were hiring, and he applied to a few, and he was accepted by

02:43   20   the border patrol.

21   Q.   And that required him coming out to California to attend

22   the academy?

23   A.   He actually was in Artesia, New Mexico.

24   Q.   Coming out west?

02:44   25   A.   Yes.

1    Q.   How about that?  Do you recall when that was, what year?

2    A.   I really don't.  I know it was -- it was after my daughter

3    got married and before my youngest son got married.  That's all

4    I can tell you.

02:44    5    Q.   2006, does that sound about right?

6    A.   Sure.  I know he's been in the border patrol for ten years,

7    so it had to have been 2005, 2006.

8    Q.   And once he moved out and came out to New Mexico and

9    subsequently California, how often would you guys talk?

02:44    10    A.   Well, when he was in the academy, we didn't talk much at

11    all because he was pretty busy.  He would call occasionally,

12    but once he moved here to California, we would probably talk at

13    least two, three, four times a month, usually on the weekends.

14    You know, sometimes I would call him or he would call me.

02:44    15    During football season we always had to stay in contact because

16    we're both big Packer fans, so we'd have a lot to talk about.

17         But, you know, we had regular phone conversations.  He'd

18    still come home when he would have vacations.  He would come

19    home for holidays, and so we would see him, what I would

02:45    20    consider, pretty regularly.

21    Q.   And these phone conversations that you'd have, how would

22    you describe Ryan's overall demeanor?

23    A.   It was just, you know, again we'd be talking, you know,

24    he'd ask me questions about what was going on at home, and at

02:45    25    that time I still lived in Wauwatosa, and a lot of his friends

1   were still in the area.  He had two of his friends move here,

2   so, you know, we talked about what he was doing.

3       Although, I have to tell you, with one son who's a Marine

4   and the other one's who is a border patrol agent, I don't ask a

02:45   5   lot of questions about their work.  A lot of people say to me

6   how can you handle having sons in those careers, and I said all

7   I say is how's work going?  They tell me fine, and I'll say are

8   they keeping you busy?  And they'll say yes, and then I move on

9   because I don't need to know the specifics because then I don't

02:46   10   have to worry about what they're doing.

11       So we really didn't talk about work a lot, but family, my

12   mom was still alive at the time.  Ryan was very close to my

13   mom, so we always had a lot to talk about.

14   Q.  So he'd share what was going on in his life, and you would

02:46   15   share what was going on in your life?

16   A.  Uh-huh.

17   Q.  And those happened two or three times a month?

18   A.  Oh, at least, yeah.

19   Q.  And I think you mentioned Ryan would come home to visit?

02:46   20   A.  Uh-huh.

21   Q.  What sorts of occasions would bring him home?

22   A.  Well, he would come home for holidays.  Usually Christmas.

23   He's never been a real big Thanksgiving celebrator, but I think

24   he may have come home once or twice to go deer hunting.  He

02:46   25   would come home for friends' weddings or if there was something

1    special, like Summerfest, going on, he might come home for a

2    concert, but it was a regular thing, and sometimes he'd stay

3    with me at my house, sometimes he'd stay with his friend, but I

4    used to always be the one he'd call to take him to the airport,

02:47  5    so I would usually see him even if it was only picking up and

6    dropping off at the airport.  Sometimes he'd stay with his

7    brother or sister, but he -- you know, he was around, and we

8    saw him.

9    Q.  Can I take a look at Exhibit 37, please.  Do you recognize

02:47  10   that guy?

11   A.  I do.

12   Q.  Do you remember about when this was taken?

13   A.  Well, that was taken in my basement because the hat that

14   he's wearing is from the governor's auction from the state

02:47  15   fair, so that had to have been after we moved to Menomonee

16   Falls, and we moved in in 2005, so it would have been somewhere

17   between 2005 and maybe 2008 or '9, something like that.

18   Q.  And what do you see when you look at that picture?

19   A.  That's my Ryan.  That's my Ryan.  That's his smile.  It's

02:48  20   very possible there's a little wad of chewing tobacco there in

21   his cheek, but that's what -- when I think of Ryan, that's the

22   face I remember.

23   Q.  Did he smile a lot?  I know you mentioned the word

24   "Chuckles" and all of that.  Was he known for that?

02:48  25   A.  You know, Ryan has a very wry sense of humor.  If you get

1    to know him, he's not -- you know, he's not a bubbly kind of

2    guy, but he has a really good sense of humor, and he'll make

3    some of those side comments, but he was always smiling, and he

4    was always laughing.  Sometimes he got real nervous.  He would

02:48    5    really giggle a little bit more than when he wasn't nervous,

6    but he was just -- that's where he got his nickname from.

7    Q.   Did you ever notice during this time period any issues with

8    Ryan being depressed?

9    A.   No.

02:49    10    Q.   Did he ever seem anxious to you?

11    A.   The only thing he was anxious to do is at the time he was

12    living in a subletted condo here, and he was really anxious to

13    move.  That, I remember.  But as far as anxiety, no, he didn't

14    have any, and, you know, like I said, he had friends out here,

02:49    15    he made friends within the border patrol, he had some of his

16    high school friend, he went to concerts, he -- no, he didn't

17    have any anxiety.

18    Q.   How about anger?  Did Ryan ever strike you as an angry guy

19    back then?

02:49    20    A.   Not any -- I mean, he'd get angry when the Packers would

21    lose just like the rest of us, but, I mean, everybody gets

22    angry, but what I can -- would I describe him as an angry

23    person, no.

24    Q.   And in addition to his visits back to see you in Wisconsin,

02:50    25    would you also come out here and visit Ryan?

1  A.   I did.  I came out to visit him right after he moved into

2  the subletted condo that he lived in, and he took me to the

3  San Diego Zoo.  It's probably not a big deal for all of you

4  here, but I've never see a panda before, and they had the panda

02:50  5  exhibit here.  We went up to Julian.  We did some wine tasting.

6  We went down to Old Town.  So he really showed me San Diego,

7  and it was my first visit here.

8       I came back to visit him -- well, we stayed with him.  My

9  daughter and grandson and I stayed with him when my other son

02:50  10  came back from deployment, and then right after, not too long

11  after that, when he bought his house that he lives in right

12  now, my Christmas present that year was a plane ticket out here

13  so I'd have a chance to see his new house.

14  Q.   The one that you were talking about where Adam returned

02:51  15  from deployment, and Adam's Ryan's brother about, right?

16  A.   Right.

17  Q.   Do you recall when that was?

18  A.   Well, let's see.  I would say that was probably -- it was

19  the spring of, I would say, around 2012 because I came out

02:51  20  again in December when Ryan bought his house, and it was prior

21  to that, so I think it was in the spring, early spring.

22  Q.   When you came out for that spring visit, were Ryan's sister

23  and Ryan's brother there with you?

24  A.   Well, Adam was with his wife, and we stayed with Ryan

02:51  25  because nobody that comes back from deployment wants their moms

```
         1   staying with them, so we made sure that we stayed with
         2   Adam -- Ryan, and it was my daughter, my grandson, and me, and
         3   Ryan, and so we spent some time with Adam and his wife, but
         4   then we gave them some of their alone time too.  So we again
02:51    5   did some sightseeing, especially this was one of Jackson's
         6   first visits to San Diego, so he wanted to see a lot of things.
         7   Q.   And then it sounds like six or eight month later you came
         8   back out for Christmas of 2012?
         9   A.   Uh-huh.
02:52   10   Q.   Yes?
        11   A.   Yes.  I'm sorry, yes, I did.
        12   Q.   Sorry.  This was to celebrate Ryan purchasing his first
        13   house?
        14   A.   Well, it was really my Christmas present, but it was to see
02:52   15   his new house because he was real proud of it and wanted to
        16   show it off, and he had just moved in, so he was in need of
        17   some furniture, so I think it's always nice to have somebody to
        18   go furniture shopping with you, and he'd never really made big
        19   purchases like this before, so -- and he wanted to show it off
02:52   20   to me too, and I was very impressed with it.
        21   Q.   Did you and Ryan during that visit talk about Ryan's
        22   future?
        23   A.   Well, we did.  I know that through the years, we have
        24   talked about things that Ryan wanted to do.  The fact that Ryan
02:53   25   had a house, you know, he mentioned the fact that he was
```

1   looking forward to, you know, settling down, having a family

2   some day.  My grandson's actually named after him.  His name is

3   Jackson Ryan.  And Ryan is such a great uncle.  He's so good

4   with him, and he's always been really great with kids, and so

02:53   5   through the years, but especially now that Ryan had really had

6   some roots, you know, he was talking about in the future

7   meeting somebody, settling down, having a family.

8   Q.   And how did that make you feel as his mom, that he's

9   finally putting down some roots and --

02:53   10   A.   That's what -- that's pretty much what every mom wants for

11   her kid.  She wants them to be happy, and naturally I'd be

12   happy if, you know, he chose never to have children, but you

13   want them to follow their dreams, and it seemed like he was

14   finally achieving the dreams that he was looking forward to.

02:54   15   Q.   And he seemed happy to you during this visit?

16   A.   Oh, yeah.

17   Q.   Again, any issues that you noticed that gave you any pause

18   for concern?

19   A.   No, he had a little trouble picking out the furniture, and

02:54   20   the prices really kind of upset him just a little bit, but, you

21   know, it's the first time he ever had to furnish a house, and

22   but no, he didn't -- he wasn't -- he didn't have any issues.

23   Again, I didn't ask him a whole lot of things about work, but,

24   again, that's just the way I handle that.  So we didn't talk

02:54   25   much about it, but he didn't seem to be upset or anything at

208

1   all.

2   Q.   And I assume you go back to Wisconsin after some point

3   following this visit?

4   A.   I did.   I was there for about five days.

02:54  5   Q.   And the phone calls and the touching base continue with the

6   same frequency they did before?

7   A.   Oh, sure.   And along with just the discussions and things

8   come a lot of questions about being, you know, a first-time

9   homeowner and, you know, what would you do in this situation,

02:55  10  and I always try to be very careful and just offer information

11  when I'm asked, but we talked a lot about things to do around

12  the house, so everything was normal as far as I was concerned.

13  Q.   And then about six months following your visit, Ryan is

14  injured?

02:55  15  A.   Yes.

