1              United States District Court

2           For the Southern District of California

3

4
                                    )
5    RYAN MOORE,                     )
                                    )   No. 15-CV-75-LAB
6         Plaintiff,                 )
                                    )   March 1, 2017
7              v.                    )
                                    )   San Diego, California
8    UNITED STATES OF AMERICA and    )
     DOES 1 THROUGH 25, INCLUSIVE,   )
9                                    )
          Defendants.               )
10

11                Day Two (Morning Session)
                   Transcript of Trial
12          BEFORE THE HONORABLE LARRY ALAN BURNS
                 United States District Judge
13
     APPEARANCES:
14
     For the Plaintiff:      GOMEZ TRIAL ATTORNEYS
15                           ROBERT J. CHAMBERS
                             BEN WOHLFEIL
16                           655 West Broadway, Suite 1700
                             San Diego, CA  92101
17
     For the Defendants:     TIM L. LASKE
18                           GARRETT J. COYLE
                             ASSISTANT UNITED STATES ATTORNEYS
19                           Federal Building, Suite 7516
                             300 North Los Angeles Street
20                           Los Angeles, CA  90012

21

22

23
     Court Reporter:         DANA PEABODY, RDR, CRR
24                           District Court Clerk's Office
                             333 West Broadway, Suite 420
25                           San Diego, California, 92101

1  Case:   Moore v. USA
   Date:   March 1, 2017
2

3

                         INDEX OF WITNESSES
4

   FOR THE PLAINTIFF:
5
                                    E X A M I N A T I O N
                              DIRECT   CROSS REDIRECT RECROSS
6
   Michael Lobatz, M.D.
7     Mr. Wohlfeil                279
      Mr. Coyle                             326
8
   Colin Koransky, Ph.D
9     Mr. Chambers                335                 390
      Mr. Coyle                             368
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1  Case:   Moore v. USA
   Date:   March 1, 2017
2
3
4                      INDEX OF EXHIBITS
5  EXHIBIT                                    EVIDENCE
6  17                                            278
7  18                                            278
8  20                                            278
9  21                                            278
10 34                                            278
11 35                                            278
12 36                                            278
13 38 through 44                                 278
14 48                                            278
15 49                                            278
16 127 through 131                               325
17 145                                           279
18 146                                           279
19
20
21
22
23
24
25
```

| | |
|---|---|
| 1 | San Diego, California, March 1, 2017 |
| 2 | * * * |
| 3 | THE CLERK:  Calling matter 1 on calendar, 15-CV-75, |
| 4 | Moore versus United States of America set for bench trial. |
| 09:08    5 | THE COURT:  Mr. Chambers -- all counsel are present. |
| 6 | The plaintiff and the defendant's representative are present. |
| 7 | Mr. Chambers, you were going to call somebody out of |
| 8 | order this morning? |
| 9 | MR. CHAMBERS:  I was, Your Honor.  We have a few |
| 09:08   10 | housekeeping matters if the Court would like to take those up |
| 11 | now. |
| 12 | THE COURT:  Sure. |
| 13 | MR. CHAMBERS:  We've got some agreed upon deposition |
| 14 | excerpts and objections to those.  I didn't know how the Court |
| 09:08   15 | wanted to handle those. |
| 16 | THE COURT:  I want to handle them contemporaneously. |
| 17 | MR. CHAMBERS:  You'd like them read in or -- |
| 18 | THE COURT:  I'll hear what the objection is, I'll rule |
| 19 | on it, and then if I sustain it, then it won't be read in, |
| 09:09   20 | otherwise it will be read in at that point. |
| 21 | MR. CHAMBERS:  Okay.  Fair enough. |
| 22 | And then there were a number of photographs yesterday |
| 23 | when I was questioning Mr. Moore that I'd like to offer into |
| 24 | evidence.  I've spoken with Mr. Laske.  I don't believe there's |
| 09:09   25 | any objection. |

           1            MR. LASKE:  No objection, Your Honor.

           2            THE COURT:  All right.  Do you want to list those?

           3            MR. CHAMBERS:  I would love to.  They are Exhibit 17,

           4   18, 20, 34, 36, 38 through 44, 48, 49, 35, and 21.

09:09      5            THE COURT:  All right.  Without objection, each of

           6   those exhibits is received.

           7        (Exhibit 17 admitted.)

           8        (Exhibit 18 admitted.)

           9        (Exhibit 20 admitted.)

09:09     10        (Exhibit 34 admitted.)

          11        (Exhibit 36 admitted.)

          12        (Exhibit 38 through 44 admitted.)

          13        (Exhibit 48 admitted.)

          14        (Exhibit 49 admitted.)

          15        (Exhibit 35 admitted.)

          16        (Exhibit 21 admitted.)

          17            THE COURT:  Anything else?

          18            MR. CHAMBERS:  Thirdly, Your Honor, yes.  There are

          19   some discovery responses, requests for admissions, and special

09:09     20   interrogatories that we'd like to enter into evidence.  Again,

          21   I've spoken with Mr. Laske.  I don't believe there's an

          22   objection, but . . .

          23            MR. LASKE:  No, Your Honor.

          24            THE COURT:  All right.  Do you want to do that now or

09:10     25   at some appropriate time?

1    MR. CHAMBERS:  Would you like those read in or -- I
2  didn't know what the Court's preference was.

3    THE COURT:  Yeah, at the end of the testimony.

4    MR. CHAMBERS:  Okay.  We'll handle that later then.

09:10   5    And then finally, Your Honor, we've got two exhibits
6  which comprise our economic expert's report which the parties
7  have stipulated to the admissibility of, so I'd like to offer
8  Exhibits 145 and 146 into evidence.

9    THE COURT:  Any objection to those exhibits?

09:10  10    MR. LASKE:  No, Your Honor.  We did stipulate to that.

11    THE COURT:  Both are received.

12    (Exhibit 145 admitted.)

13    (Exhibit 146 admitted.)

14    THE COURT:  All right.  You may call your witness now.

09:10  15    MR. WOHLFEIL:  We'd call Dr. Lobatz, Your Honor.

16    **MICHAEL LOBATZ, M.D.**,

17    PLAINTIFF'S WITNESS, SWORN

18    THE CLERK:  Would you state and spell your full name
19  for the record.

09:11  20    THE WITNESS:  Michael Allan Lobatz, L-O-B-A-T-Z.

21    MR. WOHLFEIL:  May I, Your Honor?

22    THE COURT:  Yes.

23    DIRECT EXAMINATION

24  BY MR. WOHLFEIL:

09:11  25  Q.  Good morning, Dr. Lobatz.

```
 1   A.   Good morning.
 2   Q.   Dr. Lobatz, you're a neurologist.  Is that correct?
 3   A.   That is correct.
 4   Q.   Before we jump into this case, I want to talk a little bit
 5   about you.
 6        Can you please tell us about your educational
 7   background?
 8   A.   Sure.  I was awarded a degree in biomechanic engineering at
 9   the University of Illinois in Chicago.  I did research in
10   education thereafter in neuropharmacology in a Ph.D. program.
11        THE COURT:  Keep your voice up a little bit, Doctor.
12        THE WITNESS:  I'm sorry.
13        THE COURT:  Maybe the system is down.  Maybe you can
14   turn it up.
15        THE WITNESS:  I'll just get closer.
16        THE COURT:  Yes.
17        THE WITNESS:  And then I went on to medical school at
18   the Abraham Lincoln School of Medicine at the University of
19   Illinois in Chicago as well, following which I came out to
20   California to UCSD where I did an internship and residency and
21   became a neurologist.
22        I passed my board certifications on the first try in
23   1983.  I've been in continuous practice as a neurologist since
24   that time, since basically 1981 until today, and I still
25   continue to practice very actively.
```

09:11

09:11

09:12

09:12

09:12

BY MR. WOHLFEIL:

Q.   You're licensed to practice medicine in the state of California.  Is that right?

A.   That is correct.

09:12    Q.   Since when?

A.   Since about 1978.

Q.   And you mentioned your board certifications?

A.   Yes.  So I did a residency in neurology and then did my postgraduate experience and then took my board certification

09:13    tests and passed those.

Q.   Do you have any specializations?

A.   Yes.  I do neurorehabilitation.  I'm the director of the Rehabilitation Center at Scripps Hospital where we have a 30-bed acute patient rehabilitation center.  I've been involved

09:13    in a neurorehabilitation, especially in traumatic brain injury, for more than 20 years.  I've published on this as well as led educational courses on a yearly basis that are attended by people from all over the country.

Q.   How long have you been leading those conferences where

09:13    people attend from all over the country?

A.   The 12th conference is about to occur on March 10th and 11th here at the San Diego Mission Bay Hilton.  I'm expecting at least 200, maybe 300 people.

Q.   You mentioned you're actually published in the field?

09:13    A.   I have.  I have a peer-reviewed article that came out in

 1   December of 2014 on death after discharge in traumatic brain
 2   injury in elderly patients.
 3   Q.  Doctor, approximately what percentage of your time is spent
 4   actually caring for patients?
 5   A.  I'd say about 80 percent plus.  I spend easily four or five
 6   hours a day doing my neurorehabilitation practice at Scripps
 7   Hospital and then several hours in the afternoon seeing
 8   patients.  About 20 percent or so is what I would call forensic
 9   where I do medical/legal evaluations.  It's grown a little bit
10   over the last few years as I've gotten grayer, so . . .
11   Q.  Doctor, what experience do you have -- or do you have
12   experience in treating people with traumatic brain injuries?
13   A.  I do.  I have extensive experience both on an inpatient
14   basis with people that have had very serious injuries such as
15   penetrating head wounds from gunshots, explosive injuries, car
16   accidents, falls, fractures, and things of that nature.  That's
17   almost a daily basis that I take care of those patients in the
18   inpatient rehabilitation center.

19           And then I follow these patients as outpatients over a
20   prolonged period of time.

21           I also have experience in -- and the privilege of
22   treating our military who return from combat who also may, in
23   addition to other people that -- other active duty that have
24   car accidents or falls or fractures or motorcycle accidents and
25   things of that nature as well.

1       Currently I think I have three inpatients that are

2    active duty military currently plus a number of outpatients.

3       I run an outpatient brain injury program as well as

4    part of my duties at Scripps.  There I have about probably 15

09:15   5    to 20 people coming per day, getting therapy and recovery from

6    their rehabilitation -- for their rehabilitation from their

7    injuries, TBI and other acquired injuries.

8    Q.   Thank you, Doctor.

9       I want to next talk about traumatic brain injuries.

09:16  10    A.   Certainly.

11    Q.   Doctor, can you help us understand what a traumatic brain

12    injury is?

13    A.   Sure.  Well, let's -- I'm going to refer to some notes if

14    that's okay.  So a brain injury is caused by a blow to the head

09:16  15    or a sufficient impulsive force to the body even -- it doesn't

16    have to occur directly to the head -- where there's enough

17    force that the brain can coil and recoil within the skull.

18       The skull is a protective mechanism.  It's sort of

19    like a jacket, of course, around the brain.  It's hard, and the

09:16  20    brain floats inside that in what we call spinal fluid.  The

21    brain itself is made up of a gelatinous kind of material, sort

22    of like Jell-O.  And as it gets bounced around, forces can make

23    their way through the brain from one side to the other and

24    deform the structures within.

09:17  25       They can bounce back and into their normal

1    configuration, but on a microscopic level, things can change,

2    and there can be issues relating to the connections that

3    we -- that are in the brain called axons and dendrites.  So any

4    force that's sufficient can cause that brain to move back and

09:17   5    forth, hit the front of the skull, hit the back of the skull.

6    We call that a coup contrecoup kind of injury.  And, again, the

7    forces are transmitted all the way through.  It's not just a

8    blow to the front or a blow to the back.  Everything goes right

9    through the whole thing.

09:17  10        So that's really the basis of an injury that can occur

11   to a brain.  Of course, it can also occur from a penetrating

12   injury, like a missile going into -- through the skull,

13   fractures penetrating the brain tissue.

14   Q.   Thank you, Dr. Lobatz.

09:18  15        I want to talk about how it is neurologists diagnose a

16   traumatic brain injury.

17   A.   The diagnosis is really based on a few things.  First of

18   all, it's the clinical history.  It's the fact that there was a

19   blow to the head or a sufficient force to the body that may

09:18  20   have caused this to occur.  And then typically patients have a

21   set of symptoms that occur following the injury that might be

22   immediate or develop over a period of a few days.  There's a

23   biochemical reaction that occurs within the brain after an

24   injury that takes a while to develop, and then it takes a while

09:18  25   to get better and go away.

1         So not all symptoms are immediately evident in

2    patients that have TBI, especially those that have other severe

3    injuries that are being attended to that are more important

4    than perhaps aspects of the brain injury itself.

09:19    5         So neurologists will listen to the patients' story.

6    Do they have symptoms that occurred with the onset of the

7    injury?  For instance, have they lost memory for the injury,

8    what we call amnesia?  Is that amnesia present for events prior

9    to the onset of the injury, what we call retrograde amnesia, or

09:19    10   is the amnesia after the event itself, what we call anterograde

11   amnesia, or do they have both?

12        We also look for symptoms, the somatic nature,

13   symptoms like pain, headache, blurred vision, balance,

14   dizziness, inability to think properly, memory loss, what we

09:20    15   call loss or change in executive function, the ability to plan

16   things out, to follow along, to make adjustments as you do plan

17   and act on whatever those things are that you're working on.

18   They're called executive function.

19        There may be differences or changes in personality.

09:20    20   There could be the development of irritability.  Very common to

21   have sleep disturbance following an injury, insomnia, inability

22   to maintain sleep, and things of that nature.

23        So as neurologists we listen carefully to the story,

24   and if it links to the injury itself in a reasonable fashion,

09:20    25   we would diagnose the patient as having had a brain injury of

1    some type.

2          We would also be looking to other imaging kinds of

3    studies or objective kinds of studies that include CAT scans

4    and/or MRIs.

09:21  5          Typically in the emergency room where there is a lot

6    going on and speed and the desire to rapidly evaluate a patient

7    and get to all of their injuries, especially if it's what we

8    call polytrauma or multiple trauma, where they have multiple

9    fractures plus a brain injury, there's a triage that occurs

09:21  10   initially in the emergency room looking at the severity of the

11   brain injury, if present, and the severity of the other kinds

12   of injuries.

13         So sometimes the brain injury, if it's mild enough,

14   takes a second tier to the other kinds of things going on.  But

09:21  15   what's usually done is a CAT scan.  This can take only a minute

16   or less with today's modern CAT scanners to look at the brain

17   and make sure there's nothing massively wrong; however, that

18   test is not a perfect test.  It doesn't look at the more subtle

19   or milder abnormalities that could occur, and it may miss small

09:22  20   things.

21         The perfect test for that is an MRI, but the MRI is

22   not appropriate to be done in an emergency setting.  They're

23   rarely ever done in emergency departments because it takes at

24   least an hour to do an MRI.  You're in a scanner in a hole by

09:22  25   yourself, and if you have serious other injuries, it just can't

1   be done.

2         But it is the preferred test.

3         The best analogy that I could give you regarding the

4   difference between a CT and an MRI, from a layperson's

09:22   5   perspective and from what I think, is that if you were to dive

6   into a swimming pool and open your eyes underwater, you could

7   see, but not very well.  You would make out shapes and sizes

8   and things of that nature.  You might be able to navigate your

9   way around.  The MRI is like jumping into a swimming pool

09:23   10   wearing goggles and opening your eyes.  You can see so much

11   better.  The spacial resolution is much improved, and,

12   therefore, you can discern smaller things that you wouldn't

13   ordinarily be able to see on a CAT scan.

14         In addition, the MRI is a completely different

09:23   15   technology.  It doesn't use X-ray, it uses magnetism, and it

16   can find evidence of things like small hemorrhagic lesions that

17   a CAT scan could completely miss.

18         So ultimately an MRI is an appropriate test for a

19   person to have if they have lingering symptoms and you're

09:23   20   interested to know why their symptoms are lingering and you're

21   looking at a whole variety of things that might cause those

22   lingering symptoms, at that point an MRI, in my view, my humble

23   opinion, is the appropriate test to do, and I would do it every

24   time.

09:24   25   Q.   Thank you, Doctor.

1    You may have touched on this during your explanation,

2    but I want to make sure I understand.

3    Can you explain the role of the Glasgow Coma Scale?

4    A.   Sure.  So the Glasgow Coma Scale is a scale that's been

09:24   5    used since the early '70s developed in Glasgow, Scotland, and

6    it looks at the -- and it was developed for the purpose of

7    triaging patients in the emergency department.  How do you know

8    that, one, that you have to call the neurosurgeon to come and

9    get a subdural hematoma?  What are the criteria for

09:24   10   classification of the patient in the emergency department who

11   you're going to ring all the alarm bells, bring in the

12   neurosurgeon, get the immediate CAT scan, open up the operating

13   room, and get it ready for that patient?  Because moments mean

14   a lot to patients in serious conditions like subdural hematomas

09:25   15   or intracranial hemorrhages of various kinds.

16   So the Glasgow Coma Scale was developed to look at

17   that, and it has three components.  The first is whether or not

18   a patient can open their eyes or not.  And you get a series of

19   points, one to four points.  One for no eye-opening, four for

09:25   20   spontaneously opening your eyes.

21   The second criteria is best verbal response.  If you

22   have no verbal response, you get one point.  And if you have a

23   good verbal response where you're oriented and you can tell the

24   person where you're at, what day it is, what the situation is,

09:25   25   so forth, then you get six points.  I'm sorry, five points.

1        And then the last is best motor response.  And motor

2    response you get one point if you're completely paralyzed and

3    you're not moving, and you get six points if you're obeying

4    commands and lifting your arm and leg up.

09:26    5        So perfect Glasgow Coma Scale score is 15.  The worst

6    possible score you can get is three.  You get three for showing

7    up, and, otherwise, you can't get a zero or anything like that.

8        So the way we classify it is that if a person has a

9    Glasgow Coma Scale of 13 to 15, we would classify that as a

09:26    10   mild kind of a presentation and you don't need to ring the

11   alarm bells.  If it's less than nine, if it's eight, down to,

12   let's say, six, that's a more moderate, and you would want to

13   start, not necessarily within the moment, but with -- pretty

14   quickly getting the patient evaluated from a neurological and

09:26    15   neurosurgical perspective.

16       If you have six or eight or less actually, eight or

17   less, you would have an emergency situation where you would be

18   doing everything and getting the operating room ready.

19       So that's the purpose of that?

09:27    20       What's happened with that over the years is that

21   people have taken that and have turned it into what they would

22   think is a prognostic feature, and there's some basis to that.

23   Patients who have Glasgow Coma Scale of 13 to 15 typically have

24   milder injuries, and they have a better prognosis.

09:27    25       But the important thing to note about the Glasgow Coma

1    Scale is you could have a perfect Glasgow Coma Scale of 15 and

2    still have a brain injury.  It's just for the purpose of

3    triaging.

4    Q.   So, Doctor, on that point, how would you describe the

09:27    5    utility of the Glasgow Coma Scale in diagnosing traumatic brain

6    injury?

7    A.   It's used as a triage tool.  It's not the end all, and,

8    like I said, you could have a perfect 15 and still have an

9    injury, so that's not -- it's not the -- it's not used in the

09:28    10   definition, essentially.

11   Q.   It sounds like the utility would be pretty limited?

12   A.   It is.

13   Q.   So, Doctor, I think we've got a couple of videos that I'd

14   like to show you.

09:28    15        MR. WOHLFEIL:  Can we turn to 125, please?

16   BY MR. WOHLFEIL:

17   Q.   Doctor, do you recognize 125 on the screen in front of you?

18   A.   Yes, so this is a video that I provided to you that was

19   provided to me by a professor of engineering at Harvard who is

09:28    20   one of the speakers at my conference, and he tried to

21   illustrate that wave that comes through the brain when one

22   impacts the brain.  He uses actual Jell-O here, and you see the

23   finger flicking, and then you get the sense, you'll understand,

24   I think, why the waves go through and how.  Just because it's

09:28    25   the finger is flicking one side of the Jell-O mold, the whole

1    Jell-O mold is involved.

2         MR. WOHLFEIL:  Could you play it one more time?

3         MR. CHAMBERS:  Sure.

4         THE WITNESS:  The other thing to notice about this

09:29    5    video is the timeline.  You're seeing in the upper right the

6    milliseconds coming across and how quick this whole thing is,

7    time lapse photography, and in less than two-tenths of a

8    second, 120 milliseconds or so, that wave has made its way

9    through.

09:29   10    BY MR. WOHLFEIL:

11    Q.   Just to be clear, the Jell-O in that case is supposed to be

12    the brain, representative of the brain?

13    A.   That's correct.

14    Q.   Okay.

09:29   15    A.   So general consistency.

16    Q.   Okay.  I think we've got a second video.

17         MR. WOHLFEIL:  Can you turn to 126, please.

18         THE WITNESS:  So that is video that I developed with a

19    graphic artist for the purpose of teaching other healthcare

09:30   20    professionals and patients about what actually happens in a

21    injury, especially in what we call a sheering injury.

22         Let me stop and explain sheering.  So your brain is

23    made up of hundreds of billions of nerve cells.  The nerve

24    cells have two major components to it, the cell body, which

09:30   25    contains nucleus and other kind of chemicals and water within

1   it, and then a wire that comes out of it that's communicating

2   with another nerve cell down the line called an axon, cell

3   bodies and axon.

4        So they're of different densities.  The cell body is

09:30   5   heavy, filled with water.  The axon is light and thin.

6        The best analogy, lay analogy, for this would be a

7   mushroom.  If you were cleaning a mushroom at home in your

8   kitchen and you're not careful, you can separate the cap from

9   the stem, and the reason that happens is because they're of

09:31   10  different density, and it's right at that point where the

11  density is -- that interface is where it's most vulnerable to

12  change because of the differences in density.

13       So you take a brain, and you concuss it, you hit it,

14  and what happens in the -- at the junction of the axon with the

09:31   15  cell body, well, there's inertia and force and acceleration,

16  and the cell body keeps moving because it's heavier, and the

17  axon isn't moving as fast, and you get sheering of those two

18  things.

19       That is thought to be the basis of a lot of the

09:31   20  symptoms that patients have post injury, especially in

21  concussive injury.

22       And the other sort of analogy that's a good one, I

23  think, is this is like making a -- when you have a sheering

24  injury, it's like making a telephone call between here and

09:32   25  Los Angeles.

09:32

1      Normally it goes straight through on your cell phone,

2  but if the lines are down and it isn't going straight through,

3  it's going, maybe, rerouting itself to various other places and

4  then finally gets to Los Angeles.  And this would be like

5  listening on a cell phone where there's an echo and things are

6  not caught up quickly, and things happen so rapidly in the

7  brain that even a millisecond or less of processing delay can

8  cause people to feel like their memory isn't functioning

9  normally, that they can't process quickly enough, that they

09:32
10  have to slow down to get things correct and so forth.

11      So this is -- this cartoon that we developed is for

12  the purpose of educating people about sheering injury.

13      MR. WOHLFEIL:  Can you play it one more time?

14      THE WITNESS:  So you see there the initial hit and the

09:33
15  wave going through.  This is a nerve cell body and the axon

16  coming out of it, and then you see the sheering that occurs

17  there.  There's a delayed secondary effect down the line where

18  the neuron itself actually may shrivel up and not recover.

19      And here's another -- showing the brain bouncing and

09:33
20  the energy going through it and then the injury to the axon.

21  You see the cell body there, and normally there are chemicals

22  flow down from the cell body into the axons, and that's

23  disrupted, and there is potentially even a delayed reaction

24  that occurs because the nutrients aren't getting there.  The

09:33
25  right chemicals aren't getting there, and in the final

1    analysis, you have a bunch of neurons that aren't functioning

2    very well.

3    BY MR. WOHLFEIL:

4    Q.   Thank you, Doctor.

09:34    5         Following a diagnosis of a traumatic brain injury, can

6    you talk about the functional outcome or the results?

7    A.   Sure.  The vast majority of patients from a milder brain

8    injury, let's say, like a sports-related concussion on the

9    field or a car accident or things of that nature, the vast

09:34   10   majority recover.  The Center For Disease Control

11   estimates -- and some people have published -- that as many as

12   15 percent of patients do not have a full recovery.

13        In my own personal experience, that number is a bit

14   high for me.  I would say -- and I've treated thousands of

09:34   15   patients with brain injuries of various types.  I would say

16   it's probably more like 5 percent or less that don't have

17   quality recoveries.  Neurologists tend to call these people the

18   miserable minority.

19        They have a lot of different symptoms potentially, not

09:35   20   the least of which ordinarily would be either some kind of

21   headache or pain-related thing, other somatic symptoms like

22   dizziness or blurred vision, but most predominantly and not

23   infrequently they complain of cognitive difficulties; that it

24   isn't the same as it was before.

09:35   25        So we think that the majority of people recover.

1    There's a small group of people that don't.  And in my own

2    personal practice, when I see a patient that hasn't

3    recovered -- and that's, frankly, most of the patients that I

4    see are the ones that are coming to me that are having

09:35    5    continuing problems.  I don't see the ones, very infrequently,

6    that just get better.

7            And then the question becomes what's going on?  What

8    is the different sets of circumstances that are occurring in

9    this patient to produce the symptoms that they have?  And it's

09:36    10   complicated.  It's not simple.  And it's not black or white.

11   It's really gray.  And it has to do with a variety of different

12   factors.  One being is there a physical injury?  Did a physical

13   injury actually occur?  The second is essentially what other

14   factors are there?  Could the person be in chronic pain?

09:36    15   Anybody who's in pain all the time is not going to be able to

16   think straight.  They're going to have to slow down and take it

17   easy to get it right.

18          In addition to that, they may have emotional

19   difficulties and problems that occur as a result of the injury

09:36    20   or maybe they had emotional difficulties before that get mixed

21   in.

22          So it becomes very complicated, and where I have

23   personal issues with how these things are parsed out is with

24   the notion that it's either one thing or another thing.  It's

09:37    25   -- in my opinion, it's a complicated subject, and often all of

296

