UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE LARRY ALAN BURNS, JUDGE PRESIDING

_____

```
                                        )
RYAN MOORE,                             )
                                        ) CASE NO. 15CV0075-LAB
            PLAINTIFF,                  )
                                        )
                                        )
VS.                                     )
                                        )  SAN DIEGO, CALIFORNIA
UNITED STATES OF AMERICA,               )WEDNESDAY MARCH 1, 2017
AND DOES 1 THROUGH 25, INCLUSIVE        )     3:40 P.M.
            DEFENDANTS.                  )
----------------------------------------
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL/DAY TWO

**PAGES 489 - 546**

REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY, ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

COUNSEL APPEARING:

FOR PLAINTIFF:            ROBERT J. CHAMBERS, ESQ.
                          BEN WOHFEIL, ESQ.
                          GOMEZ TRIAL ATTORNEYS
                          655 WEST BROADWAY, SUITE 1700
                          SAN DIEGO, CALIFORNIA 92101


FOR DEFENDANT:            EILEEN M. DECKER,
                          UNITED STATES ATTORNEY
                          BY:  TIM L. LASKE,
                               GARRETT J. COYLE,
                          ASSISTANT UNITED STATES ATTORNEYS
                          FEDERAL BUILDING, SITE 7516
                          300 NORTH LOS ANGELES STREET
                          LOS ANGELES, CALIFORNIA 90012

```
 1  SAN DIEGO, CALIFORNIA – WEDNESDAY, MARCH 1, 2017 – 3:45 P.M.
 2                          *   *   *
 3            THE COURT:  COUNSEL AND PARTIES ARE PRESENT.
 4            MR. CHAMBERS:  WE WOULD RE-CALL AGENT MOORE.
 5            THE COURT:  IF YOU WOULD COME BACK UP, AGENT MOORE,
 6  PLEASE.
 7            YOU CAN BRING YOUR WATER IF YOU WANT.
 8            THE WITNESS:  THANK YOU.
 9            THE COURT:  YOU ARE STILL UNDER OATH.
10            GO AHEAD.
11            MR. CHAMBERS:  THANK YOU, YOUR HONOR.
12                      DIRECT EXAMINATION
13  Q.    (MR. CHAMBERS) HELLO AGAIN.
14  A.    HELLO.
15  Q.    WHEN WE WERE CHATTING YESTERDAY, I THINK WE LEFT OFF
16  WHEN YOU WERE TALKING A LITTLE BIT ABOUT WHAT THE LAST THREE
17  YEARS HAVE BEEN LIKE FOR YOU PHYSICALLY.
18        SO IS THERE ANYTHING ELSE YOU WOULD LIKE TO ADD TO YOUR
19  TESTIMONY FROM YESTERDAY BEFORE WE MOVE FORWARD?
20  A.    JUST A COUPLE OF THINGS THAT DR. LOBATZ TOUCHED ON IS --
21  IT IS NOT SO MUCH PAIN BUT ANNOYING THAT THE NERVE DAMAGE BACK
22  HERE, EVERY TIME I TOUCH MY HEAD IT TINGLES INSIDE MY EAR
23  HERE.  THEN ON THE LEFT SIDE OF MY FACE HERE I STILL HAVE
24  TINGLING.
25        AND THEN THE DROOP OF MY EYE.  AND WHEN I SMILE OR TRY
```

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1   TO TAKE PICTURES JUST DEFORMITY OF MY MOUTH, IT IS STILL NOT

2   NORMAL.

3   **Q.**    WHEN YOU SAY THE DEFORMITY OF YOUR MOUTH, WHAT DO YOU

4   MEAN?

5   **A.**    IT, LIKE, DOESN'T LOOK LIKE MY NORMAL MOUTH.  IT, LIKE,

6   DROOPS DOWN THIS WAY.

7        I REALLY DON'T LIKE WHEN PEOPLE ASK TO TAKE A PICTURE OR

8   GET IN A PICTURE, I WILL RUN AWAY AND TRY TO GET OUT OF IT.

9        ONE OF MY BEST FRIENDS GOT MARRIED IN 2015, AND HE ASKED

10  ME TO STAND UP IN HIS WEDDING, YOU KNOW, WHICH IS VERY

11  ADMIRABLE.  BUT WE HAD TO TAKE ALL OF THE WEDDING PHOTOS

12  AFTERWARD AND I DIDN'T HAVE TEETH.  AND YOU CAN'T EVEN EXPLAIN

13  HOW EMBARRASSING THAT IS.  I MEAN, I HAD TO JUST SHUT MY MOUTH

14  FOR EVERY PICTURE AND NOT SMILE SO NO ONE WOULD -- WHO IS THAT

15  GUY WITH NO TEETH.  THINGS LIKE THAT.

16            **THE COURT:**  ARE YOU STILL SELF CONSCIOUS ABOUT IT

17  NOW?

18            **THE WITNESS:**  YES.

19            **THE COURT:**  DID THEY HAVE ANY FOLLOW-UP SURGERY

20  SCHEDULED FOR YOUR CHEEK, OR HAVE THEY FIXED IT TO THE EXTENT

21  THEY CAN?

22            **THE WITNESS:**  THEY SAID I COULD HAVE FURTHER ONES,

23  BUT, I MEAN, THAT IS JUST MORE MONEY AND --

24            **THE COURT:**  YEAH.  WHAT DO THEY SAY THEY CAN DO, CAN

25  THEY SMOOTH IT OUT A LITTLE BIT MORE OR SOMETHING?  KIND OF

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

```
 1  LIKE A COSMETIC TYPE OF SURGERY?
 2          THE WITNESS:  YEAH, IT WOULD BE COSMETIC.  BUT THE
 3  DROOP ON THE LIP THEY WOULD REALLY -- THEY SAID THEY COULD
 4  HELP FIX.
 5          THE COURT:  THEY CAN FIX THAT?
 6          THE WITNESS:  YEAH.
 7          THE COURT:  I NOTICED YOU WORE A BEARD IN SOME OF
 8  THE OTHER PICTURES.  DO YOU STILL WEAR A BEARD, OR NOT BY
 9  CHOICE, OR WHAT IS YOUR PRACTICE?
10          THE WITNESS:  I DID FOR A WHILE AFTERWARDS TO COVER
11  UP THE THINGS.  THIS SIDE WOULD NEVER COVER UP, THIS SCAR
12  WOULD STILL REMAIN.
13          THE COURT:  I SAW SOME PRE-ACCIDENT PICTURES,
14  THOUGH, WHERE IT LOOKED LIKE YOU WERE WEARING KIND OF A LIGHT
15  BEARD.
16          THE WITNESS:  UM-HUM.
17          THE COURT:  HOW LONG DID YOU WEAR A BEARD LIKE THAT?
18          THE WITNESS:  PRETTY MUCH FOR MOST OF THE THREE
19  YEARS I WAS ON THAT DRUG AND GANG TASK FORCE.
20          THE COURT:  ALL RIGHT.
21          GO AHEAD.  I AM SORRY.
22          MR. CHAMBERS:  NO PROBLEM.
23          THE WITNESS:  JUST TO ADD FOR THE, YOU KNOW, SENSE
24  WITH THE BEARD.  I GOT TO A POINT WHERE I AM, LIKE, I DON'T
25  WANT TO HIDE IT, I JUST WANT PEOPLE TO SEE IT AND TAKE IT FOR
```

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

```
 1   WHO I AM.  SO I DON'T EVEN GROW BEARDS ANYMORE.
 2           THE COURT:  THAT'S WHAT I TOLD MYSELF AFTER I
 3   STARTED GOING BALD AT ABOUT 24.
 4           (LAUGHTER)
 5   Q.    (MR. CHAMBERS) THE NUMBNESS THAT YOU MENTIONED THERE
 6   KIND OF IN THE FRONT OF YOUR MOUTH, HOW DOES THAT IMPACT
 7   THINGS?
 8   A.    WELL, FIRST OFF, JUST, LIKE, BITING DOWN ON MY LIP OR
 9   SOMETHING I WON'T FEEL IT.  LIKE, I CAN BITE AS HARD AS I WANT
10   ON THE BOTTOM OF MY LIP AND I AM NOT GOING TO FEEL IT.
11           WHEN I ORIGINALLY GOT MY TEETH AND AFTER TWO WEEKS I WAS
12   DRILLING IN A SCREW, AND APPARENTLY I WAS CLENCHING MY TEETH,
13   AND MY TOOTH CHIPPED.  I DIDN'T FEEL A THING.  ALL I HEARD WAS
14   SOMETHING, AND THEN I FELT THE TOOTH IN THERE.  I'M, LIKE, OH,
15   YOU GOT TO BE KIDDING ME.  BUT I COULDN'T FEEL IT AT ALL.
16           THEN, AFTER THAT HAPPENED WHEN I WENT TO DR. KOHANI AND
17   GAVE HIM MY UPPER TEETH AGAIN TO FIX, THEN I, OF COURSE, HAD
18   NO TEETH AGAIN, HE GAVE ME LIKE A TEMPORARY THING TO WEAR TO
19   HELP, FOR A WEEK OR TWO.  BUT I COULDN'T REALLY EAT MUCH WITH
20   IT BECAUSE THEN IT MIGHT BREAK OR SOMETHING.
21           AND ONE OF THE FIRST TIMES I EVER GOT THE MOTIVATION AND
22   ENERGY TO TALK TO A FEMALE, MY BUDDY AND I WENT OUT TO A
23   RESTAURANT IN TOWN.  AND WE WERE HANGING OUT WITH THESE TWO
24   GIRLS, AND MY BUDDY GOT SOMETHING TO EAT.  HE IS, LIKE, DO YOU
25   WANT ANYTHING?  I AM, LIKE, NO, I AM SCARED MY TEETH WILL
```

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1   BREAK.

2       AND SO HE ACTUALLY GOT A CAPRESE SALAD.  AND YOU KNOW ON

3   THE CAPRESE SALAD YOU HAVE A THIN SLICED TOMATO.  HE IS, LIKE,

4   YOU CAN TRY ONE OF THESE.

5       SO I DID.  AND AS SOON AS I TOOK A BITE, THE TOP

6   TEMPORARY TEETH BROKE IN HALF, AND I'M TRYING TO PLAY IT OFF

7   SO THE GIRL DOESN'T NOTICE AND STUFF.  AND THEN, LIKE,

8   THROUGHOUT THE REST OF THE DAY, TRYING TO TALK TO HER AND

9   STUFF, MY TEETH KEEP, LIKE, FALLING OUT.

10      IT WAS ONE OF THE TOP MOST EMBARRASSING THINGS SINCE MY

11  ACCIDENT.  AND THAT IS JUST PART OF BEING ALL NUMB THERE, I

12  DON'T FEEL IT HAPPENING.

13          **THE COURT:**  HAVE YOU HAD PROBLEMS WITH THEM SLIPPING

14  OR FALLING OUT SINCE THE PERMANENT DENTURES WENT IN?

15          **THE WITNESS:**  THE TOP ONES, BECAUSE THEY ARE ONLY

16  TEMPORARY CEMENT, SOMETIMES THEY DO GET LOOSE, AND I WILL HAVE

17  TO GET IN AND GET THEM RECEMENTED.

18          **THE COURT:**  THE BOTTOM ONES ARE PRETTY SOLID?

19          **THE WITNESS:**  YEAH, THEY ARE SCREWED IN.  THOSE

20  AREN'T GOING ANYWHERE.

21          **THE COURT:**  THE DENTIST TALKED ABOUT A SCREW ON THE

22  TOP ONES TOO THAT IS ADJUSTABLE, AND THEN HE COVERS IT.  IT

23  WASN'T REAL CLEAR TO ME WHAT THAT SCREW DOES.

24          **THE WITNESS:**  IT DOESN'T DO MUCH BECAUSE THE CEMENT

25  ACTUALLY HOLDS THOSE IN UP THERE.  LIKE, I, TECHNICALLY, COULD

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    PROBABLY PULL IT OFF.

2         **THE COURT:**  HOW OFTEN DO YOU HAVE TO GO IN AND HAVE

3    THE CEMENT REAPPLIED AND HAVE THEM CHECKED?

4         **THE WITNESS:**  ANY TIME I FEEL IT IS STARTING TO GET

5    LOOSE AND STUFF.

6         **THE COURT:**  WHAT HAS YOUR EXPERIENCE BEEN WITH THAT?

7         **THE WITNESS:**  I HAVE ONLY HAD TO DO IT, SINCE

8    GETTING THE NEW ONES AGAIN, ONLY ONCE.

9         **THE COURT:**  OVER WHAT PERIOD OF TIME?

10        **THE WITNESS:**  I PROBABLY -- I GOT THEM, THE FIRST

11   SET, IN, LIKE, JUNE.  THEN I CHIPPED IT TWO WEEKS LATER.  SO I

12   PROBABLY GOT THE FULL SET BACK IN JULY.  AND THEN AT ONE POINT

13   IN THE FALL, I THINK, I WENT AND GOT IT RECEMENTED.

14        **THE COURT:**  DID THE DOCTOR -- IT WASN'T CLEAR TO ME,

15   MAYBE YOU KNOW.  DID THE DOCTOR EVER EXPLAIN TO YOU WHY THEY

16   CAN'T MORE PERMANENTLY ATTACH THOSE WITH A SCREW FROM THE BACK

17   INTO YOUR IMPLANTS?  BECAUSE I SAW THE LITTLE HOLE, YOU KNOW,

18   IN SOME OF THEM.  AND IT SEEMED LIKE -- WHO CARES IF THERE IS

19   A SCREW IN THE BACK AND IT IS COVERED A LITTLE BIT.  NOBODY

20   EVER SEES THE BACK OF YOUR FRONT TEETH ANYWAY, RIGHT?

21        **THE WITNESS:**  YEAH.

