1                    United States District Court

2              For the Southern District of California

3
                                      )
4    RYAN MOORE,                      )
                                      )  No. 15-CV-75-LAB
5         Plaintiff,                  )
                                      )  March 2, 2017
6            v.                       )
                                      )  San Diego, California
7    UNITED STATES OF AMERICA and     )
     DOES 1 THROUGH 25, INCLUSIVE,    )
8                                     )
          Defendants.                 )
9

10                   Trial Day 3 (Morning Session)
                         Transcript of Trial
11             BEFORE THE HONORABLE LARRY ALAN BURNS
                     United States District Judge
12
     APPEARANCES:
13
     For the Plaintiff:       GOMEZ TRIAL ATTORNEYS
14                            ROBERT J. CHAMBERS
                              BEN WOHLFEIL
15                            655 West Broadway, Suite 1700
                              San Diego, CA  92101
16
     For the Defendants:      TIM L. LASKE
17                            GARRETT J. COYLE
                              ASSISTANT UNITED STATES ATTORNEYS
18                            Federal Building, Suite 7516
                              300 North Los Angeles Street
19                            Los Angeles, CA  90012

20

21

22   Court Reporter:          CYNTHIA R. OTT, RDR, CRR
                              District Court Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California, 92101
24

25

```
 1                    I N D E X

 2   EXAMINATIONS                                    PAGE

 3   RYAN MOORE..........................................
     CROSS EXAMINATION RESUMED BY MR. LASKE.............. 549
 4   REDIRECT EXAMINATION BY MR. CHAMBERS................ 558
     RECROSS EXAMINATION BY MR. LASKE................... 565
 5
     ROLANDO PASCUA......................................
 6   DIRECT EXAMINATION BY MR. LASKE..................... 570
     CROSS EXAMINATION BY MR. WOHLFEIL.................. 588
 7
     ERIC SWICKHEIMER....................................
 8   DIRECT EXAMINATION BY MR. LASKE..................... 613
     CROSS EXAMINATION BY MR. WOHLFEIL.................. 619
 9   REDIRECT EXAMINATION BY MR. LASKE.................. 620
     RECROSS EXAMINATION BY MR. WOHLFEIL................ 621
10

11                  E X H I B I T S

12                                                   PAGE

13

14   Defendant's Exhibit 147, Photos 1 through 52, was   622
     received in evidence...............................
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                San Diego, California, March 2, 2017
 2                            *   *   *
 3          THE COURT:  All right.  Agent Moore, if you want to
 4  come back and have a seat on the stand, unless there's some
 5  different arrangement this morning.  Do you intend to finish
 6  your cross-examination?
 7          MR. LASKE:  Yes, Your Honor.
 8          THE COURT:  All right.  Agent Moore, if you'll come
 9  back.  You can bring your water with you, if you want.  You're
10  still under oath.
11      RYAN MOORE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
12                   CROSS EXAMINATION RESUMED
13  BY MR. LASKE:
14  Q.  Good morning, Agent Moore.
15  A.  Good morning.
16  Q.  I think where we last left off, we were talking about the
17  7-Eleven that was near where you lived in Ramona.
18  A.  Okay.
19  Q.  I only have a couple more questions about that and then
20  we'll move to a slightly different topic.  Do you recall using
21  the pressure gauge at the 7-Eleven that one time?
22  A.  I don't recall either way.
23  Q.  And you don't recall if it had a gauge, right?
24  A.  I have no idea.
25  Q.  Is that because of the passage of time or you've lost that
```

```
 1   memory?
 2   A.   I can't say either way.
 3   Q.   The Chula Vista station is how many miles away from your
 4   house in Ramona?
 5   A.   Probably around 40.
 6   Q.   How long of a commute would that be back in 2013?
 7   A.   Well, depends on what shift I was on.
 8   Q.   I think you worked Sunday through Thursday, noon to 8, so
 9   say on like a Monday, how long would that take you?
10   A.   Probably 45, 50 minutes.
11   Q.   Going in, and then coming home probably a little faster?
12   A.   Still about 45 minutes.
13   Q.   Even at that time of night?
14   A.   What's that?
15   Q.   Even at that time of night?
16   A.   Yeah, if I go the speed limit.
17   Q.   Okay.  You mentioned earlier in your testimony, I think it
18   was end of day Tuesday, you have some experience filling tires,
19   correct?
20   A.   Yes.
21   Q.   And I think you said you'd done it at least 50 times in
22   your lifetime?
23   A.   Yes.
24   Q.   That experience includes inflating wheelbarrow tires?
25   A.   Yes.
```

1    Q.    How many times?

2    A.    Probably two or three, probably two at the most.

3    Q.    And you believe you're trained in inflating tires based on

4    your experience in inflating tires in the past?

5    A.    Correct.

6    Q.    And in your experience you've only used tire inflators that

7    had the -- that had a lens where inside the lens there was a

8    PSI reading, correct?

9    A.    Can you --

10   Q.    So the lens in this case, it had a glass eye and underneath

11   the eye there was a PSI reading?

12   A.    Uh-huh.

13   Q.    At your depo I asked you and I believe you said, you know,

14   the only ones you've ever used is that kind.  I gave you

15   another example the kind where it has like a dipstick where it

16   pops out, you said you never used that kind.

17   A.    I can't say for sure if either one.  I'm sure I used both.

18   Q.    Okay.  But you have used the one where it did have a glass

19   eye and inside there was a gauge?

20   A.    Yes.

21   Q.    And you used something like that more than once?

22   A.    Yes.

23   Q.    Do you recall if in the past you looked at the PSI gauge

24   when you filled tires?

25   A.    I can't recall if I did or not.

1  Q.  And you don't recall if you would ever fill the tire when

2  you filled it up to see if it needed more air?

3  A.  If -- I'm a little confused.

4  Q.  When you would fill the tire, some people eyeball it, some

5  people look at the gauge, some people may even, like, squeeze

6  the tire or put their foot on it, would you do any of those

7  things?

8  A.  I --

9         MR. CHAMBERS:  Objection, vague.

10        THE COURT:  Do you understand what he's asking you?

11        THE WITNESS:  Yes.

12        THE COURT:  You may answer.  Objection is overruled.

13        THE WITNESS:  I've -- I've done all of the above

14  you've mentioned.

15  BY MR. LASKE:

16  Q.  Do you recall how you would determine when to stop

17  inflating a tire, so not the day of the accident but in the

18  past?

19  A.  Specifically, I wouldn't have a routine.  I mean, I would

20  do all three of the points you mentioned earlier.

21  Q.  So you would find a way to fill the tire, you'd eyeball it,

22  or you'd look at the gauge?

23  A.  Yes.

24  Q.  And the tire inflator at the station, you had used that

25  before, correct?

```
1   A.   That specific one, I'm not sure, but, yes.

2   Q.   The filling station?

3   A.   Yes.

4   Q.   And that's the one that's near the garages by the ATVs?

5   A.   Yes.

6   Q.   I would like to direct your attention to Exhibit 142, page

7   one.  So in this photograph, if you look just to the right of

8   the sign that says notice, a little bit down there is

9   a -- looks like a handheld gauge, the size of maybe this pencil

10  or pen.

11       You had never seen that before, had you?

12  A.   Are you talking about that day or?

13  Q.   That particular gauge, you had not seen that before on the

14  fence?

15  A.   No.

16  Q.   And no one you worked with had ever mentioned to you before

17  that that gauge was on that fence?

18  A.   No.

19  Q.   And how many times had you used the tire fill station prior

20  to the accident, that specific one, by the garage and ATVs?

21  A.   Probably like, I would say 10 times or so.

22  Q.   And when you inflated the tires sometimes you would hear

23  the air compressor running, correct?

24  A.   I would imagine.

25  Q.   Do you remember that or?
```

```
1   A.   Specifically, no.

2   Q.   Why would you say you would imagine?

3   A.   Just if it's running and I'm taking air out of a -- what's

4   producing the air.

5   Q.   I understand.  And you had been to that filling station

6   during daylight hours, correct?

7   A.   Yes.

8   Q.   So sometimes you would fill up at night, sometimes it would

9   be during the day?

10  A.   Yes.

11  Q.   And on occasion you had seen the fence actually opened,

12  unlocked and opened, right?

13  A.   Yes.

14  Q.   Because during daytime hours, if it's Monday through

15  Friday, the garage people sometimes work there, right?

16  A.   Yes.

17  Q.   And you used this filling station that we're all talking

18  about for both your personal vehicle and your government

19  vehicle?

20  A.   Yes.

21  Q.   And in the past you hadn't asked for help to fill a tire,

22  correct?

23  A.   No.

24  Q.   Specifically at that station?

25  A.   No.
```

1   Q.   And isn't it true at your deposition you said it didn't

2   seem that complicated?

3   A.   As in?

4   Q.   Isn't it true when I asked you if you'd ever asked for help

5   to inflate a tire and you said, no, it didn't seem that

6   complicated?

7   A.   Yeah, I agree with that.

8   Q.   And isn't it true that you did not previously have any

9   issues with the filling station?

10  A.   No, I did not.

11  Q.   And you did not previously have any issues with the tire

12  inflator, whichever one happened to be hooked up that day?

13  A.   No.

14  Q.   And you never had any prior issues where you could not see

15  the PSI reading, correct?

16  A.   I can't say yes or no on that.

17  Q.   Is it because you don't remember?

18  A.   Yeah, I mean, I don't remember.

19  Q.   Your deposition was taken back in November 13th, 2015, and

20  I guess I just want to ask an initial question, is it you don't

21  remember today or you don't think you ever remembered?

22  A.   With?

23  Q.   For that particular question, if you had ever looked at the

24  PSI readings.

25  A.   Yeah, I mean I have no idea if I ever have or not.

 1   Q.   Okay.  Would it refresh your memory if I were to show you

 2   part of your deposition transcript?

 3   A.   Go ahead.

 4   Q.   I direct your attention to page 20, 22, line 22 to line 24.

 5   That was page 20, line 22 to 24.

 6   A.   Okay.

 7   Q.   The other entry where I think this question came up was

 8   also page 25, line 24 to page 26, line one.

 9           THE COURT:  Mr. Laske, it would be helpful to me if

10   you'd read it.  I have a copy of the transcript so.

11           MR. LASKE:  Sure, Your Honor.  I was just going to

12   refresh his memory first.

13           THE COURT:  Okay.

14           MR. LASKE:  And if it doesn't refresh it, then I might

15   read it.

