1              United States District Court

2          For the Southern District of California

3

4
                                              )
5    RYAN MOORE,                              )
                                              )   No. 15-CV-75-LAB
6         Plaintiff,                          )
                                              )   March 2, 2017
7              v.                             )
                                              )   San Diego, California
8    UNITED STATES OF AMERICA and            )
     DOES 1 THROUGH 25, INCLUSIVE,           )
9                                            )
          Defendants.                        )
10

11              Day three (Afternoon Session)
                     Transcript of Trial
12          BEFORE THE HONORABLE LARRY ALAN BURNS
                 United States District Judge
13
     APPEARANCES:
14
     For the Plaintiff:      GOMEZ TRIAL ATTORNEYS
15                           ROBERT J. CHAMBERS
                             BEN WOHLFEIL
16                           655 West Broadway, Suite 1700
                             San Diego, CA  92101
17
     For the Defendants:     TIM L. LASKE
18                           GARRETT J. COYLE
                             ASSISTANT UNITED STATES ATTORNEYS
19                           Federal Building, Suite 7516
                             300 North Los Angeles Street
20                           Los Angeles, CA  90012

21

22

23
     Court Reporter:         DANA PEABODY, RDR, CRR
24                           District Court Clerk's Office
                             333 West Broadway, Suite 420
25                           San Diego, California, 92101

```
Case:  Moore v. USA
Date:  March 2, 2017
```

**INDEX OF WITNESSES**

FOR THE DEFENDANT:

E X A M I N A T I O N

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Daniel Smoak** | | | | |
| Mr. Laske | 627 | | | |
| Mr. Wohlfeil | | 632 | | |
| **Miguel Ponce** | | | | |
| Mr. Laske | 634 | | 656 | |
| Mr. Chambers | | 644 | | |
| **David Weber** | | | | |
| Mr. Laske | 657 | | | |
| Mr. Wohlfeil | | 667 | | |
| **Michael Martinez** | | | | |
| Mr. Laske | 669 | | | |
| Mr. Chambers | | 684 | | |
| **William Dana** | | | | |
| Mr. Laske | 692 | | | |
| Mr. Wohlfeil | | 703 | | |
| **Ted Evans** | | | | |
| Mr. Coyle | 705 | | 753 | |
| Mr. Chambers | | 741 | | |
| **Eric Deyerl** | | | | |
| Mr. Laske | 754 | | | |

1  Case:   Moore v. USA
   Date:   March 2, 2017
2

3

4                        **INDEX OF EXHIBITS**

5  **EXHIBIT**                                      **EVIDENCE**

6  52 and 55                                          692

7  56 and 57                                          654

8  410 and 270                                        692

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | San Diego, California, March 2, 2017                                  |
|       | 2  | * * *                                                                |
|       | 3  | THE COURT:  All right.  Counsel are present, the party               |
|       | 4  | and party representatives are present.                               |
| 01:04 | 5  | The government may call its next witness.                            |
|       | 6  | MR. LASKE:  Yes, Your Honor.                                         |
|       | 7  | **DANIEL SMOAK**,                                                     |
|       | 8  | DEFENDANT'S WITNESS, SWORN                                            |
|       | 9  | THE CLERK:  Would you state and spell your full name                 |
| 01:04 | 10 | for the record.                                                      |
|       | 11 | THE WITNESS:  Daniel Smoak, D-A-N-I-E-L S-M-O-A-K.                   |
|       | 12 | DIRECT EXAMINATION                                                    |
|       | 13 | BY MR. LASKE:                                                         |
|       | 14 | Q.  Good afternoon, Agent Smoak.                                      |
| 01:04 | 15 | A.  Good afternoon.                                                   |
|       | 16 | Q.  How long have you worked for the border patrol?                  |
|       | 17 | A.  Almost nine years.                                                |
|       | 18 | Q.  And where is your duty station?                                   |
|       | 19 | A.  Chula Vista station.                                              |
| 01:04 | 20 | Q.  How long has that been your duty station?                        |
|       | 21 | A.  The entire nine years.                                            |
|       | 22 | Q.  What is your current job title?                                   |
|       | 23 | A.  Border patrol agent.                                              |
|       | 24 | Q.  And do you work with a particular team?                          |
| 01:05 | 25 | A.  Just a regular line watch.                                        |

1  Q.   Are you a supervisor?

2  A.   No.

3  Q.   And what is your job title -- what was your job title in

4  June of 2013?

01:05  5  A.   Border Community Liaison Agent.

6  Q.   And what did you do as a border community liaison?

7  A.   I traveled from meeting to meeting in an official

8  government capacity.  I represented the border patrol to

9  different meetings, different aspects, presenting information

01:05  10  about what we do, representing the border patrol.

11  Q.   And would you have to -- it sounds like you had to drive a

12  lot?

13  A.   Yeah.

14  Q.   Were you given a government vehicle to do that?

01:05  15  A.   Yes.

16  Q.   What were your typical job hours, 9:00 to 5:00?

17  A.   Usually it was a 9:00 to 5:00 or 8:00 to 5:00, it could

18  vary, 6:00 to 4:00, later in the day.

19  Q.   And what was your typical workweek Monday through Friday or

01:05  20  a different schedule?

21  A.   Monday through Friday.

22  Q.   Was that the same June 24, 2013, which was a Monday?

23  A.   Yes.

24  Q.   Are you familiar with the compressed-air system at the

01:06  25  Chula Vista station near the garages?

|   |   |   |
|---|---|---|
| | 1 | A.  Yes. |
| | 2 | Q.  And what period of time had you had an opportunity to use |
| | 3 | the air compressor there to fill tires? |
| | 4 | A.  What period of time? |
| 01:06 | 5 | Q.  Yes.  Like a period of a couple months, a period of years? |
| | 6 | A.  Oh, it was a couple years. |
| | 7 | Q.  And did you have a chance to use the compressed-air system |
| | 8 | before Agent Moore's accident on June 24, 2013? |
| | 9 | A.  Yes. |
| 01:06 | 10 | Q.  How many times? |
| | 11 | A.  15 or 20. |
| | 12 | Q.  And what kind of tires were you inflating prior to June 24, |
| | 13 | 2013, or on that day? |
| | 14 | A.  The government tires for the vehicles. |
| 01:06 | 15 | Q.  Ever have a chance to inflate ATV tires? |
| | 16 | A.  Not at that point, no. |
| | 17 | Q.  How about truck tires? |
| | 18 | A.  Yes. |
| | 19 | Q.  And how about one of the Tahoes? |
| 01:07 | 20 | A.  Yes. |
| | 21 | Q.  Did -- in your experience, did you ever -- or did you ever |
| | 22 | see at Chula Vista any large trucks like a tractor-trailer or |
| | 23 | some kind of larger vehicle than a pickup truck? |
| | 24 | A.  I don't recall. |
| 01:07 | 25 | Q.  Have you ever seen a van? |

| | | |
|---|---|---|
| | 1 | A. Yes. |
| | 2 | Q. Is that the largest vehicle you've seen there? |
| | 3 | A. Yes. |
| | 4 | Q. And when was the first time you think you used the tire |
| 01:07 | 5 | inflater near the garages? |
| | 6 | A. Probably within a month of actually arriving at the |
| | 7 | station. |
| | 8 | Q. Did you ever see anybody inflate a wheelbarrow tire there? |
| | 9 | A. No. |
| 01:07 | 10 | Q. When was the last time you used the tire inflater and air |
| | 11 | hose near the garage either on or before June 24, 2013? |
| | 12 | A. It was the morning of. |
| | 13 | Q. How can you remember that date? |
| | 14 | A. It was my birthday. |
| 01:08 | 15 | Q. And daylight hours, nighttime? |
| | 16 | A. Probably 7:00 in the morning. |
| | 17 | Q. So, "Happy birthday, here's a flat to change"? |
| | 18 | A. Yes. |
| | 19 | Q. Can I have you look at Exhibit 147, page 15? |
| 01:08 | 20 | And did you use some kind of tire inflater to inflate your |
| | 21 | vehicle tires? |
| | 22 | A. Yes. |
| | 23 | Q. And if you look at that image on 147, page 15, is that what |
| | 24 | you used? |
| 01:08 | 25 | A. I believe so, yes. |

```
 1   Q.   And how did you determine if you needed to inflate a tire
 2   at that time that morning?
 3   A.   I had changed the tire out, and when I put a new tire on, I
 4   noticed it was low in comparison to the other tire.  So I
 5   increased the air in the tire.
 6   Q.   When you last used the tire inflater, did you have any
 7   problems with it?
 8   A.   No.
 9   Q.   Did you have any problems with the air hose?
10   A.   No.
11   Q.   And what kind of tire were you inflating at the time?
12   A.   Right on my government vehicle, the community liaison
13   vehicle.
14   Q.   SUV, compact car?
15   A.   Tahoe.
16   Q.   What's the maximum tire pressure on that Tahoe?
17   A.   I believe it's 35 pounds.
18   Q.   How long did it take to inflate the tire?  I think you
19   mentioned it was half full.
20   A.   Less than 30 seconds.
21   Q.   Do it all at once, or did you break it up?
22   A.   No, I usually did it three or four second spurt and would
23   check with the other tires and see if it was somewhere close.
24   Q.   And how did you know when to stop putting air in?
25   A.   In my experience with using tire deflators -- inflaters --
```

01:08

01:08

01:09

01:09

01:09

1   Q.   Did you eyeball it, for instance, or did you --

2   A.   Yeah, I looked at the other tires and seen if it looked

3   similar.

4   Q.   Okay.  And then were you ever injured by inflating the tire

01:10   5   that day?

6   A.   No.

7   Q.   Did you have any problems inflating the tire that day?

8   A.   No.

9   Q.   And have you ever been injured using the tire inflater

01:10   10   that's near the ATVs in the garage?

11   A.   No.

12   Q.   Have you ever been injured using the compressed-air system

13   at Chula Vista?

14   A.   No.

01:10   15   Q.   And other than Agent Moore, are you aware of anyone else at

16   Chula Vista who's suffered an injury using the tire inflater

17   that we're talking about?

18   A.   No.

19           MR. LASKE:  Nothing further, Your Honor.

01:10   20           THE COURT:  Cross-examination.

21           MR. WOHLFEIL:  Yes, Your Honor.

22                      CROSS-EXAMINATION

23   BY MR. WOHLFEIL:

24   Q.   Good afternoon.

01:10   25   A.   Good afternoon.

1   Q.   So you didn't witness what happened with Ryan Moore on June

2   24, 2013, did you?

3   A.   No.

4   Q.   You weren't anywhere near the inflater that Ryan Moore used

01:11   5   on June 24, 2013, a few minutes after 9:00 p.m.?

6   A.   No.

7   Q.   You don't know what PSI was coming out of these two

8   compressors that were behind the barbed-wire fence at that

9   time, do you?

01:11   10   A.   No.

11           MR. LASKE:   Nothing further from the government,

12   Your Honor.

13           THE COURT:   All right.   Thank you.

14       May Agent Smoak be excused?

01:11   15           MR. LASKE:   Yes.

16           MR. WOHLFEIL:   Yes.

17           THE COURT:   Thank you, Agent Smoak.   You're excused as

18   a witness.   You can stand down.

19       Next witness.

01:11   20           MR. LASKE:   The government will be calling agent David

21   Weber.   Actually, sorry.

22           THE COURT:   Not Weber?

23           MR. LASKE:   Ponce has been sitting out there for a

24   while, so he gets priority.

01:11   25           THE COURT:   The name of the witness you are calling?

1          MR. LASKE:  Miguel Ponce.

2                     **MIGUEL PONCE**,

3              DEFENDANT'S WITNESS, SWORN

4          THE CLERK:  Would you state and spell your full name

01:12   5   for the record.

6          THE WITNESS:  Miguel Ponce, M-I-G-U-E-L P-O-N-C-E.

7                   DIRECT EXAMINATION

8   BY MR. LASKE:

9   Q.   Good afternoon.

01:12   10  A.   Good afternoon.

11  Q.   How long have you worked for the border patrol?

12  A.   Since 2002, sir.

13  Q.   Where is your duty station?

14  A.   The Chula Vista station.

01:12   15  Q.   How long has that been your duty station?

16  A.   Since I first began my career.

17  Q.   In June of 2013, where were you assigned?

18  A.   I was assigned to the Critical Incident Investigative Team,

19  otherwise known as the CIIT team.

01:13   20  Q.   And where was that located?

21  A.   It was inside the Chula Vista station, sir.

22  Q.   How familiar are you to the area where the accident

23  happened?

24  A.   Very familiar.

01:13   25  Q.   And why is that?

1  A.   Prior to being on the CIIT team, I was on the ATV unit, and
2  our garage for the ATVs was pretty much right next to where the
3  incident occurred.
4  Q.   And where was CIIT in relation to the accident?
5  A.   The CIIT officer?
6  Q.   The CIIT office.
7  A.   About two buildings over to the incident scene, to the
8  garage.
9  Q.   What is your job title today?
10  A.   I'm a border patrol agent.
11  Q.   Are you a supervisor?
12  A.   No, sir.
13  Q.   And what was your job title at the time of the accident?
14  You were with the CIIT team.  Did you have an official title?
15  A.   No official title.
16  Q.   Just a team member?
17  A.   Correct.
18  Q.   And on the team, would you take different turns doing
19  different duties, or was it always the same?
20  A.   We would take turns doing different duties.
21  Q.   Can you describe what the duties were?
22  A.   You could be the team leader -- I'm sorry, the case agent
23  on one call-out, and then you would rotate with the other team
24  members.  If you weren't the case agent, you would be the field
25  evidence technician.  So then you would just rotate those

01:13

01:13

01:13

01:14

01:14

1    positions amongst the team members with each call-out.

2    Q.   And for this accident scene involving Agent Moore, what was

3    your role?

4    A.   I was the field evidence technician, sir.

01:14    5    Q.   And the case agent was?

6    A.   Lynsy Dornan.

7    Q.   So when did you first learn about the plaintiff's accident?

8    A.   That evening.

9    Q.   And who informed you?

01:15    10    A.   It was my supervisor at the time, Armando Gonzalez.

11    Q.   And then what did you do after learning of the accident?

12    A.   I went to the CIIT office to meet with the rest of the

13    team.

14    Q.   Anyone there when you got there?

01:15    15    A.   Lynsy was there.

16    Q.   And then did someone come after that?

17    A.   The third member, Elizabeth Deleon, showed up.

18    Q.   Anyone else?

19    A.   No, sir.

01:15    20    Q.   What time did you make your way to the accident scene?

21    A.   Specifically, I don't remember the time.

22    Q.   Maybe you can say after you arrived, how many minutes after

23    that did you go to the accident scene?

24    A.   I'd say about 30 minutes maybe after we talked a little

01:15    25    bit, kind of had a little debrief, and then headed over there.

1   Q.   When you arrived, did someone put some tape around it, or

2   did you do that?

3   A.   Someone had already cordoned off the area.

4   Q.   And when you got there, was it your understanding nothing

01:15   5   had been moved?

6   A.   Correct.

7   Q.   So no one came up to you and said, "we moved this item"?

8   A.   Correct.

9   Q.   What was your job at the accident scene?

01:16   10   A.   Assisting Lynsy and placing evidence markers around the

11   whole scene to document it.

12   Q.   Were you there when most of the photographs were taken?

13   A.   Yes, I was.

14   Q.   Did you take some of them?

01:16   15   A.   I did not.

16   Q.   So you arrive on scene.  Tell me what you do first.

17   A.   When Lynsy and I arrived on scene, we did a scene

18   walk-through, just to see what we had, to get a better

19   understanding of the scene in its entirety.

01:16   20      After we did that, then I believe Lynsy said, "I'm going to

21   be taking photographs."  So then that's what I started placing

22   the evidence markers.

23   Q.   And it looks like -- and we have some of the photos, but

24   actually we'll just pull up a random one.  How about 147-15.

01:16   25   So this photo -- there's no evidence marker, correct?

1   A.   Correct.

2   Q.   I think the next page, there might be one.  147-16.

3        So do you know the sequence of the photos?  Is it take a

4   photo, place a marker, take a photo, or is it take all the

01:17   5   photos and come back and place the markers?

6   A.   The sequence for the photos is you do the whole area, you

7   get it from all corners just to make sure you capture all four

8   corners of the area, and then you start zooming in on whatever

9   you want to zoom in on, and then once you -- in this instant,

01:17   10   number 3, once we identify that, that's when we place a marker,

11   so the photo -- I'm sorry, the marker dictates exactly what

12   we're focusing on with the picture.

13   Q.   And was that condition -- the condition the inflater was in

14   when you found it?

01:17   15   A.   Yes, sir.

16   Q.   So you didn't move it and take a photo?

17   A.   Correct.

18   Q.   And the hose that its connected to, is that the condition

19   that you found it in?

01:17   20   A.   Yes, sir.

21   Q.   I think if we take a step back to the previous photo

22   147-15, you can see the hose a little bit better, but that's

23   the condition it was?

24   A.   Yes, sir.

01:18   25   Q.   And it was reeled out like that?

639

1    A.   Yes, sir.

2    Q.   Someone didn't reel it back in, as far as you know?

3    A.   Correct.

4    Q.   What items did you collect that evening?

01:18    5    A.   That evening, we collected a rim, a tire, and an inner

6    tube.

7    Q.   And do you recall why those items?

8    A.   Based on the information that we had had from the injury

9    when we got there, those were the three ones that were there

01:18    10    and --

11    Q.   How was the injury described to you?  And I'm assuming

12    there was a call-out on the radio.

13    A.   To me, the call?  It was the phone.  When I first got the

14    call from Armando Gonzalez, there was an injury to an agent.

01:18    15    Q.   Okay.  Was there any description as to how the agent was

16    injured?  I imagine in your line of work, it could be anything.

17    A.   I don't recall exactly, but he might have specified it

18    involved a rim and an injury to the face.

19    Q.   Okay.  Did he say anything about a tire or no?

01:19    20    A.   To be completely honest, I don't recall if he did or not.

21    Q.   That's fine.

22         That evening, what were the conditions like when you

23    arrived?  It was probably at least after 9:00.

24    A.   Correct, it was dark, but there was ambient lighting from

01:19    25    the garage.

1  Q.  And where is the lighting in the garage?  Is it like flood

2  lights, or is there like a tall light, like a light pole?

3  A.  I believe there's at least one light pole, and then there's

4  a floodlight over by the -- off to the corner, the southeast

01:19  5  corner, I believe, but it was enough to where we can see fairly

6  decent.

7  Q.  So did you need flashlights to walk around?

8  A.  No.

9  Q.  If you did use flashlights, was it to find evidence or so

01:19  10  you didn't trip?

11  A.  Just to double-check we didn't miss anything because as you

12  walked further -- I believe it did get darker, but where the

13  scene itself happened, we didn't really need a flashlight.

14  Q.  Were there actually three flood lights, one was out, and

01:20  15  then there were two that was on?

16  A.  I don't recall.

17  Q.  Did you have any difficulty locating the tire?

18  A.  No, sir.

19  Q.  Any difficulty locating the rim?

01:20  20  A.  No, sir.

21  Q.  Any difficulty locating the tire inflater and the air hose?

22  A.  No, sir.

23  Q.  And big question; why didn't you take the tire inflater and

24  the air hose at that time?

01:20  25  A.  Like I said, our knowledge that was relayed to me was that

1    the injury was to the face from a rim and a tire, so when we

2    got there, those three items were right there, so we deemed

3    okay, this is our evidence right here.

4    Q.  And did CIIT determine a cause of the accident?

01:21    5    A.  No, sir.

6    Q.  Does CIIT ever determine the cause of an accident?

7    A.  No, sir.

8    Q.  Have you ever responded to an accident involving a tire

9    explosion?

01:21    10    A.  No, sir.

11    Q.  So this was the first one?

12    A.  Correct.

13    Q.  And I'm not limiting it to a wheelbarrow, just any tire

14    explosion?

01:21    15    A.  Correct.

16    Q.  Were you present the next morning when Rolando Pascua went

17    out to the same area?

18    A.  I was.

19    Q.  And why did you head out there?

01:21    20    A.  To witness a function test on the hose.

21    Q.  Did that occur?

22    A.  Yes.

23    Q.  What did you see?

24    A.  I observed Rolando inspect the hose, make sure it didn't

01:21    25    have any kinks, tears, and then he grabbed the inflater, the

1   lever, he squeezed it, you know, a couple of puffs of air came

2   out on the PSI meter, the little needle went up and down as he

3   squeezed it.

4   Q.   With his other hand, did he do anything with the end of the

01:22   5   tip or --

6   A.   I don't recall if he did or not.

7   Q.   Okay.  Did you happen to see the gauge or the indicator

8   inside the gauge move at all?

9   A.   I believe I did because he was holding it down, and he

01:22   10   squeezed it a couple times, and it was right here, I just

11   happened to look, and with each squeeze, it moved up and down.

12   Q.   And how close were you standing to him?

13   A.   Less than a foot away.

14   Q.   Like where that water pot is or closer?

01:22   15   A.   About right here, maybe.

16        MR. LASKE:  Okay.  For the record, the witness, I

17   think, indicated about a foot, maybe two feet.

18        THE COURT:  All right.

19   BY MR. LASKE:

01:22   20   Q.   At that time, do you recall why you didn't take the tire

21   inflater and the air hose?

22   A.   I was there for a functions test.  We didn't collect it the

23   day before.  It never occurred to me to collect it the day of

24   the functions test.  It wasn't the evidence.

01:22   25   Q.   Rolando Pascua, he works for what group?

1  A.  At the time I believe he was the lead mechanic for the

2  garage.

3  Q.  And equipment like tire inflaters and air hoses, what is

4  that considered?

01:23  5  A.  I'm sorry, say that again.

6  Q.  Something like a tire inflater and an air hose, what is

7  that considered?

8  A.  I --

9  Q.  In other words, is it garage equipment?  Is it something

01:23  10  else?

11  A.  It would be garage equipment.

12  Q.  And do you know who Ron Zermeno is from the union?

13  A.  I've heard of his name, yes.

14  Q.  Have you ever met him?

01:23  15  A.  I've met him.

16  Q.  Did Ron -- did you see Ron Zermeno the next day?

17  A.  I did not.

18  Q.  Did you see Ron Zermeno the evening of the accident?

19  A.  I did not.

01:23  20  Q.  Did Ron Zermeno ever tell you you need to keep the air hose

21  and the tire inflater?

22  A.  No, sir, he did not.

23  Q.  Did you direct anyone to dispose of the tire inflater and

24  air hose?

01:23  25  A.  No, sir, I did not.

1  Q.  And, to your knowledge, did anybody at CIIT direct anyone

2  to dispose of those items?

3  A.  To my knowledge, no.

4       MR. LASKE:  Nothing further, Your Honor.

01:24  5       THE COURT:  All right.  Cross-examination.

6                   CROSS-EXAMINATION

7  BY MR. CHAMBERS:

8  Q.  Good afternoon, Agent Ponce.

9  A.  Good afternoon, sir.

01:24  10  Q.  When you were out at the scene the night that Mr. Moore was

11  injured, one of the things that you were tasked with doing was

12  identifying and marking potential evidence.  Is that right?

13  A.  Correct.

14  Q.  And you walked around the scene, and we've seen in some of

01:24  15  the photos those little yellow evidence markers?

16  A.  Yes, sir.

17  Q.  That was you who placed those?

18  A.  Yes.

19  Q.  And you marked and collected, as we just heard, the rim,

01:24  20  the inner tube, and the tire, right?

21  A.  Yes, sir.

22  Q.  Anything else other than those three items?

23  A.  That we collected, no, sir.

24  Q.  And, in fact, you don't even remember if you considered the

01:24  25  air hose and the inflater to be evidence, right?

1    A.   Correct.

2    Q.   You can't tell us one way or another whether you think it's

3    evidence or not evidence, true?

4    A.   At the time we considered not evidence, but, like I said,

01:24   5    when we heard the information about Mr. Moore, that the injury

6    came from a rim, when we got there, that's what we saw, and

7    that's what we concentrated on.

8    Q.   So I'm sorry, did I hear you just say that you thought it

9    was evidence?

01:25   10   A.   It was not.

11   Q.   So you concluded when you were there on the scene that the

12   hose and the inflater was not evidence?

13   A.   Yes.

14   Q.   I'd like to read from your deposition, page 43, lines 19

01:25   15   through 21.

16           MR. LASKE:   What was the lines again?

17           MR. CHAMBERS:   19 through 21.

18           MR. LASKE:   Okay.

19   BY MR. CHAMBERS:

01:25   20   Q.   Okay.

21       "Question:   So you don't remember whether or not the hose

22   was evidence?

23       "Answer:   Correct."

24       I want to talk a little bit more about that evening while

01:25   25   you were out there.

1       As I understand it, you didn't take any video of the scene?

2    A.   Correct.

3    Q.   And Ms. Dornan was the one who was responsible for

4    photographing it?

01:25   5    A.   Yes.

6    Q.   And while you were out there, did you do anything at all to

7    inspect the hose?

8    A.   No, sir.

9    Q.   Did you handle the hose at all?

01:25   10   A.   No, sir.

11   Q.   Did you do anything to inspect the inflater to ensure that

12   it was working appropriately?

13   A.   The night of, no, sir.

14   Q.   And did you look at the gauge that was on the inflater to

01:26   15   determine whether or not it was functioning correctly?