16  Q.   And how did you find out about that?

17  A.   Well, I was in bed because it was midnight Central Standard

18  Time, and the phone rang, and my husband answered the phone and

19  said, "It's for you."   So I answered and it, said, "Hello," and

02:55  20  a man asked me if I was Debra Halbman, if I was Ryan Moore's

21  mother, and I said yes, and he said this is -- and I can't even

22  repeat to you what he said because I could not understand his

23  name.   I asked him to repeat it twice, and finally he said

24  just, "Call me Roger."   And I said, "Okay, Roger, why are you

02:55  25  calling me?"   Because why would he call me at midnight, and he

```
 1   said, "Well, there's been an accident."  And the first thing I
 2   thought of is that I thought maybe he'd been shot because just
 3   the nature of what he does.  And I said, "Well, what happened?"
 4   And he said, "Well, I'm not sure, but he has some facial
 5   lacerations, and we're taking him to the hospital."  And I
 6   said, "So he has facial lacerations?  What happened?"  And he
 7   said, "Well, a tire exploded," and he said, "We've had
 8   problems -- we have -- you know, he was filling a tire at the
 9   station with a -- an air compressor, and it's been faulty.
10   We've had problems with this compressor before, and there was
11   an explosion, and he has some facial lacerations."
12           MR. LASKE:  Objection, Your Honor.  Hearsay.  Move to
13   strike.
14           THE COURT:  Yeah, sustained.  The last portion of the
15   answer relating to what she was told is stricken.  It's
16   hearsay.
17           THE WITNESS:  Okay.
18           THE COURT:  Next question.
19   BY MR. CHAMBERS:
20   Q.  I think you were continuing to tell me about your
21   conversation about how you learned of Ryan's injuries.
22   A.  So anyway, he did tell me he was being taken to the
23   hospital, and he told me it was Scripps Memorial, and so he
24   said, "Doesn't Ryan have a brother who lives here in
25   California?"  I said, "Yes, his brother, Adam, which I'm
```

1    surprised you didn't call him first because he's closer."  And

2    he said, "Well, we tried to, but he didn't answer."  So I asked

3    him to keep me informed and let me know once they got to the

4    hospital.  And he said he would.  But then I called my son,

02:57   5    Adam, because it just didn't seem right that if he just had a

6    few -- and in my mind, a laceration is a slight cut.  He didn't

7    say a severe laceration or a gash or he didn't say that, you

8    know, it exploded into his face with such power.  So I called

9    my son, Adam, and I said, "I don't know what's going on," but I

02:57   10   told him what they had told me, and he said he'd seen the

11   call -- the number, but he didn't recognize the number, so he

12   said, "You know, mom, I think I'm going to meet him at the

13   hospital."  So he drove to San Diego and got there just about

14   the time that the ambulance got there with Ryan.  So that's how

02:58   15   I learned about the accident, and Adam was the one that called

16   me an hour later and said, "Mom, you need to get out here."

17   Q.   And did you?

18   A.   I did.  I didn't sleep at all that night.  I was on a plane

19   by 10:00 a.m. in the morning, and I was out here by 4:30 in the

02:58   20   afternoon.

21   Q.   Where did you go once you came to San Diego?

22   A.   Adam picked me up at the airport, and we went right to the

23   hospital, and at that point Ryan was in ICU.

24   Q.   Did somebody greet you at the hospital?

02:58   25   A.   Well, when we walked into -- you have to walk into a

1   waiting room outside of ICU, and then you have to call on the

2   phone to let them know that you're there to see a certain

3   patient, and then they send somebody to escort you into ICU.

4   And so when we walked into the waiting room, it was full, and

02:59   5   the majority of people in that waiting room were either border

6   patrol agents or task force members because Ryan had been on a

7   task force that prior to this accident, and I'd never met these

8   people before, so eventually they allowed us to go into ICU.

9   So it was my son Adam, myself, and Ryan's best friend, Dave,

02:59   10   who is the one I told you moved out here and was kind of like

11   my third son.  The three of us went into the ICU.

12   Q.  What did Ryan look like when you first saw him?

13   A.  Well, luckily Adam had prepared me with what had been done

14   so far, and Ryan's nurse came to meet me at the door.  It was a

03:00   15   male nurse, and he wanted to take me in a room and sit down and

16   talk to me and prepare me, and I said, "You know what?  I've

17   taken care of my three kids all their lives.  And I've been

18   with these boys when they've had broken bones and anything

19   that's happened to them."  I said, "I can handle it.  I know

03:00   20   what to expect.  Adam filled me in."  So we walked right over.

21       Ryan was in a hospital bed, but they had the back up so

22   that he was almost sitting upright.  He had a tracheotomy tube

23   in his throat, he had gauze bandages all around his head, had

24   just wrung around his head, he had tubes down his nose, he had

03:00   25   IVs in his arm, his head and his neck were about three times

1   their normal size because due to the swelling, and even though

2   his eyes were open, I'm not -- I wasn't real sure if he was

3   truly with us.  They had restraints on his arms because he kept

4   trying to pull the tubes out.

03:01   5   So when I walked in there, he's in there in a hospital gown

6   in a hospital bed almost sitting straight up with restraints on

7   his arms and tubes coming tout of everywhere.

8   Q.   Were you able to communicate with Ryan at all?

9   A.   I did talk to him and he did open his eyes.  He couldn't

03:01   10   speak himself because of the trach.  I think he responded to

11   me.  I don't know if he really did or if it -- I just wanted

12   him to acknowledge that I was there.  I didn't -- I really

13   didn't say too much to him because I just wanted him to know I

14   was there.

03:01   15   Q.   And you spent the next roughly two weeks or so basically by

16   his side in ICU, right?

17   A.   Well, I was with him when he was in ICU.  He was in ICU for

18   about three or four days, and we could only spend little bits

19   of time, so I spent a lot of time in the waiting room, and then

03:02   20   once he got his regular room, then I was there every day from

21   about -- well, it depended.  There were a couple of days that

22   Adam -- Adam at the time was the company commander at MCRD here

23   in San Diego, so when he had to stay overnight and couldn't

24   drive me back and forth, a border patrol agent would come and

03:02   25   pick me up.  I was staying in Oceanside where Adam lived, and

1  so on those days, I never got to the hospital quite as early,

2  but when I went with Adam, I was there from about 6:30 in the

3  morning until about 10:00, 11:00 at night depending on what was

4  going on with Ryan, if a doctor was coming.  Most of the

03:03  5  doctors made their rounds late at night, so I was there

6  sometimes -- I would see all three shifts of nurses that

7  worked.

8  Q.   So it sounds like you were relatively involved or fairly

9  involved in his medical care while he was in the hospital?

03:03  10  A.   Definitely.

11  Q.   Do you have an idea of the sorts of injuries that Ryan

12  sustained as a result of being there with him?

13  A.   Well, I'm not a medical professional, but I do remember the

14  conversations I had with the doctors, so I know that when they

03:03  15  initially brought him in, his throat was almost swollen closed,

16  so that's why they did the emergency tracheotomy, and it's my

17  understanding they did it without anesthesia because it was

18  that imminent, that it had to be done.  I know that initially

19  they suspected that he had a skull fracture because he was

03:03  20  bleeding from his ear, although I was told later that they

21  qualified that and said it was just a really bad concussion,

22  but the bleeding from the ear was probably because of the

23  broken sinus.

24     I know that he had a major gash all the way down the side

03:04  25  of his face and another one on his chin.  I know that he lost a

 1   lot of teeth.  I know that his salivary ducts were severed,

 2   which they were very concerned about because you do have -- you

 3   do have more than one salivary duct, but that's really

 4   important to hydration and, you know, eating and so forth, and

 5   so they were hoping that once they sutured the gash that they

 6   would be able to reattach those, but that never happened.  I

 7   know his jaw was shattered.  I know that, like I said, he had

 8   lost all the teeth.  I think that was about most of what they

 9   had told me.  They were concerned that he may have lost hearing

10   from his ear also because he didn't respond as well from the

11   ear on the side of the big gash, but eventually I think his

12   hearing was okay.

13   Q.   Was Ryan able to verbally communicate with you while he was

14   in the hospital?

15   A.   Not at all.  Everything -- when he finally was conscious

16   enough that he -- that it -- he seemed to know what was going

17   on, he had to write everything down because he had the trach

18   tube in, and while he was there -- again, I'm not a medical

19   profession, so I can't tell you exactly all the ramifications,

20   but I had to suction out his trach tube almost every couple

21   hours.  Not that the nurses couldn't do it, but it would take

22   so long for us to ring for the nurse and have them come, and

23   he'd be really uncomfortable.  The way he wrote it out is he

24   said it kind of felt like when you're -- when you're underwater

25   and you can't breathe, so I can only imagine what it must have

1    really felt like.

2    Q.   And how were those two weeks for you as his mom?

3    A.   Well, no mother wants to see her child in that much pain or

4    in that condition.  I knew that I had to be -- I had to be

03:06    5    present and that I had to be in control because people were

6    asking me questions and wanting me to make decisions for him.

7    I was so glad that my son, Adam, had been there because Adam

8    really helped support me, but I think I helped support him too.

9    I guess my main focus was trying to make Ryan comfortable and

03:07    10    just hoping that everything would turn out okay.  I mean, from

11    day one that I got there, no one told it to me, but I know when

12    Adam met the ambulance, they weren't real sure Ryan was going

13    to make it.

14    Q.   And did you leave before or after Ryan was discharged?

03:07    15    A.   I left just before.  I stayed long enough that he had had

16    the jaw surgery.  I would have liked to have stayed longer, but

17    I had only asked off for a week, and now we'd gone into two

18    weeks, and so we decided as a family, I left, my daughter came

19    the day before I left, she stayed for a week, then Ryan's

03:07    20    father and his uncle came out right when he got released from

21    the hospital, and they stayed with him.  Well, his father

22    stayed with him at home, and then my cousin came.  So as a

23    family we spread out our support of Ryan so that he wasn't

24    alone, that somebody was always with him during those first few

03:08    25    weeks.

1    Q.   I want to talk a little bit now about your relationship

2    with Ryan since he sustained these injuries.

3              THE COURT:  Maybe this would be a good time to take

4    our afternoon break, Mr. Chambers.

03:08    5         MR. CHAMBERS:  It would be a great time, Your Honor.

6              THE COURT:  Okay.  We'll be in recess until 3:30.  Be

7    ready to go at 3:30.  We're in recess.

8         (Recess.)

9              THE COURT:  Mr. Chambers, you may continue.

03:33    10         MR. CHAMBERS:  Thank you, Your Honor.

11   BY MR. CHAMBERS:

12   Q.   Mrs. Halbman, right before we broke I wanted to start

13   getting into your relationship with Ryan and perhaps some

14   differences that you've noticed in him since he was injured.

03:34    15   So why don't we pick up with the telephone calls.

16             We'll pick up with the telephone calls.  You were

17   talking regularly before the incident happened, did that

18   continue following your return to Wisconsin?

19   A.   Well, initially when Ryan got released from the hospital,

03:34    20   it bothered him to talk.  And so he asked that our

21   communication be through text.  So I understood that, and they

22   were less frequent, but I also knew that, you know, there were

23   times I was sure that he was resting and so I didn't think too

24   much of it.

03:34    25             A couple of times I called, and I have to tell you the

1    first few times we did speak, I had a real -- I had a difficult

2    time understanding him in some cases and I'd have to ask him to

3    repeat himself and he would get a little bit upset.  So one day

4    he said, that's why I want you to just text me.