```
 1   the things are operative, and it's a chore to sort it out.
 2   Q.   Thank you, Doctor.
 3        Before we go into your workup in Ryan Moore's case, I
 4   just want to talk about the differences between, for example,
 5   mild versus moderate versus severe traumatic brain injury.  Can
 6   you talk about those categories?
 7   A.   Yeah.  So mild traumatic brain injury is -- would refer to
 8   an injury like a concussion.  In fact, the CDC, the Congress of
 9   Rehabilitation Medicine, the American Academy of Neurology, the
10   Zurich Conference on the Consensus in Sports-Related
11   Concussion, which is the latest group of data that's come out,
12   all agree that a concussive injury is the same and is
13   synonymous for mild traumatic brain injury.
14        So a concussive injury or mild traumatic brain injury,
15   you get patients who have a blow to the head or a sufficient
16   force to the body to cause a change in some neurologic function
17   that shows up as symptoms that I mentioned before.  They
18   actually say -- all of them pretty much agree that you only
19   need one symptom and the force to diagnose a concussion.  You
20   could have different types of grades of concussion.  Sometimes
21   they're referred to as grade 1, 2, and 3.  A grade 3 concussion
22   would be somebody who has had loss of consciousness.  A grade 2
23   concussion would be somebody who has symptoms that last for
24   more than 15 minutes.  And a grade 1 would be concussion that
25   is 15 minutes or less in terms of symptoms.
```

1          Some people might argue also that if you have symptoms

2     that last more than 15 minutes, you're -- I'm sorry, more than

3     30 minutes or so, they become permanent.  That's more than a

4     grade 2.  It would be considered a grade 3.

09:39    5          The purpose of the grading system -- it was developed

6     by the American Academy of Neurology about 15 years ago -- was

7     for coaches on the field to be able to determine when they can

8     send their player back.  A couple of years ago the academy

9     revised these guidelines to say nobody goes back to play unless

09:39   10     they're cleared by a professional who is equipped to make a

11     determination about a concussive injury.

12          So that's changed a lot.

13          The -- so mild is the term that we use for that kind

14     of concussion where the CAT scan is normal.  Often even a

09:40   15     regular MRI could be normal, but the patient has symptoms that

16     have gone on and ordinarily, like I said, resolved within a

17     period of a few weeks or a few months and in a very small

18     percentage of patients go on permanently.

19          But when you use the word "mild," you have to be

09:40   20     careful because mild is very contextual to the individual.  If

21     you have a high degree of need for using your intellect, such

22     as myself as a physician in analyzing problems and making

23     decisions and planning for patients, if I have mild symptoms of

24     memory impairment, that's a big deal.  And it could be

09:41   25     career-ending.  So the word "mild" has to be taken in quotes.

1    It really is contextual to the individual and how they're
2    doing.
3         A moderate brain injury would be somebody who has that
4    injury where you can demonstrate abnormalities on scans.  You
09:41  5    might see evidence of bleeding or bruising or hematoma.
6         A more severe injury would be those that have -- you
7    know, that maybe that low Glasgow Coma Scale that we talked
8    about plus evidence of intracranial bleeding plus obvious
9    paralysis, loss of speech or things of that nature, coma,
09:41  10    things of that nature.
11    Q.   Thank you, Doctor.
12         This may be obvious already, but just for the record,
13    you were retained by plaintiff's counsel in this case.  Is that
14    correct?
09:41  15    A.   I was.
16    Q.   Do you know the current status of your billing in this
17    case?
18    A.   I think -- I looked at it this morning because I was
19    anticipating that question would be asked, and I think to date,
09:42  20    over the last two years or so, year and a half or so since this
21    all began with me, it's about $9500.
22    Q.   Have you been paid at this point?  Do you know?
23    A.   I hope so.  I don't pay attention to those things, but I
24    think I have.
09:42  25    Q.   Very good.  Thank you, Doctor.

1       Okay.  Let's move into your workup in Ryan Moore's

2    case.

3       My understanding is that you conducted a neurologic

4    examination of Mr. Moore.

09:42    5    A.   I did.  Let me pull those notes out, please.

6    Q.   Sure.

7    A.   Yes, I conducted an examination of Mr. Moore on or about

8    October 22, 2015.

9    Q.   And what does a neurologic examination entail?

09:43   10    A.   The examination is multipart.  It contains the history that

11    one does from the patient, their recollection of events in

12    terms of the injury itself.  It also involves questioning the

13    patient regarding current symptoms as to whether or not they

14    are having particular problems, how those symptoms have evolved

09:43   15    or changed over time.  We also ask about the past medical

16    history, when there was any similar events in the past, whether

17    there was any other medical conditions that might confound the

18    analysis on the patient.

19       And then we go over medications, what I call social

09:43   20    history, which is how the patient -- is the patient working or

21    smoking, drinking, using drugs, or things of that nature, a

22    little bit about their family history to rule out any genetic

23    issues, and then we go into the examination itself.

24       The examination itself involves a number of things

09:44   25    including observing the patient's interaction, assessing for

1   mood and for the individual's forthrightness and honesty.  We

2   look at their speech pattern, and then in his particular case

3   as well as I do in many cases, I did a mental status

4   examination, and I used a particular form of that called a

09:44   5   Montreal Cognitive Assessment.

6        Then following the mental status testing, I usually

7   observe their walking, have them do some maneuvers with regards

8   to that.  I examine their face and around their head in what we

9   call the cranial nerve examination.  I then do a motor

09:45   10   examination testing their strength and their agility and their

11   muscles and their upper and lower extremities.  I check their

12   reflexes, I check some sensation, I check their coordination,

13   what we call cerebellar testing.  And often we will look at

14   their neck and their pulses and things of that nature.

09:45   15        THE COURT:  November of 2015?

16        THE WITNESS:  October 2015, October --

17        THE COURT:  So more than two years had passed since

18   the injury?

19        THE WITNESS:  Correct.  The injury itself, as I

09:45   20   understand it, was June 24th of 2013.

21   BY MR. WOHLFEIL:

22   Q.   Doctor, did you consider the passage of time when you were

23   examining Ryan Moore?

24   A.   Oh, of course.  And as in most patients, I would expect

09:45   25   that there would have been some improvement, and he echoed that

1    to me, that he had improved.

2    Q.   What did you learn during your examination of Mr. Moore?

3    A.   Well, the first important thing is that he himself has no

4    recall of any of the events.  So by definition, he has amnesia

09:46    5    for the events.

6         What's interesting is that he had very prolonged

7    retrograde amnesia where he didn't remember things that were as

8    long as two weeks prior to the injury.  That's highly

9    significant.  He also had anterograde amnesia for a few weeks,

09:46    10    although that may be a result of the medications that he

11    received and the multiple surgical procedures and the

12    anesthesia that he received within the first few weeks of him

13    being in the hospital, being treated for his extensive facial

14    and oral injuries; however, that does not explain the

09:46    15    retrograde amnesia.  One would not expect any difference in

16    retrograde memory due to anesthesia going forward from an

17    event, and there's literature to support that.

18    Q.   Thank you, Doctor.

19         In terms of the other tests that you mentioned, for

09:47    20    example, the balance test, what else did you learn?

21    A.   Well, the other part of the history is that he noted to me

22    that he -- his first notation of memory and cognitive problems

23    was when he got home, and it's usually at that point a person

24    needs to start functioning a little bit more.

09:47    25         He felt, though, as most people do, that, you know,

1    time will heal, medication's probably the cause, and he was

2    sort of patient in regards to that.

3         He, however, noted that over time, there continued to

4    be issues, and he specifically endorsed difficulties of an

09:48    5    ongoing nature with me of concentration, attention, inability

6    to do as many multiple tasks, multitasking, as we call it.  He

7    had some word-finding difficulties, and he felt that he had

8    slowness in processing of information, and he felt forgetful.

9         He told me that he had returned to work and that he

09:48    10    was working pretty good, but that he had to write things down

11    more, that he was more unsure of himself, and tended to

12    procrastinate over what he needed to do, but that said

13    he -- I'm sorry, and one more thing.  He had more difficulty

14    just sort of making decisions on that basis.

09:48    15         That said, he told me he was doing okay with his bills

16    and banking, which is often a good indication of how a person's

17    doing.  And he also told me that he was filing his own taxes

18    using TurboTax.  Now, I've never used TurboTax, and I have no

19    idea what the complexity of that, but I'm going to assume for a

09:49    20    moment that that requires some level of intelligence and

21    ability to get things done.  It doesn't say how long it takes

22    him to do that or whatever and how he struggled through it or

23    whether it even was correct, but at least he was doing that.

24         He also told me that he had been diagnosed by others

09:49    25    with post-traumatic stress disorder, depression, and anxiety,

1    and that he was being followed by a psychiatrist and

2    psychologist and that he was on medication for those things.

3    He also said that he had some other continuing somatic

4    symptoms including some tingling across his left ear and across

09:49    5    the back of his head on the left side.  He had an odd symptom

6    where he would touch the left back of his head and would get

7    tingling on the ear, and those -- there's a nerve that connects

8    those two, and he may have some residual minor symptoms related

9    to that.

09:50    10    He also noted that he was having pain in the back of

11    his neck, often on the right.  He also had jaw pain

12    bilaterally.  This was chronic.  He had jaw clicking.  He was

13    still having difficulty chewing, and he still had not had all

14    his teeth replaced.

09:50    15    And he was also having some visual symptoms,

16    especially in the left eye.  In bright lights he noted that it

17    would close a little bit on its own.  And he also noted some

18    quivering in the lid that would occur from time to time there.

19    These are minor symptoms but purported.

09:50    20    The other important parts of his past medical history

21    were, number one, he has no prior history of head or facial

22    trauma.  So this is a single event that we're talking about.

23    Not one where, let's say, he's had a multiplicity of

24    concussions.  He has no prior history of depression that he

09:51    25    told me about or attention deficit or school problems or

1   anything of that nature or PTSD for that matter.

2          And he has another condition called hemochromatosis,

3   which is an odd condition of possibly hereditary nature where

4   you can get too much iron in your body, and it can affect

09:51  5   things.  It can cause you to develop liver problems, you can

6   develop diabetes from injury to the pancreas from too much iron

7   in your system.  And that's been treated by a hematologist at

8   Scripps, Dr. Saven.  This was important for me to know because

9   the MRI that I did on him later to look at why he was having

09:51  10  persistent symptoms, I wanted to be clear with the radiologist

11  ultimately, and I wanted to know does this condition predispose

12  somebody to having an abnormal brain MRI?  And I told that to

13  the radiologist after I saw the initial findings of the scan,

14  and he went back and did his own research, as did I, and

09:52  15  there's no relationship, so that's important just to -- in case

16  that comes up.

17         He talked to me about the medications he said that he

18  was on, including Zoloft, which is an

19  antidepressant/antianxiety medication, and he's a -- was on a

09:52  20  low dose of a tranquilizer, lorazepam that he used in the

21  evening for his anxiety.

22  Q.  Thank you, Doctor.

23         THE COURT:  If I can interrupt for just a second, you

24  mentioned that initially he had prolonged retrograde amnesia;

09:52  25  in other words, it wasn't just forgetting about the

1   circumstances that led to the accident, but it went back weeks

2   before, he couldn't remember things.  Had that improved by the

3   time you'd seen him?

4          THE WITNESS:  No, that's a permanent feature.  That

09:53   5   tape was erased.

6   BY MR. WOHLFEIL:

7   Q.  And how -- what's his last memory before the accident?

8   What's the last thing --

9   A.  He told me that he had difficulty or was -- imperfect

09:53   10   recall of a trip he took with his brother two weeks before the

11   accident.

12          THE COURT:  Okay.

13   BY MR. WOHLFEIL:

14   Q.  Very good.  Thank you, Doctor.

09:53   15          Your examination lasted approximately 90 to 120

16   minutes.  Is that correct?

17   A.  That's correct.

18   Q.  In addition to the examination, did you also have a chance

19   to review Ryan's medical records?

09:53   20   A.  I did.  They were quite extensive, including all of his

21   surgical procedures and so forth.

22   Q.  We'll talk about the surgeries in a moment, but did you

23   note just the injuries he sustained in the incident?

24   A.  I did.  The injuries included bilateral jaw fractures,

09:54   25   mandibular fractures, maxillary sinus fractures, alveolar ridge

1    fractures, nasal fractures, he had an injury to his left

2    salivary gland here called the parotid, he had facial

3    lacerations, tongue laceration, he also sustained an aspiration

4    pneumonia as a result of the event, and those were the main

09:54    5    injuries.  Obviously, he had a head injury at the time.

6    Q.   Doctor, is it important for your diagnoses to note Ryan's

7    injuries?

8    A.   It is, especially in light of the literature on facial

9    trauma, especially with fractures in patients of this type.

09:55    10   There's a high percentage of patients who have facial fractures

11   that sustained mild traumatic brain injuries.  In a recent

12   article, it was as high as 75 percent.  And it's often

13   underreported mainly because everybody's focused on the

14   fractures, and it comes out later.  And the 75 percent group

09:55    15   that I just mentioned is a very thorough and careful study by

16   the military using their Concussion Evaluation System which are

17   quite sophisticated now.

18   Q.   Thank you, Doctor.

19        I believe you also noted that Ryan had endured

09:55    20   surgeries following the incident?

21   A.   He did.  He had multiple -- I counted them up.  I may have

22   missed a few, but he's had at least nine different surgical

23   procedures.

24   Q.   What is your understanding of those procedures?

09:56    25   A.   First of all, he had a tracheostomy, a hole put in his

1    throat.   That was to prevent the aspiration from reoccurring.

2    He had an operation where he had 11 teeth removed on June 25th,

3    13, he had an operation that same day where he had his left

4    parotid gland explored and his facial nerve explored, and he

09:56   5    had to have reconstruction of the muscles of his left cheek.

6    There was a 14-centimeter laceration, he had a six-centimeter

7    laceration of his tongue that was repaired, and he had a

8    seven-centimeter lower lip laceration.

9        Second set of surgeries occurred on July 2nd.  He had

09:56   10   repair of his left parotid salivary duct which became blocked.

11   He had the open reduction and internal fixation, basically

12   setting of his jaw bilaterally, the mandibles.  He had

13   treatment of palatal fracture, he had closure of his jaw

14   muscles, called the masseter muscle, and others.

09:57   15        On July 26th he had a procedure to remove a lot of the

16   hardware that was in there now that things were starting to

17   sort of set up correctly.  He had a stint that was put in his

18   parotid at the first surgery that was then removed.

19        On August 23rd of 2013 he had three more teeth

09:57   20   removed.   He had further removal of hardware.

21        And March 8th of '14 he then started having his tooth

22   implants.   He had 11 implants.

23        The following day he had revisions of scarring on his

24   cheek, and then on September 10th, which is the last surgery

09:57   25   that I'm aware of that I'm available to review of 2015, he had

1    what we call a vestibuloplasty, which is getting the gumline

2    ready for the additional implants to occur.

3    Q.   Thank you, Doctor.

4         In addition to your examination of Ryan and your

09:58    5    review of his medical history, did you also perform an MRI?

6    A.   I did.  And as I had said earlier, the reason was you have

7    an individual here who's having persistent symptoms where the

8    initial CT was normal, but that's not the perfect test, and

9    it's very clear that if I wanted to know what was going on and

09:58   10   help to describe what happened to this man, an MRI would be the

11   appropriate test to do, 3T MRI in particular.  I can explain

12   that for a moment.

13        MRI has evolved, and it continues to evolve in terms

14   of the technology.  Originally when it came out, the magnets

09:58   15   were fairly weak in terms of their magnetic field strength.  As

16   time has gone by, they've gotten stronger and stronger.  The

17   standard MRI that's out there today in the United States is a

18   1.5 Tesla MRI, Tesla meaning the strength of the magnetic

19   field.  And that's roughly 15,000 times the earth's magnetic

09:59   20   field strength if you took a compass.

21        Now, they have 3.0 Tesla MRIs that have better

22   signal-to-noise ratio.  You can see more and you can do more

23   with them.  You can do other kind of fancy studies looking

24   actually at the nerve tracts and looking at the chemistry of

09:59   25   the brain.  So you get more than just an anatomical picture,

1    but you can actually get some physiologic data out of those

2    scans as well.

3            In San Diego there are a few 3.0T MRIs, and the one

4    that I sent him to is actually a freestanding company here in

10:00    5    San Diego called Imaging Healthcare Specialists, which put this

6    in, and I had been referring patients there for the longest

7    time because it's the best test available.  And what's nice is

8    where as originally it was very expensive to get a 3T MRI, this

9    company was charging the same for that as they would for a

10:00    10    regular MRI, so why not?  So that's the reason I ordered the

11    MRI, and that's the reason I ordered a 3T MRI and specifically

12    to that location.

13    Q.    Thank you, Doctor.

14            The approximate date of the MRI was December 10, 2015.

10:00    15    Is that right?

16    A.    That's correct.

17    Q.    So this is about two-and-a-half years since the original

18    incident.  Does the MRI have value even though it was two-and-a-

19    half years later?

10:00    20    A.    My view, absolutely, yes, and, again, the whole purpose of

21    it is to -- you're asking the question why is this man having

22    his symptoms the way he's -- why didn't he resolve like the

23    other 95 percent?  And what are all the different factors that

24    are involved?  And the best test to look at the brain today is

10:01    25    a 3T MRI if it's available at a reasonable price.

310

1          So I would be astounded if somebody were to disagree

2    with that.  I am astounded by any disagreement regarding the

3    value of an MRI, even at this late date.

4    Q.   Thank you, Doctor.

10:01   5          What are you looking for when you look at a scan of an

6    MRI?

7    A.   Well, you're looking at the anatomical structure of the

8    brain.  You have different parts of the brain:  Right, left,

9    front, back.  And you're looking for signs of bruising

10:01   10   typically.  You may see delayed complications such as

11   enlargement of fluid-containing structures in the brain called

12   ventricles and so forth.  But if the proper sequences are done

13   on the MRI, you can also see the evidence of blood products.

14   When there's bleeding in the brain, blood gets out into the

10:02   15   tissue, and the body will take it out, will remove it over

16   time, usually a few months; however, it has no way of removing

17   the iron that is in the red blood cell.  Iron, very important

18   to the health of red blood cells, when you become

19   iron-deficient, you get anemic, so iron is in red blood cells,

10:02   20   and when red blood cells get out into the brain where they

21   shouldn't be, the body can remove the other parts of the red

22   blood cell, but it can't remove the iron.  It stays forever.

23   And when you put a person into a magnetic field of sufficient

24   strength and you do the proper sequence -- they're called

10:02   25   susceptibility-weighted images -- you can see the iron.  It's

1    like putting a piece of iron next to a magnet or a compass

2    needle next to a magnet.  You can see it.  And that's primarily

3    the reason to do the scan is to look for microscopic

4    hemorrhages or what we call microhemorrhages that otherwise

10:03    5    would not be seen.  They may not even be seen on a 1.5T MRI,

6    although they often are, and they would not be seen on CT

7    scanning, another reason to do the MRI to try to find those

8    things and try to give some credence or explanation as to why

9    the patient is continuing with their symptoms.

10:03    10            THE COURT:  What effect does this residual iron have

11    on brain function?

12            THE WITNESS:  I would say probably it has no effect,

13    but it's the -- what I call the footprint in the sand of

14    something that came by and passed and left its footprint, and

10:03    15    it's highly suggestive when you see it that there's been

16    bleeding in the brain, because, otherwise, it just doesn't get

17    there, and it's suggestive that injury occurred.

18    BY MR. WOHLFEIL:

19    Q.   Thank you, Doctor.

10:04    20            A moment ago you mentioned the proper sequences in

21    relation to an MRI.  Specifically with Ryan's MRI, were all

22    those proper sequences followed?

23    A.   They were.

24    Q.   And did you have a chance to look at the images from Ryan's

10:04    25    December 10, 2015 MRI?

1    A.   I did, extensively.

2    Q.   Very good.

3            MR. WOHLFEIL:  Can we pull up 127, please?

4    BY MR. WOHLFEIL:

10:04  5    Q.   Doctor, do you recognize what's shown in Exhibit 127?

6    A.   I recognize it as a brain.

7    Q.   What -- whose brain?

8    A.   I'm going to assume that it's Mr. Moore's brain, but I

9    can't be certain because it isn't particularly labeled, but

10:04  10   it's an exhibit, so it must be the right thing.

11   Q.   Very good.

12           What do you see on Exhibit 127?

13   A.   Well, is there a way that I can touch this?

14           THE COURT:  Yes.

10:05  15           MR. WOHLFEIL:  You can touch it.

16           THE WITNESS:  There you go.  Ignore that red dot, but

17   I want you to look at this arrow here, and that arrow is

18   pointing to a black dark spot right at the bottom of the brain

19   there.  That's -- unless this is turned around, that's the left

10:05  20   side of the brain, not the right.  Everything in radiology is

21   backwards, so right is left and left is right when you're

22   looking at the scan.

23           So that little black dot there -- this is on a

24   susceptibility-weighted image -- is iron deposition.  But I

10:05  25   think you see it better on other scans as well.

1    MR. WOHLFEIL:  Okay.  Let's take a look at 128,

2    please.

3    THE COURT:  Gabby, can you clear the red mark?  Thank

4    you.

10:05    5    THE WITNESS:  Here you have another view, and you see

6    a number of arrows here, and this part of the brain that it's

7    in -- I'm going to draw a tighter circle around -- is called

8    the temporal lobe.  The temporal lobe is the part of the brain

9    where you have emotion and memory residing and language also

10:06    10    occurred in these regions, on the left side in particular, and

11    there you see a number of arrows pointing to these dark dots.

12    These again are areas of hemiacidrin iron deposition suggestive

13    of prior hemorrhage.

14    MR. WOHLFEIL:  Let's take a look at 129, please.

10:06    15    BY MR. WOHLFEIL:

16    Q.  Do you recognize 129, Doctor?

17    A.  Yes, it's similar, and, again, this shows in the left

18    region now a little bit better at a higher level.  This is a

19    cut little higher.  You see these arrows again pointing to

10:07    20    black dots.  These things should not be there.  And they are

21    probably, in all probability and with a high degree of

22    certainty, hemiacidrin iron deposition suggestive of hemorrhage

23    in the area.

24    These kind of things, all these dots, are the kinds of

10:07    25    things that you see when there's axonal sheering occurring.

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | The other thing about these dots is their location.                    |
|       | 2  | They're right at the junction between the cell bodies which are         |
|       | 3  | residing in the cortex of the brain, this white ribbon around          |
|       | 4  | the brain, and the deep white matter.  They're all occurring at        |
| 10:07 | 5  | the junction.  And that is the typical location of a sheering          |
|       | 6  | injury because of the difference in cell body and axon                 |
|       | 7  | densities.                                                             |
|       | 8  | THE COURT:  Do you have any way to gauge the age, the                  |
|       | 9  | age of those deformities?                                              |
| 10:08 | 10 | THE WITNESS:  No.  There's no way to do that.  The                     |
|       | 11 | only thing that I could say about it is absent any other               |
|       | 12 | history of injury in this patient, it would be more likely than        |
|       | 13 | not ascribable to his facial trauma blast injury that occurred.        |
|       | 14 | THE COURT:  You mentioned that he had some                             |
| 10:08 | 15 | peculiar -- is it genetic -- where he produced more iron?              |
|       | 16 | THE WITNESS:  Correct.                                                 |
|       | 17 | THE COURT:  It ran in his family?                                      |
|       | 18 | THE WITNESS:  Yes.                                                     |
|       | 19 | THE COURT:  But you mentioned that the radiologist                     |
| 10:08 | 20 | looked at this and didn't believe that that condition could            |
|       | 21 | account for these spots.                                               |
|       | 22 | THE WITNESS:  That's correct, and --                                   |
|       | 23 | THE COURT:  Would these spots only come from where                     |
|       | 24 | there has been blood and blood's recessed and these are                |
| 10:08 | 25 | the -- this is the residual iron left from the red blood cells?        |