22        **THE COURT:**  I DIDN'T UNDERSTAND WHY THEY COULDN'T GO

23   IN THROUGH THE BACK WITH SOME KIND OF A TOOL, YOU KNOW, AND

24   RATCHET THEM INTO THE --

25        **THE WITNESS:**  I THINK PART OF THE REASON FOR HIS

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    DOING THAT IS IN CASE A SITUATION LIKE THAT HAPPENED, IF IT

2    HAPPENED AGAIN THAT THEY CAN EASILY JUST TAKE IT OFF AND GET

3    IT FIXED RATHER THAN HAVING TO MESS WITH ALL OF THE IMPLANTS

4    IN THE GUMLINE ITSELF WHEN TAKING THESE OUT.  OTHER THAN THAT,

5    I REALLY COULDN'T TELL YOU.

6         **THE COURT:**  IT SEEMS LIKE -- IT SOUNDED LIKE HE WAS

7    GOING TO PUT SOME KIND OF A BOND OVER THE BACK WHERE THE SCREW

8    WAS, WHEREVER THE SCREW HOLE WAS.  MAYBE I SHOULD HAVE ASKED

9    HIM THIS BECAUSE HE IS THE DENTIST, BUT I DIDN'T UNDERSTAND

10   WHY THEY COULDN'T SCREW IN FROM BEHIND, LET'S SAY THREE OF THE

11   POSTS, YOU KNOW, SO YOU WOULD HAVE SOMETHING MORE PERMANENT.

12   AND THEN GO AHEAD AND BOND THOSE.  AND THEN JUST SCRAPE IT OUT

13   IF HE NEEDS TO TAKE THOSE OFF, UNDO THE SCREWS AND PULL IT

14   DOWN.

15        **THE WITNESS:**  YEAH.  I MEAN, YEAH, I DON'T KNOW WHAT

16   THE BEST WAY IS, OR ANYTHING.  I MEAN -- BUT THEY -- THE THING

17   THAT BOTHERS ME A LOT IS, SO, PEOPLE WILL LOOK AT ME AFTER ALL

18   OF THIS AND THEY WILL GO, OH, YOUR TEETH LOOK NICE, AND

19   EVERYTHING LIKE THAT.  I HATE EVEN SHOWING PEOPLE MY TEETH.

20        **THE COURT:**  YEAH.

21        **THE WITNESS:**  I DON'T EVEN LIKE THEM.  THEY ARE

22   UNCOMFORTABLE AND --

23        **THE COURT:**  YOU HAVEN'T GOTTEN USED TO THEM?

24        **THE WITNESS:**  NO, AND I HAVE HAD THEM FOR A WHILE.

25   I DON'T THINK I WILL EVER GET USED TO THEM JUST BECAUSE ALL OF

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1   THE DAMAGE DOWN HERE, AND THEY JUST DON'T FEEL LIKE TEETH.

2   EVEN WHEN I AM EATING STUFF, STUFF GETS CAUGHT IN THOSE THINGS

3   SO EASILY.  AND IT EVEN HURTS MY JAW, STILL, CHEWING ON

4   THINGS.

5           **THE COURT:**  ARE YOU USING THE ELECTRIC TOOTHBRUSH

6   THE DOCTOR TALKED ABOUT NOW?

7           **THE WITNESS:**  I USE THE WATERPIK.

8           **THE COURT:**  WATERPIK OKAY.

9           I AM SORRY, MR. CHAMBERS.  GO AHEAD.

10          **MR. CHAMBERS:**  NO PROBLEM, YOUR HONOR.

11  **Q.**    **(MR. CHAMBERS)** LET'S TURN, IF WE COULD, AWAY FROM THE

12  PHYSICAL SO MUCH, AND I AM INTERESTED TO TALK A LITTLE BIT

13  WITH YOU ABOUT HOW YOUR INJURIES IN THIS INCIDENT HAVE

14  IMPACTED YOU FROM A MENTAL STANDPOINT.  HAS IT IMPACTED YOU

15  FROM A MENTAL STANDPOINT?

16  **A.**    OH, ABSOLUTELY.

17  **Q.**    HOW?

18  **A.**    WHERE TO START.  EMBARRASSMENT I ALREADY MENTIONED.

19  DEPRESSION.  ANGER.  ANXIETY.  MEMORY.  THAT WAS PRETTY MUCH

20  HOW I WOULD BREAK IT DOWN.

21  **Q.**    ALL RIGHT.  LET'S TALK ABOUT THE ANGER FOR A MINUTE.  WE

22  HEARD FROM YOUR MOM A LITTLE BIT ABOUT THAT.  WHAT BRINGS

23  ABOUT THE ANGER?

24  **A.**    I HAVE CERTAIN TRIGGERS THAT DEFINITELY SET THAT OFF.

25  ONE OF THEM IS PEOPLE ASKING ME QUESTIONS ABOUT WHAT HAPPENED

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1   TO ME, OR HOW AM I FEELING, AND STUFF LIKE THAT.  IT JUST

2   TAKES ME BACK, AND I DON'T WANT TO TALK ABOUT IT.  LIKE, I

3   MEAN, JUST STUPID THINGS THAT YOU WOULD NEVER DO OR SAY.  LIKE

4   MY MOM AND ALL MY FAMILY WERE SENDING ME CARDS, YOU KNOW,

5   NONSTOP.  AND I HAD TO CALL MY MOM AND TELL HER TO TELL THEM

6   TO QUIT SENDING ME CARDS BECAUSE IT WOULD JUST MAKE ME REALLY,

7   REALLY MAD.

8   **Q.**    THINGS THAT REMIND YOU OF THE ACCIDENT MAKE YOU ANGRY?

9   **A.**    YEAH, BECAUSE IT MAKES ME MAD HOW PEOPLE USED TO

10  CONSIDER ME, I WOULD GUESS, PRETTY SUCCESSFUL AND, YOU KNOW, A

11  LITTLE BIT OF A MENTOR AND TOUGH GUY AND ALL THAT.  AND FROM

12  NOW ON THEY ARE ONLY GOING TO THINK OF ME AS THAT ACCIDENT.

13       AND I JUST DON'T LIKE TALKING ABOUT IT.  I HAVE TO WALK

14  AWAY WHEN PEOPLE CONTINUE TO DO IT AND DON'T GET IT.

15       AND I RESPECT EVERYBODY WHO ASKS ME.  I KNOW THEY ARE

16  ACTUALLY CONCERNED AND EVERYTHING, BUT IN THE SAME SENSE I GET

17  REALLY UPSET ABOUT IT AND I JUST WANT TO GET AWAY.

18       ANOTHER ONE THAT WOULD KIND OF TRIGGER IT LIKE THAT IS

19  BEING LIED TO, AND NOT BEING ABLE TO TRUST MOST PEOPLE

20  ANYMORE.  IF SOMEONE LIES TO ME OR SOMETHING, I WANT NOTHING

21  TO DO WITH THEM.

22  **Q.**    WERE YOU THAT WAY BEFORE?

23  **A.**    NO.

24  **Q.**    SO THAT'S SOMETHING NEW THAT YOU ARE HAVING TO COPE

25  WITH?

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1    **A.**    YEAH, IT'S PART OF A LOT OF THINGS I DEALT WITH ALONG

2    THE WAY BEFORE SITTING HERE, AND IT'S JUST ONE THING I

3    CAN'T -- I DON'T HAVE THE PATIENCE FOR ANYMORE.

4    **Q.**    THE MEDICATION THAT YOU ARE TAKING, WHICH WE WILL TALK

5    ABOUT HERE IN A MINUTE, DOES THAT HELP CONTROL SOME OF THE

6    ANGER RESPONSES THAT YOU HAVE?

7    **A.**    YOU KNOW, I THOUGHT IT DID, BUT I KEPT TAKING THE STUFF

8    AND I WOULD STILL -- AND STILL TO THIS DAY -- JUST GET THESE,

9    LIKE, ANXIETY ATTACKS AND ANGER.  AND I SERIOUSLY AM, LIKE --

10   LIKE, BENT OVER ON, LIKE, MY KITCHEN SINK OR SOMETHING LIKE

11   THAT, AND MY CHEST IS JUST POUNDING, LIKE I THINK I AM GOING

12   TO HAVE A HEART ATTACK.  AND THAT'S WITH TAKING THIS

13   MEDICATION.

14          AND I CAN ONLY IMAGINE IF I NEVER WAS TAKING IT.  LIKE,

15   IF I'M THIS BAD TAKING THE MEDICATION, SOMETHING BAD WOULD

16   HAPPEN IF I WASN'T.  AND IT MADE ME REALIZE THAT I'M GOING TO

17   HAVE TO TAKE IT FOREVER.

18   **Q.**    WE HEARD DURING, I THINK IT WAS DR. MARKEL'S

19   CROSS-EXAMINATION, A REFERENCE TO A DUI.  DO YOU KNOW WHAT

20   THAT REFERENCE IS TO?

21   **A.**    YES.

22   **Q.**    CAN YOU TELL US A LITTLE BIT ABOUT WHAT THAT ENTAILED?

23   **A.**    THAT WAS ALL SAID BEFORE.  LIKE, AFTER MY INJURIES AND

24   BEING LET BACK HOME AND TRYING TO RECUPERATE AT HOME AND GOING

25   THROUGH A COUPLE MORE SURGERIES, I KNEW SOMETHING WASN'T

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

```
 1    RIGHT.  BUT I WAS -- THOUGHT IT WOULD BE THE MEDICINE, IT WAS
 2    GOING TO GO AWAY, YOU KNOW, IT WAS JUST PART OF THE RECOVERY.
 3         BUT FURTHER AND FURTHER, WHEN IT WAS STILL KIND OF
 4    HANGING AROUND, I STARTED KIND OF GETTING WORRIED ABOUT IT,
 5    BUT I STILL DIDN'T WANT TO BE THAT GUY TO GO TALK TO A
 6    PSYCHOLOGIST OR PSYCHIATRIST.  I MEAN, IT'S JUST SOMETHING I
 7    NEVER WANTED TO DO.
 8         SO A WEEK BEFORE MY MARCH 8TH, 2014 SURGERY WITH
 9    DR. BERGER, ONE OF MY GOOD FRIENDS INVITED ME DOWN TO HIS
10    HOUSE TO HELP HIM INSTALL SOME LIGHTS AND STUFF IN HIS HOUSE,
11    BECAUSE HE IS NOT TOO HANDY AND I LIKE DOING THAT STUFF.  SO I
12    WENT DOWN TO HELP HIM, AND BEFORE I WENT I SAID, DO YOU MIND
13    IF I BRING MY DOG?  BECAUSE MY BUDDY USED TO BE ROOMMATES WITH
14    ME, AND WE ARE OBVIOUSLY PROBABLY GOING TO HAVE SOME BEERS AND
15    DO STUFF LIKE THAT.  SO HE SAID YEAH, NO PROBLEM.
16         SO I BRING MY DOG DOWN.  A COUPLE MORE OF OUR FRIENDS
17    SHOW UP, AND WE START DRINKING AND TALKING ABOUT THINGS.  AND,
18    OF COURSE, EVERYTHING GOING ON WITH ME CAME UP.  AND I WAS
19    KIND OF EXPLAINING TO THEM ABOUT SOME DOCUMENTS I RECEIVED FOR
20    MY CASE, AND I JUST -- I LOST IT.  I'M, LIKE, I'M LEAVING.
21         AND THERE WAS NOTHING THEY COULD DO TO STOP ME BECAUSE I
22    JUST WANTED TO GET HOME TO MY SAFE PLACE, WHICH IS MY HOUSE,
23    EVEN THOUGH I KNEW I SHOULDN'T HAVE BEEN DRIVING.  AND I GOT
24    PULLED OVER DIRECTLY IN FRONT OF MY HOUSE, AND ENDED UP
25    GETTING ARRESTED FOR DUI.  IT EVENTUALLY GOT -- IT WAS PLED
```

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1   DOWN TO A RECKLESS DRIVING.  BUT I OWNED UP TO IT.  I DID MY

2   PROBATION, WENT TO ALL OF THE CLASSES THEY MADE ME DO.  PAID

3   ALL OF MY FINES.

4          AND IN A WAY, I'M KIND OF GLAD IT HAPPENED, BECAUSE IT

5   FINALLY -- FINALLY MADE ME GO SEE -- OR GET SOME HELP.

6   **Q.**    AND DO YOU ATTRIBUTE THE ANGER THAT YOU JUST TALKED

7   ABOUT TO THE REASON YOU DECIDED TO LEAVE THE HOUSE AND GET IN

8   THE CAR AND DRIVE?

9   **A.**    YES.

10  **Q.**    AND THESE WERE WITH YOUR CLOSE FRIENDS?

11  **A.**    YES.

12  **Q.**    AND THEY WERE JUST ASKING HOW YOU WERE DOING AND HOW

13  THINGS WERE GOING?

14  **A.**    WELL, THEY WERE ASKING QUESTIONS ABOUT WHAT IS GOING ON.

15  AND I WAS GIVING THEM UPDATES.

16         LIKE I WAS TELLING YOU BEFORE, THAT IS ONE OF MY

17  TRIGGERS, SO.

18  **Q.**    AND WOULD YOU DESCRIBE YOURSELF PRIOR TO THIS INCIDENT

19  AS BEING A PATIENT PERSON?

20  **A.**    YEAH.  VERY LAID BACK.  PATIENT.

21  **Q.**    HOW HAS YOUR PATIENCE BEEN SINCE?

22  **A.**    ABSOLUTELY HORRIBLE.

23  **Q.**    WITH ANY PARTICULAR THING OR IS IT ACROSS THE BOARD?

24  **A.**    IT IS REALLY ACROSS THE BOARD.  I MEAN, IT IS JUST --

25  THROUGHOUT ALL OF THIS I HAD TO KEEP MY PATIENCE AS WELL AS I

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1    COULD.  AND IT IS JUST EATING ME UP INSIDE WHERE NOW, IN ALL

2    OF THE DIFFERENT ASPECTS OF MY LIFE, I AM READY TO SNAP, LIKE

3    THAT.  AND THAT'S EVEN WITH THE MEDICATION.

4    **Q.**    AND YOU SAY WHEN THAT HAPPENS YOU TEND TO GO AWAY OR BE

5    BY YOURSELF?

6    **A.**    YEAH, BECAUSE I AM -- FOR ONE, MY HOUSE IS MY SAFE

7    PLACE.  AND, TWO, I SOMETIMES WORRY ABOUT WHAT I MIGHT DO.

8    **Q.**    WHAT DO YOU MEAN?

9    **A.**    JUST LOSE MY MIND, AND DO SOMETHING STUPID THAT I WILL

10   REGRET LATER.

11   **Q.**    DO YOU FIND YOURSELF, SORT OF IN THAT SAME VEIN, BEING

12   MORE ISOLATED IN GENERAL SINCE THIS HAS HAPPENED?

13   **A.**    OH, ABSOLUTELY.

14   **Q.**    HOW COME?