16           THE COURT:  All right.

17           THE WITNESS:  Which was the one on page 25?

18   BY MR. LASKE:

19   Q.   It was line 24 to page 26, line one.

20   A.   What was that?

21   Q.   So it starts on page 25, line 24, and then it goes to the

22   very next page and it stops at line one.

23       And you don't recall ever having any prior issues with

24   seeing the PSI readings, correct?

25   A.   I mean, as this says, it's not that I recall, so it's the

1  same thing I told you earlier.

2  Q.  Okay.  And you had never had any prior issues where the

3  gauge was stuck, correct?

4  A.  Not that I recall.

5  Q.  And you had never had any instances where you felt you

6  couldn't see or where you needed a flashlight?

7  A.  Not that I recall.

8  Q.  And you never complained to anyone about the lighting by

9  the tire fill station?

10  A.  No.

11  Q.  And you never asked anyone for the PSI settings for the air

12  compressors?

13  A.  No.

14  Q.  And you had never seen anyone actually fill a wheelbarrow

15  tire at the station?

16  A.  No.

17  Q.  And you had never heard of anyone having an instance where

18  a tire exploded using that filling station, correct?

19  A.  I had never heard of that, no.

20  Q.  Did you know that if you had any issues with equipment, you

21  could tell someone about it?

22  A.  Sure.

23  Q.  And -- like your supervisor for example?

24  A.  Yes.

25  Q.  But you never told any supervisors you had any issues with

```
 1  the tire filling station that we're talking about?
 2  A.  No.
 3  Q.  And you previously used the tire filling station without
 4  any problems, correct?
 5  A.  Correct.
 6          MR. LASKE:  Nothing further, Your Honor.
 7          THE COURT:  All right.  Redirect.
 8          MR. CHAMBERS:  Briefly, Your Honor.
 9                       REDIRECT EXAMINATION
10  BY MR. CHAMBERS:
11  Q.  Mr. Moore, just so we're clear, the few times that you'd
12  used this particular tire inflation station before your
13  incident, was that all to fill vehicle tires?
14  A.  Yes.
15  Q.  Did you ever use it to fill anything other than a passenger
16  vehicle tire?
17  A.  No.
18  Q.  And remind me again, were there any restrictions that
19  you're aware of whatsoever as to what sorts of tires you could
20  use those compressors to inflate?
21  A.  No.
22  Q.  I want to go back to just a couple of points that were made
23  yesterday about you being vocal with your mental and your
24  physical issues and limitations.  Why didn't you ever tell
25  anybody at the border patrol about those issues?
```

1    A.   Because I was embarrassed and feared that something might

2    occur if I mentioned everything I'm going through, and it just

3    would have made another unknown in what's going to happen.

4    Scared what people are going to think or what actions might be

5    after I provided that information, but like I mentioned

6    yesterday, it could be career suicide, but I mean that's what

7    we're here for is to tell the truth.  And I'm sick of keeping

8    everything in and hiding all the damages that I deal with every

9    day.

10   Q.   And conversely, did any of your coworkers at the border

11   patrol or your command staff ever inquire about your mental or

12   psychological issues?

13   A.   Not that I remember.  Everything was always focused on my

14   physical and my mouth and my teeth.  Like I mentioned

15   yesterday, everybody only seems to think it's my teeth that

16   I've always cared about or that's the biggest thing, and that's

17   nothing.

18   Q.   And we heard I think yesterday during the initial parts of

19   your cross-examination that the FBI task force that you're on

20   currently is set to expire within the next month or so?

21   A.   Correct.

22   Q.   And then after that, you're to go back to the Chula Vista

23   station?

24   A.   Correct.

25   Q.   And what would you be doing there?

1    A.   The same duties I was doing prior to the accident.

2    Q.   So as opposed to having a desk job like you have currently,

3    you'd be out in the field doing patrols and whatnot?

4    A.   Yes.

5    Q.   How do you feel about the prospects of going back to the

6    station where this injury occurred and doing those sorts of

7    things?

8    A.   Scared, anxious, you know, especially after all this being

9    let out and it's -- that's one of the things that bugs me, you

10   know, when people ask me about the physical or mental

11   limitations I might have with using the gun or doing stuff like

12   that, it's -- it bothers me that I won't be able to make the

13   quick decision that we have to make in that line of employment

14   that it scares me if I can do that still or not, and I'm very

15   frightened to go back.

16          MR. CHAMBERS:  Thank you.  I don't have anything

17   further.

18          THE COURT:  I have a few questions, Agent Moore.

19          Mr. Laske showed you the picture of the stand-alone

20   tire gauge, maybe you've seen them before, I've seen them a

21   hundred times, sometimes they're long and sometimes they're

22   round with just a meter on it, you plug it on there.  In the

23   times that you recall using or inflating tires, have you ever

24   used one of those stand-alone gauges yourself?

25          THE WITNESS:  Yes.

```
 1              THE COURT:  Okay.  And you have no recollection of
 2   any -- whether you saw it or didn't see it, I mean, everything
 3   is a blackout for you regarding two weeks before this incident
 4   and, I assume, sometime afterwards?
 5              THE WITNESS:  Yes.
 6              THE COURT:  Haven't been able to reconstruct any of
 7   it?
 8              THE WITNESS:  I wish.
 9              THE COURT:  Have you discussed with any supervisors at
10   border patrol your anxiety about going back to regular patrol
11   duties?
12              THE WITNESS:  No.
13              THE COURT:  Do you intend to?
14              THE WITNESS:  Well, after today I don't think I'm
15   going to have to, but.
16              THE COURT:  What do you mean by that?
17              THE WITNESS:  Well, just people here in this room are
18   in charge of that station and it's pretty much out in the open
19   now.
20              THE COURT:  Okay.  How long have you harbored anxiety
21   about going back and resuming the patrol duties of -- usual
22   patrol duties of a border patrol agent?
23              THE WITNESS:  Pretty much since my accident.
24              THE COURT:  Okay.  It hasn't gotten any better?
25              THE WITNESS:  No.
```

```
 1              THE COURT:  You have had some active duty since you've

 2    recovered, mostly recovered from the accident?  You've been

 3    involved with the searches on teams that have executed search

 4    warrants and all?

 5              THE WITNESS:  Yes.

 6              THE COURT:  Okay.  And I think you said -- did you say

 7    you'd made two arrests since the time of the accident?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Okay.  And that would be physical arrests

10    yourself where you handcuffed people and brought them in and so

11    on?

12              THE WITNESS:  One was arrested at the port that I had

13    an arrest warrant for, so we just had to transport him back to

14    a station and do the processing, and I had a partner with me.

15    And the second one I had to, he was a -- a documented gang

16    member with weapons history.  And I actually approached him and

17    he got in his car and I told him get out of his car and unlock

18    it and he refused to.

19              And I had to try to open the door to get in and it

20    actually broke off, but finally he complied and came out.  And

21    I did put cuffs on him and I asked him in the post interview,

22    I'm like, why didn't you just listen to my commands from the

23    beginning, you know, this could have got bad.

24              And he said well, all I saw were the scars on your

25    face and I thought you were trying to do it.  And I'm like so
```

1   now I've got to worry about these bad criminals worrying about

2   the scars on my face and even something else to worry about.

3   And I don't know.

4          THE COURT:  What was the gist of his statement to you,

5   that he didn't think you were a border patrol agent, he thought

6   you were something else?

7          THE WITNESS:  Because he didn't look at like down here

8   the badge or anything, he looked at my face and saw the scars,

9   and -- so I mean, I had to worry -- well, now I have to worry

10  about -- and then he -- I also had someone else tell me that

11  just in an interview.  They're like enthralled with my scars.

12         And I just -- my biggest worry is you go back to

13  patrol and you're going hands on all the time and, you know, a

14  lot of the people we confront run from you or want to fight and

15  stuff.  And if I was back there and somebody hit me in the

16  face, I'd -- I'd lose my mind, I think.

17         Just, I've wrestled with my dogs at home and if their

18  paw hits me or something I like instantly I just -- I go from

19  here to here.  And -- I don't want to, part of not going

20  through that again but all the work that's already been done

21  and everything and I just -- I don't know, it's very sensitive,

22  I guess.

23         THE COURT:  How many years do you have in?

24         THE WITNESS:  Almost -- it'll be 11 in June.

25         THE COURT:  And this is neither here nor there

1   regarding your claims in this case, but are you eligible to

2   seek a medical retirement?

3          THE WITNESS:  I don't believe so since the government

4   didn't declare this an on-duty injury.

5          THE COURT:  Did you seek a designation that this was

6   an on-duty injury?

7          THE WITNESS:  No, I tried with the Department of Labor

8   to get it on-duty injury and they denied it, and then I tried

9   to appeal it and they denied it again.  So that's why we're

10  here today.

11         THE COURT:  Okay.  I see.  So you think the position

12  of the United States Border Patrol and the United States

13  Government is that this was -- you were on your own, this was

14  not an on-duty injury?

15         THE WITNESS:  I mean, it was all considered by

16  everybody involved that it was on duty.  Like I said, there was

17  no policy stating we couldn't do that while there or.

18         THE COURT:  What -- what other alternatives do you

19  have besides going into the field and doing field work?  Can

20  they accommodate you with desk type work where you wouldn't be

21  in encounters with people clawing at your face?

22         THE WITNESS:  I'm sure there are options.  I haven't

23  really even talked to anybody about that.

24         THE COURT:  Do you have an intention to do that before

25  you go back to regular border patrol duties after the task

```
 1   force expires?
 2            THE WITNESS:  Yeah, I mean, I haven't -- it hasn't
 3   been set in my mind yet but, you know, in a way it's like well,
 4   I want to go out there and maybe try to see if I can do it
 5   again, but I don't want to sometimes take that risk where if it
 6   doesn't.
 7            THE COURT:  Yeah.
 8            THE WITNESS:  You know.
 9            THE COURT:  Yeah, you'll --
10            THE WITNESS:  It just bugs me because I was up here
11   and that's who I am and I love arresting people and talking to
12   them and all that, and to not be able to do that, and I am not
13   a fan of sitting behind a computer, but it is what it is, I
14   guess.
15            THE COURT:  All right.  Any questions based on the
16   Court's questions?
17            MR. LASKE:  A couple, Your Honor.
18            THE COURT:  Yes, go ahead.
19                      RECROSS EXAMINATION
20   BY MR. LASKE:
21   Q.  Agent Moore, isn't it true that you had a beard at that
22   time of the arrest you were talking about?
23   A.  A beard.
24   Q.  Yes, didn't you have facial hair at the time that you made
25   that arrest where you said the person commented about your
```

```
 1  scar?

 2  A.  I did not.

 3  Q.  When was that arrest?

 4  A.  I don't recall specifically.

 5  Q.  This year, last year?

 6  A.  No, it was 2015 probably.

 7  Q.  Winter, summer, fall?

 8  A.  I don't recall.

 9  Q.  Were you wearing a short-sleeved shirt or were you wearing

10  a jacket?

11  A.  I might have a sweatshirt on.  You might be thinking of

12  another one than I'm talking about.

13  Q.  Okay.  Which one are you talking about?  Were you on a task

14  force at the time or were you on just regular duty?

15  A.  I was on a task force.

16  Q.  This was with the border crime suppression team?

17  A.  Yes.

18  Q.  And can you remind me again what years, what period of time

19  was that?

20  A.  March 2015 to like May or April of '16.

21  Q.  Does that in any way refresh your memory of what period of

22  time that might have happened?

23  A.  Somewhere in there.  I mean, I don't remember the specific

24  date.

25  Q.  That's fine.  Every assignment that you've had since your
```

1   accident, you've chosen those assignments, correct?