16   A.   No, sir.

17   Q.   Did you go back behind the gate and inspect the

18   compressors?

19   A.   That area is locked, I believe.

01:26   20   Q.   So you couldn't access even if you wanted to?

21   A.   Correct.

22   Q.   And did you do anything to check what the PSI settings

23   would have been that evening?

24   A.   No, sir.

01:26   25   Q.   And I think we just heard that you were back out the next

1  morning for an inspection with Mr. -- Mr. Pascua?

2  A.  Yes, sir.

3  Q.  And was anybody else present other than just you and

4  Mr. Pascua?

01:26   5  A.  Just us two, sir.

6  Q.  And I think you said you saw Pascua holding the inflater

7  into the air and sort of puffing air out of it?

8  A.  It was more of a downward position, more or less, one, two,

9  three puffs, I believe.

01:26   10  Q.  And he's puffing it into the air?

11  A.  Yes, sir.

12         MR. LASKE:  Objection.  Misstates prior testimony.

13  The witness said he didn't recall.

14         THE COURT:  No, overruled.  He's answered that.  That

01:26   15  answer will stand.

16  BY MR. CHAMBERS:

17  Q.  So he's puffing it out into the air, and you see the gauge

18  moving on the PSI thing?

19  A.  Correct.

01:26   20  Q.  Just to be super clear on this, the end of the inflater, it

21  wasn't connected to a tire or anything, was it?

22  A.  No.

23  Q.  It wasn't connected to anything?

24  A.  The inflater itself?

01:27   25  Q.  The end where --

1   A.   Just the hose.  That's it.

2   Q.   Let me finish my question.

3       The end of the inflater where you'd stick it on a tire

4   normally, that was just held up into the air, correct?

01:27   5   A.   Correct.

6           MR. LASKE:  Objection, misstates the testimony.  He

7   said it was pointed down.

8           THE COURT:  It doesn't misstate his testimony.

9   Overruled.

01:27   10  BY MR. CHAMBERS:

11  Q.   And, again, when you were out there that next morning with

12  Mr. Pascua, did you do anything to check the compressors

13  themselves?

14  A.   No, sir.

01:27   15  Q.   Did you personally inspect the hose for any issues?

16  A.   No, sir.

17  Q.   And did you personally inspect the actual inflater?

18  A.   No, sir.

19  Q.   Mr. Pascua was the only one who handled it?

01:27   20  A.   Correct.

21  Q.   Now, at some point the hose was removed from the scene.  Is

22  that true?

23  A.   Yes.

24  Q.   And if I understand it correctly, you have no idea why that

01:27   25  happened?

```
        1   A.   No, sir.

        2   Q.   Nor any involvement in that?

        3   A.   No.

        4   Q.   At some point further down the road, a few months later,

01:28   5   people were looking for that hose, weren't they?

        6   A.   Yes.

        7   Q.   And you were contacted about that, weren't you?

        8   A.   Yes.

        9        MR. CHAMBERS:  Can I get Exhibit 56, please?

01:28  10   BY MR. CHAMBERS:

       11   Q.   I'll give you a moment to read Exhibit 56.

       12   A.   Okay.

       13   Q.   Do you recognize this, sir?

       14   A.   Yes.

01:28  15   Q.   This looks like it's an email from Michael Martinez to you?

       16   A.   Yes.

       17   Q.   From December of 2013?

       18   A.   Yes.

       19   Q.   Any reason to think that you never received this?

01:28  20   A.   To think I didn't receive it.  I received it.

       21   Q.   Do you recall receiving it?

       22   A.   Yes.

       23   Q.   And if we look into the text here, it looks like

       24   Mr. Martinez is looking for the hose.  Would you agree with

01:29  25   that?
```

1  A.  Yes.

2  Q.  And he's asking you if you can help him locate it?

3  A.  Yes.

4  Q.  When you received this email, you didn't have any idea

01:29  5  where the hose was.  Is that right?

6  A.  Correct.

7  Q.  And if you read further down, I think it's about the third

8  line there, Mr. Martinez is saying to you, "The last thing I

9  heard was that the garage was instruction [sic] to throw it

01:29  10  away."

11          MR. LASKE:  Objection.  Hearsay.

12          MR. CHAMBERS:  It's an admission, Your Honor.

13          THE COURT:  Overruled.

14    You may answer.

01:29  15         THE WITNESS:  I'm sorry.  Say the question one more

16  time.

17  BY MR. CHAMBERS:

18  Q.  Sure.  Mr. Martinez is telling you, "The last thing I heard

19  was that the garage was instruction [sic] to throw it away."

01:29  20    My question is, did you ever give an instruction to the

21  garage for them to throw the hose away?

22  A.  No, sir, I did not.

23  Q.  If we read a little further, it says, "Rolando was told the

24  case was closed."

01:29  25    Did you ever tell Mr. Pascua that the case was closed?

1  A.  I did not, sir.

2  Q.  And then Mr. Martinez continues, "Sorry, but he said the

3  instructions came from you."

4     Any idea why Mr. Martinez is attributing these instructions

01:29  5  to you?

6  A.  No, I don't.  No idea, sir.

7  Q.  You never had any discussion at all with Mr. Pascua about

8  disposal of the hose?

9  A.  I don't remember if I spoke with -- it was someone at the

01:30  10  garage, and it was kind of like, "Hey, do you guys still need

11  the hose?"  And I asked my supervisor, "Hey, the garage is

12  asking what's going on with the hose," and I believe he said,

13  "Well, we don't need it anymore."

14         MR. CHAMBERS:  All right.  Let's take a look at

01:30  15  Exhibit 57, please.

16  BY MR. CHAMBERS:

17  Q.  And I think this might be the email that you're referring

18  to.

19     If we look at the bottom, I think this is your email to

01:30  20  Mr. Martinez.  Is that correct?

21  A.  At the very bottom?

22  Q.  Yes.

23  A.  Yes.

24  Q.  And it's dated December 19th of 2013?

01:30  25  A.  Yes.

1    Q.   Do you recall sending this email to Mr. Martinez?

2    A.   I do.

3    Q.   And if you read the first and second line, it says, "I told

4    Rolando that we wouldn't be taking the hose and nozzle and to

01:30    5    do whatever he needed to do with it."

6         What does that mean?

7    A.   Since we weren't taking it, we weren't going to be using

8    it.  If he wanted to keep it or -- I mean, whatever he wanted

9    to do with it, that was up to him, his call.

01:31    10   Q.   But that's not your call to make as a CIIT team member, is

11   it?

12   A.   Well, after my supervisor told me hey, we're good, we don't

13   need it, then that's what I relayed the information to Rolando

14   Pascua.

01:31    15   Q.   Let me make sure I understand the chronology.

16        Mr. Martinez reaches out to you to find out where the hose

17   is.  Is that right?

18   A.   Are you asking the chronological order between Mr. Martinez

19   and then from when I relayed the message?

01:31    20   Q.   Well, if you could answer that question, we'll get to the

21   chronology?

22   A.   Well, I don't want to mess up the chronological order.

23   Q.   My question right now is simply, did this start off with

24   Mr. Martinez asking you if you knew where the hose was?

01:31    25        MR. LASKE:  Objection.  Vague.  What is "this"?

```
 1              THE COURT:  Sustained.
 2         You're talking about the email?
 3              MR. CHAMBERS:  Yes.
 4    BY MR. CHAMBERS:
 5    Q.  Why don't we start again.
 6         I'm trying to understand the chronology of everything.
 7         We're looking at these emails.  Mr. Martinez reached out to
 8    you and asked you if you knew where the hose was.  Isn't that
 9    true?
10    A.  Yes.
11    Q.  And at that point in time, did you then call your
12    supervisor and ask your supervisor any questions?
13    A.  I believe the first thing that happened was the garage
14    reached out to me saying do you need it.  I asked my
15    supervisor.  He said no, we don't need it.  And then I relayed
16    that right here where it says, "We don't need it.  Do whatever
17    you want."  And then after, I believe, is when Michael Martinez
18    sent me the email.
19    Q.  Okay.  Do you recall when it was that the garage reached
20    out to you?
21    A.  I don't.
22    Q.  And who did you talk to, your supervisor that gave you
23    permission to do with the hose whatever you'd like?
24    A.  Armando Gonzalez.
25    Q.  And Mr. Gonzalez told you that you could dispose of the
```

01:31
01:32
01:32
01:32
01:32

```
        1   hose?
        2   A.   No, he told me to relay to the garage that we don't need it
        3   and they can do whatever they want with the hose.
        4   Q.   And you don't recall when this was?
01:32   5   A.   No.
        6   Q.   And it was not via email?
        7   A.   No.
        8   Q.   Telephone call or in person?
        9   A.   Telephone call.
01:32   10  Q.   And that would have preceded this email that we see here,
        11  correct?
        12  A.   I believe so, yes.
        13          MR. CHAMBERS:  I'd like to offer Exhibits 56 and 57
        14  into evidence, Your Honor.
01:33   15          THE COURT:  Any objection to these?
        16          MR. LASKE:  No objection, Your Honor.
        17          THE COURT:  All right.  Both are received.
        18      (Exhibit 56 and 57 admitted.)
        19          MR. CHAMBERS:  I have no further questions.
01:33   20  Thank you, Agent Ponce.
        21          MR. LASKE:  I have no further questions, Your Honor.
        22  You can step down.
        23          THE COURT:  I have --
        24          MR. LASKE:  Sorry.
01:33   25          THE COURT:  When Mr. Pascua was inspecting the
```

        1   inflater and the hose, were you watching what he was doing?

        2          THE WITNESS:  I was, Your Honor.

        3          THE COURT:  You said you saw him squirt air out of the

        4   end of the inflater; in other words, test it to make sure it

01:33   5   was functioning and producing air?

        6          THE WITNESS:  Yes, Your Honor.

        7          THE COURT:  Did you ever see him try to test the

        8   pressure or put his finger on the end of the --

        9          THE WITNESS:  I don't recall him doing that, sir.

01:33  10   Your Honor, I apologize.

       11          THE COURT:  But you believe you were watching him the

       12   whole time?

       13          THE WITNESS:  I was.

       14          THE COURT:  If he testified that he did that, what

01:34  15   would your -- what would your reaction be, that he didn't do

       16   it, you can say for sure that he didn't, or you didn't see it

       17   if he did that?

       18          THE WITNESS:  I don't remember if he did or not.  I

       19   just remember him squeezing the lever.  Whether he did this, I

01:34  20   don't remember.

       21          THE COURT:  Okay.  How close were you when Mr. Pascua

       22   was inspecting the end of the inflater and the hose?  How close

       23   to him were you?

       24          THE WITNESS:  About a foot away.

01:34  25          THE COURT:  And was your attention concentrated on

| | |
|---|---|
| 1 | him, or were you doing other things? |
| 2 | THE WITNESS:  Maybe taking a note here and there, but |
| 3 | for the most part, looking at him, Your Honor. |
| 4 | THE COURT:  Okay.  Any other questions based on the |
| 01:34  5 | Court's questions? |
| 6 | MR. LASKE:  Just one question. |
| 7 | REDIRECT EXAMINATION |
| 8 | BY MR. LASKE: |
| 9 | Q.  Since you were actually relatively close, do you recall if |
| 01:34  10 | you were focusing in on the bubble gauge, because the hose is |
| 11 | about 12 inches or so, or were you looking at the end of it, or |
| 12 | really at the whole thing? |
| 13 | A.  I was probably looking at the end with the lever portion of |
| 14 | it. |
| 01:35  15 | Q.  Okay. |
| 16 | MR. LASKE:  Nothing further, Your Honor. |
| 17 | THE COURT:  Anything else? |
| 18 | MR. CHAMBERS:  No, Your Honor. |
| 19 | THE COURT:  All right.  Thank you.  You may be |
| 01:35  20 | excused. |
| 21 | THE WITNESS:  Thank you. |
| 22 | THE COURT:  Next witness. |
| 23 | |
| 24 | |
| 25 | |

1          MR. LASKE:  The next witness is David Weber.  Agent

2     Weber.

3                          **DAVID WEBER**,

4                   DEFENDANT'S WITNESS, SWORN

01:35   5          THE CLERK:  Would you state and spell your full name

6     for the record.

7          THE WITNESS:  David Weber, W-E-B-E-R.

8          THE CLERK:  Thank you.

9                        DIRECT EXAMINATION

01:36   10    BY MR. LASKE:

11    Q.   Good afternoon, Agent Weber.

12    A.   Good afternoon.

13    Q.   How long have you worked at the border patrol?

14    A.   A little over eight years.

01:36   15    Q.   And what is your current job title?

16    A.   Border patrol agent.

17    Q.   Are you with a particular group?

18    A.   No, just line watch agent.

19    Q.   Are you a supervisor?

01:36   20    A.   No.

21    Q.   Have you been in the past?

22    A.   No.

23    Q.   And what was your job title back in June of 2013?

24    A.   I was the Vehicle Control Officer.

01:36   25    Q.   And what is a Vehicle Control Officer?

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | A.   I was pretty much the liaison between the garage and the          |
|       | 2  | station.   The vehicles need to get services, agents would write       |
|       | 3  | them up, and then I'll bring up the keys and give them to the          |
|       | 4  | shop later, and he'll assign the work.                                 |
| 01:36 | 5  | Q.   Any other tasks that you perform?                                 |
|       | 6  | A.   Also ordering fuel and keep track of fuel, smogs, and stuff       |
|       | 7  | like that.                                                             |
|       | 8  | Q.   How many vehicles are we talking about?                           |
|       | 9  | A.   Probably about 250, I think at the time.                          |
| 01:37 | 10 | Q.   Would that include things like vans?                              |
|       | 11 | A.   Yes.                                                              |
|       | 12 | Q.   And it would include things like pickup trucks?                   |
|       | 13 | A.   Yes.                                                              |
|       | 14 | Q.   ATVs, or is that different?                                       |
| 01:37 | 15 | A.   We also manage some of the ATVs.                                  |
|       | 16 | Q.   And then passenger cars?                                          |
|       | 17 | A.   Yes, for the unmarked.                                            |
|       | 18 | Q.   Am I missing any other vehicles?                                  |
|       | 19 | A.   No.   I think we had a couple fuel trucks.                        |
| 01:37 | 20 | Q.   When you say fuel trucks, can you describe what that is?          |
|       | 21 | A.   It's a truck, like a dually, and it has a portable tank on        |
|       | 22 | it so we can fill up vehicles in the field or equipment, heavy         |
|       | 23 | equipment.                                                             |
|       | 24 | Q.   How long did you have that?                                       |
| 01:37 | 25 | A.   Excuse me?                                                        |

659

|    |    |                                                                        |
|----|----|------------------------------------------------------------------------|
| 1  | Q. | How long did you have that fuel truck?                                 |
| 2  | A. | I think we still have them.                                            |
| 3  | Q. | Okay.  Do you know how many PSIs those tires take?                     |
| 4  | A. | The fuel trucks?                                                       |
| 5  | Q. | Yes.                                                                   |
| 6  | A. | I'm not sure, no.                                                      |
| 7  | Q. | Did you work with anyone as a VCO?                                     |
| 8  | A. | Yes.                                                                   |
| 9  | Q. | Who did you work with?                                                 |
| 10 | A. | Chris Jones is my partner.                                             |
| 11 | Q. | And anyone else?  Do you have a supervisor or someone?                 |
| 12 | A. | At the time, my supervisor was Mike Martinez.                         |
| 13 | Q. | And this is June of 2013?                                              |
| 14 | A. | Yes.                                                                   |
| 15 | Q. | Agent Jones, same job, different job?                                  |
| 16 | A. | Same job.                                                              |
| 17 | Q. | And why two of you?                                                    |
| 18 | A. | A lot of the things we do, it takes more than one person.            |
| 19 |    | You have to shuttle a vehicle, you know, drop one off, pick two       |
| 20 |    | up, or like smog checks, drop a couple off, pick two up, and --       |
| 21 | Q. | How long were you a VCO?                                               |
| 22 | A. | Three years, three and a half years.                                  |
| 23 | Q. | Do you recall when you started and when you terminated --             |
| 24 | A. | April 2011 to October 2014.                                            |
| 25 | Q. | And when did you first hear about the accident involving              |

1    Agent Moore?

2    A.   When I -- I guess the day following the accident when I

3    came into work, we got a phone call.  I don't know if Chris was

4    already there or I got the phone call, I can't remember, but

01:39   5    they said there was an accident the night before and they

6    needed our help to clean up the scene.

7    Q.   Did they tell you anything about the accident?

8    A.   No.

9    Q.   So they didn't -- because I imagine, you know, border

01:39   10    patrol, there potentially could be a number of different types

11    of accidents that occur?

12    A.   Yes.

13    Q.   So they didn't describe the type of accident?

14    A.   No, I can't remember that being described.

01:39   15    Q.   And who called you?

16    A.   I believe it was Mike Martinez.

17    Q.   Who was Mike Martinez again?

18    A.   Supervisor.

19    Q.   And what time do you think you arrived at work?

01:39   20    A.   I started about 7:00, so I mean it might have been 7:00,

21    7:15, 7:30.  It was right when I got there.

22    Q.   When you got that phone call?

23    A.   Yeah.

24    Q.   And then what did you do next?

01:40   25    A.   Chris and I went to the back because it's right out the

1    back by the tire shop, and we helped clean it up.

2    Q.   And I don't think I asked you this.  Where is your office

3    located in relation to the tire inflater at issue?

4    A.   It would be -- it's the garage.  Our office is in the

01:40   5    actual garage, which would be just kind of right next to it.

6    Q.   Okay.

7    A.   There's a parking lot behind the garage, and that's where

8    the tire shop is.

9            MR. LASKE:  So, Your Honor, we're going to pull up

01:40   10   Exhibit 308 briefly, and this is an aerial view of the

11   Chula Vista station.  I think it's actually orientated where

12   the top of 308 is focused -- it actually puts south at the top

13   of the page, and north is at the bottom.

14   BY MR. LASKE:

01:40   15   Q.   So when you look at it, that's the orientation, and it will

16   pop up on your screen in a second.  There we go.

17           So you see a red circle in this picture?

18   A.   Yes.

19   Q.   Can you tell me if you recognize that building?  And,

01:41   20   again, the orientation is south at the top, north at the

21   bottom?

22   A.   Yeah, that's the garage.

23   Q.   And is that where you worked?

24   A.   Yes.

01:41   25   Q.   And you worked there for roughly a little over three years?

```
 1   A.   A little over three years.
 2   Q.   And when you went down to the site, what did you do?
 3   A.   Well, I think I was using the hose.  One was using like
 4   litter to -- there's still some blood puddles, so they had to
 5   soak that up and then brush it out with a broom, and then I
 6   just kind of follow up and rinse it up.
 7   Q.   When you say "hose," are we talking about --
 8   A.   Water hose.
 9   Q.   And at some point did you happen to see the tire inflater
10   and the air hose?
11   A.   I can't remember.  I don't know.
12   Q.   At some point, did you come in contact with it, whether
13   it's that day or a different day?
14   A.   No, the inflater hose was in our office sometime after the
15   incident, yes.
16   Q.   And when you're using the term "inflater hose," are we
17   talking about the tire inflater and the air hose?
18   A.   Yes.
19   Q.   And are you calling it that because they were connected in
20   some way?
21   A.   I believe -- yes, yes, there was a hose and the inflater
22   itself.
23   Q.   When it was in your office, were those two pieces taken
24   apart from each other, or were they still connected?
25   A.   I think they were connected still.
```

01:41 (line 5)
01:42 (line 10)
01:42 (line 15)
01:42 (line 20)
01:42 (line 25)

```
         1   Q.   Where did you -- where did you put the -- or did you put

         2   that item in your office?

         3   A.   When I saw it, it was just in the corner of our office in

         4   a -- like a clear trash bag.

01:42    5   Q.   Did Ron Zermeno, the union representative, ever tell you to

         6   do anything particular with the tire inflater?

         7   A.   No.

         8   Q.   Did Zermeno ever talk to you the day after the accident?

         9   A.   Not that I remember.

01:43   10   Q.   And did he ever talk to you at any other day about the tire

        11   inflater?

        12   A.   No.  I'm not really even sure who Ron Zermeno is.

        13   Q.   So you've never met him?

        14   A.   I can't put a -- I know the name, but I can't put a face to

01:43   15   it.

        16   Q.   When did you learn that the tire inflater and air hose had

        17   gone missing?

        18   A.   When -- I got a phone call from Mike Martinez, and he was

        19   like, "Hey, where's the hose?"  Or, "I need the hose."  And I

01:43   20   said, "All right.  Hold on.  Let me look".  And I looked in the

        21   corner to where it was, and it wasn't there.  So I said,

        22   "Mike," you know, "it's not here."

        23   Q.   And Mike called you or you called him?

        24   A.   He called me.

01:43   25   Q.   And you distinctly remember that conversation?
```

```
      1   A.   Yes.
      2   Q.   Do you remember when that happened, when that call
      3   happened?
      4   A.   No, I don't know the date, no.
01:44  5   Q.   Can you estimate when is the last time you saw the air hose
      6   based on the information that you remember?
      7   A.   I can't, no.
      8   Q.   What did you do to attempt to find these items?
      9   A.   I looked through all the bays.  There was like some storage
01:44  10  stuff inside one of the bays where they keep like old tools and
      11  stuff, so I looked there, I looked in the office, Rolando's
      12  office.  Just anywhere connected to the garage, I kind of just
      13  looked around, and I couldn't find it.
      14  Q.   How big is your office?
01:44  15  A.   It's probably ten by ten.
      16  Q.   So it was pretty -- I mean, did you turn over every item,
      17  open every drawer?
      18  A.   Yeah.
      19  Q.   And you never found it?
01:45  20  A.   I never found it, no.
      21  Q.   Did you talk to Chris Jones, your VCO partner?
      22  A.   Yes.
      23  Q.   Did Jones know where it went?
      24  A.   No.
01:45  25  Q.   Did you talk to Rolando Pascua?
```

1  A.   Yes.

2  Q.   And did Rolando know where it went?

3  A.   No.

4  Q.   Did you draw some kind of conclusion based on your attempts

01:45   5  to find it?

6  A.   Our conclusion was that it was missing, gone missing.

7  Q.   And did you ever think at some point there might be a

8  lawsuit involved where someone would need the tire inflater and

9  the air hose?

01:45   10  A.   No.

11  Q.   Did you think it was evidence of border patrol agent

12  Moore's accident?

13  A.   No.

14  Q.   And did you direct anyone to dispose of the tire inflater

01:45   15  and the air hose?

16  A.   No.

17  Q.   Did anyone direct you to do that?

18  A.   No.

19  Q.   And did you dispose of the tire inflater and the air hose?

01:45   20  A.   No.

21  Q.   And during your time as a VCO, in the VCO office, did you

22  have occasion to use the tire inflater?

23  A.   Yes, I've used it.

24  Q.   Do you recall what period of time?

01:46   25  A.   No.  Sometime between when I started as VCO and the

accident.

Q.   So sometime in that -- I think you ended your term a few months after the accident, so roughly three years, maybe a little bit beyond that?

01:46    A.   Yes.

Q.   How many times do you think you used it in that period of time?

A.   At least three times.

Q.   And around that time that you were a VCO, what kind of car

01:46    did you own?

A.   I have an Acura, 2007 Acura TSX.

Q.   Does the TSX have any way of telling you you need to change your -- or put more air in the tires?

A.   Yes, it has a readout that -- or it shows you the exact

01:47    tire pressure for each tire.

Q.   So, for instance, if your pressure was 28, it's actually going to say "28" on it?

A.   Yes.

Q.   It won't just show one of those flat tire symbols?

01:47    A.   No, it will show the exact pressure.

Q.   And during the times you'd inflated in the past, how did you know when to stop putting air in?

A.   When -- well, I'd look at the air hose and say, "All right, 32."  And then I'd look at the vehicle and see 32.  If it's a

01:47    little low, I'd pump a little more air until the vehicle said

1    the correct pressure.

2    Q.   And in your experience, although it was only three times,

3    did those pressures match?

4    A.   Yeah, I don't remember any major discrepancy.

01:47    5    Q.   And, again, I'm talking about between the tire inflater

6    gauge and the reading in your car.

7    A.   Yes.

8         MR. LASKE:  Nothing further, Your Honor.

9         THE COURT:  All right.  Cross-examination.

01:47    10        MR. WOHLFEIL:  Yes, Your Honor.

11                   CROSS-EXAMINATION

12   BY MR. WOHLFEIL:

13   Q.   Good afternoon, Agent Weber.

14   A.   Good afternoon.

01:47    15   Q.   So I know you talked about this a little bit on direct, but

16   I just want to clarify.  You were a VCO at the Chula Vista

17   border patrol station from April 2011 to October 2014.  Is that

18   right?

19   A.   Yes, sir.

01:48    20   Q.   And during that entire time, Supervisor Martinez was your

21   supervisor?

22   A.   Yes, sir.

23   Q.   VCOs, or Vehicle Control Officers, are not evidence

24   custodians, are they?

01:48    25   A.   No.

1  Q.   Your office, the VCO office, was not a security office, was

2  it?

3  A.   No.

4  Q.   The call that you described before when Supervisor Martinez

01:48  5  called you looking for the inflater and the hose, that occurred

6  about six months before you stopped being VCO.  Is that right?