03:35   5        So I wanted to remain in touch with him, so I did it

6    through text, but, you know, sometimes you just want to talk to

7    him and find out how he's doing and you can tell by the sound

8    of somebody's voice how they're doing.  So when I did get in

9    touch with him and I did talk with him, it was mostly a

03:35   10   monologue by me, which I can do, but that's not why I called, I

11   called to talk to Ryan and everything was yes and no answers.

12       And there were times that there were these long pauses

13   in our conversations and then we'd just hang up.  And so

14   initially I just thought it would take him a time to heal.

03:36   15   When it continued to go on and on and on and I'd get more

16   information from talking to my other son than I would from

17   Ryan, I thought my gosh, have I done something, did I do

18   something to make him mad, and I know that was probably selfish

19   on my part to think that, but as a mom with a child she'd had

03:36   20   such a great relationship with and now it was like he didn't

21   want to talk to me.

22       And so the calls, I mean, for a while there, I was

23   lucky if I talked to him once a month and sometimes it was once

24   every other month.  We would still text occasionally.  He would

03:36   25   call me when things, like something bad happened, like if he

1    got some bad news about a doctor visit or something like that,

2    then he would call, because he needed somebody to vent to.

3         But other than that, he rarely ever called me.

4    Q.   It sounds like a pretty stark contrast between your

03:37    5    relationship with him over the phone before this and after?

6    A.   Definitely.  Definitely.

7    Q.   What do you attribute that to?

8    A.   Well, I think part of it was the fact that initially he

9    didn't want to talk and it was difficult for him to talk and I

03:37   10    know he was embarrassed when you had to ask him to repeat

11    things.  Talking with my other son, he said he just didn't like

12    people asking him a lot of questions.  Well, when you're the

13    mom and you want to call up and find out how your child is

14    doing, you're going to ask some questions, but Ryan just didn't

03:37   15    want to answer questions.

16         And so there was this distance between us, and it hurt

17    me a lot because I -- my kids have always come first.  So it

18    was really hard to think that I was losing touch with one of

19    them.  But I didn't know why because -- I mean I knew, I knew

03:37   20    some of what was happening because of Adam and, you know, Adam

21    was such a great support to his brother, I'm so thankful that

22    he was here, because at least Ryan reached out to Adam.  So I'm

23    really glad he had somebody to reach out to, but it kind of

24    hurt that it wasn't me.

03:38   25    Q.   And you've had an opportunity to see and hear about Ryan

219

1   and Adam interacting since this has happened?

2   A.   You know, when my boys were young, I told you before that

3   Ryan kind of took over the father figure in the family and he

4   several times protected his younger brother.  In fact, there

03:38   5   was one time they were playing a soccer game together because

6   they were both on the high school varsity team and the goalie

7   had cold-cocked Adam and knocked him out cold and they didn't

8   stop the game.  So Ryan went, on his senior year when he was on

9   his way to making the All-State team, and stood over his little

03:38   10   brother and swore at the ref so the ref would give him a red

11   card and that stopped the game and then they sent the ambulance

12   to pick up Adam.

13          So, you know, Ryan was always Adam's protector.  He

14   looked out for his little brother, even though I know his

03:39   15   little brother used to drive him crazy, he still was the

16   protector.

17          He protected his sister.  When his sister had problems

18   in college, he drove there just to hang out with her for a few

19   hours and it was, you know, an hour and a half, two-hour drive

03:39   20   both, you know, one way.

21          So he was the protector, and now it seems like the

22   past few years those roles have changed and Adam's kind of been

23   the support for Ryan.  And like I said, I'm so grateful that he

24   has been.  I'm sure there's times that he still kind of drives

03:39   25   Ryan a little nuts, but at least he's got somebody there.  But

1   I can only imagine that that has to be kind of difficult too

2   when you've been the big brother and now you're kind of

3   changing roles.

4   Q.   So you've seen kind of a role reversal between Adam and

03:40   5   Ryan?

6   A.   Definitely.

7   Q.   And how about in your interactions with Ryan since this,

8   let's say in the few years, couple years since he was injured,

9   have you noticed any issues with depression?

03:40   10   A.   Well, I have to admit that for the -- it was probably the

11   first two years after his accident that there was very little

12   communication between us at all.   That has improved a little

13   bit.   I didn't talk to him enough to know if there was a lot of

14   depression and, like I said, he would call me when he was very

03:40   15   angry, but I do know now that -- I know he's being treated for

16   depression and I can tell you now that he's been on some

17   medication there's been a big difference in him.

18         There's been, I hope, a difference in our

19   relationship.   So now when I look back on that period of time

03:41   20   where we had no communication, I can only imagine that that was

21   part of it, as well as the fact that I know he was -- he just

22   became an angry person.

23   Q.   What about sadness or withdrawal, did Ryan seem to be sad

24   or withdrawn from you?

03:41   25   A.   You know, he hasn't been home for a holiday since before

1   his accident.  And so many of his friends have wanted to see

2   him and he may text a few of his friends, but he really doesn't

3   have the same relationship with them.  When he does come home

4   to Wisconsin, he doesn't go visit his friends.

03:41   5       Yeah, I've noticed -- I mean to me he's a sad angry

6   young man and he's kind of, you know, built his own little

7   corner of the world at his home and his work and that's kind of

8   his new normal.

9   Q.  And from your standpoint, what's your impression as to why

03:42   10   he doesn't want to see his friends anymore?

11   A.  Well, one thing I know is he hates to be asked questions.

12   He said, Mom, I don't want to relive the accident over and over

13   and everybody's going to ask me questions.  But I can't help

14   but also think that part of it is just Ryan was always very

03:42   15   concerned about his appearance.

16       I can remember when he lived at home, he'd always come

17   and ask me if I thought he looked okay and what he was wearing

18   and he'd ask his sister if he looked okay, not that he was like

19   a fashion hound or anything, but he cared how he looked.  And I

03:42   20   know that has to bother him a little bit because he doesn't

21   look the same as he used to.

22   Q.  And what about the smiley, happy-go-lucky Ryan that you

23   described for us a little while ago, the one we see in Exhibit

24   37, do you still see him?

03:42   25   A.  No, I miss him.

1  Q.   And have you been out to visit Ryan since he got out of the
2  hospital?

3  A.   Two years ago I came out for Mother's Day because neither
4  one of my boys have come home for Mother's Day in many years,
03:43  5  so I decided I was going to come and visit them.  And I was
6  kind of -- actually when I told them both I was coming I was a
7  little worried that Ryan might not want me to come, but he said
8  it was okay.

9        So I spent the first half of the week with Adam and I
03:43  10  spent the second half of the week with Ryan.  And it was a
11  very -- it was a very great visit.  I'm so glad I came.  I had
12  a great time.  I tried not to ask Ryan a lot of questions
13  because I didn't want him to shut me off, but it was nice -- it
14  was really nice to spend time with him.

03:43  15  Q.   When you came out to visit with him and spend some time
16  with him, what were your takeaways from that time together?
17  A.   I left being kind of sad because -- well, for example, we
18  went out -- we went out to lunch with Ryan's friend Dave and
19  Adam, and we went to one of these places that has micro brews
03:44  20  and all these different lunch specials and everything.

21        We had to stand and wait for quite a long time to get
22  in and, you know, Ryan and Dave -- or Adam and Dave ordered a
23  steak sandwich and pulled pork and I forget what I ordered or
24  what I originally was going to order, and Ryan had to order a
03:44  25  grilled cheese sandwich because at that point he had no teeth

1  in, the implants.  And he couldn't eat any of the things that

2  all the other guys were having.  And I know it bothered him.

3         He didn't say anything, but you know how you can tell

4  that somebody's kind of embarrassed when they have to do that.

03:44    5  I mean -- so it was a great -- it was a great trip.  It was

6  great to come back with him.  We didn't talk a whole lot about

7  his accident and his recovery.  He told me a little bit about

8  it, but at that time he didn't -- he didn't share as much with

9  me as he has since.

03:45   10  Q.  But even though he wasn't as vocal with you, you still came

11  away with this sort of sad feeling?

12  A.  Oh, yeah, definitely.  Just looking at him, you know, we

13  took his dog for a walk and, again, we talked but it was -- it

14  was different.  And I enjoyed -- like I said, I enjoyed the

03:45   15  time with him but yet, yes, I left feeling that that's not my

16  Ryan.

17  Q.  So we've talked a little bit about the sadness that you've

18  seen and perhaps some depression that you've seen, some anger

19  that you've seen, what about Ryan's memory, have you noticed

03:45   20  any issues with Ryan's memory since this happened?

21  A.  Well, you know, before you asked me about the number of

22  times that I'd come to visit Ryan and that trip that I told you

23  about that my daughter Carrie and my grandson Jackson and I

24  came when Adam came back from deployment.  You know, we stayed

03:46   25  with Ryan in his one-bedroom apartment.  So it's not like he

1    could forget we were there, but he doesn't remember that visit,
2    and we were with him for five days.

3    My daughter called me up one night and she was -- she
4    was kind of teary-eyed and she said she'd just gotten off the
03:46  5    phone with Ryan.  And one of the things that Ryan wanted to do
6    as a young adult as he started to travel a little bit is his
7    goal was to take pictures all the major baseball and
8    football stadiums.  And he was going to make some kind of a
9    collage or scrapbook or something, I'm not sure which, but I
03:46  10   remember he and I were in Baltimore together staying at my
11   cousin's and we went into Baltimore to take a picture of the
12   Ravens stadium.  So I knew this was something that he wanted to
13   do and he'd gotten like 20 or 25 different pictures.  And so
14   Carrie and her son, Jackson, went to Boston last year and they
03:47  15   went on a tour of the Patriots stadium.

16   And so she took all kinds of pictures and she called
17   him up and she was so excited because she wanted him to know
18   that she had all these pictures of the stadium for him.  And he
19   goes, I don't know what you're talking about.

03:47  20   And she said, well, you always wanted to collect
21   pictures of all the stadiums.  He said, I don't know what
22   you're talking about.  And prior to that, she'd had a
23   conversation with him about some friends that she'd gone to
24   high school with, and Ryan and Carrie were only a year apart in
03:47  25   high school so their friends were the same.  And there were

1  some of the names that she was bringing up that he should have
2  known that he didn't remember.

3      And so he said to her, and this is I think what got
4  her so emotional, he says, you know what, Carrie, you're going
03:47  5  to have to be my memory for me.  And that's really sad if you
6  can't remember your childhood.

7  Q.  Has he expressed that to you that he doesn't remember
8  portions of his childhood?

9  A.  Well, there's certain things that I'll bring up and allude
03:48  10  to that he says he doesn't remember.  And there's certain
11  important things that I really feel he should remember.  I
12  don't try to make a big deal out of it.  Initially when he used
13  to start -- when he started telling me he didn't remember
14  things I figured it was just his way of shutting me up.

03:48  15      But I honestly think he doesn't remember some of the
16  things.  And he was very, very close to his grandparents and to
17  think that he may not remember some of the times that he spent
18  with them, again, I -- I just feel that's so sad.

19  Q.  And how about -- as opposed to distant memories, more
03:48  20  short-term memories, have you noticed him doing anything
21  differently to try and remember things close in time?