```
        1              THE WITNESS:  You got it, yes.
        2              THE COURT:  It takes more than a trivial amount of
        3    force before you expect to see these things?
        4              THE WITNESS:  That's correct.
10:09   5              THE COURT:  Because enough force to cause bleeding?
        6              THE WITNESS:  Correct, and sheering.
        7              THE COURT:  Okay.  Sheering.
        8              All right.  Thank you.  Go ahead.
        9              MR. WOHLFEIL:  Thank you, Your Honor.
10:09  10    BY MR. WOHLFEIL:
       11    Q.  Doctor, anything else of note on 129?
       12    A.  No.
       13              MR. WOHLFEIL:  Let's turn to 130, please.
       14    BY MR. WOHLFEIL:
10:09  15    Q.  Doctor, do you recognize 130?
       16    A.  Yes.  Same situation here, especially in the left side of
       17    the brain.  Here you see a particularly -- I'm sorry, a
       18    particularly big hemiacidrin deposition, another small one, a
       19    couple small ones below it where the arrows are located.
10:09  20    Q.  And finally can we look at 131?
       21    A.  Same thing here in the back of the brain.
       22    Q.  Okay.  So, Doctor, considering all the points of your
       23    workup in Ryan's case, did you reach certain diagnoses or
       24    opinions in this case?
10:10  25    A.  I did.
```

1    Q.   Are all of your diagnoses within a reasonable degree of

2    medical probability?

3    A.   They are.

4    Q.   Let's start with number one.

10:10    5    A.   Well, first off, I believe to a reasonable degree of

6    certainty that this patient has sustained a traumatic brain

7    injury.  I base that on the history of the injury itself, the

8    sufficient force, the development of symptoms afterwards that

9    would be in anybody's dictionary consistent with traumatic

10:11   10    brain injury.  And the imaging.  I actually don't even need the

11    imaging, but it's very helpful to explain why he's having these

12    persistent symptoms since most people would recover from a

13    concussive injury.

14           My second diagnosis is a neurocognitive disorder.

10:11   15    This is fancy terminology from the neuropsychologists and

16    psychiatrists for memory problems and difficulty functioning

17    from a cognitive perspective.

18           I defer to the neuropsychologists that I think are

19    going to come in and talk about these things, but his symptoms

10:11   20    are he has memory forgetfulness, he has to slow down, he's more

21    unsure of himself, and so forth.

22           Thirdly, he has this post-traumatic left-sided head --

23    what we call hemicranial paresthesias or tingling or numbness.

24    It's not a big deal, but he reports it.  It's subjective in

10:12   25    nature.  I have no way of objectively proving that it's

1    present, but it's there from his perspective.

2            He also has post-traumatic left facial numbness, very

3    understandable, again, a subjective symptom, but fits.

4            And he also has a little bit of a droop of his left

10:12   5    eyelid, at least he had it when I saw him.  That's conceivable.

6    It could yet improve.

7            And then I diagnosed him with an adjustment reaction,

8    which is really based on the psychologists telling me what's

9    going on with him from a psychological perspective, and I defer

10:12   10   to them about that level of post-traumatic stress disorder

11   depression, anxiety.

12           I would just go back though to a statement I made

13   earlier about the complexity of these patients, and that it's

14   never black and white.  It's always gray.  And my experience,

10:13   15   vast experience, in treating TBI, lots of patients have

16   depression after they're seriously injured, and to ascribe

17   everything to the depression is often fraught with error.  He's

18   in chronic pain.  That's in the next diagnosis, and then I just

19   list the fractures and the various different medical conditions

10:13   20   that he underwent, which we already spoke about.

21   Q.   Thank you, Doctor.

22           Can we return briefly to the first diagnosis, the

23   traumatic brain injury?  I understand your diagnosis is the

24   traumatic brain injury, but can you describe it in any more

10:13   25   detail; for example, the direction of the injury?

318

1   A.   I'm not sure what you mean by "direction."

2   Q.   You referred earlier to a profound injury or sheering

3   injury?

4   A.   Oh, okay.  This patient, Mr. Moore, has features of a mild

10:14   5   traumatic brain injury from a clinical perspective.  Absent any

6   other findings, one could reasonably say he's had a concussive

7   injury, a mild traumatic brain injury and that he has these

8   residual symptoms.

9        When you look at the neuroimaging, though, the MRI,

10:14   10   you get a different feel for this, and I think in my

11   deposition, I call this a more mild to moderate injury as a

12   result of this.  Some people would call this a complicated mild

13   traumatic brain injury because of the findings on the MRI.

14        So it's not exactly a mild and it's not severe.  It's

10:14   15   sort of in between mild and moderate.

16   Q.   And I think we've touched on this a little bit, but can you

17   explain again the relationship or the role of the retrograde

18   amnesia in this case?

19   A.   So patients that have that length of time of amnesia

10:15   20   typically have worse prognosis than somebody who remembers

21   everything.

22        Often when you have a patient tell you "I remember up

23   until the moment of the accident and I remember everything

24   after the accident," that carries a really good prognosis.

10:15   25        When people tell me they don't remember things for two

1    weeks, it's just an indication of the seriousness or the degree

2    of force that was involved, and, of course, it makes total

3    logical sense that those patients may not recover the same way

4    as somebody who has no amnesia whatsoever.

10:15    5    Q.   Thank you, Doctor.

6         THE COURT:   Is the MRI that you ordered the first one

7    that had been ordered in connection with this?

8         THE WITNESS:   Yes.

9         THE COURT:   Why was that?   Why -- I understand that it

10:15   10   may not be the first order of business if there are other

11   traumatic injuries that have to be treated, but three months

12   out, why didn't somebody order an MRI?

13        THE WITNESS:   That's a great question, and I think he

14   wasn't being seen by anybody neurologically.   They were

10:16   15   focusing on his teeth and on his face and on his fractures,

16   and --

17        THE COURT:   In the medical history you reviewed, did

18   he report from the get-go that he had memory lapse, couldn't

19   remember anything about the accident?

10:16   20        THE WITNESS:   I don't recall seeing that.

21   BY MR. WOHLFEIL:

22   Q.   Dr. Lobatz, given your workup in this case and your

23   diagnoses of Ryan, did you make certain recommendations for his

24   future care?

10:16   25   A.   I did.