15   **A.**    LIKE I SAID, IT IS MY ONLY SAFE PLACE WHERE IT IS JUST

16   ME AND MY DOGS.  AND NO ONE IS ASKING ME QUESTIONS, NO ONE IS

17   LOOKING AT ME FUNNY.  I DON'T HAVE TO EXPLAIN ANYTHING.  AND I

18   CAN JUST KIND OF HIDE OUT FROM SOCIETY.

19   **Q.**    WE HAVE HEARD BEFORE HOW ACTIVE YOU WERE SOCIALLY.  WHAT

20   ARE YOUR WEEKENDS LIKE NOW?

21   **A.**    I DON'T EVER CALL ANYBODY TO ASK WHAT THEY ARE DOING.

22   IT IS EITHER I AM AT HOME BY MYSELF, OR A FRIEND OR TWO MAY

23   COME UP ONCE A MONTH TO HANG OUT FOR A NIGHT.  BUT, BESIDES

24   THAT, I STAY AT HOME.

25   **Q.**    WHY DO YOU THINK THAT IS?

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1    **A.**    I DON'T KNOW.  IT'S JUST -- I DON'T KNOW IF I GOT USED

2    TO IT OR IT IS JUST WHERE I FEEL COMFORTABLE.  THAT ALL THE

3    STUFF THAT TROUBLES ME KIND OF TAKES A BREAK WHEN I'M THERE.

4    **Q.**    SO YOU FIND -- YOU MENTIONED YOUR SAFE PLACE.  YOU CAN

5    KIND OF ESCAPE THINGS BY BEING BY YOURSELF IN YOUR HOUSE?

6    **A.**    YEAH.

7    **Q.**    YOU TALKED A FEW MINUTES AGO ABOUT ANXIETY.  TELL US

8    WHAT YOU ARE ANXIOUS ABOUT.

9    **A.**    I'M ALWAYS ANXIOUS NOT KNOWING, LIKE, WHAT'S GOING TO

10   HAPPEN NEXT OR WHAT I'M GOING TO DO IN THE FUTURE.  JUST NOT

11   BEING ABLE TO, LIKE, HAVE THE PATIENCE IN CERTAIN SITUATIONS

12   THAT ARE COMING UP OR -- A LOT OF IT IS JUST STUPID THINGS.

13   **Q.**    LIKE WHAT?

14   **A.**    LIKE, ON JANUARY 1ST OF THIS YEAR THE PACKERS WERE

15   PLAYING, AND TWO OF MY WISCONSIN FRIENDS, THEY LIVE OUT HERE,

16   THEY USUALLY COME UP FOR GAMES AND STUFF.  AND THEY WOULDN'T

17   GIVE ME A YES OR NO IF THEY WERE COMING SATURDAY OR SUNDAY,

18   AND I WAS SICK OF THEM NOT MAKING A DECISION.

19        AND, LIKE, EVEN ONE OF THEM SUGGESTED, WELL, WHY DON'T

20   YOU COME DOWN HERE?  BECAUSE THEY BOTH LIVE DOWN NEAR SAN

21   DIEGO, WHICH WOULD MAKE SENSE, I GUESS.  BUT I LOST MY MIND.

22   LIKE, I TOTALLY SHUT THEM BOTH OFF, AND THEN I WAS JUST MADDER

23   THAN HECK.  AND THOUGHT I WAS GOING TO HAVE A HEART ATTACK.

24   IT WAS JUST OVER SOMETHING STUPID LIKE THAT THAT -- IT IS

25   STUPID.

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1       BUT, YEAH, WHY AM I FEELING THAT WAY?  I MEAN, AT THAT
2   POINT IN TIME, TOO, I WAS TRYING TO GO OFF THE LORAZEPAM BY
3   MYSELF JUST BECAUSE I'M NOT -- I DON'T LIKE TAKING PILLS.  BUT
4   BETWEEN THAT AND SOME DREAMS I STARTED HAVING, I KNEW THEN
5   THAT I WILL BE TAKING ALL THIS FOR A LONG TIME.
6   **Q.**   WHAT SORTS OF THINGS DO YOU WORRY ABOUT IN YOUR FUTURE?
7   **A.**   I DON'T KNOW, IT IS JUST THE UNKNOWN.  I DON'T KNOW
8   WHERE I'M HEADED.
9   **Q.**   AND IS THAT DIFFERENT THAN THE RYAN BEFORE THIS
10  HAPPENED?
11  **A.**   OH, YEAH.  I MEAN, IT HAS BEEN MENTIONED, I WAS AT THE
12  BEST POINT IN MY CAREER WHERE I WAS EITHER GOING TO DO A
13  NUMBER OF THINGS; EITHER TRANSFER OVER TO ANOTHER AGENCY TO BE
14  AN INVESTIGATOR OR PROMOTE IN THE BORDER PATROL TO HELP BE A
15  SUPERVISOR AND LEADER.  AND I THINK BOTH OF THOSE ARE, YOU
16  KNOW, GONE NOW.
17  **Q.**   LET'S TALK A LITTLE BIT ABOUT YOUR MEMORY.  HOW HAS THAT
18  BEEN SINCE THE INCIDENT?
19  **A.**   LIKE I SAID, AT FIRST I WOULD NOTICE SOME THINGS BUT I
20  THOUGHT IT MIGHT HAVE BEEN MY MEDICATIONS OR JUST PART OF THE
21  RECOVERY.  BUT I KNEW I DID TAKE A BIG BLOW TO MY HEAD, I'M,
22  LIKE, OH, THAT STUFF WILL GO AWAY.
23      BUT IT HASN'T.  AND LATELY IT SEEMS TO BE GETTING WORSE.
24  I DON'T KNOW WHAT THAT IS, BUT -- I MEAN, WHEN I START
25  FORGETTING WHEN MY MOM AND SISTER AND NEPHEW WERE OUT HERE, I

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1    MEAN, THAT'S JUST BAD.

2         AND WHEN I'M TALKING TO FRIENDS BACK HOME, THEY WILL

3    TALK ABOUT, YOU KNOW, GUYS THAT I USED TO PLAY SOFTBALL WITH

4    ON TEAMS FOR, LIKE, FIVE, SIX YEARS, AND GREAT BUDDIES WITH

5    THEM.  THEY WILL MENTION THEIR NAME AND I'M, LIKE, NO CLUE.

6    SO THEN I HAVE TO PLAY IT OFF LIKE, OKAY, YEAH, YOU KNOW,

7    YEAH; EXCEPT I DON'T KNOW.

8         AND EVEN AT WORK, I HAVE PRETTY MUCH BEEN DOING COMPUTER

9    WORK FOR EVER SINCE I GOT INJURED.  AND ONE OF MY JOBS THAT I

10   DO A LOT IS RUN RECORD CHECKS FOR PEOPLE.  AND DURING THAT

11   TIME YOU ARE RUNNING NAMES AND BIRTHDATES IN DIFFERENT

12   SYSTEMS, LIKE, YOU KNOW, ONE SYSTEM IS HERE ONE IS HERE,

13   AND -- BUT YOU CAN'T COPY AND PASTE THEM.

14        SO IF I TRY TO DO THAT JUST BY LOOKING AT IT, IT WILL

15   TAKE ME FOUR TIMES TO GO BACK AND FORTH TO GET THE WHOLE NAME

16   AND BIRTHDATE DONE.

17        BUT NOW I WILL SIT THERE AND I WILL WRITE DOWN THE NAME

18   AND BIRTHDATE ON THIS ONE, JUST SO I CAN COPY IT IN QUICK ON

19   THIS ONE.  AND YOU KNOW HOW ANNOYING THAT IS?

20   **Q.**   AND HAVE YOU NOTICE IT BOTH WITH YOUR SHORT-TERM MEMORY,

21   LIKE YOU JUST DESCRIBED, AS WELL AS LONG-TERM?

22   **A.**   YEAH.  EVEN LIKE A MONTH OR TWO AGO, I WAS OUT IN

23   CALEXICO WITH AN FBI AGENT ON MY TEAM, AND WE WERE

24   INTERVIEWING A GUY IN REGARDS TO NARCOTICS AND PEOPLE HE KNOWS

25   AND STUFF.  AND I WORKED A CASE ON A DRUG TRAFFICKING

MOORE - DIRECT EXAMINATION

1  ORGANIZATION BY MYSELF FOR TWO YEARS.  AND THE HEAD OF THE

2  ORGANIZATION I TRIED GETTING ARRESTED AND DOING EVERYTHING,

3  AND HE WAS THE ONLY THING THAT, LIKE, KEPT ME OCCUPIED FOR TWO

4  YEARS IS WORKING ON HIM.  SO WE WERE SITTING DOWN ASKING THIS

5  GUY QUESTIONS AND I'M, LIKE, HEY, DO YOU -- BECAUSE I KNEW THE

6  HEAD OF THE C2 I WORKED ALSO WAS MOVING NARCOTICS THROUGH

7  CALEXICO AS WELL.  AND I'M ASKING HIM, LIKE, HEY, DO YOU

8  KNOW -- AND I CAN'T THINK OF THE GUY'S NAME, YET HE WAS MY

9  MAIN TARGET ON A CASE I JUST WORKED TWO YEARS ON.  I COULDN'T

10  EVEN THINK OF HIS NAME, AND I JUST HAD TO LET IT GO.

11       AND MEMORY WAS MY BEST TOOL BEFORE THE ACCIDENT.  AND IT

12  AFFECTS ALL PARTS OF MY LIFE.

13  **Q.**   HOW ABOUT YOUR CONCENTRATION, HAVE YOU NOTICED ANY

14  ISSUES THERE?

15  **A.**   YEAH.  I MEAN, WHATEVER I'M DOING I HAVE TO CONCENTRATE,

16  LIKE, FULLY ON IN ORDER TO ACCOMPLISH WHAT I'M DOING.  IF YOU

17  ARE ASKING ME TO DO, LIKE, A MULTITASK THING -- WHICH I WAS

18  AWESOME AT BEFOREHAND.  YOU ARE ASKING ME TO DO THAT NOW, I

19  GOT TO STAY FOCUSED ON THE ONE THING.  AND IT TAKES ME LONGER.

20  I WILL STILL, MOST LIKELY, GET IT DONE, BUT I AM SO FOCUSED ON

21  THAT ONE THING THAT IT USES UP ALL OF MY ENERGY.

22  **Q.**   AND WHEN YOU ARE EXPERIENCING THESE KINDS OF

23  DIFFICULTIES THAT YOU ARE DESCRIBING FOR US, HOW DOES THAT

24  MAKE YOU FEEL?

25  **A.**   HORRIBLE.  I MEAN, I AM JUST EMBARRASSED.  AND I WISH --

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    I WISH THERE WAS A WAY THAT IT COULD GO AWAY, BUT I PRETTY

2    MUCH HAVE ACCEPTED THAT THESE THINGS ARE JUST A PART OF MY

3    LIFE NOW.

4    **Q.**   HAVE YOU MADE SIGNIFICANT CHANGES TO YOUR LIFE TO TRY

5    AND ACCOMMODATE THE MENTAL ISSUES THAT YOU HAVE BEEN FACING?

6    **A.**   YEAH, I MEAN, LIKE I MENTIONED EARLIER ABOUT WRITING

7    DOWN EVEN THE RECORD CHECKS.  BUT LIKE GOING TO THE GROCERY

8    STORE, I HAVE TO WRITE DOWN WHAT I AM GOING FOR.  I HAVE GONE

9    MULTIPLE TIMES TO GET TWO THINGS, AND I WILL GET THERE AND I

10   WILL HAVE NO IDEA WHAT I WENT THERE FOR.  SO I HAVE TO GO HOME

11   AND LOOK AGAIN.

12       I WILL BE CLEANING MY HOUSE, I WILL BE UPSTAIRS AND I

13   WILL GO DOWNSTAIRS TO GRAB SOMETHING, YET WHEN I GET

14   DOWNSTAIRS I'M, LIKE, WHAT DO I GRAB?

15       AND, YOU KNOW, PEOPLE ARE GOING TO SAY, OH, IT HAPPENS

16   TO ALL OF US.  WELL, DOES IT HAPPEN TO YOU FOUR TIMES IN A

17   ROW?  NO.

18   **Q.**   ARE YOU CURRENTLY SEEING ANY MENTAL HEALTH

19   PROFESSIONALS?

20   **A.**   YES.

21   **Q.**   WHO ARE THEY?

22   **A.**   TRENTON MOYER AND DR. MARVIN.

23   **Q.**   WHAT DOES DR. MARVIN DO FOR YOU?

24   **A.**   HE IS A PSYCHOLOGIST.

25   **Q.**   WHAT DO YOU SEE HIM FOR?

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    **A.**    I GO TO SEE HIM WHEN I'M ON THE VERGE OF SNAPPING, I

2    WANT TO SAY.

3    **Q.**    AND HOW OFTEN DO YOU FIND YOURSELF ON THE VERGE OF

4    SNAPPING?

5    **A.**    A COUPLE TIMES A YEAR, LIKE WHEN IT GETS REALLY BAD.

6    BECAUSE I HAVE SEEN HIM A LOT AND HE HAS TAUGHT ME WAYS TO

7    HELP COPE WITH SOME STUFF.  AND I AM LUCKY TO HAVE A GOOD

8    FRIEND IN LAW ENFORCEMENT THAT WENT THROUGH SOME TRAUMATIC

9    STUFF, AND HE IS ABLE TO PROVIDE ME WITH THE SUPPORT I NEED

10   MOST OF THE TIME WHEN I NEED IT.

11   **Q.**    AND DR. MOYER, IS HE THE ONE WHO PRESCRIBES YOUR

12   MEDICATIONS?

13   **A.**    YES.

14   **Q.**    AND HOW REGULARLY DO YOU SEE HIM?

15   **A.**    I JUST SAW HIM, LIKE, TWO WEEKS AGO.  IT IS USUALLY LIKE

16   EVERY TWO TO THREE MONTHS.

17   **Q.**    THAT IS FOR A MEDICATION CHECK TO MAKE SURE EVERYTHING

18   IS WORKING OKAY?

19   **A.**    YEAH.

20   **Q.**    HAVE YOU ADJUSTED YOUR MEDICATIONS AT ALL RECENTLY?

21   **A.**    HE JUST PUT ME ON AN ADDITIONAL -- IT IS CALLED

22   VISTARIL, FOR ANXIETY.  THAT GOES ALONG WITH THE LORAZEPAM I

23   AM TAKING.

24   **Q.**    NOW LET'S KIND OF SHIFT GEARS AGAIN, AND I WANT TO TALK

25   ABOUT YOUR WORK WITH THE BORDER PATROL.  AND YOU WENT BACK TO

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1   WORK VERY SOON AFTER THIS HAPPENED, DIDN'T YOU?