2   A.   Chosen as in?

3   Q.   You were consulted and you were asked what assignment and

4   you picked an assignment, in other words, you weren't told to

5   go some place?

6   A.   While on light duty?

7   Q.   Yeah.  You had some choice in which assignment you were

8   taking?

9   A.   I don't agree with that.

10   Q.   All right.  And why don't you agree with that?

11   A.   Because at first I was told I was going to have to go to

12   radio dispatch when I first went back to light duty and I

13   couldn't talk and I had to fight to be put on a desk to help

14   one of our squads out with any record checks and stuff.

15   Q.   Who did you have to fight for that?

16   A.   My command staff at my station.

17   Q.   Do you have a specific name or names?

18   A.   At the time, I know it was -- he's over at Brownfield now,

19   Boone Smith.  They brought me in and gave me a pep talk about

20   working at radio dispatch and it's not a bad thing or anything,

21   yet you look at my mouth, I couldn't talk and why would I go

22   work there.

23   Q.   Any other issues or is it just that one instance?

24   A.   With?

25   Q.   You said not getting assignments that you wanted.

1    A.   I mean, I didn't have many choices while on light duty.

2    Q.   The light duty, did you have a choice -- well, actually,

3    did you ultimately do radio dispatch?

4    A.   I did not.

5    Q.   What ultimately were you doing?

6    A.   I was working for one -- our smuggling interdiction group

7    just in their office doing record checks or any computer work

8    they might need help with.

9    Q.   Did you have any choice about being part of that group?

10   A.   Yeah, I asked to be assigned to that group.

11   Q.   And was that granted or was it initially denied and you had

12   to fight to get it granted?

13   A.   Oh, it was initially denied until I brought a new doctor's

14   note in.

15   Q.   And then it was granted?

16   A.   Yes.

17   Q.   The doctor's note was from which doctor?

18   A.   Vecchione.

19   Q.   As far as any duty injury or medical retirement, those

20   decisions are made in Washington, D.C., correct, through the

21   Department of Labor?

22   A.   I would imagine.  I mean, I really didn't research it to

23   where exactly it comes from.

24   Q.   Do you have any understanding if the decision is actually

25   made here in San Diego as opposed to somewhere out in a

1   different location?

2   A.  I couldn't tell you.

3   Q.  Okay.  So you didn't look into it one way or the other?

4   A.  No.

5   Q.  Have you asked for an extension to remain on the FBI task

6   force?

7   A.  I have not.  The agent or self, I don't think we're allowed

8   to, it has to come from either my supervisor or the task force

9   commander or somebody like that.

10  Q.  If for some reason you're mistaken about that, do you plan

11  on asking for an extension?

12  A.  No, I mean I would like to have an extension, but I never

13  count on -- you can't really count on it.

14  Q.  No, I understand you can't count on it.  But if you have

15  some say, would you at least express that?

16  A.  Oh, yeah.  Yes, I would.

17  Q.  And what is your understanding if you do get an extension,

18  are we talking a month, are we talking six months, a year,

19  three years?

20  A.  I think they can pretty much extend you for the time period

21  they choose.

22          MR. LASKE:  All right.  Nothing further, Your Honor.

23          THE COURT:  Anything else?

24          MR. CHAMBERS:  No, Your Honor.

25          THE COURT:  All right.  Thank you, Agent Moore.  You

 1    may stand down.  You're excused as a witness.  Any other

 2    evidence on behalf of the plaintiff?

 3            MR. CHAMBERS:  No, Your Honor.

 4            THE COURT:  Plaintiff rests at this time.  Of course,

 5    subject to looking over your exhibits, making sure everything's

 6    been admitted.

 7            MR. CHAMBERS:  Yes, Your Honor.

 8            THE COURT:  All right.  Plaintiff rests.

 9            Mr. Laske, you may call your first defense witness.

10            MR. LASKE:  The government's going to be calling

11    Rolando Pascua.

12             ROLANDO PASCUA, DEFENDANT'S WITNESS, SWORN

13            THE COURTROOM DEPUTY:  Can you please state and spell

14    your first and last name for the record.

15            THE WITNESS:  Rolando Pascua, R-O-L-A-N-D-O, Pascua,

16    P-A-S-C-U-A.

17                          DIRECT EXAMINATION

18    BY MR. LASKE:

19    Q.  Good morning, sir.

20    A.  Good morning.

21    Q.  How long have you worked for the border patrol?

22    A.  About 25 years, since 1992.

23    Q.  And how familiar are you with the area where the accident

24    happened?

25    A.  Very familiar.

1   Q.   And how is it that you're very familiar with that area, do

2   you work in that area?

3   A.   I work there every day and the tire shop is part of the

4   garage.

5   Q.   And what is your job title?  What is your title at the

6   station?

7   A.   Lead technician.

8   Q.   Is that kind of the same thing as a lead garage mechanic?

9   A.   Yes.

10  Q.   Because I think there may be some references to the lead

11  garage mechanic, so.

12  A.   Yes.

13  Q.   If people talk about that, they're talking about you?

14  A.   Yes.

15  Q.   What are your job duties as the lead mechanic?  And

16  actually, sorry, more specifically in 2013, what were your job

17  duties as the lead mechanic?

18  A.   Part of my duties as a lead technician back in June 2013 is

19  to ensure that our garage is a safe place to work and to make

20  sure all our equipment are in working condition.

21      If an equipment is not working or broken, I then submit the

22  request to get it repaired or replaced.

23  Q.   And would that include the tire inflator and the air hose?

24  A.   Yes.

25  Q.   How would you learn if a piece of equipment wasn't working?

1    A.   I either -- agents will tell us or they will tell to their

2    muster every morning when they muster up, then I'll get a call

3    from either the SOS or a supervisor from the station.

4    Q.   And what type of tools are connected to the compressed air

5    system?

6    A.   From all our equipment, the compressor supplies -- provides

7    air for our equipment, shop equipment, like our tire machines,

8    airlifts, oil pumps and tire inflators is part of our tools and

9    all other hand tools that we use on a daily basis.

10   Q.   And can you just briefly explain how the system works?

11   There was some testimony before you got here that there were

12   two compressors but after that, can you just kind of walk us

13   through how it works?

14   A.   Yes.

15   Q.   And sorry, actually, it might make it easier if we pop up a

16   picture on the screen.  We're going to put up Exhibit 308, and

17   it'll be an aerial view of the area, so that might help you a

18   little bit.

19       So I think if you look at the red circle towards the middle

20   left, that's your garage.  I think if you look to -- I don't

21   know if this is north, I think this is actually south, so south

22   of that is -- what is that building south of there?  Of those

23   cars, what's south of that?

24   A.   Well, that picture is not so clear.

25   Q.   The red circle --

```
 1    A.   The red circle --

 2    Q.   -- is your garage?

 3    A.   Yes.

 4    Q.   And the building that's just to the left, that's facing

 5    south actually, so that wouldn't actually be north, what

 6    building is that?

 7              THE COURT:   Do you know which building he's talking

 8    about?

 9              MR. LASKE:   The building that I believe is the ATV

10    garage.

11              THE WITNESS:   Is that with the icon?   Where you have

12    your icon moving?

13    BY MR. LASKE:

14    Q.   Yes.

15    A.   That's right there.

16    Q.   Is that the ATV garage?

17    A.   That's the ATV garage, yes.

18    Q.   Okay.   And next to that to the left --

19    A.   To the left --

20    Q.   -- is the filling station?

21    A.   -- that's the tire shop.

22    Q.   Yeah.   And in that building where the icon is, that's where

23    the two air compressors are?

24    A.   Yes, back in June 2013, both compressors were located in

25    that location.
```

1    Q.   So can you just walk us and the Court through the best you

2    can to explain how the system works, how does it branch out?

3    A.   Both compressors were tied up together.  From there, there

4    is a pipe that comes out of the building through the fence,

5    south side of that area there, so the -- I mean the pipe

6    were -- are tied up to the fence line.  And then from there it

7    comes, comes down from the underground to clear the area there

8    over the parking lot, then it comes up -- it comes up to the

9    shop for our air.

10   Q.   What part of the line was connected to the tire inflator

11   that's at issue in this case?

12   A.   It was a hard pipe then comes out of a -- then from the

13   hard pipe with a hose.  And the hose --

14   Q.   And is there a fence?

15   A.   Yes.

16   Q.   How does -- how does it connect through the fence?

17   A.   It's bolted on with a bracket, so the hose rail is sticking

18   out outside the gate.

19   Q.   If someone had to shut it off, could they do it from

20   outside the fence or would they have to be behind the fence?

21   A.   You have to be behind the fence.

22   Q.   Your duty station in June of 2013 was where?

23   A.   Chula Vista garage, 3752 Beyer.

24   Q.   How long has that been your assigned station?

25   A.   I believe since '94, mid '90s.

1    Q.   And that's been consecutive years?

2    A.   Yes, sir.

3    Q.   When did you first hear about Agent Moore's accident?

4    A.   After the accident, June 25th, 2013.

5    Q.   I believe that was a Tuesday, so that was a day you

6    normally work, correct?

7    A.   Yes, I don't remember the exact day, but, yes, I was there

8    that day.

9    Q.   But you work a Monday through Friday schedule?

10   A.   Yes, Monday through Friday.

11   Q.   Who informed you that the accident happened?

12   A.   Well, when I got there that morning, I heard rumors

13   floating around that somebody got hurt that night, the night

14   before.

15   Q.   Did someone specifically tell you though that something had

16   happened?  So in other words, did you get a call from anyone or

17   you just heard rumors?