7  A.   I'm not sure of the exact date, no.

8  Q.   But it was approximately six months before?

9         MR. LASKE:  Objection.  Asked and answered.

01:48  10        THE WITNESS:  I'm not sure.

11        THE COURT:  No, the answer will stand.

12     Next question.

13        MR. WOHLFEIL:  Your Honor, I'd like to read from Agent

14  Weber's deposition transcript.

01:48  15        THE COURT:  All right.

16        MR. WOHLFEIL:  Page 27, line 7 through 13.

17     "Question:  How long after you got the phone call did you

18  leave or stop being VCO?

19     "Answer:  I don't know.  Maybe six months.

01:49  20     "Question:  We're talking about April 2014 then?

21     "Answer:  I'm not sure.  I don't know.

22     "Question:  Your best estimate is six months?

23     "Answer:  Somewhere around then maybe."

24        THE COURT:  Were you asked those questions, and did

01:49  25  you give those answers at an earlier deposition?

     1          THE WITNESS:  Yes.

     2          THE COURT:  All right.

     3          MR. WOHLFEIL:  I have no more questions, Your Honor.

     4          THE COURT:  Anything else on behalf of the

01:49     5  United States?

     6          MR. LASKE:  No, Your Honor.

     7          THE COURT:  All right.  May this gentleman be excused?

     8          MR. WOHLFEIL:  Yes, Your Honor.

     9          THE COURT:  All right.  Agent Weber, thank you.

01:49    10  You're excused.

    11          THE WITNESS:  Thank you.

    12          THE COURT:  Next witness.

    13          MR. LASKE:  Supervisory Border Patrol Agent Michael

    14  Martinez.

01:49    15                    **MICHAEL MARTINEZ,**

    16                  DEFENDANT'S WITNESS, SWORN

    17          THE CLERK:  Would you state and spell your full name

    18  for the record.

    19          THE WITNESS:  My name is Michael Joseph Martinez,

01:50    20  M-I-C-H-A-E-L J-O-S-E-P-H M-A-R-T-I-N-E-Z.

    21                    DIRECT EXAMINATION

    22  BY MR. LASKE:

    23  Q.  Good afternoon, Agent Martinez.

    24  A.  Good afternoon.

01:50    25  Q.  Sorry to make you come back two days in a row.  I hope

1    traffic was light.

2         How long have you worked for the border patrol?

3    A.   I was employed with the border patrol on November 16th,

4    1998.

01:51   5    Q.   And what is your job title?

6    A.   My current title is supervisory border patrol agent.

7    Q.   How long has that been your title?

8    A.   I was promoted in October of 2007.

9    Q.   And in June of 2013, what was your title?

01:51   10   A.   I was a supervisor assigned to the special operations

11   supervisor office.  I was in charge of tactical infrastructure,

12   maintenance, fleets, inventory, health and safety, and I was in

13   charge of the agents assigned to the garage.

14   Q.   Would that include the garage personnel?

01:51   15   A.   It would be the agents assigned.  They're called the

16   Vehicle Control Officers, so agents assigned to assist the

17   mechanics.

18   Q.   And June of 2013, how many VCOs were there?

19   A.   There was three at the time.

01:52   20   Q.   Why three?  We heard testimony that there may have been

21   only two.

22   A.   That's correct.  Dave Weber and Chris Jones were the

23   assigned VCOs, and at the time, there was a light-duty agent

24   that was assigned to the VCOs, Dave Ibarra, so he was just

01:52   25   temporarily assigned to the VCOs.

1  Q.   And you mentioned one of your job duties as supervisor of

2  SOS was to deal with health and safety-related issues?

3  A.   That's correct.

4  Q.   And could you kind of go into a little bit of detail what

01:52  5  that would involve?

6  A.   Sure.  At the time, that was there, Ron Zermeno, who's one

7  of the union reps, he would send me documents of items that

8  needed to be corrected at the station.

9  Q.   And as a union representative, did Ron Zermeno ever

01:52  10  identify any potential safety hazards at Chula Vista?

11  A.   He had some, yes.

12  Q.   Any involving the equipment that's at issue in this case,

13  which would be the two air compressors, the tire inflater, and

14  the air hose near the tire-filling station by the ATVs?

01:53  15  A.   No.

16  Q.   How many reports from Ron Zermeno would you receive in your

17  role as supervisor of SOS?

18  A.   At that time, he submitted quite a few.  There was probably

19  a packet of seven different areas, but most of those didn't

01:53  20  involve our buildings.  They were ones that I was responsible

21  for.

22  Q.   And would those also involve the building where the air

23  compressor is located?

24  A.   There would have been for the garage, correct.

01:53  25  Q.   Any of those relating to, again, the air compressors, the

         1   tire inflater, or the air hose?

         2   A.   No.

         3   Q.   Did Ron Zermeno ever complain about any issues regarding

         4   warnings?

01:54    5   A.   No.

         6   Q.   And, again, maybe I should -- on behalf of the union, did

         7   Ron Zermeno ever complain about any issues regarding warnings

         8   by the filling station?

         9   A.   No.

01:54   10   Q.   Did Ron Zermeno, on behalf of the union, complain about any

        11   issues regarding training to the agents to inflate tires?

        12   A.   No.

        13   Q.   Did anyone identify any potential hazard involving the

        14   compressed-air system, to your knowledge?

01:54   15   A.   No.

        16   Q.   Where were you stationed in June of -- sorry.

        17        How long have you been at the Chula Vista station?

        18   A.   Over 18 and a half years.

        19   Q.   Same station?

01:54   20   A.   Same station.

        21   Q.   And have you been to the location where this accident

        22   happened?

        23   A.   Yes, many times.

        24   Q.   How many times before the accident?

01:55   25   A.   At that time, it would have been 15 years there.  I would

| | |
|---|---|
| 1 | imagine 20 times, if not more. |
| 2 | Q.   How close was your office to the VCOs? |
| 3 | A.   200 to 300 yards.  Just up the hill. |
| 4 | Q.   Okay.  And how far away is that from the location where the |
| 5 | tire-filling station was? |
| 6 | A.   The VCO office and the tire station? |
| 7 | Q.   Your office. |
| 8 | A.   My office?  Same area.  So same distance. |
| 9 | Q.   In your 18 years at the Chula Vista station, did you ever |
| 10 | have occasion to use the tire inflater in the area where this |
| 11 | accident occurred? |
| 12 | A.   Yes, I have. |
| 13 | Q.   What period of time are we talking about? |
| 14 | A.   Of course, some days I used it more.  I was on ATVs.  But I |
| 15 | would say at least once a year I'd probably use it. |
| 16 | Q.   What's significant about being on ATVs? |
| 17 | A.   It's just those -- the tires get deflated easier, so you're |
| 18 | using it quite a bit. |
| 19 | Q.   How long were you with the ATV unit? |
| 20 | A.   Probably a total of three and a half years. |
| 21 | Q.   Okay.  What period of time are we talking about? |
| 22 | A.   That's probably 2005, 2007, somewhere around there. |
| 23 | Q.   When is the last time you think you used the tire inflater |
| 24 | before the accident? |
| 25 | A.   I would say the accident was in June of 2013.  I was |

01:55
01:55
01:56
01:56
01:56

1   still -- I had a vehicle where I took out in the field.  I'd

2   say within 12 months of that time.

3   Q.  Once, twice?

4   A.  I don't recall.  Maybe once or twice.  That's all I can --

01:56   5   Q.  How would you know how much air to put in the tires?

6   A.  I would use the air hose, the gauge on there.

7   Q.  Have you ever seen someone put a portable gauge maybe the

8   size of this pen and clip it on to the fence there?

9   A.  No.

01:57   10  Q.  Did you ever have any problems with the gauge?

11  A.  No.

12  Q.  Did you ever suffer any injuries from using the tire

13  inflater?

14  A.  No.

01:57   15  Q.  And other than Agent Moore, are you aware of anyone at the

16  Chula Vista station who suffered injury from using that tire

17  inflater?

18  A.  No.

19  Q.  When did you first hear about the accident?

01:57   20  A.  It would have been that evening, on June 24th, 2013.  I

21  received a text from one of our friends, and then I called them

22  back that same evening.

23  Q.  Were you -- where were you at that time?

24  A.  I was at home.  It was late.  I was getting ready for bed.

01:57   25  Q.  Did you eventually make it to the scene?

1  A.  I did the next day, the next morning.  I started work at

2  7:00.

3  Q.  And did someone contact you?

4  A.  That morning when I was reviewing my emails, I received an

01:58   5  email from the watch commander, Jeff Milke.

6  Q.  And what did Milke ask you to do?

7  A.  Milke asked me to have the garage check the compressor and

8  hose to make sure it was safe.

9  Q.  Did you do that yourself?

01:58  10  A.  No, I did not.

11  Q.  Did you ask someone to do that?

12  A.  Yes, I called the lead garage mechanic, Rolando, and asked

13  him to do a safety check on the hose and the compressor.

14  Q.  Is that Rolando Pascua?

01:58  15  A.  Yes, it is.

16  Q.  And did you go to the site that next morning?

17  A.  I did.

18  Q.  Roughly what time?

19  A.  I would say probably shortly after I called him, so maybe

01:58  20  7:45, 8:00.

21  Q.  You don't have to go into too much detail, but did you go

22  to watch Rolando do the safety check, or was there another

23  reason?

24  A.  No, I just went there to see the site and to direct the

01:59  25  VCOs to clean up the site.

1   Q.   What did you ask Rolando to do specifically?

2        Sorry.

3        Do you know whether or not the air hose was removed?

4   A.   When I arrived, the air hose was still on the fence, so

01:59   5   when I was at the site there, the VCOs were with me.  Rolando

6   was there.  And I asked Rolando to go ahead and take the air

7   hose off the fence and give to it the VCOs.

8   Q.   And could you tell us roughly -- say Rolando is checking

9   the tire inflater -- what were the VCOs doing at that time?

01:59   10   You don't have to get into great detail.

11   A.   I don't remember -- Rolando checking the tire inflater at

12   that time.

13   Q.   You didn't --

14   A.   I didn't see him, no.  He was -- just happened to be there,

01:59   15   and we were talking.

16   Q.   You don't know if the VCO's caught anything of what he was

17   doing?

18   A.   No, I don't know.  I was only there for five, ten minutes.

19   Q.   And the tire inflater and air hose, do you know where that

01:59   20   ends up next once it's removed?

21   A.   When I instructed them -- Rolando to take it down, I asked

22   him to give it to the VCOs, and I asked the VCOs to put it in a

23   bag, tag it, and put it in the rafters.

24        MR. LASKE:  And can we look at Exhibit 410?

25

```
 1   BY MR. LASKE:
 2   Q.   And the top image, I believe it's --
 3   A.   I see it.
 4   Q.   Is that the tire inflater?
 5   A.   Yes.
 6          MR. LASKE:  And can we look at Exhibit -- for the
 7   Court, can we look at Exhibit 147, page 15?
 8   BY MR. LASKE:
 9   Q.   Is that the same tire inflater and air hose?
10   A.   Yes.
11          MR. LASKE:  And can we look at Exhibit 147, 43?
12   BY MR. LASKE:
13   Q.   Same air hose?
14   A.   Yes, it is.
15   Q.   When you saw it in the bag, was it all connected, the hose
16   and the inflater still?
17   A.   It wasn't in the bag at the time.  I asked them to take it
18   down and give it to the VCOs and for those guys to bag it.  I
19   never saw the hose or the bag anytime after this.
20   Q.   Did Ron Zermeno ask you to keep the tire inflater and air
21   hose?
22   A.   No.
23   Q.   Did you witness Ron Zermeno talk to anyone to keep the tire
24   inflater and air hose?
25   A.   No.
```

02:00 (line 5)
02:00 (line 10)
02:00 (line 15)
02:01 (line 20)
02:01 (line 25)

1   Q.   And at some point, fast-forwarding a bit, there was a

2   search, it sounds like by you, to look for the tire inflater

3   and air hose.  Do you remember that?

4   A.   That's correct.

02:01   5   Q.   Why were you looking for it?

6   A.   I was looking for information.  I received an email from my

7   DPAC, the Deputy Patrol Agent in Charge, and there were items

8   that needed to be answered.

9   Q.   When did you learn it had gone missing?

02:02   10   A.   I received the email on December 16, 2013.  By the 18th, I

11   believe that's when I kind of came to the conclusion it had

12   gone missing, by the 18th.

13   Q.   So you were tracking some of this down through emails?

14   A.   Yes.  I had sent emails to Ponce, who's one of the CIIT

02:02   15   team agents, and asked him if he knew anything about it, and he

16   had emailed me back and said that no, he had instructed Rolando

17   to do what he wanted to do with it, that they were done with

18   their part of the investigation.

19   Q.   And at any time did you direct anyone to dispose of these

02:02   20   items?

21   A.   No, I did not.

22   Q.   Did anyone direct you to dispose of these items?

23   A.   No.

24   Q.   And what did you do to attempt to find them?

02:03   25   A.   Well, on the 16th I first called the VCOs from my desk and

1  asked them -- that I needed to take pictures and document some

2  of the information that was on this request, and I spoke with

3  Dave Weber.  He was one of the VCOs, and he said that the air

4  hose or the bag was not in the office.

02:03  5      So shortly after, I went up to their office and looked for

6  the bag.  It was not there.  I believe the other VCO was also

7  there, Chris Jones, and he didn't know where the bag was also.

8      Rolando at the time was not working on the 16th, so I

9  wasn't able to ask him about it.

02:03  10      So I believe it must have been the next day that I must

11  have spoken to Rolando and asked him about it as well, either

12  the 17th or 18th of 2013.

13  Q.  So I think there's an email.  It may have been read

14  earlier.  I don't have the exact number on me, but did you

02:04  15  write an email to the effect that you had talked to Rolando and

16  something about it being thrown away?

17  A.  Yes.

18  Q.  Can you kind of walk us through how you got to that point?

19  A.  So on the 16th, Rolando wasn't there, so I -- it must have

02:04  20  been the next day, or the 18th, the 18th is when I went to his

21  office and confronted him as to what happened to the bag.

22      He just seemed nervous.  He didn't know how to explain what

23  happened to the bag.  He said that, "Ponce told me to throw it

24  away.  I don't know what happened to it.  It's probably in the

02:04  25  trash," something to that effect.  He didn't know what

1    happened, so . . .

2    Q.  Did Rolando ever say he was the one who threw it in the

3    trash?

4    A.  He didn't tell me that exactly.  I think he -- he didn't.

02:04   5    Q.  Did you draw that inference?

6    A.  I think at first I did because I -- he didn't know how to

7    explain how it went missing.  At one point he even said, "It

8    was the man with white hair that told me to throw it away."  So

9    it went from "Miguel Ponce told me to throw it away" to "The

02:05   10   man with the white hair told me to throw it away.  I don't know

11   what happened to it."

12   Q.  Did you ever figure out if -- did someone come forward and

13   say "I threw it away"?

14   A.  No.

02:05   15   Q.  To this day do you know?

16   A.  No idea.

17   Q.  Did you reach a conclusion as to what you think happened?

18   A.  I believe someone did throw it away.  If I had to guess who

19   it was, it would have been one of the VCOs.  I think it

02:05   20   probably was Chris Jones.

21   Q.  Why would you guess that it's one of the VCOs?

22   A.  Just the conversation I had with him.  He seemed nervous.

23   He said that it was --

24   Q.  You don't have to go into detail.

02:06   25   A.  No, he just said, "It was here, and it's probably in the

```
        1    trash," is how -- he kind of threw his hands up.

        2    Q.  So you ultimately didn't think it was Rolando Pascua then?

        3    A.  No.

        4    Q.  And when did you reach that conclusion?

02:06   5    A.  It probably would have been about the 18th, about that

        6    time.  I think when I started sending the emails out saying

        7    that they don't remember or nobody wants to admit they threw it

        8    away.

        9    Q.  I think we have some emails, so let's just see if we can

02:06   10   find that one.  I think there might be one from December 19,

        11   2013.

        12   A.  That's right.

        13        MR. LASKE:  It might be Exhibit -- I think it might be

        14   Exhibit 56 or 57.  If we could pull one of those up.  Maybe

02:07   15   it's 57.

        16   BY MR. LASKE:

        17   Q.  Can you make out this email?

        18   A.  It's dated December 13th.  I sent it out at --

        19   Q.  Actually, hold on.  We'll let it get blown up there.

02:07   20        Does that help you?

        21   A.  Yes.

        22   Q.  What's the date on the document?

        23   A.  December 19th, 2013, at 8:18 a.m.

        24   Q.  And so this is basically -- I guess you're expressing some

02:07   25   frustration that you can't figure out if someone threw it away?
```

|       |    |    |                                                                  |
|-------|----|----|------------------------------------------------------------------|
|       | 1  | A. | That's correct.                                                  |
|       | 2  | Q. | So you're not necessarily saying you know who did it, but        |
|       | 3  |    | you think you know it was thrown away and you can't find it?     |
|       | 4  | A. | That's correct.                                                  |
| 02:07 | 5  | Q. | Did you know Agent Moore before the accident?                    |
|       | 6  | A. | I did, very well.                                                |
|       | 7  | Q. | How well did you know him?                                       |
|       | 8  | A. | We were good friends, golf buddies, he worked on my teams.       |
|       | 9  | Q. | And had you been to his house before?                            |
| 02:08 | 10 | A. | I was at his house three days prior to the accident.            |
|       | 11 | Q. | Would that be -- the accident was June 24, 2013, a Monday,       |
|       | 12 |    | so you're talking about three days prior to being Friday?       |
|       | 13 | A. | It would have been Friday, the 21st.                             |
|       | 14 | Q. | It's a while ago.  How do you remember that day?                 |
| 02:08 | 15 | A. | We'd play golf together.                                         |
|       | 16 | Q. | And why did you go to his house?                                 |
|       | 17 | A. | He was going to install a putting green at his house, and I      |
|       | 18 |    | told him I would help him, so after golf, I drove to his house,  |
|       | 19 |    | and we started working on the putting green.                     |
| 02:08 | 20 | Q. | Sounds like a big job.  Did you need to use any tools?           |
|       | 21 | A. | Yes, we used shovels, rakes, and a wheelbarrow.                  |
|       | 22 | Q. | And we're going to put on the screen Exhibit 270, page 7.        |
|       | 23 |    | We'll see if we can rotate that, but can you make out that       |
|       | 24 |    | image?                                                            |
| 02:09 | 25 | A. | Yes, that's a wheelbarrow.                                        |

1   Q.   And is that the wheelbarrow that you happened to use that

2   day?

3   A.   Yes.

4   Q.   What was the condition of the wheelbarrow at that time?

02:09  5   A.   The wheelbarrow had a flat tire.

6   Q.   Did you inflate it?

7   A.   No, it was flat.

8   Q.   And is the photo that's in Exhibit 270, page 7, is that a

9   true and accurate depiction of the wheelbarrow minus a tire?

02:09  10   A.   Yes.

11   Q.   When you last saw that wheelbarrow three days before the

12   accident, so there was a tire on it?

13   A.   There was a tire on there.

14   Q.   Any discussion with Agent Moore about the fact that it was

02:09  15   flat?

16   A.   I had explained to him I have this same similar

17   wheelbarrow, and I had purchased an inner tube and installed it

18   on my wheelbarrow, and with that inner tube, the tire tends not

19   to go flat right away.

02:10  20   Q.   Did Agent Moore ever tell you how he intended to inflate

21   the tire, if at all?

22   A.   I don't recall us talking about that.

23   Q.   Did he ever tell you that he was contemplating taking it to

24   the station to use its air compressor?

02:10  25   A.   No.

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | MR. LASKE:  Nothing further, Your Honor.                         |
|       | 2  | THE COURT:  Cross-examination.                                   |
|       | 3  | CROSS-EXAMINATION                                                |
|       | 4  | BY MR. CHAMBERS:                                                 |
| 02:10 | 5  | Q.  Good afternoon.  Is it Supervisor Martinez?                  |
|       | 6  | A.  Yes.                                                         |
|       | 7  | Q.  I want to make sure I'm addressing you appropriately.        |
|       | 8  | MR. CHAMBERS:  Why don't we pull up an email?  Can I             |
|       | 9  | get Exhibit 52, please?                                          |
| 02:11 | 10 | BY MR. CHAMBERS:                                                 |
|       | 11 | Q.  While that's being pulled up, the day following Mr. Moore's  |
|       | 12 | accident, you instructed Mr. Pascua to go out and perform -- I   |
|       | 13 | think you called it -- a safety check?                           |
|       | 14 | A.  Correct.                                                     |
| 02:11 | 15 | Q.  What did a safety check entail in your mind?                 |
|       | 16 | A.  For him to check the hose, the nozzle, the compressor,       |
|       | 17 | check for leaks.  That would be the extent.                      |
|       | 18 | Q.  What specifically would he be looking for in the hose and    |
|       | 19 | the inflater and the nozzle that pertains to safety?             |
| 02:11 | 20 | A.  I wouldn't know how to answer that.  He's the mechanic.  I   |
|       | 21 | have very limited knowledge or experience with the compressor.   |
|       | 22 | Q.  I understand that.                                           |
|       | 23 | You used the word, I think, a moment ago in your testimony       |
|       | 24 | "safety check," and I'm trying to figure out where the word      |
| 02:11 | 25 | "safety" comes from?                                             |

1  A.   Well, with vehicles, when they get in accidents, we ask the

2  mechanics to do a safety check, so I imagine there's different

3  points that they have to check.  I'm not sure how the

4  compressor works.

02:12   5  Q.   When you instructed Mr. Pascua to perform a safety check

6  the next day, was that to ensure that it was operational, that

7  it worked?

8  A.   That it was safe for people to use.

9  Q.   All right.  Let's take a look at Exhibit 52, if we could,

02:12   10  which should be on the screen in front of you.

11  A.   I see it.

12  Q.   I'm interested in the top email, and it looks like its an

13  email from you to an assortment of people on June 25, 2013.  Is

14  that right?

02:12   15  A.   Correct.

16  Q.   And this is an email that you sent?

17  A.   Yes.

18  Q.   Do you recall sending this?

19  A.   Yes.

02:12   20  Q.   And if we look at item number 1 in your email, it says that

21  the compressor and hose were inspected by Mr. Pascua.  I'm

22  paraphrasing.  They were both deemed safe for operational use.

23      What do you mean, "They were both deemed safe for

24  operational use"?

02:12   25  A.   That would have been a conversation that Rolando and I had.

| | | |
|---|---|---|
| | 1 | He would have called me and said, "Hey, I checked the |
| | 2 | compressor.  It's good to go." |
| | 3 | Q.  So you're telling the recipients on the email that the |
| | 4 | compressor and the hose are safe? |
| 02:13 | 5 | A.  According to Rolando. |
| | 6 | Q.  All right.  So I'm assuming, then, that you gave the |
| | 7 | all-clear and let all the agents have access to the hose at |
| | 8 | that point? |
| | 9 | A.  Well, not that hose, because I asked Rolando to take it off |
| 02:13 | 10 | the fence, so we were not going to use that air compressor. |
| | 11 | Q.  I don't understand.  If somebody just performed a safety |
| | 12 | check and determined that it was safe, why did you order them |
| | 13 | to take it off? |
| | 14 | A.  Well, we had another compressor out in this compound, so |
| 02:13 | 15 | when I went to see the site -- I just -- I saw the blood, I saw |
| | 16 | what was there, and I just didn't want other agents and Ryan to |
| | 17 | have to go to that site again, so we had another option. |
| | 18 | Q.  So it was more for the blood and the material that you saw |
| | 19 | out there, that that was the reason that prompted the removal? |
| 02:13 | 20 | A.  Yes. |
| | 21 | Q.  As opposed to some issue with safety? |
| | 22 | A.  Correct. |
| | 23 | Q.  I see. |
| | 24 | And then following the removal of the air hose and the |
| 02:14 | 25 | inflater, you instructed who to put it in a bag? |

1    A.   It would have been the VCOs, so that would have been Dave

2    Weber, Chris Jones, and Dave Ibarra.

3    Q.   And when you gave that instruction, you told them that they

4    needed to bag it and keep it, right?

02:14   5    A.   Correct.

6    Q.   And a moment ago during your direct examination, did you

7    ask them to tag it as well?

8    A.   Correct.

9    Q.   What does that mean?

02:14   10   A.   Well, in law enforcement, when we take things into

11   inventory, we put it in a sealed bag, we write down

12   information, and then we turn it over.

13   Q.   Kind of like you do with evidence?

14   A.   Correct.

02:14   15   Q.   And when they took the hose down and they put it in this

16   bag that you asked them to put it in and they tagged it, you

17   told them to go store it in the rafters in the garage.  Isn't

18   that right?

19   A.   Correct.

02:14   20   Q.   And you did that because you felt it was important to store

21   the hose because it was from Ryan's accident, right?

22   A.   Correct.

23   Q.   And you picked the garage rafters because it's a place that

24   was less likely for people to go and get it.  Is that right?