22  A.  Well, he's very good at compensating, because even when I
23  was -- even initially when he got out of the hospital, he's
24  always -- he started to take copious notes.  And the few times
03:49  25  I've seen him since his accident, he's always writing things

1  down.  Or the few times that we did talk about doctor visits

2  and I would ask him questions, a couple of times he said, I'm

3  going to have to go check my notes or I'll let you know later

4  because I'll have to check my notes.

03:49  5        And I mean I know he makes -- he writes a lot of

6  notes.  He takes more notes than I do and I'm 30 years older

7  than him.  I should be the one writing everything down.  But

8  that's how he compensates.  So that is what gets him through,

9  I'm sure gets him through his professional life as well as his

03:49  10  home life.

11  Q.  How would you describe Ryan now?

12  A.  Well, Ryan's a wonderful young man, but unfortunately I

13  think he's an angry and sad young man.  He has -- he's somebody

14  that hides his feelings.  He hides his pain.  You know, even

03:50  15  when I was listening to the doctor talk about the surgery he

16  had on the roof of his mouth, I knew he had that surgery and I

17  thought to myself, oh my God, that must have just been horribly

18  painful.

19        And when I asked him, he said oh, it wasn't the worst,

03:50  20  but I heard what the doctor said and that had to have been

21  painful.  And so he's somebody that can hide that, and he's

22  hidden it from me.  He's even hidden some of his surgeries from

23  me that I didn't even know he had.

24  Q.  Do you think you're ever going to get the Ryan that you

03:50  25  knew before this happened back?

1    A.   I think that Ryan is going to have to create a new normal

2    for himself and so, no, I don't think I'm ever going to get the

3    old Ryan back.  I'm hopeful that the new normal that he's going

4    to create for himself is going to be something that -- a life

03:51    5    that he can be happy in.

6         MR. CHAMBERS:  Your Honor, I'd like to offer Exhibit

7    36 which is the photo we've been looking at -- excuse me, 37

8    into evidence.

9         THE COURT:  Any objection to the photo?

03:51   10         MR. LASKE:  No, Your Honor.

11         THE COURT:  It's received.

12    (Plaintiff's Exhibit 37 was received in evidence.)

13         MR. CHAMBERS:  I don't have any further questions.

14    Thank you, Mrs. Halbman.

03:51   15         THE COURT:  Cross-examination?

16         MR. LASKE:  No cross-examination, Your Honor.

17         THE COURT:  Thank you.  You may stand down.  Next

18    witness.

19         MR. CHAMBERS:  Your Honor, I'd like to call Ryan

03:51   20    Moore.  Could we have just a few minutes to collect himself, a

21    minute.  Are you good?

22         THE WITNESS:  I'm good.

23         MR. CHAMBERS:  All right.  Never mind.

24          RYAN MOORE, PLAINTIFF'S WITNESS, SWORN

03:52   25         THE COURTROOM DEPUTY:  Please state and spell your

 1    first and last name for the record.

 2         THE WITNESS:  Ryan, R-Y-A-N, Moore, M-O-O-R-E.

 3                   DIRECT EXAMINATION

 4    BY MR. CHAMBERS:

03:52    5    Q.  Hi.  You get the enormous task of following up after your

 6    mom --

 7    A.  Yeah.

 8    Q.  -- so good luck with that.  I want to talk a little bit

 9    about your background.  I know we just heard from your mom from

03:52   10    her standpoint, but I'm interested to get your perspective on

11    sort of your formative years.  So why don't you tell us a

12    little bit about where you grew up and what it was like.

13    A.  I grew up in a suburb of Milwaukee, Wauwatosa, actually

14    born in Milwaukee and then moved to Wauwatosa.  Went to

03:52   15    elementary, middle and high school in Wauwatosa.  I was very

16    involved in sports growing up.

17    Q.  What kind of sports did you play?

18    A.  Baseball, soccer, football, and basketball for a while.

19    Q.  Any favorites?

03:53   20    A.  Baseball most likely, actually I was pretty decent at it.

21    Q.  What was it about baseball that drew you to it?

22    A.  I was a pitcher, so I enjoyed being in kind of command of

23    the game.  I didn't have to rely on anybody else for part of

24    the game, but I was actually scouted by the Philadelphia

03:53   25    Phillies and Milwaukee Brewers when I was a sophomore in high

 1   school.

 2   Q.   Wow, must have been pretty decent then.

 3   A.   Till I blew my arm out my junior year, so.

 4   Q.   You have a sister, brother?

03:54   5   A.   Yes.

 6   Q.   We've heard a little bit about them.  Tell us about your

 7   relationship with each of them.

 8   A.   Growing up, it was good.  My sister was a very good

 9   student, and my brother and I kind of took the sport route more

03:54   10   than concentrating on school per se, hundred percent, so -- but

 11   always close.  It was the three of us and my mother most of the

 12   time, so we were all pretty tight-knit.

 13   Q.   Did you guys do a lot of things, you and your siblings

 14   together, growing up?

03:54   15   A.   Yeah, family trips, and then my brother and I would go to

 16   each other's athletic competitions and -- but we took a lot of

 17   family trips.

 18   Q.   Where did you go on your family trips?

 19   A.   Well, my mom would make us read 10 books a year in order to

03:54   20   get to go to Great America every summer, and I may have missed

 21   one or two but that was one that we always usually went on.

 22         And then camping and fishing and going to ball games

 23   and things like that.

 24   Q.   Pretty active as a young man it sounds like?

03:55   25   A.   Yeah.

1   Q.   And then in high school we heard from your mom who talked

2   about, you know, you had a lot of friends, is that your memory

3   of it too?

4   A.   Yeah.

03:55   5   Q.   Did you like to be social?

6   A.   Yeah.  I think she'd kind of really go to the extent of

7   when I used to come home all the time I'd spend more time with

8   my friends than my family, which probably isn't good, but I

9   had -- I still have a lot of friends back home.

03:55   10   Q.   And when you were back in high school, would you go to

11   their house, they'd come to your house, what was the

12   arrangement typically?

13   A.   Yeah, I mean both.  A couple of us would walk to school

14   until we got cars.  And then every weekend, I was either

03:56   15   involved in sporting events or we went to sporting events or

16   just hung out.

17   Q.   And how would you describe your childhood years?

18   A.   They were good.

19   Q.   Happy?

03:56   20   A.   Yeah.

21   Q.   Do you look back on them with fond memories?

22   A.   Yeah.

23   Q.   And then at some point you apply for and start college?

24   A.   Correct.

03:56   25   Q.   When was that?

1    A.    It was 1995.

2    Q.    Okay.

3    A.    In the fall.

4    Q.    And you were living at home at this point in time?

03:56   5    A.    Yes.

6    Q.    And so you start college at what school?

7    A.    University of Wisconsin - Milwaukee.

8    Q.    And did you have a major declared at that point?

9    A.    Yeah, actually it was criminal justice first.

03:56   10    Q.    Okay.  What was it about criminal justice that drew you to

11    it?

12    A.    I just always have been a fan of police officers and

13    investigations and trying to help people who can't help

14    themselves the most, and it just really interests me, and the

03:57   15    camaraderie as well coming from a big sports background.

16    Q.    And so you start at the University of Wisconsin and you go

17    until when?

18    A.    I went for three years, but in that three years I changed

19    my major to education after -- after a year or a

03:57   20    year-and-a-half.

21    Q.    And we heard from your mom, you're relatively young at this

22    point?

23    A.    Yeah, I was only like 19 or I started when I was -- no, I

24    was 18, yeah.

03:57   25    Q.    So you start when you're 18, you go to college for three

1  years?

2  A.   Yeah.

3  Q.   And then what happens?

4  A.   Since I was -- I was paying for it all by myself and I just

03:57  5  kind of lost interest and I stopped going and, in return, I

6  started wasting my own money.  And I decided to take a break

7  and get a full-time job and see how that lifestyle was like.

8  Q.   When you say take a break, what was it that you were taking

9  a break from?

03:58  10  A.   School.

11  Q.   What, were you not enjoying yourself or?

12  A.   I just wasn't focused enough to accomplish what I was there

13  for.

14  Q.   And what do you attribute that to, your lack of focus back

03:58  15  then?

16  A.   Being young and not -- majority of my friends really

17  weren't going to college and, like I said, I switched majors

18  twice and I wasn't sure which one to do and it was just I

19  needed a break.

03:58  20  Q.   Okay.  And so you take a break and you start working, you

21  said?

22  A.   Yes.

23  Q.   What sorts of jobs were you holding down?

24  A.   I was bartending and then I became a bar manager.  Well,

03:59  25  let me step back, before then in high school I worked hauling

           1    kegs of beer around for this music festival, Summerfest, and
           2    that was all summer long.  And I continued to do that for -- I
           3    think I worked there for almost 10 years, like just in the
           4    summers, but then I also became a bar manager for a very
03:59      5    successful bar and I would actually take my own leave from that
           6    job to go work at Summerfest.  And then I also got into
           7    painting and rehabbing houses, so semi construction work.
           8    Q.   But your work life started much earlier than that?
           9    A.   Yes.
03:59     10    Q.   10 or 11, right?
          11    A.   Yes.
          12    Q.   And you were delivering papers back then?
          13    A.   Yes.
          14    Q.   And have you been working since then?
03:59     15    A.   Yes, I went from the papers to working at the grocery store
          16    for a couple years and then -- then I started working the
          17    summers down at Summerfest.
          18    Q.   Why?  I mean that seems awful young to start work.  What
          19    was it about work that you enjoyed?
04:00     20    A.   It was just the way we were raised.  And like my mom was
          21    saying earlier that if we wanted something like I would want
          22    special shoes or a special glove for baseball and stuff, she
          23    wasn't going to buy it, so I had to work in order to get those
          24    things if I wanted them, and just the -- instilled the hard
04:00     25    work ethic in us.  Pretty much single mother raising three

 1   kids, working three jobs, so just hard work.

 2   Q.   Was she sort of a role model for you in terms of hard work?

 3   A.   Oh, absolutely.

 4   Q.   And when you were working, was it something where you were

04:00  5   driven to be the best at what you were doing or were you just

 6   happy to be getting a paycheck?

 7   A.   No.   Anything I do I'm pretty competitive and want to be

 8   the best.   Even the bar I worked at, my friend's brother owned

 9   it and his two other brothers also worked there yet he promoted

04:01  10  me before them and they'd actually worked there longer.   So

 11  anything I ever did, even painting and construction, you know,

 12  I would try to learn as much as I can to try to be the best

 13  that I could.

 14  Q.   That's true in work and in sports it sounds like too?

04:01  15  A.   Oh, absolutely.

 16  Q.   When you were working throughout your teenage years and

 17  into your 20s when you took your leave of absence from college,

 18  did you have any limitations in terms of what you were able to

 19  do physically?

04:01  20  A.   No.