```
         1   Q.   Just one second, Doctor.

         2             MR. WOHLFEIL:  Can we look at 66, please?

         3   BY MR. WOHLFEIL:

         4   Q.   Did you share those recommendations with Doreen Casuto?

10:16    5   A.   I did.

         6   Q.   And is it your understanding that Ms. Casuto is Ryan's life

         7   care planner in this case?

         8   A.   That is correct.

         9   Q.   Can we look at page 2?  I think I think your initials are M

10:17   10   as in Mary and L as in Lobatz?

        11   A.   Yes.

        12   Q.   I see a recommendation in this column entitled "Care need

        13   for rehabilitation neurologist physiatrist ML"?

        14   A.   Yes.

10:17   15   Q.   Can you explain that recommendation?

        16   A.   Well, on average, I would say Mr. Moore should have

        17   somebody monitoring his situation once or twice a year, maybe

        18   twice a year for the first year or two, and then yearly

        19   thereafter, but that could go no evaluations or treatment for a

10:17   20   few years, and then with the appearance of symptoms, that could

        21   be delayed in nature, could need more evaluation later, so

        22   that's why I put this.

        23   Q.   Now, are you responsible for the costs of that treatment or

        24   is that Ms. Casuto?

10:18   25   A.   I think that's Ms. Casuto.  She analyzes that.
```

| | |
|---|---|
| 1 | Q.   Thank you, Doctor. |
| 2 | MR. WOHLFEIL:  Can we turn to 3? |
| 3 | BY MR. WOHLFEIL: |
| 4 | Q.   Let's see, Doctor, looking down, I think you've got a |
| 10:18  5 | recommendation fourth up from the bottom for a |
| 6 | neuroophthalmologist? |
| 7 | A.   Correct. |
| 8 | Q.   Can you explain that recommendation? |
| 9 | A.   He has symptoms of that lid drooping, he has some visual |
| 10:18  10 | sensitivity, light sensitivity.  To have a single evaluation by |
| 11 | a neuroophthalmologist seems quite appropriate to make sure |
| 12 | that there's nothing else going on in that department. |
| 13 | Q.   Very good. |
| 14 | And I see the bottom row entitled "Diagnostics."  You |
| 10:18  15 | also supported, it looks like, an MRI of the brain? |
| 16 | A.   Correct. |
| 17 | Q.   Can you explain that? |
| 18 | A.   From my perspective, patients that have these kinds of |
| 19 | findings on their MRI need follow-up periodically.  If he were |
| 10:18  20 | to come back later, let's say, ten years from now and say "my |
| 21 | memory is worse, I'm not doing as well," somebody's going to |
| 22 | order an MRI.  And it's inconceivable to me that he would go |
| 23 | the rest of his life with this finding of that hemiacidrin |
| 24 | deposition and facing an uncertain future regarding the late |
| 10:19  25 | cognitive deficits and the premature aging of the brain that |

1    occurs following injury -- people are going to do MRIs.  So two

2    to four times over his lifespan, to my way of thinking, if you

3    want to average that three times, is a very reasonable estimate

4    for the MRI that he's going to need in the future.

10:19    5    THE COURT:  What value would the subsequent MRIs have,

6    I mean, beyond just simple diagnostic value?

7    THE WITNESS:  Only diagnostic value.  No other -- I

8    mean, there's no treatment value.  If he were to have -- let's

9    say he were to come back at age 65 and say "I'm not remembering

10:20    10   things as well as I normally would," one could look at their

11   current MRI and compare it to the -- that MRI at the time and

12   make judgment regarding is there atrophy occurring?  Is this

13   delayed long-term effects of TBI?  We know that that occurs

14   now, certainly quite popularized in the football players, for

10:20    15   instance.

16   THE COURT:  But the value would be just diagnostic, it

17   would tell him this is a result of that injury and what's

18   happened over time?

19   THE WITNESS:  You may decide based on what you see

10:20    20   there to start him on some medicine for memory if that were the

21   case, if it were bad enough.

22   BY MR. WOHLFEIL:

23   Q.   Thank you, Doctor.

24   Speaking of medication, can we turn to 4?  I think the

10:20    25   top row there entitled "Medications," your recommendation is

1  for Gabapentin.  Is that right?

2  A.   Right, Gabapentin, also known as Neurontin, is a medication

3  that we use for nerve pain, tingling, numbness.  And it's very

4  well tolerated.  It can be given generically, it's not super

10:21  5  expensive, and it can help control that uncomfortable feeling

6  that he has of tingling.  It might also help his other pain.

7  Q.   Thank you, Doctor.

8         And returning or going down to "Therapeutic

9  Self-Management Pain Program," it looks like the fifth row, is

10:21  10  that your recommendation as well?

11  A.   I think there's one above that, the "Cognitive

12  Remediation."

13  Q.   Oh, excuse me.  Yes.  Is it your recommendation for

14  cognitive remediation?

10:21  15  A.   Yeah.  So cognitive remediation is meeting with a speech

16  cognitive therapist and going through some exercises, and

17  rehabilitation is about two things.  It's about strengthening

18  what can be strengthened through repetitious exercise, and if

19  you can't strengthen something, you need to adapt.  So adaptive

10:22  20  strategies would be taught as well.  Something as simple as,

21  you know, "We're going to write stuff down because we don't

22  remember it as well."  That's a very simple adaptive strategy

23  we all use, but there may be more sophisticated ones, including

24  the more sophisticated use of smart phone and/or computer or

10:22  25  things of that nature that a therapist would go through with an

```
 1    individual and teach them.
 2          THE COURT:  This all contemplates that Agent Moore is
 3    back at work and apparently functioning fine at high-stress job
 4    that involves attention to detail and all?
 5          THE WITNESS:  Well, he would undoubtedly benefit from
 6    some additional instruction even though he's doing reportedly
 7    well.  It doesn't mean that -- referring somebody for this does
 8    not presuppose that they're not doing well in other parts of
 9    life, but what he's reporting is that it's harder for him and
10    taking longer for him to do the work that he does.  And so why
11    not give him something reasonably inexpensive as a tool, as a
12    crutch, to be able to do better?
13          THE COURT:  This could help improve his acuity?
14          THE WITNESS:  I believe so.
15    BY MR. WOHLFEIL:
16    Q.  Thank you, Doctor.
17          Finally the one that I wanted to go to earlier, too
18    soon, the therapeutic self-management pain program, is that
19    your recommendation for Mr. Moore as well?
20    A.  Yes, so this is a way of handling pain that is nonmedical
21    in its approach.  So my patients that go through this
22    program -- and I'll point out to you, it's at Sharp Hospital,
23    which is my competitor, in a way.  They have this great program
24    there that helps people to cope with pain without using
25    medication.  So if there's anything out there that can help
```

```
 1  reduce the dependence on medication, this is what I tend to
 2  gravitate toward.
 3  Q.   Thank you, Doctor.
 4       I think I've covered all of your care recommendations
 5  for Ryan.
 6       At this point I don't think I have any other
 7  questions, but yes, Your Honor, I'd offer Exhibits 125, 131.
 8            THE COURT:  Were those the MRI shots?
 9            MR. WOHLFEIL:  In addition to the two videos, yes.
10            THE COURT:  125, 131?
11            MR. WOHLFEIL:  Yes, through 131.
12            THE COURT:  Any objection?
13            MR. COYLE:  We object to 125 and 126.  We were told by
14  plaintiff's counsel they would be demonstrative only.
15            THE COURT:  This is the Jell-O and the other
16  type -- the cartoon-looking image of the coup and contrecoup
17  injury to the brain?
18            MR. WOHLFEIL:  Thank you, Your Honor.
19            I withdraw that.  127.
20            THE COURT:  127 through 131.
21            MR. WOHLFEIL:  I apologize.
22            THE COURT:  127 through 131 are admitted.
23       (Exhibit 127 through 131 admitted.)
24            MR. WOHLFEIL:  Thank you, Your Honor.
25            THE COURT:  Is this a convenient time to have the
```

                1  morning break?

                2          MR. COYLE:  I don't need one.  I'm prepared to go.

                3          THE COURT:  How long do you think you'll be?

                4          MR. COYLE:  Not long.  I would say ten minutes.

10:25           5          THE COURT:  Okay.  Let's do that then.

                6                      CROSS-EXAMINATION

                7  BY MR. COYLE:

                8  Q.  Good morning, Dr. Lobatz.

                9  A.  Good morning.

10:26          10  Q.  Now, you testified on direct your opinion is that the

               11  accident in this case caused Agent Moore to sustain a traumatic

               12  brain injury, with I think your word was "profound sheering"?

               13  A.  I think I said that in my depo, yes, and that's based on

               14  the findings of the MRI.

10:26          15  Q.  Right, and that's the 3 Tesla MRI that we talked about?

               16  A.  That is correct.

               17  Q.  Now, the neuroradiologist that read that MRI, he didn't use

               18  the word "profound," correct?

               19  A.  No, but he doesn't correlate clinical findings with the

10:26          20  imaging.  He just reports the imaging.

               21  Q.  Right, so the word "profound" is your word?

               22  A.  It is.

               23  Q.  Now, the 3 Tesla MRI, you talked about this a bit, but it's

               24  a very sensitive scan.  You would agree?

10:26          25  A.  More sensitive than this 1.5, correct.

1    Q.   It's the most sensitive kind of MRI available, isn't it?

2    A.   There's actually 6 Tesla MRIs now where we can actually see

3    down to the cellular level, but those are still in experimental

4    forms, but it's commercially the most sensitive.

10:27    5    Q.   And would you also agree that the more sensitive the scan,

6    the more abnormalities you'll see, even in patients with no

7    neurological symptoms?

8    A.   I'm not necessarily agreeing with that.  You may find

9    findings, for instance, such as deep white matter microvascular

10:27   10   change, which is a -- has a completely different appearance

11   than what this scan shows on Mr. Moore that in a patient who

12   has no symptoms, but when you see microscopic hemorrhages,

13   that's a whole different ball game.  That has to come from

14   trauma.

10:27   15        Now that said, you could have those findings and have

16   no symptoms as well.

17   Q.   Right.  My question is just the more powerful the scan, the

18   more you're going to see?

19   A.   That's true.

10:28   20   Q.   Okay.  And would you also agree that no single scan or test

21   can replace a complete clinical neurological examination?

22   A.   No, I don't agree with that.  I think that you use each one

23   of the tools at your disposal to bring together your final

24   analysis.  There are things that you simply will not detect on

10:28   25   a neurologic exam that could be seen on a scan and vice versa.

1    Q.   So are you testifying that a single scan can replace a

2    complete clinical neurological examination?

3    A.   No, I'm just saying that it's additive to it.

4    Q.   Right.  It does not replace it?

10:28   5    A.   It does not replace it.

6    Q.   Okay.  Now, let's talk about Agent Moore's real world

7    neurological and cognitive functioning.

8         It's your opinion that from a cognitive perspective,

9    Agent Moore has gotten better since the accident, right?

10:28   10   A.   I think that's true, yes.

11   Q.   And you know Agent Moore is currently working as a border

12   patrol agent on an FBI task force?

13   A.   You mean as of today?

14   Q.   As of today.

10:29   15   A.   I didn't know that.

16   Q.   You know he's working as a border patrol agent?

17   A.   I do.

18   Q.   You know he returned to that job about three months after

19   the accident in this case?

10:29   20   A.   Correct.

21   Q.   And you know he's been doing it full-time ever since?

22   A.   Okay.  I wouldn't have any way of knowing that, but I'll

23   accept that.

24   Q.   Do you know that as part of his job, he executes warrants?

10:29   25   A.   It wouldn't surprise me, but I don't know the exact

329

```
          1  specifics of his job.
          2  Q.   Do you know that he makes arrests?
          3  A.   It wouldn't surprise me as well.
          4  Q.   He carries a gun?
10:29     5  A.   I think I knew that.
          6  Q.   Do you understand that he has to make rapid decisions about
          7  whether to fire that gun?
          8  A.   It wouldn't surprise me that he needs to do that.
          9  Q.   You would agree that his job requires a high level of
10:29    10  cognitive function?
         11  A.   Agreed.
         12  Q.   And you know he drives himself to and from work every day?
         13  A.   Correct.
         14  Q.   By himself?
10:30    15  A.   Don't know that for a fact, but it would be appropriate.
         16  Q.   He also pays his own bills and does his own banking?
         17  A.   He told me that.
         18  Q.   He prepares his own taxes?
         19  A.   Correct.
10:30    20  Q.   In fact, it's your opinion that his cognitive and
         21  behavioral functioning show a mild traumatic brain injury,
         22  correct?
         23  A.   Correct.
         24  Q.   And like you said on direct, a mild traumatic brain injury
10:30    25  is synonymous with a concussion?
```

330

```
      1  A.   That's true.
      2  Q.   Okay.  So now let's talk about Agent Moore's prognosis and
      3  future care.
      4        Now, you mentioned on direct that there are
10:30 5  patient -- the miserable minority, I think, is the word you
      6  used.
      7  A.   Right.
      8  Q.   And that's talking about the patients with the mild
      9  traumatic brain injury who don't fully recover?
10:30 10 A.   That's correct.
      11 Q.   And you said, in your experience, that was about 5 percent
      12 of patients?
      13 A.   My own personal experience.  Literature may be quoting more
      14 than that, but that's my own personal experience, which is over
10:30 15 thousands of people.
      16 Q.   And the remainder do recover?
      17 A.   They either fully recover or adequately recover.
      18 Q.   Okay.  Now, there are no studies or literature indicating
      19 that patients with mild traumatic brain injury tend to
10:31 20 experience significant deterioration years after the event?
      21 A.   No, there is literature to that extent.
      22 Q.   From a single mild traumatic brain injury?
      23 A.   Yes.  In fact, there's literature now that's coming out
      24 that's showing that even a single TBI can cause chronic
10:31 25 traumatic encephalopathy.
```

1  Q.   Do you remember testifying in your deposition that there

2  was no literature to that effect?

3  A.   There may be literature now.  My deposition was a while

4  ago.  I can't give you the exact source of that literature, but

10:31  5  I can tell you that we have considerable concern about people

6  who have serious concussive injuries such as Mr. Moore's

7  long-term cognitive health.

8  Q.   Your deposition was taken on May 2nd 2016?

9  A.   Yes.

10:31  10  Q.   And you're saying there's literature that has come out

11  since then, but you can't tell us exactly the source of that?

12  A.   I didn't come prepared to tell you that today.

13  Q.   And yet without knowing the exact source of that

14  literature, you believe Agent Moore will need brain MRIs for

10:32  15  the rest of his life?

16  A.   That has nothing to do with that literature in particular.

17  It's my own personal experience of following patients for 35

18  plus years who have had these injuries who do experience these

19  problems later and prematurely.

10:32  20  Q.   Now, you also believe that as a result of the accident

21  Agent Moore is going to need future cognitive therapy, correct?

22  A.   I would give him a single course of therapy like I just

23  said, just to help in those particular areas that he's having

24  difficulties with.

10:32  25  Q.   And that's to improve things specifically like memory and

1    processing speed?

2    A.   Correct.

3    Q.   And as we talked about before, he's currently doing tasks

4    at his job that require high level functioning in those areas?

10:32    5    A.   If you're representing that to me as true, I will take

6    that.

7    Q.   Do you know whether Agent Moore is interested in going to

8    cognitive therapy?

9    A.   No, I haven't asked him.

10:33   10    Q.   Does -- in your experience, does a patient's willingness to

11    participate in cognitive therapy affect how well it works?

12    A.   Definitely, if they're not interested, they're probably not

13    going to get a result.

14    Q.   Finally, Doctor, you mentioned the numbness that

10:33   15    Agent Moore is experiencing in his face.  That's -- I think you

16    said that that's based on his own self-reports?

17    A.   That's correct.

18    Q.   Not any objective tests?

19    A.   It's subjective in nature.

10:33   20    Q.   And that numbness isn't interfering with his daily life

21    activities like his job, as far as you know?

22    A.   It was my understanding that that was a minor complaint and

23    it wasn't interfering.

24          MR. COYLE:  Thank you, Doctor.  Nothing further.

10:33   25          THE COURT:  Any redirect?

1        MR. WOHLFEIL:  No, Your Honor.

2        THE COURT:  May Dr. Lobatz be excused as a witness?

3        MR. WOHLFEIL:  Yes, Your Honor.

4        THE COURT:  Okay.  Thank you, Doctor.  You're excused.

10:33   5        Let's take our morning break until quarter till.

6   We'll resume with your next witness at quarter to 11:00.

7        (Recess.)

8        THE COURT:  All right.  Next witness, please.

9        MR. CHAMBERS:  If we could take up one item before I

10:50   10  call my next witness.

11        THE COURT:  Sure.

12        MR. CHAMBERS:  If we could revisit the depo excerpts.

13        Mr. Laske and I were both under the assumption that we

14   were going to designate the transcripts and then submit them to

10:51   15  the Court given the limited time frame as opposed to having

16   them read in.  If the issue is the Court ruling on objections,

17   he and I are willing to waive the objections that we posed to

18   either side and just submit the transcripts --

19        THE COURT:  How long are the excerpts?  Here's what

10:51   20  I'm not willing to do.  I'm not willing to expand the time it

21   takes to read an hour or two of excerpts outside of the time

22   limits I set, which I think now were probably overly generous.

23   So how long are the excerpts?

24        MR. CHAMBERS:  These are the total transcripts.

10:51   25  Obviously, they're not entirely excerpted.

|   |   |
|---|---|
| | 1 |
| | 2 |

                    MR. LASKE:  For instance, there's one that has 64
          different excerpts.
                    THE COURT:  Give me a ballpark figure.  How long will
          it take me to read and digest these excerpts?
10:51     MR. CHAMBERS:  I don't think it will be very long.
          This isn't thoughty, difficult reading.
                    THE COURT:  Half-hour?  I mean, if it's something like
          that, I'll eat it.  Otherwise, I'm going to equally assess it
          off of your time.
10:52               MR. LASKE:  I mean, the government, I think, is doing
          okay on time, so whether it's read in court or whether you take
          it off our overall time by reading it in chambers.
                    THE COURT:  You can live with it?
                    MR. LASKE:  We can live with it.  I think our timing
10:52     is pretty good right now.
                    THE COURT:  All right.  Then you may submit them, and
          I'll look at them overnight.
                    MR. CHAMBERS:  Thank you, Your Honor.
                    THE COURT:  But they're designated, the excerpts,
10:52     right?
                    MR. CHAMBERS:  They're highlighted.  There's a cover
          page that spells out exactly what's being --
                    THE COURT:  Okay.  All right.
                    Next witness.