2   **A.**    I DID.

3   **Q.**    HOW SOON?

4   **A.**    LIKE TWO AND A HALF MONTHS OR SOMETHING.

5   **Q.**    SO TWO AND A HALF MONTHS AFTER YOU WERE INVOLVED IN THIS

6   INCIDENT YOU WERE BACK TO WORK?

7   **A.**    YES.

8   **Q.**    WHY DID YOU GO BACK SO SOON?

9   **A.**    I DIDN'T HAVE A CHOICE.  I WAS FINDING OUT THAT THE

10  GOVERNMENT WASN'T GOING TO COVER MY MEDICAL EXPENSES, SO I

11  STARTED GETTING BILLS, CRAZY.  MY LEAVE THAT I HAVE WAS

12  GETTING REALLY LOW, AND I HAVE BEEN TOLD OH, YOU CAN GET

13  PEOPLE TO DONATE FOR YOU AND STUFF, BUT EVEN WITH THAT LEAVE

14  YOU ARE STILL MAKING LESS MONEY.  AND I DIDN'T WANT ANY HELP

15  FROM ANYBODY.  AND I THOUGHT IT MIGHT TRY TO HELP ME GET BACK

16  IN THE SWING OF THINGS, AND TAKE MY MIND OFF STUFF.

17  **Q.**    DID YOU FEEL YOU WERE READY TO GO BACK WHEN YOU WENT

18  BACK?

19  **A.**    ABSOLUTELY NOT.

20  **Q.**    WHY NOT?

21  **A.**    AT THAT POINT, PHYSICALLY, I WAS JUST NOT -- I DIDN'T

22  HAVE THE ENERGY.  I WAS, LIKE, 40 POUNDS LESS AT THAT TIME.  I

23  WAS ONLY EATING SOFT FOODS.  AND I WAS STILL ON MEDICATION.  I

24  MEAN, EVEN DRIVING TO WORK WHEN I STARTED THERE AND BACK, I

25  KEPT FALLING ASLEEP TO WORK AND ON THE WAY HOME.  AND LUCKILY

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1   I NEVER HIT ANYBODY, BUT.

2   **Q.**    AND WHAT SORTS OF WORK –– WHEN I SAY WORK, WHAT SORTS OF

3   RESPONSIBILITIES DID YOU HAVE AT WORK THERE WHEN YOU WENT

4   BACK?

5   **A.**    I WAS JUST BEHIND A DESK THERE TO ASSIST A GROUP I WAS

6   WORKING WITH.

7   **Q.**    SO IT WASN'T ANYTHING PHYSICALLY ACTIVE?

8   **A.**    NOTHING AT ALL.

9   **Q.**    AND YOU WEREN'T OUT IN THE FIELD?

10  **A.**    NO.

11  **Q.**    DID THE BORDER PATROL EVER PERFORM ANY EVALUATION OR

12  CHECK ON YOU BEFORE YOU CAME BACK TO WORK TO ASSESS YOUR

13  ABILITY TO DO YOUR JOB?

14  **A.**    WHEN I CAME BACK TO WORK ––

15  **Q.**    AFTER THE INCIDENT.

16  **A.**    NO.  I JUST NEEDED A DOCTOR'S NOTE, AND THAT WAS IT.

17  **Q.**    I WANT TO TALK A LITTLE BIT MORE CURRENTLY WITH YOUR

18  WORK LIFE.  I AM CURIOUS, HOW MANY ARRESTS HAVE YOU MADE IN,

19  SAY, THE LAST YEAR?

20  **A.**    IN THE LAST YEAR, ZERO.

21  **Q.**    HOW ABOUT SINCE YOU HAVE BEEN BACK TO WORK FOLLOWING

22  YOUR INCIDENT, SO BACK SINCE 2013?

23  **A.**    TWO.

24  **Q.**    JUST TWO ARRESTS?

25  **A.**    (WITNESS NODS)

MARCH 1, 2017

MOORE — DIRECT EXAMINATION

1  **Q.**    SO THIS IDEA THAT WE KIND OF HEARD YOU ARE OUT THERE,

2  GUNS BLAZING, CHASING BAD GUYS; IS THAT AN ACCURATE DEPICTION

3  OF WHAT YOU ARE DOING ON A DAY-TO-DAY BASIS?

4  **A.**    NO, IT IS COMPLETELY FALSE.

5  **Q.**    WHAT ARE YOU DOING?

6  **A.**    I SIT BEHIND A DESK AT THE FBI OFFICE.  I AM PRETTY MUCH

7  A GLORIFIED ANALYST.

8  **Q.**    AND HOW LONG HAVE YOU BEEN DOING THAT FOR?

9  **A.**    A LITTLE OVER A YEAR, OR CLOSE TO A YEAR.

10  **Q.**    AND WHAT DID YOU DO PRIOR TO THAT?

11  **A.**    BEFORE THAT I WAS ON THE CROSS BORDER, YOU KNOW, THE

12  BORDER CRIME SUPPRESSION TEAM.

13  **Q.**    AND WHAT KINDS OF THINGS WERE YOU DOING THERE?

14  **A.**    THAT WAS A LITTLE BIT MORE ENFORCEMENT, BUT WE WERE ON A

15  TEAM WITH THE SHERIFF'S DEPARTMENT.  AND MOST OF OUR ROLE WAS

16  TO DO CRIMINAL DRUG INTERDICTIONS, YOU KNOW, STOP VEHICLES ON

17  THE HIGHWAY THAT SOMEBODY TOLD US WAS FULL OF DRUGS.

18      I HAD ABSOLUTELY NO RESPONSIBILITY ON THAT TASK FORCE.

19  WE WERE JUST ASSISTING THE DEPUTIES, AND THAT IS HOW THEY

20  THOUGHT OF US.  AND I REALLY JUST HAD TO SHOW UP.

21  **Q.**    AND HOW DOES YOUR WORK SINCE YOU HAVE BEEN BACK COMPARE

22  TO THE WORK YOU WERE DOING BEFORE YOUR INJURY?

23  **A.**    BIG TIME.  BEFORE THE INJURY, I WOULD -- I HAD BEEN CASE

24  AGENTS ON MULTIPLE-JURISDICTION OPERATIONS, AND I AM OUT THERE

25  EVERY -- WE ARE LITERALLY OUT THERE EVERY DAY DOING FOURTH

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    WAIVERS, SEARCH WARRANTS, STUFF LIKE THAT, CONTACTING PEOPLE.
2    AND I LOVED IT, AND I WAS GOOD AT IT.  I COULD REMEMBER
3    LICENSE PLATES, AREAS WE HAD BEEN, HOUSE NUMBERS, I MEAN, LIKE
4    THAT.  IT WAS ALWAYS -- I WAS ALWAYS COMPLIMENTED ON HOW I
5    COULD REMEMBER THINGS.
6    **Q.**    HOW MANY ARRESTS WERE YOU DOING, ON AVERAGE, PRIOR TO
7    YOUR INJURY?
8    **A.**    AT LEAST -- AT LEAST 10 A YEAR, AT LEAST.  AND, I MEAN,
9    THAT WAS BOTH STATE ARRESTS AND FEDERAL ARRESTS.
10   **Q.**    AND YOU HAVE ONLY DONE TWO SINCE YOU HAVE BEEN BACK
11   FOLLOWING YOUR INJURY?
12   **A.**    YES.
13   **Q.**    YOU HAVE DESCRIBED FOR US IN SOME DETAIL THE PHYSICAL
14   AND MENTAL LIMITATIONS THAT YOU ARE HAVING TO DEAL WITH ON A
15   DAY-TO-DAY BASIS.  HOW ARE YOU ABLE TO FUNCTION AT WORK NOW?
16   **A.**    IT IS HARD.  AND I WANT TO SAY THAT I THINK I HAVE DONE
17   A PRETTY GOOD JOB OF MASKING WHEN WHAT I'M ACTUALLY GOING
18   THROUGH.  I GUESS THE ISSUES I HAVE WITH THE MEMORY WITH THE
19   RUNNING THE RECORDS CHECKS, STUFF LIKE THAT, NO ONE IS GOING
20   TO KNOW THAT.  I'M NOT GOING TO ADMIT IT.
21       WHEN WE ARE OUT THERE -- IF WE WERE OUT THERE DOING
22   SURVEILLANCE, WHICH NEVER HAPPENS, I -- YOU SEE A LICENSE
23   PLATE, AND UNLESS I WRITE IT DOWN RIGHT NEXT TO ME I WILL
24   FORGET IT IN A SECOND.  AND IT TAKES ME ALMOST, LIKE, THREE
25   TIMES TO DRIVE BY A CAR NOW TO GET THE LICENSE PLATE, BECAUSE

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    I DRIVE BY AND I ONLY GOT THREE NUMBERS, AND SO -- IT IS,

2    LIKE, THAT NEVER HAPPENED TO ME.

3            AND BEFORE THAT, ON THE BORDER CRIME SUPPRESSION TEAM,

4    WE WOULD DO MORE SURVEILLANCE.  YOU KNOW, I KIND OF JUST HANG

5    BACK MOST OF THE TIME, BECAUSE EVEN IF I WOULD SEE SOMETHING

6    THAT IS IN PLAY AND STUFF, I WOULDN'T GET ON THE RADIO, I

7    WOULDN'T CALL IT OUT.  SO THEY ARE NEVER GOING TO KNOW I SAW

8    THEM AND JUST COULDN'T REMEMBER IT OR ANYTHING.  AND THEN JUST

9    THE ANGER AND ANXIETY AND ALL OF THAT.  THAT IS WHERE MY

10   PATIENCE WENT.

11           AND WHEN I GET HOME I'M EXHAUSTED JUST BY MASKING ALL

12   DAY LONG AND NOT BEING HONEST.  I'M -- I DON'T KNOW HONEST,

13   BUT NOT REALLY LETTING PEOPLE KNOW WHAT I AM ACTUALLY GOING

14   THROUGH.  BECAUSE IF I DID, THEY WOULD LOOK DOWN ON ME, THEY

15   WOULD THINK I'M 5150.  THEY WOULDN'T TRUST ME, AND THEY WOULD

16   SEE MY WEAKNESS.

17   **Q.**    WHAT IS 5150?

18   **A.**    THAT'S WHAT WE CALL PEOPLE THAT HAVE MENTAL ISSUES.

19           AND, I MEAN, EVEN ME TAKING THE PILLS, LIKE I SAID

20   YESTERDAY, I WORKED PROBATION PAROLE AND I WAS ON THE MENTAL

21   HEALTH UNIT.  AND KEEPING THOSE GUYS UP TAKING THEIR

22   MEDICATIONS WAS -- I MEAN, IT'S NOT EASY.  I UNDERSTAND WITH

23   THEM IT'S NOT EASY TAKING THE MEDICATIONS.  BUT IT'S LIKE,

24   SHOOT, NOW I'M AM IN THEIR SHOES.

25   **Q.**    SO IS IT ALMOST LIKE YOU ARE WORRIED ABOUT SHOWING

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1   WEAKNESS?

2   **A.**    WEAKNESS AND JUST ANY OF THAT BECAUSE –– BECAUSE I KNOW

3   IT IS A CAREER KILLER, BUT I'M SICK OF HIDING IT.

4   **Q.**    IS IT TOUGH TO GO TO WORK EVERY DAY?

5   **A.**    YEAH.

6   **Q.**    WHY?

7   **A.**    BECAUSE I HAVE TO HIDE A LOT OF TRUE FEELINGS I HAVE.

8   AND THEN WHEN I AM AT WORK AND I START FEELING, YOU KNOW,

9   SOMETHING COMING ON, I WILL DISAPPEAR FROM, YOU KNOW, MY TEAM.

10  LIKE ON THE BORDER CRIME SUPPRESSION TEAM I WOULD SAY, OH, I

11  HAVE TO GO MEET WITH THE AUSA ON THIS, OR GO MEET THIS PERSON.

12      NO, I AM GOING TO HIDE OUT IN, LIKE, A PARKING LOT AND

13  JUST SIT THERE AND TRY TO CALM DOWN.

14      WHEN I WENT OVER TO THE FBI I WOULD SAY, I AM GOING TO

15  DO SURVEILLANCE OR GO TO ONE OF MY STATIONS.

16      AND I WOULD GO TO MY EL CAJON STATION WHERE I WAS

17  ASSIGNED WHILE I WAS ON THAT OTHER TASK FORCE.  AND THERE WAS

18  AN EMPTY TRAILER THERE WITH COMPUTERS, AND I WOULD SIT IN

19  THERE FOR, LIKE, A DAY AND A HALF TO JUST NOT HAVE TO DEAL

20  WITH ANYBODY OR JUST COOL MYSELF OUT.

21  **Q.**    WHAT BRINGS ABOUT THE ANGER WHEN YOU ARE AT WORK?

22  **A.**    YOU KNOW, SITUATIONS POP UP, LIKE THE MEMORY AND GETTING

23  LIED TO, OR SEEING CERTAIN THINGS.  AND PEOPLE –– EVERYBODY

24  ELSE'S CAREER IS, LIKE, TAKING OFF AND THEY ARE TALKING ABOUT

25  THINGS.  AND, YOU KNOW, EVEN LIKE THE LAST THREE YEARS WHEN

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1    PEOPLE SIT THERE AND TALK ABOUT ALL OF THE VACATIONS THEY HAVE

2    TAKEN AND ALL OF THIS STUFF AND EVERYTHING, I HAVE USED ALL OF

3    MY LEAVE ON DOCTORS' VISITS OR HOSPITALS.  AND I'M NOT GETTING

4    ANY YOUNGER.

5    **Q.**    IN YOUR MIND WHERE DO YOU SEE YOUR CAREER GOING FROM

6    HERE?

7    **A.**    I HAVE NO IDEA.

8    **Q.**    IS THAT DIFFERENT THAN THE RYAN BEFORE?

9    **A.**    YEAH.

10   **Q.**    NOW, YOU ARE, AS A BORDER PATROL AGENT, SUBJECT TO

11   PERFORMANCE REVIEWS FROM TIME TO TIME, ARE YOU NOT?

12   **A.**    YES.

13   **Q.**    HOW FREQUENTLY DID THOSE OCCUR?