18   A.   Yes, I received a call around -- between 7:15, between

19   7:15, 7:45, 7:30, either from Ponce with CIIT team or

20   Mr. Martinez at the time.

21   Q.   So is that the SOS, the supervisory official -- and I don't

22   remember the other?

23   A.   I think it's special operations supervisor.

24   Q.   Special Operations Supervisor Mike Martinez?

25   A.   Yes, sir.

1    Q.  And the other person you're referring to is the critical

2    incident investigation team member, Miguel Ponce?

3    A.  Yes.

4    Q.  Might just refer to him as SOS Martinez and CIIT team

5    member Ponce, if that's okay.

6    A.  Yeah.

7    Q.  What did you do after Mike Martinez called you or after

8    Mike Martinez or Ponce called you?

9    A.  Well, they instructed me to go to the tire shop, so

10   that's -- I went to the tire shop.

11   Q.  Do you believe that you got a call from two different

12   people or it was one or the other, you're just not sure?

13   A.  Either one of them, because I know for sure that I received

14   a call.

15   Q.  But one call versus two calls?

16   A.  Yeah.  So either Ponce or Mr. Martinez because --

17   Q.  Okay.  It was one call though?

18   A.  Yes, only one call, but --

19   Q.  Were you asked to do anything by the person who called you?

20   A.  Yes.

21   Q.  What did they ask you to do?

22   A.  They asked me to go out there, inspect the hose, and check

23   the inflator and remove the hose from the hose rail.

24   Q.  Did you do those things?

25   A.  Yes, I did.

1    Q.   So when you -- what time did you head down to the accident

2    scene?

3    A.   Right after the phone call.

4    Q.   When you went down to that area, was anyone with you or was

5    someone already there?

6    A.   Yeah, Ponce was already there at that time.  And VCO,

7    they're the ones cleaning -- cleaning the area at that time.

8    Q.   And what did you observe when you did the function test?

9    A.   Okay.  Before removing the hose, I visually checked the

10   hose to make sure that it's not leaking or not damaged, and

11   after that, I checked the inflator.  I squeezed -- pulled on

12   the trigger, the inflator, and air comes out, so it appears --

13   or it was working properly.

14   Q.   And did you do anything in particular when you looked at

15   the hose?  Were you looking for something in particular or you

16   just looked at the hose?

17   A.   Check it, I'm just pretty much visual check to make sure

18   it's not cut or kinked or any swelled up area.

19   Q.   Were there any problems with cuts, kinks, rips?

20   A.   No, because it's not leaking air.  And when I did the

21   inflator, checked the inflator and it's working properly.

22   Q.   Did you end up removing it?

23   A.   Yes.

24   Q.   And how did you do that?

25   A.   Before removing the hose I shut down the lever to cut the

1    supply line from the hose rail and released the pressure, then

2    disconnected the hose from the hose rail.

3    Q.  When you did all of that, was anyone with you?  You

4    mentioned earlier Miguel Ponce was.

5    A.  Yes.

6    Q.  Was he still there?

7    A.  He saw me did the function check on the -- on the air

8    inflator.

9    Q.  Did he stick around to see you remove it from the hose?

10   A.  Yes.

11   Q.  And what did you do after you removed it?

12   A.  After removing the hose, I put it in a clear bag, trash

13   bag.

14   Q.  And where did you take it?

15   A.  I hand it to -- I hand it to either Ponce or the VCO there.

16   Q.  Who are the VCOs at the time?

17   A.  It was -- I know it's Chris Weber for sure.

18   Q.  Do you mean David Weber?

19   A.  David Weber, sorry about that.

20   Q.  Was there more than one VCO possibly?

21   A.  Yes.

22   Q.  Okay.  Why did you -- why did you remove it from the

23   system, the hose and the inflator?

24   A.  Because I was told to remove the hose.

25   Q.  So whoever called you in the morning told you to do that?

```
 1   A.   Yes.

 2   Q.   All right.

 3   A.   It's like --

 4   Q.   And it was either Martinez or Ponce but you don't know?

 5   A.   Yeah, either Mr. Martinez or Ponce.

 6   Q.   Do you know who Ron Zermeno is from the union?

 7   A.   Yes.

 8   Q.   Did he see you that day?

 9   A.   No, I didn't see him that morning or, I don't think

10   he -- he's not there at all.

11   Q.   Yeah, but that day, did you see him in the morning or the

12   afternoon or evening?

13   A.   No, I didn't see him that morning or that day.

14   Q.   So Ron Zermeno didn't tell you anything regarding the air

15   hose and the tire inflator?

16   A.   No.

17   Q.   And when did you learn it was missing?

18   A.   Well, Mr. Martinez stopped by the garage and was looking

19   for the hose, so I would say late 2013.

20   Q.   And -- and you know that date because you remember Mike

21   Martinez looking for the hose?

22   A.   Yes.

23   Q.   Anything else that reminds you that it was late 2013?  In

24   other words, did some time pass, did something happen to make

25   you kind of remember?
```

```
 1    A.   No.   Because everybody's looking for that hose at that

 2    time.

 3    Q.   Okay.   And in your deposition, you actually said originally

 4    you weren't sure and then you went on to say that you thought

 5    it was actually late 2014, isn't that true?

 6    A.   Yes.

 7    Q.   Since your deposition though, have you learned anything to

 8    help you remember an earlier date?

 9    A.   Yes.

10    Q.   And if for the -- and was it an e-mail?

11    A.   Just the e-mail.

12    Q.   Yeah.

13    A.   E-mail and --

14         MR. LASKE:   Your Honor, I'd like to show the witness

15    Exhibit 56 and it's going to pop up on your screen.

16    BY MR. LASKE:

17    Q.   So if you could take a quick look at that.

18    A.   Okay.

19    Q.   Let me know when you're done.   There's no rush.

20    A.   Okay, I'm done.

21    Q.   So what helped you remember again?

22    A.   The date.

23    Q.   And also was there anything in the substance of the e-mail

24    that caught your attention?

25    A.   Yeah, the -- that I told him to, that the case was closed
```

```
 1   and it's okay to throw it away.
 2   Q.   Okay.  But the e-mail is not from or to you so --
 3   A.   No.
 4   Q.   -- is there anything about the e-mail that caught your
 5   attention?
 6   A.   No.
 7   Q.   Is there any significance that it's to Ponce or from
 8   Michael Martinez, for example?
 9   A.   Can you repeat that.
10   Q.   Was there any significance to the fact that it was from
11   Michael Martinez to Miguel Ponce talking about a conversation I
12   guess he had with you?
13   A.   And also they were looking for the hose at that time
14   already, it's kind of refreshed my mind.
15   Q.   Okay.  So this refreshed your memory because of what it was
16   discussing?
17   A.   Yes.
18   Q.   Even though you hadn't seen the e-mail before?
19   A.   Yes.
20   Q.   It kind of took you back to that time?
21   A.   Yeah.
22   Q.   What did you do to look for the missing inflator and air
23   hose?
24   A.   We looked around the garage, every inch of the garage, and
25   we didn't find that hose or inflator.
```

```
 1    Q.   And what conclusion did you end up reaching?

 2    A.   That it's gone.

 3    Q.   And did you direct anyone to dispose of the tire -- sorry,

 4    the tire inflator and the air hose at any time?

 5    A.   No, I did not.

 6    Q.   And did anyone at CIIT direct you to dispose of those

 7    items?

 8    A.   No.

 9    Q.   Now, who maintained the two air compressors?

10    A.   Western Pump.

11    Q.   Who is Western Pump?

12    A.   Private vendors who take care of all our shop equipment

13    like the air compressors.

14    Q.   How long have they been doing that?

15    A.   Years back.

16    Q.   And how often would they perform regular maintenance?

17    A.   Every three months quarterly.

18    Q.   How long had they been doing that for?  So going from June

19    2013 backwards, how many months, years are we talking about?

20    A.   I would say five years back after the accident.  Three to

21    five years back.

22    Q.   Before the accident?

23    A.   Before the accident.

24    Q.   And they would inspect the air compressor, take care of it?

25    A.   Yeah, they do the PM on it, they changed the oil, they do
```

1    the safety check on it, pretty much everything.

2    Q.   And how do you know that?

3    A.   Because at the end of their -- after they do the service on

4    it, they have a invoice to -- that required signature after

5    they performed the maintenance on the compressors.

6    Q.   Back in 2012 to June of 2013, were they recording the PSI

7    settings?

8    A.   Not that I know.

9    Q.   Okay.  We're going to show you a couple of the -- of the

10   documents that may help.  Exhibit 407, page seven.  And when

11   you're done let me know and I'll show you a couple more.

12        And actually, sorry, let's go to 331-1.  And I believe the

13   date on this exhibit is February 6th, 2013, and the description

14   of work describes what they were doing.  So take a second, read

15   that, let me know when you're done.

16   A.   Okay.

17   Q.   We're going to next look at Exhibit 318-1.  Can you take a

18   look at this too, the date's in the top left corner.  And also

19   just look, I guess, generally at it but the work performed.

20   A.   Yeah.

21   Q.   Are these the type of invoices or I guess -- what would you

22   call this, service something?

23   A.   Yeah, just like quarterly inspection, PM preventive

24   maintenance with the compressor.

25   Q.   Okay.  And you would get these roughly every three months

```
 1   for a period of five years before the accident?
 2   A.  Yes.
 3   Q.  And if you look at this document, I don't see the PSIs but
 4   do you anywhere?
 5           MR. WOHLFEIL:  Objection, hearsay.
 6           THE COURT:  I'm sorry, you said you don't see what?
 7           MR. LASKE:  I was curious if the witness happened to
 8   see any indication of what the PSI settings were on this
 9   document.
10           MR. WOHLFEIL:  And foundation, Your Honor.
11           THE COURT:  Well, has there been agreement on the
12   admissibility of this document?
13           MR. LASKE:  I don't believe so.
14           THE COURT:  Okay.  The document is hearsay.  It's not
15   generated by this witness.  This is generated by Western Pump?
16           MR. LASKE:  Yes, Your Honor.
17           THE COURT:  It's some kind of documentation sent by
18   them to the border patrol?
19           MR. LASKE:  Yes, Your Honor, and it was handed
20   directly to him on most occasions.
21           THE COURT:  What's the hearsay exception for
22   information asserted on the document?
23           MR. LASKE:  Business records because as part of his
24   job he was maintaining the records.
25           THE COURT:  We don't have a foundation for that
```

1    though.

2              MR. LASKE:  I understand, Your Honor.  I'll move on to

3    something else.

4              THE COURT:  Okay.  I mean, if you can lay a business

5    records foundation, I'll entertain it, but the hearsay

6    objection is a good one at this point.