02:15   25   A.   Correct.

```
          1          MR. CHAMBERS:  If I could see for a moment Exhibit 55,
          2    please.
          3    BY MR. CHAMBERS:
          4    Q.   I'm interested in the top portion.
02:15     5          MR. CHAMBERS:  Why don't we go to page 2 first before
          6    we do this.  Page 3.  I'm sorry.
          7    BY MR. CHAMBERS:
          8    Q.   If you look in the middle of page 3 there, there's an email
          9    from a gentleman named Mark Kirkpatrick.  Who is that?
02:15    10    A.   He is the Deputy Patrol Agent in Charge.
         11    Q.   Your boss?
         12    A.   At the time, he was the number two at our station, correct.
         13    Q.   But your boss, correct?
         14    A.   Yes.
02:15    15    Q.   And on December 16, 2013, do you recall receiving this
         16    email from Mr. Kirkpatrick?
         17    A.   Yes.
         18    Q.   And he's, in effect, asking you to go obtain some
         19    information.  Is that right?
02:16    20    A.   Correct.
         21    Q.   What is the information in response to?
         22    A.   A request from, I believe, the union looking for items
         23    regarding Ryan's accident.
         24          MR. CHAMBERS:  All right.  If we can go back to page
02:16    25    2, please.  Actually, let's go back to page 1.
```

1    BY MR. CHAMBERS:

2    Q.   At the bottom of page 1 there, it looks like you're

3    responding back to Mr. Kirkpatrick.  Is that correct?

4    A.   That's correct.

02:16    5    Q.   And this is on December 16th at about 3:16 p.m.?

6    A.   Correct.

7    Q.   And you recall sending this email?

8    A.   Yes.

9         MR. CHAMBERS:  Can we go back to page 2, please?

02:16    10   BY MR. CHAMBERS:

11   Q.   Item number 9, this is the request from the union correct?

12   A.   Yes.

13   Q.   And then the sentence underneath it that begins, "The

14   garage mechanics," is that you writing?

02:16    15   A.   Yes.

16   Q.   And you're telling whoever you're writing this email to

17   that they're not able to locate the hose and the inflater,

18   correct?

19   A.   Correct.

02:17    20        MR. CHAMBERS:  Can we go back to page 1?

21   BY MR. CHAMBERS:

22   Q.   And then at the very top, the email at the top there, which

23   is about, oh, 15 days later or so, this is another email from

24   you to Mr. Kirkpatrick, isn't it?

02:17    25   A.   Yes.

```
         1   Q.   And do you recall sending this email?

         2   A.   Yes.

         3   Q.   And you're reporting to Mr. Kirkpatrick, who, again, is the

         4   second in command at that particular station, that Mr. Pascua

02:17    5   believes that he threw the hose and nozzle in the dumpster.

         6   That's right?

         7   A.   Correct.

         8   Q.   So it's not missing.  Mr. Pascua believes he threw it away,

         9   right?  That's what you're reporting to your superiors?

02:17   10   A.   Right.  And then I go on to say that he won't or he can't

        11   say, and I'm not certain what happened with it.

        12   Q.   But you're reporting what Mr. Pascua reported to you.  Is

        13   that right?

        14   A.   That it is missing.

02:17   15   Q.   And this is the same Mr. Pascua who first told you that it

        16   was Mr. Ponce who told him to get rid of it?

        17   A.   Correct.

        18   Q.   And then at some point later told you it was an old man or

        19   a man with white hair?

02:18   20   A.   Correct.

        21   Q.   And now he believes he threw it away?

        22            MR. LASKE:  Objection.  Misstates the testimony.

        23            THE COURT:  Overruled.

        24       You may answer.

02:18   25            THE WITNESS:  I'm sorry.  Repeat the question.
```

BY MR. CHAMBERS:

Q.   Sure.  And now Mr. Pascua believes that he threw it away?
That's what you're reporting here.  Is that right?

A.   In the first sentence, yes, that's what I wrote down,
correct.

02:18

         MR. CHAMBERS:  I don't have anything further.  Thank
you very much, Supervisor.

         THE COURT:  Any other questions of Mr. Martinez?

         MR. LASKE:  No, Your Honor.

02:18

     But, for the record, can I get admitted into evidence
Exhibit 410 and 270?

         THE COURT:  You'll have to remind me what those are.

         MR. LASKE:  270 was a picture of the wheelbarrow.  410
was a picture of someone holding the tire inflater, I think,

02:18

after the accident.

         THE COURT:  Any objection to those photos?

         MR. CHAMBERS:  No objection, Your Honor.

     And as long as we're offering exhibits, I'd also like to
offer Exhibit 52 and 55.

02:19

         THE COURT:  Remind me what those are.

         MR. CHAMBERS:  Those are the two that I just showed
Supervisor Martinez.

         THE COURT:  The email?

         MR. CHAMBERS:  Yes, sir.

02:19

         THE COURT:  Any objection to those?

```
          1              MR. LASKE:  No objection, Your Honor.

          2              THE COURT:  52 and 55 are also admitted.

          3         (Exhibit 410 and 270 admitted.)

          4         (Exhibit 52 and 55 admitted.)

02:19     5              THE COURT:  Thank you.  You may stand down.

          6         Next witness.

          7              MR. LASKE:  The next witness is Area Safety Manager

          8    William Dana.

          9                         WILLIAM DANA,

02:20    10                    DEFENDANT'S WITNESS, SWORN

         11              THE CLERK:  Would you state and spell your full name

         12    for the record.

         13              THE WITNESS:  William Dana, W-I-L-L-I-A-M D-A-N-A.

         14                       DIRECT EXAMINATION

02:21    15    BY MR. LASKE:

         16    Q.  Good afternoon, sir.

         17    A.  Good afternoon.

         18    Q.  How long have you worked for the border patrol?

         19    A.  Almost 21 years.

02:21    20    Q.  When did you first start?

         21    A.  September of 1996.

         22    Q.  Continuous employment?

         23    A.  Yes.

         24    Q.  And what is your job title today?

02:21    25    A.  Area safety manager.
```

1  Q.  Was that your job title in June of 2013?

2  A.  Yes, it was.

3  Q.  Can you briefly describe your educational background as it

4  relates to your job?

02:21  5  A.  I'm a career Navy person.  The last four years of my Navy

6  career, I became involved with the safety programs from 1989 to

7  1991.  I was a divisional safety officer.  From 1992 to 1994 I

8  was a squadron safety officer.

9  Q.  A squadron safety officer?

02:22  10  A.  For the U.S. Navy.  1994 to 1996 I worked as a safety

11  officer for McDonnell Douglas, Top Gun, at Miramar, and I was

12  hired by the border patrol in September of 1996.

13  Q.  And what are your job duties today?

14  A.  My job duties involve facility inspections, responding to

02:22  15  employees' reports of unsafe or unhealthy working conditions,

16  training, respiratory protection, hearing protection.

17  Q.  And what -- do you have any degrees that relate to your

18  profession?

19  A.  I have a professional certificate from UCSD in occupational

02:22  20  safety and health.

21  Q.  So -- and what area do you cover?  Do you just cover

22  Chula Vista, or do you cover a bigger area than that?

23  A.  My stakeholders are the U.S. Border Patrol, San Diego

24  Sector, so I cover the whole sector.

02:23  25  Q.  When you say "the whole sector," what does that mean

1  geographically?

2  A.  All stations.

3  Q.  From the border to Chula Vista?

4  A.  From the border to San Clemente over to Temecula and out as

02:23  5  far as Boulevard.

6  Q.  And how many employees?

7  A.  Approximately 2500.

8  Q.  How many stations?

9  A.  Eight stations.

02:23  10  Q.  If an employee has any issues, can they reach out directly

11  to you?

12  A.  Absolutely.

13  Q.  And has that happened before?

14  A.  Many times.

02:23  15  Q.  How long have those been your job duties, the stuff that

16  you're doing now?  How long have you been doing that?

17  A.  Since September of '96.

18  Q.  And do you have access to review all injuries for the

19  sector?

02:23  20  A.  Yes, I do.

21  Q.  And what type of injuries are listed on these reports?

22  A.  Every injury that occurs in the sector that involves

23  anything first aid or above.

24  Q.  Would something like what happened to Ryan Moore fall under

02:24  25  that category?

1    A.   Yes, it would.

2    Q.   There was some talk by a witness earlier, before you were

3    here today, about a California OSHA regulation.   Does

4    California OSHA apply to --

02:24    5              MR. WOHLFEIL:   I'm sorry --

6    BY MR. LASKE:

7    Q.   Does California OSHA apply to the border patrol?

8              MR. WOHLFEIL:   Objection.   Your Honor, this is

9    improper expert opinion.   He was not designated as an expert.

02:24    10             THE COURT:   No, I think the question of whether

11   California OSHA applies to the border patrol would be within

12   the scope of his knowledge, not expert opinion.

13        You may answer.

14        Overruled.

02:24    15             THE WITNESS:   Border patrol falls under Federal OSHA.

16   Cal OSHA does not have jurisdiction.

17   BY MR. LASKE:

18   Q.   And why?

19   A.   We're federal employees, federal facilities, federal

02:24    20   equipment.

21   Q.   And are these often on federal land?

22   A.   Federal land, right.

23   Q.   Are you familiar with the compressed-air system at the

24   Chula Vista station?

02:25    25   A.   Yes, I am.

         1   Q.   When did you first go -- and did you learn of Agent Moore's
         2   accident?
         3   A.   I either received an email or a phone call.  I don't recall
         4   which one, but I received an email or a phone call early in the
02:25    5   morning before we went over.
         6   Q.   Agent Moore's accident was on June 24, 2013.  When did you
         7   receive that email or call?
         8   A.   That morning.  I mean, I'm sorry.  The next morning, the
         9   25th.
02:25   10   Q.   And what did you do when you first arrived at the scene?
        11   A.   I met with Ron Zermeno at the accident scene behind the
        12   garage.
        13   Q.   And when you got there, what did you do?
        14   A.   We just looked around, talked to a couple of people in the
02:25   15   area.  We had plans to go to the critical incident team
        16   already, so we didn't spend a lot of time there.
        17   Q.   And do you recall, did Ron talk to too many people?  Did he
        18   talk to many people?
        19   A.   No, there was only a couple of people around.
02:26   20   Q.   Did you see Ron direct anybody to do anything?
        21   A.   No.
        22   Q.   And, I'm sorry.  Mr. Zermeno.
        23        And did you have an opportunity to view any of the items
        24   from that accident of June 24, 2013?
02:26   25   A.   Not at the garage.  They were at the critical incident team

1    when we went to the critical incident office.

2    Q.   What did you inspect?

3    A.   It was an air gauge, a tire, and a rim.

4    Q.   And when you looked at them, what was the purpose of

02:26    5    looking at them?

6    A.   Just looking for any obvious defects.

7    Q.   Did you see any signs of malfunction?

8    A.   Negative.

9    Q.   And I'd like to direct your attention to Exhibit 410, page

02:27   10    1.   Just focusing on the top image, did you see the tire

11    inflater -- that tire inflater the next day?

12    A.   Yes, I did.

13    Q.   And is that actually your hand holding that?

14    A.   I am holding that.

02:27   15    Q.   And what's covering the lens, if you could tell?

16    A.   I believe it was grease, but it could have been blood.

17    Q.   And then the picture below it, you can't really make it out

18    very well on this photo, but who took that photograph?

19    A.   I believe that I took that photograph.

02:27   20    Q.   Well, then sorry.

21    Did you have a chance to read what was on the tire?

22    A.   Yes, I did.

23    Q.   And could you read what was on the tire?

24    A.   Clearly.

02:27   25    Q.   Do you recall what it said?

1    A.   "Maximum inflation 30 PSI."

2    Q.   And that was the tire from Ryan Moore's accident?

3    A.   Correct.

4    Q.   And the photos that we're looking at right now, are those

5    true and accurate depictions?

6    A.   Yes.

7         MR. LASKE:   Can we go to the next page, 410, page 2?

8    Or actually 403, page 2.

9    BY MR. LASKE:

10   Q.   Slightly better image.

11        Did you also take these photographs?

12   A.   I believe they were taken at the same time.

13   Q.   And it looks like there might be a time or a date stamp on

14   there?

15   A.   Right.

16   Q.   For the record, can you read what that time stamp is, if

17   you can decipher it?

18   A.   Give me a second to get my glasses out.

19        That would be 25 June 2013 at 1418.

20   Q.   And that is a picture of the rim that was involved in the

21   accident, correct?

22   A.   Correct.

23   Q.   And then the picture below, that's a photo of the tire and

24   the wheel?

25   A.   Correct.

699

|     |    |                                                                       |
| --- | -- |                                                                       |

1    Q.   And on the tire, were there any other messages on it?

2    A.   Just the standard data that comes on the tire.

3    Manufacture's date, model, make.

4    Q.   And are the photographs I just showed you, 403, page 2 --

02:29    5    is that a true and accurate depiction of what you saw that day?

6    A.   Yes, it is.

7    Q.   I'd like to direct your attention to Exhibit 271, page 1.

8    And I think earlier you mentioned max inflation.  Is that the

9    message that you saw?

02:30    10    A.   Right.

11    Q.   And is 271, page 1 a true and accurate depiction of what

12    you saw that day?

13    A.   Yes, it is.

14         MR. LASKE:  Can we go to Exhibit 271, page 2?

02:30    15    BY MR. LASKE:

16    Q.   And can you make that out?  Or at least the day of, could

17    you make out what that said on the tire?  We're going to try to

18    blow it up.  That might help a little bit.

19    A.   It's a warning.  I can see it's a warning.

02:30    20    Q.   Can you read it, for the record, what you're seeing?

21    A.   I can't really read it on this one here.

22    Q.   Do you remember if it had a message on it that you could

23    read a little bit better when the tire was in front of you?

24    A.   I could probably read that if it was a little larger.

02:31    25    Q.   Sorry.  I should have told you you needed to bring your

1    glasses.

2    A.    "Warning.  Tire changing and/or inflation can be dangerous

3    and should be done only by trained personnel."  I can't read

4    the last couple words on there.

02:31    5    Q.    And is 271-2 -- is that the condition that the tire was in

6    the day that you saw it?

7    A.    Yes, it was.

8    Q.    Could you read the warning on it the day of -- the day

9    after?

02:32    10    A.    Yes.

11    Q.    And so those photographs that we just looked at, those are

12    of the tire that you looked at with Ron Zermeno?

13    A.    Right.

14    Q.    And who is Ron Zermeno again?

02:32    15    A.    He's the union safety director.

16    Q.    And how long was he the union safety director, if you know?

17    A.    I believe for about two years at that point.

18    Q.    And what is your job in relation to his job?  Do you work

19    hand in hand?  Do you not work at all together?

02:32    20    A.    We work on certain items.  He accompanies me when I do the

21    facility inspections.

22    Q.    And you're there on behalf of the?

23    A.    Management.

24    Q.    And he's there on behalf of?

02:32    25    A.    Employees.

1   Q.   And did you ever talk about his background, how he became
2   the union safety manager?
3   A.   He was appointed by the union.
4   Q.   Do you happen to know what his either educational or life
5   experience background is for that job?
6   A.   I do not know his educational background, and as far as I
7   know, he didn't have any formal safety training.
8   Q.   Would Ron talk to you about his background?
9   A.   Sure.
10  Q.   Was Ron someone who was shy about sharing information about
11  himself, or would he --
12  A.   No.
13  Q.   And did he ever tell you what his background was?
14  A.   He never said he had a background in safety.
15  Q.   When did you first arrive at the Chula Vista
16  station -- actually, after the accident, the first person you
17  met was Ron Zermeno?
18  A.   Right.
19  Q.   Did you ever break apart from Ron Zermeno that day at the
20  station, or were you guys basically going from place to place
21  together?
22  A.   No, we were together the whole time there.
23  Q.   Did you observe Ron Zermeno tell anyone to do anything with
24  the tire inflater and air hose?
25  A.   No.

1   Q.   If someone was injured at the Chula Vista station, would

2   you be informed of it?

3   A.   Yes, I would.

4   Q.   And are there different levels of injuries, or would you be

02:34   5   informed of any type of injury?

6   A.   The more severe or catastrophic the injury, more likely and

7   the sooner I would be notified.

8   Q.   And eventually do you get a copy of something, some

9   paperwork if it's a different type of injury?

02:34   10   A.   I get copies of all injury reports.

11   Q.   And prior to Agent Moore's accident, had anyone ever been

12   injured using the tire inflater?

13   A.   No.

14   Q.   Anyone using the air compressor at issue?

02:34   15   A.   No.

16   Q.   Anyone using the air hose at issue?

17   A.   No.

18   Q.   Prior to Agent Moore's accident, did Ron Zermeno have any

19   complaints on behalf of the union about the equipment that

02:35   20   Agent Moore was using that evening?

21   A.   No.

22   Q.   And prior to Agent Moore's accident, did plaintiff come

23   forward with any complaints about the equipment he was using

24   that day?

02:35   25   A.   No.

```
 1   Q.   In your 21 years with the border patrol's health and safety
 2   office, have you ever seen an accident like plaintiff's?
 3   A.   No.
 4              MR. LASKE:  Nothing further.
 5              THE COURT:  Cross-examination.
 6              MR. WOHLFEIL:  Yes, Your Honor.  Thank you.
 7                      CROSS-EXAMINATION
 8   BY MR. WOHLFEIL:
 9   Q.   Mr. Dana, if I understood you correctly, Ryan Moore's
10   injury was one of the most serious you'd seen before?
11   A.   It was a serious injury, yes.
12   Q.   So given how serious it was, you would have shown up bright
13   and early the next morning?
14   A.   Right.
15   Q.   Are we talking 6:00 a.m., 7:00 a.m.?  What time?
16   A.   Depending on what we had scheduled, but I don't believe
17   that Ron was available until midmorning.
18   Q.   What time did you arrive?
19   A.   Midmorning -- same time Ron did.  We scheduled to meet
20   there, and I want to say it was either late morning or early
21   afternoon.
22   Q.   You arrived together?
23   A.   No.  He comes in from North County, and I come in from East
24   County.
25   Q.   But when you first saw the inflater that Ryan Moore had
```

|        |    |                                                                          |
|--------|----|--------------------------------------------------------------------------|
|        | 1  | used the night before, it was in the CIIT office?                        |
|        | 2  | A.   Yes.                                                                |
|        | 3  | Q.   It was actually next to the wheelbarrow tire?                       |
|        | 4  | A.   Yes.                                                                |
| 02:36  | 5  | Q.   When was the last time you saw it?                                  |
|        | 6  | A.   That was the last time I saw it.                                    |
|        | 7  | Q.   How long were you in the office?                                    |
|        | 8  | A.   Probably ten minutes, 15 minutes, at the most.                      |
|        | 9  | Q.   At that point, the inflater and hose weren't connected to           |
| 02:36  | 10 | anything, right?                                                         |
|        | 11 | A.   No, I did not see the hose there.  I saw the inflater, the          |
|        | 12 | tire, and the rim.                                                       |
|        | 13 | Q.   The inflater wasn't connected to anything?                          |
|        | 14 | A.   No.                                                                 |
| 02:36  | 15 |      MR. WOHLFEIL:  Could you pull up Exhibit 11, please?                |
|        | 16 | BY MR. WOHLFEIL:                                                         |
|        | 17 | Q.   So I think that's the same photo we just looked at.  Is             |
|        | 18 | that correct?                                                            |
|        | 19 | A.   Correct.                                                            |
| 02:37  | 20 | Q.   Can you tell me what the PSI is looking at the gauge?               |
|        | 21 | A.   No, I can't.                                                        |
|        | 22 |      THE COURT:  Do you know what the substance is on the                |
|        | 23 | gauge?                                                                   |
|        | 24 |      THE WITNESS:  In this picture, it appears to be                     |
| 02:37  | 25 | grease, but it possibly could have been blood.  It's hard to            |

1    say.  It could have been a little clearer picture, and there's

2    flash from -- there's glare from flash on this actual screen of

3    the gauge, so it's hard to see.

4            MR. WOHLFEIL:  I don't have any other questions.

02:37    5            THE COURT:  Anything else?

6            MR. LASKE:  Your Honor, we might have a clearer

7    picture.  I think it might be 403-1.  Nope.  Sorry.  We don't.

8            THE COURT:  Anything else for this gentleman?

9            MR. LASKE:  No, Your Honor.  Thank you.

02:38   10            THE COURT:  Thank you, Mr. Dana.  You may stand down

11   as a witness.

12        Next witness.

13                          **TED EVANS**,

14                   DEFENDANT'S WITNESS, SWORN

02:38   15            THE CLERK:  Would you state and spell your full name

16   for the record.

17            THE WITNESS:  Yes, Ted David Evans, T-E-D, last name

18   E-V-A-N-S.

19                      DIRECT EXAMINATION

02:39   20   BY MR. COYLE:

21   Q.  Good afternoon, Dr. Evans.

22   A.  Good afternoon.

23   Q.  Let's just talk about your qualifications briefly.  What's

24   your occupation?

02:39   25   A.  I'm a clinical psychologist.

1  Q.  Where do you work?

2  A.  I work at -- in the San Fernando Valley of Los Angeles and

3  also at the UCLA Medical Center.

4  Q.  What do you do as a clinical psychologist?

02:39  5  A.  I treat individual patients, typically adults, I evaluate

6  adult patients for neurologists and orthopedic doctors, and I

7  evaluate patients for attorneys, insurance companies for

8  medical/legal purposes.

9  Q.  As part of your expert report in this case, did you include

02:40  10  your CV?

11  A.  Yes, I did.

12  Q.  And is that accurately depicted on pages -- on Exhibit 474,

13  pages 39, and the pages that follow?  It's on the screen in

14  front of you.

02:40  15  A.  Oh, I'm sorry.  Yes, it looks to be current.

16  Q.  Okay.  Can you briefly tell the Court about your education

17  as a psychologist?

18  A.  As a psychologist, I attended the Fuller Graduate School of

19  Psychology in Pasadena, California.  I first went to the

02:40  20  seminary where I achieved a Master's Degree in theology, and

21  then went on in 1975 to achieve a Ph.D. in clinical psychology.

22  During that time, I trained at the UCLA Medical Center as a

23  psychology intern and then a fellow.

24  Q.  As a clinical psychologist, do you diagnose and treat both

02:40  25  cognitive and emotional disorders?

1    A.   Yes.

2    Q.   And are you board-certified as a neuropsychologist?

3    A.   I'm board-certified as a clinical psychologist.

4    Q.   What's the significance of being board-certified?

02:41   5    A.   Well, after five years after you're licensed, one becomes

6    eligible to become board-certified as a psychologist, and it

7    requires various written and oral examinations in front of a

8    committee that takes usually about a year from beginning to

9    end, and the fact that only about 3 to 5 percent of the

02:41  10    psychologists in the United States are board-certified, I

11    suspect, means something.

12    Q.   Do you teach in the field?

13    A.   Yes, I do.

14    Q.   And what fraction of your time would you say is spent

02:41  15    teaching?

16    A.   Approximately 5 to 10 percent.

17    Q.   Have you published papers in the field?

18    A.   I have.

19    Q.   Does your work include evaluating patients with traumatic

02:41  20    brain injury?

21    A.   Yes.

22    Q.   Okay.  Let's turn now to your task in this case.

23         Were you asked to do a neuropsychology evaluation to

24    determine whether Agent Moore sustained any neurocognitive

02:42  25    impairment or psychiatric or emotional injuries?

708

1   A.   Yes, I was.

2   Q.   What kind of documents did you consider in performing that

3   evaluation?

4   A.   Well, they're listed on page 1 and on to page 2 of my

5   report dated November 23, 2015.

02:42

6        Do you want me to go down and read all of those?

7   Q.   No, we'll put it up.   It's Exhibit 464, page 1, but, just

8   generally, what category of documents are you considering?

9   A.   Well, there were medical records beginning with Scripps,

02:42   10  Sharp Memorial Hospital, and various treating doctors,

11  including psychologist Marvin and psychiatrist Moyer.   I looked

12  at the records from the U.S. Customs and Border Protection, the

13  Department of California Highway Patrol, and then I looked at

14  various discovery documents, interrogatories, responses to

02:43   15  interrogatories, and the deposition of Mr. Moore, the

16  deposition of his brother.   Those were the primary records I

17  initially reviewed.

18  Q.   You mentioned border patrol documents.   Those are

19  employment documents?

02:43   20  A.   Yes, employment documents and various letters that were

21  included in that file on behalf of Mr. Moore from fellow

22  agents.

23  Q.   As part of your evaluation, did you also take a history

24  from Agent Moore?

02:43   25  A.   I did.

1   Q.   Why do you do that?

2   A.   Well, as it's important in any medical specialty, it's

3   important to get a history to understand, one, if there are any

4   contributing factors to the symptoms that the person may be

02:43   5   currently reporting.  If there was any kind of atypical

6   developmental issues in terms of childhood or family, marriage,

7   those types of categories, very important to cover.

8   Q.   Do you also consider a patient's education level when

9   you're evaluating them?

02:44   10   A.   Yes.

11   Q.   Why is that?

12   A.   Well, if you're doing neuropsychological testing, generally

13   speaking, a person should perform on neuropsychological tests

14   in a way that's commensurate with their intelligence and

02:44   15   education.  So those are important factors to consider in

16   interpreting the results.

17   Q.   What is Agent Moore's education level?

18   A.   Well, he went to the University of Wisconsin in Milwaukee,

19   and I think he went there initially for three years, and then

02:44   20   he left school, went to work, and then came back, and I believe

21   got a Bachelor of Science degree in criminal justice.

22   Q.   Okay.  Let's turn now to Agent Moore's injuries from the

23   accident.

24      We've heard from other witnesses about the injuries

02:44   25   Agent Moore sustained to his jaw and his face.  What, if any,

1    brain injury did Agent Moore sustain from the accident?