 21  Q.   Any limitations in terms of mental limitations?

 22  A.   No.

 23  Q.   Any memory issues that you recall from back then?

 24  A.   No.

04:01  25  Q.   Didn't keep any calendars or to-do lists extensively when

1   you were in your early 20s?

2   A.   No.

3   Q.   And was your memory something that you used quite

4   frequently back then?

04:02   5   A.   Yes.

6   Q.   That's true both in school and in work?

7   A.   Yes.

8   Q.   And at some point you go back to school, right?

9   A.   Yes.

04:02   10   Q.   What prompted that?

11   A.   I guess you can say I matured and after kind of working

12   these other jobs and looking at the big picture at things that

13   I was finally ready and knew what I wanted to do and I went all

14   in for it.

04:02   15   Q.   So when you say you were mature and ready and knew what you

16   wanted to do, what was that?

17   A.   What did I want to do?

18   Q.   Uh-huh.

19   A.   Well, I wanted to go back in the criminal justice and

04:02   20   finish my degree so I could move into the law enforcement

21   field.

22   Q.   And you'd switched your major from criminal justice to

23   education before you left, right?

24   A.   Correct.

04:02   25   Q.   So why the switch back to criminal justice?

A.   Just after years off -- I mean I was off five years, so I
had a lot of time to think and talk to a lot of people and
educate myself more and I knew that was where I wanted to go.

Q.   So you go back to school after a five-year layoff, how was
life at college when you go back?

A.   It's all business, no -- no fun.  I took the maximum amount
of credits we could take a semester just to try to get it done
as quick as possible.

Q.   And how were your grades?

A.   They were good.

Q.   How was your social life during that time?

A.   I mean, I still had a social life yet I didn't allow my
social life to interrupt what I was trying to do at school.  So
I could balance the two pretty good.

Q.   And that's that maturity that you talked about before?

A.   Yeah.

Q.   And you continued to work during this second go at college?

A.   Yes.

Q.   And you supported yourself through college; is that right?

A.   Yes.

Q.   And was that doing the painting and the bars still?

A.   It was more the painting when I went back.  Painting and
construction.

Q.   And I understand that you were a fairly successful student
when you went back in terms of your grade point average?

```
 1  A.   Yes, I mean I finally applied myself fully and took the
 2  responsibility.
 3  Q.   And were you on a dean's list or get any other academic
 4  accolades?
 5  A.   I was on the dean's list.
 6  Q.   And did you graduate with any kind of honors or anything?
 7  A.   Not that I'm aware of.
 8  Q.   Maybe they're just holding it back from you.  So you
 9  graduate in what year?
10  A.   I was summer of 2004.
11  Q.   Okay.  And your degree is in what?
12  A.   It's in -- Bachelor's of Science in criminal justice.
13  Q.   And then what did you do at that point?
14  A.   Well, before then I was already starting to apply to a
15  bunch of law enforcement agencies, and the first one that
16  picked me up was the probation/parole for the State of
17  Wisconsin.
18  Q.   And what were you doing for them?
19  A.   I was a probation and parole agent for the mental health
20  unit in downtown Milwaukee.
21  Q.   And what did that job entail?  Give us a little flavor.
22  A.   A lot of things.  Meeting with the criminal offenders.  If
23  they were on probation, you'd meet them at your office first
24  and then you'd do home visits with them.  With the guys on
25  parole, I'd have to go meet them in prison before they were
```

238

 1  released and then do the same once they got out.

 2       But the challenging part was the mental health unit is

 3  the hardest unit to work on and making sure they're taking

 4  their medications and doing what they're supposed to be doing,

04:05  5  it was pretty challenging.

 6  Q.  So were you looking elsewhere at the time that you were

 7  working for them?

 8  A.  No, I started to.  I just wanted to get my foot in the door

 9  because that's what a lot of other places told me.  Like, I had

04:06 10  an interview with the Department of State before I graduated

11  and they just told me I need more experience before being

12  hired.  So I started getting the experience and finding out

13  other options to apply for and I wanted to kind of get out of

14  the social aspect of law enforcement -- I mean, that doesn't

04:06 15  sound right.

16       Probation and parole is more like social work, I

17  believe, and my aspirations in law enforcement are different

18  than that.

19  Q.  What were your aspirations at that point in your life?

04:06 20  A.  I've always wanted to be an investigator.  The best tool I

21  feel I have or had in law enforcement was my memory and my mind

22  and to be able to help solve crimes using your brain and things

23  like that.  I mean, that just really, that's what I wanted to

24  do.

04:07 25  Q.  I'm not familiar with law enforcement, can you tell us what

```
      1   an investigator does or what that is?
      2   A.   Well, like, you see all these shows on TV, like investigate
      3   certain types of crimes that occurred and try to backtrack and
      4   see how -- what actually happened and like murders and
04:07 5   situations like that.
      6   Q.   And did you have any particular law enforcement agency that
      7   you saw yourself working for?
      8   A.   Nothing particular, no.
      9   Q.   Okay.  So did you continue to apply for other positions?
04:07 10  A.   While I was probation and parole?
      11  Q.   Yes.
      12  A.   Yes.
      13  Q.   Okay.  Where did you apply?
      14  A.   I applied with the border patrol, the Milwaukee police
04:08 15  department, I think a couple other police departments as well.
      16  Q.   And were you ultimately hired by any of those people?
      17  A.   Milwaukee was going to hire me, but it was right at the
      18  time the border patrol offered me and I decided to try the
      19  border patrol.
04:08 20  Q.   So you'd also applied to the border patrol during that
      21  time?
      22  A.   Yes.
      23  Q.   And what was it about the border patrol that attracted you?
      24  A.   Honestly, for one, it was getting my foot in the door into
04:08 25  the federal system in order to move on to being an
```

1    investigator.  And also experience working in a new part of the

2    country I've never been and just learning -- learning the job.

3    Q.  Did you know when you applied for the border patrol that

4    you could potentially have to move to other parts of the

04:09   5    country?

6    A.  Yes.

7    Q.  And did you know specifically you would be coming out west?

8    A.  Yes.

9    Q.  Was that something that was attractive to you?

04:09   10   A.  I really didn't think of it like that.  It was -- I just

11   thought it was the next step in where I want to go and I was

12   ready to take the risk, so.

13   Q.  So you're ultimately successful and you were hired by the

14   border patrol?

04:09   15   A.  Am I -- what was that?

16   Q.  Your application was accepted and you were ultimately hired

17   by the border patrol, is that right?

18   A.  Yes.

19   Q.  When was that?

04:09   20   A.  I don't know the official dates, but I reported on June

21   26th, 2006.

22   Q.  And was that for the academy?

23   A.  Yes.

24   Q.  And I think your mom mentioned that was in New Mexico?

04:09   25   A.  Yes.

1    Q.   How long were you in the academy for?

2    A.   I think it was 19, 20 weeks.

3    Q.   And what sorts of things are you learning as you're going

4    through the border patrol academy?

04:10    5    A.   Law, of course, defensive tactics, shooting, arrest

6    procedures, ethics, driving, and physical fitness pretty much.

7    Q.   And I imagine spending 20 weeks --

8    A.   Oh, and Spanish.  I should say that.

9    Q.   I'll switch my examination over in Spanish.  I imagine

04:10    10   after spending 19 or 20 weeks at the academy you also forged

11   some friendships?

12   A.   Yes.

13   Q.   Tell me about those.

14   A.   My mom kind of touched on it earlier, but I have been lucky

04:10    15   to be able -- any group I get put to work with or do anything

16   with, I'm -- I can adapt to people very well and make friends

17   pretty quick.

18          And just being a fun happy guy and, you know, meeting

19   guys from all over the country that you don't know anything

04:11    20   about and then, you know, working together to go through a

21   difficult academy like that, I mean, it was pretty easy.

22   Q.   So you had a lot of camaraderie and sort of a team

23   approach?

24   A.   Yeah.

04:11    25   Q.   How many people were in your border patrol class?

1   A.   Well, we started off with 50.

2   Q.   How many graduated?

3   A.   37.

4   Q.   Where were you among the 37?

04:11   5   A.   I graduated first in our class.

6   Q.   Top of the class.  And following your graduation from the

7   border patrol academy, where did you go next?

8   A.   To the Chula Vista border patrol station.

9   Q.   And when you first came on board as a rookie border patrol

04:12   10   agent, any physical or mental limitations?

11   A.   No.

12   Q.   Any issues with memory that you felt were taking away from

13   your work?

14   A.   No.

04:12   15   Q.   Let's switch gears a little bit, I want to talk about the

16   Ryan sort of socially and outside of work before this injury

17   happened.  Tell us a little bit about some of the things you

18   enjoyed doing.

19   A.   Hanging out with my friends all the time, whether it be

04:12   20   golfing, taking trips places, camping, just hanging out trying

21   to meet girls, and experience a new part of the country I'm

22   living in.  Very social.

23   Q.   And that's true from the time you joined the border patrol

24   up until this happened?

04:12   25   A.   Yes.

|    |    |
|----|----|
| 1  | Q.  Fair to say you didn't often spend the weekend alone? |
| 2  | A.  No, not often. |
| 3  | Q.  And you would be out with your friends you mentioned? |
| 4  | A.  Yes. |
| 5  | Q.  Golfing I think?  Yes? |
| 6  | A.  Golfing, yes. |
| 7  | Q.  And then did you enjoy outdoor activities, hunting, |
| 8  | fishing, things like that? |
| 9  | A.  Like I mentioned, camping and fishing as well. |
| 10 | Q.  And then sporting events too, if you're anything like your |
| 11 | mom, I guess you're a Packers fan. |
| 12 | A.  I am. |
| 13 | Q.  I don't think you have a choice about that one.  And would |
| 14 | you go to games?  Or tell me a little bit about your love of |
| 15 | sports. |
| 16 | A.  Yeah.  I mean multiple Padre games a year, every time the |
| 17 | Brewers would come out on the west coast I'd see them here and |
| 18 | in LA.  Went and saw the Brewers in Phoenix, in San Francisco. |
| 19 | I think that's it, but yeah, multiple sporting events. |
| 20 |         MR. CHAMBERS:  Can I have Exhibit 48, please. |
| 21 |         THE WITNESS:  I went to the Rose Bowl three times too. |
| 22 | BY MR. CHAMBERS: |
| 23 | Q.  And if you weren't actually out at these venues you'd be |
| 24 | home watching or with your friends watching? |
| 25 | A.  With my friends, yeah. |

04:13
04:13
04:13
04:14
04:14

1    Q.   Why don't we take a look at the screen here, this is

2    Exhibit 48.   What are we looking at?

3    A.   That is in Mission Beach in 2010 during the Packers playoff

4    and that was against the Atlanta Falcons.

04:14  5    Q.   Who won?

6    A.   The Packers.

7    Q.   Who are we seeing in this photo with you?

8    A.   The guy on the left in the 15 jersey, that's my buddy

9    Jeremy who I went to high school with.   He was in town

04:14  10   visiting.   The guy next to him is my good friend, Erik Freitag,

11   who lives out here.   The guy next to him is Kevin Huyler who I

12   grew up with and went to high school with, and he was out

13   visiting.