```
          1        MR. CHAMBERS:  I'd like to call Dr. Colin Koransky.

          2                    COLIN KORANSKY, Ph.D,

          3                  PLAINTIFF'S WITNESS, SWORN

          4        THE CLERK:  Would you state and spell your full name

10:53     5   for the record.

          6        THE WITNESS:  Yes, Colin Koransky, C-O-L-I-N G.

          7   K-O-R-A-N-S-K-Y, Ph.D.

          8        THE COURT:  All right.  Go ahead, please.

          9                    DIRECT EXAMINATION

10:53    10   BY MR. CHAMBERS:

         11   Q.  Good morning, Dr. Koransky.

         12   A.  Good morning, sir.

         13   Q.  You are a clinical psychologist.  Is that right?

         14   A.  Correct.

10:54    15   Q.  Can you give us a brief rundown of your education,

         16   training, and experience to be a psychologist?

         17   A.  Yes.  I will work backwards from the Ph.D.

         18        I obtained my Ph.D. in clinical psychology in 1978 in

         19   South Africa in Johannesburg.  My Ph.D. was in the area of

10:54    20   neuroscience and clinical psychology in conjunction with the

         21   university medical school.  The so-called British medical model

         22   dictates the flavor of the training in South Africa, so it was

         23   very heavily focused on neuroscience, neuropsychological

         24   testing, and all the clinical aspects of psychiatry.

10:54    25        During that time I was appointed to -- the first
```

1    clinical psychologist to be the lecturer at the medical school

2    to teach psychiatric residents and Master's and Ph.D.

3    psychologists in psychological testing and neuropsychological

4    testing.

10:55    5        And in addition to that, I was the lead researcher for

6    a major drug company that was developing Alzheimer's drugs back

7    in the '70s -- some of them are used today -- to evaluate the

8    efficacy of these drugs because the way you evaluate the

9    efficacy of an Alzheimer's drug is the patient's memory,

10:55   10    concentration, attention, et cetera.

11        And I came to the United States in 1978.  I was

12    employed by Long Beach Neuropsychiatric Institute in

13    Long Beach, which is subsequently taken over by Charter Medical

14    Corporation.  I worked there till 1981.

10:55   15        And then went into a joint neuropsychiatric and

16    neurological practice with a neurologist, Phillip O'Carroll,

17    who's currently the head of the neuroscience department at Hoag

18    Hospital in Newport Beach.

19        And for the last -- it will be 40 years this year that

10:56   20    I'm here -- I focused a lot on post-traumatic stress disorder.

21    I've seen many, many patients with PTSD.  I have a forensic

22    practice that's largely focused on a lot of PTSD patients.

23    I've attended many conferences, et cetera, and was last year

24    sometime approached by Homeland Security Department or they

10:56   25    were thinking of a dividing the United States into regions for

337

 1   the VA to evaluate specifically PTSD issues, and they wanted me
 2   to be part of that task force.  I think that's maybe in the
 3   works.

 4             So up to that point I have patients, clinical
10:56    5   patients, with PTSDs.  Some are translators from the war that
 6   have been referred to me having witnessed horrific events and
 7   have PTSD, and my CV reflects many forensic cases where PTSD is
 8   an issue on both plaintiff and defense side in federal and
 9   civil court.
10:57   10   Q.  So it sounds like PTSD both in your forensic practice and
11   clinical practice is sort of a specialty of yours?
12   A.  Very much so.
13   Q.  And how long have you been seeing and treating patients
14   with post-traumatic stress disorder?
10:57   15   A.  Well, in the United States, from the early '80s when I
16   moved into private practice, I would say I began to see
17   patients with PTSD.  Many were from the Vietnam war era, and
18   after the Gulf War, 1991, there was a surge of PTSD, and
19   particularly after 9/11, and the two wars, it's raised in
10:58   20   people's consciousness what PTSD is, and the clinical world has
21   been inundated with many, many studies and research on 9/11 and
22   the war, and so as a result of that, the clinical population
23   has become greater.
24   Q.  And in addition to the clinical population becoming
10:58   25   greater, has the science behind PTSD and clinicians

1   understanding of it similarly become greater?

2   A.   It's monumental, to put it mildly.   The research on the

3   neurochemistry of trauma has advanced significantly since the

4   '90s.   It's literally a new science.   The population of

10:58   5   patients -- as a matter of fact, the PTSD and traumatic brain

6   injury is the so-called signature injury of the wars.   We have

7   the largest cohort of patients with this combination of

8   disorders are coming out of the war.

9           And so at Ramstein Air Force Base in Germany where

10:59   10   they take all the patients from the Humvee IED accidents,

11   et cetera, they've generated a lot of research on PTSD and

12   trauma, and there are journals specifically dedicated to the

13   new information and the conferences all over the world.   And I

14   belong to the International Society For Traumatic Stress, which

10:59   15   is an international organization with multiple journals and

16   studies.   So it's really a huge flowering of information that

17   is very new.

18   Q.   And I assume because you're a clinician and are here

19   testifying for us that you try and stay abreast of that new

10:59   20   information?

21   A.   All the time.

22   Q.   And in this case, you were tasked with doing an evaluation

23   of Mr. Moore.   Is that right?

24   A.   That is correct.

10:59   25   Q.   When did you see him?

1    A.   I saw him on the 19th of October 2015.

2    Q.   And what was the purpose of you seeing him?

3    A.   The purpose was to do a standard IME, Independent Medical

4    Examination, of Mr. Moore with regard to what the attorneys

11:00   5    call emotional distress, in our language, depression, anxiety,

6    any elements of post-traumatic stress, any psychiatric or

7    psychological issues that he would present or presented with.

8    So the IME is a three-part process that involves the clinical

9    history, which is you take the history of the patient, the

11:00   10   medical history, social history, educational, et cetera; the

11   mental status examination, which is interwoven into the

12   history, which covers the domains of mental functioning,

13   including orientation, thought processes, perceptual abilities,

14   cognitive abilities, judgment, insight, suicidality,

11:01   15   intellectual endowment, et cetera; and then you administer a

16   select series of psychological tests of which there are

17   literally hundreds.

18            And so based on the clinical history and the mental

19   status exam, using clinical judgment, I select a menu of tests

11:01   20   to administer and come up with an opinion regarding a

21   diagnostic impression.

22   BY MR. CHAMBERS:

23   Q.   So your goal was to sort of evaluate the psychological

24   component of Mr. Moore's injury?

11:01   25   A.   That is correct.

1    Q.   And you administered the tests you just mentioned.  The

2    psychological tests that you administer, is that typical of

3    every patient?  Do you use the same tests for every patient?

4    A.   No, not at all.

11:01    5    Q.   What determines which test you give?

6    A.   Well, there are some tests that are consistently used, for

7    example, MMPI, which is consciously used in these issues, but

8    we have -- as I said, I used the word "menu."  We have an array

9    of tests available to us that focus on specific issues like

11:02   10    depression or anxiety or PTSD-related symptoms or brain

11    function or cognitive function.

12              So I just use clinical judgment based on my 35 years

13    of experience of what test to use.  I don't have all the tests

14    in the office.  I have a filing cabinet full, and I choose what

11:02   15    I deem to be appropriate, but they usually cover what we're

16    looking for.

17    Q.   And are there tests that you administer that test for

18    validity measures?

19    A.   Absolutely.  Briefly, I'll be very brief.  The first thing

11:03   20    you want to evaluate in an IME is the issue of malingering,

21    which is a validity issue.  Is the patient being honest?  Is

22    the patient putting their best foot forward?  Are they

23    answering the questions in an open and honest way?

24              So one administers a test that they have which gives

11:03   25    us an indication of that; therefore, also redundancy issues in

1  other tests that look at validity.

2  Then one looks at motivation.  Is the patient putting

3  forth his best effort to do his best?  Kind of what attorneys

4  do at the bar exam.  You put your best foot forward.

11:03  5  And then you do the clinical tests, and based on the

6  tests of malingering, motivation, and clinical judgment on the

7  patient's presentation in the office, we make an assumption

8  about their validity of their presentation, so there are

9  validity measures in the tests, and there's clinical judgment

11:04  10  involved.

11  Q.  And based on the clinical presentation and your own

12  judgment, were there any questions about the validity of

13  Mr. Moore's testing?

14  A.  No.

11:04  15  Q.  And were there any tests that you administer that you think

16  are particularly significant for the diagnoses that we're about

17  to get into?

18  A.  Yes.

19  Q.  Okay.  Which ones?

11:04  20  A.  Well, as I said, firstly, he passed the malingering test.

21  There was no evidence of malingering.  The motivation test was

22  good.  He was, you know, genuinely into the process and put his

23  best foot forward.

24  So I then administered based on the presentation and

11:04  25  the story -- by the way, if I could just add, we have a saying

1    in mental health, from the president of the Psychiatric

2    Association, that "90 percent of the diagnosis is in the

3    history in psychiatry and psychology."

4         So based on the history, I administered a depression

11:05    5    test called the Beck Depression Inventory.  I administered a

6    specific anxiety test called the Beck Anxiety Inventory.  And I

7    administered the MMPI, which is a test of looking at all the

8    psychiatric diagnoses across the board, anxiety, depression,

9    bipolar disorder, schizophrenia, organic brain damage,

11:05    10   personality characteristics, characterological features, and

11   then I administered a test called Millon, M-I-L-L-O-N, which is

12   a test that also overlaps with the MMPI, but also looks at

13   personality disorder issues, if any, like antisocial

14   personality or narcicisstic personality or that kind of thing.

11:06    15   Q.   Now, these various tests that you administered, are these

16   forms that Mr. Moore would fill out and then you would then

17   evaluate?

18   A.   Yes.

19        By the way, I also administered a PTSD inventory as

11:06    20   part of the emotional distress piece.

21   Q.   What's the name of that test?

22   A.   That's called a Diagnostic Assessment of Post-Traumatic

23   Stress.

24   Q.   Okay.

11:06    25   A.   The Beck -- the first four tests that I mentioned are

1    administered by a computer.  The patient sits in front of the

2    computer and answers the questions that come up.  Some of them

3    are true/false, like "I have a good appetite; true or false?"

4    And some of them are rating scales, which is "Do you worry a

11:07    5    lot?  Some of the time?  All of the time?  Most of the time?

6    Never?"  That kind of answer.

7             So he enters those on the computer, and then these

8    tests are owned by a company called Pearson, which all

9    psychologists use, and we don't own the test, we buy

11:07    10    administrations from the company.  So you buy the

11    administration fee, you pay a fee, and submit the results to

12    the computer company, and they generate a computer printout.

13             The post-traumatic test is a pencil and paper test

14    that he reads the questions, and it's also a rating scale,

11:07    15    mild, moderate, severe kind of thing.

16             I also did some cognitive screening tests, but I'm

17    just focusing on what you asked about the emotional distress

18    piece.

19    Q.   And after obtaining Mr. Moore's clinical history and

11:08    20    administering these various tests, did you arrive at any

21    diagnoses with respect to his psychological condition?

22    A.   Yes, yes.  Let me just preface this quickly with a

23    one-minute comment.

24    Q.   Please.

11:08    25    A.   No psychological test is ever designed to stand on its own

1   as a diagnostic instrument.  It's not an X-ray.  It's not a

2   pregnancy test.  It's not the bar exam.  True, you pass/fail.

3   It's never meant to stand on its own.  It's always meant to be

4   used in conjunction with a battery of test that has redundancy

11:08  5   built into it so you have some commonality across various

6   domains.  Number one.

7           No test battery is appropriately used to come up with

8   a diagnosis absent a history or a review of the mental status

9   exam, et cetera.

11:08  10          So it's really an integrated presentation of data.  So

11   the diagnoses that I came up with were --

12   Q.  Let me make sure I understand the comment that you just

13   made.

14          I think what you're saying is that you can't rule in

11:09  15   or rule out a particular psychological disorder with just the

16   history alone.  Is that right?

17   A.  No, I wouldn't say that.  Psychiatrists do that all the

18   time.

19   Q.  Okay.

11:09  20   A.  Because they don't do psychological testing.  Occasionally

21   they do the computer piece because they can also buy the

22   administrations and they're licensed to do that, but it's

23   generally my field.

24          So yes, the history alone from a good psychiatrist or

11:09  25   a good psychologist will give you diagnostic information.