14   **A.**    ONCE OR TWICE A YEAR.  I DON'T KNOW FOR SURE.

15   **Q.**    AND DO YOU RECALL HAVING A PERFORMANCE REVIEW DONE EVERY

16   YEAR THAT YOU HAVE BEEN WITH THE BORDER PATROL?

17   **A.**    YES.

18   **Q.**    AND THAT INCLUDES BOTH BEFORE THIS INCIDENT AND SINCE?

19   **A.**    YES.

20   **Q.**    WHAT DO THOSE PERFORMANCE REVIEWS ENTAIL?

21   **A.**    WELL, NOWADAYS WE JUST GET AN EMAIL, AND YOU JUST

22   ACKNOWLEDGE THAT YOU GOT IT.  THAT THEY CHECKED THE BOX YES,

23   AND THAT'S IT, YOU SEND IT BACK TO THEM.

24       BEFORE THEN THEY MADE YOU SIGN IT AND THAT WAS IT.

25   **Q.**    IS THERE A PERSONAL INTERVIEW THAT TAKES PLACE WHERE A

MARCH 1, 2017

MOORE – DIRECT EXAMINATION

1  SUPERVISOR IS GIVING YOU FEEDBACK ON YOUR PERFORMANCE?

2  **A.**    ABSOLUTELY NONE.

3  **Q.**    IS THERE ANY KIND OF EXCHANGE OF INFORMATION, HERE IS

4  HOW I'M DOING, HERE IS WHAT YOUR EXPECTATIONS ARE; ANYTHING

5  LIKE THAT?

6  **A.**    NONE.

7  **Q.**    IT IS LITERALLY JUST AN EMAIL THAT IS SENT TO YOU?

8  **A.**    CHECK THE BOX.

9  **Q.**    WHAT BOX ARE THEY ASKING YOU TO CHECK?

10  **A.**    YES OR NO -- NO, I'M NOT CHECKING THE BOX, THEY ARE.

11  I'M JUST SIGNING IT, ACKNOWLEDGING IT.

12  **Q.**    SO THE PERFORMANCE REVIEWS COME TO YOU ALREADY

13  COMPLETED.

14  **A.**    YES.

15  **Q.**    AND YOU ARE JUST SUPPOSED TO SIGN THEM?

16  **A.**    YES.

17  **Q.**    IS ANY FEEDBACK GIVEN AT ALL ABOUT YOUR PERFORMANCE?

18  **A.**    NO.

19  **Q.**    IF YOU PERSONALLY HAD TO RATE YOURSELF AS A BORDER

20  PATROL AGENT NOW, COMPARED TO THE BORDER PATROL AGENT YOU WERE

21  BEFORE, HOW WOULD YOU RATE YOURSELF?

22  **A.**    ON A SCALE OR --

23  **Q.**    HOWEVER YOU WOULD LIKE TO RATE.

24  **A.**    BEFORE I THOUGHT I WAS UP THERE NEAR THE TOP.  I MEAN, I

25  BUSTED MY BUTT, AND WAS GOOD AT IT.  AND CARED, AND TRIED.

MARCH 1, 2017

MOORE - DIRECT EXAMINATION

1   AND NOW I AM AT LEAST LIKE HALF OF THAT PERSON, IF NOT LESS

2   SOMETIMES.

3   **Q.**     AND THIS LAWSUIT, UNDERSTANDABLY, CAN BE A STRESSFUL

4   THING.  DO YOU THINK ANY OF THE THINGS THAT WE HAVE TALKED

5   ABOUT TODAY AND YESTERDAY, FROM A PHYSICAL STANDPOINT OR A

6   MENTAL STANDPOINT, IS GOING TO CHANGE ONCE THIS CASE GOES

7   AWAY?

8   **A.**     NO.

9   **Q.**     WHY NOT?

10  **A.**     THROUGHOUT MY WHOLE RECOVERY, YOU KNOW, AT FIRST IT WAS

11  GETTING THE SURGERIES DONE, AND NOT BEING ABLE TO EAT, AND

12  THEN -- SO ONCE I WOULD START, LIKE, EATING SOFT FOOD AND

13  STUFF, YOU KNOW, YOU WOULD THINK YOU WOULD START FEELING

14  BETTER, OH, THIS IS GETTING BETTER.  NO.

15       AND THEN ONCE I COULD START PROGRESSING TO EVEN EATING

16  SOLID FOOD, GRANTED I WOULD HAVE TO CUT IT UP AND IT WOULD BE

17  EMBARRASSING IF I WAS IN A RESTAURANT, BUT -- AND EATING THAT

18  WAY SO I COULD GAIN WEIGHT BACK AND EVERYTHING.  AND THAT

19  DIDN'T EVEN MAKE A BLINK WITH ME.

20       THEN, LIKE A BIG ONE THAT EVERYBODY ELSE SEEMS TO CARE

21  ABOUT IS MY TEETH.  AND IT DOESN'T -- IT DOESN'T CHANGE

22  ANYTHING.

23       I STILL FEEL AS HORRIBLE OR IF NOT MORE TODAY, AND

24  WHAT'S THE LAWSUIT GOING TO CHANGE IN THAT?

25            **MR. CHAMBERS:**  THANKS FOR RIGHT NOW.  I DON'T HAVE

MARCH 1, 2017

```
 1   ANY MORE QUESTIONS.
 2          THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.
 3                  CROSS-EXAMINATION
 4   Q.   (MR. LASKE)  GOOD AFTERNOON, AGENT MOORE.
 5   A.   GOOD AFTERNOON.
 6   Q.   IF ANY TIME YOU NEED A BREAK, OBVIOUSLY PLEASE LET ME
 7   KNOW AND WE WILL ASK THE COURT TO INDULGE IT.
 8   A.   THANK YOU.
 9   Q.   YOU HAVE BEEN A BORDER PATROL AGENT SINCE JUNE 26, 2006?
10   A.   CORRECT.
11   Q.   AND THE BORDER PATROL -- I AM SORRY.  YOUR DOCTORS HAVE
12   CLEARED YOU TO WORK RIGHT NOW, CORRECT?
13   A.   CORRECT.
14   Q.   YOU WERE, FOR A WHILE, IN THE RECENT PAST, ON THE BORDER
15   CRIMES SUPPRESSION TEAM?
16   A.   YES.
17   Q.   AND THAT WAS A TASK FORCE WITH THE SHERIFF'S DEPARTMENT.
18   A.   CORRECT.
19   Q.   WHAT PERIOD OF TIME WAS THAT?
20   A.   I THINK, LIKE, MARCH OF 2015 TO MARCH, APRIL OF 2016.
21   Q.   AND THEN AFTER THAT TASK FORCE YOU MOVED ON WITH THE
22   FBI, OR SOMETHING ELSE?
23   A.   YEAH, THE FBI.
24   Q.   OKAY.  GOING BACK JUST ONE STEP.
25        WITH THE TASK FORCE WITH THE SHERIFF'S DEPARTMENT, WHAT
```

MARCH 1, 2017

1    WAS THE -- WHAT WERE YOUR DUTIES FOR THAT POSITION?

2    **A.**    PRETTY MUCH JUST TO ASSIST THE SHERIFF DEPUTIES WITH ANY

3    KIND OF OPERATION THEY HAD GOING ON.

4    **Q.**    AND WERE YOU ABLE TO PERFORM THOSE DUTIES?

5    **A.**    YES.

6    **Q.**    AND DID THE JOB INVOLVE YOU HAVING A FIREARM?

7    **A.**    IT DID.

8    **Q.**    DID YOU ALSO DRIVE TO CONDUCT SURVEILLANCE?

9    **A.**    YES.

10   **Q.**    YOU DID BACKGROUND CHECKS, IT SOUNDS LIKE.

11   **A.**    YES.

12   **Q.**    AND WOULD YOU GO ON ANY OF THE RAIDS WHERE THEY WERE

13   SERVING WARRANTS?

14   **A.**    I WAS ON A FEW.  WE DIDN'T REALLY DO THAT MANY WHEN I

15   WAS ON THERE.

16   **Q.**    WHAT DOES A FEW MEAN TO YOU?

17   **A.**    I WOULD SAY TWO OR THREE.

18   **Q.**    OVER THAT, ROUGHLY, YEAR PERIOD?

19   **A.**    YES.

20   **Q.**    WHAT WERE YOUR WORK HOURS?

21   **A.**    I THINK LIKE 6:00 TO 4:00, ABOUT THAT.  AND SOMETIMES WE

22   WOULD BE STUCK WORKING LATER.

23   **Q.**    MONDAY THROUGH FRIDAY, FIVE DAYS A WEEK?

24   **A.**    YEAH, MONDAY THROUGH FRIDAY.

25   **Q.**    ANY ATTENDANCE ISSUES?

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1    **A.**    NOTHING BESIDES DAYS I WOULD HAVE TO TAKE OFF FOR A
2    SURGERY OR DOCTOR'S APPOINTMENTS.  OR IF I WAS FEELING NOT
3    WELL IN THE HEAD I WOULD CALL IN SICK.
4    **Q.**    DO YOU RECALL HOW MANY TIMES YOU HAD TO DO THAT, WHERE
5    YOU HAD TO CALL IN SICK BECAUSE YOU WEREN'T FEELING WELL?
6    **A.**    PROBABLY, LIKE, THREE OR FOUR TIMES.
7    **Q.**    YOU MENTIONED YOU MIGHT WORK OVER YOUR SCHEDULED HOURS.
8    IS THAT CONSIDERED OVERTIME?
9    **A.**    I DON'T KNOW THE EXACT WORD FOR IT ANYMORE, BUT, SURE.
10   **Q.**    I THINK I HAVE SEEN THE TERM A.U.O.
11   **A.**    WE DON'T HAVE THAT ANYMORE.
12   **Q.**    DO YOU GET PAID FOR WORKING OVERTIME?
13   **A.**    NO, WE GET COMP HOURS.
14   **Q.**    I UNDERSTAND.
15        HOW OFTEN WOULD YOU HAVE TO WORK OVERTIME IN, MAYBE, THE
16   TYPICAL MONTH?  AGAIN, I AM TALKING WHEN YOU WERE ON THIS
17   BORDER CRIME SUPPRESSION TEAM.
18   **A.**    IT WOULD KIND OF BE SPORADIC, LIKE WE MIGHT BE BUSY FOR
19   A WEEK OR TWO, AND THEN IT WOULD BE DEAD FOR A WEEK OR TWO.
20   SO PROBABLY EVERY MONTH I WOULD HAVE AT LEAST, LIKE, MAYBE 10
21   EXTRA HOURS.
22   **Q.**    AND I THINK YOU MENTIONED TWO OR THREE TIMES YOU WENT ON
23   RAIDS WHERE YOU SERVED WARRANTS.  WHAT TYPE OF WARRANTS WERE
24   THEY?
25   **A.**    I DON'T KNOW SPECIFICALLY, BUT I WOULD ASSUME MAYBE

MARCH 1, 2017

1   NARCOTICS.

2   **Q.**     OKAY.  I'M NOT A CRIMINAL LAWYER, SO I IMAGINE THERE IS

3   WARRANTS TO PICK SOMEONE UP, THERE IS WARRANTS TO SEIZE

4   EVIDENCE.  THERE IS PROBABLY WARRANTS TO DO A VARIETY OF

5   THINGS.  DO YOU REMEMBER WHAT THOSE WERE?

6   **A.**     NOT SPECIFICALLY.

7   **Q.**     WHAT TYPE OF PEOPLE WAS THE BORDER CRIME SUPPRESSION

8   TEAM TARGETING; DRUG DEALERS, GANG MEMBERS, SOMETHING

9   DIFFERENT?

10  **A.**     PRETTY MUCH ANYBODY.  IT WAS PRETTY MUCH A VAST CIRCLE,

11  BUT I WAS TRYING TO -- THE MAJORITY OF WORK WE DID, WE WERE

12  HELPING ANOTHER AGENCY DO THAT, IT WASN'T OUR OWN CASES.  SO

13  WE WERE JUST OUT THERE ASSISTING THEM.

14  **Q.**     AND HOW MANY CASES ARE WE TALKING ABOUT THAT YOU WOULD

15  BE ASSISTING THEM?

16  **A.**     LIKE I SAID, IT WOULD KIND OF BE SPORADIC.  TWO TO THREE

17  A WEEK ON GOOD WEEKS.  THEN MAYBE SOME WEEKS JUST ONE OR TWO,

18  SOME WEEKS JUST ONE.

19  **Q.**     AND I GUESS TAKING A STEP BACK A LITTLE BIT, WHEN YOU

20  DID ACTUALLY HAVE TO DO ANY RAIDS, DID YOU EVER HAVE TO MAKE

21  FORCED ENTRY?

22  **A.**     OUR TEAM DID, YES.

23  **Q.**     HOW MANY TIMES?

24  **A.**     I DON'T RECALL SPECIFICALLY.

25  **Q.**     ONCE, MORE THAN ONCE?

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1    **A.**    I COULDN'T TELL YOU.  PROBABLY MORE THAN ONCE.

2    **Q.**    ANY ISSUES PERFORMING THOSE DUTIES WHEN YOU WERE ON A

3    TEAM WHERE YOU WERE CONDUCTING A RAID?

4            **MR. CHAMBERS:**  LET ME OBJECT THAT IT IS VAGUE AS TO

5    "THOSE DUTIES," YOUR HONOR.

6    **Q.**    **(MR. LASKE)** WHAT ARE THE DUTIES INVOLVED WITH SERVING A

7    WARRANT FOR THE BORDER CRIME SUPPRESSION TEAM?

8    **A.**    I MEAN, NO WARRANT IS THE SAME, BUT YOU WOULD USUALLY

9    HAVE A TEAM THAT WOULD BE ON THE ENTRY TEAM, AND THEY WOULD BE

10   THE ONES THAT GO IN THE HOUSE AND CLEAR IT AND TAKE DOWN

11   ANYBODY IN THERE.  THEN YOU WOULD HAVE PERIMETER SUPPORT ON

12   THE OUTSIDE IN CASE ANYBODY RAN OUT, OR ANYTHING.

13   **Q.**    WHAT WAS YOUR POSITION?  I THINK YOU MENTIONED ONCE --

14   ACTUALLY MAYBE TWO OR THREE TIMES.

15   **A.**    I WAS ALWAYS OUT ON THE PERIMETER.

16   **Q.**    AND DID YOU HAVE ANY ISSUES PERFORMING THOSE DUTIES?