7    BY MR. LASKE:

8    Q.  Mr. Pascua, as it related to regular maintenance of the

9    tire inflator, when would you replace the tire inflator?

10   A.  When they're broken or when it gets reported that it's not

11   working or broken.

12   Q.  And who would tell you this?

13   A.  Either the agents or the mechanics or the SOS or the VCO.

14   Q.  Would supervisors sometimes tell you that?

15   A.  Yes.

16   Q.  And can you walk me through the process of replacing an

17   item like the tire inflator, specifically the one by that

18   filling station?

19   A.  Okay.  Can you repeat that question.

20   Q.  So I know -- do you have more than one tire inflator for

21   the garage?

22   A.  Yes, for each mechanic they have their own in a toolbox

23   assigned to them.

24   Q.  Okay.

25   A.  And --

```
 1    Q.   So I'm just focusing in on the one that's by the filling
 2    station, the one we're talking about today.
 3    A.   There's only one there.
 4    Q.   Yeah.  So can you walk me through the process of replacing
 5    that one?  If someone told you there was a problem, what do you
 6    do next?
 7    A.   So if we have it on hand and I -- so the bad one will get
 8    replaced, see, it's a hard -- hard install to the hose,
 9    permanently screwed into the hose.  It didn't have the quick
10    disconnect on it.
11    Q.   Anything else you would do to replace it?
12    A.   Well, before you replace it you had to shut off the
13    main -- main line first.  So make sure there's no pressure on
14    the line.
15    Q.   Anything else that you do before you replace it?
16    A.   Yes.  Make sure the hose is serviceable before we replace
17    it.
18    Q.   And would you -- would you buy these in bulk, would you
19    sometimes do a one-off and just go to the store, like how would
20    you end up with a new one?
21    A.   Well, if we don't have it on hand then I submit a request
22    to -- to get another one to get ordered.
23    Q.   Had you ever seen a wheelbarrow at the Chula Vista station?
24    A.   No.
25    Q.   And on June 24th, 2013, were you working that day?
```

```
 1   A.   Yes.

 2   Q.   What were your hours that day?

 3   A.   From 7:00 until 3:30 p.m.

 4   Q.   And was that your normal work hours in 2013?

 5   A.   Yes.

 6   Q.   So was it -- what days of the week would you work?

 7   A.   Monday through Friday.

 8   Q.   So Monday through Friday, 7 a.m. to 3:30 p.m.?

 9   A.   Yes, sir.

10   Q.   And if a border patrol asked you how to inflate the tires

11   or for help, would you have answered them?

12   A.   Definitely, yes.

13   Q.   And if Agent Moore had asked for assistance, would you have

14   responded?

15   A.   Yes.

16   Q.   If someone was injured at the Chula Vista station using

17   garage equipment provided by the garage, would you be informed?

18   A.   Yes.

19   Q.   And prior to Mr. Moore's accident, had anyone been injured

20   using the tire inflator at the location that we're talking

21   about?

22   A.   No.

23   Q.   How about the air compressor, had anyone ever been injured

24   by the air compressors?

25   A.   No.
```

1  Q.   And how about the air hose that we're talking about today,

2  has anyone been injured by that?

3  A.   No.

4  Q.   Prior to Agent Moore's accident did the union have any

5  complaints about the equipment Agent Moore was using that day?

6  A.   No.

7  Q.   And are you aware of anyone who's ever been injured using

8  the compressed air system at Chula Vista station?

9  A.   No.

10 Q.   And other than Agent Moore are you aware of anyone at the

11 station who suffered an injury from using the tire inflator at

12 issue?

13 A.   No.

14          MR. LASKE:  Nothing further at this time.

15          THE COURT:  Cross-examination.

16          MR. WOHLFEIL:  Yes, Your Honor.

17                    CROSS EXAMINATION

18 BY MR. WOHLFEIL:

19 Q.   Good morning, Mr. Pascua.

20 A.   Good morning.

21 Q.   Just give me one second.  Let's start with the compressors.

22 So in June of 2013 there were actually two compressors in the

23 shop; is that right?

24 A.   Yes.

25 Q.   Can we look at 308 actually.  One was the Ingersoll Rand,

```
 1   is that right?

 2   A.  Yes.

 3   Q.  That's the upright one?

 4   A.  Uh-huh.

 5   Q.  Yes?

 6           THE COURT:  Yes?

 7           THE WITNESS:  Yes.

 8   BY MR. WOHLFEIL:

 9   Q.  The other was a Stewart-Warner; is that right?

10   A.  Yes.

11   Q.  That was the horizontal one?

12   A.  Yes.

13   Q.  The Ingersoll Rand was in the master position, the primary

14   compressor?

15   A.  At that time?

16   Q.  Yes.

17   A.  I think so, yes.

18   Q.  The Stewart-Warner was in the secondary or slave position?

19   A.  Yes.

20   Q.  The compressors were actually behind a locked gate; is that

21   right?

22   A.  Can you repeat that, please.

23   Q.  The compressors were located behind a locked gate; is that

24   right?

25   A.  Yes.
```

1          MR. LASKE:  Objection, vague as to time.

2          MR. WOHLFEIL:  In June of 2013.

3          MR. LASKE:  Vague as to time of day.

4          THE COURT:  Did they keep the compressors locked at

5  all times?  Were they behind a locked gate?

6          THE WITNESS:  After working hours, sir.  We secured

7  the gate --

8          THE COURT:  Yeah.

9          THE WITNESS:  -- at 3:30.

10         THE COURT:  Okay.  Is the gate open during the day?

11         THE WITNESS:  Yes.

12         THE COURT:  Or was it at the time?

13         THE WITNESS:  Yes.  It's open during the working day.

14         THE COURT:  Okay.  So people can get back in the area

15  where the compressors were?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Go ahead.

18  BY MR. WOHLFEIL:

19  Q.  In June of 2013 during what hours was the gate that

20  surrounded the two compressors closed, locked?

21  A.  Around, before our shift -- our knockoff day, 3:30.

22  Q.  3:30 to roughly 7 a.m.?

23  A.  Yes.  Open at 7 p.m. -- a.m. and closed at 3:30.

24  Q.  Okay.  And that gate actually had barbed wire around it,

25  didn't it?

```
1    A.   Yes, on top of the gate, on top of the fence.

2    Q.   That's to keep people out, right?

3    A.   What is that?

4    Q.   That's to keep people out, that barbed wire, right?

5    A.   Yes.

6    Q.   Yeah.  Let's talk about the garage.  You're actually the

7    lead mechanic at the garage; is that right?

8    A.   Yes.

9    Q.   And you were in June of 2013?

10   A.   Yes.

11   Q.   The garage has nine bays, is that right?

12   A.   I would say about 10 bays.

13   Q.   10 bays, okay.  Each bay has a hard line that runs to it,

14   yes?

15   A.   Yes.

16   Q.   And that was true in June of 2013?

17   A.   Yes.

18   Q.   And all those hard lines run back to those two compressors,

19   the Ingersoll Rand and the Stewart-Warner, is that right?

20   A.   That's correct.

21   Q.   And the bays have hose reels that power air tools?

22   A.   Yes.

23   Q.   The tools in the garage include vehicle lifts, right?

24   A.   Yes.

25   Q.   Actually three vehicle lifts?
```

```
 1   A.   About three vehicle lifts, yes.
 2   Q.   Those are vehicle lifts that can get a Chevy Tahoe off the
 3   ground, right?
 4   A.   Yes.
 5   Q.   The garage also, the tools in the garage also included an
 6   air gun; is that right?
 7   A.   Yes.
 8   Q.   That's a device used to remove wheels from vehicles?
 9   A.   Uh-huh.
10           THE COURT:  Yes?
11           THE WITNESS:  Yes.
12   BY MR. WOHLFEIL:
13   Q.   Like in NASCAR you see where they [makes noise], like that?
14   A.   Yes, sir.
15   Q.   Yep.  Air chucks were included in the garage?
16   A.   Yes, sir.
17   Q.   Ratchets?
18   A.   Air ratchets, sir.
19   Q.   Lube, air lube tools?
20   A.   Yes, sir.
21   Q.   Oil tube -- air-powered oil tools?
22   A.   Oil pump.
23   Q.   Oil pump.
24   A.   To pump our oil.
25   Q.   Very good.  And a crusher machine?
```

```
1    A.   Crusher machine.

2    Q.   What does the crusher machine do?

3    A.   To crush waste oil, so it squeezes out all the waste oil

4    retained on that old filter.

5    Q.   And that was all true in June of 2013?

6    A.   Yes.

7    Q.   Okay.  The minimum PSI to run those pneumatic hand tools is

8    90 PSI, isn't that right?

9    A.   For the hand tools 90 is the minimum.

10   Q.   In the garage you used the two compressors we've talked

11   about to power all those tools every day, right?

12   A.   Every day.

13   Q.   During open hours that we've already talked about?

14   A.   Yes.

15   Q.   The PSI coming out of those two compressors in June of 2013

16   was approximately 150, wasn't it?

17   A.   Well, I don't know the PSI before or that of June -- June

18   24, 2013, but I know the following day I went to check there

19   and it was 150 on the gauge.

20   Q.   Any reason to think that it wasn't 150 on June 24, 2013?

21   A.   I don't know.

22   Q.   At the garage you're actually in charge of maintaining the

23   entire fleet of vehicles at the Chula Vista station; isn't that

24   right?

25   A.   That's correct.
```

```
 1   Q.   The fleet includes SUVs, right?

 2   A.   Yes.

 3   Q.   Tahoes, right?

 4   A.   Yes.

 5   Q.   Expeditions?

 6   A.   Yes.

 7   Q.   Sedans?

 8   A.   Yes.

 9   Q.   Trucks?

10   A.   Yes.

11   Q.   And ATVs?

12   A.   Yes.

13   Q.   That garage that you pointed to on Exhibit 308 earlier is

14   actually the ATV garage, is that right?

15   A.   That's part of it.  We have a bay that's for ATV.

16   Q.   Your finger will actually create writing if you touch the

17   screen.  Circle the shop compressors, the Ingersoll Rand and

18   the Stewart-Warner, where they were kept.

19   A.   Somewhere around there.

20   Q.   Okay.  And the ATV garage?

21   A.   The ATV garage are part of the -- right below the antenna,

22   somewhere around there.

23   Q.   Were there actually ATVs stored right next to the shop

24   compressors?

25   A.   Yes, that's where they parked the ATVs.
```

1    Q.   Okay.  Use your finger, show the judge where the ATVs were

2    parked.