2    A.   Well, as I indicated in my initial report, some of the

3    difficulties or the neurobehavioral factors that were reported

4    upon his hospitalization were consistent with a mild traumatic

02:45   5    brain injury.  But given the fact -- and I often see this when

6    there are significant other injuries and when there's surgery

7    and general anesthesia and the administration of narcotic pain

8    medication, that could also cause, for example, compromise in

9    cognitive functioning irrespective of whether there was a brain

02:45   10   injury or not.  So the question initially was whether or not,

11   in fact, there was a mild traumatic brain injury.

12   Q.   Okay.  And so what are the factors pointing in one

13   direction and the other direction?

14   A.   Well, that he -- his mental status was compromised

02:45   15   initially.  Whether or not he lost consciousness was

16   questionable, but he certainly had altered consciousness.  I

17   don't believe he was fully oriented initially.  He was amnestic

18   to the event; that is, he had no recall of the event itself.

19   And those are all consistent with the possibility of a

02:46   20   traumatic brain injury.

21   Q.   What else besides traumatic brain injury could cause the

22   altered mental state you were talking about?

23   A.   Well, when someone is in -- sustained a serious physical

24   injury in an accident, they are -- there's research to show

02:46   25   this -- it doesn't involve the brain.  They can present as

1   confused, having compromised mental status, not being fully

2   alert just due to the emotional impact of the event itself.

3   Q.   You mentioned that Agent Moore has amnesia around the

4   accident and for the time after the accident as well.   What

02:46   5   else besides a traumatic brain injury could explain

6   Agent Moore's post-accident amnesia?

7   A.   Well, again, he was -- he underwent surgery, and so there

8   was general anesthesia, and it would be typical for someone who

9   is administered anesthesia to have patchy memory for events or

02:47   10   maybe complete amnesia.  He was also taking narcotic pain

11   medication, which also can produce amnesia or, again, less than

12   intact memory.

13   Q.   Now, in your opinion, that typically wouldn't cause

14   pre-accident amnesia, would it?

02:47   15   A.   Not typically.  I have seen cases where there were

16   significant orthopedic injuries and a person had multiple

17   surgeries in the hospital with anesthesia and narcotic pain

18   medication that also had a bit of what's called retrograde

19   amnesia; that is, before the hospitalization, they have fuzzy

02:47   20   memory.  That can sometimes happen, but that's much less common

21   than post-traumatic amnesia.

22   Q.   If Agent Moore did sustain a traumatic brain injury, what

23   is your opinion about what type of traumatic brain injury it

24   was?

02:48   25   A.   Well, subsequently there was an MRI done, and if we are to

1  accept that at face value and that's accurate, it would be a

2  mild, what's called, complicated traumatic brain injury.

3  Q.  What does that mean?

4  A.  "Mild" is that -- in other words, his Glasgow Coma Index

02:48  5  was between 13 and 15, and I believe his initially was 14.  He

6  had slightly altered mental status.  And he didn't have

7  post-traumatic amnesia for more than 24 hours.

8  Q.  And then the second part of it from the MRI?

9  A.  "Complicated" means that there was either a skull fracture

02:48  10  or -- and/or there was some intracranial bleed.  And the

11  subsequent MRI showed areas of bleed, but that I would have to

12  defer to a neurologist to talk about the significance or lack

13  of significance of that finding.

14  Q.  All right.  If Agent Moore did sustain a mild traumatic

02:49  15  brain injury, would you expect to see mental or emotional

16  deficiencies lasting more than a few weeks after the accident?

17  A.  You could, but probably not more than six months after the

18  accident.  One has to take into consideration that he had other

19  injuries that were compromising; that is, they could have an

02:49  20  emotional effect on him, and emotional dysfunction can often

21  compromise cognition.  So it wouldn't be directly related to

22  the brain injury, but it could last for a few months.

23  Q.  Okay.  Let's talk now about the neuropsychological testing

24  that you gave Agent Moore.

02:49  25      How long did that testing last?

1  A.   Well, the whole neuropsychological testing took about three

2  and a half to four hours.

3  Q.   And what is the purpose?  What are you trying to assess?

4  A.   Well, I'm trying to assess his functioning in all cognitive

02:50  5  domains.  First we give a general intelligence test to surmise

6  what his baseline cognitive abilities were prior to the injury.

7  And then with that as a baseline, we give multiple tests in

8  attention, concentration, auditory memory, visual memory,

9  executive functioning, perceptional reasoning, processing

02:50  10  speed.  We try to hit every possible cognitive domain that we

11  can measure.

12  Q.   You mentioned the baseline testing.  How does the baseline

13  testing work?  If you're doing the testing after the accident

14  happened, how is that measuring the patient's pre-accident

02:50  15  cognitive function?

16  A.   Sure.  There is 11 sections of a -- the general

17  intelligence test.  Some of those sections will be affected by

18  a brain injury.  There are some on that test that will not be.

19  And that will be a mirror into the person's baseline

02:51  20  functioning.

21       For example, vocabulary.  Someone's vocabulary, their

22  ability to define words will not be affected by a mild

23  complicated traumatic brain injury.  There are other measures

24  in terms of perceptional reasoning that will not be

02:51  25  significantly affected by a brain injury, much less more than

1   two years later.

2        So that gives us a window into what his baseline was and

3   then we can compare that baseline to how he functions on those

4   tests that would be affected by brain injury.

02:51  5   Q.  Okay.  Before we talk about the emotional and psychiatric

6   test, let's talk about the cognitive tests?

7        Can you tell the Court how those tests are used to evaluate

8   the person's cognitive functioning?  You just talked about it a

9   bit, but maybe in a bit more detail.

02:51  10  A.  Well, I'm not sure I understand.  When you say how they're

11  used --

12  Q.  So what does the testing entail?

13  A.  Well, Mr. Moore is sitting with me or the other

14  psychologist in my office, and we administer various tests

02:52  15  face-to-face that, again, measure attention, concentration,

16  memory, and so forth, speech and language, verbal fluency,

17  those kinds of things.  And those are objective, standardized

18  measures within the field that are well accepted.

19  Q.  How are the -- his tests scored and compared to the other

02:52  20  people who have taken the test?

21  A.  Sure.  Well, he'll produce what's called a raw score on

22  each test.  Let's say, just to throw one out, 20, and then you

23  look, and you convert that to what's called a standard score.

24  Think of a standard score as an IQ score with a hundred being

02:52  25  right average, right midline of the population.  And that

1  converts to the 50th percentile.  So you compare his raw score

2  to large populations within his age group and with his relative

3  education.  And you see where he stands compared to age peers,

4  sometimes also gender peers, within those various skills.  And

02:53  5  then you convert that to a percentile score.  Again,

6  theoretically, 90th percentile would be superior, 50th

7  percentile would be average, and so forth.

8  Q.  Can you -- you mentioned 90th superior, 50th average.  Can

9  you just break down the entire spectrum briefly from zero to

02:53  10  99?

11  A.  Sure.  So a standard score of 90 to 110 is average.  And

12  that is from an IQ of -- that's from a percentile score of

13  about 25 to 74.  And the vast majority of the population will

14  fit within those two parameters.

02:54  15      Now, if you're going backwards now, an IQ of 80 to 89,

16  which is in the low teens in terms of percentile, that's low

17  average.  If you go 70 to 79, which is -- you're getting into

18  the single digits, like the eighth percentile, the sixth

19  percentile, which is low.  That's borderline impaired.  And

02:54  20  then anything below 70 is impaired, frankly impaired, whereas

21  if you're going in the upper ranges, 110 to 119 is high

22  average, and that goes from a 75th percentile to the 89th

23  percentile, and then when you get over 120, you're in the 90s

24  in terms of percentile, and that's superior and very superior.

02:54  25  Q.  Before we talk about particular test results, what did your

```
 1    test results show overall about Agent Moore's level of

 2    cognitive function?

 3    A.   Well, that he was functioning in a manner that was

 4    consistent with his baseline intelligence and education and

 5    that the vast majority, 91 percent of his scores, were in the

 6    average range or higher, and so there was no identified

 7    cognitive impairment or deficit that he demonstrated.

 8    Q.   And how many different scores -- how many different scores

 9    did your testing of Agent Moore entail?

10    A.   Okay.  Well, if you'd just give me a second, I'll turn to

11    that page.

12         So our test battery produced 45 separate scores.

13    Q.   How many of Agent Moore's scores were in the range of very

14    superior or superior?

15    A.   Six of the 45 or 13 percent.

16    Q.   13 percent.

17         Okay.  And then -- and just to clarify, we've talked about

18    other scales, validity scales, where high scores are bad, but

19    on these tests, high scores are good, right?

20    A.   Yeah, we're talking about cognition, so the higher the

21    better.

22    Q.   What percentage of Agent Moore's scores were in the high

23    average range?

24    A.   18 percent.

25    Q.   What about the average range?
```

02:55 (line 5)
02:55 (line 10)
02:55 (line 15)
02:56 (line 20)
02:56 (line 25)

```
          1   A.   49 percent.
          2   Q.   The low average range?
          3   A.   Nine percent.
          4   Q.   The borderline impaired range?
02:56     5   A.   Seven period.
          6   Q.   The actual impaired or very impaired range?
          7   A.   Four percent.
          8   Q.   Were there any areas where Agent Moore showed particularly
          9   strong levels of cognitive functioning?
02:56    10   A.   Paradoxically -- and I say paradoxically because his
         11   primary subjective complaint at the time of my evaluation was
         12   his memory, and, in fact, during his brother's deposition, he
         13   testified that, you know, some time ago he was having memory
         14   difficulties, so -- but, again, paradoxically he scored very
02:57    15   well on many memory tests, including into the superior and very
         16   superior range.
         17        I will tell you just one quick anecdote.  One of the tests,
         18   the Rey Auditory Verbal Learning test, which is on page 29 of
         19   my report, a list of 15 words is read to the examinee, and then
02:57    20   they try to remember as many as they can.  By the third
         21   exposure to the 15 words, he got all 15 out of 15.  That's
         22   unusual and very superior and actually impressive, so that's
         23   why I said "paradoxically."
         24   Q.   Can you explain the paradox?
02:57    25   A.   You mean in terms of why it's happening?
```

1    Q.   Yeah, if he's noticing memory issues, how can he perform so

2    well on these tests?

3    A.   Well, I think that, as I said, I -- in my report, I didn't

4    think he was making it up.  I don't think he was being

02:58    5    disingenuous.  I think that this was not a neurocognitive

6    deficit.  This was a function of his emotional status, him

7    feeling badly about himself, his -- what I think is a

8    depression, an agitated type of depression which is going to

9    produce cognitive inefficiency.

02:58    10    Q.   Did your cognitive testing show any areas of cognitive

11    impairment?

12    A.   No.

13    Q.   Any areas of weakness?

14    A.   Yes.

02:58    15    Q.   What were those areas?

16    A.   There was one area, and that was his speed of information

17    processing.  On a few -- on a few tests of processing speed, he

18    was in the low average, and one was even in the high borderline

19    range.  Now, again, it was a paradox that on other measures of

02:58    20    psychomotor speed, he performed well within the average range,

21    but this was, I felt, a cognitive weakness that he was having,

22    at least at the time.

23    Q.   And speed of information processing, that is what it sounds

24    like?

02:59    25    A.   Yes, how fast you can perform a mental task.

1   Q.   Can you give the Court an example?

2   A.   Sure.  On the -- on a page there will be certain symbols

3   with empty boxes below each symbol.  And at the top, there will

4   be numbers, and each one will have a different symbol

02:59   5   underneath it, and as fast as he can, he has to put the proper

6   symbol into each numerical box, and he has two minutes to do as

7   many as he can.  That's one simple measure of processing speed.

8   Q.   Do you believe that Agent Moore's weakness in the area of

9   processing speed is a result of the traumatic brain injury?

02:59   10   A.   No.

11   Q.   Why not?

12   A.   Well, it would be extremely unusual.  I've never seen it --

13   and I don't recall anything in the literature -- that a

14   traumatic brain injury would cause a relative weakness in one

03:00   15   isolated cognitive domain but not affect all the other

16   cognitive domains.  That just wouldn't be a profile you would

17   see in a traumatically induced deficit.  That would be the

18   primary reason.

19        The other reason I would offer is I think there's a much

03:00   20   more parsimonious explanation for that finding.

21   Q.   Which is?

22   A.   Well, again, I found him to have a moderate clinical

23   depression when I examined him, and one of the things that

24   clinical depression does is slow you down.  It slows down your

03:00   25   behavior.  It slows down your motor functioning.  It slows down

1  your thinking.  And so I think that's clearly why this finding

2  existed.

3  Q.  Did you also review the neuropsychological testing

4  performed by Dr. Markel, the plaintiff's neuropsychology

03:01  5  expert?

6  A.  Yes, I did.

7  Q.  And were her test results consistent with yours?

8  A.  Yes, I believe they were.

9  Q.  Do you agree with Dr. Markel's interpretation of her test

03:01  10  results?

11  A.  I respectfully, but strongly, disagree.

12  Q.  Why?

13  A.  Because Mr. Moore did not produce any defined impairments

14  on her testing.  And her statements that they represent -- that

03:01  15  his scores represented a mild neurocognitive disorder, when you

16  go through his actual scores, that diagnosis is just not

17  supported.

18  Q.  None of his scores were in the impaired range?

19  A.  I think there was one or two that, again, were very

03:02  20  isolated.

21  Q.  I want to talk about four specific tests that Dr. Markel

22  gave Agent Moore.

23      First is the D-KEFS Motor Speed Test, and I'm going to pull

24  up her report.  This is Exhibit 135, page 24.  And this shows

03:02  25  Agent Moore had a scaled score of 11?

1   A.   Yes.

2   Q.   That's the 63rd percentile?

3   A.   Yes, it would be.

4   Q.   If Dr. Markel testified that this test doesn't measure

03:02   5   processing speed, would you agree?

6   A.   I would not agree.

7   Q.   Why not?

8   A.   Well, the D-KEFS Motor Speed Test is line drawings that you

9   have to do quickly, so it involves perceptional skills,

03:02   10   perceptional organization, and then accuracy on top of a speed

11   component.  That's why it's called "motor speed."  I mean, it's

12   definitely a processing speed measure, and you will notice that

13   it's listed -- I don't know how she can make that argument.

14   It's listed under "motor processing speed."

03:03   15   Q.   Okay.  Would you expect someone with a processing speed

16   deficit to score in the 63rd percentile on that test?

17   A.   No, I think they're incompatible, and, as I said, within my

18   own exam, there were measures of processing speed that he

19   performed completely normally, so it wouldn't be possible to

03:03   20   have a deficit in that area and normal performance on some of

21   the measures within that domain.

22   Q.   Okay.  Let's talk about the second test that Dr. Markel

23   gave Agent Moore.  We'll pull that up as well.

24       It's a visuospatial matrix reasoning test shown on page 23

03:03   25   of her report, Exhibit 135.

```
     1  A.   Okay.
     2  Q.   And Agent Moore scored in the 91st percentile on that test?
     3  A.   Yes.
     4  Q.   That's the superior range?
03:04 5  A.   Yes, it is.
     6  Q.   If Dr. Markel testified that those results don't measure
     7  Agent Moore's processing speed because that test is not timed,
     8  would you agree?
     9  A.   No, I would not.
03:04 10 Q.   Why not?
     11 A.   Well, it is timed.  On each item, there's, I think, 22 or
     12 23 items within matrix reasoning, and if you want me to explain
     13 how that test works, I will, but the examinee has 45 seconds to
     14 respond.  Now, in the earlier items that are quite simple,
03:04 15 that's easy to do, but the items become more difficult as you
     16 go along, and they're very difficult to do correctly within 45
     17 seconds.
     18 Q.   And you don't get partial credit?
     19 A.   No, it's either right or wrong.
03:04 20 Q.   Would you expect someone with a processing speed deficit to
     21 score in the superior range on that test?
     22 A.   It's possible if someone has superior perceptional
     23 reasoning abilities, but they're only average in terms of
     24 processing speed.  You could possibly see a superior range
03:05 25 score on matrix reasoning, but that would be quite rare, I
```

1    think.

2    Q.   Do you believe that applies to Agent Moore?

3    A.   No.

4    Q.   Okay.  Third, Dr. Markel gave Agent Moore the WAIS-IV

03:05    5    Similarities Test and the WAIS-IV Matrix Reasoning Test.  We'll

6    pull those up.  And Agent Moore scored in the 50th and 91st

7    percentile on those tests, respectively?

8    A.   Yeah, on Matrix Reasoning was the one we just described.

9    Q.   Okay.  Now, if Dr. Markel testified that those tests don't

03:06    10    measure a patient's executive function, would you agree?

11    A.   No, I would not.

12    Q.   Why not?

13    A.   Well, these are purely executive function tests.  I mean,

14    they are purely that, in the verbal and visual realm.

03:06    15    Similarities is a measure of abstract reasoning.  Abstract

16    reasoning is largely mediated by the frontal lobe of the brain

17    and is an executive function test.  So when you ask someone how

18    a fly and a tree are alike, it's those type of questions, they

19    have to engage in conceptual reasoning.  Well, how are a fly

03:06    20    and a tree alike?  Conceptual reasoning is a cornerstone of

21    executive functioning, and what differentiates us from other

22    mammals is we can engage in that kind of executive functioning.

23    So I very strongly -- very strongly disagree with that.  I'm a

24    little incredulous that that was the testimony.

03:07    25        Matrix reasoning is the same kind of conceptual reasoning,

1    but in the visual perceptual area where you show someone

2    complex geometric designs, and they have to fit in the missing

3    piece.  That's a highly frontal lobe function that is grounded

4    in executive function.

03:07  5    Q.   And can you just explain a little bit in layman's term what

6    executive functioning is, and maybe give an example?

7    A.   Executive functioning is abstract or conceptual reasoning

8    where we can see things that are similar and deduce a

9    conclusion about them or see things that are entirely separate

03:07  10   that have no relationship so that we don't have to keep

11   learning concrete things like lower mammals would.  It involves

12   executive functioning, problem solving, the ability to

13   formulate a plan and to carry it out.  Those are executive

14   functioning skills.

03:08  15   Q.   Would you expect someone with executive functioning

16   deficits to achieve these scores shown on the screen?

17   A.   No, I would not.  My only hesitation was if this person had

18   an IQ of, let's say, 160 or 170, which is, frankly, unheard of,

19   and their similarity score was only at the 50th percentile, you

03:08  20   can maybe say that they're not quite up to par where they

21   should be, but, of course, matrix reasoning is already in the

22   superior range.  So given Mr. Moore's baseline intelligence,

23   these scores are fine, if not impressive.

24   Q.   Okay.  Finally, Dr. Markel gave Agent Moore the WMS4

03:09  25   Auditory Memory Index.  And that includes two logical memory

725

1    subtests?

2    A.   Yes.

3    Q.   And we've got that up on the screen.  That's page 25 of

4    Exhibit 135.  Agent Moore scored in the 95 percentile on

03:09    5    immediate recall logical memory 1 and the 99th percentile on

6    delayed recall or logical memory 2, correct?

7    A.   Yes.

8    Q.   If Dr. Markel testified that it's concerning that

9    Agent Moore scored worse on immediate visual memory than

03:09   10    delayed visual memory, would you agree?

11   A.   It's concerning?

12   Q.   That it's concerning.

13   A.   No, I would not agree.  Was there any elaboration on that?

14   Q.   Well, why is it entirely normal for a person to score

03:09   15   higher -- a higher percentile on delayed recall?

16   A.   Okay.  Well, logical memory is you read the person two

17   paragraph stories, and as soon as you're finished, they recall

18   it for you immediately, and then without telling them, 30

19   minutes later you say, "Remember that story?  Tell me as much

03:10   20   about it as you can remember."  So that's logical memory 2.

21   It's immediate and delayed.  When someone is scoring at the

22   95th and 99th percentile, they are so far in the superior range

23   that the difference between the 95th and 99th percentile is

24   infinitesimal.

03:10   25        An analogy would be, for example, if you had a child that

1  was, let's say, in the second grade, and they do these height

2  charts, and in the second grade, the person was at the 99th

3  percentile, and then two years later, they did another

4  measurement to see how they're growing, and then they're only

03:10  5  at the 95th percentile.  That's meaningless.  It's a

6  meaningless difference.

7  Q.  It doesn't mean the child got shorter?

8  A.  No.  It means that they're still above 94 percent of the

9  same aged population in terms of height.

03:11  10      I should tell you if you think of a bell-shaped curve, and

11  that's what we're really talking about, and we get out the

12  superior range, the difference between 95 and 99th percentiles

13  are so subtle as to almost be indistinguishable statistically.

14  Q.  Would you expect someone with memory deficits to be able to

03:11  15  achieve those scores?

16  A.  Well, most certainly not.  I mean, that's obvious, and

17  that's one of the statements I made about my own examination;

18  that Mr. Moore performed equally superior on these types of

19  measures in my exam.  No.  It's the exact opposite of a memory

03:11  20  deficit.

21  Q.  Given the results of both your and Dr. Markel's

22  neuropsychological testing, would you expect Agent Moore to

23  have substantial difficulties in his day-to-day life?

24  A.  Not from a cognitive standpoint.

03:12  25  Q.  What standpoint might he have difficulties from?

1   A.   Well, I mean, the only finding I had in my exam that was

2   significant was what I would call an emotional psychiatric

3   issue.

4   Q.   Okay.  Let's talk about Agent Moore's real-world

03:12   5   functioning.  And when you evaluate a patient's level of

6   cognitive function, what else do you consider besides the

7   neurocognitive testing results?

8   A.   What they're reporting to me; for example, about their job

9   performance, if they're in school, what they're reporting to me

03:12   10   about their school's performance, what their job evaluations

11   say, what their academic transcripts indicate, and please

12   understand that I'm interviewing the person over the course of

13   a few hours in my office observing their cognition.

14   Q.   Why is the -- all that information outside of the cognitive

03:13   15   testing -- why is that important?

16   A.   Well, because the cognitive testing is kind of encapsulated

17   within these standardized tests within the four corners of

18   these measures, but these deal -- these other considerations

19   deal more with real-world functioning, and hopefully there's a

03:13   20   correlation between the two, but there isn't always, and,

21   again, my observations of their cognition over six or seven

22   hours in my office is also significant.

23   Q.   In the case of Agent Moore, what did you consider and how

24   did it affect your opinions?

03:13   25   A.   Cognitively?

1    Q.   Yes.

2    A.   Well, he certainly had a post-traumatic amnesia.  He

3    had -- he was amnestic to the event itself, and he had amnesia

4    for several days, if not a couple weeks, prior to the incident.

03:14   5        So you have a presentation of retrograde and post-traumatic

6    amnesia, which, again, could argue for traumatic brain injury,

7    it could argue for other factors that we've already talked

8    about.  So there was that.

9        He reported more day-to-day memory problems, which I did

03:14   10   not at all observe when taking a history from him.  He gave a

11   very cogent, detailed history of his post-accident medical

12   treatment, so I wasn't observing the kind of memory

13   difficulties he was subjectively reporting.

14       That didn't make me distrust his report, it just created a

03:14   15   question mark, and then, of course, on these tests, he

16   performed -- on memory tests -- very well, so . . .

17   Q.   What about his real-world functioning since the accident?

18   A.   He told me on the job he was having no significant

19   difficulties in the performance of his job.  Once he

03:15   20   returned -- you know, he was off work for a few months, and

21   then I believe he returned to a desk job, and then I

22   think -- and please correct me if I'm wrong -- he was some

23   border crime suppression team, and he indicated -- I asked, and

24   he was not having any significant difficulty in the performance

03:15   25   of his job duties.

1    Q.   What was your understanding of what he was doing as part of

2    that border suppression team?

3    A.   I didn't have a real -- I can't recall the details he

4    provided or if I even asked.

03:15    5    Q.   If a person is executing warrants and making arrests, what

6    kind of cognitive skills does that require?

7    A.   Well, I would say it requires intact cognitive skills.

8    Q.   Can you explain to the Court exactly what cognitive skills

9    and how they're implicated by those tasks?

03:16   10    A.   Well, again, you're talking a lot about executive

11    functioning.  You're talking about formulating a plan, carrying

12    them out, following up, making any corrective actions in your

13    plan, and so forth.

14    Q.   What about driving?

03:16   15    A.   Well, yes, that certainly could involve driving.

16    Q.   What kind of cognitive functions does driving require?

17    A.   Well, again, it requires executive skills, and it requires

18    motor functioning, intact motor functioning primarily.

19    Q.   Now, there's been testimony that Agent Moore's now working

03:16   20    on an FBI task force where he's largely in front of a computer.

21    He's essentially an FBI analyst.  What kind of cognitive

22    function would that job require?

23    A.   Well, I think I might need to know a little bit more about

24    it to go into detail, but the word "analyst," to me, again,

03:17   25    reflects executive functioning, developing a plan, carrying it

1    out, identifying success or lack of success, and carrying

2    through to completion?

3    Q.   If Agent Moore reported that he were having, you know,

4    minor difficulties remembering numbers as he took them from one

03:17   5    source and put them into another source, would that be

6    something you would expect to see?

7    A.   Expect on what basis?

8    Q.   Would a person who had a mild traumatic brain injury --

9    A.   Not this long after the injury, no, I would not expect

03:17   10   that.