14   Q.   So these are some close friends of yours?

04:15  15   A.   Yeah.

16   Q.   And was this a pretty typical Sunday afternoon at least

17   during football season?

18   A.   Yeah.

19   Q.   Get together with your friends and have a good time and

04:15  20   watch the game?

21   A.   Yes.

22   Q.   Can I see Exhibit 39, please.   Who do we have here?

23   A.   That's myself, my brother and my nephew.

24   Q.   That's you on the left of the photo?

04:15  25   A.   Yes.

1    Q.   And then who's in the middle?

2    A.   That's my nephew, Jackson.

3    Q.   Is he the one who's named after you?

4    A.   Yes.

04:15    5    Q.   And it looks like you guys are at Petco?

6    A.   Yes.

7    Q.   Was this something that you guys would typically do when

8    Adam and your nephew were in town?

9    A.   I mean, I can't say every time or for sure.  I just don't

04:15    10   remember, but -- we obviously went to a game it looks like.

11   Q.   And you enjoyed going to sporting events with Adam and with

12   your nephew?

13   A.   Yeah.  I enjoy going with anybody.

14   Q.   And then you mentioned before going on some trips, what

04:16    15   sorts of places would you visit?

16   A.   Like I said before, Phoenix, I've been out a couple times

17   either for sporting events or concerts.  I've been up to

18   Spokane, Washington, San Francisco, northern California,

19   Nevada.  And I even -- one Christmas I took a trip by myself

04:16    20   when we had -- during the holidays I had some vacation to use,

21   so I took a trip by myself to the Grand Canyon.  And then I

22   went up to Bryce Canyon in Utah and Zion National Park in Utah

23   and then Las Vegas on the way back.

24   Q.   And these trips, other than that one you mentioned where

04:17    25   you were just traveling alone, were these with other people?

```
         1   A.   Yes, always my -- a buddy or two.
         2   Q.   So you'd take a few friends and you'd go visit these
         3   various cities?
         4   A.   Yes.
04:17    5   Q.   Can I see Exhibit 36, please.  That's you in the picture, I
         6   assume.
         7   A.   Yes.
         8   Q.   When was this taken?
         9   A.   That's when I took the trip to the Grand Canyon.  I think
04:17   10   it was December of 2011.
        11   Q.   And you were just out hiking alone?
        12   A.   Yes.
        13   Q.   You liked to be outdoors and be active and do those sorts
        14   of things?
04:17   15   A.   Yes.
        16   Q.   Was that something that you'd do frequently here in town as
        17   opposed to traveling?
        18   A.   I mean, I'd do it both.  I'd do it both.
        19   Q.   Can I see Exhibit 38, please.  And where are we here?
04:18   20   A.   That is up in Julian.
        21   Q.   And is that Jackson again?
        22   A.   That is.
        23   Q.   What were you guys doing up in Julian?
        24   A.   Showing him it and we were hiking around a little bit, like
04:18   25   we were at an overlook there.
```

1   Q.   Who else was with you guys, if you remember?

2   A.   Oh, I'm guessing my sister was.

3   Q.   You don't remember?

4   A.   I mean, not specifically, but I would imagine it was her.

04:18   5   Q.   And then in addition to taking these trips and spending

6   time with your family, you also enjoyed working?

7   A.   Yes.

8   Q.   And you talked a little bit before about the camaraderie

9   and the team work that you grew in the academy with, was that

04:18   10   something that carried over when you joined the border patrol

11   full time?

12   A.   Yes.

13   Q.   What was it specifically that you enjoyed about being a

14   border patrol agent?

04:18   15   A.   Protecting the country and working with your brothers and

16   sisters and just feeling like you're doing something worthwhile

17   to help out.

18   Q.   Can I have Exhibit 40, please.  Who do we have here?

19   A.   Those are members of a drug and gang task force I was on

04:19   20   for a little over three years.

21   Q.   What are you guys doing here in the photo?

22   A.   Trying to look cool, I guess.

23   Q.   Do you remember when this was taken?

24   A.   Not specifically.  I mean, I was on that squad from 2010 to

04:19   25   right before my accident.

1   Q.   And you look pretty happy here.  Were you enjoying your

2   work?

3   A.   I was.  I worked on a team -- I was the only federal agent

4   on the team.  Everybody else on the team was either police

04:20   5   officers or probation, parole, and district attorney.  So I got

6   to experience another aspect of law enforcement I wasn't too

7   familiar with.

8   Q.   Now, we've heard a couple times now throughout the course

9   of the trial the different task forces that you've been on as

04:20   10   opposed to other assignments, can you give us the differences,

11   what's a task force versus what a typical border patrol agent

12   would do?

13   A.   A task force is when they combined multiple jurisdictions

14   or law enforcement agencies together in order to target

04:20   15   specific crimes.

16   Q.   And how were you selected to be part of these task forces?

17   A.   You have to submit memos and then do interviews and be

18   selected.

19   Q.   So prior to your injury, what was it about a task force

04:20   20   that was attractive to you?  What made you want to sign up?

21   A.   Try something new and educate myself more, have a new

22   challenge.

23   Q.   Was there a point in time prior to your injury where you

24   were actually out, I don't know what you'd call it, on patrol

04:21   25   or out in the field?

1  A.  What's that?

2  Q.  Was there ever a time prior to your injury where you were

3  on patrol or out in the field?

4  A.  Oh yeah, all the time.

04:21  5  Q.  Okay.  And this is different than the task force?

6  A.  Yes.

7  Q.  What are the differences between being on patrol -- am I

8  using that term correctly?

9  A.  Yes.

04:21  10  Q.  Okay.  So what's the difference between being on patrol and

11  being part of a task force?

12  A.  Well, being on patrol at your station you're pretty much

13  focused on one certain area and depending on where you're

14  stationed you're limited of what you can actually -- what laws

04:21  15  you can actually enforce and what you may run into criminal

16  wise per se.  And on a task force you're more, you're more semi

17  like a detective or investigator focused on criminals that are

18  on -- are in gangs or on drugs.  And the unit I was on was

19  focused mostly on those people that were on probation or parole

04:22  20  and involved in those two.

21  Q.  So it sounds like your time on the task force was a more

22  directed investigation as opposed to just being out looking for

23  bad guys?

24  A.  Yes.  Yes.

04:22  25  Q.  Can I have Exhibit 34, please.  Looks like you in the

```
 1   center of the picture there?
 2   A.   Yes.
 3   Q.   With the badge around your neck?
 4   A.   Yes.
 5   Q.   When was this taken?
 6   A.   I guess during that time period, 2010 to 2013, I don't know
 7   specifically.
 8   Q.   And do you recall what you guys were doing in this picture?
 9   A.   The packages behind us are full of marijuana, so a big
10   narcotics seizure.
11   Q.   So you just made a drug bust?
12   A.   Yes.
13   Q.   And you were kind of doing the trophy shot in front of the
14   bust?
15   A.   Yes.
16   Q.   And these look like some of the same guys that were in the
17   last photo we saw?
18   A.   Yes.
19   Q.   So these were guys that were on the task force with you?
20   A.   Yes.
21   Q.   Friends of yours?
22   A.   Yes.
23   Q.   Can I have Exhibit 35, please.  What are we looking at
24   here?
25   A.   Same situation, just a different seizure.
```

04:22   5
04:23   10
04:23   15
04:23   20
04:23   25

1    Q.   Was that part of the task force that you were involved in's

2    goal was to go out and seize drugs?

3    A.   Well, like I said, it was a drug and gang task force, so it

4    was one of our duties.

04:23    5    Q.   And, again, we've got sort of the trophy shot here in front

6    of all the drugs that you seized?

7    A.   Yes.

8    Q.   Do you remember -- strike that.

9         I want to focus in now -- we've talked a little bit

04:24   10    about your background, a little bit about your work history.  I

11    want to focus in on the months leading up to your injury.  We

12    heard from your mom that you bought a house?

13    A.   Yes.

14    Q.   Tell me a little bit about that.

04:24   15    A.   Oh, I'd lived out here in San Diego in apartments for,

16    shoot, six, seven years and always been a dream of mine to own

17    a home.  And at that time the market was down and I felt it was

18    now or never to try to jump on it.  So I'd been saving my money

19    for years and, of course, I didn't get like the first two or

04:24   20    three houses I wanted to buy and I had to expand my search a

21    little bit.

22         But I found a very nice house, a little farther out in

23    Ramona, but I decided to jump on it.

24    Q.   And what was it about buying your first house that was

04:25   25    particularly important to you?

1   A.   I mean, a sense of pride and accomplishment, you know, not

2   many people are able to do that. And I'd been busting my butt

3   ever since I was 10 years old working and that's something I

4   believe you work for is to own your own home and advance your

04:25   5   life from that point.

6   Q.   So this was a big sort of life event, a big step in your

7   life?

8   A.   Yes.

9   Q.   Had you thought about settling down and starting a family?

04:25   10   A.   Yes.

11   Q.   Tell me a little bit about that.

12   A.   Well, as you get older, you know, and you're kind of

13   getting over the chasing around and hanging out at bars and

14   stuff like that too much, you kind of look at the bigger

04:26   15   picture of things in life. You see a bunch of your friends

16   getting married, and that also came into mind when I actually

17   bought this house as well because it's on the same -- off the

18   same street as the middle school and high school up there. And

19   I always had the vision of having kids that they can just walk

04:26   20   to school and have their kids come over and play here and.

21   Q.   And was having kids something that you looked forward to?

22   A.   Yes.

23   Q.   Still something you look forward to?

24   A.   I would like it but.

04:26   25   Q.   Can I see Exhibit 49, please. Do you remember when this

1    picture was taken?

2    A.   I believe it was in that same time period of 2010 to 2013.

3    Q.   Do you remember where it was taken?

4    A.   I do not, but a friend who's on the task force took it, so

04:27   5    I'm guessing it was by their police department.

6    Q.   And you don't remember what you were doing in this picture

7    or where you guys were?

8    A.   No.

9    Q.   But that's you in it, right?

04:27   10   A.   Yes.

11   Q.   So fair to say life was sort of looking up in the late

12   2012, early 2013 timeframe?

13   A.   Yes.

14   Q.   All right.  Well, let's move forward a little bit then.

04:27   15   We're obviously here today to talk about some difficult things.

16   So I want to delve in and see what you remember, what you don't

17   remember and get your take on things.

18        I'd like first to talk about the incident itself, the

19   explosion and your injury.  Do you have any memory at all of

04:27   20   that evening, June 24th, 2013?

21   A.   No.  And it bugs me every day.

22   Q.   How come?

23   A.   I don't think we'd be sitting here right now, for one.  And

24   because it's changed my life.