```
      1          What I'm saying is one test on its own or even a
      2   battery of tests on its own absent the history of the story is
      3   questionable.  That's why we do an IME that's integrated into
      4   the history, the mental status, and the testing.
11:09 5   Q.  Understood.
      6          And you did that with Mr. Moore?
      7   A.  I did.
      8   Q.  And what did you diagnose Mr. Moore with?
      9   A.   Firstly, I felt that the man when I saw him was
11:10 10  significantly depressed.  He endorsed many items on the test,
      11  and the outcome based on the statistics was a severe level of
      12  depression, and he endorsed on "severe" items five items; on
      13  "moderate" items, about seven items; and on "mild" items, about
      14  nine.  He was not suicidal.  That's always a concern in
11:10 15  depression with clinical people like myself.
      16          But his level of depression was severe, according to
      17  this test.
      18          It was also speaking about redundancy.  On the MMPI
      19  and on the Millon, the scores were the same.  There was a major
11:11 20  depressive quality to his presentation.
      21          So my first diagnosis was that there was a major
      22  depressive disorder present.
      23          I then also administered the Beck Anxiety Test, and
      24  there was also a significant level of anxiety, tension, worry,
11:11 25  and fear.  Or that was also borne out on the Millon by elevated
```

1   scores on anxiety, major depression, and he had slightly higher
2   score on a paranoid scale, but not paranoid in the -- in a
3   English, common English, sense.  Paranoid meaning concerned and
4   vigilant about what would happen to him in the future.  That's
11:11   5   sort of beliefs about the future which were pessimistic,
6   negative, fearful.
7   Q.  Did you get into any specifics about what those particular
8   concerns were?
9   A.  Yes.  If I may add that anxiety and depression are
11:12   10   disorders of mood.  And they are both regulated by similar
11   neurochemistry in the brain, so there's a common chemical
12   element to both mood states, but there's also a dynamic
13   commonality, and the dynamic is lost.  We get depressed when we
14   lose things, and we get anxious when we anticipate losing
11:12   15   something.  So if a person thinks they're going to lose all
16   their money on the stock market tomorrow, they're anxious,
17   tense, worried, and fearful.  It hasn't happened yet, but they
18   think it's going to happen.  The mood is tense, worry, and
19   fear.  Tomorrow the market crashes.  You lose everything.  You
11:12   20   sustain the loss.  So the tension, worry, and fear now changes
21   to despondency and despair and pessimism.
22         So the issue of loss is a major psychological factor
23   in the diagnosis of depression and anxiety.
24         In this case in particular Mr. Moore has both.  He
11:13   25   sustained some loss, loss of health and loss of teeth and loss

1    of some integrity, some of the disfigurement, a loss of some

2    issues around psychosocial involvement, he became very

3    isolated, he was very concerned about having no teeth,

4    couldn't -- didn't want to ask a woman out, couldn't eat

11:13    5    properly, a loss of health, per se.  And then there was

6    anticipated loss, which is in 2015 what else am I going to lose

7    in terms of relationships, job, my future?

8            So those are therapeutic issues to be dealt with in a

9    sort of therapy, but they're diagnostically significant because

11:14    10    the history tells you that loss is a factor.  And that was also

11    picked up by his psychiatrist who prescribed antidepressant and

12    antianxiety drugs for him.

13            He also had as part of my diagnostic impression some

14    of the clusters of symptoms associated with PTSD.  Not a

11:14    15    full-blown PTSD like we see with some of the soldiers coming

16    back, but we do have a catalog of partial PTSD, which is

17    anxiety and depression are symptoms of PTSD as well.

18            PTSD used to be classified as an anxiety disorder up

19    to the DSM-5.  It was under "Anxiety" together with phobias and

11:14    20    OCD.

21    Q.  What's a DSM?

22    A.  Sorry.  The DSM is the Diagnostic Statistical Manual.  It's

23    the psychiatrists' little Bible of what the disorders are and

24    what the criteria are for making the diagnosis.  It's sort of a

11:15    25    guide.  "Bible" may be the wrong word.  It's a guide that the

1    American Psychiatric Association is continuously revising.

2    We're now up to the 5, which came in last year or the year

3    before, and so the DSM-IV still had PTSD classified as anxiety

4    disorder, and in 5, they made some changes to the criteria, and

11:15  5    they moved it to a separate catalog called trauma-related

6    disorders.

7          So in my opinion, looking at the DSM-5, Mr. Moore had

8    some clusters of symptoms associated with a partial PTSD.

9    Q.   The DSM-5, when did that come about?

11:15  10   A.   Well, they're working on it for years, but it really -- I

11   would say in the last year or two, it's become -- I would say

12   probably -- I don't have an exact date for you, but within the

13   last two years.

14   Q.   And is that now the new standard in the field of psychology

11:16  15   in terms of diagnosing people?

16   A.   Yes, there's still a lot of people that use DSM-IV because

17   they didn't change everything.  They changed a few things.

18   They dropped a few things that were regarded as mental illness.

19   You know, at one point being gay was regarded as a mental

11:16  20   illness.  That's not regarded as a mental illness anymore.  And

21   so they've made -- they've tweaked it, and they've -- you know,

22   they've revised some drug addiction categories, et cetera.

23   Q.   What's the distinction or significance between PTSD being

24   described as an anxiety disorder in DSM-IV and now a

11:16  25   trauma-related disorder in DSM-5?

1   A.   Well, this is just a thought.  I think the -- as I

2   mentioned before, since 9/11 and the two wars, the explosion of

3   work and research in PTSD, in my opinion, got the people, the

4   psychiatrists, psychologists that developed the PT, to think

11:17   5   that it warranted a separate diagnostic category.

6          Back in the '70s and the '80s, I mean the Vietnam Vets

7   got a short shrift on PTSD.  They didn't know much about it,

8   and it wasn't very much.  They just lumped it with anxiety.

9          So my feeling is due to the -- what has happened in

11:17   10   the last couple of decades, particularly since 9/11, the

11   research has been so great that I think that's why they did it.

12   It's an academic issue really.

13   Q.   And what is PTSD?  I think we've all heard the term thrown

14   around or read it in the newspaper, but what exactly is it?

11:18   15   A.   PTSD is a disorder that has a sort of -- patient is exposed

16   to a horrific event that is generally outside the bounds of

17   human experience.  It comes out of the blue.  And as a result

18   of this event, significant biological chemical changes take

19   place in the brain that lead to a cluster of symptoms

11:18   20   associated with the experience of the events, the

21   reexperiencing of the event, intrusive thoughts about it.

22   There's -- sometimes avoidance of talking about it, revisiting

23   your doctors and lawyers to go through this again and again.

24   Their reexperiencing of it generates symptomology -- and I'll

11:19   25   get into that -- and then there's what we call hyperarousal,

1    which is a level of tension, worry, and fear, and anxiety in
2    the face of the reminder.

3            The biggest force in PTSD is the traumatic reminder.

4            I was sitting outside here looking at jetliners
11:19   5    landing between high-rise buildings, and I was anxious.  If a
6    9/11 PTSD person was sitting out there today, he'd be having a
7    panic attack because it's kind of frightening.  The omnipresent
8    nature -- and I would underline "omnipresent nature" -- of the
9    reminder is what happens in PTSD.

11:19  10            For example, I'm not a 9/11 PTSD survivor, so I get
11   tense for five minutes looking at a plane, but I'm now okay.
12   The traumatic reminder in a PTSD patient is the reminder of the
13   event, a movie about it, a picture of it is constantly
14   generating the limbic system -- and I have the slide for
11:20  15   that -- to generate neurochemical changes in the brain that
16   lead to tension, worry, fear, and arousal, and so the traumatic
17   reminder in this case was physical injury, pain, even the
18   lawsuit, doctors' visits, every time he looks in the mirror.

19            So when you have an omnipresent traumatic reminder,
11:20  20   the patient is in relatively constant state of what we call
21   physiological arousal, and that's a characteristic of PTSD.
22   Q.    Let's take a quick look at your slides, which are Exhibit
23   118, and I'm interested if you could talk a little bit more
24   about the neurochemical changes and the biologic changes that
11:21  25   you mentioned just a moment ago.  We'll put it up there.

1    A.   Okay, great.

2    Q.   So this is Exhibit 118?

3    A.   All right.  So deep in the brain we have what's called the

4    limbic system.  That's the center of fight or flight.  It's the

11:21   5    part of the nervous system called the sympathetic nervous

6    system.  It's when one is faced with the proverbial lion

7    attacking, charging at you, the brain has to decide whether to

8    fight the lion or flee the lion, and flee the lion seemed to be

9    the most survivable option, and so in order to flee a lion, a

11:21   10   lot of physiological changes need to take place in the brain.

11            So if you look at the slide at the top arrow, the

12   perception of the lion-like event hits the hypothalamus.  Then

13   on the left side of the slide releases stress-related hormones

14   which redistribute blood from non-necessary -- you don't need

11:22   15   blood in your cheeks, so you go pale.  You need blood in your

16   biceps and thighs to fight or flee.

17            So blood is redistributed to necessary areas for fight

18   or flight.

19            In order for the blood to get there, the heart rate

11:22   20   has to beat.  So the heart rate will go up to the 140s or

21   whatever.

22            The heart rate being so high will push the blood

23   pressure up, which pushes the body temperature up, so the

24   patient may start sweating.

11:22   25            There may also be a signal to the bowels to void.

1   without being off color, every culture has the metaphor of
2   losing control of your bowels with fright.

3        Okay.  The limbic system, it's a light in the body for
4   the flight or to create a diversion for the lion.  It's a very
11:23   5   primitive, chemical, involuntary movement.

6        In today's world we don't lose control of our bowels,
7   but we sometimes get butterflies in the stomach as the bowel
8   constricts.  The pupils dilate for greater acuity in the forest
9   to get away.

11:23   10        All this happens in an all-or-none fashion.  There is
11   no cognitive process, which is, "Is the lion tame?  Is the lion
12   hungry?  Maybe it ate three people this morning.  It's not
13   interested."  As soon as you do that, you get eaten.

14        So the limbic arousal is like an all-or-none thing.
11:23   15   It occurs instantly and facilitates the flight.

16        So when you see this go down on the left-hand side of
17   the slides to the bottom, it says "Adrenal Cortex."  That's
18   where the adrenaline is injected into the system.

19        Now, if we go up on the right side, the dotted line,
11:24   20   back to the hypothalamus, which is once the person gets back to
21   his cave and the lion is now not there, the danger is gone, and
22   so the signal to the limbic system, to the rest of the brain,
23   is the danger's over, and the body restores to equilibrium,
24   blood pressure comes down, heart rate goes to normal,
11:24   25   et cetera.

1        So that circle is the way we deal with stress on an

2   everyday basis.  Get a traffic ticket, sitting here on the

3   witness stand, et cetera.  When it's over, stability.

4        Now, when you have a traumatic reminder and you have a

5   PTSD-like disorder, what happens is the middle of the slide,

6   you have the dotted line veering off to the left.  In other

7   words, the recovery doesn't take place.  That's the

8   reexperiencing phenomenon, which is it keeps going.  And so you

9   have adrenaline and stress hormones and the limbic system in

10  overdrive.  That's the reason why if you were a sentry in the

11  Marine Corps and air force base tonight, they keep you on guard

12  duty for four hours or five hours.  You're tense, you're

13  vigilant, you're anxious, you're scanning the border, and after

14  five hours, they say, "Mr. Chambers, Corporal Chambers, go back

15  to your barracks.  We're bringing up somebody else."  Because

16  you cannot maintain that level of functionality when you're in

17  a constant state of stress without a break.

18  Q.   So you're saying somebody with PTSD-type symptoms is

19  experiencing this sort of stress cycle on a regular basis?

20  A.   Yes.  So if you go to the next slide, it's really similar,

21  but it's -- I think that's pretty much -- yeah, I think isn't

22  that the same slide?  Oh, yeah, that's just a -- with a bit of

23  describing what the cortisol levels.  They're stress hormones.

24  They're just showing when recovery doesn't occur, you have an

25  increase in adrenal, adrenaline activity, which is why the

1    treatment of PTSD is often an anxiety related or

2    depression-related process, which is what happened here.

3           The psychiatrist, Dr. Moyer, I believe, is prescribing

4    initially Zoloft, which was the first drug that FDA-approved

11:26   5    for the treatment of PTSD, and some similar -- and antianxiety

6    drug, lorazepam, I believe, which is the anxiety piece.

7           What those drugs do is they try and short circuit this

8    vicious circle at the bottom of the slide and they try to

9    facilitate the completed circle.

11:27  10           So in Mr. Moore's case, that's the neurochemistry of

11   trauma.  It's hard neuroscience that the limbic system is

12   constantly active, which keeps the patient very much in a high

13   state of arousal, so that leads to sleep disturbance, it leads

14   to fatigue, it leads to some social withdrawal, which -- other

11:27  15   aspects of various clusters of PTSD.

16   Q.   Now, let's turn to the actual diagnostic criteria for PTSD,

17   if we could.

18   A.   Yes.

19   Q.   And as I understand it, there's several different things

11:27  20   that one would need to meet in order to be diagnosed with PTSD.

21   Is that right?

22   A.   Yes.

23   Q.   Can you summarize what those are for us?  Let's start with

24   number 1.

11:27  25   A.   Well, one of the criteria is the intrusive memories of the

1    event that enter spontaneously into the patient's thinking even

2    if they don't want to think about it, they're thinking about

3    it.  And as we say, the traumatic reminder precipitates that.

4            Sometimes nightmares, disturbed sleep with nightmares

5    with some content related maybe to that.

6            Patients sometimes have flashbacks to the event.  The

7    physiological hyperarousal that we spoke about occurs.

8    Avoidance, avoiding -- in cases avoiding talking about it,

9    thinking about it, and in some cases, avoiding the place.

10   Like, for example, Holocaust survivors may never go back to

11   Germany, but they'll go to France, which is 20 miles from the

12   border, but the avoidance of going there will activate

13   behavior.

14           The issue of the change in the DSM-5 was the issue of

15   the experience of the event.  I think the forefathers of the

16   DSM-5, in looking at that, realized that that was not entirely

17   correct.

18           Like a good example would be if a woman is brutally

19   raped, maybe knocked unconscious, or has some amnesia for the

20   event, and when she comes to and finds out what happened to

21   her, and she's facing whatever injuries she has, and the very

22   thought of that horrific event, but she doesn't remember the

23   actual blow to the head, to say that she's not traumatized

24   defies imagination.  Of course, she's traumatized.

25           Because in the words of the people, professors, and

1    I've spoken to a lot of these people, the patient was there,

2    and so they are left with the physical and emotional fallout of

3    the events.

4              So actually witnessing the event has been reduced to

11:30  5    actually being in the event.  And that is the major change that

6    the DSM-5 has happened, and that makes a lot of sense for some

7    of those examples and also for a lot of these IME injuries and

8    the war where the Humvee gets hit by an IED and the soldier

9    hits his head on the Humvee thing and he comes to.  He has got

11:30  10   a TBI, was knocked unconscious, but his leg's torn off, and he

11   sees other things going on, but he didn't really see the

12   explosion.

13             They've changed that, and that makes a lot of clinical

14   sense, and that's the only thing that's really changed.

11:31  15   Q.   So you're saying in the DSM-5 this intrusive memory doesn't

16   actually require there to be a memory of the specific

17   injury-causing event?

18   A.   No.   It requires them to have been there.

19   Q.   So for somebody like Mr. Moore, you understand he has

11:31  20   amnesia for a period of weeks, up to a month around the event?

21   A.   Yes, that is my understanding of it.

22   Q.   So how can he have PTSD if he doesn't even remember being

23   there?

24   A.   Well, because, as I said, he had -- or he came to in

11:31  25   hospital with major facial injuries, no teeth, pain, surgery.

1    Disfigurement in PTSD is a major area of research, particularly

2    on the face.  So yeah, you can have -- it's like the rape

3    victim.  To say that she couldn't have PTSD because she doesn't

4    remember the person -- what he actually did to her, but she

11:32   5    knows that's what he did, and she's left broken up physically

6    and emotionally, of course the trauma-related disorder is an

7    entirely -- it almost sounds like common sense.  The problem

8    with common sense it's not very common.  But that is the

9    traumatic outcome of these events that occur that change the

11:32   10   trajectory of a person's life.  They come out of the blue,

11   they're outside the bound of human experience, and they change

12   the trajectory of your life.

13   Q.   Let's turn for a minute -- as I understand it, another one

14   of the diagnostic criteria is this idea of intrusive thoughts

11:32   15   or memories?

16   A.   Yes.

17   Q.   Is that right?

18   A.   Yes.

19   Q.   And this is where they would -- the person who experiences

11:32   20   them would be overcome with -- I think in your example, the

21   9/11 victim out there having a panic attack?

22   A.   Yes.

23   Q.   How could somebody who has PTSD function in a workplace?

24   A.   Well, as I said, there are degrees of post-traumatic stress

11:33   25   disorder.  It's not an issue like pregnancy where a woman is

1    pregnant or she's not, not 50 percent.  It's not a dichotomist

2    issue.

3         In Mr. Moore's case, my feeling -- and I saw him over

4    a year ago, in 2015, the issue of a person being able to

11:33  5    work -- it's not ruled out.  There are thousands of Vietnam

6    Vets working.  They're soldiers who are back working, maybe not

7    back on the front lines.  There are a few Holocaust survivors

8    that are still alive that had 70 year careers, and they still

9    have PTSD.

11:34  10        And so the partial PTSD that exists in this case is

11    also mitigated by Mr. Moore's -- his way of being in the world.

12    You know, he's a tough guy, had a job that was a sort of part

13    of his life which he went to every day, gave him a living, gave

14    him friends, gave him a sense of usefulness, a sense of

11:34  15    purpose, and he didn't strike me as a fellow that had a huge

16    array of outside interests other than his career and his

17    friends and some of the -- whether it was fishing or bike

18    riding or whatever else he did.

19        But he was very much identified with his career and

11:35  20    possible advancement and having a life.  And when that ended

21    through this accident, and when I saw him still with major

22    facial and no teeth injuries, I mean that would have been hard

23    for me to imagine him going back to work, but I think his

24    motivation, as we saw in the test, his motivation is high to go

11:35  25    back to work, I think transcended the idea of sitting at home

1    and wasting away.

2            So there are PTSD patients -- more the partial PTSD

3    rather than the full-blown PTSD.  I mean, there are guys

4    sitting in Walter Reed that are never going to work sort of

11:35   5    salaried, full-time job.  But definitely the volume of PTSD

6    patients out there that can function on a job, that can be

7    done, I would say yes.

8    Q.  So it's not mutually exclusive, one's ability to work and a

9    PTSD diagnosis?

11:36   10   A.  It's not mutually exclusive, and I would say that the level

11   of PTSD -- I use the word "partial" because that's the word

12   that they use in the clinical world.  The partial PTSD drives

13   his mood.  The depression and the anxiety which I see is really

14   the primary clinical piece of this case, which is if he was

11:36   15   anxious or depressed before the accident, it was more the

16   anxiety and depression that we all experience with whatever

17   everyday life things upset us, but we recover whether it's a

18   divorce or a failing an exam or a relationship issue, most

19   normal people recover.  People get through grief.  It takes

11:37   20   longer in some people, but they recover.

21            The human capacity to survive is quite phenomenal in

22   some people, but the PTSD with the traumatic reminder tends to

23   pull them back periodically.  And that's why in the case of

24   PTSD, it can pull them back.

11:37   25            If I could take you -- 30 seconds --

1    Q.   Sure.

2    A.   -- I did a case about ten years ago with a Vietnam Vet PTSD

3    from the Vietnam war that was working and was involved in the

4    Metrolink train crash that happened a few years ago.  There

11:37   5    were two fatalities in the crash, the passenger and the

6    conductor, and the conductor ended up dead on top of this guy

7    who was working with a PTSD diagnosis from the VA.

8         And the reexperiencing of the bloody conductor on top

9    of him put him back to Danang, and he went into a full-fledged

11:38   10   PTSD disorder, back into the hospital, and, you know, so that

11   horrific event that reoccurred years later set him back.

12        Now, that's unusual because it doesn't typically

13   happen that trains crash, but it was a dramatic example of the

14   traumatic reminder setting a person back.

11:38   15       In a milder sense, the reminder of doctor's visits or

16   pain or having no teeth or not being able to go on a date

17   because you can't eat properly, which is the situation when I

18   saw him, is enough not to put him in the hospital like the

19   train victim, but to set him back emotionally as a result of

11:38   20   the slide-demonstrated chemistry.

21   Q.   And, in addition, I imagine the physical signs of his

22   injury could serve those traumatic reminder purposes?  In other

23   words --

24   A.   Oh, absolutely, they do.  That's very common.

11:39   25   Disfigurement, bodily injury, particularly to the face, more so