17   **A.**    NO.  I MEAN, I AM JUST STANDING THERE WATCHING A HOUSE.

18   **Q.**    ANY PHYSICAL LIMITATIONS WHERE YOU COULDN'T PERFORM THE

19   DUTIES?

20   **A.**    PHYSICALLY, I WOULD SAY YES.

21   **Q.**    DID YOU EVER INFORM ANYONE OF THAT?

22   **A.**    DID I EVER INFORM ANYBODY OF WHAT?

23   **Q.**    THAT YOU DIDN'T FEEL COMFORTABLE PARTICIPATING IN A RAID

24   BECAUSE PHYSICALLY YOU WERE NOT UP TO IT?

25   **A.**    NO.

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1    **Q.**    AND DID YOU HAVE ANY MENTAL LIMITATIONS?

2    **A.**    YES.

3    **Q.**    IN TERMS OF PERFORMING RAIDS?

4    **A.**    YES.

5    **Q.**    AND DID YOU EVER NOTIFY ANYONE OF THAT?

6    **A.**    NO.

7    **Q.**    HAVE YOU EVER EXPRESSED ANY CONCERNS ABOUT YOUR ABILITY

8    TO CARRY A FIREARM TO ANY OF YOUR SUPERIORS?

9    **A.**    NO.

10   **Q.**    SO YOU HAVE BEEN ON AN FBI TASK FORCE SINCE -- WOULD IT

11   BE APRIL OR WOULD IT BE MAY OF 2016?

12   **A.**    IT WAS ONE OF THEM, APRIL OR MAY.

13   **Q.**    AND HOW LONG WILL THE FBI TASK FORCE LAST?

14   **A.**    UNLESS I GET AN EXTENSION, I AM DUE TO GO BACK INTO

15   UNIFORM AT THE CHULA VISTA STATION BEGINNING OF APRIL, I

16   BELIEVE.

17   **Q.**    OF THIS YEAR?

18   **A.**    YES.

19   **Q.**    ARE YOU APPLYING FOR AN EXTENSION, OR IS THAT SOMETHING

20   THAT SOMEONE DOES FOR YOU?

21   **A.**    YEAH, IT'S NOT UP TO ME.

22   **Q.**    WHAT ARE YOUR JOB DUTIES FOR THE FBI TASK FORCE?

23   **A.**    I AM LITERALLY JUST A GLORIFIED ANALYST.  I PRETTY MUCH

24   DO BORDER CROSSING CHECKS AND STUFF LIKE THAT TO ASSIST OTHER

25   PEOPLE THERE.

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

```
1          I APPLIED FOR MY SECRET CLEARANCE FOR THEM IN MAY OF
2     LAST YEAR, AND OUR AGENCY HAS STILL REFUSED TO GIVE ME IT.  SO
3     I CAN'T ACCESS THEIR COMPUTER SYSTEMS, I HAVE TO GET ESCORTED
4     IN AND OUT OF THE BUILDING EVERY DAY.  THEY WON'T GIVE ME A
5     RADIO.
6     Q.   ARE YOUR DUTIES THE SAME AS THE BORDER CRIME SUPPRESSION
7     TEAM, OR ARE THEY DIFFERENT?
8     A.   I MEAN, THEY ARE DIFFERENT IN A WAY WHERE I AM ALL
9     HANDS-OFF.
10    Q.   SO YOU DON'T GO ON ANY RAIDS.
11    A.   NO.  I WOULDN'T WANT TO GO ON A RAID WITH THEM.
12    Q.   AND YOU DON'T GO ON ANY SURVEILLANCE.
13    A.   I THINK I HAVE BEEN ON TWO SURVEILLANCES SINCE I HAVE
14    BEEN ON THE TEAM.
15    Q.   AND YOU STILL CARRY A FIREARM, CORRECT?
16    A.   YES.
17    Q.   EVER EXPRESS A NEED, TO ANYONE, THAT YOU DIDN'T FEEL
18    COMFORTABLE CARRYING A FIREARM?
19    A.   NO.
20    Q.   ANY PHYSICAL LIMITATIONS WITH THIS FBI TASK FORCE?
21    A.   NO.
22    Q.   ANY MENTAL?
23    A.   YES.  I MEAN, THE ONES I MENTIONED EARLIER.
24    Q.   BUT YOU HAVEN'T EXPRESSED THAT TO ANYONE?
25    A.   NO, I HAVEN'T.
```

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1   **Q.**   WHAT ARE YOUR WORK HOURS?

2   **A.**   USUALLY 7:00 TO 5:00, OR 7:00 TO -- 10 HOURS A DAY.

3   LIKE 7:00 TO 6:00, 7:00 TO 5:00.

4   **Q.**   YOU WORK OVER TIME OCCASIONALLY FOR THIS JOB TOO?

5   **A.**   NOT TOO OFTEN.

6   **Q.**   MONDAY THROUGH FRIDAY?

7   **A.**   YES.

8   **Q.**   AND EVER HAVE TO COME IN ON THE WEEKENDS?

9   **A.**   NO.

10  **Q.**   AFTER THE ACCIDENT YOUR HEARING WAS NOT AFFECTED, WAS

11  IT?

12  **A.**   MY HEARING?

13  **Q.**   YEAH.  IS YOUR HEARING FINE TODAY?

14  **A.**   YEAH, IT APPEARS TO BE PRETTY GOOD.

15  **Q.**   YOU DIDN'T SUFFER ANY INJURIES TO YOUR HANDS FROM THE

16  ACCIDENT, DID YOU?

17  **A.**   NO.

18  **Q.**   HOW ABOUT YOUR ARMS?

19  **A.**   JUST MY SHOULDER IN 2014.

20  **Q.**   BUT THAT WASN'T FROM THE TIRE ACCIDENT.

21  **A.**   YEAH, BUT YOU ARE ASKING ANY TIME AFTER.

22  **Q.**   SORRY.  DID YOU SUFFER ANY INJURIES RELATED TO THE

23  ACCIDENT THAT WE ARE COVERING IN THIS CASE THAT AFFECTED YOUR

24  ARMS?

25  **A.**   NO.

MARCH 1, 2017

1   **Q.**   AND DID YOU SUFFER ANY INJURIES TO YOUR LEGS FROM THE
2   ACCIDENT?
3   **A.**   NO.
4   **Q.**   YEAH, SORRY.  I UNDERSTAND YOU LATER ON HAD AN ISSUE
5   WITH YOUR SHOULDER.  WHEN I REFER TO THE ACCIDENT I AM JUST
6   REFERRING TO THE ONE ON JUNE 24TH, 2013.
7   **A.**   OKAY.
8   **Q.**   DID YOU SUFFER ANY BROKEN BONES BELOW THE NECK FROM THE
9   ACCIDENT?
10  **A.**   NO.
11  **Q.**   DID YOU LOSE ANY FINGERS?
12  **A.**   NO.
13  **Q.**   YOU WERE ABLE TO START LIVING ON YOUR OWN ABOUT A MONTH
14  AFTER BEING RELEASED; IS THAT TRUE?
15  **A.**   I MEAN, THAT SOUNDS ABOUT RIGHT.  I MEAN, I DIDN'T
16  REALLY HAVE A CHOICE, BUT SOUNDS ABOUT RIGHT.
17  **Q.**   AND YOU RETURNED TO WORK, I THINK YOU DESCRIBED, WAS IT
18  SEPTEMBER 19TH, 2013?
19  **A.**   THAT SOUNDS RIGHT IN THERE SOMEWHERE.
20  **Q.**   AND AT THAT POINT -- ACTUALLY I THINK YOU DESCRIBED IT.
21  YOU DROVE TO WORK BY YOURSELF?
22  **A.**   YES.
23  **Q.**   HOW MANY MILES IS IT FROM YOUR HOUSE TO THE FBI TASK
24  FORCE ASSIGNMENT?
25  **A.**   UM, LIKE 30.

MOORE – CROSS-EXAMINATION

1   **Q.**    30 MILES?

2   **A.**    I THINK SO.  ONE WAY.  SO IT IS 60 ROUND TRIP.

3   **Q.**    HOW LONG OF A COMMUTE IS THAT ROUND TRIP?

4   **A.**    THAT DEPENDS ON WHAT TIME I LEAVE IN THE MORNING.  IT

5   CAN VARY FROM HALF HOUR, 45 MINUTES TO SOMETIMES AN HOUR.

6   **Q.**    AND FOR THE BORDER CRIME SUPPRESSION TEAM, HOW LONG WAS

7   THE COMMUTE?

8   **A.**    BECAUSE MOST OF THE TIME FOR THAT ONE WE WORKED OUT OF

9   THE EL CAJON STATION, SO THAT WAS ONLY 20 MILES, 25 MILES.

10  **Q.**    AND HOW LONG WOULD IT TAKE FOR THE ROUND TRIP COMMUTE IN

11  TERMS OF TIME?

12  **A.**    THE EL CAJON ONE?

13  **Q.**    YES.

14  **A.**    PROBABLY LIKE 45 MINUTES.

15  **Q.**    ROUND TRIP?

16  **A.**    YEAH.

17  **Q.**    AND FOR THE BORDER CRIME SUPPRESSION TEAM, DID YOU DRIVE

18  BY YOURSELF OR CARPOOL WITH ANYONE?

19  **A.**    I DROVE BY MYSELF.

20  **Q.**    HOW ARE YOU CARING FOR YOUR NEW TEETH NOW?

21  **A.**    HOW AM I CARING?

22  **Q.**    YEAH.  IN OTHER WORDS, I THINK DR. KOHANI MENTIONED

23  THERE WAS A WATERPIK YOU COULD USE, YOU COULD PROBABLY DO

24  DIFFERENT THINGS.  HOW DO YOU CARE FOR YOUR TEETH NOW?

25  **A.**    I USE THE WATERPIK TWICE A DAY AND THEN I USE THE BRUSH

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1   RIGHT AFTER THE WATERPIK.

2   **Q.**    AND ARE WE JUST TALKING ABOUT A STANDARD TOOTHBRUSH?

3   **A.**    AFTER THE WATERPIK, YEAH.

4   **Q.**    ANYTHING ELSE?

5   **A.**    NO.  I MEAN, I POUR ALCOHOL-FREE MOUTHWASH OR WHATEVER

6   IN THE WATERPIK TO COMBINE WITH THE ALCOHOL TO GET THAT DEEPER

7   IN THE GUMS.

8   **Q.**    ARE YOU HAVING -- DO YOU HAPPEN TO GO TO SPEECH THERAPY?

9   **A.**    NO, I HAVEN'T.

10  **Q.**    HAVE YOU FOUND ANY ISSUES SPEAKING SINCE YOU HAVE HAD

11  THE NEW TEETH?

12  **A.**    YES, I STILL SLUR CERTAIN LETTERS AND WORDS.

13  **Q.**    I THINK WHEN I TOOK YOUR DEPOSITION, IT ACTUALLY WAS

14  BACK ON NOVEMBER 13TH OF 2015.  AT THE TIME I ASKED YOU IF YOU

15  COULD DESCRIBE YOUR PAIN IN YOUR MOUTH, 10 BEING THE WORST, 1

16  BEING PRETTY GOOD.  YOU MENTIONED IT WAS 3 OUT OF 10, CORRECT?

17  **A.**    CORRECT.

18  **Q.**    AND I THINK DURING YOUR DEPOSITION YOU MENTIONED THAT

19  YOU WENT TO STOP -- SORRY -- YOU STOPPED SEEING PSYCHIATRISTS

20  BECAUSE YOU WERE KIND OF SICK OF SEEING DOCTORS.

21  **A.**    NO, I NEVER STOPPED.  YEAH, I DEFINITELY WAS SICK OF

22  SEEING DOCTORS.  I MEAN, YOU LOOK AT ALL OF THE APPOINTMENTS I

23  WENT TO, WHO WOULDN'T BE SICK OF SEEING THE DOCTORS.

24  **Q.**    SO YOU ORIGINALLY STARTED OFF WITH A PSYCHOLOGIST, DR.

25  MARK MARVIN.

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    WAS IT FROM ROUGHLY MARCH -- MARCH 2014 TO LATE 2014?

3   **A.**    OH, NO, I SEEN HIM WELL PAST THEN.

4   **Q.**    BUT YOU FIRST STARTED SEEING HIM.

5   **A.**    YEAH.

6   **Q.**    THEN YOU STOPPED FOR A WHILE AND THEN YOU WENT TO SEE

7   DR. MOYER.

8   **A.**    YEAH.  DR. MARVIN RECOMMENDED ME TO GO SEE DR. MOYER TO

9   GET MEDICATION.

10  **Q.**    SO FOR A PERIOD OF TIME YOU WERE SEEING DR. MARVIN, THEN

11  YOU STARTED SEEING DR. MOYER, AND NOW YOU ARE SEEING BOTH OF

12  THEM?

13  **A.**    YEAH, I MEAN, AFTER I STARTED SEEING -- OR GETTING THE

14  MEDICATION FROM DR. MOYER, I WOULD STILL SPORADICALLY GO SEE

15  DR. MARVIN WHEN I THOUGHT THINGS WERE GETTING A LITTLE TOO

16  CRAZY.

17  **Q.**    AND BY SPORADIC, ONCE A YEAR?  TWICE A YEAR?

18  **A.**    THREE OR FOUR TIMES A YEAR.

19  **Q.**    WHAT MEDICATIONS ARE YOU ON NOW?

20  **A.**    ZOLOFT, LORAZEPAM, AND NOW VISTARIL.

21  **Q.**    WHO HAS PRESCRIBED YOU VISTARIL?

22  **A.**    DR. MOYER.