3    A.   Somewhere around there.

4    Q.   And that was true in June of 2013?

5    A.   Yes.

6    Q.   And in the garage you guys are maintaining the fleet of

7    vehicles that we've just described using all the tools that

8    we've just described all day during open hours, right?

9    A.   That's right, if we're busy.

10   Q.   There are actually bikes at the border patrol station,

11   weren't there?

12   A.   Yes.

13   Q.   Mountain bikes?

14   A.   Mountain bikes.

15   Q.   Like 40 to 50 mountain bikes?

16   A.   Something like that.

17   Q.   They use the inflator to fill the mountain bikes?

18   A.   Yeah, they use the air inflator to air up the tires.

19   Q.   Let's talk about regulators.  You know what a regulator is,

20   don't you?

21   A.   Yes.

22   Q.   A regulator actually steps down air pressure when it goes

23   to a tool; is that right?

24   A.   Yes.

25   Q.   There were actually several pneumatic tools in the garage

```
 1   that had regulators, isn't that right?

 2   A.  Yes.

 3   Q.  And that was true in June of 2013?

 4   A.  Yes.

 5   Q.  Just -- you understand that the word chuck and inflator

 6   actually mean the same thing, isn't that right?  You use those

 7   terms interchangeably?

 8   A.  Air chuck and inflator, yeah.

 9   Q.  Yeah.

10   A.  We use that terminology in the shop.

11   Q.  Okay.  They mean the same thing though?

12   A.  Same thing.

13   Q.  Yeah.  The waste filter crusher inside the garage actually

14   had its own regulator, isn't that right?

15   A.  Yes, sir.

16   Q.  And it regulated down the PSI to 90 or 95?

17   A.  Well, somewhere around there.

18   Q.  Okay.

19   A.  I don't know the exact, but between 90 to 95 or a hundred.

20   Q.  Okay.  The oil pump had a regulator as well, didn't it?

21   A.  Yes.

22   Q.  And that was inside the garage?

23   A.  Inside the Conex box, outside the garage.

24   Q.  Okay.  Connected to those compressors, right?

25   A.  Yes.
```

1    Q.   And that reduced the PSI down, isn't that right?

2    A.   Yeah.  We regulated down to, I would say between 80 to 90,

3    so that way we can control the flow of oil that comes out of

4    it.

5    Q.   Can we see 263, please.  Mr. Pascua, just one second.

6         Mr. Pascua, do you recognize what's shown in Exhibit 263 in

7    front of you?

8    A.   Yes.

9    Q.   That's the hose that Ryan Moore used on June 24, 2013,

10   right?

11   A.   Yes.

12   Q.   That hose was connected at the time to the two compressors

13   we've talked about?

14   A.   Yes.

15   Q.   You actually installed that hose, didn't you?

16   A.   The whole setup I did, yes.

17   Q.   Yeah.  That was in about 2010?

18   A.   Somewhere around there.

19   Q.   There was a change that occurred though with the reel at

20   some point, wasn't there?

21   A.   Before that, the reel was installed above the gate there.

22   Q.   It was automatic before?

23   A.   With an automatic retractable type of a hose reel.

24   Q.   But you changed it to the manual one that we see in 263,

25   didn't you?

```
 1   A.   Yes.

 2   Q.   That was actually years before Ryan Moore's incident?

 3   A.   Something like that.

 4   Q.   Yeah.  And you did that because agents were rough with the

 5   inflators, right?

 6   A.   Yeah, because in the morning when we get there, the hoses

 7   always get tangled up with the other one.

 8   Q.   Okay.  Agents were rough with the hose, right?

 9   A.   Something like that.

10          MR. LASKE:  Objection, argumentative.

11          THE COURT:  Oh, I'll let the answer stand.  Overruled.

12   BY MR. WOHLFEIL:

13   Q.   In the five years or so after you installed the hose that

14   we're looking at in 263, did you have to replace the inflator?

15   You did, right?

16   A.   Yes.

17   Q.   About five times?

18   A.   Maybe more.

19   Q.   How many more?  Six, seven?

20   A.   I don't know the number but maybe more than five times.

21   Q.   We talking about like 10?

22   A.   I know it's more than five times.

23   Q.   Okay.  Well, let's figure it out, would you say 10, 8 to

24   10?

25   A.   I don't want to say 10 because I'm not sure if it's 10.
```

1    Q.   Okay.  Let's go back from there, would you say nine?

2    A.   I know it's more than five at least, at least five times.

3    Q.   Okay.  So we're talking at least six?

4          MR. LASKE:  Objection, Your Honor, asked and answered.

5          THE COURT:  Yeah, sustained.  He says he remembers

6    doing it more than five times, beyond that he doesn't know.

7    Next question.

8    BY MR. WOHLFEIL:

9    Q.   You don't know what's required to maintain or calibrate the

10   inflators, do you?

11   A.   When we put a new one, I mean, it's already calibrated,

12   it's brand new.

13   Q.   Right.  That's not the question I asked.  You don't know

14   what's required to maintain or calibrate those inflators?

15   A.   No.

16   Q.   You've never known that?

17   A.   No.

18   Q.   Even though you're the one in charge of replacing them,

19   right?

20   A.   Yes.

21   Q.   You never did anything to maintain or calibrate those

22   inflators, did you?

23   A.   Because they get replaced often enough, it's a brand new

24   gauge.

25   Q.   You never did anything to maintain or calibrate those

```
 1   inflators, did you?

 2   A.  No.

 3   Q.  Okay.  And you actually have some technicians that work

 4   under you at the garage?

 5   A.  Yes.

 6   Q.  They didn't either, they didn't do anything to maintain or

 7   calibrate those inflators, did they?

 8   A.  I don't know that.

 9   Q.  You don't know that?

10   A.  Not that I know.

11   Q.  Okay.

12         THE COURT:  Are the inflators capable of being

13   calibrated?

14         THE WITNESS:  Well, the only way for me on my opinion,

15   the only way to check it, I believe, is getting a known

16   calibrated gauge, stick it to a hose -- stick it to a tire see

17   if you get the same reading, sir.  But if it's a brand new one,

18   it's factory calibrated.

19         THE COURT:  Okay.

20   BY MR. WOHLFEIL:

21   Q.  You could use the gauge behind in Exhibit 263, right?

22   A.  Yeah, I see that, sir.

23   Q.  Right.  So if the gauge on the hose isn't working, you have

24   that as backup, right?

25   A.  We didn't put that in there.  The gauge, I mean the
```

```
 1   inflator comes with a gauge already so.
 2   Q.   Which breaks, right?
 3   A.   Yes.
 4   Q.   Let's talk about your testing the morning of June 25, 2013.
 5        What, if anything, were you wearing on your hands during
 6   your testing?
 7   A.   Can you repeat that question?
 8   Q.   What if anything were you wearing on your hands during your
 9   testing?
10   A.   What am I wearing on my -- gloves.
11   Q.   Your testing consisted of squeezing the trigger to make
12   sure air came out, right?
13   A.   Yes.
14   Q.   Nothing else?
15   A.   Yes.
16   Q.   You didn't put a tire on the end of it, for example?
17   A.   No.
18   Q.   The purpose of your testing was just to ensure that the air
19   came out of the end of the inflator, right?
20   A.   Yes.
21   Q.   That's it?
22   A.   That's it.
23   Q.   And you mentioned after your testing you actually bagged
24   the hose and the inflator?
25   A.   Yes, sir.
```

1   Q.   And you gave it to Mr. Ponce?

2   A.   Mr. Ponce.

3   Q.   That was at his request, right?

4   A.   That's the request.

5   Q.   Okay.  So we talked earlier, at your deposition in August

6   19th, 2015, you actually testified that you last saw this hose

7   and inflator in late 2014, isn't that right?

8   A.   That's right.

9   Q.   You were under oath when you gave that testimony, isn't

10  that right?

11  A.   Yes, sir.  But after they provide me the e-mail, I read on

12  it, it's going to refresh my memory.

13  Q.   Right.  Somebody from the border patrol gave you that

14  e-mail, right?

15  A.   My attorney.

16  Q.   Okay.  Anybody else present?

17  A.   And also Mr. Martinez the -- you know, snooping around the

18  garage, asking around to see what happened to the hose.

19  Q.   Did Mr. Martinez help you remember as well?

20  A.   Yes.

21  Q.   Okay.  He's border patrol management, isn't he?

22  A.   Yes, he's the SOS at that time in charge of the VCO.

23  Q.   He helped you remember something different from your

24  deposition testimony?

25  A.   Yes.

```
 1   Q.  You had a chance to prepare for your deposition --

 2   A.  No.

 3   Q.  -- didn't you?

 4   A.  There's no e-mail or anything, no documents provided to me

 5   before my depo.

 6   Q.  You knew you were going to be there to testify under oath,

 7   isn't that right?

 8   A.  Yes.

 9   Q.  About the inflator and the hose, you knew that, right?

10   A.  Yes.

11   Q.  You knew that somebody had been seriously injured, isn't

12   that right, by the inflator and the hose before your

13   deposition?

14   A.  Yes.

15   Q.  Okay.  And you knew actually it was Ryan Moore at that

16   point, didn't you?

17   A.  Yes.

18   Q.  There was no doubt in your mind you were going to be asked

19   about this inflator and this hose, right?

20   A.  Yes.

21        MR. LASKE:  Objection, argumentative.

22        THE COURT:  Overruled.

23   BY MR. WOHLFEIL:

24   Q.  Was there any doubt in your mind that you were going to be

25   asked at your deposition about this hose and this inflator?
```

1  A.  Yes, because it's part of our equipment.

2  Q.  And you knew one of the questions was going to be where to

3  go, right?

4  A.  I mean --

5  Q.  Right?  You knew that.

6       THE COURT:  You have to answer.  Did you know or did

7  you anticipate they would ask you what happened to the hose and

8  the inflator before the deposition?

9       THE WITNESS:  Yes.  I anticipated that they're going

10  to ask the questions.

11       THE COURT:  Okay.

12  BY MR. WOHLFEIL:

13  Q.  Because as you said before, everybody was looking for that

14  thing before, right?

15  A.  Yes.

16  Q.  I mean pretty much from the start everybody was looking for

17  this hose and inflator, right?

18  A.  Yes.

19       MR. WOHLFEIL:  No more questions, Your Honor.

20       THE COURT:  So I have a couple of questions for you.

21  You pronounce your last name Pascua?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  Pascua.  Mr. Pascua, the 25th, which would

24  have been the day, it was the day after --

25       THE WITNESS:  After.

1        THE COURT:  -- the accident, you were dispatched to go

2   look at the hose and the device connected to the end of the

3   hose?