11   Q.   Okay.  Let's talk now about the emotional and personality

12   testing.

13       How were those tests that you administered to Agent Moore

14   used to measure a patient's emotional status and personality

03:18   15   functioning?

16   A.   For the most part, these are self-reporting inventories.

17   They're two primary tests within that field.  These are

18   broad-based personality tests that Mr. Moore fills out by

19   himself independently, primarily answering true or false to

03:18   20   essentially about 750 or 800 questions over two separate tests.

21   Q.   And what did the test results from Agent Moore show?

22   A.   I think they showed that he had problems primarily with

23   depression, as I indicated, secondary problems with some

24   anxiety, and on one of the tests, they showed more longstanding

03:18   25   probably, what I would call, maladaptive personality traits.

1    Q.   Are there any alternative causes besides the accident

2    itself that you think might be responsible for those emotional

3    problems?

4    A.   Well, I think there are a myriad of consequences the

03:19   5    accident had that would fit under the umbrella of the accident

6    but are not intrinsically the result of the accident itself.

7    Q.   What specifically are you talking about?

8    A.   Well, for example, I mean, Mr. Moore told me that for a

9    considerable period of time, he couldn't even speak.  He could

03:19   10   not eat solid food.  He lost considerable weight.  He underwent

11   multiple medical procedures, both on an inpatient and, I

12   believe, on an outpatient basis.  I think the outpatient may

13   have been a dental procedure.  He received general anesthesia.

14   Some of these procedures were invasive.  He had multiple

03:19   15   doctors' involvement that he was very resentful of and fed up

16   with.  And then on top of all that, he discovered that he had

17   no insurance coverage for his injuries.  Then his workers'

18   compensation claim was denied.

19        MR. CHAMBERS:  Objection, Your Honor.  Relevance.  I'd

03:20   20   ask that the last two answers be stricken.

21        THE COURT:  Overruled.  I think it's relevant to the

22   question that was put to him, which I thought was a relevant

23   question.

24     You may continue your answer.

03:20   25        THE WITNESS:  And then he appealed his workers'

732

1    compensation denial, and that was denied, and then he began to

2    feel that he was not only not being supported by his employer,

3    but being betrayed by his employer, and he was very agitated

4    and upset about that.  And I think that whole constellation of

03:20    5    negative events and circumstances reasonably resulted in him

6    having what I would consider to be a moderate agitated type of

7    clinical depression.

8    BY MR. COYLE:

9    Q.   Do you think the unresolved state of this litigation also

03:21    10    plays any role in that?

11    A.   Yes, I do.

12    Q.   Can you explain that?

13    A.   Yes.  I've seen -- I've been involved in many litigation

14    cases.  You know, with the depositions and the interrogatories

03:21    15    and the testimony and whatnot, it's very stressful.  And it

16    tends to cause the person to regress back to their original

17    symptomatology, or at least recall it and relive it.  And it's

18    something they just want to get beyond and move on with their

19    life.  So it is clearly a stressor, and he acknowledged that.

03:21    20    Q.   In your experience, once the litigation ends, do you expect

21    to see improvement in depression -- a person's depression and

22    anxiety?

23    A.   Generally speaking, yes.  In Mr. Moore's case, clearly yes.

24    Q.   Why do you say "clearly yes" in Mr. Moore's case?

03:21    25    A.   Because I think a lot of the things that have been holding

1   him back are litigation related and subsequent consequences of

2   the accident itself.  And I think Dr. Moyer documented that

3   quite clearly.

4   Q.   Let's talk now about post-traumatic stress disorder.  What

03:22   5   is PTSD?

6   A.   PTSD is a -- it used to be an anxiety disorder.  Now it's

7   called a trauma disorder that is a result of an extreme

8   traumatic event in which there was the threat of actual death

9   or real death, catastrophic, life-changing injuries.  Just

03:22   10   beyond the pale in terms of what normal human experience would

11   typically dictate.

12   Q.   Where did you get the diagnostic definition of PTSD that

13   you used in this case?

14   A.   From the Diagnostic and Statistical Manual of Mental

03:23   15   Disorders published by the American Psychiatric Association.

16   Q.   If I could direct your attention to Exhibit 386, page 2.

17   This is page 271 of the DSM-5.  Is this the diagnostic criteria

18   that you used?

19   A.   Yes.

03:23   20   Q.   Is the DSM-5 the standard reference source for diagnostic

21   criteria for psychological disorders?

22   A.   It is now.  It replaced the DSM-IV a couple years ago.

23   Q.   If Dr. Koransky, the plaintiff's psychology expert, had

24   testified that there was a change from the DSM-IV to the DSM-5

03:23   25   so that the PTSD diagnostic criteria no longer require actually

1  memory of the traumatic event, would you agree with that?

2  A.  No, I would not.

3  Q.  Why not?

4  A.  Well, I wouldn't agree with it because it's not accurate.

03:23  5  I mean, if you look at criteria 1, "Recurrent involuntary and

6  intrusive distressing memories of the traumatic event."  A

7  person that has no recall of the traumatic event cannot have

8  PTSD by definition.

9     Now, that doesn't mean they're not emotionally distressed

03:24  10  by what happened to them.  Most certainly in this case

11  Mr. Moore is, without question.  But you can't have PTSD

12  without meeting this criteria.

13  Q.  And Agent Moore doesn't remember the accident?

14  A.  Well, at the time I examined him almost a year and a half

03:24  15  ago, he didn't, and I doubt that he's going to regain memory of

16  that subsequently.

17  Q.  So you don't think he has PTSD?

18  A.  I'm of the opinion that he does not, correct.

19  Q.  Now, Dr. Markel's diagnosis of PTSD was based primarily on

03:24  20  Agent Moore's responses on symptom questionnaires -- I think

21  you mentioned those -- about his level of functioning.  Do you

22  agree that her responses on those symptom questionnaires showed

23  that Agent Moore has PTSD?

24  A.  Well, if you just look again at the four corners of the

03:25  25  test, he's endorsing a lot of PTSD symptoms, so if you just

1  restrict -- if I'm restricting your question just to that, you

2  could say possibly, yes, but that's a flawed methodology in

3  terms of diagnosis.

4  Q.  Why is that?

03:25   5  A.  Well, first of all, PTSD inventories are notoriously

6  leading.  And I don't at all mean to say that Mr. Moore was

7  being dishonest.  I'm not suggesting that, so let's remove

8  that.  But they're very leading questions about anxiety,

9  recollections, painful recollections, upset.  So a person in

03:26  10  litigation is likely to elevate a lot of those scales if they

11  had a distressing event, even if they have no actual memories

12  of the event.  So we don't make the diagnosis of PTSD on the

13  basis of these inventories and questionnaires, we base them on

14  history.  So do they meet these criteria?

03:26  15      If you look at number 3, "Dissociated reactions, flashbacks

16  in which the individual feels or acts as if the traumatic event

17  were recurring."  I don't believe Mr. Moore has met that

18  criterion, and if you look at Dr. Moyer's initial note, he

19  specifically writes, "No flashbacks, no nightmares."  And so

03:26  20  this is the basis of the diagnosis.

21      Now, if someone does meet these criteria and by history

22  appears to have PTSD, then these inventories and questionnaires

23  can be helpful to determine what symptoms are most distressing.

24  But by relying on the inventories primarily, you're sort of

03:27  25  taking the cart before the horse, if I'm making myself clear.

736

1   Q.   Are there any studies or reports in the literature making

2   the point you made, you know, criticizing these inventories and

3   what conclusions you can draw from them?

4   A.   Well, yes, I mean -- for example, some of these inventories

03:27   5   have validity scales, and they're so poorly constructed that

6   someone who is attempted to exaggerate or even fabricate their

7   symptoms and has relatively little sophistication isn't going

8   to elevate those validity scales because the items are so

9   absurd.   It's not a -- it's not a good area of assessment in

03:28   10   terms of PTSD is giving questionnaires and inventories.

11   Q.   Let's talk now -- Dr. Koransky had some opinions about

12   Agent Moore's emotional problems.   Have you reviewed his

13   report?

14   A.   Yes.

03:28   15   Q.   So you're aware it's his opinion that as a result of the

16   tire accident, Agent Moore has significant emotional problems,

17   including PTSD, depression, and anxiety?

18   A.   I'm aware of that.

19   Q.   And you know that his opinion is based on the emotional and

03:28   20   psychiatric testing that he gave Agent Moore?

21   A.   In part, yes.

22   Q.   Did you review the raw test data from that testing?

23   A.   I did.

24   Q.   What did it show?

03:28   25   A.   Well, it showed a lot of symptom exaggeration.   It showed a

1  lot of symptom over-reporting that would -- you know, if you

2  sent this to ten psychologists blindly, I would think most, if

3  not all of them, would say, "This protocol is not valid because

4  of this symptom exaggeration."  So the test cannot accurately

03:29  5  distinguish between a genuine emotional disorder and the

6  appearance of an emotional disorder due to symptom

7  embellishment.

8          MR. CHAMBERS:  Objection, Your Honor.  I'd like to

9  have the portion of the answer where he's referring to what ten

03:29  10  other psychologists would do stricken as lacking foundation,

11  speculation.

12          THE COURT:  Overruled.

13      Next question.

14  BY MR. COYLE:

03:29  15  Q.  So you don't think the testing, the emotional testing that

16  Dr. Koransky gave, actually shows that Agent Moore has the

17  emotional problems that Dr. Koransky says?

18  A.  Well, I do agree with Dr. Koransky.  I found Mr. Moore to

19  have a moderate clinical depression of an agitated type.  I

03:29  20  don't think that's disputable.  I mean, at least when I

21  examined him in November of 2015.  Maybe he's different now.  I

22  don't know.  But I certainly agree that the primary finding was

23  depression.  I strongly disagree with post-traumatic stress

24  disorder, and in terms of anxiety, I think Mr. Moore's anxiety

03:30  25  is present, but it's secondary.

1    Q.   Okay.  Let's talk finally about future care.

2         Given the test results that you and Dr. Markel and

3    Dr. Koransky obtained showing depression and anxiety but no

4    cognitive impairment, what future psychotherapeutic care do you

03:30    5    think Agent Moore needs?

6    A.   At the time I examined him and on the basis of my review of

7    these reports, I do not believe he needs any further continuing

8    psychotherapeutic treatment unless there have been new risk

9    factors or new developments since I examined him that are not

03:31   10    reflected in Dr. Markel or Dr. Koransky's reports.

11    Q.   Why do you think Agent Moore would not benefit from

12    psychotherapy?

13    A.   Well, I think that he was very ambivalent about attending

14    psychotherapy, even when he was at Dr. Marvin's office.  He was

03:31   15    not excited, to say the least, about going.  He would miss

16    appointments, he would put off going, and he said that he was

17    just, you know, kind of fed up going to doctors' offices, and

18    so that's part of it.

19         The other part of it is Mr. Moore, for better or worse, and

03:31   20    I'm sure there's advantages of it, he kind of has a tough guy

21    attitude, which got in the way of him initially seeking out any

22    treatment to begin with.

23         And so for those various factors, and, as I indicated in my

24    report, once the litigation matters are resolved, I just don't

03:32   25    see any need for it.

1  Q.  Do you believe that Agent Moore needs psychiatric

2  medication for the rest of his life?

3  A.  No.

4  Q.  Why not?

03:32  5  A.  He just doesn't have the symptomatology or the chronicity.

6  He doesn't have a chronic mental disorder that requires

7  lifelong medication.

8      I made the recommendation that he continue to receive

9  psychiatric medications for one to two years at the time I

03:32  10  evaluated him.  So that would be more on the outside, toward

11  the end of 2017, because they have a stabilizing effect, and I

12  indicated that litigation can be stressful, it can be

13  upsetting, and he might be able to benefit from that support.

14      But he -- in my opinion, based on the personality testing

03:32  15  and my observations of him and my clinical exam, he's not a

16  talk therapy kind of guy.  He just is not.

17  Q.  The medication that you do agree is warranted for one to

18  two years.  What is that medication specifically?

19  A.  Well, as I recall at the time, it was the antidepressant

03:33  20  Zoloft, and I believe he was taking an antianxiety medication

21  in a low dose.

22  Q.  Lorazepam?

23  A.  Lorazepam.  And I thought those might be wise to continue

24  for one or two years particularly while he's going through the

03:33  25  litigation process.

 1  Q.   And it's your understanding that he has been on those

 2  medications?

 3  A.   I have no idea if he's currently taking them.

 4  Q.   I'm sorry.  Before you examined him, it was your

03:33   5  understanding that he was on those medications?

 6  A.   Yes, yes.

 7  Q.   Finally, do you think Agent Moore needs another

 8  neuropsychological evaluation?

 9  A.   No.

03:33  10  Q.   Why not?

11  A.   Well, he's had two-and-a half, and in my --

12  Q.   Two-and-a half -- I'm sorry to interrupt.

13  A.   Myself, Dr. Markel, and Dr. Koransky gave cognitive

14  testing.  It wasn't as extensive.  That's why I say a half.

03:34  15       Mr. Moore produced normal profiles.  He has relative

16  weaknesses, like everyone in this courtroom.  If they underwent

17  a full day of neuropsychological testing, I could almost

18  guarantee -- I can't guarantee.  All of us are going to have

19  certain strength and weaknesses.  It's called normal

03:34  20  variability.  He doesn't need any further neuropsychological

21  testing because his profiles are normal.  Now, if something

22  else were to occur to him, God forbid, then we're

23  talking -- then what I'm saying doesn't apply.

24            MR. COYLE:  Nothing further.

03:34  25            THE COURT:  All right.  We'll take our afternoon

```
 1   recess at this time.  We'll be in recess until 10 to 4:00,
 2   3:50.  We're in recess now.
 3       (Recess.)
 4           THE COURT:  The parties are present.  Counsel are
 5   present.
 6       Cross-examination.
 7                        CROSS-EXAMINATION
 8   BY MR. CHAMBERS:
 9   Q.  Good afternoon, Dr. Evans.
10   A.  Good afternoon.
11   Q.  Nice to see you again.
12   A.  Yes.
13   Q.  It's true that the expert work that you do, you work about
14   three-quarters of the time on behalf of defendants, correct?
15   A.  That's approximately correct.
16   Q.  And as of the time of your deposition about a year ago, I
17   think you billed about $30,000 in this case.  Does that sound
18   about right?
19   A.  If that's what I said.  I don't know that -- in front of
20   me, but if that's what I said, yes.
21   Q.  All right.  And how much have you billed since then?
22   A.  There's been very little billing since then.  There just
23   hasn't been a lot of work.  The work preparing for trial, and
24   then I submitted a very brief supplemental report, I think, is
25   all.  It's not -- hasn't been --
```

03:56
03:56
03:56
03:56
03:56
03:57

1    Q.   Can you provide an estimate in terms of a dollar figure?

2    A.   The dollar figure.  I would say 3 to $4,000, approximately.

3    Q.   Okay.  Thank you.

4         Let's talk about Ryan Moore.  And before we do that, you

03:57    5    administered some validity measures in the tests that you gave

6    to Mr. Moore?

7    A.   Yes.

8    Q.   And those all came back and showed that Ryan was giving his

9    best effort.  Isn't that right?

03:57   10    A.   Are you referring to the cognitive testing or the

11    personality testing?

12    Q.   Both.

13    A.   The personality testing did show what I would call mild

14    symptom over-reporting.  The cognitive testing he was normal in

03:57   15    terms of effort.

16    Q.   And, in fact, Dr. Koransky found the same sort of

17    over-reporting that you're mentioning now, correct?

18    A.   Yes, except it was much more extreme with Dr. Koransky.

19    Q.   And you've got a couple of opinions that you were asked

03:58   20    about on direct, and I just want to briefly summarize them just

21    to make sure I understand them.

22         So as I understand it, your opinion is that Ryan Moore has

23    some cognitive difficulties.  You just don't think they're

24    based on a brain injury.  Is that accurate?

03:58   25    A.   I think he reports having -- at the time I saw him, he

1   reported having cognitive difficulties, particularly regarding

2   memory.  Those were not evident clinically, and they certainly

3   were not evident on testing.

4   Q.  Again, you're not saying Mr. Moore is not experiencing

03:58   5   cognitive difficulties.  You're just saying it's not brain

6   based.  Is that accurate?

7   A.  Yes, that's accurate.  I would add to that that it's

8   emotionally based and related to depression.

9   Q.  Understood.

03:58   10   And one of the bases -- or one of the reasons that you

11   can't correlate his cognitive deficiencies to a brain injury is

12   because you're not offering an opinion one way or another as to

13   whether he has a brain injury, true?

14   A.  Well, based on my subsequent review of the MRI -- and,

03:59   15   again, I'm not a physician, neurologist, but if we -- if I'm to

16   take that at face value, there does appear to have been a brain

17   injury with these microbleeds.

18   Q.  All right.  So you are offering the opinion that he

19   sustained a brain injury?

03:59   20   A.  I think that's more likely than not, but I'm not qualified

21   to comment on the accuracy of that imaging study or what it

22   might mean.  So I'm deferring.

23   Q.  And have you spoken with Dr. Gluckman, the defense

24   neurologist, about that?

03:59   25   A.  I have not.

744

1    Q.    And with respect to Ryan's cognitive scores, if my math is

2    correct, and using the way that you calculated things, it

3    appears as though 20 percent of the test scores that you

4    administered to Mr. Moore were below average or worse.  Is that

04:00    5    right?

6    A.    No, that's not correct.

7    Q.    I thought you said that nine percent of his test scores

8    were below average?

9    A.    I thought you just said 20 percent?

04:00    10    Q.    I'm going to add them up for you.  So let's start with the

11    nine percent.  Nine percent were below average.  Is that right?

12    A.    Nine percent were below the grossly average range, correct.

13    Q.    Seven percent were borderline?

14    A.    Yeah.  I need to get to that page.

04:00    15    Q.    Please.  Take your time.

16    A.    Yes, okay.  Go ahead.

17    Q.    My question was seven percent were borderline, correct?

18    A.    Yes.

19    Q.    And four percent came back as impaired?

04:00    20    A.    Correct.

21    Q.    So if we add those up, that comes to 20 percent?

22    A.    No.

23    Q.    No?

24    A.    It comes to 11 percent.

04:00    25    Q.    Nine percent plus seven percent plus four percent?

1   A.   Nine percent is from the low average range.  That's normal.

2   Q.   I understand.  I'm saying if you total these up --

3   A.   You've -- I'm completely confused by what -- by your

4   question.

04:01  5   Q.   Okay.  Nine percent of his scores were below average.  Is

6   that right?

7   A.   No.  The low average range is the average.  It's just the

8   lower end of the average.

9   Q.   I understand.  The lower end of average, nine percent of

04:01  10  his scores fell within that range?

11  A.   Yes.

12  Q.   And seven percent of his scores fell in the borderline

13  range?

14  A.   Correct.

04:01  15  Q.   And four percent of his scores were impaired?

16  A.   Correct.

17  Q.   All right.  I think we're talking the same language here.

18       It's your opinion that in a typical mild traumatic brain

19  injury case like Ryan's that the cognitive problems would

04:01  20  resolve within six months or so?

21  A.   Well, that's the opinion of the neuroscientific literature,

22  yes.

23  Q.   And is that for a complicated or an uncomplicated brain

24  injury?

04:01  25  A.   For uncomplicated brain injury.  There has been additional

1  research on mild complicated brain injuries, and some studies

2  show that the recovery is similar to what a moderate traumatic

3  brain injury would be.

4  Q.   And just to be clear, it's your opinion that Mr. Moore's

04:02  5  brain injury is a complicated one, correct?

6  A.   If those MRI results are accepted at face value, yes.

7  Q.   Understood.

8      And there's no question based on your evaluation and

9  testing of Mr. Moore that he was depressed?

04:02  10  A.   Well, I clearly found him to be depressed.

11  Q.   Now, let's talk for a moment briefly about the PTSD, and

12  you don't think that Mr. Moore had PTSD?

13  A.   That's correct.

14  Q.   And you didn't administer any tests to determine that.   Is

04:02  15  that right?

16  A.   No, the tests I administered are sensitive to anxiety

17  disorders of a PTSD type.

18  Q.   Let me ask a better question.   You did not administer a

19  PTSD specific test.   Is that true?

04:03  20  A.   That's correct.

21  Q.   And the reason for your opinion -- or at least part of the

22  reason for your opinion that Mr. Moore doesn't have PTSD is

23  because he has no recall of the event?

24  A.   That's part of it, yes.

04:03  25  Q.   And in your view, anyone who doesn't remember the actual

1   injury-causing event cannot have PTSD?

2   A.   I'm not going to make an absolute statement like that, but

3   I would say it's exceedingly unlikely because then they can't

4   have intrusive memories of the event.

04:03   5   Q.   I'd like to read from a portion of your deposition because

6   I think you were a little clearer here.  I'm reading from page

7   51, line 16 through 52, 6.

8        "Question:  So based on that criteria, in your view, anyone

9   who doesn't remember the injury-causing incident cannot, by

04:04   10   definition, have PTSD?

11        "Answer:  Right."

12        And you go on to explain further.  So that's correct, isn't

13   it?

14   A.   Yes, by definition.

04:04   15   Q.   And under no circumstance could somebody learn secondhand

16   or from some other source about the injury-causing event and

17   still be diagnosed with PTSD in your view, right?

18   A.   I can't say in no circumstance.  I wouldn't talk in

19   absolute terms.  I would say it's very unlikely.

04:04   20   Q.   If we turn to page 53 of your deposition, lines 1 through

21   6.

22        "Question:  So I couldn't learn secondhand about some

23   injury that happened to me and then subsequently be diagnosed

24   with PTSD?

04:04   25        "Answer:  Correct.

1      "Question:  Under no circumstance?

2      "Answer:  Right.  Because you can't persistently

3  reexperience it, and that's, for example, why Mr. Moore doesn't

4  meet another criteria," and you go on to explain that criteria.

04:05   5  A.   Correct.

6          MR. COYLE:  I'd ask that he continue to read the

7  witness' answer.

8          THE COURT:  Or you can do it if in fairness it needs

9  to be considered.  You can do it contemporaneously under the

04:05  10  rule.  Go ahead and read the rest of it.

11          MR. COYLE:  "Answer:  Right, because you can't

12  persistently reexperience it, and that's, for example, why

13  Mr. Moore doesn't meet another criteria, which is persistent

14  avoidance of stimuli associated with the trauma.  He can go

04:05  15  back to the work, he can go to the border patrol, and not have

16  any of those avoidance features because it was never registered

17  in his brain what happened."

18          THE COURT:  Doctor, your position is, by definition,

19  he doesn't qualify because the definition implicates a memory

04:05  20  of the traumatic event?

21          THE WITNESS:  Correct.  And if I may explain just very

22  briefly.

23          THE COURT:  Sure.

24          THE WITNESS:  The reason people develop PTSD is

04:06  25  because the intrinsic emotional trauma of experiencing the

1   event is destabilizing to the psyche.  And if one learns about

2   the event subsequently, that's just a cognitive process that is

3   divorced from the emotional experiencing of the trauma, which

4   is the key factor in the development of that disorder.

04:06   5          THE COURT:  How would that be so, though, if -- what

6   Mr. Chambers posited to you, a guy wakes up from a very

7   traumatic physical injury, has to be told, "Here's what

8   happened to you," is suffering the events of that injury, which

9   implicates the last part of what you just said, but has no

04:06   10   recollection of it himself.  He deduces that, "These injuries,

11   all that I'm going through, is a result of this thing that

12   happened, even though I don't remember it."  You say still, by

13   definition, that wouldn't qualify as PTSD?

14          THE WITNESS:  Correct.  It would -- it possibly would

04:07   15   qualify for another diagnosable emotional disorder, just not

16   that one.

17          THE COURT:  Okay.  Because you believe that, by

18   definition, one necessarily must have some recollection of the

19   triggering trauma, the triggering event?

04:07   20          THE WITNESS:  Yes, they must experience it directly

21   which becomes emotionally destabilizing to them.

22          THE COURT:  The diagnosis of Agent Moore's problems

23   arising from his emotional reaction to some of the secondary

24   injuries, is there a diagnosis that fits under the DSM-5?

04:07   25          THE WITNESS:  Yes.

1       THE COURT:  What is it?

2       THE WITNESS:  It's called other specified depressive

3    disorder.  And that's what I -- that's the diagnosis I gave.

4       THE COURT:  All right.  Go ahead.

04:07    5       MR. CHAMBERS:  Thank you, Your Honor.

6    BY MR. CHAMBERS:

7    Q.  Let's talk a little bit about your future care

8    recommendations.

9       And as I understood you on your direct testimony, you think

04:07   10    once this lawsuit's over, things are going to look up for

11    Mr. Moore?

12    A.  Well, I'm not saying that exactly, and I'm certainly not

13    saying that in any cavalier manner.  I think there's an extreme

14    amount of stress this man has gone through with his medical

04:08   15    treatment, with his denial of insurance coverage, and with

16    litigation.  And that -- for the most part, those burdens will

17    be lifted off his shoulders, and he could get on with his life.

18    I'm not just saying everything will be hunky-dory, if you will.

19    Q.  So you think the burdens of his medical condition are going

04:08   20    to be lifted at the resolution of this case?

21    A.  No, but they will have -- the legal aspects of it will be

22    resolved, and he can get on with his life to whatever extent

23    those medical issues continue to be troublesome.