04:29   25   Q.   Do you want to take a minute?

```
       1   A.   No, I'm okay.
       2   Q.   Okay.  What's the last memory that you have before your
       3   injury?
       4   A.   Going on a trip with my brother.
04:29  5   Q.   Where did you guys go?
       6   A.   We went up to northern California.
       7   Q.   To do what?
       8   A.   To get away and experience it up there, do some brewery
       9   tours and some camping.
04:30  10  Q.   When you say camping, are you talking about with tents or
       11  RVs or what?
       12  A.   No, just tents.
       13  Q.   Was that something you and your brother did frequently?
       14  A.   I mean, we did occasionally.  It depends, he was gone for
04:30  15  many years and so.
       16  Q.   And do you recall when that camping trip was, how far
       17  before your injury?
       18  A.   Nah, just what people have told me.
       19  Q.   If I suggest to you it was a couple of weeks, do you have
04:30  20  any reason to doubt that?
       21  A.   No.
       22  Q.   So fair to say you don't have a memory for a couple of week
       23  period before your injury?
       24  A.   Correct.
04:30  25  Q.   And that's nothing, you don't remember anything?
```

```
        1   A.   No.
        2   Q.   And similarly you have no recollection whatsoever of using
        3   the compressors or filling a tire that evening, is that right?
        4   A.   No.
04:30   5   Q.   Let's talk a little bit about your experience filling a
        6   tire.  Had you used this particular inflator before?
        7   A.   Yes.
        8   Q.   For what?
        9   A.   To fill tires.
04:31  10   Q.   What kind of tires?
       11   A.   Before that, just vehicle tires, either government vehicle
       12   tires or my personal vehicle tires.
       13   Q.   So we're talking about passenger vehicles, you know, like
       14   I've got on my car and you've got on your car?
04:31  15   A.   Yes.
       16   Q.   Had you ever filled a wheelbarrow tire at this particular
       17   location before?
       18   A.   No.
       19   Q.   You ever filled any smaller tires, like a bicycle tire
04:31  20   maybe?
       21   A.   No.
       22   Q.   Any other small volume tires you filled out there?
       23   A.   No.
       24   Q.   And when you filled this on those prior occasions, did you
04:31  25   have any idea what the PSI coming from the compressors was?
```

1    A.   NO.

2    Q.   Did you ever ask anyone?

3    A.   NO.

4    Q.   Did you ever receive any training from the border patrol or

04:32   5    elsewhere on how to properly inflate a tire?

6              MR. LASKE:  Objection, Your Honor.

7              THE COURT:  Sustained.  Sustained.  This falls within

8    the ruling the Court made in limine.

9              MR. CHAMBERS:  I apologize, Your Honor.  I thought the

04:32   10   Court said we could still elicit testimony from Mr. Moore as to

11   his background and training.  It's not for the purpose of

12   showing the border patrol is negligent for not training, it's

13   simply to get at what his background and experience and

14   knowledge is.

04:32   15             THE COURT:  All right.  I change the ruling then, the

16   objection is overruled.  You may answer that for that purpose,

17   Mr. Moore.

18             THE WITNESS:  No.

19             THE COURT:  Border patrol ever give you training on

04:32   20   how to run this compressor?

21             THE WITNESS:  No.

22   BY MR. CHAMBERS:

23   Q.   And the prior times that you filled out there did you

24   notice any warning signs located anywhere around that

04:32   25   particular inflator?

1    A.   No.

2    Q.   And were you aware of any restrictions that were placed on

3    what you could or could not fill using that inflator?

4    A.   No.

04:32    5    Q.   Were you ever aware of any restrictions on when you could

6    use that inflator?

7    A.   No.

8    Q.   Day or night, no restriction?

9    A.   No.

04:33    10           MR. CHAMBERS:   Can I have Exhibit 271, please.

11   BY MR. CHAMBERS:

12   Q.   Maybe page two.   There we go.   Have you ever seen this

13   before?

14   A.   No.

04:33    15   Q.   Can you read what the warning says on there?   I don't need

16   you to read it out loud.

17   A.   Oh, yeah.

18   Q.   And do you recall reading any warning on your wheelbarrow

19   tire prior to inflating it that evening?

04:33    20   A.   No.

21   Q.   Do you know whether there was a warning on it prior to

22   inflating it that evening?

23   A.   No.

24   Q.   And did you have any reservations about filling the

04:34    25   wheelbarrow tire?

|  | |
|---|---|
| 1 | A.   No. |
| 2 | Q.   Do you consider yourself to be somebody who's trained in |
| 3 | filling tires? |
| 4 | A.   Not professionally trained or I'm not an expert, but I've |
| 5 | filled up numerous tires my entire life and I've never had one |
| 6 | issue. |
| 7 | Q.   So you've got some life experience to draw from? |
| 8 | A.   Yes. |
| 9 | Q.   And the life experience that you're drawing from is |
| 10 | primarily with what sorts of tires? |
| 11 | A.   All different types, vehicle, bicycle, the wheelbarrow |
| 12 | tire, ATV tires, all different sorts. |
| 13 | Q.   And never had any issues filling up any of those? |
| 14 | A.   Never. |
| 15 | Q.   Can you estimate for us how many tires in your lifetime you |
| 16 | think you filled up? |
| 17 | A.   At least over 50. |
| 18 | Q.   And, in fact, you'd filled up this wheelbarrow tire one |
| 19 | time before, right? |
| 20 | A.   Yes. |
| 21 | Q.   And where was that? |
| 22 | A.   It was at the 7-Eleven in Ramona. |
| 23 | Q.   And when you filled it up at the 7-Eleven in Ramona, any |
| 24 | issues with that? |
| 25 | A.   None. |

04:34 (line 5)
04:34 (line 10)
04:34 (line 15)
04:35 (line 20)
04:35 (line 25)

|     |     |
| --- | --- |
| 1   | Q.   Any issues with overinflating it or anything like that? |
| 2   | A.   No. |
| 3   | Q.   Did you have to read any manuals to tell you how to do it? |
| 4   | A.   No. |
04:35   5   Q.   Did you feel competent filling up the wheelbarrow tire out

6   there?

7   A.   Yes.

8   Q.   There's been some suggestion made, so I think I'll just ask

9   you, why didn't you just take this wheelbarrow tire back to the

04:35   10   7-Eleven instead of taking it to the border patrol facility?

11   A.   I can't say for sure, but I guess I just threw it in my

12   truck to fill it up whenever I was near the next air

13   compressor.

14         MR. LASKE:   Objection, move to strike, Your Honor.

04:36   15   Calls for speculation or is speculative.

16         THE COURT:   Yeah, sustained.   The answer was

17   speculative.   Sustained.   Last answer is stricken.

18   BY MR. CHAMBERS:

19   Q.   Do you have any memory as to why you took this wheelbarrow

04:36   20   tire to the border patrol facility as opposed to some other

21   place?

22   A.   No.

23   Q.   Do you recall when you put the wheelbarrow into your truck

24   to take?

04:36   25   A.   No.

| | | |
|---|---|---|
| | 1 | Q.   No idea whether it was a day before or a week before? |
| | 2 | A.   No idea. |
| | 3 | Q.   And do you remember the condition of the wheelbarrow tire |
| | 4 | in terms of how much air was in it? |
| 04:36 | 5 | A.   No. |
| | 6 | Q.   Don't remember if it was flat or not flat or some air or |
| | 7 | how much air? |
| | 8 | A.   No. |
| | 9 | Q.   What's your first memory following your injury? |
| 04:36 | 10 | A.   Waking up in the hospital. |
| | 11 | Q.   And do you recall approximately when that was? |
| | 12 | A.   Shortly before I was released to go home. |
| | 13 | Q.   So you were in the hospital for a couple of weeks, as I |
| | 14 | understand it? |
| 04:37 | 15 | A.   Yes. |
| | 16 | Q.   So it would have been a couple of weeks after the incident |
| | 17 | when you have your first memory? |
| | 18 | A.   I think I was in the hospital for two and a half weeks, so |
| | 19 | I think right around the end of the second week. |
| 04:37 | 20 | Q.   So is it fair to say there's about a month gap in terms of |
| | 21 | your memory around the time of this incident? |
| | 22 | A.   Yes. |
| | 23 | Q.   And when you first woke up in the hospital, how did you |
| | 24 | feel? |
| 04:37 | 25 | A.   Confused.  In pain.  Shocked. |

```
        1   Q.   Were you scared?
        2   A.   I would have to say yes.  I mean, I had no idea what was
        3   going on or why all these people were there and I couldn't talk
        4   or -- I was very confused.
04:38   5   Q.   And the pain that you were experiencing, what was that
        6   from?
        7   A.   From my whole mouth region and the tracheometry [as spoken]
        8   in my throat.
        9   Q.   Can I have Exhibit 41, please.  And is this a picture taken
04:38  10   of you in the hospital?
       11   A.   Yes.
       12   Q.   Is that a fair and accurate representation of what you
       13   looked like back then?
       14   A.   Yes.
04:38  15   Q.   Can I see Exhibit 42, please.  Looks like you from another
       16   angle?
       17   A.   Yes.
       18   Q.   And is that a fair and accurate representation?
       19   A.   Yes.
04:39  20   Q.   Can I see Exhibit 43, please.  Flip that.  And same
       21   question, is this a fair and accurate representation of you in
       22   the hospital?
       23   A.   Yes.
       24   Q.   Do you know what injuries you sustained?
04:39  25            MR. LASKE:  Objection, Your Honor, calls for hearsay.
```

1   THE COURT:  If you know from personal knowledge what

2   injuries, you may answer.

3   MR. LASKE:  And to the extent it might call for a

4   medical opinion.

04:40   5   THE COURT:  You may answer.  Just based on your

6   personal knowledge of what injuries you had when you woke up.

7   THE WITNESS:  Okay.

8   THE COURT:  Why don't you take that picture down now.

9   MR. CHAMBERS:  Yeah.

04:40   10   THE WITNESS:  I know I had a broken sinus, broken

11   nose, tore my parotid gland.  I suffered a skull fracture to my

12   upper mandible.  I suffered a skull fracture to my bottom

13   ridge, underneath my lip, above my chin, broken jaw, bunch of

14   teeth missing, a huge scar on the side of my face underneath my

04:41   15   chin and on the right side of my face.

16   I know I tore -- I don't know the name of it but one

17   of the muscles above my jaw that helps you eat.  Another one I

18   tore that helps you smile.  Nerve damage.  And there was

19   probably another parotid duct or something, and I know I came

04:41   20   two centimeters away from severing my carotid artery.

21   Q.  And you mentioned you were in the hospital for two and a

22   half weeks?

23   A.  Yes.  They originally told me it was going to be four

24   months -- or not four months, a month, but I was able to get

04:41   25   out in two and a half weeks.

1   Q.   And during those first couple of weeks, how were you

2   feeling?

3   A.   Pretty much the same as when I woke up, just still stunned,

4   confused, in pain, embarrassed, trying to figure out what

04:42   5   happened, what's going on, not knowing what I'm going

6   to -- what truly -- what true damage I suffered and the road

7   ahead.

8   Q.   Were you able to communicate initially?

9   A.   When I woke up?

04:42   10   Q.   Yes.