```
 1   say than the stomach scar.  That's -- we present to the world,
 2   and when that gets damaged, a person gets damaged.
 3   Q.  So anytime somebody like Ryan looks in the mirror, some of
 4   these traumatic reminders can come back?  Is that what you're
 5   saying?
 6   A.  Yes.
 7   Q.  And you saw Ryan back in 2015 I think you mentioned?
 8   A.  Yes.
 9   Q.  Does PTSD or your diagnosis of PTSD go away?
10   A.  That's a great question.  The symptomatology can fluctuate
11   like in the example with the train crash.  I mean, it can get
12   to a point where the person can function, but they may be --
13   events that occur that reactivate the symptomatology.
14        In more severe PTSD cases, the general thinking in the
15   clinical community is that it can extend into the lifespan.
16        My grandmother was a Holocaust survivor, and she died
17   when I was about eight, and I remember I asked her once, I
18   said, you know, "Where were you in 1942?"  And she said, "We
19   don't talk about that," and she just put a lid on it, and it
20   was never addressed again.
21        And so I never thought about it when I was eight, but
22   when I was 28 and 38 and 68, I think that the idea of talking
23   about it would have been too traumatic, and so it's very common
24   in PTSD for people to shut down, and that happens, and that
25   is -- I feel one of the factors mitigating against Mr. Moore's
```

                1    motivation for psychotherapy because psychotherapy opens up the
                2    can of worms, so to speak.
                3         I won't get into that, but that's what therapy does,
                4    you talk about the issue, and for a lot of traumatic stress
11:41           5    patients, that's the last thing in the world they want to do.
                6    It's the reason they use groups at the VA because it's easier
                7    in a group, but so yeah, it can reactivate down the line.  It
                8    can be something that this person carries with them for their
                9    life.
11:41          10         But there are people, like I say, rape victims or that
               11    that get back on their feet and go on and may have periodic
               12    nightmares or periodic reminders, and so the intensity may
               13    fluctuate, but in a lot of cases -- see, we're the only species
               14    in the world that can articulate our history and make some
11:42          15    prediction for the future.  That's why we have 401(k)s and we
               16    can talk about what happened to us.  We're the only species
               17    that can do that.  It's a bit of a curse.  And we can
               18    articulate what happens to us, and when that resurfaces
               19    periodically through discussion, movies, books, whatever, the
11:42          20    person is vulnerable, and that's also a very key piece in PTSD.
               21         The vulnerability to the traumatic reminder, like the
               22    airplane example in San Diego, the PTSD 9/11 person is
               23    vulnerable in this city because it's kind of crazy, but not me
               24    or you, so the vulnerability is -- and, of course, therapy,
11:42          25    talking about it, opening up about it, admitting to -- because

1    he's a macho kind of guy.  Admitting to weakness or emotional

2    problems is not what comes easy, and so it's avoided.

3    Q.   And in your view, how have your diagnoses of PTSD and major

4    depressive disorder and anxiety that we talked about here

5    today -- how have they impacted Mr. Moore's life?

6    A.   Well, I think they changed the trajectory of his life, as

7    an accident of this nature does.  Of course, I haven't seen him

8    for over a year, but when I saw him, he was dejected,

9    depressed, anxious -- it came out in the testing -- and very

10   pessimistic about what his psychosocial world would be like

11   relationshipwise, his physical appearance, the pain that he had

12   to go through, some of the medical stuff, maybe some of the

13   financial stuff of paying bills, et cetera, job issues.

14            And so when you're -- the trajectory of your life

15   changes, you are really dominated by the chemistry of the

16   brain.  And so everyday experience ceases to be a teacher for

17   you.  You're just locked in the past.  And that's what I felt

18   was a key factor with Mr. Moore and with many other

19   trauma-related patients.

20   Q.   And for that reason, you've made some recommendations for

21   some future treatment for Mr. Moore?

22   A.   I did.

23   Q.   And what did you recommend?

24   A.   Well, within my field of expertise, I think that it would

25   be a bifurcated strategy of medication and therapy.  The level

1    of psychopharmacological intervention, psych meds, is very high

2    end these days.  We know a lot.  We've got new drugs that

3    weren't around in the '90s, even ten, 15 years ago.  They're

4    improving them all the time, but they're antidepressant-related

5    drugs and antianxiety drugs are recommended.

6         Now, I'm not a psychiatrist, I can't prescribe them,

7    but I know what they do, and I work with these men and women

8    all the time.

9         What those drugs do is they try and correct what's on

10   the slide.  They make the -- they get rid of the small dotted

11   line in the middle and just make it go better.

12        Then there's a psychotherapy piece, which is my

13   expertise.  I'm a psychotherapist per se.  And the

14   neuroscientific basis of therapy in PTSD is that when a person

15   is faced with trauma, every language in the world has the

16   metaphor of stunned into silence, numb with shock, deer in the

17   headlight.  That's a survival mechanism to shut down the verbal

18   areas.  If a lion is stalking you, you keep quiet and try and

19   get away.  Every time they have a school shooting, the first

20   thing they do is they send in people like me to talk to these

21   stunned, silent, surviving students sitting up against the

22   library wall.

23        So the treatment -- so what happens is if you do PET

24   scans, which look at metabolic activity in the brain in trauma,

25   you see that the verbal areas go dark.  There's no

1   articulation.  Like my grandmother.  "We don't talk about

2   that."  Done.  Finished.

3          The therapy of PTSD is to get them to talk about it,

4   to open up the channels from their right hemisphere of the

11:46   5   brain, which is the experience of the event, to the left

6   hemisphere of the brain, which is our language centers with

7   which we are endowed to articulate stuff.  It's very tough,

8   it's very difficult, but that's the treatment strategy that's

9   been shown to work.  All the research on PTSD shows the

11:47   10   combination of the medication piece and the psychotherapy piece

11   has the best outcome versus medication alone or therapy alone.

12          So I need the psychiatry professional to write the

13   prescriptions for the people, and they need me to do the

14   therapy.

11:47   15   Q.   And so you're recommending a series of psychotherapy --

16   A.   Yes.

17   Q.   -- for Mr. Moore?

18   A.   Yes.

19   Q.   It looks like a session a week for a year?

11:47   20   A.   Right.  You know, that is, again, a sort of standard of

21   care recommendation.  It's what I do in the office.  It doesn't

22   always work out as a session a week for a year.  There's summer

23   vacations, I'm away, the patient's away, there are public

24   holidays, et cetera.  Even the insurance companies put 50

11:47   25   visits a year allowing for two weeks vacation.  But I would say

1    the first year, more of a regular psychotherapeutic connection.

2    The medication is like a daily-dose regimen, but he doesn't

3    have to see the psychiatrist necessarily every month.  The

4    psychiatrist may want to see him the first month to see how the

11:48  5    meds are doing, and then they usually go quarterly.  But they

6    have -- the patient has access to the psychiatrist if he has a

7    side effect and wants to talk about it.  So the psychiatrist

8    would be like 12, 13 visits a year -- sorry, quarterly, say

9    five, a few in the beginning and then quarterly, and then,

11:48  10   ideally, a psychotherapy intervention of weekly.

11              There's another modality which I have sometimes the

12   luxury of using at UCI, University of California at Irvine.

13   The head of the PTSD unit there is a colleague of mine,

14   Dr. Novack, with whom I do a lot of work.  He's published and

11:49  15   everything.  He runs a PTSD group at UCI, and so the group

16   therapy modality, which is what they use in the military, is a

17   very useful modality because, for a lot of reasons that we

18   won't get into here, the group is useful for altruistic

19   reasons.  People receive through giving.  They see other

11:49  20   patients with the same issues, and so that's a good modality.

21   There are not many around, but I just put it in there as an

22   option that the community can offer.

23   Q.  And then going forward in terms of psychotherapy, it sounds

24   like maybe once every other week or once a month to be repeated

11:49  25   a couple of times over the course of Mr. Moore's life.  Is that

1    about right?

2    A.   Yes, what I would say is a lot depends on progress in

3    treatment.  If he does well on the meds and he does well on the

4    therapy, he may not need to come once a week.  I have patients

11:50    5    that I see every couple of months.  I have patients that call

6    in on an as-needed basis at the other extreme.  I have patients

7    that come back after years when something happens, like a

8    divorce or something.  But so you can taper it down.

9         The meds may not necessarily be tapered down depending

11:50    10    on what the psychiatrist wants, but the therapy piece could be

11    tapered down because very often if -- say we do a good year of

12    psychotherapy with a patient.  I like to think of myself as a

13    sort of full-service guy, so the patients have 24-hour access

14    to me.  They have my cell number, they can text me, and so on.

11:50    15    So even though they may not be seeing me every week, I'm there.

16    And I give patients license to call me, text me, email me

17    et cetera, and that is sometimes a comforting thing.

18         So even though they're not specifically coming in in

19    the second year or the third year, they'll text me, they'll

11:51    20    call in, they'll come for one visit, tune-up, so to speak, so

21    it's an ongoing thing.

22    Q.   But you think that sort of recommendation is appropriate

23    for Ryan going forward?

24    A.   Absolutely.

11:51    25         MR. CHAMBERS:  I don't think I have any further

368

```
          1  questions.  Thank you, Doctor.

          2          THE COURT:  Cross-examination.

          3          MR. COYLE:  I would estimate I'll probably go about a

          4  half an hour.  Do you want to proceed now?  I'm happy to.

11:51     5          THE COURT:  The doctor's been waiting.  I'd like to

          6  finish with him and get him on his way.

          7          THE WITNESS:  Thank you.

          8                      CROSS-EXAMINATION

          9  BY MR. COYLE:

11:51    10  Q.  Good morning, Dr. Koransky.

         11  A.  Good morning, sir.

         12  Q.  You're not board-certified by the American Board of

         13  Professional Psychology, are you?

         14  A.  I am board-certified by the Board of Psychology in

11:52    15  California.  That's what the license is.

         16  Q.  But not by the American Board of Professional Psychology?

         17  A.  Those are voluntary organizations through the APA, and I --

         18  Q.  I understand.

         19  A.  It's a no.  I'm licensed with the Board of Professional

11:52    20  Psychology.

         21  Q.  And you don't hold any faculty positions at any

         22  universities or colleges, do you?

         23  A.  No, I don't.

         24  Q.  And you're a psychologist, not a psychiatrist, right?

11:52    25  A.  Correct.
```

1  Q.   That means you're not licensed to prescribe medication?

2  A.   Correct.

3  Q.   Okay.  Now, let's get into your opinions.

4       Your opinion in this case is that the tire incident

11:52   5  caused Agent Moore to have PTSD, depression, and anxiety,

6  correct?

7  A.   I would say partial PTSD, depression, and anxiety.

8  Q.   Partial PTSD?

9  A.   Right.

11:52  10  Q.   And it's because of those emotional problems that you

11  believe Agent Moore is going to need future psychotherapeutic

12  treatment, right?

13  A.   Yes.

14  Q.   In other words, if Agent Moore didn't have those

11:53  15  conditions, he wouldn't need the treatment?

16  A.   Yes.

17  Q.   Now, would you agree that a patient's willingness to attend

18  psychotherapy effects how well it works?

19  A.   Well, as I said earlier, one of the problems in PTSD is

11:53  20  that therapy is a traumatic reminder, and a lot of patients do

21  avoid it.  So, obviously, if the patient is not there, it's

22  hard to say whether therapy works.  So if you don't take your

23  medicine, you can't say whether the medicine works or not.

24  Q.   I understand that, but if a patient does attend but does it

11:53  25  begrudgingly, doesn't want to participate and is just forced to

1    through whatever reason, it's less likely to work in that

2    circumstance?  Would you agree with that?

3    A.   My opinion there, it depends on the therapist.

4    Q.   So you are saying a patient's willingness can't tell

11:54  5    anything about how likely it is to work?

6    A.   Well, if they're unwilling, they're not going to come,

7    generally speaking.  They're going to be absent.  And so if

8    they're absent, yeah, it's not going to work.

9    Q.   All right.  Let's talk now -- before we get into the

11:54  10   testing that you used to reach your opinions, I want to talk

11   about Agent Moore's reliability as a historian.

12          Now, when you assess a patient, you depend in part on

13   the patient to be a reliable historian and a reliable reporter

14   of the symptoms, right?

11:54  15   A.   Correct.

16   Q.   And if the patient is not a reliable historian or is not a

17   reliable reporter of his symptoms, that can affect the validity

18   of your conclusions and diagnoses, correct?

19   A.   It could affect taking into account all the testing, yes,

11:54  20   it would affect it.

21   Q.   And in this case, you took a medical history from

22   Agent Moore?

23   A.   Yes, I took a history, and I reviewed some documents from

24   Dr. Moyer.

11:55  25   Q.   And you concluded that Agent Moore was a reliable

1  historian, correct?

2  A.   On the information that he gave me relative to his

3  background, his family history, his educational history, his

4  medical history with some injury that he had to his toe years

11:55  5  back, yes, I believe that information he gave me was true, and

6  it was validated in other test reports.

7  Q.   Now, he told you he was involved in a previous car

8  accident, correct?

9  A.   Yes.

11:55  10  Q.   And he told you the accident wasn't his fault, correct?

11  A.   I don't have extensive notes on that.  I remember there was

12  an accident.  I can't recall exactly what he told me

13  specifically to that accident.

14  Q.   Well, specifically the quotation in your report on page 5

11:55  15  is that he told you he was, quote, "hit by a driver going up

16  the wrong side of the road," correct?

17  A.   If I wrote that, that's what he told me, yes.

18  Q.   He didn't tell you that he was found at trial to be 85

19  percent at fault, did he?

11:56  20  A.   No.

21  Q.   He didn't tell you that there was a verdict in that case

22  for $5.4 million?

23  A.   No.

24  Q.   Does that affect your conclusion that he's a reliable

11:56  25  historian?