23  **Q.**    THERE HAS BEEN SOME TESTIMONY THAT YOU HAVE HAD SOME

24  ANGER ISSUES SINCE THE ACCIDENT.  AND HAVE YOU BEEN ANGRY AT

25  ANYTHING UNRELATED TO THE JUNE -- SORRY -- TO THE JUNE 24TH,

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1    2013 ACCIDENT?  HAS SOMETHING OTHER THAN THAT ACCIDENT MADE
2    YOU ANGRY?
3    **A.**    OH, YEAH, I MEAN, IT'S ALL OVER MY LIFE.  THAT'S WHAT I
4    HAVE ISSUES WITH.  IT'S NOT JUST THAT ACCIDENT, BUT IT'S
5    STUPID STUFF NOW THAT I WOULD NEVER GET MAD AT.
6    **Q.**    ISN'T IT TRUE THAT YOU WERE -- YOU GOT A LITTLE ANGRY
7    ABOUT THE RESULTS OF THE SUMMER OF 2014 LAWSUIT THAT INVOLVED
8    A DIRT BIKE RIDER THAT YOU COLLIDED WITH?
9    **A.**    I WASN'T REALLY UPSET, OR I DIDN'T REALLY FEEL A CERTAIN
10   WAY.  I MEAN, I WAS TRYING TO RECOVER, MYSELF, FROM MY FACIAL,
11   THAT WAS NOT A BIG PART OF ANYTHING IN MY LIFE.
12   **Q.**    ISN'T IT TRUE THAT AFTER YOUR DUI IN MARCH OF 2014 YOU
13   WANTED YOUR FIREARM BACK?
14   **A.**    THEY TOOK IT FROM ME.
15   **Q.**    THEY DID, BUT YOU WANTED IT BACK.  DID THAT MAKE YOU --
16   YOU TRIED TO GET IT BACK IMMEDIATELY, CORRECT?
17   **A.**    I DON'T THINK SO.
18   **Q.**    SO WHEN THEY TOOK YOUR SIDEARM AFTER THE DUI YOU DIDN'T
19   TRY TO GET UNION REPRESENTATION TO GET IT BACK?
20   **A.**    I MAY HAVE.
21   **Q.**    AND HAVE YOU EVER TAKEN THE PROMOTIONAL ASSESSMENT EXAM?
22   **A.**    WHICH ONE IS -- WHAT IS THAT?
23   **Q.**    THAT IS THE EXAM THAT YOU WOULD HAVE TO TAKE IN ORDER TO
24   EVEN APPLY FOR PROMOTION.
25   **A.**    I HAVE TAKEN IT.

MARCH 1, 2017

MOORE – CROSS–EXAMINATION

1  **Q.**    WHEN DID YOU TAKE IT?

2  **A.**    I WANT TO SAY 2011 OR '12.

3  **Q.**    DO YOU KNOW IF THAT TEST LAPSES AND YOU HAVE TO TAKE IT

4  AGAIN?

5  **A.**    I THINK THAT YOU CAN KEEP YOUR SCORE.

6  **Q.**    AND THAT'S BASED ON SOMEONE IN PARTICULAR TELLING YOU

7  THAT OR --

8  **A.**    YEAH.

9  **Q.**    WHO IS THAT?

10  **A.**    I HAVEN'T EVEN LOOKED AT IT IN YEARS, SO I DON'T KNOW.

11  I THOUGHT THAT YOU GET TO KEEP THE TEST SCORE.

12  **Q.**    BUT YOU HAVEN'T APPLIED FOR A PROMOTION OVER THE LAST

13  FEW YEARS, HAVE YOU?

14  **A.**    I HAVE NOT.

15  **Q.**    AND THAT WAS YOUR CHOICE.

16  **A.**    YES.

17  **Q.**    YOU HAD A WORKER'S COMPENSATION CLAIM.  I JUST WANT TO

18  ASK ONE QUESTION.  WHEN WAS IT DENIED?

19         **MR. CHAMBERS:**  OBJECTION, YOUR HONOR.  IT IS

20  IRRELEVANT.  THE PARTIES HAVE STIPULATED THAT THAT IS NOT AT

21  ISSUE IN THIS CASE.

22         **THE COURT:**  WHAT'S THE RELEVANCE?

23         **MR. LASKE:**  THE RELEVANCE IS THEY ARE CLAIMING THAT

24  WHILE WE MAY HAVE KNOWN SOME LAWSUIT WAS COMING, WE DISPOSED

25  OF SOME EVIDENCE.  I GUESS THE POINT I AM TRYING TO MAKE IS IF

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1    THE CLAIM WAS DENIED THERE MIGHT HAVE BEEN A WINDOW OF TIME

2    WHERE PEOPLE DIDN'T REALIZE ANY LAWSUIT WAS COMING, THEY

3    THOUGHT IT WAS OVER.

4            **THE COURT:**  SUSTAINED.  THAT IS TOO ATTENUATED.

5    SUSTAINED.

6            **MR. LASKE:**  OKAY.

7    **Q.**    **(MR. LASKE)** WHEN DID YOU FILE YOUR FTCA CLAIM?  THE

8    FEDERAL TORT CLAIM ACT WHICH LED TO THIS LAWSUIT?

9    **A.**    I DON'T REMEMBER THE SPECIFIC DATE.

10   **Q.**    IT WAS IN 2014, CORRECT?

11   **A.**    I DON'T KNOW.

12   **Q.**    AND DIDN'T RON ZERMENO, THE UNION REPRESENTATIVE --

13           **MR. LASKE:**  WHO WE SUBMITTED TO YOUR HONOR

14   DEPOSITION TRANSCRIPT TESTIMONY OF.

15   **Q.**    **(MR. LASKE)** DIDN'T HE ADVISE YOU TO DECLINE THE LEAVE

16   DONATIONS AND RETURN TO WORK?

17   **A.**    NOT TO MY KNOWLEDGE ABOUT THE LEAVE DONATIONS.  EVEN IF

18   HE HAD, IT'S MY CHOICE, SO.

19   **Q.**    PRESENTLY YOU LIVE BY YOURSELF, CORRECT?

20   **A.**    YES.

21   **Q.**    AND OTHER THAN SHORT-TERM HOUSE GUESTS YOU HAVE LIVED BY

22   YOURSELF SINCE NOVEMBER OF 2012.

23   **A.**    YES.

24   **Q.**    HOW BIG IS YOUR HOUSE?

25   **A.**    I THINK IT IS JUST UNDER 1900 SQUARE FEET.

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

```
 1   Q.    I THINK YOU MENTIONED EARLIER, OR SOMETIME YESTERDAY,
 2   THAT YOU BUILT YOURSELF A PUTTING GREEN.
 3   A.    YES.
 4   Q.    AND DID YOU USE THE WHEELBARROW AT ISSUE FOR THAT?
 5   A.    WELL, I DEFINITELY USED IT FOR THE DECOMPOSED GRANITE.
 6   Q.    IN FACT MIKE MARTINEZ HELPED YOU WITH THE PUTTING GREEN,
 7   CORRECT?
 8   A.    YEAH, HE DID.
 9         MR. LASKE:  I WOULD LIKE TO DIRECT THE WITNESS'S
10   ATTENTION TO EXHIBIT 270, PAGE 7.
11   Q.    (MR. LASKE) SO WE ARE GOING TO TRY TO SEE IF WE CAN
12   FLIP THIS.  BUT PRIOR TO YOUR ACCIDENT, YOU DID OWN A
13   WHEELBARROW THAT HAD THE WORDS TRUE TEMPER ACROSS IT, CORRECT?
14   A.    YES.
15   Q.    DID YOU ACTUALLY TAKE THE PHOTOGRAPH THAT WE ARE LOOKING
16   AT?
17   A.    IF YOU COULD TURN IT.
18   Q.    SEE IF WE CAN FIGURE A WAY TO DO THAT.  OTHERWISE,
19   BEHIND YOU THERE SHOULD BE AN EXHIBIT BOOK THAT SAYS 270.
20         I BELIEVE THIS MIGHT BE IT.
21   A.    OKAY.  CAN YOU REPEAT YOUR QUESTION?
22   Q.    SURE -- ACTUALLY I HADN'T ASKED YOU A QUESTION YET, I
23   JUST ASKED YOU TO LOOK AT IT.
24   A.    OH.
25   Q.    MY QUESTION WAS, DID YOU TAKE THAT PHOTOGRAPH?
```

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1    **A.**    THAT I CAN'T SAY YES OR NO.

2    **Q.**    OKAY.  YOU WERE DEPOSED IN THIS CASE, CORRECT?

3    **A.**    YES.

4    **Q.**    AND I CAN READ YOUR TRANSCRIPT WHERE YOU SAID YOU TOOK

5    THE PHOTO.

6    **A.**    NO, THAT'S FINE.  I BELIEVE IT.

7    **Q.**    AND THE PHOTOGRAPH WASN'T -- THIS PHOTOGRAPH WAS TAKEN

8    AFTER YOUR ACCIDENT, CORRECT?

9    **A.**    THAT I COULDN'T TELL YOU EITHER.

10   **Q.**    OKAY.  I CAN READ THAT AGAIN.

11   **A.**    WHATEVER.

12   **Q.**    ALL RIGHT.

13          **MR. LASKE:**  YOUR HONOR, FOR THE RECORD I WOULD LIKE

14   TO READ FROM THE TRANSCRIPT OF RYAN MOORE FROM NOVEMBER 13TH,

15   2015.

16          **THE COURT:**  ALL RIGHT.  GIVE COUNSEL A CITATION TO

17   PAGE AND LINE.

18          **MR. LASKE:**  SURE.  I BELIEVE IT IS PAGE 52.  IT

19   STARTS WITH LINE 2.  IT SAYS, I WILL HAND YOU WHAT WE WILL

20   MARK AS EXHIBIT NO. 2.

21          **MR. CHAMBERS:**  OKAY.  GO AHEAD.

22   **Q.**    **(MR. LASKE)** I HAVE QUESTION -- ACTUALLY I THINK IT

23   STARTS ON LINE 9.

24        DO YOU RECOGNIZE WHAT'S DEPICTED IN THESE PHOTOGRAPHS?

25        YES.

MARCH 1, 2017

1          SORRY.  LINE 19.

2          DID YOU TAKE THESE PHOTOGRAPHS?

3          ANSWER -- LINE -- 20:  YES.

4          SO ON JUNE 24TH, 2013, DID YOU OWN A TOYOTA 4RUNNER?

5  **A.**    YES.

6  **Q.**    AND THE ENTIRE WHEELBARROW WOULD ACTUALLY FIT IN YOUR

7  4RUNNER, CORRECT?

8  **A.**    POSSIBLY.  I DON'T KNOW IF IT WOULD HAVE TO STICK OUT,

9  BUT IT POSSIBLY COULD.

10          **MR. LASKE:**  YOUR HONOR I WOULD LIKE TO READ FROM THE

11  TRANSCRIPT OF MR. MOORE, PAGE 41 LINE 8 TO LINE 11.

12          AND THE QUESTION WAS:  WAS IT BECAUSE THE

13  WHEELBARROW WON'T FIT IN YOUR CAR, FOR EXAMPLE?

14          THERE WAS NO OBJECTION STATED.

15          THE ANSWER WAS:  NO.  IT PROBABLY WOULD, BUT WHY

16  WOULD I BRING THE WHOLE WHEELBARROW.

17  **Q.**    **(MR. LASKE)** THE PRIOR OWNER OF YOUR HOUSE GAVE YOU THE

18  WHEELBARROW, WITH THE TIRE, IN NOVEMBER OF 2012, CORRECT?

19  **A.**    YES.

20  **Q.**    AND THE ONLY INFORMATION THAT YOU HAD ABOUT THE

21  WHEELBARROW WAS WHATEVER WAS ON IT.

22  **A.**    YES.

23  **Q.**    BUT THE TIRE HAD SOMETHING WRITTEN ON IT, CORRECT?

24  **A.**    WRITTEN ON IT?

25          **MR. LASKE:**  YOUR HONOR, I WOULD LIKE TO DIRECT THE

MOORE - CROSS-EXAMINATION

1   WITNESS'S ATTENTION TO EXHIBIT 271, PAGE 2.  AND, AGAIN, THAT

2   SHOULD BE IN THAT BOOK.

3            **THE COURT:**  ALL RIGHT.  THIS IS AN EXCERPT FROM THE

4   DEPOSITION AGAIN?

5            **MR. LASKE:**  NO, THIS IS JUST AN EXHIBIT.

6            **THE COURT:**  OKAY.

7   **Q.**   **(MR. LASKE)** YESTERDAY COUNSEL SHOWED YOU THE SAME

8   PHOTO --

9   **A.**   I GOT IT.

10  **Q.**   HE ASKED IF YOU COULD READ THE MESSAGE, AND YOU SAID

11  THAT YOU DID.  I DON'T NEED YOU TO READ IT ALOUD, I JUST

12  WANTED TO HAVE YOU LOOK AT IT.

13       MY QUESTION IS, PRIOR TO YOUR ACCIDENT YOU UNDERSTOOD

14  THAT THE TERM PSI REFERS TO AIR PRESSURE, CORRECT?

15  **A.**   YES.

16  **Q.**   AND AT THE TIME YOU DIDN'T KNOW WHAT A PROPER TOOL FOR

17  INFLATING A WHEELBARROW TIRE WAS AT THE TIME OF THE ACCIDENT,

18  CORRECT?

19  **A.**   BY DEFINITION OR -- I HAVE HAD PLENTY OF LIFE

20  EXPERIENCES FILLING UP ALL KINDS OF TIRES WITH THE SAME

21  DEVICE, SO I DON'T KNOW WHAT THE TECHNICAL PROPER TOOL IS.

22           **MR. LASKE:**  YOUR HONOR, I WOULD LIKE TO READ FROM

23  THE DEPOSITION TRANSCRIPT OF THE PLAINTIFF.

24           **THE COURT:**  ALL RIGHT.

25           **MR. LASKE:**  PAGE 56 LINE 20 TO PAGE 57 LINE 3.