4        THE WITNESS:  Yes, sir.

5        THE COURT:  The device connected to the end, do they

6   call that the inflator?

7        THE WITNESS:  Inflator, yes, sir.

8        THE COURT:  Okay.  And that has some kind of gauge on

9   it, a bubble gauge or something?

10       THE WITNESS:  Yes, sir.  By the handle there's a

11  bubble gauge there.

12       THE COURT:  So you've testified that you looked at the

13  hose, you didn't find anything wrong with the hose; is that

14  right?

15       THE WITNESS:  Yes, sir.

16       THE COURT:  And then you looked at the inflator device

17  and actually blew air through it?

18       THE WITNESS:  Yes.

19       THE COURT:  And were you -- at any point did you make

20  an inspection of the bubble gauge to see if it was activating,

21  moving?

22       THE WITNESS:  Well, on those gauge when you plug your,

23  put your finger on the tip.

24       THE COURT:  Right.

25       THE WITNESS:  And you squeeze the trigger, you see a

1    little bit of movement on the gauge, and I did that.

2         THE COURT:  That's my question to you.  Did your

3    inspection include inspecting the gauge to see if it was

4    registering air pressure?

5         THE WITNESS:  Yes, sir.  The gauge moved a little bit.

6         THE COURT:  It moved.

7         THE WITNESS:  Yes, it moved.

8         THE COURT:  So you have a recollection of putting your

9    finger on the end of the inflator, pushing down on the lever

10   and creating -- creating resistance and then seeing the gauge

11   move?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  Okay.  Do you remember how much it moved?

14        THE WITNESS:  About five PSI.

15        THE COURT:  All right.

16        THE WITNESS:  It just moved, barely moved, little bit.

17   It moves a little bit.

18        THE COURT:  Did the movement seem to be consistent

19   with the pressure you were putting on the end?  Did it seem

20   like it was --

21        THE WITNESS:  Yes, yes.

22        THE COURT:  You were putting five pounds of PSI

23   against the end with your thumb?

24        THE WITNESS:  Right.  Holding it against it, yes, sir.

25        THE COURT:  Did you see anything out of the ordinary

1    about the inflator device?

2             THE WITNESS:  No.

3             THE COURT:  Anything?

4             THE WITNESS:  To me it's working properly.

5             THE COURT:  Now you also said that you, you checked

6    the total air pressure coming out of that particular hose or

7    that installation?

8             THE WITNESS:  No, it just whatever the reading on the

9    compressor, that's the line pressure.

10            THE COURT:  Okay.  You had mentioned at some point

11   that the PSI was 150 the next day, 150.

12            THE WITNESS:  150 PSI -- 150 PSI, it's the reading

13   from the air compressor.

14            THE COURT:  Okay.  So you believe the output from the

15   compressor itself the next day was 150?

16            THE WITNESS:  It should be.

17            THE COURT:  And is there a gauge on there, is that how

18   you determine that?

19            THE WITNESS:  Yes, there's a gauge built into the

20   compressor.

21            THE COURT:  So the 150 figure is what -- you looked at

22   the gauge it showed output of 150?

23            THE WITNESS:  150, yes, sir.

24            THE COURT:  Okay.  Did you do any other inspection of

25   either the compressor or the particular air hose that was

1    involved in the accident?

2            THE WITNESS:  Just the hose attached to the air

3    inflator.

4            THE COURT:  Your pneumatic tools take approximately 90

5    pounds of pressure to operate correctly?

6            THE WITNESS:  Minimum, sir, yes.

7            THE COURT:  Minimum.  And is there any regulator on

8    the air coming into the repair shop?

9            THE WITNESS:  No, sir.

10           THE COURT:  So if it was showing 150 the next day, you

11   would expect you were getting about 150 in the shop then,

12   right?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Okay.  Had anyone ever suggested to you

15   that there should be a regulator on the -- on the inflator that

16   was used to fill tires?

17           THE WITNESS:  No, sir.

18           THE COURT:  How long had you worked there prior to

19   the -- prior to the, prior to 2013, how long had you been a

20   mechanic with border patrol?  '92?

21           THE WITNESS:  '92, that's when I started there, sir.

22           THE COURT:  Had you ever been aware in all that time

23   of a tire being overinflated and blowing up?  Exploding?

24           THE WITNESS:  No, sir.

25           THE COURT:  Had anything like that ever happened in

```
 1    the repair shop, had anybody ever overinflated a tire and had
 2    it explode?
 3            THE WITNESS:  Never.  Never, sir.
 4            THE COURT:  You're not aware of anything in your
 5    experience, okay.  Any other questions based on the Court's
 6    questions?
 7            MR. LASKE:  I don't have any questions.
 8            MR. WOHLFEIL:  Yes, Your Honor.
 9            THE COURT:  All right.  Go ahead.
10            MR. WOHLFEIL:  Your Honor, I only have the one copy of
11    his deposition transcript.  May I approach and read it at the
12    witness stand.
13            THE COURT:  Either that or read it to him from there.
14            MR. WOHLFEIL:  Okay.
15            MR. LASKE:  Your Honor, what's the purpose of it being
16    read?  He hasn't been asked a question yet.
17            THE COURT:  Well, I don't know yet.  I mean I'm
18    assuming maybe something inconsistent, something different.
19            MR. WOHLFEIL:  It's very inconsistent.
20            THE COURT:  Yeah.
21    BY MR. WOHLFEIL:
22    Q.  Page 89, line 11 through page 90, line 18.  Let me know
23    when you're ready.  Are you ready?
24            MR. LASKE:  Yes, I'm ready.
25            MR. CHAMBERS:  Okay.  Good.
```

1          THE COURT:  So he's going to ask you, Mr. Pascua, if

2    you were asked certain questions and gave certain answers when

3    your deposition was taken.  That's what he's going to do now.

4          THE WITNESS:  Okay, sir.

5          THE COURT:  Go ahead.

6    BY MR. WOHLFEIL:

7    Q.  Starting at line 11.

8          "QUESTION:  So you hang up with Ponce and you go

9    straight out to the hose reel?

10          "ANSWER:  Yeah.

11          "QUESTION:  And you grab the chuck?

12          "ANSWER:  Uh-huh.

13          "QUESTION:  And you push the lever down to make sure

14   air comes out?

15          "ANSWER:  Yeah.

16          "QUESTION:  Right?

17          "ANSWER:  Yes.

18          "QUESTION:  And it did?

19          "ANSWER:  It did.

20          "QUESTION:  And then you went ahead and disconnected

21   the entire hose length?

22          "ANSWER:  Well, kind of visually checked the hose

23   first and then turned off the main.  There's a shutoff, a

24   shutoff line for this red one, shut it off to remove the

25   pressure on it.

1          "QUESTION:  Is that shutoff behind the gate?

2          "ANSWER:  Yes, it's on the wall behind the gate.

3          "QUESTION:  Okay.

4          "ANSWER:  It's like a shutoff.

5          "QUESTION:  Kind of a lever thing?

6          "ANSWER:  Yeah, lever type.

7          "QUESTION:  So you went back, shut off the air supply,

8   came back around and disconnected the hose from the hose reel?

9          "ANSWER:  Yeah, after checking the air chuck.

10          "QUESTION:  Right?

11          "ANSWER:  Yes.

12          "QUESTION:  Then you placed the entire orangish hose

13   we see in Exhibit 2 along with the chuck into a bag.

14          "ANSWER:  Yes."

15          Is that correct, Mr. Pascua?

16   A.  That's correct.

17   Q.  Never mentioned anything about the thumb on the chuck,

18   right?

19          THE COURT:  Well, he wasn't asked.  I mean, you know,

20   he wasn't asked.  It's not fair to say that.  He can't

21   volunteer at a deposition.  Was there a specific question asked

22   about whether he put his thumb on the end of the inflator and

23   tried to check for pressure?  If there was, read that.  But if

24   he wasn't asked, it's not fair to say, well, you never

25   mentioned this.

1          A witness in a deposition answers questions that are

2   put to him and is frequently instructed answer only questions

3   put to you.  So if there's something in there that I missed in

4   that exchange where he was asked beyond inspection, did you

5   test or try to test the pressure, read that.  Is there

6   anything?  Was he asked that question?

7          MR. WOHLFEIL:  No, Judge.

8          THE COURT:  Okay.  Any other questions of this

9   gentleman?

10          MR. WOHLFEIL:  No, Your Honor.

11          MR. LASKE:  No, thank you, Your Honor.

12          THE COURT:  Okay, Mr. Pascua, thank you.  You're

13   excused as a witness.  You may stand down.

14          Do you have a witness that will take 15 minutes or

15   less?

16          MR. LASKE:  I have a witness that will maybe take five

17   minutes.

18          THE COURT:  Yeah, please, call your next witness.

19          MR. LASKE:  Eric Swickheimer.

20          ERIC SWICKHEIMER, DEFENDANT'S WITNESS, SWORN

21          THE COURTROOM DEPUTY:  Can you please state and spell

22   your first and last name for the record.

23          THE WITNESS:  Eric Swickheimer, E-R-I-C, Eric

24   Swickheimer, S-W-I-C-K --

25          THE COURT:  Wait, wait, speak up and speak slower when

```
 1   you spell your last name.  Adjust the mike so it's right up
 2   again.  Now spell your last name slowly.
 3            THE WITNESS:  S-W-I-C-K-H-E-I-M-E-R.
 4            THE COURT:  And your first name is E-R-I-K?
 5            THE WITNESS:  E-R-I-C.
 6            THE COURT:  E-R-I-C, okay.  Go ahead.
 7                        DIRECT EXAMINATION
 8   BY MR. LASKE:
 9   Q.  We'll try to keep this quick today, I know your son is
10   sick.  So, how long have you worked for the border patrol?
11   A.  Almost 10 years since April '07.
12   Q.  And when you started, where were you stationed?
13   A.  Chula Vista station.
14   Q.  In June of 2013 where were you stationed?
15   A.  I was on the ATV unit at Chula Vista station.
16   Q.  So between the time you started and June of 2013, the same
17   place?
18   A.  I did five years in intel, but Chula Vista is my home
19   station.
20   Q.  What is your current job title?
21   A.  Right now I'm a border patrol agent.
22   Q.  Are you a supervisor?
23   A.  No.
24   Q.  What was your job title in June 2013?
25   A.  Border patrol agent.
```

1    Q.   And you were part of the ATV unit?

2    A.   Yes, sir.

3    Q.   When did you start with the ATV unit?

4    A.   October 2012.

5    Q.   And when did you cycle off that unit?

6    A.   October of 2013.

7    Q.   I'd like to show you a photograph, it's an aerial view,

8    Exhibit 308.  Take a second to orientate yourself, but I think

9    it's actually -- I think it's a view, and if we can maybe blow

10   up the section by the red dot.  It's a view that we're looking

11   at north and south, but it's actually the opposite.  South

12   would be on top of the page and north would be below it.