24    Q.  And, in fact, when I took your deposition about a year ago,

04:09   25    you thought it would be reasonable for some psychotherapy for

1    Mr. Moore, didn't you?

2    A.   I thought his psychotherapy at the time was reasonable and

3    indicated.

4    Q.   Are you sure?  You didn't tell me back at your deposition

04:09    5    that he could have continued psychotherapy for the next 12 or

6    24 months?

7    A.   I don't recall recommending that.  I think I mentioned that

8    related to the psychiatric treatment for medication.

9    Q.   Let me read one portion for you to that point.  It's at the

04:09   10    bottom of page 65, lines 25 through 66, 10.  Let me know when

11    you're there, please.

12         "Question:  Well, certainly, when you see your clinical

13    patients, you want to do what's in their best interests, right?

14         "Answer:  Yes.

04:10   15         "Question:  So you're going to make recommendations based

16    on what you think is in their best interest from a medical and

17    clinical standpoint?

18         "Answer:  Right.

19         "Question:  And in Ryan's case, that would mean

04:10   20    psychotherapy, true?

21         "Answer:  Yes, with a competent psychologist."

22         And, in fact, in Mr. -- Ms. Engler's life care plan, you

23    disagreed with the frequency recommendation of the plaintiff's

24    life care planner, but you recommended individual psychotherapy

04:10   25    one time a week for six to 12 months.  That's all --

1   A.   Okay, yes, I thought you said 12 to 24, so I -- it threw me

2   off a little.  Yeah, I think that's reasonable.

3   Q.   Is that from today's date?

4   A.   No, it was the time of the deposition, and I don't recall

04:11   5   exactly -- the exact date of the deposition.

6   Q.   Understood.

7        And the psychiatric care that Ryan's undergoing currently

8   for medication monitoring and whatnot, do you think that's

9   reasonable to continue that for the next few months, right?

04:11   10   A.   I said at the time, I believe, one to two years.

11   Q.   I'm asking you now.

12   A.   You know, that estimate was based on my assessment of him

13   at the time.  I haven't seen him in 14 or 15 months.

14   Q.   So you can't make a recommendation about psychiatric care

04:11   15   because you haven't seen him in a year and a half?  Is that

16   what you're saying?

17   A.   I can't state today -- as of today what I would recommend.

18   I was stating as of my assessment and during the time of my

19   deposition.

04:11   20   Q.   And the same would be true for psychotherapy, wouldn't it?

21   You haven't seen Mr. Moore for a year and a half.  How do you

22   know how he's doing today?

23   A.   I don't think Mr. Moore, as I testified earlier, will

24   benefit from psychotherapy as he would from the medications.

04:12   25            MR. CHAMBERS:  I don't have anything further,

1    Your Honor.

2           THE COURT:  All right.  Any other questions of the

3    doctor?

4           MR. COYLE:  Very briefly, Your Honor.

04:12    5                    REDIRECT EXAMINATION

6    BY MR. COYLE:

7    Q.   Doctor, there was talk of the low average range and then

8    the below the average range.  Is there a difference between

9    those two?

04:12   10    A.   Yes.

11    Q.   Can you explain that briefly?

12    A.   Yeah, the low average range would be a standard score of 80

13    to 89.  That's at the low end of the average range whereas

14    anything below 80 is borderline impaired, and that's the scores

04:12   15    that are abnormal in someone of Mr. Moore's intelligence.

16           MR. COYLE:  Nothing further.  Thank you.

17           THE COURT:  All right.  You may stand down, Doctor.

18    You're excused as a witness.

19           THE WITNESS:  Thank you.

04:13   20           THE COURT:  Next witness.

21           MR. LASKE:  Is it okay if we bring up a couple of

22    demonstratives?

23

24

25

1    THE COURT:  Sure.

2                    **ERIC DEYERL**,

3              DEFENDANT'S WITNESS, SWORN

4    THE CLERK:  Would you state and spell your full name

04:13   5    for the record.

6    THE WITNESS:  Sure.  First name is Eric, E-R-I-C, last

7    name is Deyerl, D-E-Y-E-R-L.

8                    DIRECT EXAMINATION

9    BY MR. LASKE:

04:14   10   Q.  Good afternoon, Mr. Deyerl.

11   A.  Good afternoon.

12   Q.  What is your occupation, sir?

13   A.  I'm a consulting mechanical engineer.

14   Q.  And what does that mean?

04:14   15   A.  So I'm a mechanical engineer in this case who applies the

16   laws of physics to investigate and construct accidents that

17   have a mechanical nature.

18   Q.  And is that for purposes of litigation or purposes of

19   something else?

04:14   20   A.  Usually for litigation, but sometimes we get contacts

21   outside of litigation.

22   Q.  Can you describe your educational background for the Court?

23   A.  I have a Bachelor of Science degree in aerospace

24   engineering from UCLA and a Master of Science degree in

04:14   25   mechanical engineering also from UCLA.

755

1    Q.    And do you have any professional registrations?

2    A.    I do.   I'm a registered Professional Mechanical Engineer in

3    the state of California.

4    Q.    And are you a member of any professional organizations?

04:15    5    A.    I am, a number of them, including the American Society of

6    Mechanical Engineers, the American Society of Safety Engineers,

7    the American Society For Testing of Materials, and there's a

8    number of other accident reconstruction groups too.

9    Q.    Can you describe your work history?

04:15    10    A.    Yeah, sure.   Out of college, I was for almost seven years

11    with what was at the time one of the largest firms dedicated to

12    the investigation and prevention of accidents and failures.   It

13    was called Failure Analysis Associates.   There we did kind of

14    major disaster-type investigations.

04:15    15        For example, I was one of a large team that worked on the

16    grounding of the Exxon Valdez oil tanker and the crash of the

17    United Sioux City DC10 in the late '80s as well.

18        After that, I went with a few other gentlemen from that

19    firm to a smaller firm called Quan Smith & Associates where I

04:16    20    was for ten years also doing similar type work, investigative,

21    reconstruction work.

22        And then eight years ago I started my own firm, Deyerl

23    Engineering, and, again, doing similar work.

24    Q.    So what is your experience investigating accidents with a

04:16    25    mechanical aspect?

1   A.   So I've looked at hundreds of different types of accidents

2   over the years, many of which involve kind of mechanisms,

3   machines, anything from material-forming machines like presses,

4   to vehicle control machines like electronic gates and barriers,

04:16   5   just a whole variety of different things, some involving

6   pressure vessels, things like that.

7   Q.   And have you investigated legal cases for both plaintiff

8   and defendant?

9   A.   Sure, absolutely.

04:16   10   Q.   In this case, are you retained by the United States?

11   A.   I am.

12   Q.   And have you been paid in this matter?

13   A.   I have.

14   Q.   Do you happen to know how much to date?

04:17   15   A.   I think -- I don't know about to date, but up until the

16   time of my deposition, I think, was about $40,000, somewhere

17   around there.

18   Q.   And what did you understand your assignment to be in this

19   matter?

04:17   20   A.   I understood to have three parts:  One was to evaluate the

21   events that led up to Mr. Moore's accident; the second was to

22   evaluate the cues available to Mr. Moore while he was filling

23   the wheelbarrow tire; and then the third would be to review and

24   comment on the work performed by experts for the plaintiff.

04:17   25   Q.   And when you're talking about cues, what do you mean by

1  that?

2  A.   I'm talking about sensory cues, either tactile or sound or

3  observation, visual.

4  Q.   And what did you do to carry out this assignment?

04:17  5  A.   In general, I reviewed a number of documents that were

6  provided to me of different types.  I visited the U.S. Border

7  Patrol facility and documented it.  I examined the subject

8  wheelbarrow wheel assembly, and I also did testing on exemplar

9  wheelbarrow tires and wheels.

04:18  10  Q.   Provided any other information that we didn't just cover?

11  A.   There was a number of documents.  I was given incident

12  reports, depositions, photographs, things like that.

13  Q.   When you say "photographs," photographs from which source?

14  A.   So the one that comes to mind, I think, was the

04:18  15  investigation team that took photos on the evening of the

16  accident of the accident scene itself.

17  Q.   Roughly 52 photos?

18  A.   I don't remember.  It could be.  It seemed like a couple

19  dozen.

04:18  20  Q.   And deposition testimony, do you recall how many

21  depositions you had to read?

22  A.   I could check my binder if you like, but --

23  Q.   Was it another -- sometimes experts, they just review the

24  plaintiff's deposition and they stop.  In this case, did you do

04:18  25  that?

1   A.   No, there were a number.  Different border patrol agents,

2   Mr. Pascua, the kind of leader of the service group there, the

3   plaintiff, and several others.

4   Q.   And from all the information that you've reviewed, did the

04:19   5   plaintiff remember the accident?

6   A.   No.  Based on his description, he didn't have any memory of

7   the accident.

8   Q.   Did you also review the descriptions given by the other

9   border patrol officers?

04:19   10   A.   Yes.

11   Q.   But none of them saw the accident, right?

12   A.   Correct.

13   Q.   But some did see some of the -- see the scene afterwards,

14   right?

04:19   15   A.   Yes.

16   Q.   And do you recall which agents those were?

17   A.   I could check my notes.  I think Basinger was one of them.

18   There was another one that started with a M.

19   Q.   Membreno?

04:19   20   A.   Yes.  And then I forget the third.  But they gave

21   statements soon after and kind of wrote in the incident report

22   what they observed right after the accident.

23   Q.   And were you given the deposition testimony of the company

24   that serviced the air compressor?

04:20   25   A.   Yes, western pump, yes.

1    Q.   And you had an opportunity to review that?

2    A.   Yes.

3    Q.   As part of your work, I think you did mention you went to

4    the accident location?

04:20  5    A.   Correct.

6    Q.   And how many times?

7    A.   Twice.

8    Q.   Do you recall what dates?

9    A.   May I check my notes?

04:20  10            THE COURT:  Sure.

11            THE WITNESS:  Is that okay?

12            MR. LASKE:  And if you want, we could put your report

13   up, but I don't know if you need that.

14            THE WITNESS:  No.

04:20  15       So I visited the Chula Vista border patrol facility first

16   on August 20, 2015, and then again on, it looks like, November

17   24, 2015.

18   BY MR. LASKE:

19   Q.   What did you do during your first visit?

04:20  20   A.   During my first visit, I just visually examined the

21   facility, got an idea of the layout of the pneumatic system

22   that powers the subject tire inflater as well as the other

23   devices that are being used there, I took still photography, I

24   kind of sketched the layout of the pneumatic system.

04:21  25       Also during that first visit I had a chance, that's where I

1    looked at the subject wheel and tire assembly that was

2    involved.

3    Q.   And what did you do during your second visit?

4    A.   During the second visit, we went back and actually

04:21  5    performed testing at the site using one of the compressors that

6    was available as well as an inflater and the pneumatic system

7    there to perform some burst testing of the tires.

8    Q.   Did you have a chance to obtain some kind of overhead view

9    of what the station looked like?

04:21  10   A.   Yes.

11   Q.   And we'll put up what has been marked as Exhibit 418,

12   page 3.

13       And the document that's going to come up in a second,

14   418-3, is that something that made its way into either of your

04:22  15   reports?

16   A.   If it's what I think it is, yes.

17   Q.   Okay.   I believe it's -- actually what I have is 478-1,

18   so -- or page 1, so that may also be a reason why they're not

19   able to find it.

04:22  20       And is this the aerial image that's from your report?

21   A.   Yes.

22   Q.   Can you describe to us what we're seeing in this exhibit?

23   A.   Yeah, so it's kind of tilted, but north is to the right as

24   we're looking at it, and the large structure at the top there

04:23  25   is the vehicle maintenance garage, and down in the lower area,

761

          1   which is maybe slightly out of focus, we see what's been called

          2   the tire shop where there are tire mounting and demounting

          3   devices.  That's outlined in orange.  And then the compressor

          4   house where two compressors are housed that power the

04:23     5   pneumatics to all of these things is labeled in yellow, and

          6   then the hose reel where the accident occurred is also labeled

          7   there, kind of in the middle as well.

          8       Oh, I can point to things?

          9   Q.  Yeah, you can actually draw on the screen.

04:23    10       Where did you obtain the aerial photo from?

         11   A.  This one came from a service we use called Nearmap, and it

         12   was dated -- the aerial itself was dated September 11, 2014.

         13   Q.  And was there anything else that's noteworthy that we

         14   haven't covered so far?

04:23    15   A.  Also, right near there is the ATV parking garage as well.

         16   I just made a note of that.  That's it.

         17   Q.  Based on your review of documents as well as your visit,

         18   did you gain an understanding of how the system worked?

         19   A.  Yes.

04:24    20   Q.  And how did it work?

         21   A.  In general, there are two compressors that are in that

         22   compressor house that provide pressurized air for use

         23   throughout this maintenance facility.  That air goes through

         24   pipes that run underground and around and into the maintenance

04:24    25   garage, but there's also one that runs to that hose reel and

1    provides air pressure to that hose to allow folks to inflate

2    their tires.

3    Q.   And --

4            THE COURT:   Do you want to take the red off the

04:24   5    screen?

6    BY MR. LASKE:

7    Q.   And did you take a photograph of what you saw for the

8    compressors?

9    A.   Yes.

04:24   10   Q.   And is it what has been marked as Exhibit 478, page 2?

11   A.   Yes.

12   Q.   And this is a photograph of -- sorry, from 2015, correct?

13   A.   Correct, during my inspection.

14   Q.   And based on the review of your materials, did you learn

04:25   15   how the two compressors operated?

16   A.   Yes.

17   Q.   And how was that?

18   A.   So there are two compressors located in this compressor

19   house.  They both feed the whole system.  They do that

04:25   20   together.  The compressors are comprised of a motor that's

21   connected to a pump, and it just sucks air from the outside and

22   compresses it, squeezes it down, and puts it into each of these

23   tanks.

24       Those are storage tanks that hold the compressed air.

04:25   25       From those storage tanks runs a pipe, and the pipe joins

1   both tanks, and that pipe then runs over to the service area,

2   but also back into the tire rack and into the hose reel as

3   well.

4        So that's generally how they work, and one is designated as

04:26   5   a primary and one is designated as a secondary.

6   Q.   So primary and secondary, do they have to be aligned in

7   terms of the PSI settings?

8   A.   Well, so what happens is one is designated as a primary so

9   that one runs more often than the other.  That's the one that,

04:26   10   as people use air in the system, tends to turn on so that you

11   don't have them both running at the same time because then

12   they'd both wear out kind of in time together, and you'd have

13   to replace both of them.

14        Instead they designate one that's a primary so that one has

04:26   15   a higher, what they call, cut-in pressure.  That's the pressure

16   where the compressor is caused to start again.

17        So at the time of the accident, the one on the right is an

18   Ingersoll-Rand.  It's an upright tank.  It was designated as

19   the primary, which means that, in general, it would run anytime

04:26   20   the system would get low on air and only if there was a lot of

21   use of air in the system.

22        For example, if people, you know, ran lifts and tools and

23   all at the same time, then the second one would help join in.

24        So the idea is that you really put wear on one first and

04:27   25   just use them that way.

                1    What we see here on the left is one made by NAPA.  That's
                2  the one that's currently there.  And it's currently the
                3  primary.  But the time of the accident, there was one
                4  manufactured by Stewart Warner instead of that NAPA, and that
04:27           5  one was the secondary, and the Ingersoll-Rand was the primary.
                6  Q.   So if, for example, the primary says 150 and the secondary
                7  says 150, is it 300?
                8  A.   No.  So they both -- they both have mechanical gangs that
                9  read the pressure in the tank.  That's the same pressure that's
04:27          10  in the system that goes out to all the tools and things.  Those
               11  two should read about the same within the range of their
               12  mechanical gauge, but they are just both reading the same
               13  pressure.  So if they both say 150, that means that's what the
               14  pressure is in the system.
04:28          15  Q.   Okay.  Because they're sharing the same line?
               16  A.   Correct.  What goes out comes from both tanks, correct.
               17  Q.   And did you have an understanding, what you saw on the day
               18  of your inspection, was that the setup back in 2013?
               19  A.   No.  So back at the time of the accident, my understanding
04:28          20  was that the NAPA had instead not been replaced by, but had
               21  been preceded by one manufactured by Stewart Warner.
               22  Q.   And based on your inspection, did you determine what the
               23  maximum output pressure is?
               24  A.   Well, I saw the rating, if you're talking about the
04:28          25  Ingersoll-Rand.

1    Q.   I'm not saying what it was set to.  What's the maximum that

2    that machine --

3    A.   It's rated to put out 175 PSI.

4    Q.   And is that synonymous with a factory setting?

04:28    5    A.   That's my understanding based on having reviewed

6    depositions, yes.

7    Q.   So earlier in this trial, Mr. Rondinone testified that in

8    his report, which I believe you've seen, he noted the pressure

9    gauge in the Ingersoll-Rand, now the secondary compressor, read

04:29   10    180 PSIs during his site visit.

11        He also testified that in his report, he listed the NAPA,

12    the primary compressor, was reading 160 PSIs.

13        Did you happen to see this in his report?

14    A.   I think so, I think so.  It's been a while.

04:29   15    Q.   And how did Mr. Rondinone determine that the NAPA, now the

16    primary compressor, was running at 160 or at least had 160 PSI?

17    A.   I think he testified he just looked at it visually.

18    Q.   And are there any issues with just doing a visual

19    inspection?

04:29   20    A.   I mean, that's okay.  You have to trust that mechanical

21    gauge, but better would be to install on the system a digital

22    pressure transducer, which is another fancy word for a digital

23    pressure gauge like we did later during our testing and get a

24    better idea of what the actual pressure is.

04:29   25    Q.   So during either of your visits -- and it sounds like

1    perhaps the second visit -- did you actually hook something up

2    to the system?

3    A.   We did.

4    Q.   And could you tell what was being produced from the

04:30    5    Ingersoll-Rand?

6    A.   Yes.

7    Q.   And when was that second visit again?

8    A.   That was, I think, November.

9    Q.   I think you mentioned it was November 24th, 2015?

04:30    10    A.   Yes.

11    Q.   And after you attached -- what's the term again?

12    A.   It's a pressure transducer.

13    Q.   Pressure transducer.

14         And is it calibrated?

04:30    15    A.   It is.

16    Q.   With the pressure transducer, what did -- did it give you a

17    measurement?

18    A.   It did.

19    Q.   And what was measurement?

04:30    20    A.   It showed us that the pressure actually headed toward the

21    hose reel, or coming out of the hose reel, was about 30 PSI.

22    Then the mechanical gauge on the Ingersoll-Rand.  So when it

23    read 175, we were reading about 145.

24    Q.   So the gauge happened to be reading higher than what it was

04:31    25    really producing?

```
 1   A.   Correct.
 2   Q.   Why did you focus on the Ingersoll-Rand?  Why didn't you do
 3   it with the NAPA?
 4   A.   Because, again, at the time of the accident, the
 5   Ingersoll-Rand was the primary, and that's the one that would
 6   really be controlling the pressure.
 7   Q.   And as part of your work, did you review and analyze any
 8   photographs taken of the scene?
 9   A.   I did.
10   Q.   And did those photographs depict the component parts of the
11   wheelbarrow tire assembly?
12   A.   Yes.
13   Q.   It also depicts some other physical evidence?
14   A.   Yes.
15   Q.   Did you create a series of exhibits which depicts some of
16   these photos?
17   A.   Yes.
18   Q.   And I'm going to show you what's listed as 478-3.  It's
19   figures 4 and -- figures 4 and 5 from your December 14, 2015,
20   report.  Can you see that clearly?
21   A.   I do.
22   Q.   And what are we looking at?  You have kind of a number of
23   boxes here.
24   A.   Yeah, I don't know if it's possible to zoom in to one at a
25   time.  The upper figure, figure 4, is a photograph taken again
```

04:31 (line 5)
04:31 (line 10)
04:31 (line 15)
04:32 (line 20)
04:32 (line 25)

1   just after the accident facing to the south and a bit to the

2   east, and in the left half of the photo, in the upper left,

3   it's labeled "Tire Shop," and that's where these tire devices

4   are.

04:32   5       In the middle of the photo at the top, it's labeled

6   "Compressor House."  That's where the two compressors were

7   located.

8       The ATV parking garage is off to the right.

9       Down right in the middle is the hose reel that provides a

04:32   10  hose to the inflater and gauge for tire inflation.

11      And then there were a number of things related to Mr. Moore

12  and his belongings and the accident, including his vehicle,

13  Toyota 4Runner, some sandals, and the wheelbarrow inner tube

14  and tire were here, ended up here, and the wheelbarrow -- what

04:33   15  folks have been calling a rim, I call it a wheel -- was over in

16  this area, so I'm just pointing these things out for

17  orientation.

18  Q.   And I think the next figure we have might be figure 6 from

19  your report.  Give us one second, though.  We're going to grab

04:33   20  that.

21      And that also is from your report.  And what was the

22  purpose of focusing in on some of the pictures?  Like I said,

23  there might be 52 photos.  Why not obviously all 52?

24  A.   Yeah.  Well, just to kind of orient us as to where some of

04:33   25  the evidence came to rest, what it looked like, the fact that

1    the tube and the rim were together, but the wheel was separate.

2    That's really mainly it.

3    Q.   Okay.  I think we're ready to go.

4         So we're looking at figure 6 from your report.  Why did you

04:34   5    focus in on what's in Exhibit -- or figure 6?

6    A.   One thing I noticed was that there was a smart phone

7    located right by where the incident occurred.  And I made note

8    of it because in the end, one of my conclusions has to deal

9    with attention to the task at hand, so that's why I was looking

04:34   10   at it.

11   Q.   And if you look at the next Exhibit 478-5 or page 5, I

12   believe there's two figures, figure 7 and figure 8, and what

13   were you trying to focus us in on on those figures?

14   A.   The upper one shows the hose reel to which the -- you know,

04:34   15   inflater -- inflater gauge was attached, and I'm just showing

16   what it looks like.  It's a manual reel, meaning you have to

17   pull it out, and you have to reel it in by hand, and it does

18   not pivot, so it's fixed in place there.

19   Q.   You may notice -- actually, if we go back to figure 7,

04:35   20   there's been some point made of what looks like a manual tire

21   inflation gauge?

22   A.   Correct.

23   Q.   Have you heard or seen any testimony that relates to any

24   information about that?

04:35   25   A.   Yes.

1    Q.   And does anyone know why that thing is there?

2    A.   No.   So based on the depositions I read of the folks

3    working at this facility, nobody had an answer for why that's

4    hanging there.

04:35    5    Q.   Now, let's turn to Exhibit -- or figure 8 from Exhibit 478,

6    page 5, what were you trying to focus in on this figure?

7    A.   Here are a few of the items, again, right after this

8    accident.   There's a baseball cap, the wheelbarrow, inner tube,

9    and tire.   But now I'm focusing in on the inflater gauge, the

04:35    10    air hose that supplied it, and then the tire chuck at the end

11    just to, again, orient us.   The chuck is that stiff device that

12    you put on the tire valve to admit air into a tire.   The

13    inflater/gauge is a single unit that you press down on the

14    handle to let air come in through the chuck, and when you

04:36    15    release and you hold the chuck on there, there's a pressure

16    gauge in here, and they call it a bubble gauge because they've

17    got a little sight glass in it, and when you let go, you can

18    see a little indication of pressure.

19         MR. LASKE:   If it's okay, can we have the witness pull

04:36    20    an exemplar out so the Court may be able to see what this is?

21    I know we've been talking about it for several days.

22         MR. CHAMBERS:   Your Honor, I'd object to that without

23    a proper foundation anyways.   I don't know that there's been

24    any evidence at all as to what type or manufacturer of the

04:36    25    inflater --

1          THE COURT:  It goes to weight.  Overruled.

2    BY MR. LASKE:

3    Q.  So while we're doing that, let's look at another image.

4    It's Exhibit 478, page 6.  And actually there are two.  And if

04:37   5    we draw your attention briefly to figure 9, what are we looking

6    at from the tire assembly?

7    A.  So this is a close-up taken at the accident scene.  And you

8    can see the tire in the middle.  That's the donut, obviously.

9    It's intact.  The inner tube, though, has been blown out, and

04:37  10    it's split in the middle and has been pushed out.  This is

11    indicative to me that this was overinflated forcing that inner

12    tube out to expand and rupture and release pressure.

13    Q.  And then the next image is figure 10.  What are we looking

14    at there?

04:37  15    A.  Here we're looking at the wheelbarrow wheel itself.  It's a

16    steel, two-piece wheel, and it's got a hub in the middle

17    through which an axle goes that connects it to the wheelbarrow,

18    and we're looking here -- if you look at the damage to the

19    wheel, you can see this outer rim flange in that area has

04:38  20    become buckled, which I thought at first, and later confirmed,

21    indicated to me it had been subject to, again, excessive

22    pressure so that the tire puts what we call hoop stress on it.

23    It wants to compress that wheel, and it buckles it.  It puts so

24    much force on it that the lip literally collapses and buckles,

04:38  25    and ultimately, in my opinion, that's what let the inner tube

1    expand and release pressure.

2    Q.   So I think the problem with attorneys trying to use terms

3    that engineers would use is we might call things like a wheel a

4    "rim."   And did you notice that was kind of a common thing that

04:38   5    was showing up in the deposition transcripts?

6    A.   Yes, some people do refer to that as a rim.

7    Q.   So did you notice in some of the documents what we're

8    really talking about is a wheel, but people are calling it a

9    "rim"?