11   A.   No.

12   Q.   Why not?

13   A.   Because I had the tracheometry in my throat.

14   Q.   How about as the days moved forward, were you able to start

04:42   15   communicating and talking?

16   A.   Well, not until they took it out.

17   Q.   Once the tracheotomy was removed, were you able to

18   communicate?

19   A.   I mean I could speak, but I wouldn't say I could

04:42   20   communicate because it hurt too much to talk and I was missing

21   so many teeth and my jaw was messed up.

22   Q.   How would you communicate with others around you?

23   A.   I mean, mostly writing stuff down or on the phone just

24   texting.  I mean, it hurt too much to talk and no one could

04:43   25   understand me anyway, so.

1    Q.   So you were released and you went where after you were

2    released from the hospital?

3    A.   To my house.

4    Q.   And was somebody there with you?

04:43    5    A.   At first it was my brother, my dad, and my uncle.

6    Q.   And how were you feeling once you got home?

7    A.   Glad to be out of the hospital, but I was useless.  I

8    couldn't eat.  Couldn't do anything.  Just, I was in pain all

9    day.  Couldn't sleep.  I was worthless.

04:44    10   Q.   And that's how you felt?

11   A.   Yep.

12   Q.   You were eating, how were you eating or sustaining

13   yourself?

14   A.   I couldn't eat.  Only thing I could do is drink.  I don't

04:44    15   even remember how -- I know I don't even think I could use a

16   straw so -- so I know, the only thing I could have is liquid.

17   Q.   Can I have Exhibit 44, please.  I forgot this one.  This is

18   you still in the hospital?

19   A.   Yes.

04:44    20   Q.   And this is after you've awoken?

21   A.   Yes.

22   Q.   And this is a fair and accurate depiction of what you

23   looked like?

24   A.   Yes.

04:44    25   Q.   Is that the swelling we see along the left side of your

1    face there?

2    A.   Yes.

3    Q.   Can I see Exhibit 17, please.  And this looks like you a

4    little further along in your recovery.  What are those things

04:45   5    on your face?

6    A.   I don't know what you'd call them, bandages or something

7    after one of my surgeries.

8    Q.   And is this a fair and accurate representation of what you

9    looked like?

04:45   10   A.   When?

11   Q.   When this picture was taken.

12          MR. LASKE:  Objection, vague as to time.

13   BY MR. CHAMBERS:

14   Q.   Do you recall when this photo was taken?

04:45   15   A.   It was after one of my surgeries, but it wasn't one of

16   the -- after I got home right away.

17   Q.   Right.  No, I can tell you're a little further along in the

18   road to recovery.

19   A.   Yes.

04:45   20   Q.   Do you recall what surgery it followed?

21   A.   Not off the top of my head.

22   Q.   But that's a photo of you, is it not?

23   A.   Yes.

24   Q.   Can I see Exhibit 18.  And when was this taken?

04:46   25   A.   That was after another surgery.  I believe it was the

1  second one I had with Dr. Berger.

2  Q.  And that's a fair and accurate representation of what you

3  looked like following that procedure?

4  A.  Yes.

04:46  5  Q.  Can I have Exhibit 20, please.  This looks similar to

6  number 17, looks like maybe a larger bandage along the left

7  side of your face there?

8  A.  Yes.

9  Q.  And this is a fair and accurate representation of you?

04:46  10  A.  Yes.

11  Q.  And do you recall when this was taken?

12  A.  Yeah, after one of the surgeries.

13  Q.  Do you recall what surgery?

14  A.  Not specific, no.

04:46  15  Q.  Were you taking this photo?

16  A.  I could have been.

17  Q.  Don't remember one way or the other?

18  A.  No.

19  Q.  So let's go back to you getting home and starting the

04:47  20  recovery process.  You said you felt worthless, how was your

21  pain during those first few weeks at home?

22  A.  Horrible.  Like I said, it was all day long and that's why

23  I didn't even want to talk or anything because the more I would

24  try to talk the more it would hurt.

04:47  25        I would just take as much medication as I could to try

1   to get me as comfortable as possible and just lay there.

2   Q.   And then shortly after you were released from the hospital,

3   you had a surgery; is that right?

4   A.   Yes.

04:47   5   Q.   So the incident happened in June of 2013 and I think you

6   were released and then you went back in, in July of 2013, does

7   that sound right?

8   A.   Yes.

9   Q.   Late July?

04:47   10   A.   I believe it was later July.

11   Q.   And do you recall what that surgery entailed?

12   A.   That was back at Scripps Mercy and it was by Dr. Vecchione

13   and Dr. Azer, they were removing the stints that they put in my

14   parotid duct or gland and removing some arch bars that they had

04:48   15   put in earlier.

16   Q.   Okay.  And what was the recovery like from that procedure?

17   A.   I mean, pain again and still just not knowing of what's

18   ahead.  I mean, I didn't even know Dr. Berger's name until

19   after that one still, and had no idea what was coming.

04:48   20   Q.   And then about a month after that surgery, you have another

21   one at Sharp Memorial, is that right?

22   A.   That was the first one I had with Dr. Berger on my

23   birthday.

24   Q.   Tell me a little bit about what that procedure involved.

04:49   25   A.   He broke -- rebroke my jaw.  He took a bone out of my hip

```
 1   to put it, graft it in my mouth.  He put a bunch of titanium
 2   mesh in my mouth and just started kind of reconfiguring my
 3   face, I guess.
 4   Q.   And the recovery from that particular surgery was
 5   difficult, wasn't it?
 6   A.   Yes.  It was the most painful one I've been through.
 7   Q.   What about it was painful?
 8   A.   I didn't really know the extent of what he was going to do,
 9   but I felt like someone took a sledge hammer and just cracked
10   me over the face with it.  I mean, my whole entire face was
11   sore.  I couldn't touch anything and my whole face got black
12   and blue, my eyes, everything like.  It sucked.
13   Q.   And, again, about a month after that one you go back in to
14   have some additional teeth pulled; is that right?
15   A.   Yes.
16   Q.   And that was with Dr. Berger as well?
17   A.   Yes.
18   Q.   You've had quite a few surgeries to try and put you back
19   together, haven't you?
20   A.   Yes.
21   Q.   Do you have any estimate as to how many?
22   A.   I think probably around 10 or so.
23   Q.   And you don't even remember the first two that you had when
24   you were in the hospital, do you?
25   A.   No.
```

04:49 (line 5)
04:49 (line 10)
04:50 (line 15)
04:50 (line 20)
04:50 (line 25)

1  Q.  I want to kind of stick with the physical injuries that

2  you've sustained.  What's the last three, almost four years

3  been like for you physically?

4  A.  A lot of ups and downs, but I mean for the most part just

04:51   5  horrible.

6  Q.  Tell me a little bit more, what's been so horrible about

7  it.

8  A.  Well, the pain, of course.  I lost 50 pounds because I

9  couldn't eat anything.  I had to buy all new clothes.  And then

04:51  10  I'd be able to eat again or I got to go from liquid to soft

11  food for a little while, then I'd have another surgery.  Then

12  I'm back on the liquid diet and that happened, you know, back

13  and forth for years.  And, physically, just being in pain when

14  you just don't -- you don't know when it's going to end.

04:52  15  Q.  Has it really ended even though three plus years have

16  passed?

17  A.  No.

18  Q.  Why not?

19  A.  Just all the damage done.  It's -- it's not going away.

04:52  20  Q.  And we heard from Dr. Kohani you only recently got your

21  teeth; is that right?

22  A.  Yes.

23  Q.  And so for the better part of the last three, three and a

24  half years, did you have any teeth at all?

04:52  25  A.  I had a couple.

1   Q.   How about any teeth in the front?

2   A.   No.

3   Q.   And would you go out in public that way?

4   A.   I would have to.

04:53   5   Q.   Why?

6   A.   There's no other way to go to doctor's visits, go to the

7   store, go to work, do anything.

8   Q.   Did you have any kind of temporary thing that you could put

9   in there or retainer of some sort?

04:53   10   A.   I did at first, but when Dr. Berger pulled out more teeth

11   the fake teeth wouldn't fit anymore and they wouldn't make me

12   new ones, so I said screw it.

13   Q.   You'd rather just not have teeth than have teeth that

14   weren't fitting?

04:53   15   A.   Because it would cost me thousands more dollars just for

16   the fake teeth.

17   Q.   What about your facial cuts and scarring, how has that been

18   over the last couple years?

19   A.   Not good.

04:54   20   Q.   Why?

21   A.   Because people look at you differently and you get a

22   thousand questions asked, well, what happened to you, and they

23   look at me funny.

24   Q.   Does that bother you?

04:54   25   A.   Yeah.

1  Q.  And then we've heard a little bit about the numbness, can

2  you tell us a little bit about the numbness that you're

3  experiencing?

4  A.  It's right in my -- pretty much my bottom lip and below it

04:55  5  into my chin and up to my upper lip like right here.  Tingling

6  and numbing all day every day.

7  Q.  Has it gotten any better?

8  A.  No.

9  Q.  And what about pain, are you still in pain?

04:55  10  A.  I am, but kind of gotten used to it.  But it's there.

11        MR. CHAMBERS:  Your Honor, this might be a good place

12  to stop for this afternoon.

13        THE COURT:  All right.  We'll take our afternoon

14  recess at this time.  Agent Moore, you may stand down.  We'll

04:55  15  see you tomorrow at 9:00.  We'll begin promptly at 9.

16        You can leave your things here.  We're going to lock

17  the courtroom up.  It'll be reopened at 8:30 tomorrow.  But

18  anything you don't need to take with you for tonight you may

19  leave here.  Any other things we need to discuss before we

04:56  20  recess?

21        MR. CHAMBERS:  Just to make the Court aware, Your

22  Honor, we sort of took Ryan out of order.  So we've got some

23  doctors lined up for the morning, so we'll pick up with Ryan's

24  testimony tomorrow afternoon, if that's all right.

04:56  25        THE COURT:  Yeah, that's fine.  Plaintiffs are at

1   almost five hours.  The defendants are at an hour and 10

2   minutes at this point just for your planning purposes.

3    (The proceedings concluded at 4:56 p.m., February 28, 2017.)

1                    COURT REPORTER'S CERTIFICATE

2

3       We, CYNTHIA R. OTT and DANA PEABODY, Official Court

4   Reporters, United States District Court, Southern District of

5   California, do hereby certify that pursuant to 28 U.S.C. §753

6   the foregoing is a true, complete and correct transcript of the

7   stenographically reported proceedings had in connection with

8   the above-entitled matter and that the transcript page format

9   is in conformance with the regulations of the Judicial

10  Conference of the United States.

11      DATED at San Diego, California, February 28, 2017.

12

13

14              _____/s/ CYNTHIA R. OTT_____
                CYNTHIA R. OTT, RDR, CRR

15

16              /s/ DANA PEABODY

17              _____
                DANA PEABODY, RDR, CRR

18

19

20

21

22

23

24

25