```
         1   A.   It doesn't affect my diagnostic opinion.  It's an omission
         2   from the history, but it doesn't affect my clinical opinion
         3   with regard to depression and anxiety as being the most
         4   significant features arising out of this tire accident.
11:56    5   Q.   Let's talk now about the validity of your emotional and
         6   psychiatric testing.
         7   A.   Yes.
         8   Q.   Now, you mentioned you gave Agent Moore five emotional and
         9   psychiatric tests in October of 2015, correct?
11:56   10   A.   Correct.
        11   Q.   Now, those tests have internal mechanisms built in to check
        12   that the patient is accurately reporting his symptoms, correct?
        13   A.   Yes.
        14   Q.   And those are called validity scales?
11:56   15   A.   Validity indices.
        16   Q.   Validity indices.
        17        Now, if a patient's scores on those validity indices
        18   are significantly elevated, that can indicate that the patient
        19   is not credibly reporting the symptoms he's experiencing,
11:57   20   correct?
        21   A.   Sometimes, but not all of the time.
        22   Q.   In other words, it can affect the validity of the patient's
        23   test results, in fact?
        24   A.   Sometimes, but not all of the time, and I can explain.
11:57   25   Q.   In other words, sometimes, but not all of the time you
```

1   can't reliably draw conclusions about the patient's emotional

2   condition from the patient's test results?

3   A.   Incorrect.

4   Q.   You're saying you can -- it doesn't affect the reliability

11:57   5   of the conclusions you can draw from the test?

6   A.   Well, the tests have redundancy factors built into them,

7   number one.  Number two, you've established malingering and

8   motivation issues with other tests, and in this case, in

9   particular -- and this is even commented on by Dr. Evans --

11:58   10   Mr. Moore has a tendency to amplify and exaggerate some

11   symptomatology, but even, as Dr. Evans pointed out, not with

12   the intent to deceive, quote, Dr. Evans.

13          This is how it works.  And I'll explain very quickly

14   to you.  If you have a mild headache and you go to a doctor and

11:58   15   you tell him you've got the worse headache in the world, you're

16   not malingering, you've got a headache, but you're experiencing

17   it as a monumental headache.  You're not malingering.  You're

18   amplifying.  Maybe for a lot of reasons.

19          If you haven't got a headache and you go to the doctor

11:58   20   and you tell him you have the worst headache in the world so

21   he'll give you a Vicodin prescription so you can abuse it or

22   sell it, that's malingering.  So he hasn't got a headache, so

23   it's not a clinical headache.  It's lying.

24          Both Evans and myself found that there's an

11:58   25   exaggerated amplification quality to Mr. Moore's testing, which

1    is he endorses some of the items at a higher level of

2    experience or intensity than they really are.

3         So the headache hypothetically is there, but he

4    reports it at a higher level.

11:59   5    Q.  Doctor, my question isn't about the patient's intent.  All

6    I'm asking is everything else equal, if the clinical -- if

7    these indices, validity indices, are elevated, that can

8    sometimes, but not always, you said, affect the reliability of

9    the conclusions you can draw from the test results?

11:59   10   A.  Yes, but the tests also states from the scoring that the

11   reliability indices on the MMPI produce a scorable report and

12   on the Millon produced a scorable report with some of this

13   amplification.

14   Q.  We'll get into that in a moment, Doctor.  I want to ask you

11:59   15   specifically about those, but I'm asking generally, big

16   picture, what the purpose of these validity indices are.

17   That's the purpose of my question was intended to address now.

18   In other words, it means that there's a substantial risk when

19   you have elevated validity indices that the patient's test

12:00   20   results are a false positive.  In other words, they can

21   indicate that he's got an emotional problem that he might not

22   really have.  Is that correct?

23   A.  False positive.  If all you're doing is testing, ignore the

24   history, ignore the presentation in the office, ignore all the

12:00   25   medical records, if you just do the testing, that's why I said

1    earlier you never just do the testing.  If you were doing the

2    testing, yes, you're right.  If you're just doing the testing,

3    blind testing, nothing else, an elevation on the indices is a

4    bit of a red flag.

12:00    5    Our job, my job, is to differentiate between the red

6    flag and the red herring, and when you have all the other

7    information, the elevation, the exaggeration, the

8    amplification, my opinion is a red herring and not a red flag.

9    Q.   I understand, but everything else equal with your taking

12:00   10    the history, you're exam, everything else equal, if the

11    validity indices are elevated, that increases the likelihood of

12    a false positive?

13    A.   Yeah, you could say that it increases the likelihood of

14    some question about why he was doing that.

12:01   15    Q.   Thank you.

16    Now, let's talk about Agent Moore's validity scores on

17    three of the tests that you gave him; specifically the MMPI-2,

18    the MCMI-3, and the DAPS.

19    So first the MMPI-2.  That stands for the Minnesota

12:01   20    Multiphasic Personality Inventory-2.

21    A.   Multiphasic.

22    Q.   Multiphasic.

23    Now, Mr. Moore scores on four separate validity

24    scales -- or validity indices.  Is that your word?

12:01   25    A.   Yes, sir.

1   Q.   His score is on four separate validity indices of the

2   MMPI-2 were significantly elevated, were they not?

3   A.   They were elevated.

4   Q.   Now, one of those scales is called the fake bad scale,

12:02   5   correct?

6   A.   Yes.

7   Q.   It's also known as the FBSR scale?

8   A.   Correct.

9   Q.   And that measures symptom exaggeration, correct?

12:02   10   A.   Yes.

11   Q.   Agent Moore's score on the fake bad scale was 73?

12   A.   Yes.

13   Q.   And a score over 65 is considered significant?

14   A.   Yes.

12:02   15   Q.   Now, the developers of these tests, they publish

16   interpretive reports and test manuals to explain what the

17   different scores mean, correct?

18   A.   Yes.

19   Q.   And according to the interpretive report written by the

12:02   20   MMPI-2 test developer, Agent Moore reported, quote, "Somatic

21   symptoms rarely described by individuals with genuine medical

22   concerns," correct?

23   A.   Correct.

24   Q.   Now, somatic symptoms, that just means physical complaints,

12:02   25   right?

A.   Yes.

Q.   And according to that same interpretive report, Mr. Moore also reported, quote, "an unusual combination of responses that is associated with non-credible memory complaints," correct?

12:03

A.   Yes.

Q.   Now, the second validity indici -- index on the MMPI-2 is called the response bias scale?

A.   Yes.

Q.   And that validity index is designed to identify something

12:03

called response bias, correct?

A.   Yes.

Q.   That means it's designed to detect exaggerated memory complaints, right?

A.   Yes.

12:03

Q.   Agent Moore's score on that validity index was an 84?

A.   Yes.

Q.   And a score over 65 is considered significant?

A.   Yes.

Q.   And according to the scoring program written by the test

12:03

developer, Agent Moore's scores on that validity index show, quote, "an unusual combination of responses that is associated with non-credible memory complaints," correct?

A.   Yes, but let me add, there's a whole other side of this, which I will defer to Dr. Markel, which regards cognitive

12:04

functioning issues.

1   Q.   We'll talk about cognitive function later.

2   A.   That affects what you just mentioned.

3   Q.   Did you review Agent Moore's results on the cognitive tests

4   given by Dr. Markel as well as by Dr. Evans, the United States

5   neuropsychology expert?

6   A.   Sorry.  Repeat the question, please.

7   Q.   Did you review the cognitive test results given by the two

8   neuropsychologists in this case?

9   A.   Yes, I did.

10   Q.   And are you aware that Agent Moore frequently scored in the

11   superior range on those cognitive tests?

12   A.   On some of them, yes.

13   Q.   And even sometimes in the very superior range?

14   A.   I would have to look at them to tell you, yes, but if

15   that's what it says, yes.

16   Q.   Okay.  Now, the third validity index on the MMPI-2 is

17   called the infrequency scale, correct?

18   A.   Yes.

19   Q.   And that's known as the FR scale?

20   A.   Correct.

21   Q.   Now, that validity scale asks the patient about things that

22   members of the general population very infrequently report,

23   right?

24   A.   Yes.

25   Q.   So it measures symptom exaggeration, correct?

1    A.   Right.

2    Q.   So like, for example, it asks the patient whether or not

3    when he's with people, he's bothered by hearing very strange

4    things.  Is that an example of something that's asked?

12:05   5    A.   I believe that's one of the -- could be one of the items.

6    Q.   And Agent Moore, in fact, endorsed that one, that item?

7    A.   I'd have to look, but he may have.  I don't know exactly.

8    There are 500 items there.  I don't know specifically what he

9    said to that, but he may have endorsed that to get that score.

12:05   10   Q.   Okay.  And overall his score on that validity index was 92?

11   A.   Yes.

12   Q.   And a score over 65 is significant, correct?

13   A.   Yes.

14   Q.   Now, according to the test manual written by the test

12:05   15   developer, Agent Moore's score on that validity scale

16   indicates, quote, "possible over-reporting of psychological

17   dysfunction"?

18   A.   Yes, it means exaggeration amplification.

19   Q.   Now, the fourth validity index on the MMPI-2 is called the

12:06   20   FS scale?

21   A.   Yes.

22   Q.   F as in Frank, S as in Sam.

23        And that validity scale is designed to measure

24   over-reporting of physical complaints, correct?

12:06   25   A.   Yes.

380

1   Q.   Agent Moore's score on that validity index was an 83?

2   A.   Yes.

3   Q.   And, again, a score over 65 is considered significant?

4   A.   Yes.

12:06   5   Q.   And according to the scoring program written by the test

6   developer, Agent Moore, quote, "reported a much larger number

7   than average of somatic symptoms" -- somatic is physical --

8   "rarely described by individuals with genuine medical

9   conditions.  This level and type of infrequent responding may

12:06   10   occur in individuals with substantial medical problems who

11   report credible symptoms, but it could also reflect

12   exaggeration," correct?

13   A.   Yes.

14   Q.   Let's talk about the second test, the MCMI-3.  That stands

12:07   15   for the -- that's the Millon test you were talking about?

16   A.   Millon, M-I-L-L-O-N.

17   Q.   Millon?

18   A.   Clinical Multiaxial Inventory.

19   Q.   Now, Agent Moore's scores on two separate validity indices

12:07   20   of the Millon test were significantly elevated, correct?

21   A.   Yes.

22   Q.   Those two validity indices are the, quote, "disclosure

23   scale" and, quote, "the debasement scale," correct?

24   A.   Yes.

12:07   25   Q.   Now, the purpose of those validity indices is to detect if

1   the patient is exaggerating or over-reporting his symptoms,

2   correct?

3   A.   Yes.

4   Q.   And a score above 75 on those validity indices is

12:07   5   considered significantly elevated, correct?

6   A.   Correct.

7   Q.   Agent Moore scores an 81 on the disclosure scale?

8   A.   Yes.

9   Q.   And an 82 on the debasement scale?

12:07   10   A.   Yes.

11   Q.   And according to the profile report written by the test

12   developer, Agent Moore's response, quote, "may indicate a broad

13   tendency to magnify the level of experienced illness or a

14   characterological inclination to complain or to be

12:08   15   self-pitying."

16   A.   That's what the manual says, yes.

17   Q.   And the manual also says that his scores, quote, "may be

18   somewhat exaggerated, and the interpretation of this profile

19   should be made with this consideration in mind," correct?

12:08   20   A.   Yes.

21   Q.   Now, you didn't mention that caveat when you discussed

22   Agent Moore's test results in your expert report of November

23   2015, did you?

24   A.   Because he has a tendency to exaggerate, but he didn't

12:08   25   malinger, and the tendency to exaggerate symptomatology in

1    cases like this, don't forget these manuals are kind of generic

2    manuals.  They don't know that the man has had his face cut up

3    and his teeth knocked out and he's having pain and symptoms and

4    he endorses them maybe in an amplified fashion, but it doesn't

12:09    5    mean that the symptoms are absent.

6    Q.   You didn't mention either exaggeration or malingering in

7    your report, did you?

8    A.   Well, I attached the -- no, the TOMM test was -- he didn't

9    malinger on the malingering test.

12:09    10   Q.   You didn't mention any of these validity indices in your

11   test report -- in your expert report, did you?

12   A.   No, because the MMPI reported a scorable profile, and that

13   the MCMI modified the account of these indications on page 10

14   of my report.  The computer modifies the scores in the

12:09    15   direction of tension and dejection and anxiety and depression.

16   Q.   Let's talk about the third test you gave Mr. Moore.  That's

17   the detailed assessment of post-traumatic stress?

18   A.   Correct.

19   Q.   It's also called the DAPS, D-A-P-S, for short?

12:09    20   A.   Right.

21   Q.   And that test is designed to determine whether a patient

22   has PTSD, correct?

23   A.   Right in conjunction with everything else I've said before.

24   Q.   Right, and the DAPS test measures five different areas of

12:10    25   symptoms, right?

1    A.   Correct.

2    Q.   And a score on each of those areas of over 65 is considered

3    significant, right?

4    A.   Yes.

12:10  5    Q.   Agent Moore's scores in all five areas were over a hundred?

6    A.   Yes.

7    Q.   Those are dramatically elevated scores, are they not?

8    A.   They are amplified.

9    Q.   You would expect a person with scores over a hundred in all

12:10  10   five areas to be profoundly emotionally distressed, wouldn't

11   you?

12   A.   When you take into account the amplification styles -- you

13   talked about response bias.  The style of responding was to

14   endorse symptoms at a higher level than they really exist, not

12:10  15   whether they exist or not.

16   Q.   So you need to reduce the scores he got to reflect his

17   tendency to exaggerate?

18   A.   Based on history, mental status, and the rest of the

19   records.

12:11  20   Q.   You didn't mention that in your expert report, did you?

21   A.   That what?

22   Q.   That you needed to reduce his results on the DAPS test in

23   light of --

24   A.   Well, I wouldn't have reduced them to not having a

12:11  25   trauma-related disorder.  I think the scores would be -- the

1    graph is too high on the page.

2    Q.   My question is, just did you mention that in your report?

3    A.   No, because I still think he has a partial PTSD based on

4    everything.

12:11    5    Q.   Would you expect a person who actually had scores over a

6    hundred in all five of the symptom areas to be able to function

7    in daily life?

8    A.   That's why you never look at a test in isolation.  I'm

9    trying to make the point.  Yeah, of course, that would be the

12:11    10   case, but when you look at it and you look at the history and

11   the way of responding, the amplification, and the kind of guy

12   he is, you lower the graph on the page to make your

13   interpretation.  It doesn't change the diagnostic opinion.

14   Q.   Would you expect a person who genuinely had scores over a

12:12    15   hundred in all five areas to be able to hold down a full-time

16   job as a border patrol agent carrying a gun, executing

17   warrants, making arrests?

18   A.   Well, the scores are amplified.  I can't address the issues

19   of whether he carries a gun or not.

12:12    20   Q.   I'm just asking hypothetically, a person who genuinely had

21   scores over a hundred in all five of the symptom areas --

22   A.   If the scores were all over a hundred, were 100 percent

23   valid, like a pregnancy test, which is -- that's what it is,

24   no.

12:12    25          When you take it like I'm trying to explain, a battery

1  of tests with everything else and all the other records, you

2  modify the results based on what we call response style or

3  response bias.

4  Q.  But you didn't mention anything about modifying the results

12:12  5  in your report?

6  A.  Didn't change this diagnostic opinion.

7  Q.  All right.  Let's talk now about PTSD.  And you mentioned

8  the DSM-5.  Besides Agent Moore's results on the DAPS test,

9  your diagnosis of PTSD is also based on the DSM-5's diagnostic

12:13  10  criteria, right?

11  A.  As a guide, yes, we do that.

12  Q.  Would you consider the DSM-5 to be a reliable authority

13  when it comes to the diagnostic criteria for psychological

14  disorders?

12:13  15  A.  Yes.

16  Q.  Now, you testified on direct that the DSM-5 no longer

17  requires memory of the actual event, correct?

18  A.  Correct.  That's the thinking and the clinical world.

19  Q.  Now, that doesn't come directly from the DSM-5's diagnostic

12:13  20  criteria, does it?

21  A.  That's the thinking in the clinical world, and the specific

22  language is "requires the exposure to the actual event."

23  Q.  So according to the DSM-5, the actual words of the -- I'm

24  going to show it to you.

12:14  25  A.  I've got it in front of me.

1    Q.   I'll put it up on the monitor.  This is Exhibit 386, page

2    2.  This is page 271 of the DSM-5.  These are the diagnostic

3    criteria for PTSD, and according to this, one of the diagnostic

4    criteria is "recurrent, involuntary, and intrusive distressing

12:14    5    memories of the traumatic event," correct?

6    A.   Yes.

7    Q.   It doesn't say "of other events that are associated with

8    the traumatic event."

9    A.   A PTSD patient who sustains these kind of injuries will

12:14   10    have the recurrent and involuntary intrusive memories of this

11    event, experiencing the damage, the physical damage, the

12    thought about it, the pain.  That's what that means.

13    Q.   The reason this diagnostic criteria is important is because

14    it tells you how a patient is likely to function in the real

12:15   15    world, right?

16    A.   I don't see that says anything about functionality.  The

17    people have distressing memories all the time and do things in

18    the world.

19    Q.   But the reason the diagnostic criteria focuses on intrusive

12:15   20    memories is it's intrusive into the patient's daily life

21    functioning, correct?

22    A.   They do that, yes.

23    Q.   So if a person is experiencing intrusive memories of the

24    traumatic event, those memories interfere with their daily life

12:15   25    activities, right?

1    A.   It increases anxiety.

2    Q.   Agent Moore doesn't remember the tire accident at all, does

3    he?

4    A.   No, he has a retrograde amnesia for that.

12:15  5    Q.   All right.  Let's talk now about the cognitive tests in

6    addition to the emotional and psychiatric tests that you gave

7    Agent Moore and that we already talked about.

8         You also gave him several cognitive tests, correct?

9    A.   Right.  The cognitive piece wasn't the main focus of my

12:16  10   evaluation.  That was deferred to Dr. Markel.

11   Q.   I understand.

12        You also --

13   A.   I gave it as part of a standard of care IME to get some

14   idea of the patient's intellectual functioning and cognitive

12:16  15   functioning, so I don't do the Nancy Markel thing, but I do

16   some cognitive tests, and I did them in this case.

17   Q.   And one of them was called the Micro Cog Assessment?

18   A.   That is correct.

19   Q.   And that test assesses the patient's cognitive function,

12:16  20   right?

21   A.   A range of cognitive functioning, yes.

22   Q.   Agent Moore scored in the above average or average range in

23   93 percent of the scores on the Micro Cog Assessment, right?

24        MR. CHAMBERS:  Excuse me, Your Honor.  I think this is

12:16  25   beyond the scope.  There's actually another witness that's

1    going to be designated on the cognitive issues who will be

2    speaking next.

3                    THE COURT:  Overruled.

4                    Answer the question, please.

12:16    5             THE WITNESS:  Can you repeat the question, please?

6    BY MR. COYLE:

7    Q.   My question is, Agent Moore scored in the above average or

8    average range in 93 percent of the scores on the Micro Cog that

9    you administered?

12:17   10    A.   I didn't calculate the percentage, but the scores were

11    erratic ranging from below average, average, and some above

12    average, so that is correct, yes.

13    Q.   In fact, none of Agent Moore's scores on the Micro Cog

14    Assessment fell below the grossly average range, correct?

12:17   15    A.   Actually, I don't have that with me, but I remember they

16    were erratic scores, and they were good scores.  He was good on

17    some things and not so good on some others, and I don't have

18    the percentage.

19    Q.   Do you have any reason to doubt that if I told you that?

12:17   20    A.   No.

21    Q.   Another cognitive test you gave Agent Moore was called the

22    Rey Complex Figure Test?

23    A.   Yes.

24    Q.   And that test assesses the patient's visual memory?

12:17   25    A.   Correct.

1   Q.   You show the patient a drawing of a figure, and the patient

2   draws it, and then you take the figure away, and ask the

3   patient to draw it again?

4   A.   A few minutes later, yes.

12:18   5   Q.   And then you redo the test 30 minutes later to test their

6   long-term memory?

7   A.   Right, correct.

8   Q.   Delayed recall, I suppose, it's called?

9   A.   That's what it's called.

12:18   10   Q.   Okay.  Agent Moore scored in the 76th percentile on

11   immediate recall?

12   A.   Yes, he's got good physical memory.

13   Q.   And the 76 percentile means he scored better than 76

14   percent of the other people who have taken the test, correct?

12:18   15   A.   Correct.

16   Q.   That's in the high average range, right?

17   A.   Yes.

18   Q.   And on delayed recall Agent Moore scored in the 46th

19   percentile, correct?

12:18   20   A.   Yes.

21   Q.   That's in the average range?

22   A.   It's a little bit below.  You know, it was some

23   deterioration of the detail, but it's low average range, yes.

24   Q.   You're saying it's below the average range?

12:18   25   A.   Low average.

1    Q.   It's in the low average range?

2    A.   Yes.

3    Q.   So what is the average range?

4    A.   The average range would be a T score of 50, I believe.

12:19   5    Q.   You have to hit that exact number to be in the average

6    range?

7    A.   No, no, the range is like an IQ.  It would be like 90 to

8    110.  It would be like one standard deviation above or below

9    the mean.

12:19   10   Q.   And a standard deviation would extend about 12 to 15

11   percentile points?

12   A.   Right.

13   Q.   So the 47 percentile would be in this average rage?

14   A.   Right, right.

12:19   15   Q.   Okay.  And none of Agent Moore's scores on the Rey Complex

16   Figure Test showed any cognitive problems, did they?

17   A.   In error of visual memory on that test, no.

18          MR. COYLE:  I have nothing further.

19          THE COURT:  Any redirect?

12:19   20         MR. CHAMBERS:  Very briefly, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. CHAMBERS:

23   Q.   Dr. Koransky, a lot was just made about the validity of

24   Mr. Moore's test scores and whatnot from the tests that you

12:19   25   administered.

1    As I heard you on direct, that was one of the reasons

2  that you testified it's important to take both the clinical

3  history and the test scores and consider them together.   Is

4  that right?

12:19   5  A.   That's the standard of care.

6  Q.   You can't look at scores in a vacuum.   Is that right?

7  A.   Absolutely, no.

8  Q.   And the test scores that you administered and the clinical

9  history that you administered, you felt that you had enough

12:20   10  information to render the opinions that you've rendered.   Is

11  that right?

12  A.   Absolutely, yes.

13  Q.   And you thought the test scores were valid enough for you

14  to glean some information from them, right?

12:20   15  A.   I gleaned a wealth of information from them, yes.

16  Q.   And the amplification that you talked about just a few

17  minutes ago with Mr. Moore's test scores, does that mean

18  somehow that he's not being truthful to you?

19  A.   Not at the all.   He passed the malingering test.   The

12:20   20  amplification, as I gave you my little headache example, is not

21  malingering or lying about symptomatology.   It's a style of

22  response that patients have sometimes to amplify symptoms on a

23  test which results in very elevated scores, but still

24  clinically significant.

12:20   25    If he was malingering, which he's not, the scores

1   would be totally incorrect, but when a patient is not

2   malingering, based on clinical interview, clinical impression,

3   and even Dr. Evans said there was no evidence of him amplifying

4   with intent to deceive, the results are valid.

12:21   5   Q.  And the amplified scores that you were just questioned

6   about doesn't mean that the symptoms themselves aren't

7   existing, does it?

8   A.  Not at all.  This comes back to the common sense.  It's

9   pretty normal to be depressed and anxious when you sustain some

12:21   10   of these catastrophic injuries.

11   Q.  And the amplification doesn't somehow invalidate your

12   diagnoses?

13   A.  Not at all.

14        MR. CHAMBERS:  Thank you.  I have nothing further.

12:21   15        THE COURT:  Anything else?

16        MR. COYLE:  No, Your Honor.

17        THE COURT:  May this witness be excused?

18        MR. CHAMBERS:  Yes, Your Honor.

19        THE COURT:  All right.  Thank you, Dr. Koransky.

12:21   20   You're excused.

21        We'll be in recess until 1:20.  The plaintiffs may

22   call their next witness at 1:20.

23        MR. CHAMBERS:  Can we get an update on our time so

24   far?

12:22   25        THE COURT:  You have a little less than four hours

1    left?

2              MR. CHAMBERS:  Thank you, Your Honor.

3              THE COURT:  Defendants have used an hour and 45

4    minutes.

5         (Recess.)

6                           ---000---

7

8                    C-E-R-T-I-F-I-C-A-T-I-O-N

9

10             I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13             Dated March 1, 2017, at San Diego, California.

14

15
                         /s/ Dana Peabody
16                       Dana Peabody,
                         Registered Diplomate Reporter
17                       Certified Realtime Reporter

18

19

20

21

22

23

24

25