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

```
 1            AND THERE ARE NO OBJECTIONS INTERPOSED IN THIS LINE
 2   OF QUESTIONING.
 3            IT MENTIONS HERE USING THE TOOL -- USING THE PROPER
 4   TOOLS.  DID YOU HAVE ANY UNDERSTANDING OF WHAT TOOLS YOU COULD
 5   USE TO INFLATE A WHEELBARROW TIRE?
 6            ANSWER:  I MEAN, SPECIFICALLY FOR A WHEELBARROW TIRE
 7   ITSELF?
 8            WHICH IS A QUESTION.
 9            THE NEXT QUESTION:  UH-HUH.
10            ANSWER:  I MEAN, I DON'T KNOW THE SPECIFIC WHAT THEY
11   WOULD CONSIDER THE PROPER TOOLS.  I MEAN, I DON'T KNOW.
12            THE COURT:  SO, MR. LASKE, I AM NOT ENTIRELY SURE --
13   YOU ARE CERTAINLY ALLOWED TO READ FROM THE DEPOSITION IF YOU
14   ARE TRYING TO REFRESH HIS MEMORY OR IF IT IS AN INCONSISTENT
15   STATEMENT.  BUT IF YOU ARE GOING TO JUST READ FROM THE
16   DEPOSITION, YOU SHOULD JUST SUBMIT IT TO ME.
17            MR. LASKE:  YOUR HONOR, I --
18            THE COURT:  YOU ARE NOT PHRASING IT IN TERMS OF, DO
19   YOU REMEMBER BEING ASKED THIS QUESTION AND GIVING THE ANSWER,
20   OR GIVING HIM A CHANCE TO ANSWER THAT DIRECTLY.
21            MR. LASKE:  I UNDERSTAND, YOUR HONOR.  I WILL TRY TO
22   DO THAT IN THE FUTURE.  MY UNDERSTANDING IS THESE WOULD BE
23   CONSIDERED ADMISSIONS, SO AN ADMISSION I CAN READ IT.
24            THE COURT:  OKAY.  YEAH.  IT SEEMS LIKE IT IS AN
25   AWKWARD TIME TO DO IT WHILE HE IS ON THE STAND.  IF YOU WANT
```

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1   TO READ ADMISSIONS IN, YOU KNOW, THE OPPOSING COUNSEL READ A

2   COUPLE OF ADMISSIONS, DISCOVERY ADMISSIONS.  AND I WOULD SAY

3   DO THAT RATHER THAN HAVE HIM -- BECAUSE I THINK IT LEAVES THE

4   WITNESS SORT OF, WHAT AM I SUPPOSED TO SAY ABOUT THIS?  YEAH,

5   I REMEMBER SAYING THAT, OR I DIDN'T.

6           **MR. LASKE:**  I UNDERSTAND, YOUR HONOR.

7   **Q.**   **(MR. LASKE)** AT THE TIME OF THE ACCIDENT YOU UNDERSTOOD

8   THE PROPER WAY TO FILL A WHEELBARROW TIRE WAS THE SAME AS

9   FILLING A CAR TIRE, A BIKE TIRE, OR JUST A TIRE IN GENERAL,

10  CORRECT?

11  **A.**   CORRECT.

12  **Q.**   AND YOU HAVE SEEN DOCUMENTS REGARDING YOUR WORK SHIFT

13  THE WEEK OF JUNE 24TH, 2013.

14  **A.**   YES.

15  **Q.**   AND I WOULD LIKE TO SHOW YOU WHAT WE HAVE MARKED AS

16  EXHIBIT 291 PAGE 1.

17          **MR. LASKE:**  AND FOR THE RECORD IT SAYS AT THE TOP,

18  G41 DAILY UNIT ASSIGNMENT LOG SUMMARY, GROUP C.

19          IF YOU GO DOWN, ACTUALLY, HALF WAY, AND I THINK IT

20  SAYS LINE 10 ON THE FAR LEFT OR -- YEAH.

21  **Q.**   **(MR. LASKE)** WERE YOU SCHEDULED THAT WEEK TO WORK FROM

22  NOON TO 8:00 P.M.?

23  **A.**   YES.

24  **Q.**   AND WAS YOUR WORK SCHEDULE SUNDAY THROUGH THURSDAY?

25  **A.**   I DON'T REMEMBER THE SPECIFIC, BUT THAT SOUNDS LIKE IT

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1   COULD BE.

2   **Q.**    THAT SCHEDULE HAD BEEN YOUR SCHEDULE SINCE APRIL OF

3   2013.

4   **A.**    YES.

5   **Q.**    AND I THINK YOU SAID YOU HAD A ROUTINE.  YOU WOULD LEAVE

6   YOUR HOUSE IN RAMONA AT ABOUT 10:30 A.M. TO GET TO THE CHULA

7   VISTA STATION BY NOON?

8   **A.**    THAT SOUNDS ABOUT RIGHT.

9   **Q.**    WHEN YOU GOT TO THE CHULA VISTA STATION, WHY WOULD YOU

10  GET THERE EARLY?

11  **A.**    I WOULD CHANGE INTO MY UNIFORM, CHECK THE EMAIL, AND

12  PICK UP EQUIPMENT THAT GETS SIGNED OUT TO YOU.  I ALWAYS TRY

13  TO DO IT BEFORE OUR MUSTER AT 12:00 O'CLOCK, BECAUSE I DIDN'T

14  WANT TO WAIT IN LINE AFTERWARDS.

15  **Q.**    AND YOU HAD WORKED UNTIL ABOUT 10:00 P.M. REGULARLY.

16  **A.**    YES.

17  **Q.**    SO THAT IS ROUGHLY TWO HOURS OF OVERTIME?

18  **A.**    YES.

19  **Q.**    AT NIGHT WHAT WAS THE LIGHTING LIKE BY THE GARAGE?

20  **A.**    I SPECIFICALLY CAN'T SAY WHAT IT WAS LIKE.  I DON'T

21  REMEMBER.

22  **Q.**    DO YOU REMEMBER?

23  **A.**    NO.

24  **Q.**    WERE YOU ASSIGNED A GOVERNMENT VEHICLE EACH DAY?

25  **A.**    YES, UNLESS WE WERE ASSIGNED TO WORK INSIDE.

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1   **Q.**   BETWEEN APRIL OF 2013 AND THE DAY OF THE ACCIDENT, WHICH

2   WAS JUNE 24TH, 2013, HOW OFTEN WERE YOU ASSIGNED A GOVERNMENT

3   VEHICLE?

4   **A.**   LIKE I SAID, IT ALL DEPENDS ON WHERE WE ARE ASSIGNED FOR

5   CERTAIN PERIODS OF TIME.  LIKE, DURING THAT TIME THEY WOULD

6   HAVE US INSIDE FOR A FULL WEEK, AND THEN OUT IN THE FIELD

7   ANOTHER WEEK.  IT WOULD SHIFT.

8   **Q.**   AND YOU DON'T REMEMBER THE ACCIDENT, CORRECT?

9   **A.**   NO.

10   **Q.**   YOU DON'T RECALL USING A TIRE INFLATER.

11   **A.**   NO.

12   **Q.**   AND YOU DON'T RECALL IF THE TIRE INFLATER HAD ANY

13   PROBLEMS.

14   **A.**   NO.

15   **Q.**   AND YOU DON'T HAVE ANY EVIDENCE THAT YOU NOTIFIED ANYONE

16   OF ANY PROBLEM WITH IT.

17   **A.**   NO.

18   **Q.**   I WOULD LIKE TO DIRECT YOUR ATTENTION TO EXHIBIT 147,

19   PAGE 48.

20        A LITTLE EARLIER I ASKED IF YOU OWNED A TOYOTA 4RUNNER.

21   IS THAT YOUR TOYOTA 4RUNNER?

22   **A.**   YES.

23   **Q.**   AND I THINK JUST TO THE RIGHT CENTER OF IT, YOU CAN SEE

24   THE WORD "TIRE SERVICE?"

25   **A.**   YES.

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1    **Q.**    AND BEHIND IT, THAT LOOKS LIKE A LIGHT.

2    **A.**    YEAH.

3    **Q.**    AND THEN A LITTLE TO THE LEFT, MORE TO THE CENTER, THERE

4    IS ANOTHER LIGHT.

5    **A.**    YES.

6    **Q.**    DO YOU RECALL THAT ACTUALLY THERE WAS ANOTHER LIGHT, AND

7    I THINK YOU CAN SEE IN THIS BLOWNUP IMAGE A THIRD LIGHT?

8    **A.**    I CAN SEE THE ONE THAT IS NOT WORKING, YEAH.

9    **Q.**    AND YOU DON'T RECALL REPORTING THAT LIGHT THAT WAS OUT,

10   DO YOU?

11   **A.**    NO.

12   **Q.**    NOW I WOULD LIKE TO DIRECT YOUR ATTENTION TO

13   EXHIBIT 147, PAGE 8.

14          **MR. LASKE:**  IF WE CAN ZOOM IN.

15   **Q.**    **(MR. LASKE)** THAT'S A CELL PHONE ON THE GROUND.  IS THAT

16   YOUR CELL PHONE?

17   **A.**    YES.

18   **Q.**    AND DO YOU REMEMBER WHETHER OR NOT YOU WERE USING YOUR

19   CELL PHONE THAT EVENING?

20   **A.**    I HAVE ALREADY STATED MULTIPLE TIMES, I DON'T REMEMBER

21   WHAT HAPPENED.

22   **Q.**    OKAY.  AND YOU DON'T REMEMBER WHY YOU TOOK YOUR

23   WHEELBARROW TO WORK.

24   **A.**    NO.

25   **Q.**    YOU LIVE IN RAMONA, CALIFORNIA, CORRECT?

MARCH 1, 2017

MOORE - CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    YOU ARE A LAW ENFORCEMENT OFFICER SO I DON'T WANT YOU TO

3    STATE YOUR EXACT ADDRESS.

4         YOU HAVE LIVED THERE SINCE NOVEMBER OF 2012, CORRECT?

5    **A.**    YES.

6    **Q.**    AND YOU LIVE ABOUT A MILE OR TWO AWAY FROM TIRE SHOPS IN

7    RAMONA, CORRECT?

8    **A.**    YES.

9    **Q.**    AND YOU HAPPEN TO OWN A HAND PUMP, TOO.

10   **A.**    A HAND PUMP AS -- PUMP UP A BASKETBALL OR FOOTBALL.

11   **Q.**    DID YOU OWN THAT AT THE TIME OF JUNE 24TH, 2013?

12   **A.**    I DON'T EVEN KNOW.

13   **Q.**    AND YOU PREVIOUSLY FILLED YOUR TIRE AT A 7-11 IN RAMONA

14   ON MAIN STREET BEFORE THE ACCIDENT.

15   **A.**    YES.

16   **Q.**    YOU TOOK IT THERE BECAUSE THE TIRE WAS LOW.

17   **A.**    YES.

18   **Q.**    AND YOU TOOK IT THERE BECAUSE IT WAS CLOSE TO YOUR

19   HOUSE.

20   **A.**    YES.

21   **Q.**    THE 7-11, HOW MANY MINUTES AWAY IS IT?

22   **A.**    LIKE FIVE MINUTES.

23   **Q.**    AND YOU DON'T RECALL SPECIFICALLY USING THAT INFLATION

24   STATION OR THAT FILLING STATION AT 7-11, BUT YOU REMEMBER THAT

25   YOU DID IT.

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    AND YOU PAID ABOUT A QUARTER TO INFLATE?

3   **A.**    IT IF IT WASN'T FREE I PAID A QUARTER.

4   **Q.**    WERE YOU ABLE TO SUCCESSFULLY DO SO WITHOUT ANY

5   PROBLEMS?

6   **A.**    YES.

7   **Q.**    BUT YOU DON'T RECALL HOW YOU DETERMINED HOW MUCH AIR

8   PRESSURE TO PUT IN, DO YOU?

9   **A.**    NO.

10  **Q.**    AND YOU DON'T RECALL IF THE 7-11 FILLING STATION HAD A

11  PRESSURE GAUGE.

12  **A.**    I DON'T RECALL.

13  **Q.**    AND IF IT DID, YOU DON'T RECALL USING IT.

14  **A.**    CORRECT.

15          **THE COURT:**  YOU HAVE QUITE A BIT MORE?

16          **MR. LASKE:**  I DO HAVE A LITTLE BIT MORE, YOUR HONOR.

17          **THE COURT:**  OKAY.

18          **MR. LASKE:**  IT PROBABLY WILL TAKE ABOUT 15 MINUTES

19  OR SO.

20          **THE COURT:**  I DON'T THINK WE ARE IN ANY RUSH NOW.

21  WHY DON'T WE TAKE OUR RECESS, AND YOU CAN RESUME AT 10:30

22  TOMORROW MORNING.

23          **MR. LASKE:**  SURE, YOUR HONOR.

24          **THE COURT:**  AS I UNDERSTAND IT, THE PLAINTIFFS ARE

25  PREPARED TO REST AFTER AGENT MOORE'S TESTIMONY IS COMPLETE?

MARCH 1, 2017

MOORE – CROSS-EXAMINATION

1          **MR. CHAMBERS:**  YES, YOUR HONOR.

2          **THE COURT:**  WE WILL BEGIN AT 10:30 TOMORROW, A

3   LITTLE BREAK.  I AM GOING TO GO GET THIS CAST OFF IN THE

4   MORNING.  AND THE DEFENDANT SHOULD BE PREPARED TO COMPLETE

5   THEIR EXAMINATION OF AGENT MOORE, AND THEN BEGIN PRESENTING

6   THEIR CASE.

7          **MR. LASKE:**  THANK YOU, YOUR HONOR.  I APOLOGIZE FOR

8   ANY CONFUSION ABOUT READING IN THE TRANSCRIPT.

9          **THE COURT:**  NO, NO, THAT'S OKAY.  THAT'S ALL RIGHT.

10  I SEE IT HAPPEN ALL THE TIME.  IT JUST STRIKES ME AS ODD -- AS

11  AN ODD TIME TO OFFER ADMISSIONS, PARTICULARLY WHEN YOU HAVE A

12  LIVE WITNESS HERE WHO CAN CONFIRM THE SAME THING FROM THE

13  STAND.  MAYBE HE DOESN'T REMEMBER.  ANYWAY, DIFFERENT STROKES

14  FOR DIFFERENT FOLKS, I GUESS.

15         I WILL SEE YOU TOMORROW MORNING.  10:30, EVERYONE.

16         YOU CAN LEAVE WHATEVER YOU DON'T NEED FOR THE

17  EVENING HERE.  NO ONE WILL DISTURB IT.

18         WE ARE IN RECESS.

19

20                          *   *   *

21         I CERTIFY THAT THE FOREGOING IS A CORRECT
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
22         IN THE ABOVE-ENTITLED MATTER.

23         S/LEEANN PENCE                        3/1/2017
           LEEANN PENCE, OFFICIAL COURT REPORTER    DATE
24

25

MARCH 1, 2017

INDEX OF WITNESSES

DIRECT    CROSS    REDIRECT    RECROSS

MOORE, RYAN

  BY MR. CHAMBERS    491

  BY MR. LASKE                519

_____

INDEX OF EXHIBITS

| EXHIBIT | IDENTIFIED | RECEIVED |
|---------|------------|----------|
| 270     |            | 534      |
| 271     |            | 537      |
| 291     |            | 539      |
| 147     |            | 541      |

MARCH 1, 2017