13       So the red dot is the garage.  Can you point out where the

14   ATV unit is?

15   A.   It's going to be south and slightly east of --

16   Q.   You can draw on it if you want with like an X.

17   A.   Okay.  I put a dot on it.

18   Q.   And do you know where the tire filling station was in

19   relation to that?

20   A.   Yeah, it was about right there.

21   Q.   And where was the -- and the garage is obviously the red

22   dot, right, or the red circle?

23   A.   Yes.

24   Q.   Are you familiar with the compressed air system at the

25   Chula Vista station near the garage?

1   A.   Yes.

2   Q.   And why is that?

3   A.   I was detailed to the ATV unit and every day I had to air

4   up my tires on the ATV prior to going to the field.

5   Q.   And so at least for that year of October '12 until the time

6   they removed it in June of 2013 you were using it every day you

7   went to work?

8   A.   The flat tire problem was probably two months before the

9   accident, several times a week.

10  Q.   And you were primarily inflating ATV tires?

11  A.   Yes.

12  Q.   And how many days a week did you work?

13  A.   Five.

14  Q.   What was your shift, not in terms of days but in terms of

15  daytime, so was it 8 a.m.?

16  A.   I was on late days, I don't remember the start time.  I

17  think it was noon.

18  Q.   So around noon you would use the tire inflator?

19  A.   Yes.

20  Q.   And how did you determine if you needed to inflate a tire?

21  A.   It would look flat.

22  Q.   Could you see that?

23  A.   Yeah, it's pretty noticeable.  The bottom wouldn't be

24  round.

25  Q.   Had you ever seen an agent use the tire inflator that we're

1    discussing today for a wheelbarrow, a wheelbarrow tire?

2    A.   No.

3    Q.   When is the last time you used the tire inflator and the

4    air hose prior to the June 24th, 2013 accident?

5    A.   Can't be for sure, most likely I did use it the day of or

6    the day prior.

7    Q.   Did you have a Sunday to Thursday schedule or something

8    different?

9    A.   I worked the day of the accident, the day prior, and was

10   off before those two days.

11   Q.   So you worked on Monday, June 24th, 2013?

12   A.   Was that the day of the accident?

13   Q.   That was the day of the accident.

14   A.   Yes.

15   Q.   And you also worked the day before Sunday, June 23rd, 2013?

16   A.   Yes.

17   Q.   And you believe at least one of those days you used the air

18   compressor?

19   A.   Fairly certain.

20   Q.   I'm going to show you what's marked as Exhibit 147-5.

21        Sorry, 147-15.  Is that the tire inflator by the ATVs that

22   you used?

23   A.   It looks like it, yes.

24   Q.   And we're going to look at another photo, 147-16.  A closer

25   photo, but same items.  Again, is that a true and accurate

1  depiction of the tire inflator and the air hose that you used?

2  A.  It is, yes.

3  Q.  And when you last used the tire inflator, did you have any

4  problems with it?

5  A.  No, I don't recall any.

6  Q.  Did you have any problems with the air hose?

7  A.  I don't recall any.

8  Q.  And sometimes people say they don't recall because of the

9  passage of time.  Is it I don't recall or is it yes or no?

10  A.  I didn't -- never imagined I'd be here.  I didn't take

11  notes.  I don't know.

12  Q.  Okay.  I understand.  What kind of tires were you inflating

13  at the time?

14  A.  ATV tires.

15  Q.  And how much air pressure did you put in those tires?

16  A.  I run about four pounds.

17  Q.  Four PSIs?

18  A.  Yes, four PSI.

19  Q.  How long does it take to inflate a tire like an ATV tire to

20  four PSIs?

21        MR. WOHLFEIL:  Objection, foundation.

22        THE COURT:  No, overruled.  You may answer based on

23  your experience.

24        THE WITNESS:  Just one or two squirts of air.

25  BY MR. LASKE:

```
 1   Q.   Are we talking a second, two seconds, more than that?

 2   A.   A few one-second bursts, yes.

 3   Q.   So one or two bursts, three or four?

 4   A.   Two or three.

 5   Q.   And the last time you used the tire inflator, were you

 6   injured?

 7   A.   No.

 8   Q.   And did you have any problems inflating ATV tires the last

 9   time you used the tire inflator?

10   A.   No.

11   Q.   Have you ever been injured using that tire inflator that

12   we're talking about today?

13   A.   No.

14   Q.   Have you ever been injured using the compressed air system

15   at Chula Vista?

16   A.   No.

17   Q.   Other than Agent Moore, are you aware of anyone at Chula

18   Vista station who tried to inflate a wheelbarrow tire?

19   A.   No.

20   Q.   And other than Agent Moore, are you aware of anyone at

21   Chula Vista station who suffered an injury while using the tire

22   inflator?

23   A.   I don't know of anyone else.

24          MR. LASKE:  Nothing further, Your Honor.

25          THE COURT:  Cross-examination.
```

```
 1              MR. WOHLFEIL:  Yes, Your Honor.
 2                          CROSS EXAMINATION
 3   BY MR. WOHLFEIL:
 4   Q.  Just so I'm clear, Agent, you actually weren't at the Chula
 5   Vista border patrol station on June 24, 2013?
 6   A.  I was working a late day shift, yes.
 7   Q.  Were you anywhere near the inflator at about 9 p.m.?
 8   A.  Oh, no, I didn't see anything with the accident.  I only
 9   saw the aftermath, much -- several hours after.
10   Q.  You don't know what PSI was coming out of the compressors
11   at that time, do you, 9 p.m. on June 24th, 2013?
12   A.  No.
13              MR. WOHLFEIL:  Nothing else.
14              THE COURT:  Can you put the two photos back up for
15   just a second that were shown to the witness of the inflation
16   device, the inflator?
17              MR. LASKE:  Yes, Your Honor.
18              THE COURT:  There were two photos, I'd like to see the
19   first of the two.
20              MR. LASKE:  Give us a second, we can try to do that.
21              THE COURT:  One was 147-16, I think.
22              MR. LASKE:  Yeah, I need to switch over the monitor.
23              MR. COYLE:  This is 147-15.
24              THE COURT:  This is the first one?
25              MR. LASKE:  Do you want to try to do a side by side?
```

1          THE COURT:  Can you show me the second one.

2          So Agent Swickheimer, looking at this photo, you see

3    the inflator itself with the lever that dispenses the air?

4          THE WITNESS:  Yes, sir, the hand valve, yes.

5          THE COURT:  There's some type of meter on this that

6    shows you the PSI or purports to show the PSI?

7          THE WITNESS:  There may have been, sir, but.

8          THE COURT:  You don't remember it?

9          THE WITNESS:  I was only putting four pounds of air, I

10   would just eyeball it.

11         THE COURT:  Okay.  Do you have any recollection of

12   whether there was or was not a meter on the inflator?

13         THE WITNESS:  I don't recall.

14         THE COURT:  All right.  I have nothing else.

15         MR. LASKE:  Can I ask the witness one more question.

16         THE COURT:  Sure, of course.

17                        REDIRECT EXAMINATION

18   BY MR. LASKE:

19   Q.  Can we look at Exhibit 147, page 43.

20       You see by this notice sign a little bit underneath it,

21   looks maybe even the size of this pen, looks like a gauge, had

22   you ever seen that before?

23   A.  I don't recall seeing it.

24         MR. LASKE:  I have nothing further, Your Honor.

25         THE COURT:  Okay.  Anything else from plaintiffs?

 1              MR. WOHLFEIL:  Yes, Your Honor.

 2              THE COURT:  All right.

 3                        RECROSS EXAMINATION

 4  BY MR. WOHLFEIL:

 5  Q.  We're showing you 147-7.  Agent Swickheimer, do you

 6  recognize what's in 147-7?

 7  A.  The four wheeler?

 8  Q.  Yeah.  Is that the size of tire that we're talking about?

 9  A.  Yes, sir.

10  Q.  Okay.  These are large tires, would you agree, on an ATV?

11  A.  Average ATV tires, yeah.

12  Q.  Much bigger than a wheelbarrow tire?

13  A.  Yes.

14              THE COURT:  Anything else?

15              MR. LASKE:  I have nothing further, Your Honor.  I

16  just wanted to move some exhibits in, but the witness can be

17  excused.

18              THE COURT:  All right.  Anything else of this witness?

19              MR. WOHLFEIL:  Nothing here.

20              THE COURT:  Thank you, Agent Swickheimer, you're

21  excused as a witness.  You may offer your exhibits now.

22              MR. LASKE:  Your Honor, these were stipulated to in

23  the pretrial order, so I don't believe there's any issue, but I

24  was just going to move in -- can we just move in the entire

25  147, so we don't have to keep?

```
1              THE COURT:  147 what through what?
2              MR. LASKE:  I think it's 1 through 52, 52.
3              THE COURT:  And this is a series of photos?
4              MR. CHAMBERS:  Correct.
5              MR. LASKE:  Yes, it's a series of photos taken that
6    evening.
7              THE COURT:  No objection, I take it, to that?
8              MR. CHAMBERS:  None, Your Honor.
9              THE COURT:  All right.  So that series of photos 1
10   through 52 on Exhibit 147 are all admitted.
11         (Defendant's Exhibit 147, Photos 1 through 52, was
12           received in evidence.)
13             THE COURT:  Let's take our noon break and if you'll be
14   kind enough to be back at 1, the government may continue with
15   its next witness at that time.  Can I see counsel briefly
16   before we leave.  I'd like to chat with you in chambers for
17   just a minute.
18             (Whereupon, a lunch recess was taken at 12:00 p.m.)
19             (End of morning session.)
20
21
22
23
24
25
```

1            COURT REPORTER'S CERTIFICATE

2

3      I, CYNTHIA R. OTT, Official Court Reporter, United States

4   District Court, Southern District of California, do hereby

5   certify that pursuant to 28 U.S.C. §753 the foregoing is a

6   true, complete and correct transcript of the stenographically

7   reported proceedings had in connection with the above-entitled

8   matter and that the transcript page format is in conformance

9   with the regulations of the Judicial Conference of the United

10  States.

11

12       DATED at San Diego, California, March 2, 2017.

13

14                         _____/s/ CYNTHIA R. OTT_____
                           CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25