04:38   10    A.   Yes.

11    Q.   Were you able to examine the tire and wheel components from

12    Agent Moore's wheelbarrow?

13    A.   I was.

14    Q.   And where did you do that?

04:39   15    A.   I did that at the border patrol facility.

16    Q.   And is that the area -- or is that the site of the

17    accident?

18    A.   Yes, I looked at it in an office nearby.

19    Q.   And do you recall when that occurred?

04:39   20    A.   I can check my notes.   That was on August 19, 2015.

21    Q.   And was that the only purpose of your visit that day?

22    A.   Yeah, I think it was, yes.

23    Q.   And what did you do during your inspection?

24    A.   I examined the components, the failed wheel and the inner

04:39   25    tube and the tire, took pictures, and I also laser-scanned them

1   as well, which where we use a laser scanning device to take

2   measurements of the pieces.

3   Q.   And did you end up taking a series of photographs of the

4   components of the tire?

04:39   5   A.   I did.

6   Q.   And can you just briefly describe what those components

7   are?  And I think the first one is actually on page

8   478 -- sorry, Exhibit 478, page 7.

9   A.   So this is the subject wheelbarrow tire that came from

04:40   10   Mr. Moore's wheelbarrow, and, you know, I just noted it was a

11   True Temper tire.  That's the brand.  I noted the size, and,

12   really, it's not otherwise remarkable.  It did not fail.  The

13   tire itself was intact.  And it did not look damaged.

14       By the way I put these little labels on there for

04:40   15   photography purposes.  Those are like little letter markers.

16   Q.   And let's turn to the next one.  What did the undulation in

17   the sidewall -- why did you point that out?

18   A.   I was just pointing out any irregularity I saw, and I just

19   noticed that.  It didn't really mean anything to me.

04:41   20   Q.   Was there anything significant about the inner tubing?  If

21   there's not, I'll skip ahead.

22   A.   Yeah, the inner tube tells us -- that's what failed.

23   Q.   So if we look at Exhibit 478, page 8.

24   A.   So up top we're seeing a photograph of the inner tube that

04:41   25   came out of the tire.  It looks sort of intact there because

```
        1   I've put it back together and just arranged it for photography,

        2   but it's a thin rubber membrane.  That's what holds the

        3   pressure inside the tire.  It's got a valve on it.  We call a

        4   Schrader valve.  It's like a standard bicycle valve.

04:41   5       And then down below, I've now opened it up, and you can see

        6   that there's a split, and that split is on the inner

        7   circumference of the donut of the inner tube, and it runs about

        8   180 degrees, and it's consistent with overpressurization and

        9   failure and rupture, which, in my opinion, led to the loss of

04:42  10   pressure.

       11   Q.   Could you tell from looking at that stem if it would be

       12   possible to use a hand pump on that tire?

       13   A.   Sure, you could do that.  That's a standard stem.

       14   Q.   During your inspection of the tire, did you happen to see

04:42  15   any writing on it?

       16   A.   I did.

       17   Q.   And did you take photographs of that writing?

       18   A.   I did.

       19       MR. LASKE:  Your Honor, we'd like to show the witness

04:42  20   at this time Defense Exhibit 449, page 2.

       21       And is there a way to zoom this?

       22   BY MR. LASKE:

       23   Q.   And what was the purpose of taking a photograph of this

       24   section of the tire?

04:42  25   A.   So I was just taking a picture of the various markings on
```

1   the tire, instructions, warnings, specifications.  This is one

2   of those indications of the rating of the tire.

3   Q.   What is the rating of the tire?

4   A.   So it says in the middle of the photograph, "Max inflation

04:43   5   30 PSI or 2 bar."  So 30 PSI refers to 30 pounds per square

6   inch of pressure, and so that's the rated operating pressure of

7   this tire.

8   Q.   Is 2 bar just a metric conversion?

9   A.   Yeah, I think so.  A bar is close to an atmosphere.  That's

04:43   10   all I know.

11        MR. LASKE:  And I'm showing you what we've marked,

12   Your Honor, as Exhibit 449, page 3.

13   BY MR. LASKE:

14   Q.   Did you also take this photograph?

04:43   15   A.   Yes.

16   Q.   Can you see it clearly enough, or do you need it to be

17   focused?

18   A.   I can just about see it.

19   Q.   Otherwise, I can hand you another picture.

04:43   20   A.   Yeah.  I may have it too.  Thank you.

21   Q.   And why did you take a picture of this writing?

22   A.   Again, just documenting the warning on the tire relating to

23   inflating the tire.

24   Q.   And if you can make it out, what does it say?

04:44   25   A.   Yeah, it says, "Warning.  Tire changing and/or inflation

1    can be dangerous and should be done only by trained personnel

2    using proper tools."

3    Q.   As part of your work in this case, did you conduct any

4    pressure testing of exemplar wheel assemblies?

04:44    5    A.   We did.

6    Q.   And was the attempt to find something that was similar to

7    the wheel assembly that Mr. Moore was using that evening?

8    A.   That's what we were striving to do, yes.

9    Q.   Can you explain the process of how you undertook that?

04:44    10   A.   So we -- a couple of things.  We were -- we looked for

11   current replace wheel assemblies for the wheelbarrow made by

12   True Temper, and we obtained several of those.  Those are a

13   little bit different than the wheel that was on the wheelbarrow

14   at the time.  There's been a change in how they manufacture

04:45    15   them, so we also strove to look in the field and try to find

16   one of these older wheels that might still be on a wheelbarrow.

17   So we searched for quite a while, and eventually we were able

18   to find a single example.

19   Q.   And how many tests did you ultimately run?

04:45    20   A.   There were nine events, but there were eight actual tests

21   where something failed.

22   Q.   And where did you conduct the tests?

23   A.   Both in our laboratory at my office as well as at the

24   border patrol facility.

04:45    25   Q.   Let's take the first one, the laboratory.  How many did you

1    perform at the lab?

2    A.   Let's see if I can tell you that.

3    Q.   While you look for that, I'll ask you a quick other

4    question.  Why even do the test?

04:45    5    A.   So, ultimately, I was looking to put a number on the

6    pressure it would take to blow the tire.  And we were trying to

7    replicate and confirm that the way the tire and the wheel

8    failed was due to overpressurization.  So I wanted to see how

9    long it would take and how much pressure it would take.

04:46    10    Q.   Do you have an understanding if that was what Mr. Rondinone

11    was trying to do?

12    A.   I'm sorry, to do what?

13    Q.   To see how long it would take and the pressure it would

14    take.

04:46    15    A.   Yes, that is my understanding.

16    Q.   How many tests did you run in your laboratory?

17    A.   It looks like out of the eight, five of them were in our

18    lab.

19    Q.   And that would mean the other three tires that failed were

04:46    20    at the border patrol facility?

21    A.   Correct.

22    Q.   And at the border patrol facility you ran those tests at

23    the second site visit?

24    A.   Correct, during the second site visit, yes.

04:46    25    Q.   Were you able to make the tires fail every time?

A.   We were able to make either the tire or the wheel fail, so, in this case, it's my opinion that the wheel failed on Mr. Moore's wheelbarrow, and that let the inner tube expand and force the wheel out.  So we were trying to get the wheel to buckle the same way, but in six out of our eight tests, the tires actually blew instead of the wheel failing, so only twice did we get the wheels to buckle and fail.

Q.   Did you create a graphic to highlight the laboratory tests you performed?

A.   I think so.  I mean, we did different plots and things. Oh, I see, like an explanation of how we did it.  Yes.

Q.   And we may turn to that a little bit later.

How would you go about conducting the pressure test?

A.   So in our lab, we had a compressor which put out pressurized air.  We ran that through an exemplar inflater like this one that was similar to the one being used at the time of the accident, at least visually.  And we'd run that into a tire, a wheel assembly.  Typically that was in a cage, a tire cage.  And we would just run the air full bore until the tire inflated and something blew.  More often than not, it was the tire, but a few times, we got the wheel to buckle.

Q.   And did you have an opportunity to look at Dr. Rondinone's data?

A.   Yes.

Q.   And what did his data reveal in terms of his first test?

1    Because I believe the second test wasn't fully recorded.

2    A.   Yeah.   I forget which one.   There was one that wasn't fully

3    recorded, I think, because maybe the batteries ran out on the

4    video, but, basically, both of his tests, he ran two tests on

04:48   5    the newer style wheel, got them both to buckle, and it took

6    just under a minute for both of them, I think.   The last data

7    was 46 on one and maybe 56 on the other, something like that,

8    seconds.

9    Q.   And when you looked at Dr. Rondinone's data, did you

04:48   10   understand how he was recording everything?

11   A.   Yes.

12   Q.   Was it confusing at all to you?

13   A.   A little bit.   We did it differently because we use a

14   digital transducer which you plug into a computer, and it takes

04:49   15   readings of all the pressure all the time, and you have that

16   readout, and it collects it instantly while you're doing it.

17       Dr. Rondinone would -- didn't have that system, so he used

18   sort of a manual gauge and put video cameras on the gauges and

19   then would inflate partially, stop to look at the pressure,

04:49   20   inflate partially, stop to record the pressure again, and over

21   and over.

22       So you have to kind of glean that data by looking at videos

23   of his pressure gauges essentially, so --

24   Q.   And with Dr. Rondinone, he made some adjustments to his

04:49   25   data -- he testified about that a couple days ago -- using a

1    calibrated -- sorry -- transducer?

2    A.   I think he used just another calibrated pressure gauge.

3    Q.   But for what you were using, did you have to make

4    adjustments?

04:49   5    A.   No.  So we used a calibrated digital transducer that was

6    good to a thousand PSI and came calibrated with a traceable

7    standard.

8    Q.   So why did you run nine tests?

9    A.   So, again, we were just trying to search for that wheel

04:50  10   buckling, try to recreate that wheel buckling, and,

11   unfortunately, in six out of the eight, a tire blew first.

12   Q.   Even in instances when the tire blew, did you start

13   noticing a pattern, or was there no pattern?

14   A.   Interestingly, the level at which the tires blew was in the

04:50  15   same range as when the wheels buckled as well.  In general, all

16   of these wheels and tires failed somewhere between 120 and 140

17   PSI.

18   Q.   And is that consistent with what you had seen in the

19   manufacturer True Temper's person most knowledgeable, PMK,

04:50  20   depo?

21   A.   Yes.

22   Q.   So why conduct the ninth test?  You've done eight.

23   A.   Yeah, so, again, we were searching for a wheel that was

24   substantially similar to the one on Mr. Moore's wheelbarrow

04:51  25   because the others are of newer construction, and finally we

1    found one in the field.  It came from a firewood supplier who

2    uses wheelbarrows here in Southern California, and we purchased

3    it from him, and that was the only wheel that we could find

4    that was -- what I would consider to be very close to

04:51    5    Mr. Moore's wheel.

6    Q.   And was -- how did you conduct that test?

7    A.   So we did that test in our laboratory with our system and

8    equipment, and that one we happened to have the wheel attached

9    to an exemplar wheelbarrow.

04:51    10    Q.   Why leave it on the wheelbarrow?

11    A.   So we were examining a scenario where instead of the wheel

12    being brought loose to the border patrol facility to be filled

13    up that it remained attached to the wheelbarrow to see what

14    effect, if any, it would have on the trajectory of the wheel

04:51    15    assembly if it blew.

16    Q.   And did it have any effect?

17    A.   It did.

18    Q.   And so what was that effect?

19    A.   So instead of the loose wheel being forced due to the

04:52    20    release of pressure up into the air and up into Mr. Moore, in

21    this case the wheelbarrow wheel assembly remained attached to

22    the wheelbarrow.  The brackets that held the axle were a bit

23    bent, but it stayed attached so it didn't become a projectile.

24    Q.   And is it your understanding that Agent Moore removed the

04:52    25    wheel from the wheelbarrow before bringing it to work?

1    A.   That's my understanding.

2    Q.   What's involved in removing a wheel assembly from a

3    wheelbarrow?

4    A.   So for this particular one, you have to get a wrench and

04:52   5    take off four nuts that hold two brackets that hold the axle

6    that runs through the wheel.  So first you've got to take the

7    four nuts off, then the two brackets, then pull the axle out,

8    and the wheel comes out.

9    Q.   Did you determine if it was even plausible for Agent Moore

04:52   10    to even put it into his vehicle?

11    A.   Yes.

12    Q.   And how did you do that?

13    A.   So we have a scale diagram of a Toyota 4Runner, and we

14    overlaid a box that's the size of the external dimensions of

04:53   15    the wheelbarrow and overlaid it onto that diagram and also

16    checked online photographs of the cargo area of a Toyota

17    4Runner, and we found that it could fit.

18        Mr. Moore, in his deposition, also offered that he thought

19    it probably would have fit in the back.

04:53   20            MR. LASKE:  And, Your Honor, we'd like to direct the

21    witness' attention to Exhibit 478, page 17.

22    BY MR. LASKE:

23    Q.   What were you trying to depict in this photograph?

24    A.   So the upper photograph -- or it's a diagram.  That's a

04:53   25    scale diagram of a Toyota 4Runner of a similar vintage to

1    Mr. Moore's.  And in the pink area, there is a box that's the

2    overall dimensions of the True Temper C6 model wheelbarrow he

3    had.  That's a bigger box than the wheelbarrow actually is

4    because I'm just showing the longest extent of the handles and

04:53   5    the wheel.  It's actually smaller than that whole box.  But we

6    then compare that to the bottom photo, which shows the -- an

7    exemplar 4Runner that we found online with the rear seats up.

8    You can then fold those rear seats down, and you'd have room to

9    fit this wheelbarrow in there.

04:54   10   Q.  Was the wheel assembly from this test the same as the

11   modern True Temper wheel assembly from the earlier test?

12   A.  No.  So the one we found in the field from the firewood

13   folks was a thinner gauge metal.  It's the same kind that was

14   on Mr. Moore's wheelbarrow.  That's the main difference between

04:54   15   the two.  Otherwise, they're, generally, dimensionally similar.

16   Q.  So was the issue trying to use the newer wheel or did you

17   actually have issues trying to find the older wheel?

18   A.  So the issue was trying to find the older wheel, sorry, but

19   the newer wheel was more ready available, yeah.

04:54   20          THE COURT:  Do they have serial numbers on them?

21          THE WITNESS:  They don't.  They have stamps on them

22   that have certain ID, but no specific number, unfortunately.

23          THE COURT:  How can you be sure the exemplar wheel was

24   the same as the one involved in the accident?

04:55   25          THE WITNESS:  Because I inspected both and could

1    compare the two.

2         THE COURT:  Did you take gauge measurements?

3         THE WITNESS:  I laser-scanned both, and we fit them

4    over each other, and they were super close.

04:55   5    BY MR. LASKE:

6    Q.  What was the result of the test using the exemplar wheel

7    that was more of the earlier version versus the modern version?

8    A.  So the one that was more similar to the Moore wheel, it

9    took 26 seconds to fill that tire until the wheel collapsed,

04:55  10    and it collapsed at a pressure of 123 PSI.

11    Q.  Did you document this test in any way?

12    A.  We documented all the tests in video and recording the

13    digital pressure data as well.

14    Q.  Did you create a video demonstrative exhibit for this case?

04:55  15    A.  We did.

16         MR. LASKE:  Your Honor, we'd like to direct your

17    attention to Exhibit 432.  Sorry, Mr. Deyerl.

18         THE COURT:  All right.

19         MR. LASKE:  Sorry, Your Honor.  I believe it is 476.

04:56  20    BY MR. LASKE:

21    Q.  And where was this video shot?

22    A.  This was in our warehouse lab at my office.

23    Q.  So it wasn't one of the tests at the border patrol?

24    A.  No.

04:56  25         MR. LASKE:  I believe we're ready to play the video.

|       | 1  | THE WITNESS:  Sure.  And what we'll see is that |

1          THE WITNESS:  Sure.  And what we'll see is that

2     older-style wheel, the one we got from the firewood folks --

3          MR. LASKE:  Why don't we just watch it first.

4          THE WITNESS:  Sure.

04:56    5          MR. LASKE:  Sorry.  Can we stop for a second while

6     we're working this out?

7     BY MR. LASKE:

8     Q.  While we restart it, why don't you tell us quickly, what

9     are we going to see in this test?  What is this test showing

04:57   10     us?

11     A.  So this is an exemplar wheelbarrow of the same model that

12     Mr. Moore's was.  It's upside down on the ground.  We've

13     mounted the wheel assembly to it using the hardware that came

14     with the wheelbarrow, and that -- field wheel that we found.

04:57   15     And we start from a zero pressure condition, a flat condition

16     of the tire, and we are now running air at 145 PSI into that

17     tire through an inflater just like this.

18     Q.  Okay.  And we'll play the video now.

19          And that tire failed at how many seconds?

04:58   20     A.  26 seconds.

21     Q.  And in order to get the wheel assembly similar to

22     Mr. Moore's to fail, you had to fill for half a minute, and

23     what was the pressure source?

24     A.  So it was our compressor we had in our warehouse which puts

04:58   25     out 145 PSI.

1   Q.   And did you create -- did you create an exhibit that shows

2   what -- like did you take a photograph of what this looks like

3   after it fails?

4   A.   Yes.

04:59   5   Q.   And is there anything else that you wanted to note about

6   this test?

7   A.   Yeah, the sound was a little quiet, but one thing you could

8   notice is that there's a flow that goes into the tire while

9   it's expanding, and a while before the tire actually fails or

04:59   10   the wheel fails, that flow of air, you can hear that sound

11   diminish, and that's starting to get near the point where the

12   wheel fails.

13        The other thing you can notice is that the rim flange on

14   the wheel itself, you can actually see where it buckles and

04:59   15   opens up and lets the inner tube out to release the pressure,

16   and then finally, of course, you can see that that wheel

17   remained attached to the wheelbarrow in this case.

18   Q.   And in the video, does the rim shoot out?  It doesn't

19   appear that it does.

04:59   20   A.   No, you can see that it remains attached.  That's what I

21   was saying.  So if you look at it right in the -- you'll see

22   I'll put a circle around here, right where you'll see that rim

23   flange buckling, you can hear the hissing.

24   Q.   What's that hissing?

05:00   25   A.   That's the air flowing into the tire through our system.

1    Q.   So there's an auditory component to letting someone know

2    they're pushing some air in?

3    A.   Correct.

4    Q.   And other visual signs?

05:00    5    A.   Here the stem moved a little bit right before the end, and

6    then in that area I circled is where you finally see the flange

7    buckle.

8         The other thing is the wheel becomes larger and also

9    becomes a lot firmer as well.

05:00   10    Q.   And did you happen to see Dr. Rondinone's test?

11    A.   I did.  On the video.

12    Q.   And in his test, do we see any signs that the tire might

13    fail?

14    A.   Yeah, you see similar things.  You see the tire growing.  I

05:00   15    think you see the stem -- valve stem move, in one of the tests

16    at least.  And if you could get in there -- he had it in a

17    compartment -- but you'd feel the tire was also very stiff.

18    Q.   And in Dr. Rondinone's testimony, he took it off the wheel

19    well?

05:01   20    A.   Correct.

21    Q.   So some similar signs, some similar cues?

22    A.   I'm sorry?

23    Q.   You mentioned the stem moving?

24    A.   Right.  Or similar to our test.

05:01   25    Q.   That doesn't rely on whether it's on the wheelbarrow or

1   not?

2   A.   Correct.

3   Q.   Whether the tires expands, does that require it to be on

4   the wheelbarrow versus off?

05:01   5   A.   No.

6   Q.   And basically any of the visual signs you might get, is it

7   dependent on whether the wheelbarrow is on -- I mean, sorry --

8   whether the tire is on the wheelbarrow versus on the ground?

9   A.   No, they don't.

05:01   10   Q.   So those should be the same?

11   A.   Correct.

12   Q.   And if we look at -- and, actually, I think you brought

13   some exemplar tires here.   And I think there are three.

14       Can you just describe for the Court why there's three and

05:01   15   what's the difference between each one?

16   A.   So just as a demonstrative exhibit, I brought three

17   exemplar tire wheel assemblies we had that are the same size

18   and type.   They're the newer style wheels from True Temper, and

19   we inflated them to three different pressures to just get

05:02   20   a -- to depict or give you a chance to feel the difference in

21   stiffness between a flat tire, one that's inflated to 30 PSI,

22   which is the rated load, and one that's inflated to twice the

23   rated load, about 60 PSI, because there's even a difference

24   between that, so that's what we brought with us.

05:02   25   Q.   And like for the first one, for example, if you could pull

789

1    it out, what was your understanding of the tire pressure of the

2    tire that Ryan Moore was filling on the day of the accident?

3    A.   So based on the description by his colleague, Mr. Martinez,

4    he described that it was totally flat.

05:02    5    Q.   So it would be something like you're holding there with the

6    same kind of consistency to it?

7    A.   Yeah, so you can tell, if there's no air in it -- and this

8    actually has a tiny little bit in the tube, but we couldn't get

9    it all out, but that's how it feels, very floppy, it's obvious

05:02    10   they're a gap between the rim flange and the tire.

11            THE COURT:  When a tire can be manipulated like that,

12   is there any PSI reading in it when it's flat?

13            THE WITNESS:  Not on a gauge because the gauge

14   typically needs a few PSI.  You wouldn't read anything.

05:03    15            THE COURT:  Okay.

16   BY MR. LASKE:

17   Q.   And then you can probably just leave it up there for a

18   second.  If you want to pull the second one out.

19            Can you tell us what the second one is an exemplar of?

05:03    20   A.   So this is another one of these exemplar newer True Temper

21   wheel assemblies.  This one we've inflated to 30 PSI, and so

22   that's the rated pressure, and visually, obviously, it becomes,

23   you know, more balloon-like and donut-like, and you can feel

24   it's fairly firm.  It's got a little give to it.

05:03    25   Q.   So it does have a little give, if you can feel it?

          1    A.   It does, it does, but it's already -- even without a gauge,

          2    you will feel this, and, in my opinion, you can see this has

          3    got to be close to full.

          4    Q.   Do you mind leaving that one up there and take the other

05:03     5    one out, and let's see if we can see any difference.

          6         What's the next one?

          7    A.   The third one is inflated to 60 PSI or twice the rated

          8    load.  I would say it's hard to tell visually.  It's probably

          9    got some size difference, but the main thing you can really

05:04    10    feel is this one is hard as a rock.

         11    Q.   So if you could squeeze it --

         12    A.   If you hit it with your knuckle, you can really feel it.

         13            THE COURT:  You said there were some differences

         14    between the wheels on the older model True Temper and then the

05:04    15    newer ones.  Were there differences between the tires that you

         16    found and the tire that was involved here?

         17            THE WITNESS:  The only thing I could note was the

         18    identification on the outside.

         19            THE COURT:  Did you laser-scan the tires to see if

05:04    20    they were the same -- the gauge was the same, the rubber was

         21    the same?

         22            THE WITNESS:  I did not.  We laser-scanned them, but I

         23    did not compare the tire because it was the wheel that failed,

         24    so I was concentrating on the wheel.

         25

1   BY MR. LASKE:

2   Q.   And after you did your test, did you take some photographs?

3   A.   I did.

4         MR. LASKE:   Can we turn to Exhibit 477, which would be

05:05   5   page 1?  Exhibit 477, page 1.  Sorry.

6         THE COURT:   Is this a convenient time for us to recess

7   for the afternoon?  Do you have quite a bit more?

8         MR. LASKE:   I do have a little bit more, Your Honor,

9   but --

05:05   10         THE COURT:   Okay.  Well, sir, Eric Deyerl --

11         THE WITNESS:   Deyerl.

12         THE COURT:   -- I'm sorry, I hate to have you come

13   back, but we've had a long day, and I'm sure there will be

14   cross-examination, so we can't -- I don't think we can

05:05   15   accommodate all that this afternoon.

16      We'll be in recess until tomorrow 9:00.  9:00.

17      You're going to start with Mr. Deyerl tomorrow then?

18         MR. LASKE:   Yes.

19         THE COURT:   Okay.  How many additional witnesses do

05:06   20   you contemplate?

21         MR. LASKE:   We have -- I think we have five more

22   witnesses, but I think you've seen the pace we're going.  We'll

23   get it done.

24         THE COURT:   All right.  You are at six hours 50

05:06   25   minutes, almost seven hours.  The plaintiffs are at ten hours

1   25 minutes.  So plaintiffs have approximately an hour and a

2   half, and defendants have approximately five hours left.  Okay.

3            MR. LASKE:  Thank you, sir.

4            MR. CHAMBERS:  Thank you.

05:06   5            THE COURT:  We're in recess.  We'll see you tomorrow.

6            MR. CHAMBERS:  Is it your intention we close tomorrow

7   afternoon?

8            THE COURT:  Yeah, I think so.  I may reserve decision

9   until next week.  I'm not sure depending on what happens

05:07   10   tomorrow and the way things go, but, on the other hand, if we

11   finish early, I may take my notes and the exhibits and render a

12   decision tomorrow.

13                            ---000---

14

15                    C-E-R-T-I-F-I-C-A-T-I-O-N

16

17      I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.

19

20         Dated March 3, 2017, at San Diego, California.

21

22

                              /s/ Dana Peabody
23                            Dana Peabody,
                              Registered Diplomate Reporter
24                            Certified Realtime Reporter

25