1                United States District Court

2           For the Southern District of California

3

4  RYAN MOORE,

                            No. 15-CV-75-LAB

5      Plaintiff,

                            March 3, 2017

6        v.

                            San Diego, California

7  UNITED STATES OF AMERICA and

  DOES 1 THROUGH 25, INCLUSIVE,

8

      Defendants.

9

10                    Trial Day 4

                Transcript of Trial

11      BEFORE THE HONORABLE LARRY ALAN BURNS

           United States District Judge

12

  APPEARANCES:

13

  For the Plaintiff:      GOMEZ TRIAL ATTORNEYS

14                    ROBERT J. CHAMBERS

                    BEN WOHLFEIL

15                    655 West Broadway, Suite 1700

                   San Diego, CA  92101

16

  For the Defendants:     TIM L. LASKE

17                    GARRETT J. COYLE

                    ASSISTANT UNITED STATES ATTORNEYS

18                    Federal Building, Suite 7516

                   300 North Los Angeles Street

19                    Los Angeles, CA  90012

20

21

22  Court Reporter:         CYNTHIA R. OTT, RDR, CRR

                   DANA PEABODY, RDR, CRR

23                    District Court Clerk's Office

                   333 West Broadway, Suite 420

24                    San Diego, California, 92101

25

```
Case:   Moore v. USA
Date:   March 3, 2017
```

## INDEX OF WITNESSES

FOR THE DEFENDANT:

### E X A M I N A T I O N

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **David Finta** | | | | |
| Mr. Coyle | 797 | | 803 | |
| Mr. Chambers | | 801 | | |
| **Eric Deyerl** | | | | |
| Mr. Laske | 805 | | 860 | |
| Mr. Chambers | | 831 | | 862 |
| **Richard Gluckman, M.D.,** | | | | |
| Mr. Coyle | 863 | | | |
| Mr. Wohlfeil | | 892 | | |
| **J. Thomas Chess** | | | | |
| Mr. Laske | 896 | | 927 | |
| Mr. Chambers | | 922 | | |
| **Stephanie Engler** | | | | |
| Mr. Laske | 932 | | 959 | |
| Mr. Wohlfeil | | 955 | | |
| **Jose Martin Del Campo** | | | | |
| Mr. Laske | 963 | | 983 | |
| Mr. Wohlfeil | | 980 | | |

1  Case:   Moore v. USA
   Date:   March 3, 2017
2

3

4                        INDEX OF EXHIBITS

5  EXHIBIT                                          EVIDENCE

6  Exhibit 11                                           985

7  Exhibit 270 - Page 7                                 986

8  Exhibit 271                                          986

9  Exhibit 291                                          985

10 Exhibit 308                                          987

11 Exhibit 403                                          987

12 Exhibit 410                                          986

13 Exhibit 449                                          988

14 Exhibit 466                                          987

15 Exhibit 471                                          987

16 Exhibit 485 Pages 5 - 8                              988

17

18

19

20

21

22

23

24

25

```
 1              San Diego, California, March 3, 2017
 2                            *   *   *
 3              THE COURT:  All right.  When we took our recess
 4     yesterday, the government was examining Mr. Deyerl.
 5              MR. COYLE:  Your Honor, we have another witness we'd
 6     like to call out of order to accommodate his schedule.
 7              THE COURT:  Okay, sure.
 8              MR. COYLE:  The United States calls FBI Supervisory
 9     Special Agent Brady Finta.
10              MR. CHAMBERS:  Your Honor, we'd object to that.  I
11     don't know who that is and he wasn't listed on any exhibit list
12     that I've seen -- or excuse me, witness list.
13              THE COURT:  Was he listed or she?
14              MR. COYLE:  He's an impeachment witness.  He was not
15     listed.
16              THE COURT:  Okay.
17              MR. LASKE:  And, Your Honor, just so you know, he is
18     Ryan Moore's current supervisor at the FBI.
19              THE COURT:  All right.  I'll hear the testimony
20     subject to motion to strike.  If it's not true impeachment,
21     I'll disregard and strike it.
22              DAVID FINTA, DEFENDANT'S WITNESS, SWORN
23              THE COURTROOM DEPUTY:  Can you please state your name
24     for the record and spell your first and last names.
25              THE WITNESS:  Yes.  My name is David Brady Finta.  My
```

09:07
09:07
09:08
09:08
09:08
09:09

1    first name is D-A-V-I-D, last name is F as in Frank, I-N-T-A.

2    I do go by my middle name though which is Brady.

3              THE COURT:    Go ahead.

4                         DIRECT EXAMINATION

09:09    5    BY MR. COYLE:

6    Q.    Good morning, what do you do for a living?

7    A.    I'm an FBI agent.

8    Q.    How long have you been doing that?

9    A.    18 years.

09:09    10    Q.    Do you know Border Patrol Agent Ryan Moore?

11    A.    Yes.

12    Q.    How do you know him?

13    A.    He's a detailee to my task force, so we call him a TFO,

14    task force officer.

09:09    15    Q.    How long has he been on your task force?

16    A.    I don't know exactly, but somewhere around May or June of

17    2016 is when he started, I believe.

18    Q.    And what -- can you describe your task force generally,

19    what kinds of crime do you target?

09:09    20    A.    We're officially called the cross border violence task

21    force, traditionally dealing with essentially Mexican cartels.

22    Q.    You're Agent Moore's supervisor on the task force; is that

23    right?

24    A.    Correct.

09:10    25    Q.    How often do you see Agent Moore?

1    A.    I would say most days.

2    Q.    Can you describe for the Court what kind of activities

3    Agent Moore does on the task force?

4    A.    Specifically as a border patrol agent we try to kind of

09:10    5    mostly utilize his particular skills in terms of a liaison with

6    the border patrol and CBP, work down along the border, which a

7    large portion of our work is, conduct interviews,

8    surveillances.

9         Actually to tell you the truth, the majority of what

09:10    10    everybody else on the task force does, same stuff.

11    Q.    You mentioned surveillance.   Agent Moore participates in

12    that surveillance?

13    A.    Yes.   I mean, you know, depending, but when we have

14    surveillances it doesn't always take the entire task force but,

09:11    15    yes, he participates in our surveillances.

16    Q.    And can you tell the Court what that surveillance entails?

17    A.    You know, usually it's -- it's a targeted subject as

18    opposed to just a residence or something like that.   We follow

19    them around and see who they meet with, where things like

09:11    20    money, payments go, what businesses they travel to, where their

21    homes are, trying to do it without being discovered.

22    Q.    So it entails driving, for example?

23    A.    Yeah, it's mostly just driving and talking on the radio.

24    Q.    Would you characterize this surveillance as high risk?

09:11    25    A.    Not generally.   There are times when it is.   When we have

1    surveillances on extortion crews, murder for hire groups,

2    kidnapping subjects, we treat it as high risk, meaning, you

3    know, we take some precautions, we have operations, plans, and

4    such.   But when a surveillance is truly high risk, like we

09:12    5    expect there to be physical contact with subjects, it's

6    relatively rare and, oftentimes, we use the SWAT team for that.

7    Q.   The surveillance is field work, it's not sitting in front

8    of a computer?

9    A.   Yes.

09:12    10    Q.   Okay.   And does --

11    A.   It all ends up on the computer though, right.

12    Q.   Does Agent Moore have any specific responsibilities,

13    especially recently in conducting the surveillance?

14    A.   Well, I don't know about conducting the surveillance per se

09:12    15    but yeah, he's kind of the lead on our -- we have an operation,

16    kind of an ongoing operation down at the border right now

17    conducting surveillances and contacting subjects, yes.

18    Q.   You said he's the lead, what does that entail?

19    A.   Well, in this particular circumstance he's drawing kind of

09:12    20    resources from border patrol to mix with the FBI, so we call it

21    a joint operation.   He's organizing that.   He's kind of

22    designating some of the surveillance targets and conducting

23    interviews.

24    Q.   Is it fair to say he's planning it?

09:13    25    A.   Yeah, yeah.   In conjunction with the FBI case agent, yes.

1    Q.   Does the task force do any advanced targeting of border

2    crossings?

3    A.   Yes.   But when you say the task force basically it's just

4    Ryan.

09:13    5    Q.   And what does that entail?

6    A.   Using CBP systems to give us detailed intelligence on

7    border crossing subjects and their affiliates that most of us

8    really don't have access or knowledge to be able to do that.

9    Q.   Is Agent Moore good at his job?

09:13    10    A.   Yes.

11    Q.   Do you have any concerns about his performance?

12    A.   No.

13    Q.   If Agent Moore were to request an extension of his tenure

14    on your task force, would you support it?

09:13    15    A.   Wholeheartedly, yes.

16            MR. COYLE:   Nothing further.

17            THE COURT:   Any questions of Agent Finta?

18            MR. CHAMBERS:   Your Honor, I'd object and move to

19    strike the testimony.   I'm not sure if anything that was said

09:14    20    was different than what Mr. Moore said.

21            THE COURT:   Oh, there was some, there was some

22    difference.   It was nuanced, I acknowledge that, but he does

23    have responsibility for surveillance, for targeting certain

24    individuals.   That's -- conjures up in my mind different job

09:14    25    responsibilities than simply sitting behind a computer all the

1    time.   So the objection is overruled, the testimony stands.

2                            CROSS EXAMINATION

3    BY MR. CHAMBERS:

4    Q.    Good morning.

09:14    5    A.    Good morning.

6    Q.    I just have a couple of questions for you.   In Ryan's

7    current role with your task force, does he have access to the

8    FBI computers?

9    A.    No.

09:14    10    Q.    And does he have an FBI radio?

11    A.    Yes.

12    Q.    And --

13              THE COURT:   Does anyone other than an FBI agent have

14    access to the FBI computers?

09:15    15              THE WITNESS:   Yes -- yes, Your Honor.   We've been

16    trying to get him access since June of last year.

17              THE COURT:   What's the hang-up?

18              THE WITNESS:   I don't want to just blame border

19    patrol, but generally once border patrol passes his clearance

09:15    20    to the FBI security office in DC it happens pretty quickly

21    after that.

22         And on the last border patrol agent it took a very long

23    time for that to happen too.   We can't figure out where the

24    disconnect is in DC, but we're not allowed to locally pass

09:15    25    clearances anymore, so it all happens up there.

1        THE COURT:  It's not peculiar to Mr. Moore?

2        THE WITNESS:  No, sir.

3        THE COURT:  It's a border patrol problem?

4        THE WITNESS:  Yes, sir.

09:15    5    BY MR. CHAMBERS:

6    Q.   And the primary or one of the primary responsibilities that

7    Mr. Moore has with your task force is to do record checks on

8    computer systems, is that accurate?

9    A.   Yes, yes.

09:15   10   Q.   And do you recall how many surveillances Mr. Moore's

11   actually been on?

12   A.   I just very quickly kind of went through some of our cases,

13   and I think I came up with probably six or eight that I could

14   definitely look at and say Ryan was on this one.  And I would

09:16   15   say that was before the last couple of weeks with all the stuff

16   going on down at the port where he's -- I mean he's gone daily

17   down there for the last couple weeks, I would imagine.

18   Q.   And the surveillance you're talking about, as you mentioned

19   before, entails, I think as you put it, driving and talking on

09:16   20   a radio?

21   A.   That's pretty much it, yeah.

22   Q.   Lot of sitting around, I imagine?

23   A.   Yeah.  Yeah.

24   Q.   I'm not trying to diminish what you do.

09:16   25   A.   No, I mean, yeah, it's not brain surgery.

1    Q.   In how many cases is Ryan the actual case agent on?

2    A.   He's not the primary on any of our cases.   He's one of a,

3    what we call a case manager.   He's one of the case managers on

4    probably our second biggest case on the squad.

09:16    5            MR. CHAMBERS:   I don't have anything further.   Thank

6    you.

7            THE COURT:   How many people are on this task force?

8            THE WITNESS:   It fluctuates a little bit, Your Honor,

9    between about 14 and 17.

09:16    10            THE COURT:   Okay.   Any other questions of Agent Finta?

11                        REDIRECT EXAMINATION

12    BY MR. COYLE:

13    Q.   Just one, Your Honor.   When you're doing the surveillance

14    or when Agent Moore is doing surveillance, is it covert

09:17    15    surveillance?

16    A.   We hope so, yes.

17            MR. COYLE:   Thank you, nothing further.

18            THE COURT:   Thank you, Agent Finta, you are excused as

19    a witness.   You may stand down.

09:17    20            THE WITNESS:   Thank you, Your Honor.

21            THE COURT:   Next witness.

22            MR. LASKE:   We're going to jump back in order and have

23    Mr. Deyerl.   I know it's spelled a little bit differently than

24    it sounds, but it's actually Eric Deyerl.

09:17    25            THE COURT:   I keep butchering his name, I have it as

```
 1   D-E-Y-E-R-L?
 2              MR. LASKE:  That is correct.
 3              THE COURT:  But he pronounces it like the soap, like
 4   Dial soap?
 5              MR. LASKE:  It does, like D-I-A-L.
 6              THE COURT:  Okay.
 7              MR. LASKE:  Which is why his company is Dial
 8   Engineering.  I had also butchered his name when I first met
 9   him.
10              THE COURT:  Yeah, that's, I bet he gets a lot of
11   people mispronouncing his name, D-E-Y-E-R-L.
12              MR. LASKE:  Yeah, I think that's why -- so he has his
13   own company and he named it Dial.
14              THE COURT:  The R is silent, is that what it is?
15              MR. LASKE:  I don't know.  Several of those things are
16   silent.
17              THE COURT:  Come forward, Mr. Deyerl.  We were just
18   discussing the pronunciation of your name.  The R is silent in
19   your name?
20              THE WITNESS:  It is.
21              THE COURT:  Yeah, I bet you get a lot of people
22   mispronouncing it.
23              THE WITNESS:  I had two German parents, immigrants and
24   even the Germans don't get it right so.
25              THE COURT:  You're still under oath, Mr. Deyerl.  You
```

09:17
09:17
09:18
09:18
09:18

805

1    may continue your examination.

2              ERIC DEYERL, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

3                      DIRECT EXAMINATION RESUMED

4    BY MR. LASKE:

09:18    5    Q.   Your Honor, I think when we last left off we had been

6    talking about -- Mr. Deyerl, I think we had been talking about

7    the setup, some of the testing, the things you did that led up

8    to your opinions, correct?

9    A.   I think so, yes.

09:18    10   Q.   So I'd like to finish covering that and I -- I think maybe

11   take a couple steps back just really quick.  I think you

12   described your setup, but did you take any photos of the setup

13   where you tested the tire with just the wheel?

14   A.   Yes.

09:19    15   Q.   Okay.  And I think if we're able to pull it up, it's

16   Exhibit 451, page 141.

17        And when it does pop up on the screen, 451, page 141, what

18   are we going to see on the screen?

19   A.   It should be a photograph of our laboratory setup where we

09:19    20   tested one of the wheels.

21              THE COURT:  Is it our problem or?

22              MR. LASKE:  You know what, I have a picture, I'll just

23   put it on the doc cam.  That'll make it easier.

24              THE COURT:  There we go.

09:19    25   BY MR. LASKE:

1    Q.   And this is from Exhibit -- actually 478, page 13.

2         So what are we -- can you just walk through some of the

3    things that we're seeing in the picture.  And I think the other

4    day you were talking about some of the differences between the

09:20   5    way you did the testing and the way Mr. Rondinone did the

6    testing, so to the extent that it helps highlight some of those

7    issues, can you point some of the things out?

8    A.   Sure.  So this is a shot of our warehouse lab and we had a

9    similar setup in the field when we went to the border patrol

09:20  10    station.   But basically we had a pressure source, which is a

11    compressor here, that has 200 PSI in the tank that gets

12    regulated to 145 PSI.  That runs through a hose that's sitting

13    here on the table.

14         And it goes into this pressure transducer.  This is the

09:20  15    digital sensing device that senses pressure and then sends that

16    to the laptop which records the pressure.  We get a visual

17    readout of that pressure right here.  You can see the gauge

18    pressure right there is .8 PSI on the screen and it rapidly

19    increases and it acquires data very rapidly.

09:21  20         The hose then continues on past that into the tire.  This

21    was an exemplar tire that we were testing at the time.  The

22    tire is sitting in a cage because we knew we were going to

23    burst this tire and we wanted to constrain it, so that's a tire

24    cage, and it's made to contain tires like that.

09:21  25         And then we had a number of cameras.  There's a camera on

the ground and lights, just around here, to document what we

had.  We had two high-speed cameras and then just a regular

speed camera somewhere, I forget where it is, but that's it.

And we did something similar at the border patrol station

09:21   except I think without the lights.

Q.   And for the one where you did the testing with the

wheelbarrow on it, did you also take a picture of the setup?

A.   Yes.

Q.   And the picture that you took, was it before you conducted

09:22   the test?

A.   I believe so.  I'd have to see the photo.  I think it is.

Q.   Or at least pretty contemporaneous with it?

A.   Yeah, we took some before and some after.

Q.   So it wasn't like a day before or it wasn't --

09:22   A.   No, no, it was right then.

Q.   I'm going to show you what is marked as 478-14.  So can you

kind of point out some of the pertinent information on this?

A.   Right.  So here's one of the tests we did.  Actually this

looks like the final test with the -- the wheel that we found,

09:22   the older wheel that seemed the most similar to Mr. Moore's.

We put the wheelbarrow upside down on the ground.  The air hose

runs into the wheel.  We made a special fitting to keep that

hose on the tire valve and, again, we have cameras and lights

and that's basically it.  And then we ran the test that way.

09:23   Q.   And were there any other photos of any of the other testing

1  that's kind of pertinent to show?

2  A.    There's maybe the post test photo from this test is of

3  interest because, like we talked about yesterday, this

4  wheelbarrow constrained the tire after the tire blew and there

09:23  5  was some minor damage to it but, again, the brackets held.   So

6  I had kind of a close-up photo of that, maybe.

7  Q.    And this one, I guess in this photo you have a camera and

8  then a videocamera?

9  A.    Yes, so both of these are high-speed cameras here and then

09:23  10  up here I think is where we had our regular speed video

11  real time.

12  Q.    And then -- so after the tests, did you actually take the

13  wheel assembly apart and compare the damage to the test wheel

14  to the damage sustained in the wheel from Ryan Moore's case?

09:24  15  A.    I did.

16  Q.    Did you also happen to take any photographs of that?

17  A.    I did.

18  Q.    And is that a picture of the subject wheel?

19  A.    Yeah, I don't know if there's a way to zoom out slightly on

09:24  20  this or.

21         THE COURT:    The subject wheel being the one that

22  has --

23         MR. LASKE:    I think we can switch over to maybe --

24         THE COURT:    Mr. Laske, the subject wheel is the one

09:24  25  that has historical connection here to the events, that's what

1  you're talking about?

2          MR. LASKE:  Yes, sorry, Your Honor.  I mean the wheel

3  that based on your understanding and from that one inspection

4  where you went to the border patrol at their, I think, CIIT

09:24  5  team office to look at it, that's what I'm calling the subject

6  wheel.

7          THE COURT:  Wait.  I'm confused by the title.  Subject

8  wheel, is that the one that blew up on Mr. -- on Agent Moore?

9          MR. LASKE:  Yes, it is.

09:24  10          THE COURT:  Okay.

11          THE WITNESS:  Correct.

12          MR. LASKE:  So I think this image might be better for

13  you to look at on the screen.

14          THE WITNESS:  Yes, this is great.  Thank you.

09:24  15  BY MR. LASKE:

16  Q.   So what are we looking at?

17  A.   The top photo is the wheel from the Moore wheelbarrow and,

18  again, we're seeing the rim flange of the wheel in this area

19  and it appears to me to be buckled.  Buckling occurs when you

09:25  20  push from end to end on a thin device and it tends to want to

21  bend in the middle.  And then if you look at the test wheel we

22  tested below, this is the field wheel we found, the only one we

23  were able to find.  It's a little bit rusty but otherwise has

24  the same size and the same layout.

09:25  25          And you can see the resulting buckling after we tested the

1   wheel as well, so generally similar.  The idea is that a lot of

2   force was put into the rim and it buckled.

3   Q.   You said rusty, but what's your understanding of the

4   condition of the wheel that Mr. Moore's tire was in?

09:25   5   A.   It was -- you can see there's minor bits of rust on the

6   inside of the Moore wheel but not as extensive as the rust on

7   the wheel we tested.  But I would still say even the wheel we

8   tested, the rust was kind of on the surface.  It didn't appear

9   to be, you know, through the wall of the wheel.

09:26   10   Q.   And so did that have any significance to you?

11   A.   Well, if anything, our test might be a little conservative

12   because there's more rust on our wheel than on the Moore wheel

13   making it potentially weaker.

14   Q.   So it might cause the test wheel to fail slightly earlier?

09:26   15   A.   Correct.

16   Q.   Now let's talk about the findings you had with regard to

17   what occurred in the accident.  Based on the work in this case,

18   did you arrive at a conclusion regarding what happened during

19   plaintiff's accident?

09:26   20   A.   Yes.

21   Q.   And what is your opinion with regard to how the accident

22   occurred?

23   A.   In my opinion, Mr. Moore applied pressure to the subject

24   wheel, did so, and did it in a fashion that put a multiple

09:26   25   times the rated pressure into that tire.  That tire then

squeezed the rim, caused it to buckle.  The inner tube came out
in that opening where it buckled, split, and released the
pressure from inside the tire.  That pressure release then
forced the steel wheel itself out of the tire and into
Mr. Moore's face.

Q.   So to maybe break a little bit of that down, the subject
tire, 30 PSIs was the maximum rate?

A.   That's what it was rated for, correct.

Q.   And based on the tests that you ran, the tests that
Mr. Rondinone ran, the tests that True Temper runs before they
sell any of these tires, what's the rating that people are
getting?  What's the minimum?  So at least gets to this
pressure before it explodes, what is that?

A.   Yeah, so all of these tests require at least 120 PSI to get
one of these wheels to fail, so four times the rated pressure.

Q.   And isn't it true Mr. Rondinone failed the tire at 136 PSI?

A.   Could be, I might have to look at the notes, but his were
up there too.

Q.   And even True Temper, some of their failures happened
higher than 120?

A.   Yes.

Q.   So let's now talk about kind of your second part of your
assignment, I think we talked about a little bit as we've been
going because it made sense to do it then.  But just going into
slightly more detail, trying not to cover the same stuff, what

1    was the second part of your assignment?

2    A.   Again, based on my discussions with you was to evaluate the

3    cues, the sensory cues available to Mr. Moore while he was

4    filling this tire that might have told him what the pressure of

09:28    5    the tire was or how much was going in.

6    Q.   And how did you complete that assignment, was that just

7    part of observing the test?

8    A.   Yeah, so we conducted, again, eight failure tests and I was

9    present at every one, videoed every one and observed each one.

09:28    10    Q.   And you mentioned video, but you were there to observe it,

11    did you ever watch the video?

12    A.   Oh, sure.   Sure.

13    Q.   And so based on your firsthand observation, your later

14    review of the test video, and I'm assuming you also looked at

09:28    15    the video of Mr. Rondinone too?

16    A.   I did.

17    Q.   You're of the opinion that there would have been some kind

18    of sensory cues or warnings to Mr. Moore?

19    A.   Indications to him that this tire was becoming very

09:29    20    pressurized, yes.

21    Q.   Can you walk through what those sensory cues would have

22    been?

23    A.   Sure.   I think there were four of them.   Probably the most

24    clear and important one in my mind is duration or time passing.

09:29    25    We carried out two tests that resulted in wheel buckling, the

1    one that we saw here, the wheel that was closest to Mr. Moore's

2    took almost half a minute, took 26 seconds to fail.

3        We had another one that took almost four minutes and that

4    had to do with the way we ran the test. We ran that test at

09:29    5    the border patrol facility and we considered a scenario where

6    the tank and the compressor didn't necessarily start out at the

7    highest pressure because the odds that that tank is actually

8    operating at the highest pressure at any time is pretty low

9    because it cycles from its lowest pressure to its highest

09:30   10    pressure.

11        And when it gets to the highest pressure, there's leaks in

12    the system, and we observed that and we measured that. And the

13    leaks come out of the system at about two PSI a minute. So the

14    odds that it's ever right at that high pressure are actually

09:30   15    pretty slim.

16        So we considered another scenario where it started at the

17    low end of the pressure range, and we ran that test. And the

18    compressor cycled while we were doing it, but then the

19    compressor is kind of playing catchup, you know, trying to put

09:30   20    out pressure while you're taking pressure out and that test

21    took four minutes to buckle the wheel. It was also a new

22    wheel. It wasn't the old wheel.

23        So we had a range from anywhere from half a minute to four

24    minutes. Mr. Rondinone failed two wheels. They're both the

09:30   25    new style wheels. And one he recorded I think as much as 46

seconds, but it was early, the other I think he recorded 53

seconds, so he was getting about a minute to fail these wheels.

My point being whether it's half a minute, a minute, four

minutes, this is a long time to fill a small volume tire like a

09:31   wheelbarrow tire.  I kind of liken it to a bicycle tire that if

you're going to use a powered piece of equipment to pressurize

that, which may not be recommended, you've really got to

monitor it and do it in short bursts and not kind of hang on

it, you know.

09:31   THE COURT:  The PSI would never have been lower than

the cut-in point though, right?

THE WITNESS:  Correct.  Correct.

THE COURT:  Because it'll recycle on its own if leaks

cause it to go below the cut-in point then the compressor will

09:31   come on and put it at least up to the cut-in point?

THE WITNESS:  Correct.

THE COURT:  And the cut-in point here was?

THE WITNESS:  There's some debate.  So there was

testimony by the Ingersoll Rand gentleman.  At one point he

09:31   said 145, another point he said 135.  When I was there doing

our tests, if you read the manual gauge, it came down to and it

hung at about I think 153 and just before it cut back on it

dropped to 135 and that's what it said on the gauge.  However,

what we were measuring on the digital gauge was 30 PSI less.

09:32   So there's an issue with this compressor in terms of what

1   it was putting out.

2          THE COURT:   When you attached the digital gauge, were

3   you getting cut-in pressure below 145?

4          THE WITNESS:   Oh yeah, it was 110, yeah.   And it was

09:32   5   interesting, because our gauge matched the gauge on the NAPA

6   compressor pretty close within 5 PSI, but the Ingersoll gauge

7   was 30 PSI off.   So it's a debate, but I would say anywhere

8   from 110 to 135 is what it sounds like.

9          THE COURT:   How many -- there was a manifold attached

09:32   10   to one or both of the compressors?

11          THE WITNESS:   Correct.   They both feed the same pipe.

12          THE COURT:   How many lines ran out of the manifold?

13          THE WITNESS:   So they went -- that one manifold had

14   one single pipe, but then that pipe split two other places.

09:32   15          THE COURT:   Did you ever determine how many different

16   end points there were being serviced by the compressors?

17          THE WITNESS:   Only generally.   You know, it went to a

18   number of different machines, so I would say, you know,

19   probably at least a dozen.

09:32   20          THE COURT:   The more there are, the more likely it is

21   that there'll be some leakage or release of pressure?

22          THE WITNESS:   Exactly.

23          THE COURT:   Before -- I'm making this assumption but

24   tell me if it's correct, before the compressor fully

09:33   25   pressurizes, the line that was used by Agent Moore has to go

816

1   back and backfill all the other lines, only then is the

2   pressure sufficient to push it out at full force from the line

3   that he's using?

4            THE WITNESS:   Yes.   So essentially it's pressurizing

09:33   5   everything at once, that's correct.

6            THE COURT:   Thank you.   Go ahead.

7            THE WITNESS:   So that was the first sensory cue would

8   have been time.

9   BY MR. LASKE:

09:33   10   Q.   Can I stop you one second.

11   A.   Sure.

12   Q.   So just to go back a step to what you were just saying,

13   when you did the testing of the Ingersoll, you saw it go from

14   like 152 and then all of a sudden it dropped to 135 on the

09:33   15   Ingersoll gauge?

16   A.   Correct.

17   Q.   But then it read lower on the digital gauge?

18   A.   Correct.

19   Q.   And what is the importance of the Ingersoll, I mean at the

09:33   20   time you viewed it, it was secondary, why would that matter?

21   A.   Oh, I'm sorry, so -- no, I should clarify that too.   When

22   we did our test, we had a technician come out and reset the

23   Ingersoll to be the primary just like it was at the time of the

24   accident.   So that's why we were keeping an eye on that one.

09:34   25   So it's a little confusing.

1    Currently, the NAPA is the primary and the Ingersoll is the

2    secondary.  We wanted to recreate what was there at the time of

3    the accident, so we had a technician come out and reset that.

4        THE COURT:  Where was the -- but the NAPA wasn't

09:34  5    involved, right?  It had -- by the time you got there two years

6    later, the NAPA had been the replacement for the one that was

7    secondary at the time?

8        THE WITNESS:  Correct.

9        THE COURT:  And what had happened to that compressor?

09:34  10       THE WITNESS:  I looked at it.  It was put in a storage

11    facility.  So it was --

12       THE COURT:  Any tests done on that one?

13       THE WITNESS:  No.

14       THE COURT:  Do you believe that the primary source of

09:34  15   the pressure when Agent Moore went to inflate the tire was the

16   Ingersoll compressor?

17       THE WITNESS:  Correct, correct.

18       THE COURT:  Go ahead.

19   BY MR. LASKE:

09:34  20   Q.  And that's based on the setup you described earlier in your

21   testimony?

22   A.  Correct.

23   Q.  Were there any other issues or sensory cues relating to the

24   duration of fill time?

09:35  25   A.  That's -- that's really it.  Time was one of these four

1   cues that I saw.

2   Q.   And is it your opinion that you would expect Mr. Moore to

3   notice the passage of time?

4   A.   I think a user filling a small volume tire like this would

09:35   5   be aware like, you know, hey, what's going on, either it's not

6   filling or it's getting hard, yeah.

7   Q.   And what's another sensory cue?  I think you mentioned

8   four.

9   A.   Yeah, another one is what we discussed yesterday and that

09:35   10   has to do with the tension in these tires.

11   Again, even without a gauge, without knowing exactly what's

12   in the tire, it's like a bicycle tire, you can fill it and

13   quickly feel like, hey, that's firm, you know, so that's

14   something that's immediate and felt even with the hand right on

09:35   15   the tire.  So gauge or not I think that's a good indication of

16   how full the tire is.

17   Q.   Is there kind of a common example that you could use, I

18   think you mentioned bike tires, is that something people do

19   sometimes, they fill the tire?

09:36   20   A.   I would say that's probably the best example.  I mean, you

21   know, it's what I do when I fill bike tires.  You fill it and

22   you kind of feel it and put your hand on it.  And if you want

23   to be real accurate you put a gauge on it.

24   Q.   And I think when I was asking you some questions yesterday

09:36   25   you mentioned that the stem on this type of wheelbarrow tire is

819

1  basically the same or very similar to the type for a bicycle?

2  A.   It is.   It's what they call a Shrader valve.   It's very

3  standard.

4  Q.   And with a Schrader valve can you use a hand pump?

09:36   5  A.   You sure can.

6  Q.   Do you recall in Mr. Moore's testimony from his deposition

7  if he acknowledged whether or not he owned a hand pump?

8  A.   That I forget.   I could check, but I don't recall.

9  Q.   What was the next cue that you think would have been

09:36   10  available to Mr. Moore?

11  A.   Yeah, another one would have been the size of the tire.

12  It's -- I would say out of all the cues it's probably the least

13  apparent, but it is apparent that this tire grows in size,

14  particularly when it gets over the rated pressure.   And in our

09:37   15  testing when it gets near burst it becomes noticeably puffier,

16  if you will.

17  Q.   And this you believe would be another available visual cue?

18  A.   Correct.   Correct.   And --

19  Q.   Go ahead.

09:37   20  A.   Go ahead, it's fine.

21  Q.   Based on your understanding of where the tire was found, it

22  was on the ground?

23  A.   Correct.

24  Q.   And so did you have some at least understanding or did you

09:37   25  draw a reasonable assumption as to where he probably was

1    positioned in relation to it?

2    A.    Yes.

3    Q.    And would he have been likely in the position where he

4    could have just touched the tire with his hand?

09:37    5    A.    Yes, so it almost requires that the hand be very near the

6    tire itself because you have to hold that chuck on to the

7    valve.   So, you know, the hand would be right there.

8    Q.    So it wouldn't be something where he was standing and more

9    than like the size of his height so?

09:37    10    A.    No.

11    Q.    So five to six feet away where maybe he couldn't touch it?

12    A.    Correct.

13    Q.    I think you mentioned there might be a fourth sensory cue,

14    what would that be?

09:38    15    A.    Yeah, and that would be sound.   And we discussed that a

16    little bit yesterday during the test video we played.   And it's

17    going to depend on the ambient sound.

18        When I was at the border patrol facility, I went there at

19    night as well, it's fairly quiet.   I don't know if Mr. Moore's

09:38    20    car was idling or not.   Didn't get mentioned that way, but as

21    long as it's relatively quiet there's going to be an audible

22    sensation of the air coming in.   And then mainly once it gets

23    near burst pressure that noise stops completely as there's very

24    little flow and, you know, eventually the tire goes.

09:38    25        So that would be another cue as well.

1    Q.   So if the tire was completely flat, is there more of a

2    distinction in sound versus if it already had air in it?

3    A.   Yes, again, it's closer, again, to the end where the tire

4    is about to burst, that's where it really shuts off, you know.

09:38    5    Q.   Any other sensory cues that we haven't discussed?

6    A.   That's what I can think of.

7    Q.   And is it your opinion that that's something that would be

8    apparent to someone filling a tire, this type of tire?

9    A.   Yeah, depending, again, on the ambient conditions, you

09:39    10   know, I went there at night.   There is some light there.   It is

11   quiet.   But I didn't perform this test under those conditions.

12   But certainly the duration, number one, and the stiffness,

13   number two, are really the primary ones.

14   Q.   So potentially size and sound would have to depend on the

09:39    15   surroundings?

16   A.   Correct.

17   Q.   But the duration and just the ability to fill the tire,

18   that's always available regardless of the conditions?

19   A.   I would say it's readily apparent, yes.

09:39    20   Q.   And is that why you brought the exemplar tires today that

21   would show an example of that?

22   A.   Exactly.   Exactly.

23   Q.   Did you have a chance to review the report of the other

24   expert, Mr. Rondinone?

09:39    25   A.   I did.

1    Q.    And were you provided all of his materials?  I believe that

2    they were provided to us and we sent them to you.

3    A.    Yes.

4    Q.    So you got his testing data?

09:40    5    A.    Yes.

6    Q.    And I think there were two videos?

7    A.    Yeah -- yes.  There may have been more than two because I

8    think there was one on the tire and then one on the valve

9    outside.

09:40   10    Q.    There were two files which had two different tests and

11    within the files were there multiple videos?

12    A.    Yes.

13    Q.    And for the Court, we only looked at one small clip of the

14    videos, but could you tell us what -- I think the second test

09:40   15    or whichever test wasn't completed because the videocamera shut

16    off, we're not going to focus on that, we'll focus on the one

17    that actually was completed with the videocamera.

18         Can you tell us roughly how many videos were in that and

19    kind of what they were?  Because I believe the way

09:40   20    Mr. Rondinone did his setup you could see the tire in a video

21    and then there was another video where it was showing something

22    else.

23    A.    Yes.

24    Q.    What was that something else?

09:40   25    A.    So he had placed the tire in a compartment that he was

09:41

1    pressurizing it in and then I think outside of the building he

2    had a series of valves where he could admit air into the tire

3    and then shut it off and have a pressure gauge that then read

4    what was now that static pressure in the system downstream of

5    the valve including the tire.

6        And he just did that repeatedly.  So he would open the

7    valve, let air into the tire, close it, see what the pressure

8    was, and kind of repeat that, you know, over and over.  And he

9    would video that valve and then take these pressure readings,

09:41    10    if you will.

11   Q.   And then separately he had another video shooting what was

12   actually happening to the tire inside?

13   A.   Correct.

14   Q.   And then was there like a slow motion video too?

09:41    15   A.   I forget.  It's been a while since I looked at it.

16   Q.   Okay.  And what was your understanding of the video that

17   was outside of I guess a building where he was moving the lever

18   up and down, what was your understanding of why he was doing

19   that?

09:41    20   A.   Again, he was not using like a digital transducer or any

21   kind of data acquisition system, so that kind of effectively

22   became his data acquisition system, these gauges that he would

23   just open the valve on, shoot the video, and then later on take

24   a look at the video and then figure out what the time and the

09:42    25   pressure was.

1   Q.   Other than the tests that he ran, you had access to his

2   data, right?

3   A.   Yes.

4   Q.   And after reviewing his data, at least the one failure test

09:42   5   that was completely videoed, it failed at a time period longer

6   than your test?

7   A.   Correct.

8   Q.   And was the pressure higher or lower than your test?

9   A.   I could take a quick look, I think I have that in a plot.

09:43   10   Q.   While you look for that, we're going to look at Exhibit

11   147-43.   We're going to pull that up.   But did you get to your

12   data?

13   A.   I did.

14   Q.   And what was the data, what is the comparison between your

09:43   15   test and the completed test that was videotaped by

16   Mr. Rondinone?

17   A.   So just looking at the data we plotted from his test, it

18   looks like his tire failed at just under 140 PSI and ours,

19   again, failed, like we talked about yesterday, at 123 PSI.

09:43   20   Q.   And the timing for your test was 26 point something but

21   basically 26 seconds?

22   A.   Correct.

23   Q.   And then for Mr. Rondinone's, his test failed at?

24   A.   That was, again, just under a minute, 53 or 56 seconds,

09:43   25   something like that.

1   Q.   Okay.  I think it was 56.5 but basically 56 seconds?

2   A.   Correct.

3   Q.   So other than the testing, we talked about the PSI, slight

4   difference, even the setup, were there any other areas of

09:44   5   disagreement with Mr. Rondinone?

6   A.   Yes.

7   Q.   And does any of that relate to what we're looking at on

8   1 -- Exhibit 147, page 43?

9   A.   Yes.

09:44   10   Q.   And what was that disagreement?

11   A.   So Mr. Rondinone's conclusion is that the pressure gauge

12   that was in the inflater attached to the end of this hose was

13   definitely nonfunctional at the time of the accident.  And he

14   bases that on a couple things.  One is he bases it on testimony

09:44   15   he reviewed, I think primarily by Mr. Pascua, indicating that

16   this inflator gauge sometimes needed to be replaced and that

17   vehicles would damage it and the agents would damage it.

18        So with regard to that aspect, I don't think that alone

19   allows you to conclude it's definitely nonfunctional at the

09:44   20   time of the accident.  Also Mr. Pascua described that it was

21   really mainly the chuck that was getting damaged at the end and

22   not necessarily the gauge and the inflator.

23        The gauge also is embedded in a pretty solid housing, so

24   unlike the chuck and the hose that kind of hang out at the end,

09:45   25   the gauge is kind of buried inside metal, so it's a bit more

1    protected than everything else.

2        The second basis he had for concluding in his opinion that

3    the gauge or the gauge again was nonfunctional is that he

4    points out that he saw in pictures of the hose, and you can see

09:45   5    it here, I'm going to circle it, there's like a kink in the

6    hose which he said indicated, again, it was being abused or

7    damaged and, again, the hose has nothing to do with the

8    inflator at the end or the gauge at the end, so, again, I don't

9    think you can draw that conclusion.  And, if anything, a kinked

09:45   10   hose is going to provide a restriction to airflow and not cause

11   any sort of increase in pressure.

12       And then the other thing he stated in his deposition was he

13   noted the presence of a manual tire gauge that was kind of

14   pinned to the fence that we see in this post-accident

09:46   15   photograph here.

16   Q.   Kind of the size of this pen, right?

17   A.   Yeah, that's correct.  And at first in his deposition he

18   said that he could think of no other reason that that gauge was

19   there other than the pressure gauge in the inflator being bad,

09:46   20   and I really disagree with that heartily.

21   Q.   Can you think of another reason?

22   A.   Sure, there's a real simple reason is this hose reel, like

23   we talked about earlier, is not one of those convenient hose

24   reels you have at the gas station where you just reel it out

09:46   25   and it auto retracts.  And it's not pivoting like at the gas

827

1    station where it's got rollers and you can pull it from side to

2    side, it's fixed on a reel and that reel is manual as well.

3        So if somebody wants to check their tires on their vehicle

4    and they wanted to use the gauge on the end of this hose,

09:46    5    they'd have to manually unreel that hose, drag it around to

6    each of the four tires, put the inflator gauge on it, read the,

7    you know, pressure, which, you know, is a bit of work if you

8    don't think your tires are necessarily flat.

9        So I could see someone sticking a gauge up there and just

09:47    10    walking around and quickly checking the tires before they

11    unreeled this hose, so.

12        THE COURT:   Mr. Deyerl, with all respect --

13        THE WITNESS:   Yeah.

14        THE COURT:   -- these conclusions, and I'm not

09:47    15    suggesting you're wrong, that they don't comport with common

16    sense, but the conclusions drawn from these things don't fall

17    into the category of your expertise or Mr. Rondinone's, right?

18    BY MR. LASKE:

19    Q.   And that was your point, right?

09:47    20    A.   That is my point actually.

21        THE COURT:   These are conclusions that you would

22    expect reasonable people to draw from circumstances that aren't

23    necessarily based on experience or technical knowledge and

24    expertise, right?

09:47    25        THE WITNESS:   And that's actually my point, because

1    Mr. Rondinone, therefore, concludes that because all these

2    things existed, you know, therefore, the pressure gauge

3    inside --

4              THE COURT:  I'm not picking on you.

09:47  5              THE WITNESS:  Yeah.

6              THE COURT:  When he was here I called him out on it

7    too, and I think he acknowledged the same thing that it wasn't

8    necessarily an experiential opinion that he was offering, that

9    he was just trying to deduce from what was readily observable

09:48  10   what was likely, which is fine, but it's not expert opinion.

11             MR. LASKE:  Yeah, Your Honor, I think the only point

12   we were trying to make is in the rebuttal report you were

13   commenting that it wasn't an expert opinion, correct?

14             THE WITNESS:  What I was saying is it's not a

09:48  15   scientific conclusion, that's correct.

16   BY MR. LASKE:

17   Q.   But you weren't trying to make an opinion beyond that?

18             THE COURT:  Mr. Chambers, no one disagrees with that,

19   right?  These are just conclusions that all of us are free to

09:48  20   draw based on available circumstances.  They're not dependent

21   on us having engineering degrees, right?

22             MR. CHAMBERS:  I would agree with that, Your Honor.

23             MR. LASKE:  Your Honor, the only reason he addressed

24   it in his rebuttal report is because Mr. Rondinone put it out

09:48  25   there in his initial report like it was a scientific --

1    THE COURT:   One or the other expert got off on the

2  wrong path and everybody's chasing him down that wrong path.

3    MR. LASKE:   We'll move on.

4    THE COURT:   I do have a question for you, Mr. Deyerl.

09:48   5  Drawing on your expert background and status, what do you think

6  explains the difference in the failure time between

7  Mr. Rondinone's test and yours?  His took 56 seconds, according

8  to him, 140, roughly 140 pounds of pressure before the wheel

9  failed, yours was less time, measurably less time, 30 seconds

09:49  10  less at a lower PSI.   What explains the difference in those two

11  test results?

12    THE WITNESS:   Most likely the change in the wheel

13  design, you know, the newer wheels have a double-walled

14  thickness wheel flange at the end.

09:49  15    THE COURT:   Were his tests done on the newer wheels?

16    THE WITNESS:   They were.

17    THE COURT:   Okay.   And did you -- you ran eight or

18  nine tests?

19    THE WITNESS:   Eight actual failure tests, yeah.

09:49  20    THE COURT:   And any of those done on the newer

21  designed wheel?

22    THE WITNESS:   Yes.

23    THE COURT:   Refresh my memory, I know wheels failed

24  twice in your test?

09:49  25    THE WITNESS:   Correct.

1    THE COURT:   Was one on an old style wheel, one on a

2  new style wheel?

3    THE WITNESS:   Correct.

4    THE COURT:   And what was the data regarding the

09:50   5  failure of the new style wheel, how long did that take?

6    THE WITNESS:   That's the one I mentioned we did at the

7  border patrol facility where we started at a low pressure and

8  that took four minutes roughly.

9    THE COURT:   Okay.   Four minutes of air time or just on

09:50  10  and off?

11    THE WITNESS:   No, no, fill time.

12    THE COURT:   Fill time, all right.   Go ahead.

13  BY MR. LASKE:

14  Q.   On Tuesday Mr. Rondinone testified that if the border

09:50  15  patrol had installed a 24-inch hose with a clip-on chuck that

16  this accident would have been prevented.   Do you agree with

17  that opinion?

18  A.   Well, so I think a longer hose provides a user with the

19  opportunity to get away, but, again, he's making the conclusion

09:50  20  that the accident would not have happened.   Someone would still

21  have to move back and stand away, so, you know, it would depend

22  on where Mr. Moore would have placed his body.   If he was still

23  relatively close and the wheel flew a certain direction, it

24  could still have happened.

09:50  25  Q.   And with any -- without any eyewitnesses, we're not sure

1    how the tire -- what direction or how it exactly moved in

2    comparison to where he was standing at the time?

3    A.   Correct.   Although, you know, in our situation I do think

4    he was close or over the wheel, yes.

09:51  5    Q.   And on Tuesday Mr. Rondinone testified and we played him a

6    12-second clip of his first tire testing video, the one

7    that -- actually the video completed before the tire burst, or

8    the tire burst and then the video captured all that.   He

9    testified that as more air is put into the tire, he said the

09:51  10    entire tire moves and so does the hose, do you agree with that

11    observation on his video?

12    A.   I think that was the case, yes.

13    Q.   And did Mr. Rondinone consider that sensory warning in his

14    report?

09:51  15    A.   Yeah, I don't think he considered any of these, you know,

16    sensory feedbacks to Mr. Moore, no.

17    Q.   But that particular one, did he consider it?

18    A.   I don't think he considered any of them, including that

19    one, correct.

09:51  20              MR. LASKE:   Nothing further at this time, Your Honor.

21              THE COURT:   All right.   Cross-examination.

22              MR. CHAMBERS:   Yes, Your Honor.

23                        CROSS EXAMINATION

24    BY MR. CHAMBERS:

09:52  25    Q.   Hello again, Dr. Deyerl.

1    A.   It's Mister, good morning.

2    Q.   Mr. Deyerl, I apologize.

3    A.   Thank you.

4    Q.   Just out of curiosity, the rim or the wheel that we've been

09:52    5    talking about, the one that was involved in Mr. Moore's

6    incident, how much does that weigh?

7    A.   It's a little over two pounds, I want to say maybe 2.6 by

8    memory.  I can look it up if you'd like.

9    Q.   And it's made of steel, correct?

09:52   10    A.   Correct.

11    Q.   And if I heard you just a moment ago, you actually agree

12    with Mr. Rondinone in terms of the failure mechanism in this

13    case; is that right?

14    A.   Correct.

09:52   15    Q.   And that's basically that the metal wheel folded over and

16    caused the explosive release of air?

17    A.   Correct.

18    Q.   And you also agree with Mr. Rondinone that a regulator set

19    to an appropriate level would have prevented this whole thing

09:52   20    from happening?

21    A.   Well, it depends what you mean by appropriate level.

22    Q.   And we'll talk about that in a minute.

23    A.   Okay.

24    Q.   But set to an appropriate level, it would prevent this

09:52   25    whole thing from happening?

A.   Again --

       MR. LASKE:   Objection, argumentative.

       THE WITNESS:   I can't agree with appropriate level unless I know what that is.   But what it would require is a level lower than the burst pressure of this tire, that's correct.

BY MR. CHAMBERS:

Q.   All right.   Well, let's talk about that.   So as I understand your opinion, your opinion is that the tire that Mr. Moore was inflating would have failed at 120 PSI or higher?

A.   Correct.

Q.   No chance that it fails beneath 120?

A.   Correct.

Q.   So fair to say that a regulator set to 120 would have prevented this whole thing from happening?

A.   Well, you'd be right at the margin, I mean, hard to say about 120, but.

Q.   119?

A.   Again, you're real close.   I mean, we're measuring things that are at 120, 123.

Q.   115?

A.   Sure, I'd say that and below.

Q.   Well, that's a little different than what you told me at your deposition, isn't it?

A.   I don't remember.

Q.    All right.  Well, let's take a look.  I'd like to read from page 95.  And I'm going to start -- or excuse me, line 19, 95, 19.

MR. LASKE:  When are you going to stop?

09:54    MR. CHAMBERS:  Let's stop at 7 on the next page.

MR. LASKE:  Okay.

BY MR. CHAMBERS:

Q.  "QUESTION:  I noticed with your section on Mr. Rondinone that you didn't mention anything about his opinion that a regulator would have prevented this from occurring.  Since it's not in there, I'm assuming you agree that a regulator set to something below 120 would have prevented this from occurring?

"ANSWER:  Can we say below a hundred?

"QUESTION:  Sure.

"ANSWER:  Let's say below a hundred.

"QUESTION:  Sure.

"ANSWER:  I would agree with that.

"QUESTION:  So you're comfortable that a regulator set below a hundred would have prevented this whole thing from happening?

"ANSWER:  Correct."

Now you're telling me it could be as high as 115.  Well, I assume one of the reasons you told me that a regulator is set to a hundred at your deposition is because you wanted to build in that safety factor just in case something happened between a

1  hundred and 120, isn't that right?

2  A.   Correct.

3  Q.   So it is possible that something could have occurred

4  between a hundred and 120 that could have caused a failure?

09:55  5  A.   Well, again, it's hard for me to say.  I mean these are

6  data points we're all doing, there is some variance in that

7  data, so I just can't say.

8  Q.   But at least in terms of planning for the worst, you'd have

9  a regulator that was set down to a hundred PSI?

09:55  10  A.   Well, again, it depends what you mean by planning for the

11  worst because to me this is not a foreseeable circumstance

12  where somebody is bringing in a small volume tire and using

13  powered equipment to do it.

14  Q.   You don't think that's foreseeable, sir?

09:55  15  A.   I don't.

16  Q.   Were you aware of any warnings in any of the documents that

17  you've read that somebody at the border patrol said, hey guys,

18  you can fill up anything except a wheelbarrow tire?

19  A.   No.   But -- no, I'll just answer your question.

09:55  20  Q.   And you also agree that a clip-on chuck with several feet

21  of hose would have at least significantly minimized the risk of

22  injury in this case, isn't that true?

23        MR. LASKE:   Objection, argumentative, misstates prior

24  testimony.

09:56  25        THE COURT:   No.   Overruled.   It's not argumentative.

1    You may answer.

2         THE WITNESS:   If that person was using that hose and

3    standing farther back, yes.

4    BY MR. CHAMBERS:

09:56    5    Q.   But it would significantly minimize the risk, you would

6    agree with that?

7    A.   If the person was standing back with that hose, yes.

8    Q.   Fair enough.   I'd like to talk a little bit about this

9    testing that you've done.   Part of your assignment in this case

09:56    10    was that you wanted to reconstruct what happened, right?

11    A.   Generally that's true.

12    Q.   And that included the performance testing that you talked

13    with Mr. Laske about?

14    A.   Generally that's true, yes.

09:56    15    Q.   And the purpose was to replicate the sort of tire failure

16    or wheel failure that we see in Mr. Moore's case?

17    A.   That was our goal, correct, with a similar wheel, that's

18    correct.

19    Q.   And also to record the pressures and the times involved?

09:56    20    A.   Correct.

21    Q.   And for all of the tests that you ran, at least in your

22    lab, you used a regulated pressure of 145 PSI, right?

23    A.   Correct.

24    Q.   That means that's the input pressure going into the tire?

09:57    25    A.   Correct.

1   Q.   I think you talked a little bit before there was some

2   testimony from the folks over at Ingersoll Rand that the

3   cut-in, the factory cut-in pressure was at 145?

4   A.   Correct, or 135 he said at one point.

09:57   5   Q.   Somewhere around there.   And then the factory cut out

6   pressure was 175?

7   A.   Correct.

8   Q.   That's how it left the plant and was shipped to folks,

9   right?

09:57   10   A.   Apparently, yes.

11   Q.   So you're within that range, maybe a shade on the low side,

12   correct?

13   A.   Correct.

14   Q.   And it's your opinion that the compressors that Mr. Moore

09:57   15   was using to fill the tire were safe, correct?

16   A.   I don't have any opinion about their design or condition, I

17   don't know about any unsafe conditions.

18   Q.   Do you think what he was doing out there was safe given the

19   pressures that were coming out of the compressors?

09:57   20   A.   I don't, no.   Well, the way he did it and because it took

21   so long and apparently applied the pressure so long, I think

22   that was unsafe, that's correct.

23   Q.   But you think there's a way to safely use the compressors

24   that were out at the border patrol facility to fill a

09:57   25   wheelbarrow tire, is that right?

1    A.    You could.    But, again, you need to just do quick bursts.

2    Q.    Understood.    But there's a way to safely do it?

3    A.    Yes.

4    Q.    And that's true even though you told me at your deposition

09:58   5    that in virtually all your tests, in fact, I think all of them,

6    it goes from zero PSI in the tire to 30 PSI which is the

7    maximum recommended inflation in about a second?

8    A.    That's correct.

9    Q.    That's pretty fast?

09:58   10    A.    It is.

11    Q.    And I think you described it at your deposition as being

12    rapid, isn't that right?

13    A.    Sure is.

14    Q.    And you couldn't tell me anything you filled in your entire

09:58   15    life that went from zero to the recommended maximum inflation

16    in one second, that's true?

17    A.    Correct.

18    Q.    If I could get Exhibit 450 up, please.    Now

19    you've -- you've made it a point to talk about I think you

09:58   20    called it a digital transducer?

21    A.    Correct.

22    Q.    And this is the little device that we saw sitting next to

23    your computer in that photograph?

24    A.    Correct.

09:58   25    Q.    And basically as I understand it, the purpose of this

839

1   transducer is to obtain pressure and time information from your

2   test and put it directly into a computer?

3   A.   Correct.

4   Q.   So we've got virtually simultaneous data down to the second

09:59   5   or better that is input into a computer; is that right?

6   A.   Down to a small fraction of a second, yes.

7   Q.   And that goes into like an Excel spreadsheet?

8   A.   It could, yes.

9   Q.   And it's your feeling that that sort of testing or at least

09:59   10   that way of obtaining test data was more accurate than the way

11   that Mr. Rondinone collected his, correct?

12   A.   It's more refined and more precise, yes.

13   Q.   All right.  Well, I like precision.  If we could, you did a

14   series of tests, we're looking at the different folders here

09:59   15   now, and there were some which we'll get into where there were

16   multiple tests performed on a given day, but for the time

17   being, why don't we start with your test on November 23rd,

18   2015.

19         And, again, this is test data that you consider valid,

09:59   20   correct?

21   A.   Yes.

22   Q.   And there may be just a little delay in loading, if you

23   printed all this out, do you have any estimate from all your

24   test data, the different Excel spreadsheets, how many pages

10:00   25   that would be?

840

A.   It might be hundreds.

Q.   Thousands?

A.   I don't know.

Q.   All right.  So what we're looking at here is sort of the top portion of the test data that you would have collected from your digital transducer, is that right?

A.   Yes.

Q.   And we've got the start date, correct, 11/23/2015?

A.   Yes.

Q.   And in the column that's marked A we're looking at time, aren't we?

A.   Correct.

Q.   And the one on the left it would be, for instance, let's take line 12, 15 minutes, 15 seconds -- pardon me, 15:15:27.579 milliseconds; is that right?

A.   Correct.

Q.   So you're measuring down to the millisecond?

A.   Correct.

Q.   Wow.  Why don't we take a look at, excuse me, line 9049. Can we scroll down just a touch.

     I chose this line because it looks to me as a layperson that that's roughly about where you're starting to apply air to the tire, would you agree with me?

A.   It could be.  I have to see all the data but.

Q.   I'm happy to scroll down for you, if you'd like.

1    A.    I mean, I see some increase there.

2    Q.    Why don't we continue scrolling just to make sure we're

3    confident.

4    A.    If you could, yeah, maybe scroll.

10:01    5    Q.    Faster.

6    A.    Yeah, that would be great.  Sometimes, you know, we

7    would --  might apply a blip of pressure, so I just want to

8    make sure it's nothing.

9    Q.    Sure.

10:01    10    A.    Yeah, that seems about right.

11    Q.    All right.  Let's go back up to line 9049, please.  So

12    we've got the start here and we're at, I'm going to -- I'm

13    going to eliminate the hour which is 15, okay, because all

14    we're concerned about here is minutes and seconds.

10:02    15    A.    Sure.

16    Q.    So we're starting the test at 16:23.556, correct?

17    A.    Correct.

18    Q.    Let's move down to line 9117, please.  And, again, I'm

19    happy to scroll around if you'd like, but it looks to me like

10:02    20    this is the first time that we reach 30 PSI in the tire, would

21    you agree with that?

22    A.    I would.

23    Q.    And this is the maximum recommended inflation by the tire

24    manufacturer; is that right?

10:02    25    A.    Correct.

1  Q.   And you testified just a moment ago that you thought

2  Mr. Moore could safely use the compressors out there at the

3  border patrol to inflate his tire to within the maximum

4  recommended pressure, correct?

10:02  5  A.   Yes.

6  Q.   All right.  Let's look at the time.  We're now up to

7  16:23.977 milliseconds, happy to write this out for you, but my

8  math indicates that's about 421 milliseconds, would you agree

9  with that?

10:02  10  A.   I would.

11  Q.   So we're going from zero to maximum recommended inflation

12  in less than half a second?

13  A.   Correct.

14  Q.   And you think Mr. Moore could have done that safely out at

10:03  15  the border patrol facility and reacted to something within a

16  half a second?

17  A.   He doesn't need to react to something in half a second, I

18  can explain if you'd like.

19  Q.   No, that's okay.  Let's just continue looking at some of

10:03  20  your data.  Let's go to line 9389.  And, again, please correct

21  me if I'm wrong, I picked this line because it looks to be the

22  first time we get to pressure inside the tire of 100 PSI, is

23  that accurate?  You would agree with me?

24  A.   I think you're right.

10:03  25  Q.   And if we look at the time, we're again at 16:25.662, you

1    would agree with that?

2    A.   Yes.

3    Q.   And, again, my math may be shoddy, but by my calculations,

4    that's about two seconds.

10:03   5    A.   Could be.  Again, I'd have to look at the numbers, but it

6    sounds right.

7    Q.   So we're going from zero PSI in this tire to a hundred PSI

8    in about two seconds?

9    A.   Correct.

10:03  10    Q.   And a hundred PSI we're now roughly, what, three and a half

11    times the recommended inflation?

12    A.   Correct.  Three and a third.

13    Q.   Three and a third.  All right.  Let's go to line 9487.

14    Looks like we're now up to 110 PSI inside the tire; is that

10:04  15    right?

16    A.   Yes.

17    Q.   And if we look at the time, I won't bother to read it off

18    here, but it looks like it's just about under three seconds

19    from when you started your test?

10:04  20    A.   I would agree.

21    Q.   Okay.  So, again, we're going from zero up to a 110 PSI in

22    under three seconds?

23    A.   Correct.

24    Q.   So at 110 PSI we're within just a few PSI of where this

10:04  25    tire could have blown, right?

1   A.   A few PSI but quite a bit of time still left before it

2   blows, correct.

3   Q.   Understood.  But you told me a moment ago too that you

4   would have set your regulator down to a hundred just in case

10:04   5   something might happen between a hundred and 120, right?

6   A.   I don't remember what we talked about, whether I would have

7   suggested setting the regulator at.  I think the question was

8   where would you set it to avoid this scenario.

9   Q.   Right.

10:05   10   A.   Yeah.

11   Q.   And you said a hundred?

12   A.   Yes, correct.

13   Q.   And that's, again, to plan for and prevent things from

14   happening between a hundred PSI and 120; isn't that right?

10:05   15   A.   Foreseeable things, yes.

16   Q.   If we can get out of this one and let's go to a different

17   test.  And I'd like to focus in on your November 24th testing.

18   Now, this is the testing that you performed out at the border

19   patrol facility?

10:05   20   A.   Let's see, that's correct.

21   Q.   And, again, you consider these tests to be valid, at least

22   in terms of the data that you collected?

23   A.   Yes.

24   Q.   And the three Excel, the S1, S2 and S3 we're looking at,

10:05   25   you did three separate tests while you were out there, correct?

1  A.   Correct.

2  Q.   All right.  Let's look at the first one which is S1.   And

3  while that's pulling up, these are unregulated tests, correct?

4  You didn't have a regulator on them?

10:06   5  A.   Correct.

6  Q.   What's the inlet pressure coming from the compressors into

7  the tire?

8  A.   Depends on the test.

9  Q.   For this particular test, S1.

10:06   10  A.   S1, let's take a look.  So the Ingersoll Rand right after

11  the test measured 165 PSI on the mechanical gauge, so we were

12  measuring about 30 PSI less.  We could take a look.  So

13  actually you can see it here, it's about 135.

14  Q.   Okay.

10:06   15  A.   Well, before it could have been a little higher, so maybe

16  140.

17  Q.   So we're now about roughly 10 PSI less than your laboratory

18  testing, is that right, in terms of inlet pressure?

19  A.   Possibly, yes.

10:07   20  Q.   Somewhere thereabouts?

21  A.   Yes.

22  Q.   All right.  Let's take a look at your tests.  Let's go to

23  line 3964.  And why don't we scroll down a little bit.  Again,

24  this looks like about where the test starts?

10:07   25  A.   I'd agree.

1    Q.    And let's go to line 4034.   First time we get to 30 PSI.

2    A.    Yes.   Are you asking me if I agree?   Yes.

3    Q.    And, again, my math suggests that that occurred in 433

4    milliseconds, does that sound about right?

10:07    5    A.    Could be, yes.

6    Q.    And then let's go to line 4474.   And here we are at a

7    hundred PSI, correct?

8    A.    Correct.

9    Q.    And that occurred in about three seconds?

10:07    10    A.    Okay.

11    Q.    Feel free to calculate, I don't want to take words out of

12    your mouth.

13    A.    Yeah, sure.   I'm just trying to remember all the numbers

14    but sure.

10:08    15    Q.    All right.   If you want to write them down, I can give you

16    where we started the test at.

17    A.    Yeah, what was the start of the test?

18    Q.    I have the start of the test at 14:52:52.557 milliseconds.

19    A.    Then I'd agree.

10:08    20    Q.    Let's go to line 4660.   And here we are all the way up at

21    120 PSI, right?

22    A.    Correct.

23    Q.    And if you look at the time -- and I'm happy to repeat the

24    start again -- looks to be about four seconds that it took to

10:08    25    get there?

1    A.   I'd agree.

2    Q.   So we go from zero PSI all the way up to 120 in four

3    seconds?

4    A.   Correct.

10:08    5    Q.   You're at the border patrol facility using the compressor

6    that was involved the night Mr. Moore was using it, right?

7    A.   Correct.

8    Q.   Four seconds?

9    A.   Correct.

10:08   10    Q.   And in your opinion a failure could have occurred at 120,

11    right?

12    A.   That's possible, yes.

13    Q.   And just for fun, let's look at line 4769.   And here we are

14    at 123 PSI, right?

10:09   15    A.   Yes.

16    Q.   And as I recall from your testimony on direct exam, 123 is

17    the PSI that the rim that you tested that you felt was most

18    similar to Mr. Moore's failed at?

19    A.   Correct.

10:09   20    Q.   All right.   Well, let's look at the time in this.   If I've

21    done my math correctly, it looks like it's just a shade under

22    five seconds?

23    A.   I think you're right.

24    Q.   So we're going from zero to the point at which you think

10:09   25    the tire failed in your testing in five seconds or less?

A.    Correct.

Q.    And it's still your opinion that those compressors are safe to fill a tire that can get to four times its recommended inflation in four or five seconds?

A.    Well, again, that's up to the user to do so carefully. That's what we were talking about earlier.  Any time you use powered equipment to fill small volume tires like bicycles -- and we discussed this at my deposition -- is you want to do just quick short bursts and then immediately get a sensation of what's going on.

      So it's not that he has to fill it to 30 in half a second and let go.  He could overshoot to 50 or 60, realize now it's, you know, way too high and then let some air out.

Q.    Realistically speaking there's no conceivable way that Mr. Moore could have filled that tire to 30 or less, right?

A.    He could have, sure, with a real quick burst, sure, absolutely.

Q.    You think so?

A.    Oh, sure.

Q.    In 300 milliseconds or 400 milliseconds?

A.    Sure, easily.  Just a quick burst, absolutely.

Q.    I see.

A.    Again, it would be hard to time it right to 30 and go I want to do it to 30 but, sure, quick burst.

          THE COURT:  So I have a question for you.  If the data

1  shows that the PSI in this small tire could have reached 120

2  within a couple seconds, five seconds, what explains why it

3  took so long for the wheel to fill in your test and in the

4  other mechanical engineer's test?  Yours was 26 seconds and his

10:11  5  fill time was over 50 seconds.

6                THE WITNESS:  Yeah.

7                THE COURT:  What's the explanation?

8                THE WITNESS:  Yeah, it's the application of that force

9  through the tire bead to the wheel rim.  It's time dependent.

10:11  10  It takes time for that to occur.  Buckling requires some little

11  deformation to get it going, so you need to reach that point

12  where you reach buckling.  And then in our videos you can even

13  see it starts opening up and then it finally collapses.  So

14  it's not like when something breaks, it's instant, it takes

10:11  15  time for that to occur.

16                THE COURT:  And that's the explanation of why it

17  didn't take two seconds or five seconds here?

18                THE WITNESS:  Correct.  In all the tests that anybody

19  did, that's correct.

10:11  20                THE COURT:  All right.

21  BY MR. CHAMBERS:

22  Q.   Let's take a look at another test.  And just for

23  clarification the test that we just looked at this is with the

24  new designed wheel?

10:11  25  A.   Yes, that's correct.

1    Q.   It's got the rolled flange that's reinforced?

2    A.   Correct.

3    Q.   Can we get out of this, please.  Let's go to S2, please.

4    This is the second test that you performed out at the border

10:12  5    patrol facility, right?

6    A.   Yes.

7    Q.   Let's go to line 4230.  Again, that looked to me like the

8    start of the test.

9    A.   That could be it, yes.

10:12  10   Q.   Let's go to line 4291.  And here we are at 30 PSI, the

11   recommended maximum inflation, and, again, that occurs in this

12   case 378 milliseconds, so a little quicker, right?

13   A.   Yeah, I'm not recalling what the last one was but sounds

14   like your number is about right.

10:12  15   Q.   All right.  Let's go to line 4551.  Hundred PSI.

16   A.   Correct.

17   Q.   And if we've got the start of the test at 30:18.498

18   milliseconds looks like we've reached a hundred in just under

19   two seconds?

10:13  20   A.   That sounds right.

21   Q.   And let's go to line 4743, please, and we're at 110 now,

22   you would agree with that?

23   A.   Yes.

24   Q.   And looks like it took about three seconds to reach 110

10:13  25   PSI?

1    A.    Could be, yes.    Sorry.    Just not remembering the numbers.

2    That could be, yes.

3    Q.    Well, I mean, if the test starts at 30:18.498 milliseconds?

4    A.    Thanks for the reminder, then, yes, that's true.

10:13    5    Q.    All right.    We can close out of this.

6         The third test that you ran out at the border patrol

7    facility, that's the one you spoke about earlier where you sort

8    of anticipated or ran it as though it would have been the

9    cut-in pressure, the low end --

10:13   10    A.    Correct.

11   Q.    -- correct?    And the reason that it took I think it was

12   four minutes or something to fill or burst?

13   A.    Correct.

14   Q.    And that was by far your longest test, wasn't it?

10:14   15    A.    It was.

16   Q.    The reason that it took so long is because the compressor

17   had to cycle as you were continuously filling a tire?

18   A.    Correct.

19   Q.    But that's not the condition that Ryan was in the evening

10:14   20   he was injured, is it?

21   A.    Not that I'm aware of, although we don't know where in the

22   cycle he started.    Well, I shouldn't say, I guess nobody knows

23   really.

24   Q.    Well, the incident that Mr. Moore was involved in occurred

10:14   25   at 9:20 or so in the evening?

1    A.    Correct.

2    Q.    Well after the garage was closed, right?

3    A.    Correct.

4    Q.    So there wouldn't have been other mechanics out there

10:14   5    utilizing tools that would have been drawing pressure out of

6    these containers, would it?

7    A.    Not tools but the leaks in the system would have still been

8    there and that's what we experienced when we were there after

9    the mechanics had left.

10:14   10    Q.    And your test was conducted when?

11    A.    You talking about the date or the time or?

12    Q.    The date.

13    A.    Yeah, so it was November 24th, 2015.

14    Q.    So we're about a year-and-a-half after the incident?

10:15   15    A.    Sounds about right.

16    Q.    Let's go to your November 25th testing.  Actually I'll tell

17    you what, let's skip ahead.  Let's go to the -- let's go to the

18    February 3rd testing.  And before we dive into this one, you

19    also conducted testing on November 25th, isn't that right?

10:15   20    A.    That's correct.

21    Q.    And on January 29th?

22    A.    That's correct.

23    Q.    And in both of those tests -- there was actually three

24    tests, but in all those tests we're talking about very similar

10:15   25    timeframes to what we just spoke about where you're reaching 30

853

1 PSI in a matter of three or four hundred milliseconds?

2 A. Again, I haven't looked at the details but I wouldn't be

3 surprised if they're the same.

4 Q. And you're up to a hundred in about two seconds?

10:16 5 A. Again, based on what we discussed earlier, yes.

6 Q. And 110 within about three seconds?

7 A. Again, based on the ones we talked about, sure.

8 Q. All right.  Now we're looking in front of us at the

9 February 3rd test that you performed, and this one was on the

10:16 10 tire and rim and wheel assembly that you felt was most similar

11 to Mr. Moore's?

12 A. Correct.

13 Q. And let's take a look at your data.  Why don't we go to

14 line 11480.  Again, looks like the start of the test here.

10:16 15 A. Sure.

16 Q. Line 11543, please.  30 PSI.

17 A. Yes.

18 Q. Under 400 milliseconds?

19 A. Yes, about 400, I forget what the first number was but.

10:16 20 Q. Okay.  Line 11803.  A hundred PSI?

21 A. Yes.

22 Q. And that occurs in about two seconds?

23 A. Correct.

24 Q. And, finally, line 11959, 110 PSI?

10:17 25 A. Correct.

1    Q.    And that occurs in about three seconds?

2    A.    Correct.

3    Q.    So in virtually all your tests we've got PSI going from

4    zero to 30 in the tire in the blink of an eye?

5    A.    I think an eye blink is actually quite a bit shorter but a

6    fraction of a second, yes.

7    Q.    Okay.  A few hundred milliseconds?

8    A.    400, correct.

9    Q.    And then it reaches a hundred PSI which is three and a

10   third times its recommended volume in about two seconds?

11   A.    Correct.

12   Q.    And then we get up to 110 in about three seconds?

13   A.    Correct.

14   Q.    And then we saw in the one example where it gets up to 120

15   in four seconds, right?

16   A.    Correct.

17   Q.    Now let's talk for a moment about the gauge.  You don't

18   have an opinion one way or another as to whether the gauge that

19   Mr. Moore was using that night was functional, right?

20   A.    Correct.

21   Q.    Do you know what kind of gauge he was using?

22   A.    It appears to be similar to the one we have here.  You're

23   talking about the inflater gauge, right?

24   Q.    Yes.

25   A.    What they call a bubble gauge.  It's got a lens on it and

1   it's spring-loaded and you can read the graduations in here.

2   Again, if he was using it, that's what it would have been.

3   Q.   And the gauge that Mr. Moore was using out there that

4   evening, the inflator, how high will that gauge read?

10:18   5   A.   I'm not certain.   I don't know if I tested it.   Actually,

6   hold on, I took some photos.

7            THE COURT:   What's the face of the gauge show?

8            THE WITNESS:   It starts at 10 and but you only see a

9   portion of the scale.   So you can see 20 and then it has to

10:18   10   pass by the lens.

11           THE COURT:   Oh, it moves inside?

12           THE WITNESS:   Yeah, so there's like a little vertical

13   scale that moves and then you can zoom in on it.   I took a

14   picture during our testing at various pressures and let me see,

10:19   15   because I think that may show the range.

16      I took pictures during our testing at the border patrol

17   facility and one of my photos shows that it goes beyond 40, so

18   that's all I could say.

19   Q.   But you don't have any idea whether it was rated to 80 PSI

10:19   20   for instance?

21   A.   Hold on.   One more potential.   I took a picture of the box

22   that it came in.   Let's see if it says something.   Yeah, looks

23   like the box that ours came in says 120 PSI.

24   Q.   All right.   And is that the one that you assumed was the

10:19   25   same that Mr. Moore was using that evening?

A.    Yes.

Q.    So the gauge that's inside of that bubble, let's assume it goes up to 120 PSI, what happens once you reach a hundred, what do you see in the bubble?

A.    Presumably a hundred centered on the -- with a little arrow next to it.

Q.    You'd expect to see three digits that say a hundred?

A.    I would think.  I don't know.  I haven't pressurized it.

Q.    You didn't test that?

A.    That's correct.

Q.    So you don't know maybe if it just said 00?

A.    I don't know.

Q.    And it's true that if you just hold the inflator, and assuming it's hooked up to a compressor, and squeezed a lever and shoot air up into the air, the gauge isn't going to register anything, will it?

A.    That's correct.

Q.    Do you even know if the gauge would move if you did that?

A.    I don't think it would.

Q.    Now you took a little time yesterday, very brief, looking at the side wall of the tire that was involved in this incident.

A.    Correct.

Q.    And I think we zoomed in and had you read for us one of the warnings that was on there, right?

1   A.   Correct.

2   Q.   And the warning said something to the effect of it should

3   only be done by trained people and so on, do you remember that?

4   A.   Correct.

10:21   5   Q.   And, in fact, that same warning or one very similar to it

6   is on the side wall of almost every tire sold in the United

7   States, isn't it?

8   A.   That I don't know.

9   Q.   Did you read Mr. Giapponi's deposition?

10:21   10   A.   I don't think I did.

11   Q.   Do you know who Mr. Giapponi is?

12   A.   Oh, sure.

13   Q.   Who is he?

14   A.   He was a tire expert retained by the United States in this

10:21   15   case.

16   Q.   And if he said that, would you have any reason to disagree

17   with him?

18   A.   No.

19   Q.   And we've also seen some photographs in your laboratory

10:21   20   testing where the tire and wheel assembly --

21         MR. LASKE:  Objection, Your Honor.  I actually move to

22   strike the last statement as hearsay.

23         THE COURT:  He didn't rely on it.  He just asked him

24   hypothetically if a tire expert said that would he have any

10:21   25   reason to disagree with it, that's how you understood the

1  question?

2       THE WITNESS:  Yes.

3       THE COURT:  It's not hearsay.  He's answered no and

4  there's a basis in fact for the question.  You don't dispute

5  that Mr. Giapponi said that -- in his deposition somewhere that

6  all of these tires have some kind of warning?

7       MR. LASKE:  I don't recall what type of tire he's

8  talking about but I'm not disputing it.

9       THE COURT:  Okay.  Overruled.

10 BY MR. CHAMBERS:

11 Q.  And we were talking about the testing that you performed in

12 your laboratory where the wheel remained mounted to the

13 wheelbarrow.

14 A.  Yes.

15 Q.  Do you remember that?

16 A.  Yes.

17 Q.  We looked at some photographs.  And you're not suggesting

18 by any stretch of the imagination that Mr. Moore should have

19 kept the wheel on the wheelbarrow in order to safely inflate

20 it, are you?

21 A.  I'm not opining as to what he should or shouldn't have

22 done, I'm just saying if he did do that, then likely that wheel

23 would have remained attached to the wheelbarrow.

24 Q.  And you looked at the wheelbarrow manual?

25 A.  Yes.

859

1   Q.   And you saw nothing in the wheelbarrow manual that

2   instructed users to keep the wheel on the wheelbarrow when

3   inflating tires?

4   A.   I don't think there was that, no.

10:22   5   Q.   And there were no warnings posted anywhere on the tire or

6   the wheelbarrow itself suggesting that?

7   A.   That's correct.

8   Q.   We've also seen a photograph very briefly, I think it was

9   from the CIIT team that took photographs that evening, and

10:23   10   there was a cell phone laying on the ground, I saw it in your

11   report there, do you recall that?

12   A.   Correct.

13   Q.   You don't have any opinion at all that Mr. Moore was using

14   his cell phone at the time, right?

10:23   15   A.   I can't say that directly.  The only thing I can say is it

16   appears he was being inattentive to the task at hand and that's

17   one explanation.  But I can't say that, no.

18   Q.   And, in fact, you've reviewed his cell phone records

19   haven't you?

10:23   20   A.   Yes.

21   Q.   And they showed no calls?

22   A.   No calls, that's correct.

23   Q.   And no texts?

24   A.   No texts, that's correct.

10:23   25   Q.   So zero information that you have that the phone was even

1    outside of his pocket when this occurred, correct?

2    A.    I can't say that either, that's correct.

3    Q.    Just out of curiosity you brought a few exemplars in terms

4    of the tires there, I think it was a zero PSI, a 30 PSI and is

10:24  5    it 60?

6    A.    Yes.

7    Q.    How come you didn't bring 120?

8    A.    I wouldn't want to take the tire to being close to its

9    burst pressure.

10:24  10    Q.    So a safety reason?

11    A.    Correct.

12              MR. CHAMBERS:  All right.  I don't have anything

13    further.

14              THE COURT:  All right.  Redirect.

10:24  15                     REDIRECT EXAMINATION

16    BY MR. LASKE:

17    Q.    For the inflator to work, you have to hold down the handle,

18    correct?

19    A.    Correct.

10:24  20    Q.    And for the inflator to give you any pressure reading you

21    have to let off the handle as well?

22    A.    You have to keep the chuck on the tire and release the

23    handle, that's correct.

24    Q.    So you can't read it while you're inflating it?

10:24  25    A.    Correct.  There wouldn't be an appropriate reading.

1   Q.   And if you don't provide pressure, it's not doing it

2   itself?

3   A.   If you don't provide pressure --

4   Q.   On the handle, if you just put the chuck on but you didn't

5   push the handle down, it's not putting air in by itself?

10:24

6   A.   Correct.   There's a valve you have to open that admits air

7   to the tire.

8   Q.   And you have an understanding of some of the vehicles that

9   are on-site, correct?

10   A.   Generally.

10:24

11   Q.   So they have ATVs, they have SUVs, they have vans?

12   A.   Correct.

13   Q.   And those all take different pressures or at least they

14   have different maximum pressures --

15   A.   Correct.

10:25

16   Q.   -- for their tires?

17   A.   Correct.

18   Q.   And there was some testimony the other day, which I don't

19   know if it was in the depositions before, but by Agent Weber

20   that they actually have fuel trucks and they've had those for a

10:25

21   while.   Do you know what the PSIs roughly are on a fuel truck?

22   A.   If it's a heavy truck tire, typical heavy truck tire, it

23   will range from 95 to 105 PSI, rated pressure, operating

24   pressure.

25   Q.   Well, I guess the point Mr. Chambers was making was a

10:25

862

1   hundred, 110, so 105, they could still fill up the fuel trucks,

2   right?

3   A.   Correct.  It would actually be difficult to do at only 110

4   because you want a fair amount of pressure over whatever it is

10: 25   5   you're filling, otherwise you'd kind of be there all day long,

6   because as you reach the pressure that's being supplied, the

7   flow rate really slows down.

8          MR. LASKE:   Nothing further, Your Honor.

9          THE COURT:   Anything else?

10: 25   10          MR. CHAMBERS:   Briefly, Your Honor.

11                         RECROSS EXAMINATION

12   BY MR. CHAMBERS:

13   Q.   When is the first time you heard about a fuel truck being

14   out at the border patrol facility?

10: 26   15   A.   Mr. Laske told me this week that there was some testimony

16   regarding that.

17   Q.   And did you have an opportunity to inspect that?

18   A.   I did not.

19   Q.   Did you look at the tires or see any pictures of them?

10: 26   20   A.   I did not.

21   Q.   Do you have any idea at all what sort of truck this is?

22   A.   No.  But if it's a fuel truck, it's likely to be a large

23   straight truck and not, you know, something smaller like a

24   light truck.

10: 26   25   Q.   So you're assuming it's a large truck even though you've

1    never seen it?

2    A.   Correct.   Correct.

3         MR. CHAMBERS:   Thank you.   Nothing further.

4         THE COURT:   All right.   Thank you, Mr. Deyerl.   You

10:26  5    may stand down.   Next witness.

6         This is just a update, but defendants are now at seven

7    hours and 40 minutes, seven hours and 40 minutes, plaintiffs

8    are at 11 hours and four minutes, so you have approximately 56

9    minutes left including summation time.

10:27  10        MR. COYLE:   The United States calls Dr. Richard

11   Gluckman.

12        RICHARD GLUCKMAN, M.D., DEFENDANT'S WITNESS, SWORN

13        THE COURTROOM DEPUTY:   Sir, can you please state your

14   name for the record and spell your first and last names.

10:28  15        THE WITNESS:   Richard Stephen Gluckman, Richard,

16   R-I-C-H-A-R-D, Gluckman, G-L-U-C-K-M-A-N, S-T-E-P-H-E-N.

17                    DIRECT EXAMINATION

18   BY MR. COYLE:

19   Q.   Good morning, Dr. Gluckman.

10:28  20   A.   Good morning.

21   Q.   What is your occupation?

22   A.   I am a neurologist.

23   Q.   Where do you work?

24   A.   I work -- my office is in San Pedro, California.

10:28  25   Q.   And what do you do?

1   A.   I see everything that comes in the door in terms of general

2   neurology, but I have specific interests in certain aspects of

3   neurology.

4   Q.   What are those?

10:28   5   A.   Those would be traumatic brain injury, Alzheimer's,

6   peripheral nerve injuries, Parkinson's disease and migraine.

7   Q.   Before we get into your specialties, can you briefly tell

8   the Court about your education as a neurologist.

9   A.   I trained at the Barrows Neurological Institute in Phoenix,

10:29   10   Arizona.   And I got my degree in neurology.   I'm board

11   certified in neurology.

12   Q.   What's the significance of being board certified?

13   A.   It's a test or standard test that most specialties have to

14   show that you can demonstrate a certain amount of knowledge

10:29   15   over a period of time, not all neurologists are board

16   certified.   I don't know how many, what the percentage is.

17   There's also a fairly high failure rate the first time you take

18   it in neurology.   I passed it the first time.

19   Q.   You mentioned a specialty in traumatic brain injury, can

10:29   20   you tell the Court about your specialized experience in that?

21   A.   It's been an area that I have been interested in.   I've

22   worked for the state athletic commission for 30 years at this

23   time, specifically seeing the professional athletes, because of

24   the issues of chronic traumatic encephalopathy and cumulative

10:30   25   brain trauma.

865

1        I was -- for a while I was a director of Casa Colina

2    Rehabilitation Center, that they had an offshoot of it in the

3    Palos Verdes Peninsula, and I directed that specifically with a

4    lot of the brain trauma.  And I've, over the course of time,

10:30  5    see a lot of patients in the office as a consequence of that

6    with residual injuries, by reputation they come in.  I see a

7    lot of the high school, college injuries at this point in time,

8    for example.

9    Q.   Your work with the state athletic commission, what type of

10:30  10   athletes are we talking about?

11   A.   We're talking about the professional athletes, specifically

12   the boxers and the mixed martial artists.

13   Q.   All right.  Let's talk now about your task in this case.

14   You were asked to do a neurological evaluation of Agent Moore

10:30  15   to determine whether he sustained any neurological injuries

16   from the tire accident?

17   A.   Yes.

18   Q.   What kind of documents did you consider?

19   A.   What kind of documents, well, I was submitted a lot of

10:31  20   records, so there were medical records, including, you know,

21   how he was taken care of after the accident, records from

22   individuals that saw him at the border patrol station.  I read

23   depositions of various doctors.  Read consultations, histories

24   and physicals of various doctors.

10:31  25        And I just, I perused some of the literature that I've seen

1    over time that I know but just to go over it again in certain

2    areas.

3    Q.    Did you also consider Agent Moore's employment records?

4    A.    Yes.

10:31    5    Q.    Did you also take a history from Agent Moore?

6    A.    Yes.

7    Q.    Why did you do that?

8    A.    Because that's probably the most important part of the

9    neurological examination, you know, getting the story and

10:32   10    information directly from the patient.

11    Q.    Why is that the most important part?

12    A.    Well, for all, not just this particular instance but

13    anybody who comes into the office with complaints, you want to

14    know what's going on, you know, you can argue that, you know,

10:32   15    80 percent or 85 percent of the diagnosis is made in a

16    neurologist's office in the first five to 10 minutes of history

17    and the rest of the time is confirming that diagnosis with both

18    the history and the neurological examination or coming up with

19    something else for that other 15, 20 percent.

10:32   20    Q.    Did you also consider Agent Moore's employment as part of

21    your neurological evaluation?

22    A.    Yes, I did.

23    Q.    Why did you do that?

24    A.    Because that is an important factor in terms of what you go

10:32   25    back to, you know, your past experiences, you know, what level

1   of training and education is required in that employment.

2   Q.   And what's your understanding of what Agent Moore does for

3   work?

4   A.   He works for border patrol.  He's at a -- as I understand,

10:33   5   a college education, with a Bachelor's University of Wisconsin,

6   which I actually remember now because my wife went to the

7   University of Wisconsin.  And then he in his capacity as a

8   border patrolman, I know that there's different things that

9   they do.  And I know, you know, he particularly liked to be in

10:33   10  the field, was my understanding.  And I think there are only

11  options to do that three years at a time, and he had done that,

12  and I think he had switched to this station a few months after

13  that and had been there a few months.  And I think that when he

14  went back, he went back into a similar in the field position

10:33   15  but not at that station.

16  Q.   And can you talk specifically about some of the tasks that

17  you understand he does in that position.

18  A.   I can't tell you all of them, but he carries a gun,

19  presumably chasing bad guys, you know, driving machinery, you

10:34   20  know, vehicles.  I would -- I would assume it takes some

21  cognitive aspects to it, you know, to some level as well.  And

22  we talked about, you know, what he could do and not do when he

23  was in my office.

24  Q.   All right.  Let's talk now about Agent Moore's injuries

10:34   25  from the tire accident.  What, if any, brain injury did Agent

Moore sustain as a result of the accident?

A.   I think he had a traumatic brain injury as a consequence of that accident.

Q.   Is there any classification of that traumatic brain injury that you would -- that you believe he had?

A.   Yes, as a general classification into mild, moderate and severe traumatic brain injury.

Q.   What's the difference between those classifications?

A.   The way that you generally have classified it in the past is by, number one, the duration of coma and less than 30 minutes in coma would be mild traumatic brain injury.  He was found, my understanding, walking around about 30 minutes after the event, so he was not in coma at 30 minutes.

Moderate, of course, would be, you know, more than that. There's a Glasgow coma scale, which is a criteria that has been used for years and particularly in the emergency rooms, which is a 15-point scale, that if you're in the category of 13 to 15, it's a mild traumatic brain injury.  If you're in the category of nine to 12, moderate.  And less than that, eight or less, you know, severe.

There's also been -- amnesia has been considered a part of it and particularly if you have, you should have anterograde amnesia for a period of time less than 24 hours.  Retrograde amnesia can suggest more significant problems but is not a part of those criteria.

1        Those were the original criteria that were set up and the

2    reason that they were set up was to try to give you prognostic

3    information of what to expect with somebody recovering down the

4    line.

10:36  5    Q.   Okay.  We'll talk about prognosis in just a second, but

6    what was Agent Moore's score on the Glasgow coma scale?

7    A.   He had a 14, which would be within the 13 to 15 for mild

8    traumatic brain injury.  I would add that, you know, over time

9    we've used other things as well and one is the imaging studies.

10:36 10    A second thing is neuropsychological testing or cognitive

11    testing.  And the most important thing is clinical judgment.

12    Q.   Okay.  We'll talk about all of those in a minute.  But one

13    other question about the Glasgow coma scale, if Dr. Lobatz

14    testified that that scale isn't very useful for diagnosing

10:36 15    traumatic brain injury, would you agree?

16    A.   I think it's an old-fashioned scale.  I think it has its

17    value.  I use all of these scales just as a part of my clinical

18    impression and my clinical diagnosis.  I don't rely on any of

19    them individually as that's the magic answer.

10:37 20    Q.   And a mild, just to clarify, a mild traumatic brain injury,

21    that's synonymous with a concussion?

22    A.   Most people use that term interchangeably.  I'm not sure

23    that I always use it interchangeably.  There are people that,

24    you know, get a bump on their head and they have some headaches

10:37 25    and some dizziness and I might call it a mild concussion and

1    not go to mild traumatic brain injury, however, lots of people

2    use the terms interchangeably.

3    Q.   You mentioned imaging and specifically MRIs, did you review

4    Agent Moore's brain MRI from December 2015?

10:37    5    A.   Yes, I did.

6    Q.   What type of MRI was it?

7    A.   It was a 3 Tesla MRI.

8    Q.   What does that mean?

9    A.   The original -- well, give you kind of a story.   When I was

10:37    10    in training -- the CT scan didn't come out till I was a chief

11    resident in training, my senior year, before that we didn't

12    even have those tools.   MRI came out, you know, well down the

13    line, you know, when I've been out in private practice.   And

14    then now they get more sophisticated MRIs.   And this 3 Tesla

10:38    15    MRI is far more sophisticated than the preliminary MRIs.   And

16    you can see more information on it than you can on a CT scan or

17    a regular MRI.

18        So it's very sensitive and most facilities don't have one.

19    So when somebody comes in to an -- a hospital with a traumatic

10:38    20    brain injury, the overwhelming majority of time they're getting

21    CT scans or MRI, the regular MRIs as -- or the old-fashioned

22    MRIs as opposed to the 3 Tesla because they're just not

23    available for the most part.

24    Q.   In your experience do you see patients who have

10:38    25    abnormalities on a 3 Tesla MRI sometimes even when they have no

871

1    other neurological symptoms?

2    A.    Yes.

3    Q.    What did Agent Moore's December 2015 3 Tesla MRI show?

4    A.    He showed a pattern of what I would call traumatic brain

10:39   5    injury.   He had some hemosiderin.   He had, you know, basically

6    a blood or microhemorrhages, so to speak, and he had some

7    little black dots which are a magnetic field that is around

8    tiny particles of metals, presumably iron.

9         And I would say it's consistent with a traumatic brain

10:39   10    injury.

11    Q.    We heard testimony about some shearing on the MRI, what

12    does that mean?

13    A.    You know, there's presumptions of what we call axon

14    shearing when you look at these MRIs, and you need to go back

10:39   15    and understand where that term came from.   There's an entity we

16    call diffuse axonal injury and that entity was developed

17    because we would have patients that would come in, in coma and,

18    you know, they're in coma for hours and hours or days and days

19    and their CT scan was normal and what's going on, you know, why

10:40   20    is this guy normal, the MRI is normal.   So a concept was

21    created for diffuse axonal injury, there must be some sort of

22    shearing effect of nerves that's causing this damage.

23         And that's where the concept came from.   The presumption is

24    that there is some shearing of particularly the axons often at

10:40   25    the gray white matter junction as a consequence -- excuse me,

1    as a consequence of the head trauma.  And that's, you

2    know -- you're not actually seeing the shearing, but you're

3    seeing some findings that seem to go along with the thinking,

4    you know, why the blood is there and what have you that maybe

10:40   5    with some shearing and injury of those nerves.

6    Q.   Would you expect to have shearing in any traumatic brain

7    injury?

8    A.   I believe you'll see it in any traumatic brain injury.  If

9    you -- the way I have described it for years in my office to

10:41   10    patients that come in with mild traumatic brain injuries,

11    concussion, et cetera, you know, the brain has the consistency

12    of hard Jell-O and that Jell-O is in a bony box we call the

13    skull.  And if you took that hard Jell-O and you put it in a

14    Tupperware container and you shook it up like that and you

10:41   15    looked up at the light, you're probably going to see a couple

16    of micro fissures in there and so that's just kind of my

17    assumption what happens.

18        There are articles out there that suggests at all levels

19    of, you know, traumatic -- you'll see MRIs, 3 Tesla MRIs

10:41   20    positive at all levels showing shearing, mild, moderate and

21    severe.  I think that's the question you're getting at.

22    Q.   Do Agent Moore's MRI results show a more -- a moderate or a

23    severe traumatic brain injury?

24    A.   That -- I don't think you can make that distinction looking

10:41   25    at it.  And I read the report several times by the

neuroradiologist who read it and he says it's traumatic brain
injury.  I reviewed this with Dr. Ahmadi, he's a
neuroradiologist that I use, he said it's, you know, traumatic
brain injury, it's consistent with that.

There's nothing in that report that suggests this is
profound traumatic brain injury, which I think is a word that
Dr. Lobatz used.  It is traumatic brain injury, that's what it
is.  And as the neuroradiologist I talked to, he says you're
the one clinically who has to determine the level of severity
of this problem, mild, moderate, severe, what have you.

Q.   In your opinion what's the significance of the MRI taken in
December 2015?

A.   I think it has very little significance at that point,
other than, you know, this comes up all the time in my
experience in medical legal situations.  Where it would be of
value is if that was done right at the time of the injury,
okay, and then you would have some prognostic information.

And I have to say, if I saw that MRI initially and I knew
he had amnesia I would be concerned about -- more concerned
about his recovery, if all of that stuff was done right in the
beginning in terms of prognostication of how he's doing.

But down the line two and a half years later, he's already
told you how he's doing by how he's performed.  I don't think
you need to do that.  Just as an example, I've had a mild
traumatic brain injury.  I had an injury about five years ago

1    on a bike with a helmet.  I was unconscious on the road.  I

2    woke up in an ambulance being taken to an emergency room.

3        I have some amnesia for -- retrograde amnesia before the

4    event going back two, three minutes and then I had a little bit

10:43   5    of fill-in amnesia or anterograde amnesia subsequent.  Went to

6    the ER, had a CT scan at the ER, it was negative.  They were

7    looking for acute blood, what we might call a hematoma or

8    intracranial bleed.  This was negative.  I went home, I was

9    back to work within two, three days.

10:44  10        I had a little bit of difficulty there, I needed post-it

11   notes and, you know, had stuff on the tip of my tongue I

12   couldn't remember, classical things that I will see with mild

13   traumatic brain injury and that lasted for a period of, you

14   know, weeks to months and then it went back to what would be

10:44  15   normal senior moments for a 70-year-old neurologist practicing.

16   It hasn't really affected my performance at this time.

17        The point is I had a CT scan that was negative.  I haven't

18   gone back for an MRI.  I know how I'm going to do from that

19   event.  There's no point in getting an MRI.  Plus if I got an

10:44  20   MRI and -- a 3 Tesla MRI and I saw these white spots all over,

21   that just might make me more anxious, so to speak.  There's

22   just no value, you know, doing that in my opinion at that

23   point.

24   Q.  You said several years down the line what is valuable for

10:45  25   assessing prognosis is how the patient has been functioning in

1    the real world.  What's your understanding of how Agent Moore

2    was functioning at the time you saw him?

3    A.   At the time that I saw him, my understanding was he had

4    gotten back to work at about three months, roughly three

10:45   5    months, from a standpoint of the cognition and I know he was

6    describing some problems with me and I think there was some

7    procrastination and he had to write things down several times.

8    Read the manual, you know, over a few times to do things.  So

9    he felt that there was some issues that were going on.

10:45   10       But it was my understanding he was able, you know, to do

11   his job.  It was also my understanding, you know, he had a gun,

12   again, he had been given back the gun for that performance.  So

13   that was at three months, which, you know, is in my bailiwick

14   for a mild traumatic brain injury.  That's about what you would

10:46   15   see.

16   Q.   When you saw Agent Moore, is it also your understanding

17   that he was driving at that time?

18   A.   It's my understanding he was driving.  I know he was not

19   driving immediately after the accident.  I think he told me or

10:46   20   someone -- somewhere in the reading that he thought he would

21   have been but his brother could drive him.  But certainly he

22   wasn't driving immediately afterwards.  And within that first

23   month I don't know, I don't recall specifically when he started

24   to drive on his own.

10:46   25   Q.   When you saw him, was it your understanding that he was

1  doing math, doing finances, doing taxes?

2  A.  Yes, he was doing his own math.  I think he was doing Turbo

3  Tax.  He was doing his own finances.  Keeping his own

4  checkbook.  Which, you know, from my perspective as a

10:46  5  neurologist, numbers and cognitive thinking in dealing with

6  numbers is very important.  It's one of the first things that I

7  ask for when, you know, people have cognitive injuries and

8  they're coming back because, you know, commonly those patients

9  will with cognitive problems, you know, they'll be overdrawn on

10:47  10  their accounts, for example, or write a check several times,

11  this kind of thing.

12      So somebody who's handling it on his own and additionally

13  doing Turbo Tax, which I once looked at and I don't want to get

14  into it, it looked above me at that point.  I have a guy does

10:47  15  my taxes.  So I thought that cognitively he was performing

16  pretty well.  If you asked me was he performing at a hundred

17  percent, I suspect he still may have some post-its and writing

18  things down and things of that nature.

19  Q.  You mentioned that the other criteria you often used to

10:47  20  assess traumatic brain injury is neuropsychological testing?

21  A.  Well, it's something else you add into the equation of all

22  the things that you're looking at, yes.

23  Q.  So it's fair to say that there's no one test you rely on?

24  A.  Yeah, there is no one test that replaces clinical judgment.

10:47  25  That's my feeling.

1    Q.    Okay.   Now, the neuropsychological testing, did you review

2    the results of the testing done by both the United States

3    expert, Dr. Evans, and the plaintiff's expert, Dr. Markel?

4    A.    Yes, and I don't claim to be a neuropsychologist, but I got

10:48   5    the general gist of the testing that was done.   Dr. Evans felt

6    that there was very little of significance from a cognitive

7    standpoint was my reading of it.   He felt that in 85, 90

8    percent of the areas in memory or what have you he was average

9    or above average.

10:48   10       I think Dr. Markel was -- found more issues or described

11   more issues, so interestingly, she used the term mild traumatic

12   brain injury or mild cognitive impairment using the term mild,

13   you know, on her testing.   But I didn't see anything, you know,

14   dramatic on either of these testing.   Not inconsistent -- when

10:48   15   I say not dramatic, it's not inconsistent with what I would

16   consider mild traumatic brain injury.

17   Q.    Anything in there suggesting something more severe than a

18   mild traumatic brain injury?

19   A.    Not by my perusal of the results.

10:49   20   Q.    Okay.   Let's talk about Agent Moore's current symptoms.

21   Now as part of your neurological evaluation in this case, you

22   performed a comprehensive neurological examination of Agent

23   Moore, right?

24   A.    Yes.

10:49   25   Q.    What does that entail?

1    A.    There's a mental status, cranial nerves, motor reflex

2    sensory, primary parietal --

3                THE COURT:    You're going a little fast.    Slow down.

4                THE WITNESS:    Mental status, cranial nerves, motor,

10:49    5    reflex, sensory, both primary and parietal, cerebella, tone,

6    gait and station.

7        Those are all standard, you know, parts of the neurological

8    examination.

9    BY MR. COYLE:

10:49    10    Q.    Do you remember when that happened?

11    A.    The date that we did that?

12    Q.    Yeah, approximately.

13    A.    I'd have to pull it out.    I've got my chart right here.    Do

14    you want me to do that?

10:49    15    Q.    What year, was it 2015?

16    A.    I believe it was 2015, yes.

17    Q.    Okay.    Can you explain to the Court how Agent Moore's

18    symptoms have changed since the accident?    So perhaps first

19    talk about his symptoms shortly after the accident.

10:50    20    A.    Well, shortly after the accident he had more -- more

21    significant memory problems.    Now I didn't see him, quote,

22    shortly after the accident, but my understanding from what he

23    told me, as well as what I saw in the records, is that that

24    memory slowly improved and it improved to the point, you know,

10:50    25    that he was back to work at three months from the, you know,

1    from the standpoint of his cognitive and his memory

2    functioning.

3         The general information in the records that I saw beyond

4    that that it was pretty stable was my understanding.  So, you

5    know, that would not be unexpected that you will see an

6    improvement over a period of time and then it stabilizes out.

7    Sometimes you will see small increments of improvement over

8    time that are hard to judge.

9         I like to describe it to my patients as, you know, for

10   example, after a stroke if they have residual and then they're

11   improving, there's a period of time where there's maximum

12   improvement, but then you may continue to improve a little bit

13   for a period of time, but it gets much more incremental, much

14   more -- much smaller.

15        And it's like going halfway to the wall.  I go halfway to

16   the wall, then I go halfway again, then I go halfway again, and

17   I'm getting closer and closer to the wall.  And as you're near

18   the wall, you know it's two, three inches and half of that, you

19   know, it's not very noticeable in terms of the improvement.  So

20   I thought, my understanding was most of that improvement was

21   back at probably about the three months, whether or not he had

22   some -- some more improvement after that, probably, but little

23   harder to define.

24   Q.   You mentioned the memory problems, what about his pain that

25   he reported between shortly after the accident and when you saw

880

1   him?

2   A.   Yeah, his pain is a separate issue.   And the pain, most of

3   the pain, you know, was from his jaw.   And I tried to stay away

4   from the jaw pain and the reasons for that since there seemed

10:52   5   to be multiple people that were involved with that and experts

6   for that.   But, obviously, the pain can be an issue and when

7   you're uncomfortable and unhappy with that, that can affect

8   your cognition in terms of depression, anxiety, what have you,

9   and it clearly can affect cognitive because of that.   In

10:52   10   addition, if you're taking pain medication, that can affect it.

11       So indirectly, you know, that's how I looked at, you know,

12   the pain affecting his cognition or potentially affecting his

13   cognition.

14   Q.   Did he report any headaches when you saw him?

10:52   15   A.   As I recall in my office, the headaches weren't a big deal

16   to him at that time.

17   Q.   What about balance problems and dizziness, did he

18   experience any of that shortly after the accident?

19   A.   I know he had those issues and he certainly had balance.   I

10:52   20   think we -- because I specifically did some tandem testing in

21   the office on that and he had no problem with that, and I think

22   that the balance has mostly, you know, at that time certainly

23   mostly resolved, with no evidence of it on my exam.   The

24   dizziness I think had pretty much settled down for the most

10:53   25   part after the event.

1    It's not uncommon in patients that have mild traumatic

2    brain injury that, you know, you'll -- they may, you know, with

3    an event or a movement quick or something get a momentary dizzy

4    or lightheadedness more than what happened before or didn't

10:53  5    happen before and might happen momentarily now.  So those kinds

6    of findings, you know, we see not infrequently.  Again, the

7    balance on his testing looked okay in my office.

8    Q.    What about numbness that he was experiencing in his face

9    and his eyelid drooping?

10:53 10    A.    Yeah.  He was still having the facial numbness and he had

11    some drooping of the eyelid and he had an asymmetrical smile.

12    And it was interesting that I put in my report -- it's

13    interesting on the smile that it almost looked to me like the

14    right side might be down below the left, even though we know

10:54 15    most all of his trauma was on the left side.  I just put it in

16    there because it was an observation.

17        He had a, what I described as a dysarthric speech I believe

18    in my report, which is kind of a thick speech, that I wasn't

19    sure how much of that was related to the issues with his teeth

10:54 20    or if that could be brain related.  I thought it was more

21    related to his teeth, and in a perfect world I would examine it

22    again when, you know, when the teeth were, you know, when the

23    teeth issue was completely resolved.

24    Q.    How is the numbness affecting Agent Moore in his day-to-day

10:54 25    functioning in your understanding?

1   A.   I think the numbness is permanent.  I don't think it should

2   be affecting him day to day.   My experience with numbness for

3   the most part in the office when it's just numbness, when it's

4   not pain is people get used to it.

10:55   5   I've got several areas of numbness in my body, as an

6   example, a hernia surgery that goes through superficial nerves

7   and there's numbness below it and you just start ignoring it,

8   you know, after a period of time.  So I would not think that

9   the numbness is a big issue.  I know that the facial injuries,

10:55   10   the perception and all of the pain that he'd gone through, I

11   know that that was a big issue for him at that time.

12   Q.   We talked a little bit about memory but what about amnesia,

13   what's your understanding of his amnesia?

14   A.   You know, the retrograde amnesia and the anterograde -- the

10:55   15   anterograde is a little harder to determine.  The retrograde

16   clearly is there in that I think he had gone camping with his

17   brother two weeks earlier or something like that and he was

18   foggy on a lot of the -- you know, what they did on that trip.

19   I think he had some memories of it, but I would expect that to

10:55   20   be permanent.

21   The anterograde, if it persists, a lot of it will stay

22   permanent.  A little bit of difficulty establishing the

23   anterograde is he was on respirator, he was given a lot of pain

24   medications, and that can certainly affect you going down.

10:56   25   But I think he was -- from his perspective, as I think he

1   told me and as I saw in the records, I think about three days

2   before he left the hospital he was -- he felt his memory was,

3   you know, coming back so to speak or, you know, I think it was

4   a two and a half week hospitalization and the last three or

10:56   5   four days that he, you know, felt that really he was

6   remembering things that were going on.

7       The memory shouldn't change down the line, okay, those

8   things will be, you know, is he going to pull out what he

9   doesn't remember from his brother's trip or what happened

10:56   10   immediately after the accident?  No.  If he hasn't filled it in

11   at this point, that's not coming back in my opinion.  But it

12   should really not affect him going forward in my opinion.

13   Q.   Besides all the symptoms we've talked about, were your

14   other neurological findings normal?

10:57   15   A.   As I recall, I think everything else was pretty -- I mean,

16   the cognitive was pretty good on my examination.  I do remember

17   specifically there was one word that I recognized he was having

18   word finding on.  And word finding had been one of the things

19   he'd complained about and, again, is very common with traumatic

10:57   20   brain injury, mild traumatic brain injury.  By that, you know,

21   you're trying to come up with a word and, for example, you

22   might want to say tree and you might say green or the green

23   thing or something because you can't come up with the word

24   tree.

10:57   25       And I remember specifically there was, and I think I

884

1    commented on it in my report that there was one word where I

2    was watching him as he was having normal conversation and it

3    looked like he got stuck on the word.   That was the only time

4    that I picked it up, you know, during my evaluation.   But I

10:57  5    thought it was real and it was there.

6    Q.   Are you aware of any reports that that is interfering with

7    Agent Moore's ability to function in daily life?

8    A.   As we speak right now, I can't remember if, you

9    know -- Dr. Markel made some comments in her reports which I

10:58 10   don't agree with.   There was reports, for example, that he was

11   hanging on by a thread, I remember that that was a quote in her

12   reports, and I just -- I didn't, you know, by my examination,

13   reading the records, I didn't see that.

14       I thought he was angry and unhappy and, you know, I think

10:58 15   there were reasons why he was angry.   And I understood that.

16   But I didn't think he was hanging on by a thread.   I think he

17   was able to do the things, he was doing his job and had, you

18   know, gotten back to a relatively normal lifestyle.

19       Now there was -- subsequent to him going back to work,

10:58 20   there was an issue with his shoulder, so then he was not

21   working for a while.   And also, partly, when he went back to

22   work because of his dental problems, they didn't want him doing

23   a lot of speaking, as I remember.   But commenting from the

24   neurological cognitive, you know, standpoint.

10:59 25   Q.   The plaintiff's neurology expert, Dr. Lobatz, also did a

1  comprehensive neurological examination of Agent Moore, did you

2  review those results?

3  A.    Yes, I did.

4  Q.    Are his findings consistent with yours?

10:59  5  A.    Yeah, I thought in his mental status examination, I thought

6  he was pretty consistent with mine, yes.

7  Q.    And his speech and comprehension?

8  A.    As far as I remember, it was normal.

9  Q.    Mood and thought processes?

10:59  10  A.    I think he stated that was normal also.

11  Q.    Any other abnormal findings?

12  A.    I think he had the same kind of facial, you know, findings.

13  I don't think he had anything of significance in terms of the

14  cognitive findings.

10:59  15  Q.    You mentioned Agent Moore's anger and depression and

16  anxiety, do you have any opinions about what caused that?

17  A.    Well, when you get a traumatic brain injury, you know,

18  certainly anxiety and depression, you know, can be a part of a

19  traumatic brain injury.  In this particular case I know there's

10:59  20  other reasons why, you know, he's upset.  My understanding was

21  partly the denial of work comp, for example, and also just the

22  frustration of what he's dealing with as somebody who in my

23  understanding was a very social guy prior to this.

24      I mean, the brother gave a specific example when, for

11:00  25  example, he went into a bar and -- before a game or something,

1   and he went up to get another round of drinks for everybody and

2   the bartender wouldn't serve him because of his -- the speech

3   issue, you know, with the teeth and he was upset.  And I get

4   that and I understand that, so those things are going on, so to

5   speak.

6   Q.    What's your understanding of how Agent Moore is dealing

7   with depression and anxiety?

8   A.    At that time I can't -- I believe he was on Zoloft if I'm

9   remembering correctly.  He was not -- I think he was seeing,

10  was it Dr. Moyer who basically -- and I'm using the phrase, I

11  think in my report he said he's basically using him to fill the

12  medication, wasn't really getting, if I'm understanding

13  correctly, psychological feedback or treatment from Dr. Moyer.

14        There had been some psychologists that he had seen, one

15  through I think the border patrol, that he had stopped seeing,

16  and he was, frankly, very frustrated with seeing physicians at

17  that point.  And I did not get the sense that, you know, at

18  that point in time that he was a good candidate for doing

19  psychological intervention.

20        I think Dr. Evans made, you know, some of the same comments

21  in regards to that.  Again, a lot of that was his frustration I

22  think from all the physicians that he'd been seeing and all the

23  visits.  It seemed like, you know, every couple weeks he had

24  another visit, but I think that he was not getting in my mind

25  at that point appropriate therapy, psychological therapy to

1    deal through this, but I think part of that was because he

2    didn't wish to do that.  That was my read on that.

3    Q.   When you saw him, how well were the medications addressing

4    his depression and anxiety?

11:02    5    A.   When I saw him and I don't pretend to be a psychiatrist,

6    but I mean, I thought he was angry at the interview, at the

7    interview, not, you know, probably frustrated having to see

8    another doctor, among other things.

9        I wasn't reading much in the depression.  I read more in

11:02   10    terms of his anger and frustration, that was what I read.  And

11    I think I put that all in my report, you know, what I saw.

12    Q.   All right.  Let's talk now about prognosis.  Given your

13    diagnosis of a mild traumatic brain injury, what is Agent

14    Moore's prognosis, in your opinion?

11:02   15    A.   I think he's probably -- I think he's where he's going to

16    be at this point, although, you know, from an emotional

17    standpoint you can go up and down.

18        And, you know, we've got the emotions of a trial going on.

19    We've got the emotions of the, you know, frustration with his

11:03   20    teeth and the appearance and this and that.  And I don't know

21    where he is at this point in regards to getting the teeth

22    completed and finished.  And I don't know if he's still going

23    through painful procedures for that as we -- as we speak, but

24    from the cognitive standpoint, he should be stable.

11:03   25        Now, if he gets more depressed, is not getting treatment

for depression, your cognition level can change when you're

depressed.  You can look like, you know, you have more

cognitive problems.  In fact, when an Alzheimer's patient comes

into the office, one of the basic things that you do is put

them on antidepressant medication.  And you do that, and if

they improve in their cognition, you didn't improve the

Alzheimer's, you improved their reaction to it, you know, you

improved their depression to it.

So, you know, that can go up and down.  The cognitive

should be as it is.  It shouldn't get any worse.  There's no

data out there that -- excuse me, there's no data out there

that a single traumatic brain injury is going to suddenly

decompensate down the line.  There's no reason, from my

perspective, of doing serial MRIs down the line to see how he's

doing or if something else is happening because of it.

Now, if there's some sort of change in his -- acute change

in his mental status as he gets older, I mean, could a guy have

a stroke, could something else, you know, then you do what is

appropriate to do.  But you don't need to do this testing, you

know, from the standpoint of you're going to check up on him

every few years.

This is not like doing a colonoscopy, you know, when you

get to be 60 and to do it every three, four years to see if you

can have colon cancer because there's a family history or

breast exams, mammograms every year because you can pick that

1   up.   There's a good logic to doing these repetitively.   There's
2   no logic in my opinion at this time to doing serial MRIs.
3   Q.   If Dr. Lobatz had testified that there are some new studies
4   published since May 2016 showing that patients with a single
11:05   5   mild traumatic brain injury experienced or can experience
6   significant deterioration years after the injury, would you
7   agree?
8   A.   I -- you know, I have a particular injury -- interest in
9   this because I had a mild traumatic brain injury, okay.   So,
11:05   10   you know, I'm not seeing anything in our refereed literature,
11   the major journals, to suggest that that's accurate.
12   Now you can get something, you know, somewhere in the
13   Icelandic journal of whatchamacallit, you know, that's not peer
14   reviewed and not, you know, approved by, you know, the
11:05   15   appropriate, you know, journals in our specialty.   And I know
16   at the time of his deposition he stated he'd seen nothing.   And
17   I think he didn't have a reference.
18   I'd be happy to look at such a reference if he saw that,
19   but I'm telling you that, you know, I pay attention to this and
11:06   20   I'm not seeing anything to suggest with a single injury that
21   you're going to suddenly decompensate or have significant
22   problems from it.
23   Multiple, you know, injuries is a different story, and
24   that's what we've spent a lot of time with, with this chronic
11:06   25   traumatic encephalopathy, i.e., the NFL football players,

1    professional boxers, et cetera, and I've probably seen more

2    athletes in that regard than anybody in the country in those

3    kinds of events.

4    Q.   Is there anything about a mild traumatic brain injury that

11:06   5    would affect Agent Moore's ability to continue to work, in your

6    opinion?

7    A.   At the time that I saw him, no.  And I think -- and I don't

8    think it was in my report but one of the reports I think

9    his -- his, I mean, I think he liked doing what he was doing

11:07   10   and I think he wanted to do that, but I think when he ran out

11   of the next three-year term, you know, I don't know what he

12   would do or not do if he couldn't get that, doing that exactly

13   again.  But my sense was from the records that he felt it

14   wasn't holding him up from promotions nor had anybody indicated

11:07   15   that, so I thought that he would continue in that realm.

16       I did not think -- I did not agree with Dr. Markel's

17   statement that he needed vocational rehabilitation.

18   Q.   Is there anything about Agent Moore's mild traumatic brain

19   injury that would affect his ability to drive in the future?

11:07   20   A.   Not that I'm aware of, no.

21   Q.   What about to clean his house?

22   A.   No.

23   Q.   We talked about some of the future care recommendations.

24   We talked about the MRIs for the rest of his life, you don't

11:07   25   think those are needed you said?

A.    No.

Q.    And what about cognitive remediation, a speech cognitive therapist and psychotherapy?

A.    I think all of those events right after this happened -- all of those treatments right after this happened would be completely appropriate.  I think when you start to get, you know, two and a half, three years down the line and somebody who has returned to work and is doing the same job that they did previously, I think the return that you're going to get on cognitive remediation therapy is, you know, three times a week for so many, I think it's very, very minimal.

Could I tell you it's not possible that you could, you know, improve, you know, a little bit, I can't say that.  But I wouldn't at this point in time with my patients do that.

In terms of psychological therapy, my sense was the same as Dr. Evans, he hadn't pursued it at the time that I saw him, it's unlikely that he was going to do it.  Now if you're going to do it, oh, I'm going to do that only because of, you know, the lawsuit or what have you, my experience with that is patients don't do very well with it.

When I -- if I suggest psychological therapy in my office, I present it to somebody and I make it very clear to them that I don't want them doing it because I'm telling them they should do it.  I want them doing it only if they think it's something else that might give an opportunity to improve, not that, oh,

1    Dr. Gluckman is going to be mad at me if I don't do this, I

2    better go, because then they almost never get anything out of

3    it.

4        So I think that his philosophical approach to it, I don't

5    think he's somebody that, you know, would do well with that,

6    you know, would be my general opinion, although I just saw him

7    once and, you know, I saw some records and, you know, that I

8    reviewed.

9            MR. COYLE:   No further questions.

10           THE COURT:   All right.   We'll take our morning recess

11   at this time.   It's 11:10.   We'll reconvene at 11:25 for the

12   cross-examination of Dr. Gluckman.   We're in recess.

13    (Whereupon, a recess was taken from 11:09 a.m. to 11:28 a.m.)

14           THE COURT:   All right.   Cross-examination of

15   Dr. Gluckman.

16           MR. WOHLFEIL:   Thank you, Your Honor.

17                        CROSS-EXAMINATION

18   BY MR. WOHLFEIL:

19   Q.   Good morning, Dr. Gluckman.

20   A.   How are you?

21   Q.   I'm well.   How are you?

22   A.   Good.

23   Q.   Doctor, I don't think I'll be too long for you because I

24   think there's some room for us to agree on this case.

25       We would agree -- you would agree -- that Ryan Moore

1  suffered a traumatic brain injury, wouldn't you?

2  A.   Yes.

3  Q.   You would agree that he has both retrograde and anterograde

4  amnesia as a result of the incident, wouldn't you?

11:29  5  A.   Yes.

6  Q.   And I think I heard you say on direct if the retrograde

7  amnesia is persistent, it will be permanent?

8  A.   Well, any amnesia around an event can be permanent.

9  Ordinarily there's some filling in as you get past the event.

11:29  10  What doesn't fill in within a relatively short period of time

11  one could expect will likely be permanent.

12  Q.   So today if Ryan still has the retrograde amnesia, that's

13  likely permanent, right?

14  A.   Yes.

11:30  15  Q.   You would agree that the medication that Ryan was given

16  immediately after the incident at the hospital did not cause

17  his retrograde amnesia, wouldn't you?

18  A.   If you're talking about the reports of anesthesia giving

19  retrograde amnesia; is that what you're saying?

11:30  20  Q.   Yes.

21  A.   I've never seen that in 40 years.

22  Q.   I think you addressed this on direct, but you agree that

23  Mr. Moore has persistent numbness on the left side of his face,

24  right?

11:30  25  A.   As of when I saw him, yes.

Q.   And if he had that today, would that likely be permanent?

A.   Yes.

Q.   You agree Ryan has chronic pain.  Is that right?

A.   At the time that I saw him, yes.  You know, where he stands with that, and I don't know if that again is alleviated by further procedures in his face.  I've not been privy to that.

Q.   Sure.  Do you have any reason to doubt that he's still in chronic pain?

A.   I don't know the answer to that because I don't know how much of the pain was healing surgeries as they were going along.  Without seeing him, I think it would be hard for me to say that.

Q.   Okay.  Let's jump into your future care recommendations for Ryan.

     You're not saying that he doesn't need any kind of checkups in the future, right?

A.   No, I think he should be followed up, you know, specifically by a neurologist.  If he was in my office, I can tell you what I would do, you know, in my office, and we're now two-and-a-half, you know, three years down the line, what have you, probably would be seeing him on a six-month to one-year basis, but if there are issues, you come in between, if something is bothering you.  I mean, that's how I would handle it.

Q.   You also agree with the recommendation for Ryan to take

1    Gabapentin.  Is that right?

2    A.    Yes.

3    Q.    Doctor, you're not a psychologist.  Is that right?

4    A.    That's correct.

11:32    5    Q.    So any opinions or ideas that you mentioned on direct that

6    sounded like psychology, those aren't your opinions, are they?

7    A.    What I would say, in a -- I'm not a psychologist.  I'm not

8    a psychiatrist.  We are, quote, "boarded" by the American Board

9    of Psychiatry and Neurology, all neurologists are.  And the

11:32    10    reason for that is because Sigmund Freud was a neurologist and

11    a psychiatrist.  That's when that started.  That doesn't mean I

12    practice psychiatry or psychology, but we do see more

13    psychological issues probably than any other specialty other

14    than a psychiatrist.  So I feel comfortable at times making

11:32    15    comment on depression, anxiety, and do I treat them, yes, but,

16    you know, for the most part, in a case like this, I'm deferring

17    since there are psychiatrists and, you know, cognitive testing

18    done, mostly deferring to them.

19        Does that make sense with that answer?

11:33    20    Q.    Thank you.  Yes.

21            MR. WOHLFEIL:  No more questions.

22            THE COURT:  All right.  Anything else?

23            MR. COYLE:  No, Your Honor.

24            THE COURT:  Thank you Dr. Gluckman.  You're excused as

11:33    25    a witness.

1         Next witness, please.

2              MR. LASKE:   Your Honor, the government calls

3   Dr. Chess.

4                        <u>J. THOMAS CHESS</u>,

11:34  5              DEFENDANT'S WITNESS, SWORN

6              THE CLERK:   Would you state and spell your full name

7   for the record.

8              THE WITNESS:   Joseph Thomas Chess, C-H-E-S-S, just

9   like the game.   I go by J. Thomas.

11:35  10                   DIRECT EXAMINATION

11   BY MR. LASKE:

12   Q.   Good morning, Dr. Chess.

13   A.   Yes, sir.

14   Q.   Where do you work?

11:35  15   A.   My office for the last 25 years has been in my home office,

16   and I've had that since 1973.   Prior to that, my brother and I

17   were downtown Los Angeles since 1964.

18   Q.   You said "home office."   How big of a plot of land are you

19   on?

11:35  20   A.   I have an estate.   I bought an old estate, and there was an

21   office on there, and I converted to it a dental office.

22   Q.   How many patients can you fit in that office?

23   A.   Excuse me?

24   Q.   How many patients can you fit in the office?

11:35  25   A.   At one time?

1    Q.   Yeah.

2    A.   We have five operatories.

3    Q.   What do you do?  Are you a dentist that practices or are

4    you a dentist that testifies?

11:35    5    A.   I am still full-time.  This is my 53rd year, 51 years with

6    implants, and I do everything.  I was trained in the day when

7    you did your own perio, you did your own root canals, you did

8    your own crown and bridge, your extractions except for severe

9    stuff that you want to refer out.

11:36    10        So I still pretty much practice that way.  I step on

11   everybody's toes.

12   Q.   So you're a maxillofacial specialist too?

13   A.   I am an oral implantologist.  I am a diplomate of the

14   American Board of Oral Implantology Implant Dentistry, and our

11:36    15   credentials are recognized in California.

16   Q.   And are you board-certified?

17   A.   That's what I'm board-certified in.

18   Q.   Do you have any other licenses?

19   A.   Well, my California dental license, my automobile license.

11:36    20   Q.   And if we were to break down the time -- and you could even

21   do it in percentages -- how much time do you spend treating

22   patients versus coming to court and testifying as an expert?

23   A.   99 percent.  I am -- this stuff is less than 1 percent.

24   Q.   And earlier in the trial, Dr. Kohani used the term

11:36    25   "wet-hand dentist."  Are you a wet-hand dentist?

1    A.    Extremely, yes.   "Wet-fingered dentist" is the proper term,

2    by the way.

3    Q.    When did you graduate dental school?

4    A.    '64.

11:37    5    Q.    And after that, any other education that relates to your

6    profession?

7    A.    I've taken courses, postgraduate courses, forever, and I've

8    taught.   I started teaching in '68, and probably through about

9    '88 or '90 I was active teaching all over the world and

11:37    10    universities, schools.

11    Q.    You mentioned some of your experience.   Is there any

12    pertinent experience that you haven't talked about so far?

13    A.    Related to?

14    Q.    Related to your opinions in this case.

11:37    15    A.    Oh, well, one thing, they're making such a big deal about

16    this 5.2 years to replace crowns.   That is not a standard of

17    care in dentistry.   That was established 50 years ago or better

18    by the insurance companies for liability purposes on how often

19    they would pay for a new crown.

11:38    20        Okay.   There are -- I belong to an international blog site.

21    There are about a thousand dentists from all over the world,

22    and I posed the question to the blog site whether any studies

23    that show longevity of crowns, bridge work, splints; and then

24    the second question, are there any legitimate studies that show

11:38    25    life expectancies on implants.   Everybody said no, there are

1    none.   There's only individual experience.

2    Q.   So if Dr. Kohani is making a statement about how long a

3    crown or an abutment or bridge work will last, is he going off

4    of, your understanding, experience or some literature?

5    A.   It may be -- it's not on literature, that's for sure.   It's

6    based on his probable personal experience, but mine and most of

7    our colleagues, you know, say otherwise.

8        In other words, there are so many factors that fall into

9    why an implant or a crown is successful.   Hygiene is extremely

10   important.   How well you keep the implant and the gingival

11   surfaces clean to prevent what we call peri-implantitis, which

12   in natural teeth is like gingivitis, where bacteria can get in

13   there and eat away at the bone.   If you keep that under

14   control, no problem.   It could go the rest of his life.

15       Now, one physical factor I just found out recently was

16   somewhere in the records somebody said he's now smoking, and

17   looking back through the records, I found an inconsistency.

18   When I examined him, he said he was not a smoker.   When I

19   looked at Dr. Berger's records, he said he smoked a half a pack

20   a day.   So he's evidently been off and on with smoking.   That

21   could affect things, the estimates.   Now, there are studies on

22   that, and that could affect the implants, the minimum is like 2

23   or 3 percent, the maximum is maybe 8 to 10 percent.   In other

24   words, it's an additional factor that you have to overcome to

25   keep things in good shape.

Q.   But the person responsible for that factor --

A.   Absolutely.

Q.   -- would be the smoker?

A.   Yes.

Q.   And in this case, it would be the plaintiff?

A.   Yes.

Q.   What type of patients do you treat?  Are any of them similar to Ryan Moore in terms of --

A.   I have had -- I've had hockey players that have had the same type of injuries except their jaws weren't broken, but they've had their front teeth knocked out, and I've had to do similar reconstructions.

Q.   How often?

A.   Oh, lately, most hockey players are wearing guards now, so we don't have to worry about that.  That goes back a long way. Certain automobile cases, somebody goes through, hits a windshield or steering wheel or something.  It varies.  One year I may be flooded with some accident cases, and then I may not see anything for two or three years.  It's hard to say, but I -- over the years, I've done a lot.

Q.   So the people you've seen, they lost teeth due to a trauma?

A.   Say again?

Q.   The people that you're seeing, they lost teeth due to a trauma?

A.   Some of them, yes.  Lately we've had a rash of people

1    cracking their teeth right through the roots, and we can't save

2    them, usually biting on an unpopped popcorn kernel is a big

3    one, hard nuts, ice cubes, hard candies, frozen Snicker bars,

4    things -- I've had a patient just the other day, front tooth,

11:41    5    frozen Snicker bar.

6    Q.   And in this case, you're being retained by the

7    United States, correct?

8    A.   Yes.

9    Q.   And you're being paid by the United States?

11:42    10    A.   Yes.

11    Q.   And how many times have you been an expert in litigation

12    cases?

13    A.   I've been doing this since -- it started by accident.   I

14    think I did my first case 1968.

11:42    15    Q.   What about the last five, ten years?  How many cases?

16    A.   The last -- well, I'd say the last five years I don't

17    believe I've had to go to court at all.   Most of the cases get

18    settled before then.

19    Q.   Are we talking about five, ten cases, or are we --

11:42    20    A.   Well, I've always got at least two or three cooking where

21    I'm advising, I'm looking at the case, getting information,

22    advising the attorneys on what's going on, what they have to do

23    and so forth.

24    Q.   So two or three a year?

11:42    25    A.   At least, and sometimes four or five.   It all depends on

1    how active things are.

2    Q.    Okay.    But that's a very small percentage of your practice?

3    A.    Oh, yeah, it's nothing.

4    Q.    Ever represent a plaintiff?

11:42    5    A.    On a couple of occasions, I have, and we lost,

6    unfortunately, but I thought they had a good case.    That's why

7    I was -- I went with them.

8    Q.    Could you break down the percentage of time plaintiff

9    versus defendant?

11:43    10    A.    Oh, probably 1 percent.    There's only two or three

11    attorneys who are, I think, straight arrows that I will -- I

12    will look at cases for plaintiffs.

13    Q.    Can you describe what you did in this case to reach your

14    opinions?    I'm assuming you did something whether it was

11:43    15    examine the patient, look at records.

16    A.    Well, in terms of this -- yes, okay.    I looked at all the

17    records.    I examined him back in November of '15.

18    Q.    Was it November 2, 2015?

19    A.    Say again?

11:43    20    Q.    Was it November 2, 2015?

21    A.    Yeah, that's what I just said, I believe.

22        I examined him, I looked at all the X-rays before his

23    accident.    Fortunately, there was -- '12, I believe.    The

24    accident was in '13.    The year before he had a full mouth set

11:44    25    of X-rays or a panorex.    I forget which it was.    I think it was

a pano.  So I had some, you know, information to compare before and after.  Again, surgically everything was done extremely well.

Q.   I'm sorry, Dr. Chess, did you also examine the patient?

A.   That's what I said, yes.  November 2nd.

Q.   Okay.

A.   We -- okay.

Q.   What did your exam reveal?

A.   What?

Q.   When you examined Mr. Moore, what did your exam reveal?

A.   It revealed he had a very clean mouth, every tooth in his head, except his two lower left molars, no fillings at all, all virgin teeth.  He had two small fillings in those two teeth. And he had five implants on top, seven implants on bottom. They had the healing caps on, and they were all extremely well-integrated, ready to be restored.  I believe he had -- a month or two before he had had some additional gingival gum grafting and vestibuloplasty work done, so he was a little sore from that.  He couldn't wear his -- they made him some partials, I guess, removables, but he was just too uncomfortable and couldn't wear them, so he was walking around snaggletooth.

Q.   Can you describe whether or not he was smoking at the time?

A.   He said to me he wasn't.  My health history showed no.

Q.   And how was his oral hygiene?

A.   It was excellent.  He was doing a good job.

Q.   Anything in the records to indicate that Ryan Moore doesn't take care of his teeth?

A.   Not that I've seen.

11:45
Q.   And you reviewed some medical and dental records relating to the plaintiff in this case?

A.   Yes.

Q.   And most of those records were probably after the accident, correct?

11:45
A.   Oh, yes.

Q.   So even after the accident, he still takes care of his teeth?

A.   Well, yes, yeah.

Q.   And during your review of information or your exam, did you
11:46
find anything out of the ordinary?  There was an issue with Dr. Kohani about teeth number -- actually, I think it was 10 and 11.

A.   10, 11.  Yes, 10 and 11 -- and my photograph shows it, his X-rays from '12 show it.  10 and 11 were absolutely in perfect
11:46
condition.  There was no chipping, no cracking, no damage from the accident.  Where the tooth emerges from the gum was perfect position, there was no recession, there was no root showing.  Same thing with number 11, 10 and 11 both.  And I suspect -- why -- that prior to the accident, I would suspect -- and
11:46
looking at his pre-op X-rays or pre-accident X-rays --

1    Q.   Actually, Doctor, let me stop you.  Why don't we put the

2    image up.  That may help.

3    A.   Say again?

4    Q.   Can I stop you and put the image up?

5    A.   Sure, please.

6    Q.   I'd like to direct your attention to Exhibit 471, page 1.

7    And something will pop up in a second.

8    A.   Yes.

9    Q.   Are these the X-rays you're talking about from '12?  You

10   mean March 13, 2012?

11   A.   Exactly.  Those were Dr. Cassell, I believe, or Cassell.

12   If you noticed, his upper tooth, his -- I have a feeling he

13   has -- before the teeth were knocked out, his original teeth, I

14   have a feeling, were a little bit bucked; in other words, they

15   were flared just a little bit forward, and in order to avoid

16   that -- you can see there's spaces, just barely spaces in the

17   contacts there, but look at where the root tips are.  Those

18   have not changed position in any of the subsequent X-rays.

19   They're still in the same position.  So there was no extrusion

20   of those teeth.

21        The problem is, is those teeth were longer in the profile

22   than Dr. Kohani wanted to restore, and if you look at that one

23   diagram he has where he's got those red lines, the one red line

24   shows where he wants the occlusal plane to be, and the other

25   red line is where it would have to be if he left those two

teeth in.

So, in my opinion, they were taken out for convenience for cosmetics.

What he also could have done -- what I would have done -- would have been to cap those two teeth and made them shorter. And because the canals are pretty big, you may have had to do a root canal besides putting the crown on the tooth if the nerve was involved.

And my office, that would have been for both teeth about a $4,000 procedure. And Dr. Kohani charged -- just to take those two teeth out and to graft those areas and do his membrane magic, it was close to $8,000 just for that.

And then on top of that, he had two pontics which he charged 3900 bucks apiece in the splint bridgework in order to replace those, which I've never seen fees that high anywhere.

Q.   What is a pontics?

A.   A pontic is a false tooth attached to the bridge.

Q.   So just to take a step back, because, obviously, you know all this by looking at it, but, sorry, a very basic question. Can you identify on this image where tooth number 10 and 11 is? And you can actually use your finger to draw on the --

A.   You can see what I'm doing?

Q.   Yes, if you draw --

A.   This is 10, this is 11.

Q.   And where's tooth number 12?

1    A.   12 would be right here.   That's a bicuspid, and then 13.

2    Here's 12, and here's 13.

3    Q.   And can you identify the cementoenamel junction or the CEJ?

4    A.   Yeah, it would be right about in there, right about in

11:50  5    there, about right in there.

6    Q.   Okay.

7    A.   And the same thing there.

8    Q.   And can we now -- I'm going to now direct your attention to

9    an image after the accident.   This was obviously taken before

11:50  10   the June 24, 2013, accident.

11       I'd like you to look at Exhibit 443, page 1.   And you can

12   hit the clear button at the bottom of the screen.

13   A.   Left or right?

14   Q.   Left.

11:50  15   A.   Which symbol?

16           THE COURT:   It's cleared.

17           THE WITNESS:   Okay.   Thank you.

18   BY MR. LASKE:

19   Q.   So looking at this image, can you identify where teeth

11:50  20   number 10 and 11 are?   And we can maybe blow it up a little

21   bit.

22   A.   Okay.

23   Q.   And this one is dated June 30, 2013.

24   A.   Blow the whole thing up, please.

11:51  25       Okay.   All right.   This is 11, this is 10, this is 9,

1    what's left of it, this is --

2    Q.   And where's 12?

3    A.   12 is there.

4    Q.   Okay.

11:51   5    A.   And 6 and 7.

6    Q.   Why don't we look at the next image.  It's Exhibit 443,

7    page 2.

8    A.   Okay.

9    Q.   This one is from --

11:51   10          THE COURT:  Go ahead and clear the screen.

11          THE CLERK:  I'll take care of it.

12   BY MR. LASKE:

13   Q.   Can we blow up that same area again?  And I believe this

14   image was taken October of 2013.

11:51   15          Can you identify 10, 11, and 12?

16   A.   Yeah, they're not too swiftly done.

17   Q.   Is it because the image quality is poor?

18   A.   Yeah, the image quality is poor and burned out.

19   Q.   Why don't we go to 443, page 3.  How about this image?

11:52   20   A.   That's better.

21   Q.   This is from Dr. Machado.  I believe it looks like it is

22   done in -- I guess the image was moved over to the right a

23   little bit more.

24   A.   Okay.  Mark?

11:52   25   Q.   A little more --

A.   10, 11, 12?

Q.   I believe it shows the date at the top of this document?

A.   8-24-08.  No, that's his birthday.  3-17-16.  Or wait.
Actually, I think it's 3-7 or 6.

11:52   Q.   That's the day it was printed.  After we minimize this, we
can talk about that?

     Can you identify 10 and 11?  It looks like it was done July
20, 2015.

A.   Got you.  10, 11, 12, and you can see the CEJs are
11:52   relatively the same.  The location of the apex, the roots is
virtually identical to pre-op and everything.

Q.   Why don't we do a quick side-by-side view.

          MR. LASKE:  Can we pull up slide 551?

BY MR. LASKE:

11:53   Q.   And I think we've blown up the two images.  The image on
the left is Dr. Cassell's, 471.  The image on the right is from
Dr. Machado, 443.

     Dr. Kohani says you can't tell the difference because there
are two different ways of, I guess, conducting the image.  What
11:53   is your view on that?

A.   My view is exactly what I've said before.  I saw no signs
of extrusion or -- movement of those teeth.  There was no
damage to them, no mobility, contacts were fine, enamel was
fine.  And my eye says that the apexes of those all match up
11:54   where they were before the accident.  So, like I say, it was a

910

convenience thing to take those teeth out.

Q.    And you did your own imaging.  I don't think we need to show them because, unfortunately, we didn't get the raw image, so it's not as good, but you did your own imaging in this case, too, in November?

A.    Very similar.

Q.    So November 2015 they looked very similar?

A.    Yes, yes.

Q.    And other than doing the imaging, was there any other indications where you felt that 10 and 11 were fine?

A.    10 and 11 were what?

Q.    Were fine.

A.    Well, in clinical examination, they were in perfect condition.

Q.    What does "clinical examination" mean?

A.    When I physically looked at those teeth, they had no cavities, no chipping, no decay, no mobility.

Q.    When someone --

A.    And the gums were perfect.

Q.    When someone has a cleaning, sometimes someone will put floss between their teeth.  Is that something you did?

A.    Yes, and it -- the floss was fine.  It -- in other words, the teeth -- the contacts were perfect.  It resisted floss going through them, so that's also an indication of no extrusion.

Q.   And when you say the contacts was in tact, you mean the teeth were touching normally?

A.   Yes.

Q.   And how about the rest of the care that Dr. Kohani provided?  You mentioned some partials.  Was there anything else that stood out to you in terms of his care?

A.   Well, he finally got the case put together; it took him a while.  I guess it turned out fine.  I saw the preliminary baking of the porcelain, but I haven't seen the final -- what he looks like.  I hope he's happy.

Q.   Did you form any opinions about the past dental costs?

A.   Yeah.

Q.   And do you know how much the past dental costs -- actually, do you know what type of dental procedures Ryan Moore had before he got to Dr. Kohani?

A.   Well, it was mostly all the surgical, the grafting, and the hospitalization, and the implants.

Q.   So you saw the records of Dr. Vecchione?

A.   Briefly -- partially, yes.

Q.   And you saw the records of Dr. Joel Berger?

A.   Yeah, he's the one who did the implants.

Q.   And Dr. Machado?

A.   Yes, he did the graft work on his gums.

Q.   And I think there might have been some other minor exam by some other dentists too?

912

A.    Yeah.

Q.    And I believe those totaled up to a little under $30,000 for several dentists.  Do you have an understanding of how much Dr. Kohani charged for his work?

11:56  A.    The last bill I saw, I think it's somewhere up around 119, $120,000.

Q.    I think in depo you were asked, you know, is this too high? What was your response at deposition, if you recall?

A.    I said I've never seen fees this high before.  And he had

11:56  the easiest job of all, really, because everything was there.

Q.    Why would you say that?

A.    Everything was aligned.

Q.    Why would you say he had the easiest job?

A.    Everything was there, everything was assigned.  All he had

11:57  to do was put the abutments in, he had a bite registration, work with his lab on making the substructure, and then the final porcelain work for aesthetics, cosmetics, and biting relationship.  I would have been happy to do it for -- let's see, how many units were there, 10?

11:57  Q.    There might have been 12.

A.    12 altogether units -- no, top and bottom --

Q.    I think --

A.    12 on the bottom, six --

Q.    I think seven on the top.

11:57  A.    Seven on the top.

1  Q.   Or maybe five.

2         MR. CHAMBERS:   Excuse me, Your Honor.   None of this

3  was disclosed in either of Dr. Chess' reports nor was it

4  discussed during his deposition.   He had no opinions on

11:57  5  Dr. Kohani's costs.

6         THE WITNESS:   Yes, I did.

7         THE COURT:   Well, hold on a second, Doctor.

8         MR. LASKE:   Your Honor, some of the costs, like I've

9  mentioned earlier in the case, were dated December -- or at

11:58  10  least the bill was dated December 1, 2016, and the bill that we

11  had at Kohani's deposition versus the bill that we got later in

12  time, there were charges removed and charges added.   I don't

13  know how many were removed and added because, as far as I

14  know -- and I'm not trying to accuse counsel of this, but as

11:58  15  far as I know, I'd only seen it this week because the page 2

16  was missing.

17         THE COURT:   Here's the question.   Dr. Chess was

18  deposed in this case?

19         MR. LASKE:   Yes, he was, but I don't recall if it was

11:58  20  before or after Dr. Kohani provided --

21         THE COURT:   During the deposition, was Dr. Chess asked

22  to comment on the cost of Dr. Kohani's care up to that point

23  with the understanding --

24         MR. LASKE:   Up to that point.

11:58  25         THE COURT:   He was asked about that?

1    MR. LASKE:  Yes.

2    THE COURT:  Did he express an opinion during the

3 deposition on the cost up to the point that he was deposed?

4    MR. LASKE:  I believe he did, yes.

11:58  5    THE COURT:  Do you have a different understanding?

6    MR. CHAMBERS:  I do, Your Honor.  He wasn't asked that

7 question, no, nor is it in either of his two reports.

8    THE COURT:  Okay.  I agree, then, if it wasn't the

9 matter of --

11:58 10    MR. LASKE:  We'll move on, Your Honor.  That's fine.

11    THE COURT:  All right.

12 BY MR. LASKE:

13 Q.  Not specifically talking about costs, but just what Kohani

14 did in relation to the other doctors involved.  Dr. Kohani

11:59 15 explained that, you know, this was a difficult case, that this

16 was a difficult case, and as a result -- again, without getting

17 specific to costs -- that led him to charge what he charged.

18    As related to Dr. Kohani's work, was it a complicated case?

19 A.  No, he had the easiest job of all.

11:59 20 Q.  And why would you say that?

21 A.  Because everything was set up for him in advance.  The

22 surgery was done, the implants were in good position.  All he

23 had to do was pop in the abutments and take impressions and

24 have his lab make up the prosthesis.

11:59 25 Q.  And --

1   A.   Slam dunk.

2   Q.   And after you were deposed, did you receive some

3   information that a life care plan by the plaintiffs had been

4   revised?

11:59   5   A.   I believe -- after my deposition?  Yeah, I believe so.

6   Q.   Your deposition, if it would refresh your memory, was April

7   22, 2016, and I can show you a copy of the transcript if that

8   would --

9   A.   Yeah, no, no, that's fine.

12:00   10   Q.   And Nurse Casuto got on the stand the other day, and she

11   talked about her report from May 6, 2016, which, obviously, is

12   later in time.

13        So when you were deposed, you didn't have that information,

14   did you?

12:00   15   A.   No.

16   Q.   And it wouldn't even have been possible because it came

17   later?

18   A.   No.

19   Q.   And so now, knowing that information, did you offer any

12:00   20   opinions to our life care planner about some of the future care

21   recommendations that had been changed and provided to the

22   defense on May 6, 2016?  And, actually, it's a couple days

23   after that.

24   A.   Well, I felt a lot of the long-term recommendations were

12:00   25   ridiculous in terms of frequency, longevity of the implants,

1    longevity of the crowns, how frequent he would have to have

2    MRIs, CT scans, how often he'd have to have the bridgework

3    removed for cleaning and so forth.

4        You have to do each one of these things on an individual

5    basis.  Everything depends upon how well the patient takes care

6    of what he has in there.

7        It's the same thing with your own natural teeth.  You have

8    people that just won't take care of their teeth, and they wind

9    up losing them, and you have other people who go to the grave

10   with their own natural teeth.  It's what we shoot for,

11   prevention.

12   Q.   And I believe Dr. Kohani had some comments about how

13   certain things would have to be replaced every five to ten

14   years -- 15 years, and I think it actually got modified to 10

15   to 15.

16   A.   Yeah, I think at 20 years, he was like 50 percent

17   replacement or something like that.

18   Q.   And do you have an opinion regarding that?

19   A.   I think it's excessive.  I think in my deposition I stated

20   that maybe one or two or three implants might have to be

21   replaced if something happened, and the same thing with the

22   crowns.  Usually most of the problems we have with this type of

23   work is some kind of a porcelain fracture, but usually

24   sometimes, depending when it happens and how extensive it is,

25   we can have that repaired, the lab can rebake that porcelain,

1  or synthetic ceramics now, depending which materials you're

2  using, and you don't have to redo everything.

3        That would be an extreme case, and, in my estimation, it's

4  possible -- anything is possible, but in Ryan's case, this

12:02  5  plaintiff's case, not very probable.  He has a excellent chance

6  of keeping it the rest of his life.

7  Q.   We're not going to look at all the costs, but we'll look at

8  a couple.

9        And are there any on this page -- I think maybe if we focus

12:02  10  down to the one that says "Dentist" at the bottom KK?

11        THE COURT:  What's the number?

12        MR. LASKE:  66, page 2, and it was used a little bit

13  earlier in the trial.

14  BY MR. LASKE:

12:03  15  Q.   Do you agree or disagree with this care recommendation of

16  three or four times a year?

17        THE COURT:  Which one are you referring to, in the

18  middle?

19        MR. LASKE:  The first one where it mentions -- I think

12:03  20  it's talking about different cleanings, so cleanings three to

21  four times a year.

22        THE WITNESS:  I disagree with it.  It all depends,

23  like I say, on how well he takes care of it.  I have patients

24  with similar bridgework, once a year takes care of it.  Some I

12:03  25  have to see them twice, and people who won't do their homework,

1    we've got to see them three times a year.

2    BY MR. LASKE:

3    Q.   Periodontal cleaning with removal and replacement of the

4    prosthetic bridge.   First of all, what is that?

12:03   5    A.   Well, his bridgework, the upper is cemented on.   That would

6    have to be tapped off and check -- check the gum tissue, clean

7    up the cement, put fresh cement on, put it back on.   The lower,

8    take out the screws, check on the tightness of the abutments.

9    Well, same thing on the upper.   Check the abutments, make sure

12:04   10   the screws holding the abutments in are tight, clean around the

11   tissue, if necessary, and then screw it back on.

12   Q.   And is that necessary every 18 to 24 months?

13   A.   No.   Again, it's an individual thing.   I've had patients go

14   four or five or six years before we've had to take anything off

12:04   15   and redo it.

16   Q.   Is it typical that you've seen people charge for

17   postoperative care, or does that usually work into the overall

18   cost?

19   A.   Post-op care?

12:04   20   Q.   Yes.

21   A.   You mean immediate post-op?

22   Q.   Yeah, post-op care within --

23   A.   Not this hygiene recall stuff.

24   Q.   No, not this.

12:04   25   A.   No, no, I mean that's included in your surgical fee.

1    Q.    Would you be surprised that Dr. Kohani had four or five

2    post-op care?

3    A.    And he charged for them?  I'd be flabbergasted.

4    Q.    Crowns, do they need to be taken out every two to three

12:05    5    years?

6    A.    No.

7    Q.    If we go maybe to the next page, "Future Replacement of

8    Implants," is this what we were talking about a little earlier

9    before we put this up?

12:05    10    A.    Yes.

11    Q.    Anything that we didn't discuss?  I don't need you to

12    discuss it again.

13    A.    No.

14    Q.    So that covered implants, that covered abutment and crowns.

12:05    15        How about the prosthetic bridge, the last item?  He has two

16    times over the lifetime for each bridge.

17    A.    Like I say, what he has now could last him the rest of his

18    life.  If he's in an automobile accident and gets a baseball in

19    the mouth, a dog hits him in the teeth or whatever, bites into

12:05    20    a Snickers bar frozen, he might need some work done, but it

21    just all depends on how well he takes care of it.

22    Q.    And what is the key to care?  In other words, what

23    is -- what's important so that these things last longer, or is

24    there anything that will make them last longer?

12:06    25    A.    Well, like I say, it's highly individual.  Some people are

920

easy on things, some people are hard on things.  Everybody's different.

Q.    Your review of Ryan Moore's records -- the little was before, but mostly after -- did he take good care of his teeth?

A.    Before the accident, absolutely.  He only had two very small occlusal cavities.

Q.    And how old was he at the time, in his mid-30s?

A.    Yeah.

Q.    And so later on, did it still seem like he had good dental habits?

A.    When I saw him, he did, yes.

Q.    And that was in November of 2015?

A.    Yes, he was doing -- he was keeping things very clean, no plaque deposits, no tarter deposits, no inflammation of the gums.

Q.    And so a lot of this care in part is dependent on how Ryan Moore continues to take care of his teeth or not?

A.    Exactly.

Q.    And some of this might be dependent on smoking?

A.    That will increase problems by, like I say, depending on which study you look at, 2 to 3 percent, some as high as 8 to 10 percent causing problems, usually peri-implantitis, causing inflammation in the gums.

Q.    That's what smoking will do?

A.    Yeah.

1  Q.    And Dr. Kohani testified that when he found out the

2  plaintiff was smoking, he recommended he stop.   Would you?

3  A.    Absolutely, I agree.   As an ex-smoker, I totally agree.

4  Q.    Not going into specific costs, but did you happen to

12:07  5  disagree with any of the future dental costs?   So just yes or

6  no.

7  A.    Yes, I did disagree, yes.

8  Q.    And did you discuss any of those opinions with the defense

9  life care planner?

12:07  10  A.    Ms. Engler, yes, I did.

11  Q.    And did you happen to review her cost comparison report?

12  A.    I believe so, yeah.   I think she had to do an amended also.

13  Q.    I think that came up because the plaintiff's one was

14  amended after -- well, May 6, 2016.

12:08  15  A.    Okay.   Yeah.

16  Q.    Did the United States place any limit on the material you

17  could review?   In other words, if you asked, would we provide

18  it?

19  A.    Yes.

12:08  20  Q.    And the opinions that you have expressed, do you hold these

21  opinions to a reasonable degree of medical certainty?

22  A.    Yes.

23          MR. LASKE:   Nothing further.

24

25

1       THE COURT:  All right.  Cross-examination.

2                    CROSS-EXAMINATION

3   BY MR. CHAMBERS:

4   Q.   Good afternoon, Doctor.

5   A.   Howdy.

6   Q.   If I did my math correctly, you've been a practicing

7   dentist for 53 years?

8   A.   This is my 53rd year, yes.

9   Q.   Congratulations.

10  A.   Thank you.

11  Q.   And you've been doing expert work nearly that long?

12  A.   I think my first one was in '68.  It was an accident.

13  Automobile Club called me thinking they were getting my cousin,

14  Jimmy Chess, who was a very famous dentist, and they got me

15  instead, and they were happy with me, and from then on, the

16  name got around.

17  Q.   And 99 percent of the time you work for the defense, true?

18  A.   Yes.

19  Q.   And as you mentioned, I think, during direct, there's

20  really only two plaintiffs lawyers you've ever worked with in

21  the 50 years you've been doing this?

22  A.   Two that I will regularly work with if they have something

23  they want to refer to me.

24  Q.   Fair enough.

25       Now, you talked a little bit about the success of the

1   implants, and I think you said that it was possible that one or

2   two or three may fail over the course of Ryan's life?

3   A.   It's possible, not probable in my case -- in this case.

4   Q.   And you highlighted that one of the most important parts

12:09   5   about the success of implants is how well they're taken care

6   of, true?

7   A.   True.

8   Q.   And you are not saying, though, that having the implants

9   that Mr. Moore has in his mouth is the same as you and I to

12:09   10   taking care of our natural teeth, are you?

11   A.   Well, it's very similar.   That's a good analogy.   It is.

12   That's why people lose their teeth.   They don't take care of

13   them.   The hardest thing we have is to teach people how to

14   brush and floss their teeth.

12:10   15   Q.   So Mr. Moore can floss his teeth?

16   A.   Yes, a Proxabrush or whatever.

17   Q.   And he can floss the prosthetics that he's got in there?

18   A.   He gets underneath the bridgework with the special floss,

19   goody bob.   There's --

12:10   20   Q.   A special floss goody bob?

21   A.   Yes, it's a little thing that goes underneath the

22   bridgework, and he can shoeshine.   He can also use

23   Proxabrushes.   They're like little bottle brushes.   He can use

24   Rotadent, he can use water irrigator.   He can handle it.   He's

12:10   25   a good man.

924

1  Q.   And despite people's best efforts, sometimes

2  peri-implantitis or mucositis develops, doesn't it?

3  A.   It can, but usually there's neglect involved.

4  Q.   And the peri-implantitis or the mucositis can, in turn,

12:10   5  lead to the failure of implant, can't it?

6  A.   If it's not cared for, treated, if somebody plays hookey

7  for ten or 15 years and they come in and they've got a bad one

8  going, yeah, we can be in trouble, but, fortunately, we're at

9  the point now where we can treat a lot of this and reverse

12:11   10  these things.   We can even grow bone back for patients.

11  Q.   You're not suggesting any bone growth treatments for

12  Mr. Moore, are you?

13  A.   No, he's perfect right now.

14  Q.   And in addition to the peri-implantitis leading to implant

12:11   15  failure, he can also have some kind of mechanical issue.   Isn't

16  that true?

17  A.   Exactly.   Usually screws loosening in the abutments.

18  Q.   Or, for instance, biting too hard and breaking something?

19  A.   Yes, exactly.

12:11   20  Q.   And that could be because of a lack of feeling or something

21  when somebody's doing that?

22  A.   No, it's just not thinking.

23  Q.   Oh, they just don't think?

24  A.   I've done it myself.

12:11   25  Q.   And absent an accident or trauma in Ryan's case, it's your

925

1    professional opinion as a dentist that the implants that he's

2    got in his mouth are going to last him for the rest of his

3    life?

4    A.    I think there's a high degree of probability that will

5    happen, yes.

6    Q.    And you understand that's another 40 or so years?

7    A.    Hopefully, if he's not shot by a jealous husband.

8    Q.    And I understood you a moment ago when you were talking

9    about some literature, that you couldn't find any literature to

10   support the idea that the implants needed to be replaced more

11   frequently or earlier than that.  Is that true?

12   A.    Exactly.

13   Q.    And, similarly, you can't find any literature out there to

14   show that they will last him for another 40 years, can you?

15   A.    Not literature, but I've been in this field for 50-some

16   years.  I know who all the experts are.  I listen to their

17   lectures.  And we all basically agree on the same thing.  I

18   wouldn't do one of these cases if I didn't think I'd had at

19   least a 90-percent chance of ten-year survival, and, like I

20   say, now -- I've got crowns in my mouth that are 50 years old.

21   Q.    Sir, my question was simply, are you aware of any

22   literature out there to support the notion?

23   A.    There is none.

24   Q.    Can I finish my question, please?

25   A.    There is none.

1   Q.   My question is simply, are you aware of any literature out

2   there that suggests or supports the notion that an implant can

3   last for 40 years?

4   A.   I don't believe there is any.

12:12   5   Q.   Thank you.

6        And I understand that you disagree with Dr. Kohani's

7   recommendations for implants, but let's assume that Ryan needs

8   them.  You don't have any dispute whatsoever with the costs

9   that were proposed by Dr. Kohani, do you?

12:13   10  A.   Sure, I do.

11  Q.   Really?

12  A.   His fees are out of sight.

13  Q.   I'd like to read from page 71 of your deposition, beginning

14  at line 8.

12:13   15       MR. LASKE:   Okay.

16       MR. CHAMBERS:   "Question:   Okay.  But assuming he does

17  need the implant, at least according to Nurse Engler, you don't

18  dispute the cost of those?

19       "Answer:   No."

12:13   20       Reading further down, beginning at line 19.

21       "Question:   But, again, assuming it did happen, you don't

22  dispute the cost?

23       "Answer:   No.   No."

24  BY MR. CHAMBERS:

12:13   25  Q.   And that's because you think that Dr. Kohani is a

1    specialist, so you have to agree with his costs, right?

2    A.   Yes, exactly, and someone who's willing to pay it.

3    Q.   But you agree that Dr. Kohani is a specialist, so you would

4    defer to him on his costs, correct?

12:14   5    A.   No, I wouldn't.   I have more time and more expertise in

6    this than he does.   He's been at it 25, -6 years.

7    Q.   I'm going to read from page 68 of your deposition beginning

8    at line 13.

9        "Question:   Right, and then you agreed with the cost as

12:14   10   well, correct?

11       "Answer:   Have to.

12       "Question:   Why?

13       "Answer:   He's a specialist.

14       "Question:   Kohani is a specialist?

12:14   15       "Answer:   Yeah."

16           MR. CHAMBERS:   I don't have anything further,

17   Your Honor.

18           THE COURT:   Any redirect?

19           MR. LASKE:   Just one question.

12:14   20                   REDIRECT EXAMINATION

21   BY MR. LASKE:

22   Q.   Just because you agreed that Dr. Kohani is a specialist,

23   that doesn't mean you're not a specialist, right?

24   A.   Exactly.

12:14   25           MR. LASKE:   That's it.

1    THE WITNESS:  And, like I say, I feel I'm more

2  qualified than he is.

3    MR. LASKE:  Nothing further, Your Honor.

4    THE COURT:  Okay.  We'll take our afternoon recess at

12:15    5  this time.

6    Dr. Chess, before you go, I have a question for you.  I

7  raised it with Agent Moore when he took the stand.

8    My understanding is that his bottom teeth have been -- his

9  bottom denture that they created for him has been screwed in.

12:15   10    THE WITNESS:  Correct.

11    THE COURT:  He doesn't have to rely on --

12    THE WITNESS:  Cement.

13    THE COURT:  I was also -- the testimony has also been

14  that there were screw placements for the top.

12:15   15    THE WITNESS:  That's what holds the abutment to the

16  root form in the bone.  The crowns are cemented on over all

17  that.  You have three pieces.  You've got the root form of the

18  bone, you've got the abutment, which is screwed into the root

19  form, and then the crown goes on top.

12:15   20    THE COURT:  You say the screws hold the abutment into

21  the root form?

22    THE WITNESS:  Yes, the abutment goes into the root

23  form.

24    THE COURT:  Why can't they use -- and this is just my

12:15   25  own curiosity, but why can't they use screws to hold his

1    denture in place on the top as well?  Why can't they put, for

2    example, small screws behind to hold that in?

3            THE WITNESS:  I believe Dr. Kohani in his deposition

4    explained why.  He would have to have penetration through the

12:16  5    cosmetic side of the tooth.

6            THE COURT:  Why?  Because you can't get to it to screw

7    it in?

8            THE WITNESS:  Evidently the way he designed it, that

9    was a shortcoming.

12:16  10            THE COURT:  Have you ever -- and, again, it's just my

11    own curiosity, but have you ever seen dentures held in with

12    screws placed behind the upper teeth?

13            THE WITNESS:  Oh, absolutely.

14            THE COURT:  And then covered with some kind of --

12:16  15            THE WITNESS:  Yes, little synthetic porcelain,

16    absolutely.

17            THE COURT:  So it's possible to do that?

18            THE WITNESS:  Oh, yes.

19            THE COURT:  It seems to me that's a more secure way of

12:16  20    keeping the denture in place.

21            THE WITNESS:  Not necessarily.

22            THE COURT:  No?

23            THE WITNESS:  Screws loosen, under the best of

24    conditions.

12:16  25            THE COURT:  What about cement, though?  It hardens

1   over time or can give way, right?

2        THE WITNESS:  But that's easy to fix.

3        THE COURT:  Okay.

4        THE WITNESS:  And by the time you know there's a

12:16   5   problem, the thing falls out.  A screw loosens, it can take a

6   year or two to show the damage.

7        THE COURT:  I see.

8      So you have no -- as a general matter, putting Mr. Moore's

9   case aside -- Agent Moore's case aside -- you have no

12:17   10   disagreement with using cement to affix these dentures?

11        THE WITNESS:  Absolutely, no.  The majority of cases I

12   do are cemented.

13        THE COURT:  Rather than screwed?

14        THE WITNESS:  Rather than screws.

12:17   15        THE COURT:  Thank you.

16        THE WITNESS:  Most of my repair work are screws that

17   are broken from somebody else.

18        THE COURT:  Okay.  Thank you.

19      Yes, you're excused as a witness.

12:17   20        THE WITNESS:  Thank you.

21        THE COURT:  We'll reconvene at 1:15.

22      How many additional witnesses does the government have?

23        MR. LASKE:  I believe, Your Honor, at this point we

24   probably just have two.

12:17   25        THE COURT:  Okay.  And how much longer do you

1    anticipate?

2            MR. LASKE:  I can't predict cross, but I would say

3    direct is probably in the range of 20 minutes for each person,

4    give or take five minutes.

12:17   5            THE COURT:  Okay.  Well, I can tell you the cross is

6    not going to take longer than 45 minutes because that's what

7    the plaintiffs have left altogether.  So --

8            MR. LASKE:  I don't know how I've been with my

9    estimated time.

12:17  10            THE COURT:  You're at nine hours and 20 minutes now.

11            MR. CHAMBERS:  You only have three hours for closing.

12            THE COURT:  Okay.  Well, that will help with the

13    planning then.

14        I'll see you back at 1:15.

12:18  15            MR. LASKE:  Is it the plan today that we'll be doing

16    the closing arguments?

17            THE COURT:  Yes.

18            MR. LASKE:  Okay.  Thank you.

19        (Luncheon Recess.)

01:16  20            THE COURT:  Counsel and party representatives are

21    here.  Government may call its next witness.

22            MR. LASKE:  Our next witness is Stephanie Engler.  Let

23    me get her sworn.

24            STEPHANIE ENGLER, DEFENDANT'S WITNESS, SWORN

01:16  25            THE COURTROOM DEPUTY:  Ma'am, please state your name

1    for the record and spell your first and last name.

2         THE WITNESS:  Yes, Stephanie, S-T-E-P-H-A-N-I-E,

3    E-N-G-L-E-R.

4                   DIRECT EXAMINATION

5    BY MR. LASKE:

6    Q.   Good afternoon, Ms. Engler.

7    A.   Hi.

8    Q.   And actually it's Nurse Engler, right?

9    A.   Yes.

10   Q.   Can you tell us where do you work?

11   A.   I work for a company called Olzack Healthcare Consulting.

12   Q.   What does Olzack Healthcare Consulting primarily do?

13   A.   Life care planning.

14   Q.   Life care planning for people in litigation or?

15   A.   Yes.

16   Q.   Anything else?

17   A.   No.

18   Q.   And before you worked for Olzack Healthcare where did you

19   work?

20   A.   I have -- I have been a nurse in a community for the last

21   17 years.  I started in Minnesota as an ICU nurse and

22   then moved to Bakersfield.  And I was a nursing professor at a

23   college there.  And then I got into legal nurse consulting and

24   life care planning.

25   Q.   How long were you an ICU nurse?

1    A.   Approximately 12 years, 13 years.

2    Q.   What -- roughly what year to what year?

3    A.   Oh, I'm sorry.   From about 2000 to 2016, so 16 years.

4    Q.   And that -- and that was before you became a professor at

01:18    5    teaching nursing?

6    A.   Yes, I was in the ICU at times at the same time I was

7    teaching but, yes.

8    Q.   And then what was your next job after that?

9    A.   I started a company called SS Legal Consuling.

01:18    10    Q.   How long did you work there?

11    A.   I still have that company, that does primarily plaintiff

12    work with legal nurse consuling, so helping them find experts

13    and doing record review chronologies for plaintiff.

14    Q.   And do you ever testify on behalf of the plaintiff with

01:19    15    that job?

16    A.   No.

17    Q.   Okay.

18    A.   There's no testimony with that job.

19    Q.   Olzack Healthcare, how long have you worked there?

01:19    20    A.   I have worked there since 2013.

21    Q.   And you work there today?

22    A.   2014, I'm sorry, January.   And I work there today, yes.

23    Q.   And does Olzack Healthcare, do they tend to represent one

24    side more than the other?

01:19    25    A.   I don't know if they represent one side more than the

1    other.   We work both plaintiff and defense.   I can only speak

2    for my cases, I guess.

3    Q.    What's your experience?

4    A.    My experience is probably 80/20, 80 percent defense, 20

01:19    5    percent plaintiff.

6    Q.    And can you briefly describe your post high school

7    education.

8    A.    Yes.   I am from Minnesota, so I went to college at a small

9    Christian school in Minnesota, and after that I went to

01:20    10    graduate school at another school in Minnesota and then

11    attended University of Florida to get my life care planning

12    certification.

13    Q.    So tired of the cold?

14    A.    Oh, yes.   And one more school, I forgot.

01:20    15    Q.    Okay.

16    A.    I did undergrad biology and then I went to nursing school

17    at St. Kate's in Minnesota.   Yes, cold, freezing.

18    Q.    What years did you go to nursing school?

19    A.    I went to nursing school from 2015 -- well, my undergrad

01:20    20    2015 to -- I'm sorry, 1995 to 1998 and then graduated in 2000.

21    Q.    Okay.   Do you have an area of expertise?

22    A.    In this current role or as a nurse?

23    Q.    As it may relate to this case.

24    A.    As it relates to this case, yes, an expert in the life care

01:21    25    planning, putting costs to the recommendations that were given.

935

1    Q.    And what type of life care planning do you do?

2    A.    I do --

3    Q.    In other words, do you look at past costs sometimes, do you

4    look at future care or is it kind of focused in on one area?

01:21   5    A.    Well, the focus is primarily is on the cost of future care.

6    Q.    In this case, did you start doing a cost comparison before

7    Ryan Moore had much of his dental work done?

8    A.    Yes.

9    Q.    So when you saw Dr. Kohani's bills and his report

01:21   10   initially, Dr. Kohani had estimated costs which he -- which

11   were related to things he hadn't done yet, correct?

12   A.    Correct.

13   Q.    And because of the passage of time of this litigation what

14   was thought as future actually became the past, correct?

01:21   15   A.    Yes.

16   Q.    So did you actually comment on some of those costs that now

17   later on became past costs?

18   A.    In my life care plan, yes.   Or in my cost comparison

19   report, yes.

01:22   20   Q.    Okay.   And I believe in Dr. Kohani's report at the time

21   before he had done many of these procedures, I think he

22   actually did one procedure for about 7,000, the others were for

23   about $91,000 that he estimated the costs, does that sound

24   about right?

01:22   25   A.    Yes.

```
         1   Q.   So an estimate of $98,000 of future care?
         2   A.   Yes.
         3   Q.   And how many times have you done a cost comparison like the
         4   one you did in this case?
01:22    5   A.   I -- I'm sorry, did you say how many?
         6   Q.   Yes.
         7   A.   I would have to estimate between probably
         8   30 -- approximately 30.  I just testified yesterday in a case
         9   where I did a cost comparison report for that.
01:22   10   Q.   Oh, and have you been involved collaboratively in making
        11   life care plans?
        12   A.   Yes.
        13   Q.   And how many times have you done that?
        14   A.   I would say approximately a hundred in collaboration in our
01:22   15   office.
        16   Q.   Collaboration, sorry.
        17   A.   That's all right.
        18   Q.   When was the last time?  It sounds like it was yesterday.
        19   A.   Yes.  I testified yesterday on that case, yes.
01:23   20   Q.   Where were you testifying?
        21   A.   In Bakersfield.
        22   Q.   Administrative proceedings, state court?
        23   A.   Oh, I'm sorry, state court.
        24   Q.   And was it for a trial?
01:23   25   A.   Yes.
```

1    Q.    Personal injury trial?

2    A.    It was personal injury, yes.

3    Q.    How many other times have you testified?

4    A.    Just one other time before that.

01:23    5    Q.    Where was that?

6    A.    That was in Orange County, state court.

7    Q.    So Superior, Orange County Superior court?

8    A.    Yes.

9    Q.    And both times were you allowed to offer your opinions?

01:23    10    A.    Yes.

11    Q.    Can you describe your methodology that you used to reach

12    your opinions in this case?

13    A.    Yes.  Well, first, review records, review medical reports

14    that have been given to me, and then I contact the medical

01:24    15    experts that have been provided and collaborate with putting

16    their recommendations or putting costs to the recommendations

17    that have been provided.

18    Q.    And did you do that task in this case?

19    A.    Yes.

01:24    20    Q.    And had you used this method in the past?

21    A.    Yes.

22    Q.    How many times?

23    A.    I would say, well, if I had said that I had previously done

24    approximately a hundred -- collaboratively worked on about a

01:24    25    hundred, I would say probably 80, not every time is the

1   methodology exactly the same.  Sometimes I'm asked to just cost

2   compare and not speak with experts, just look at the cost that

3   was provided.  So sometimes I am asked just to do that.

4   Q.   In this case you did a cost comparison that had four

01:24   5   columns, but just because this one had four columns and maybe

6   you only did four columns this one time, that doesn't mean you

7   hadn't done cost comparisons before?

8   A.   No.

9   Q.   It just means that this format -- you tailored the format

01:25   10   for the needs of the case?

11   A.   I did, yes.

12   Q.   Is the method you were using recognized in your field?

13   A.   Yes.

14   Q.   And as part of that method, how do you find out how much

01:25   15   something costs?  Walk me through, you have a case, there's a

16   recommended care that's probably by a doctor, how do you

17   determine how much that should cost?

18   A.   Well, if -- if I'm able to, then I take the recommendation

19   and I kind of do ground work, if you will, and I contact

01:25   20   medical providers related to that recommendation in the area

21   that the patient lives and I work from there.  And if I'm able

22   to find what I need in that area, then that's great.

23   Q.   And do you have an understanding -- do you have an

24   understanding of where Ryan Moore works?

01:25   25   A.   Yes.

1 Q. And where is that?

2 A. Well, actually I take that back, I think his job area may

3 have changed.

4 Q. It's possible.  Do you know generally what county?

01:26 5 A. Yes.

6 Q. What county is that?

7 A. San Diego County.

8 Q. And where does Ryan Moore live?

9 A. In Ramona.

01:26 10 Q. And did you take those two locations into account when you

11 did your methodology?

12 A. I --

13 Q. Or when you may have made calls?

14 A. No, I did not contact providers near where he works as an

01:26 15 option for the recommendations that were given to me.

16 Q. Because you considered he'd more likely go to some place

17 near his house?

18 A. Yes.

19 Q. And did you find any discrepancies -- actually, I'll get to

01:26 20 that a little bit later.  What materials did you review in

21 reaching your opinions?  You mentioned some documents, can you

22 describe more what those medical records and documents were?

23 A. Yes.  I had past medical records, depositions, expert

24 reports, and I don't know if I'm going to say the name right

01:27 25 but a lot of the discovery questions, as far as questions I

1    believe that he answered in regards to the case, pictures, and

2    billings, past billings.

3    Q.    And what type of opinions did you form to reach your cost

4    comparison report or to create your cost comparison report?

01:27    5    A.    The opinions were provided by the physicians, the

6    recommendations are theirs, and I applied costs to those

7    recommendations.

8    Q.    So say, for example, we see something in your cost

9    comparison report that mentions a recommendation that's in

01:27    10    Casuto's report and then you disagree with that, the

11    disagreement, is that your own or is that based on someone

12    else?

13    A.    It's based on the physician.

14    Q.    And the physicians in this case I believe are primarily

01:27    15    Dr. Chess, Dr. Gluckman and Dr. Evans?

16    A.    Yes.

17    Q.    Am I missing anyone?

18    A.    Doctor --

19    Q.    I believe I covered the dentist, the neurologist and the

01:28    20    neuropsychologist?

21    A.    Yes, three.

22    Q.    And along the way did you happen to speak to anyone else

23    other than those three?

24    A.    In regards to a recommendation or?

01:28    25    Q.    I guess in regards to anything.

A.   I --

Q.   Well, let's just take a step back, so for care you primarily relied on the defense experts?

A.   Yes.

01:28   Q.   And for costs how did you get to the costs?

A.   So for the costs I contacted -- well, depending on the recommendation, some of them I can get -- if it's a provider that provides a service, a psychologist, neurosurgeon, those kind of things, I can call and get those costs.  If it's a

01:28   hospital, I can get hospital costs that way.  Sometimes for a diagnostic test, a lab or a diagnostic CT or an MRI, those I am able to get through, sometimes calling directly or I have other resources that I use to get those numbers.

Q.   And we're able to put stuff on the screen if you'd like,

01:29   but just going through your cost comparison report, did you reach any opinions about the future dental care in this case?

A.   The opinion comes from the doctor, so the recommendation was theirs.

Q.   And if you disagree with the costs, that's from you?

01:29   A.   Yes.

Q.   As it related to future care regarding neurology, any -- any disagreements based on costs?

A.   For neurology --

Q.   And I guess to go back, to the extent that we see anything

01:30   in the cost comparison report that talks about disagreements

1  about care for neurologic issues, that's not you, that's the

2  doctor?

3  A.    Correct.

4  Q.    And in this case that would be either Dr. Gluckman or for

01:30   5  neuropsychology it would be Dr. Evans?

6  A.    Yes.

7  Q.    And I believe for like mental healthcare costs if you would

8  total up all the columns it comes out about to $135,684,

9  Ms. Casuto's life care plan, and I believe the defense total is

01:30   10  different.  I believe it's 31,432.  Does that sound correct?

11  A.    Yes.

12  Q.    And why a difference?  Is it a combination of things or is

13  it based just on costs?

14  A.    It -- majority is based on recommendation.  So if their

01:31   15  frequency from, it has changed in the recommendation, then that

16  brings the cost down.

17  Q.    Okay.  So there's two things that could bring the cost

18  down, one could be Ms. Casuto recommends -- or a doctor for the

19  plaintiff or Ms. Casuto, they recommend a cost, the opposing

01:31   20  expert for the defense disagrees with that, that could lower

21  the cost, right?

22  A.    Yeah.  They recommend a recommendation, they're not

23  recommending a cost but, yes.

24  Q.    But based on the recommendation, if one says someone needs

01:31   25  something 10 times, they say five times, just simple math,

943

1    it'll reduce the overall cost?

2    A.    Yes.

3    Q.    And then the other part of it is actually Ms. Casuto

4    recommending a cost and you either agreeing or not agreeing to

01:31  5    that cost?

6    A.    Yes.

7    Q.    So as it related to future mental health, you know, the

8    disparity I just mentioned between the two costs was about a

9    hundred thousand, was that primarily based on your finding

01:31  10   different costs than Ms. Casuto or was it the recommendation of

11   the experts who testified before you?

12   A.    For that particular recommendation or that item, there's a

13   few recommendations, but for the psychologist that was listed,

14   it was a combination of both.   The recommendation decreased the

01:32  15   cost but also the costs that I found made the overall -- aided

16   in having the overall costs decreased.

17   Q.    Is there a particular page you're looking at?  We might be

18   able to go to that.

19   A.    I am.   I'm on page 10.

01:32  20   Q.    So 462, page 10?

21   A.    Yes.

22   Q.    And is there a particular column or row we should be

23   looking at?

24   A.    I am looking at the first recommendation of a psychologist.

01:32  25   Q.    Okay.   Maybe I'm not looking at the right page.   Is it page

1    10?

2    A.    The page that's up says page one.

3    Q.    462, page 10?

4    A.    Yes.   It's just the one I'm looking at says page 9.

01:32    5    Q.    Ah, okay.   I think we're on the same page now.

6    A.    So this is page 8 what I'm looking at.

7    Q.    Yeah, 462, page 10.

8    A.    Next page after this one.

9    Q.    Why don't we do this?

01:33    10    A.    Oh, there it is.

11    Q.    I'll give you the one we're using.

12    A.    It's up now.

13    Q.    So please tell us which page, we'll pull it up.

14    A.    It's up now.   Page 10.

01:33    15    Q.    On that page, what should we focus in on?   We can actually

16    highlight a section or you can use your finger and you can

17    circle around it.   You can actually draw on this.

18    A.    Very neat.   So for -- for this area right here, her -- her,

19    I'm sorry, Nurse Casuto, the average cost per year for this

01:33    20    evaluation is $315.   And her cost per session is about 215.

21    Yeah, I don't know if this is going to work.

22        So her average cost is about 215.   The total of her

23    recommendation including these -- this 50 sessions a year and

24    25, this right here, for her comes out to about 24,000.   It's a

01:34    25    little bit higher, it's 24,100 something.

945

1   Q.   Okay.   And in this instance it looks like if we looked at

2   column one, column three there is actually a disagreement

3   regarding frequency of psychologist visits?

4   A.   Yes, yes.

01:34   5   Q.   But that's not you, that's Dr. Evans and that's the other

6   doctor for the plaintiff?

7   A.   Yes.

8   Q.   So for you and -- as it relates to Nurse Casuto, where do

9   you disagree?

01:34   10   A.   Okay.   So I disagree with this area right here because my

11   costs are reflected in this area and the total for her is about

12   24,000 and my total is about 17,000.

13   Q.   And it looks like -- she has a wider range obviously in the

14   numbers, some of yours, you do have a range.   For sessions

01:34   15   evaluation you have a 200.   Why 200?

16   A.   Because the places that I called to get this information

17   they all said with -- one was like 180, one was 205, so I put

18   200 just because the range was very, very small.   If I can

19   correct myself on one thing, this 17,000 right here is using

01:35   20   her recommendation, is using this number right here.   If I used

21   the recommendation that was given to me by Dr. Gluckman, it's

22   about 6,000.   If that -- hopefully that makes sense.

23   Q.   Sorry.   Do you mean Dr. Evans, the neuropsychologist, or

24   Dr. Gluckman?

01:35   25   A.   Oh, yes, I'm sorry, Dr. Evans.

1   Q.   Is there another area in mental health where it would help

2   to go through the same process?  And you can clear the screen

3   if you hit the bottom left, there's a sticker on it.

4   A.   Okay.  I don't think that I need to clear it, on the rest

01:35   5   of this page.

6   Q.   You can clear the screen by, there's a sticker on the

7   bottom there.

8   A.   Oh, yeah.

9   Q.   There you go.  So, is there any other section of the cost

01:36   10   comparison report where we should look at where there's

11   actually a disagreement between you and Nurse Casuto about

12   costs?

13   A.   Yes.

14   Q.   And where would that be?  And I'm talking about mental

01:36   15   health.

16   A.   Oh.

17   Q.   So we'll start with that and we'll kind of go to the next

18   step.

19   A.   Sorry.  The mental health area, they're just small

01:36   20   discrepancies.

21   Q.   Nurse Casuto mentioned something about a coupon and she

22   acknowledged that if there was a coupon available it would be

23   cheaper, but if it wasn't, she actually, I think during trial

24   she modified her range of costs down.

01:36   25      I guess, what is this coupon that she was talking about?

1   Why would that even play a role?

2   A.   Oh, well, for prescription medications, it's widely used.

3   The places I called, CVS, Walgreens, Rite Aid, they encourage

4   the use of a coupon that you can get to help to compensate for

01:36   5   medication costs.

6       However, it's not used for narcotics, so it is used for

7   medications that are not narcotics.   And they take this coupon.

8   You just print it off the computer.

9   Q.   Is Ryan taking any medications where he could use the

01:37   10   coupon?

11   A.   Yes.

12   Q.   And you mentioned a few places, CVS, Rite Aid, does Ryan

13   Moore live near any of those places?

14   A.   Yes.

01:37   15   Q.   Okay.   And then what other types of costs did you disagree

16   with Ms. Casuto in your plan?

17   A.   Like I said, there are minimal areas.

18   Q.   Why don't we just turn to maybe the more significant ones.

19   A.   Yeah, so if we turn to the most significant on page four.

01:37   20   Q.   Okay.   At the bottom of the document I handed you, the one

21   that I handed you just to the left --

22   A.   Oh, yes.

23   Q.   -- do you mind calling out the page that that would be.

24   It's the very bottom one.

01:37   25   A.   Sure.

1  Q.   It says Defendant, DX Exhibit, it would be 462, page -- I

2  believe it's page five.

3  A.   Five.

4  Q.   Again, you can kind of orient, point on the screen where we

01:38  5  should be looking.

6  A.   Okay.  So if you look at this area right here, for the

7  upper, I mean, you can see by looking at it the upper bridge

8  and the lower bridge, so her cost, the upper bridge of $33,300.

9  And I have a range here listed for the places that I called to

01:38  10  get costs on this item.

11  Q.   And you said places you called, how many places did you

12  call?  And I believe at your deposition you produced a list

13  that had this information, does that sound about right?

14  A.   Yes.

01:38  15  Q.   I think if we went to 458, page one, Exhibit 458, page one,

16  and you can erase the marking.

17  A.   Okay.

18  Q.   Is this kind of a list of places you called?

19  A.   It is for psychiatry is what you have listed.

01:39  20  Q.   What page do we turn to?

21  A.   So --

22  Q.   It would be one for dentist.

23  A.   Yes, page four.

24  Q.   458, page four.

01:39  25  A.   Yes.

1    Q.   So are these places you called to reach that figure?

2    A.   Yes.

3    Q.   And did Nurse Casuto do the same thing?

4    A.   I believe Nurse Casuto used Dr. Kohani's cost in her plan.

01:39    5    Q.   Did she note whether or not she formally or informally

6    talked to someone else?

7    A.   She -- my understanding is that she did not.  I didn't see

8    anywhere in her deposition that she contacted any -- any

9    providers in his area.

01:39    10   Q.   Okay.  And as far as you know, the costs were from

11   Dr. Kohani's office?

12   A.   Yes.

13   Q.   As opposed to Nurse Casuto using maybe her own experience

14   to adjust the costs?

01:39    15   A.   Yes.

16   Q.   Were there any other costs like that relating to dental

17   care where Nurse Casuto just relied on Dr. Kohani?

18   A.   Yes.

19   Q.   Did she actually do that for all of the dental costs?

01:40    20   A.   I believe so, yes.

21   Q.   And the costs that we were just looking at which was, I

22   believe it was 462, page four?

23   A.   Yes.

24   Q.   If we -- or it might have been -- page five, I believe,

01:40    25   462, page five.  What's the difference if we were to total

1  those numbers up?

2  A.   The total difference, well, the totals are listed --

3  Q.   Okay.

4  A.   -- here.

01:40  5  Q.   So the total difference actually probably would have been

6  calculated by the economists?

7  A.   Yes.

8  Q.   So if the economists reports were provided to the Court in

9  this case, the Court could just look at that, correct?

01:40  10  A.   Yes.

11  Q.   So it does look like for Nurse Casuto just a fixed number,

12  for you there is a range, and the range is based on you calling

13  three different providers?

14  A.   Yes.

01:41  15  Q.   Nurse Casuto, it's fixed because she called one person?

16  A.   Yes.

17  Q.   Any other dental costs that stand out that we should look

18  at?

19  A.   No.

01:41  20  Q.   And do you have an understanding what the total future

21  dental care costs are that are in Nurse Casuto's life care plan

22  or in the economist's report?

23  A.   I believe it's approximately $625,000 --

24  Q.   Okay.

01:41  25  A.   -- for the dental.

1    Q.    And what is the defense life care plan, what's

2    approximately the costs?

3    A.    I -- $69,500, right around that number.

4    Q.    So that's a big difference, so if you just pointed out only

01:41    5    two areas of disagreement regarding costs, why this

6    distinction?  Are there disagreements based on care?

7    A.    Based on the recommendations that were given.

8    Q.    So in other words, column 1 and 2 -- 1 and 3, those are the

9    areas where primarily it affects the costs?

01:42    10    A.    Yes.

11    Q.    The distinction between whatever Dr. Kohani has recommended

12    and whatever Dr. Chess believes is appropriate?

13    A.    Yes.

14    Q.    Were there any other costs that stood out to you that are

01:42    15    worth pointing out today?

16    A.    No.

17    Q.    Anything regarding scans and imaging, whether it's for the

18    mouth or the brain, did you disagree with any of those costs?

19    A.    No, I did not disagree.

01:42    20    Q.    And I think there was a housekeeper cost and I believe

21    Nurse Casuto was the one who provided the recommendation for

22    care, did you provide the recommendation or the counter

23    recommendation for that or was there somebody else who did

24    that?

01:42    25    A.    I -- I discussed that with Dr. Gluckman and Dr. Gluckman

1    did not think that it was appropriate to add or to have in our

2    plan.

3    Q.   And am I portraying it correctly Nurse Casuto recommended a

4    housekeeper, there wasn't another doctor who did that?

01:43   5    A.   I don't believe so, no.

6    Q.   And then Dr. Gluckman didn't agree with that?

7    A.   Correct.

8    Q.   So as a result you really didn't have to cost compare the

9    costs, right?

01:43  10    A.   Correct.

11    Q.   I think we did talk about how at the time you did your

12    first report Dr. Kohani's future care costs of 98,000, that

13    hadn't happened yet, it was still something that was considered

14    future, it only subsequently became past, correct?

01:43  15    A.   Yes.

16    Q.   And do you recall from your first report, was there any

17    disagreement in terms of the cost?  I believe at the time it

18    was 98,000, not 625.

19    A.   And I do not believe that there was a discrepancy with the

01:43  20    cost.  I would have to defer some of that to Dr. Chess.

21    Q.   Okay.  Did most of it have to do with what was recommended

22    for the care at the time?

23    A.   Yes.

24    Q.   And this was back when?  When did you first provide your

01:44  25    report, was it February of 2016?

A.    Yes.

Q.    And you were a rebuttal expert to Nurse Casuto, correct?

A.    Yes.

Q.    And at that time, as far as you knew, Ryan hadn't had a lot
of the work that he subsequently had or at least the documents
weren't provided for you to know that, correct?

A.    Correct.

Q.    Earlier in this case Dr. Kohani testified that when he
billed for his services, he used the CPT codes, he entered the
codes in the system, they gave him a number, because he
believed it was a complicated case, he adjusted the number up.
Is that a common practice?

A.    I can't comment on physicians and how they do their
billing.  From my research of CPT codes, there is not a cushion
placed or an additional cost that you add to that CPT code
depending on severity of the case or anything like that.

Q.    So in the past you hadn't seen anyone do that?

A.    No.

Q.    And when Dr. Kohani did have a code, and I'll go to page,
Exhibit 104, page one, for example.  Sorry, Your Honor, I'll
use the document camera.  This is Exhibit 104, it's dated
December 1st, 2016.  I just want to look at maybe one or two
entries.

      Let's look at the first one, May 4th, 2016, that was after
you prepared your initial report, correct?

A.    Yes.

Q.    So that at the time of your initial report, that was a future cost that became the past?

A.    Correct.

Q.    And there's a transaction, I think it's a column on the fourth column, it says D2740, what's your understanding of what that is?

A.    That that's a dental code.

Q.    So like a CPT code?

A.    With billing, yes.

Q.    And if Dr. Kohani entered that number in, got a number for his fee and increased it, was there any way to derive that by looking at his records or his report?

A.    No.

Q.    And Dr. Kohani actually initially provided a report in this case in December of 2015, correct?

A.    Correct.

Q.    Did he ever update that report?

A.    I don't believe that I saw one.  That report reflected future costs.

Q.    So the -- you've only seen one report and I think it's because there is only one, and that was from December 2015.

A.    Yes, that's the only one I've seen.

Q.    And the one that he provided in December of 2015, obviously it wouldn't have any of these charges for January 7th, 2016,

1   correct?

2   A.   Correct.

3   Q.   And to the extent that there's any charges on any of the

4   other pages that were before his report, he didn't indicate

5   whether or not he was going to adjust the prices up from what

6   the CPT code said, did he?

7   A.   No.

8   Q.   He didn't say one way or the other?

9   A.   No.

10  Q.   And even if you look at this bill, without him informing us

11  of that, we wouldn't know he adjusted them up?

12  A.   No.   Just from looking at it, no.   If you did research you

13  could tell that the costs were higher than if you were to

14  research that code, but just from looking at it, no, there's no

15  explanation to -- to having the cost be higher.

16  Q.   And the opinions you've expressed in this case, do you hold

17  those opinions to a reasonable degree of certainty?

18  A.   Yes.

19            MR. LASKE:   Nothing further at this time, Your Honor.

20            THE COURT:   Cross-examination.

21            MR. WOHLFEIL:   Yes, Your Honor.   Thank you.

22                      CROSS EXAMINATION

23  BY MR. WOHLFEIL:

24  Q.   Good afternoon, Ms. Engler.

25  A.   Hi.

956

1   Q.   So I went through your report and Ms. Casuto's report and I

2   counted 30 recommendations, is that about right?

3   A.   I would have to count them.  I have never counted them.

4   Q.   Can we see 462, please.

01:48   5   A.   I counted 32 recommendations.

6   Q.   I counted that the two of you actually agreed on 25 of

7   those recommendations, is that right, on the costs?

8   A.   Yes.

9   Q.   And I think you noted on direct that there's actual minimal

01:49   10   disagreements between you and Ms. Casuto?

11   A.   For costs, yes.

12   Q.   We're looking at 462, which is page eight of your life care

13   plan; is that right?  Ms. Engler, is that correct?

14   A.   Yes, I just had to find it.

01:49   15   Q.   Very good.  You actually had three other people help you

16   write your life care plan, is that right?

17   A.   Three, yes.  Doctor recommendations.

18   Q.   No, you had three other people in your office help you

19   write your report, is that right?

01:49   20   A.   Oh, they helped with details of it so, yes, I guess.

21   Q.   One of them was your boss, Linda Olzack?

22   A.   Yep.

23   Q.   And they helped you make your report, make sure your report

24   had everything arranged how you wanted it to be; is that right?

01:49   25   A.   Yes, the formatting of the plan.

1  Q.   And is your life care plan as you wanted it to be?

2  A.   Yes.

3  Q.   You don't want to change anything?

4  A.   I guess the one thing that I would change is I had

01:50  5  recommendations -- on the page that we're looking at, I had

6  recommendations from Dr. Evans and Dr. Gluckman in relation to

7  some of the medications.

8  Q.   Okay.  You're referring to sertraline or Zoloft, that's the

9  easier one to pronounce, and Lorazepam, is that right?

01:50  10  A.   Yes.

11  Q.   In the top two categories?

12  A.   Yes.

13  Q.   You actually relied on Dr. Evans for both of those, isn't

14  that right?

01:50  15  A.   Yes.

16  Q.   Dr. Evans is a Ph.D. isn't that right?

17  A.   Yes.

18  Q.   You've never met Ryan Moore, have you?

19  A.   No.

01:50  20  Q.   You've actually been a certified life care planner since

21  2014?

22  A.   Yes.

23  Q.   I actually went back and counted the number of

24  conversations you had with defense doctors in this case and

01:50  25  counted seven, is that right?

1   A.   Approximately, yes.

2   Q.   Well, let's go through, I counted three with Dr. Chess?

3   A.   Okay.

4   Q.   Is that correct?

01:51  5   A.   Yes, it is correct.  I was counting two in my head, but I

6   did talk to him three times.

7   Q.   Okay.  Two with Dr. Gluckman?

8   A.   Yes.

9   Q.   And two with Dr. Evans?

01:51  10   A.   Yes.

11   Q.   Okay.  Total of seven?

12   A.   Yes.

13   Q.   Would it surprise you to learn that's less than a third of

14   the conversations that Ms. Casuto had with the doctors on the

01:51  15   plaintiff's side?

16   A.   No, that would not surprise me.

17   Q.   You've actually only -- as of your depo had only worked

18   about 40 hours on this case; is that right?

19   A.   Yes.

01:51  20   Q.   One of the sources you relied on for drug pricing was a

21   website called GoodRX.com is that right?

22   A.   Yes.

23   Q.   As in Good Prescription.com?

24   A.   Yes.

01:51  25   Q.   And you noticed that Ms. Casuto relied on that resource as

well?

A.   Yes.

Q.   You talked about a coupon, that Ryan Moore would have access to a coupon?

01:51   A.   Yes.

Q.   You've never met Ryan Moore?

A.   No.

Q.   You're not sure that he has access to that coupon, are you?

A.   No, I was not able to ask him that.

01:52   Q.   And the recommendation, as we can see on page eight for this prescription medication, goes out on your plan up to two years, is that right?

A.   Yes.

Q.   You don't know if the coupon is going to be around in two

01:52   years, do you?

A.   No.

          MR. WOHLFEIL:  I don't have anything else.  Thank you.

          THE COURT:   Redirect.

          MR. LASKE:  Very briefly, Your Honor.

01:52                     REDIRECT EXAMINATION

BY MR. LASKE:

Q.   So if we pull up Exhibit 66, page one real quick, this is Nurse Casuto's life care plan.  Very quickly for the record, how many times did you change your life care plan?

01:52   A.   I --

1  Q.   You had your initial one and then?

2  A.   I did.

3  Q.   And an amended one?

4  A.   I had -- yes, and an amended one.

01:52  5  Q.   So we're talking about two?

6  A.   I take that back.  I did have three because there was one

7  little typo error on one of them, so.

8  Q.   Okay.  How many reports did Nurse Casuto have?

9  A.   She had three, I believe.

01:53  10  Q.   She lists three here, but were there other drafts that you

11  happened to see along the way?

12  A.   You know I didn't -- I don't think I was provided all of

13  them.

14  Q.   Okay.  You read her deposition though, correct?

01:53  15  A.   Yes.

16  Q.   And in her depo she acknowledged that she listed three but

17  there actually were more, correct?

18  A.   Yes.

19  Q.   So if you look at this there are three but there were more.

01:53  20  So the fact that she's calling the doctors more often, that

21  would make sense, right, if she wants them to review her

22  recommendations through different iterations of the plan?

23  A.   Yes.  And I understand that she created parts of her life

24  care plan and then needed to contact the doctors to ask them if

01:53  25  they agreed with it.  So --

1  Q.   I guess if we look at --

2  A.   -- it takes a few more.

3  Q.   Let's look at 66-2.  Did she have an interesting, well, did

4  she have a way of coding what was happening?  And I think if we

01:53  5  focus on dentist KK on page two right there, you'll see some

6  text and kind of normal font.  You'll see some that are bold.

7  You'll see bold italics.  You'll see strikethroughs.  Did you

8  have an understanding after reading her deposition how to

9  decipher this?

01:54  10  A.   I believe in her deposition she did explain her methodology

11  in these things.  It still was difficult for me to follow, to

12  be quite honest.

13  Q.   We see bold, bold three to four times a year.  What is the

14  bold?  Why bold?  Did she explain?

01:54  15  A.   She explained that she changed it.

16  Q.   Okay.  And then why the italics?

17  A.   I think after she spoke to the provider or the physician in

18  regards to this, then it was italicized if they agreed, is what

19  I'm recalling.

01:54  20  Q.   And then the strikethroughs, I guess that was one iteration

21  of the plan, got rid of that?

22  A.   Yes.

23  Q.   And you mentioned something on I think it was 462, page

24  nine, it's page eight of your report, it's 462, page nine.

01:55  25       If you could change anything, you mentioned Zoloft and

Ativan, counsel pointed out Dr. Evans is a psychologist, or a neuropsychologist, he can't prescribe medication?

A.   Correct.

Q.   Did you ever happen to talk to someone who could prescribe medication?

A.   Yes.

Q.   And who was that?

A.   Dr. Gluckman.

Q.   Did Dr. Gluckman take the same view as Dr. Evans or did he differ?

A.   He took the same view.

Q.   And did you happen to talk to him before preparing the June report?

A.   Yes.

Q.   Why isn't his name there, mistake or something else?

A.   I should have put his name there.  At the time -- because there was no comment on changing of the dose or starting the medication, so the prescription itself wasn't what Dr. Evans was commenting on, he was commenting on duration of time.

Q.   Potentially you could have listed both, right?

A.   Yes.   Uh-huh, yes.

Q.   That might have been the better way to go?

A.   Yes.

Q.   I mean with Nurse Casuto, if we looked at her report, she actually relied on, I think, sometimes three or four people, so

1    a psychologist herself, a neuropsychologist, and an M.D., so

2    she would actually rely on a combination of people, even

3    including people who couldn't prescribe medication, correct?

4    A.   Yes.

01:56   5    Q.   For these three areas, correct?

6    A.   Yes.

7              MR. LASKE:   Nothing further.

8              THE COURT:   Any other questions?

9              MR. WOHLFEIL:   No, Your Honor.

01:56   10             THE COURT:   All right.   Thank you, you may stand down.

11   You're excused as a witness.   Next witness.

12             MR. LASKE:   Your Honor, we have finally made it to our

13   last witness, it is supervisory border patrol agent Jose Martin

14   Del Campo.

01:57   15        JOSE MARTIN DEL CAMPO, DEFENDANT'S WITNESS, SWORN

16             THE COURTROOM DEPUTY:   Sir, can you please state your

17   name for the record and spell your first and last names.

18             THE WITNESS:   Jose Martin Del Campo.   J-O-S-E,

19   M-A-R-T-I-N, separate word D-E-L, separate word, C-A-M-P-O.

01:57   20                     DIRECT EXAMINATION

21   BY MR. LASKE:

22   Q.   Good morning, sir.

23   A.   Good morning.

24   Q.   How long have you worked for the border patrol?

01:57   25   A.   It'll be 22 years in July.

Q.    What is your job title today?

A.    Supervisory border patrol agent.

Q.    Where do you work?

A.    At the San Clemente station.

01:57    Q.    And do you happen to know Agent Moore?

A.    Yes, I do.

Q.    And were you ever his supervisor?

A.    Yes, I was.

Q.    When was that?

01:58    A.    From approximately June of 2015 till about August of '16.

Q.    Is that the period that you were on some kind of unit or task force?

A.    Yes, the border crime suppression team.

Q.    Is it possible Ryan Moore was actually on that team

01:58    slightly less time than you, maybe by a couple months?  He may have left a little bit earlier.

A.    He was on there for I think a couple months prior to me.

Q.    Okay.  So he may have ended a couple months earlier?

A.    He transferred to another unit a few months before I left.

01:58    Q.    Okay.  So even though you were there from June 2015 to August 2016, his time period might be a little bit different?

A.    It'll be different, correct.

Q.    But up until the time Ryan Moore left, it was from June 2015 to whenever Ryan Moore went on to his next assignment?

01:58    A.    Correct.

1  Q.   And he went on to his next assignment sometime in 2016?

2  A.   Yes.

3  Q.   But sometime far enough along into 2016 where you did a

4  mid-year evaluation of him?

01:59  5  A.   Yes.   I believe so, yes.

6  Q.   What was your job title at the time you were Ryan Moore's

7  supervisor?

8  A.   I was just the supervisor of that team, of the border crime

9  suppression team.

01:59  10  Q.   And the border crime suppression team we've heard some

11  evidence of that before you got here, is that a task force with

12  the San Diego sheriff's department?

13  A.   Yes, it is.

14  Q.   How many people did you supervise?

01:59  15  A.   On the border patrol side, it was myself and anywhere

16  between four and five agents.

17  Q.   Border patrol agents?

18  A.   Border patrol agents, correct.

19  Q.   How many people were on the task force in total?

01:59  20  A.   I believe there were 11 or 12 sheriffs and then our five.

21  Q.   So roughly 16 people?

22  A.   Yeah.

23  Q.   Would that fluctuate slightly?

24  A.   Yes, it would.

01:59  25  Q.   What were your job duties on the task force?

```
      1    A.   We did some Fourth waivers, we did warrant serving, we did

      2    a lot of surveillance.

      3    Q.   And what were Agent Moore's work hours with the task force?

      4    A.   They varied but generally they were 6 to 4.

02:00 5    Q.   6 a.m. to 4 p.m.?

      6    A.   Correct.

      7    Q.   And did he have any attendance issues?

      8    A.   No.

      9    Q.   So other than maybe medical appointments, he was there?

02:00 10   A.   Right.

      11   Q.   6 a.m., that's pretty early?

      12   A.   Yes.

      13   Q.   Did he have any issues making it on time?

      14   A.   No.

02:00 15   Q.   Did he have any issues staying until 4 or 5 p.m.?

      16   A.   No.

      17   Q.   So that's anywhere from an eight to nine-hour day, correct?

      18   A.   10 hours is what we normally work.

      19   Q.   Would Ryan Moore be able to work a 10-hour day?

02:00 20   A.   Yes.

      21   Q.   And that's five days a week, four days a week?

      22   A.   Five days a week.

      23   Q.   Was there any issues where you had to talk to Ryan Moore

      24   about not showing up on time, leaving early?

02:01 25   A.   No.
```

1  Q.   So you mentioned the tasks of the -- or the duties of the

2  task force, but can you tell me specifically are those the same

3  duties for Agent Moore or were they different?

4  A.   No, they're the same duties.

02:01  5  Q.   One of them you mentioned -- and I'd like to walk through

6  some of these so we kind of get a better understanding of what

7  Agent Moore was doing.

8       First you mentioned surveillance, what would Agent Moore

9  have to do when he was doing surveillance?

02:01  10  A.   Depending on the type of surveillance we were doing, a lot

11  of times we would find a target that we wanted to surveil and

12  we would be given positions, assignments by whoever the lead

13  for that case was.  They would ask us to stage on certain

14  streets, you know, tactically, so that way we can see where,

02:01  15  when this person left, we'd be able to follow them out.  So we

16  would kind of position ourselves in every area where they can

17  leave.

18  Q.   So if someone leaves, do you follow?

19  A.   Yes.

02:02  20  Q.   And would Ryan Moore be one of those people who would have

21  to follow?

22  A.   Yes.

23  Q.   And what does following a moving car entail?  I imagine

24  it's a little bit more difficult than you see in the movies.

02:02  25  A.   Yeah, I mean we'd get behind the vehicle.  We'd try to stay

1   at a reasonable distance to where we could still see them, but

2   try to keep ourselves covered maybe with another vehicle that

3   wasn't involved.  And just kind of stay with them to follow

4   them to see where they were going to go.

02:02    5   Q.    So you'd have to pay attention to traffic, right?

6   A.    Yes.

7   Q.    Because all the cars on the road are not your cars?

8   A.    Right.

9   Q.    And you'd have to account for things like traffic lights

02:02   10   and pedestrians?

11   A.    Correct.

12   Q.    What if you thought you were too close or you tailed for

13   too long, is there any -- what do you do?

14   A.    Yeah, sometimes -- if we felt that maybe we were too close

02:02   15   for too long we would say, hey, we're going to tail off, you

16   know, maybe make a right turn on a street when the guy was

17   going to go straight.  Or if he made a right turn we would go

18   straight and have somebody else pick up where we were and they

19   would become the first car behind them.

02:03   20   Q.    And when, for example, Ryan Moore was doing surveillance,

21   would he be driving by himself or would he have a partner next

22   to him?

23   A.    We were usually by ourselves.

24   Q.    So if he had to make a decision he's making the decision

02:03   25   solely by himself?

A.    Correct.

Q.    And he's radioing that out by himself?

A.    Correct.

Q.    While he's driving in moving traffic?

02:03    A.    Yes.

Q.    And was he capable of doing all those things?

A.    Yes.

Q.    And did he do that on more than one occasion?

A.    Yes.

02:03    Q.    Did he do that -- do you know how many occasions roughly?

A.    Multiple.

Q.    Was it common for him to conduct surveillance?

A.    Yes.

Q.    Were there any issues where Ryan tailed someone and lost

02:03    them or got seen?

A.    I don't necessarily remember that he may have lost someone

or was seen.  Sometimes it happened, we would lose sight of

them.  I don't necessarily remember that it was actually him

that lost a person.

02:04    Q.    Okay.  And what type of people were you looking for?  What

type of people were you surveilling?

A.    Most of our targets were people who were smuggling

narcotics, transferring narcotics, things of that nature.

Q.    I think one of the things you also mentioned that the task

02:04    force did and also Ryan Moore would do is entries?

A.    Yes.

Q.    I think you mentioned a Fourth waiver, what is a Fourth waiver?

A.    People that are on Fourth waiver probation, sometimes we would kind of connect them to cases that we might be working and say hey, you know what, this guy has a Fourth waiver, so let's go ahead and go knock on his door and do an inspection of his house, a search of his house, to see if we can find anything that ties him to what we were investigating.

Q.    Any of the Fourth waivers that -- well, how many Fourth waivers do you think Ryan Moore went on?

A.    Roughly --

Q.    How many entries do you think Ryan Moore went on?

A.    I would say roughly eight, 10.

Q.    Okay.  And how many of those do you think were Fourth waivers as opposed to -- well, what's the other kind of waiver if it's not a Fourth waivers?

A.    With warrants.

Q.    You can take which one's easier.  Which one, how many times did he -- was he on entry teams where there was a warrant?

A.    Probably four or five.

Q.    Okay.

A.    And that might be more, I just can't remember exactly but at least four or five.

Q.    Sorry.  And how many of them do you think related to Fourth

1    waivers, another four or five?

2    A.   Yeah, about that.

3    Q.   And plaintiff would participate in these entries?

4    A.   Yes.

02:05    5    Q.   How would you know that?  How do you know that?

6    A.   Depended like if it was a warrant, we would have like a

7    stack of guys going in, in a line, you know.  We had a lineup.

8    Q.   Would you be in that stack?

9    A.   Yes.

02:06   10    Q.   Would Ryan Moore be in that stack?

11    A.   Yes.

12    Q.   Was Ryan Moore -- so Ryan Moore wasn't always on, say, for

13    example, the perimeter?

14    A.   No, not always.

02:06   15    Q.   Out of these eight to 10 times, how many times do you think

16    Ryan was in the stack versus out on the perimeter?

17    A.   About six or seven times.

18    Q.   In the stack?

19    A.   Yeah.

02:06   20    Q.   The other times on the perimeter?

21    A.   Yeah.

22    Q.   Ryan ever express any issues where he didn't think he could

23    be in the stack?

24    A.   Not that I recall.

02:06   25    Q.   Any physical?

1   A.   Not that I recall.

2   Q.   Any mental or emotional?

3   A.   No, not that I recall.

4   Q.   What would be involved with serving a warrant?  Say you

02:06   5   have a warrant, walk us through what's involved with that.

6   A.   We would plan out how we were going to serve this.  We

7   would plan out where we were going to put people.  We would

8   create our line-up.  We would have the entry or the breacher,

9   which is the guy that would normally have either the ram or the

02:07   10   Halligan, what they call the Halligan.

11      We would have the breacher cover, which is the guy that

12   would cover any windows or anything like that where somebody

13   could possibly do something.  We would have the person doing

14   the announcement, and then after that, the rest of the stack

02:07   15   would come in behind.

16   Q.   Did Ryan Moore express any reservation during any of these

17   briefings that he shouldn't be in the stack?

18   A.   Not that I recall, no.

19   Q.   And did plaintiff in these entries, because I imagine some

02:07   20   people actually opened the door, but the times that you had to

21   do forced entry, was Ryan Moore part of that team?

22   A.   Yes.

23   Q.   How many do you think he was a part of, how many forced

24   entries?

02:07   25   A.   Maybe two or three that we did.

1    Q.    Okay.   Forced entry means they're not opening the door

2    voluntarily?

3    A.    Right.

4    Q.    Did you ever have any problems when Ryan Moore was in the

02:08    5    stack on a forced entry?

6    A.    No.

7    Q.    So he would go through the door just like everybody else?

8    A.    Yes.

9    Q.    And I think one of the things you mentioned he would run

02:08    10    background checks and investigate people?

11    A.    Yes.

12    Q.    How would one do that?   Is it pretty simple or?

13    A.    Through the different systems that we have, you know, you

14    just try to figure out based on maybe a criminal history, you

02:08    15    look at reports or contacts they may have had with other law

16    enforcement, if it's in the system and you can find it.

17    Q.    So there is some effort you have to make to find some of

18    this information?

19    A.    Yes.

02:09    20    Q.    And then once you find it, you have to connect the dots?

21    A.    Correct.

22    Q.    So it's not just easy as turning on your computer and

23    hitting one button?

24    A.    Right.

02:09    25    Q.    Did he have any issues performing the job duties of the

1    task force?

2    A.    No.

3    Q.    Did he have any issues performing, for example, the

4    background checks investigating people?

02:09    5    A.    No.

6    Q.    Did Ryan successfully investigate and find criminals?

7    A.    Yes.

8    Q.    And did he do that on more than one occasion?

9    A.    I would say, yes, yeah.

02:09    10    Q.    And did plaintiff have to perform any -- anything that

11    would require thinking?

12    A.    Yes.

13    Q.    What is that?

14    A.    Just investigating.  There's just the whole, the whole

02:09    15    investigation, you know, you try to figure out what people are

16    doing, so as you're looking up their history, the things that

17    they've been involved with, who they've been involved with, who

18    they have contact with now, you know, you have to think a lot

19    to try and put that together.

02:10    20    Q.    And did Ryan Moore ever seem to have any issues performing

21    those tasks?

22    A.    Not that I recall, no.

23    Q.    And some supervisors are supervisors for persons but they

24    rarely see them?

02:10    25    A.    Right.

1  Q.   Were you a supervisor who would see Ryan Moore on a regular
2  basis?
3  A.   Yeah, till he went on the other task force, yes.
4  Q.   So you would see him five days a week, four days a week?
02:10  5  A.   Pretty much daily.
6  Q.   And that was from roughly June 2015 until he moved on to, I
7  believe he's on an FBI task force?
8  A.   Correct.
9  Q.   Did Agent Moore have a firearm as part of the task force?
02:10  10  A.   Yes, he did.
11  Q.   Were there any issues with him carrying a firearm?
12  A.   No.
13  Q.   Did he express any concern to you about carrying a firearm?
14  A.   No, he didn't.
02:10  15  Q.   Was he able to qualify on that firearm?
16  A.   Yes, he was.
17  Q.   How often do you have to qualify?
18  A.   Once a quarter.
19  Q.   And briefly walk me through your qualifying.  Is it just
02:11  20  bang shoot the gun once or is it more than that?
21  A.   No, we fire 72 rounds.
22  Q.   72 rounds.  And does it involve the same spot?  Do you
23  move?
24  A.   No, we change distances.  We're not necessarily moving and
02:11  25  shooting, but we change distances.

```
 1    Q.   And he was able to qualify successfully?
 2    A.   Yes.
 3    Q.   And for those of us who may not have shot a gun before, is
 4    it loud?
 5    A.   Yes.
 6    Q.   And it's a loud bang?
 7    A.   Yes.
 8    Q.   And he was able to shoot and hear loud bangs 72 times?
 9    A.   Yes.
10    Q.   And not have any problem with it?
11    A.   No.
12    Q.   Were you provided any medical information by Agent Moore
13    that placed any limitations on his ability to perform the
14    functions of his job?
15    A.   No.
16    Q.   Were you provided any medical information by anyone that
17    placed any limitations on Agent Moore's ability to perform the
18    functions of his job?
19    A.   No.
20    Q.   Did you personally have any concerns that Agent Moore could
21    not do his job?
22    A.   No.
23    Q.   Did you have an opportunity to submit a work evaluation for
24    the plaintiff's job performance?
25    A.   Yes.
```

1   Q.   How many times?

2   A.   Probably -- see when I got there, I would have done the

3   midterm and a final, and then before he left I would have done

4   an initial and another midterm.

02:12   5   Q.   Can we pull up what's been marked as Exhibit 45, page five.

6   If you look at the screen, is this what we're talking about?

7   A.   Yes.

8   Q.   I guess I'm not warning people to bring their glasses.

9   A.   That's all right.

02:12   10   Q.   A lot of people have done that in this case.  Your name is

11   not on the first page, but we do see Agent Moore's name.  It

12   says organization southwest border, is that another name for

13   what you were doing?

14   A.   That's just the area.

02:13   15   Q.   Okay.  So let's go to the next page, 485, page 6.  Is your

16   name in part 4 there?

17   A.   Yes, it is.

18   Q.   And you're signing that, what's the date on there?

19   A.   9/28/2015.

02:13   20   Q.   Looks like there's only two options there, successful or

21   unacceptable?

22   A.   Correct.

23   Q.   And has that been the form for a while?

24   A.   Yes.

02:13   25   Q.   Has that been the form back maybe five, 10 years ago?

A.   I'm not exactly sure when it was implemented, but it's been over five years.

Q.   Okay.   So this is the way the form looked at least prior to 2013?

02:13  A.   Yes.

Q.   And probably into 2012 or '11?

A.   Yes.

Q.   So successful or unacceptable not really too complicated there?

02:13  A.   Right.

Q.   As far as you know, did Ryan Moore always get successful?

A.   Yes.

Q.   So is there anything in this evaluation that will tell us very much about how Ryan Moore was doing?

02:13  A.   No, not generally.

Q.   So is there anything other than this that might indicate how he's doing?

A.   Unless the supervisor did a separate memo like I would do for my guys at the end of the year to ask for them to receive

02:14  some type of an award.

Q.   Would that be time off, cash award?

A.   Either/or.   When you submit it and the sector -- excuse me, the sector heads would actually make that call.

Q.   Did you ever do that for Ryan Moore?

02:14  A.   Yes, I did.

1    Q.    And why would you do that?

2    A.    Why would I do that?

3    Q.    Yeah.

4    A.    Because I thought that they all deserved something extra.

02:14    5    Q.    Was he a good agent?

6    A.    Yes, he was.

7    Q.    So you didn't have any problems with Agent Moore?

8    A.    No.

9    Q.    If we turn I think to the next one, I think you also did at

02:15    10    least the mid-year evaluation, 485, page 7.  I think if you

11    look at the bottom B there, there's your signature.

12    A.    Yes.

13    Q.    And the date I believe is January 12th, 2016?

14    A.    Correct.

02:15    15    Q.    So you were also his supervisor at that point too?

16    A.    Yes.

17    Q.    Why don't we go to the next page, 487, page 8.  You also

18    signed the mid-year review?

19    A.    Correct.

02:15    20    Q.    So at a minimum, Ryan Moore was with your team up

21    until -- or the cross border suppression task force until April

22    26th, 2016?

23    A.    About that, yes.

24    Q.    Shortly after this, do you recall if he moved on to the FBI

02:15    25    task force?

1   A.   Yes, he did.

2   Q.   And is that where, as far as you know, is that where he

3   works now?

4   A.   Yes.

02:15   5   Q.   And have you had an opportunity to talk to his current

6   boss?

7   A.   On a couple of occasions.

8   Q.   Any complaints?

9   A.   Not that I recall, no.

02:16   10          MR. LASKE:   Nothing further, Your Honor.

11          THE COURT:   Any questions of this gentleman?

12          MR. WOHLFEIL:   Yes, Your Honor.

13          THE COURT:   All right.

14                    CROSS EXAMINATION

02:16   15   BY MR. WOHLFEIL:

16   Q.   Good afternoon, sir.

17   A.   Good afternoon.

18   Q.   Just to be clear, you didn't meet Ryan until approximately

19   June of 2015; is that right?

02:16   20   A.   Correct.

21   Q.   Before then you didn't know him from Adam, right?

22   A.   No, I didn't.

23   Q.   When you started working with him, were you aware of an

24   incident in June of 2013 involving Ryan?

02:16   25   A.   Yes, I wasn't aware of when it happened, but the prior

1    supervisor, I asked who were the guys on the unit.  He told me

2    who the different agents were and he mentioned what had

3    happened to Ryan.

4    Q.    Okay.  And what did you do with that information if

02:16    5    anything?

6    A.    I didn't do anything.  I mean, it was just info, you know.

7    Q.    Gotcha.  No, I do.  You never asked Ryan, for example, how

8    he was dealing with that, for example?

9    A.    Once I got on the unit and I got to know him a little

02:16    10    better, I would ask him how he's doing, you know, how things

11    were going with the surgeries because I know he was going

12    through a lot of different things.

13    Q.    Meaning the dental stuff?

14    A.    Correct.

02:17    15    Q.    But not anything else?

16    A.    No.

17    Q.    Okay.  This wasn't like a formal sit-down and interview

18    process, was it?

19    A.    No, it was just, you know, talking to him, you know, asking

02:17    20    how he's doing.

21    Q.    Kind of two coworkers chatting back and forth?

22    A.    Right.  Right.

23    Q.    Water cooler talk?

24    A.    I guess.  I mean, he worked for me so, you know, I just

02:17    25    would ask how they're doing, you know.

Q.   Okay.  Okay.  I counted 16 or 17 employees on the team, is that fair to say?

A.   If you include the sheriffs, correct.

Q.   And I think you mentioned that the guys were actually fluctuating?

02:17

A.   Yes.

Q.   So this is a situation where you're dealing with multiple agencies; is that right?

A.   Right.

02:17

Q.   And guys are sort of coming on and coming off the team?

A.   Yes.

Q.   And not necessarily at the same time, right?

A.   No.  No.

Q.   So in that year you probably had more than 20 guys?

02:17

A.   Yeah, probably.

Q.   Maybe 25?

A.   I'm not sure if it was that many.

Q.   Okay.

A.   But, you know.

02:18

Q.   Okay.  More than the 15 or 16 at any one time?

A.   Right.

Q.   Okay.  So were you necessarily focused on Ryan in particular as opposed to any of the other agents?

A.   No.

02:18

Q.   Some aspects of law enforcement work can be pretty dull,

983

1    right?

2    A.    Yes.

3    Q.    Sitting and watching a house, for example?

4    A.    Yeah.

02:18    5    Q.    That doesn't take a whole lot of brain power, does it?

6    A.    Not necessarily to sit and watch the house, no.

7    Q.    Okay.  Even, for example, driving a car that's not

8    particularly difficult, is it?

9    A.    Not just driving it, no.

02:18    10              MR. WOHLFEIL:  I don't think I have anything else.

11    Thank you, sir.

12                    REDIRECT EXAMINATION

13    BY MR. LASKE:

14    Q.    Very quickly, so you mentioned you had five agents and Ryan

02:18    15    Moore was one of the five or was it five plus Ryan Moore?

16    A.    No, Ryan was one of the five.

17    Q.    And when the team did fluctuate in that brief period of

18    time, June, well, actually, almost a year, June 24th, 2015 to

19    April 2016, how many border patrol agents do you think you had?

02:19    20    A.    I never had any more than five.

21    Q.    Okay.  You're primarily focused on your five because they

22    are the people you're supervising or?

23    A.    Right.  Those five were on the exact same team with me.

24    Q.    Okay.  So any time you do entries, surveillance, more

02:19    25    likely than not you're doing it with your group plus some of

1  the sheriff's people?

2  A.   Correct.

3  Q.   Versus you're mostly working with the sheriff's people and

4  occasionally one of your guys goes with you?

02:19  5  A.   Correct.

6       MR. LASKE:   Nothing further, Your Honor.

7       THE COURT:   Anything else?  All right.  Thank you.

8  You may stand down --

9       THE WITNESS:   All right.

02:19  10      THE COURT:   -- Mr. Del Campo.  Any additional

11  witnesses on behalf of the defendants?

12      MR. LASKE:   At this time, Your Honor, the government

13  rests.

14      THE COURT:   All right.

02:19  15      MR. CHAMBERS:   Your Honor, before the evidence closes,

16  there was one exhibit that I would like to offer if Mr. Laske

17  doesn't intend to.

18      THE COURT:   Sure.

19      MR. CHAMBERS:   And that was Exhibit Number 11.  It was

02:19  20  a picture of the inflator that was used yesterday with

21  Mr. Dana.

22      MR. LASKE:   Sorry, which one was it?

23      MR. CHAMBERS:   11.

24      MR. LASKE:   And, Your Honor, there actually were a

02:20  25  couple of exhibits, I think we tried to do them as we were

1   going but we got off track a little bit.  Is it okay to read

2   them now?

3          THE COURT:   Yeah.   Let me deal with 11 first.   Without

4   objection, 11 will be admitted.   You don't have any objection

02:20   5   to it?

6          MR. LASKE:   No.   Because one of my exhibits on these

7   numbers is the same picture.

8          THE COURT:   Okay.   11 is admitted.

9       (Plaintiff's Exhibit 11 was received in evidence.)

02:20   10          MR. LASKE:   So, Your Honor, I'm going to read them in

11   the order I think they were coming into evidence, some of them

12   we did read, some we didn't, but I'll do it for the record.

13       291, Exhibit 291, it's a description as a daily unit

14   assignment log, is there -- let me know if there's any

02:21   15   objection if you need a second to look at your index.

16          MR. CHAMBERS:   I need to see which one you're talking

17   about.   Who did this come in through?

18          MR. LASKE:   I believe that was discussed with Ryan

19   himself.

02:21   20          MR. CHAMBERS:   I don't remember that but I don't have

21   any objection to it.

22          MR. LASKE:   271 --

23          THE COURT:   291 -- let me, Mr. Laske, let me rule on

24   them.   291 is admitted then without objection.

02:22   25       (Plaintiff's Exhibit 291 was received in evidence.)

1      MR. LASKE:   271.

2      MR. CHAMBERS:   No objection, Your Honor.

3      THE COURT:   Received.

4      (Plaintiff's Exhibit 271 was received in evidence.)

02:22   5      THE COURT:   Next.

6      MR. LASKE:   147.

7      MR. CHAMBERS:   I thought all the CIIT photos already

8      came in.

9      MR. LASKE:   Sorry, they did.   270.

02:22   10      MR. CHAMBERS:   Your Honor, I think Exhibit 270, page

11     seven was referenced in one of the -- one of the agent's

12     testimony.   I don't believe any other part of the exhibit was.

13      MR. LASKE:   That's perfectly fine, Your Honor.   We'll

14     just go with page 7.

02:22   15      THE COURT:   All right 270, page 7, is admitted.

16      (Plaintiff's Exhibit 270 - Page 7 was received in evidence.)

17      MR. LASKE:   410.

18      MR. CHAMBERS:   I think that's the same one as number

19     11, but there's no objection.

02:23   20      MR. LASKE:   403.

21      THE COURT:   410 is admitted.

22      (Defendant's Exhibit 410 was received in evidence.)

23      MR. CHAMBERS:   Tim, were these Deyerl's photos?

24      MR. LASKE:   I believe these were the ones taken by

02:23   25     William Dana.

1        MR. CHAMBERS:   No objection, Your Honor.

2        THE COURT:   403 is received.

3     (Defendant's Exhibit 403 was received in evidence.)

4        MR. LASKE:   308.   It's the aerial view we were showing

02:23   5   everybody.

6        MR. CHAMBERS:   No objection.

7        THE COURT:   Received.

8     (Plaintiff's Exhibit 308 was received in evidence.)

9        MR. LASKE:   Excerpts of our economist's report,

02:23   10   Exhibit 466, and -- it's the thinner one.

11        MR. WOHLFEIL:   Saw something thicker in your hand.

12        MR. CHAMBERS:   No objection.   We've stipulated to

13   that.

14        THE COURT:   466 is received.

02:24   15   (Defendant's Exhibit 466 was received in evidence.)

16        MR. LASKE:   4 -- and just for the record 466, the

17   excerpted version, it has fewer pages.

18        THE COURT:   All right.   Next.

19        MR. LASKE:   471, and we stipulated to this too as

02:24   20   well.

21        MR. CHAMBERS:   No objection.

22        THE COURT:   Received.

23     (Defendant's Exhibit 471 was received in evidence.)

24        MR. LASKE:   449, pages one, two and three, it is the

02:24   25   photos from Mr. Deyerl and then a picture of the flash drive

988

1   that the photos were on.

2         MR. CHAMBERS:   449?

3         MR. LASKE:   Yes.   So it won't -- you'll only see a

4   picture of a flash drive.

02:24  5         MR. CHAMBERS:   Okay.   No objection.

6         THE COURT:   Received.

7       (Defendant's Exhibit 449 was received in evidence.)

8         MR. LASKE:   And then I believe the last exhibit for

9   the defendant is 485, the evaluation that Martin del Campo just

02:25  10  discussed today, although I realize actually it has a couple

11  more pages, so look at one to four and let me know.

12        MR. CHAMBERS:   I don't think three and four are ones

13  that he did.

14        MR. LASKE:   Okay.   I believe he just covered the last

02:25  15  four pages.

16        MR. CHAMBERS:   In fact, I don't think one or two are

17  either.

18        MR. LASKE:   He covered the last four pages five to

19  eight.

02:25  20        MR. CHAMBERS:   Okay.

21        MR. LASKE:   So just pages five to eight.

22        MR. CHAMBERS:   Yeah, no objection.

23        THE COURT:   485 pages five through eight received.

24  (Defendant's Exhibit 485 Pages 5 - 8 was received in evidence.)

02:25  25        THE COURT:   Anything else, Mr. Laske?

1        MR. LASKE:  I believe that's it, Your Honor.  Thank

2    you.

3        THE COURT:  Any other exhibits from plaintiff?

4        MR. CHAMBERS:  Nothing, Your Honor.

02:25    5        THE COURT:  All right.  I'm going to give you some

6    time to organize your thoughts.  The plaintiffs have 25 minutes

7    remaining.  The defendants have an hour and 45 minutes.  You

8    don't need to use all of that time, of course.

9        We'll reconvene at quarter till and I'll hear closing

02:26   10    arguments.  Very likely that I'll have the matter submitted,

11    there's so many exhibits now that have been added that I'm

12    going to have to take time to go over them and I won't finish

13    that by 5.  So what I'll propose is I'll hear arguments from

14    you and we can reconvene at, let's say, 12:15 on Monday, 12:15

02:26   15    on Monday, and the Court will announce its verdict at that

16    time.  Is that agreeable?

17        MR. CHAMBERS:  That sounds great, Your Honor.  Thank

18    you.

19        MR. LASKE:  Your Honor, I might have to check my

02:26   20    calendar.  I'm not sure if I have a hearing that day.  I don't

21    think I do.

22        THE COURT:  Probably wouldn't be set at 12:15, right?

23        MR. LASKE:  No, it wouldn't but I live in LA.

24        THE COURT:  Oh.

02:26   25        MR. LASKE:  In Los Angeles, I'm from a different

1    district.  I just need to check that.

2          THE COURT:  Well, all right.  Maybe you can check it

3    and I'll adjust the time if necessary.

4          MR. LASKE:  I can do it by the time we come back for

02:27   5    closing.

6          THE COURT:  Okay.  3:45 -- I'm sorry, 2:45.

7    (Whereupon, a recess was taken from 2:27 p.m. to 2:51 p.m.)

8          THE COURT:  The clerk has reminded me, through my law

9    clerk, that there may be some other exhibits that were referred

02:51  10    to, marked, but maybe not admitted.  So take a look at the end

11    of the arguments, make sure that the clerk's list of what has

12    been admitted corresponds to what your intentions are and what

13    you admitted.

14        Okay.  Happy to hear from plaintiffs first in closing

02:52  15    argument.

16          MR. CHAMBERS:  Thank you, Your Honor.

17        I'd like to first thank the Court and its staff for your

18    attention this week, Mr. Coyle, Mr. Laske for your

19    professionalism throughout the case, my co-counsel,

02:52  20  Mr. Wohlfeil, and, of course, my friend and client, Ryan Moore.

21        Your Honor, we showed this slide at the beginning of the

22    case, and I think it's even more applicable now because that's

23    exactly what this case is about.

24        Needless danger and preventable harm.  This was a needless

02:52  25    and preventable incident.

1      So what do we have to prove?  We've submitted a number of

2  jury instructions to the Court.   Among them are CACI 400.   I'm

3  sure the Court's familiar with the basic standard of care for

4  negligence.

02:52  5      I did want to point out for just a moment on causation, the

6  standard here is that it has to be a substantial factor, and I

7  think it's important to note, in a case like this, that a

8  substantial factor is kind of a misnomer.  It doesn't have to

9  be the only cause of the harm, it just has to have contributed

02:53  10  to the harm.

11      So substantial factor simply means a contribution to the

12  ultimate outcome.

13      In addition to general negligence, Your Honor, we've also

14  submitted several premises liability jury instructions, the

02:53  15  first being the essential factual elements CACI 100, and that's

16  simply that the border patrol owned the facility, they were

17  negligent in the use of their property, Mr. Moore was harmed by

18  it, and that their negligence was a substantial factor in

19  causing it.

02:53  20      THE COURT:   How does the stand-alone negligence claim

21  differ from the premises liability claim in this case?

22      MR. CHAMBERS:   They're sort of intertwined in this

23  case.   The premises liability, obviously, goes more directly to

24  property as opposed to general negligence.

02:53  25      THE COURT:   How would you articulate the general

1  negligence claim then?

2          MR. CHAMBERS:  In this case?

3          THE COURT:  Yeah.

4          MR. CHAMBERS:  Pretty much the same way.

02:54  5          THE COURT:  It can include training -- I know that was

6  in your pretrial brief -- but that was foreclosed by the

7  discretionary function, so what's left?  I mean, signage,

8  things like that, warnings.  I understand the regulator

9  argument, but all of that seems focused, really, at the

02:54  10  premises liability in mitigating, really, a known danger.

11          MR. CHAMBERS:  I think you're probably right,

12  Your Honor.  The focus of the case is on the premises liability

13  instructions, I would agree.

14          THE COURT:  So there's not an independent -- you're

02:54  15  not articulating an independent negligence claim then?

16          MR. CHAMBERS:  It's pled, and it's been alleged.  I

17  think they're so intertwined in this case that they can be

18  considered one.

19          THE COURT:  Okay, gotcha.

02:54  20          MR. CHAMBERS:  Moving on CACI 1001, the basic duty of

21  a care in a premises case, the border patrol has a duty here to

22  keep their property in a reasonably safe condition.

23      So what's an unsafe condition?  It's a condition that

24  creates an unreasonable risk of harm that the border patrol

02:54  25  knew or should have known about and that they failed to repair,

protect against, or warn.

So what do we know about this case?  We know that the unsafe condition here was the tire inflater being fed by large, industrial-strength compressors capable of putting out to 175 PSI.

We know that the particular inflater Mr. Moore was using was used exclusively for vehicle tires or tires in general.

It was Mr. Rondinone's opinion that the pressures that were provided to the inflater were way, way more than you'd safely need to have in order to inflate any kind of tire they had out there, and in his words at trial, if it's unregulated, it's unsafe.  And that's what we're dealing with here, Your Honor.

In terms of what the border patrol knew, they knew that these were industrial shop compressors.  They used them every day to power their high-powered equipment, vehicle lifts, grease guns, pneumatic tools, and so on that created a much higher PSI than was necessary to inflate, for instance, a vehicle tire.

In addition, Your Honor, they used regulators.  They knew about this.  They knew there was a fix.  They used them in several places.

You heard from Mr. Pascua.  You heard Mr. Rondinone say that during his inspection he noted one.

I think particularly telling in what you heard today, Your Honor, is from Mr. Deyerl, the defense engineer.  And what

his testing revealed -- and I should point out that the

difference between his testing and Mr. Rondinone's testing is

somewhat profound.

Mr. Rondinone was simply trying to replicate the mechanism

of failure; in other words, to get the wheel to fold over like

Mr. Moore's did.

Mr. Deyerl testified that he was, in addition to doing

that, also trying to see how long that took, what pressures

were involved.  He had a very specific laboratory setup,

including digitized equipment, that monitored things as you saw

down to the millisecond, and what his testing revealed is that

this tire that Mr. Moore was inflating would go from zero, dead

flat, to its maximum recommended pressure in literally the

blink of an eye, 300 to 400 milliseconds.  It would go from

zero to a hundred in about two seconds.

All of these tests.  He ran nine separate tests.  They're

all consistent with this.  Two seconds, and all of the sudden,

you're at three and a half times the recommended volume.  You

can read further.  Three seconds, we're all the way up to 110.

And by four seconds, we're up at 120 PSI.

THE COURT:  Isn't the measure of time, for me, in

determining, you know, causation and making determinations the

time it took for it to fail rather than the time it took to

reach the maximum PSI?

MR. CHAMBERS:  Not necessarily, Your Honor.  Because

1   as you heard from Mr. Deyerl, the only tire that he found that

2   was remotely similar to Mr. Moore's was one, and it was used.

3   Obviously, we can't test --

4               THE COURT:   Wheel, you're talking about, you mean?

02:57   5               MR. CHAMBERS:   Yes, this wheel assembly, Your Honor,

6   yes.

7               THE COURT:   But that test actually favored you because

8   it took the time down from 56 seconds to 26 seconds.

9               MR. CHAMBERS:   Right.   There were two different

02:58   10   vehicles, Your Honor, right.   Mr. Rondinone tested the new

11   design --

12               THE COURT:   Shouldn't the Court's concentration be on

13   the time it took for the tire to fail, though, rather than

14   inflation?   Because getting it up to 31 PSI, sure, that was the

02:58   15   recommended PSI for the tire, but that's -- that wouldn't have

16   caused it to fail and even extended -- even extended time I

17   don't know how long.   We know 26 seconds one failed, 56 second

18   the other.   But there's some period of time that it has to be

19   subjected to this much higher-than-indicated pressure before

02:58   20   the wheel would fail.

21               MR. CHAMBERS:   And I think there's two points to that,

22   Your Honor.   Number one, the zero to 30 PSI in the blink of an

23   eye demonstrates that virtually by definition you can't safely

24   fill a tire like this out there using those compressors.   It's

02:58   25   impossible.   You just can't react that fast.   So even if

1   Mr. Moore had the best intentions to fill it right to 30, he's

2   going to go way beyond that before he even knows what's going

3   on.

4        And, secondly, Your Honor, as Mr. Deyerl pointed out today

02:59   5   upon cross-examination, he's recommending a regulated pressure

6   down to 100.

7        And I went through it with him, and I think the part to

8   glean from his testimony is that there has to be a safety

9   factor.  He's not saying definitively it was at 120 or 123.  We

02:59   10   don't know.  This thing could have failed at 110, 105.  We

11   don't know.  We didn't test Mr. Moore's.  We weren't there.  So

12   I think those are the two important things, is how quickly this

13   thing gets up to the pressures where we are right up against

14   failure in a matter of seconds.

02:59   15        So with these unsafe conditions and despite these known

16   dangers, what did the border patrol do about it?  There were no

17   restrictions.  Employees were permitted to use this whenever

18   and however they wanted.  There were no rules.  There were no

19   policies or regulations on how Mr. Moore or others could do

02:59   20   this.  There were no warnings.  There were no posted warnings.

21   "High pressure.  Industrial-strength compressors.  Use with

22   care.  150 PSI."  Nothing.

23        And, most importantly, there, was no regulator, which all

24   of the experts, both sides agree, would have completely

03:00   25   prevented this from happening.  A $25 regulator, this never

1    happens.

2          THE COURT:   What significance do you ascribe to the

3    warning that was actually on the tire that was being filled?

4    The evidence shows there was a warning on the tire that says

5    don't do it yourself, which seems a little impractical to me,

6    when you sell a consumer product like a wheelbarrow, to tell

7    people they have to take it to a mechanic or a lawnmower shop

8    to get a tire filled with air.  I don't think most people are

9    going to do it, nonetheless, it was on there, and then it said,

10   what, max PSI 30?  Both of those are warnings, aren't they?

11         MR. CHAMBERS:   They are, Your Honor, I suppose, at

12   their core.

13         THE COURT:   I understand the border patrol didn't give

14   those warnings, but would it be fair for the border patrol to

15   assume that tires have warnings on them and they didn't need to

16   duplicate it, that people are going to follow the warnings that

17   are on tires?

18         MR. CHAMBERS:   Well, I think that gets back to the

19   Court's point from a few minutes ago in terms of how quickly

20   this fills up.  Again, even if Mr. Moore were out there and had

21   he read that and said, "You know what?  I'm going to fill this

22   up to 29, follow every manufacture's specification" --

23         THE COURT:   Mr. Deyerl seemed to think that you could

24   do that.  I know you didn't agree with him or didn't seem to

25   agree with him, but he said yes, quickly depressing it, you

1    could get it to 30 without going over 30.  That's what he said.

2         MR. CHAMBERS:  Your Honor, I'd ask the Court to use

3    its common sense.  I mean, it's literally the blink of an eye.

4    I don't think it's possible to do that, especially for somebody

03:01   5    who's unsuspecting and doesn't know the amount of air coming

6    out of these industrial compressors, using life experience that

7    he'd been using filling, you know, small tires and vehicle

8    tires and whatnot.  I can tell you, I certainly wouldn't expect

9    that filling up my truck tires to get to the maximum pressure

03:01   10   in the blink of an eye.

11        So turning back to the jury instruction, Your Honor, I

12   think the unreasonable risk of harm here is fairly clear.

13   That's what we just spoke about, the incredibly high pressures

14   that we're talking about, how quickly this thing reached those

03:02   15   pressures, and, again, we don't know.  It was unwitnessed.

16        We've got some testing that, I suppose, gives us some

17   guidance, but even the experts are careful.  He wasn't saying,

18   "Let's regulate it to 120 because I'm certain there was

19   something above that."  We don't know.

03:02   20        And, again, the border patrol knew about this.  They've

21   used regulators elsewhere.  They failed to do anything about it

22   at all.  No protection, no warning, no guidance, nothing.

23             THE COURT:  Has the evidence established how long that

24   hose and chuck were -- had been available?  I know Pascua's

03:02   25   worked there since '92, but I'm not sure that there was any

testimony about how long that hose has been out there and
available for border patrol officers to use.  Do you recall any
testimony?

            MR. CHAMBERS:  My recollection, and I could be
wrong -- my recollection was 2010 is when it was installed.

            THE COURT:  Okay.  So it hasn't been out there the
life of the border patrol station being down there then?

            MR. CHAMBERS:  No, it was a couple years before
Mr. Moore's incident.

            MR. LASKE:  Your Honor, I don't know if there was
testimony one way or the other, but I agree with Mr. Chambers;
there was testimony about when it was placed.  I don't know
that there was testimony either way about how long it was
there.

            THE COURT:  Whether there was an alternative
air-filling spot you mean?

            MR. LASKE:  No, if the hose had ever been replaced.  I
don't think anyone asked it.

            THE COURT:  My question, has -- it goes to how long
has it been that border patrol agents, for example, had the
opportunity to fill up a tire at some facility at the border
patrol compound?  Is there any evidence about that?

            MR. CHAMBERS:  I don't know about the broader
question.  I think the testimony was that this particular
inflater was placed in 2010.

1          THE COURT:  All right.

2          MR. LASKE:  And I think, Your Honor, other agents that

3     did testify, they did talk about experiences filling up tires

4     over the years, that it spanned longer.

03:04   5          THE COURT:  Yeah, it wasn't definitive as to how long

6     that's been the practice or the ability to do so has existed.

7          Go ahead.

8          MR. CHAMBERS:  We've heard a lot from the border

9     patrol throughout this trial on sort of would have, could have,

03:04   10    should haves, so I've kind of candidly referred to them as

11    defense smokescreens.

12         Here we've heard a lot about Mr. Moore filling up the tire

13    previously at a 7-Eleven or that, "Did he have a hand pump?  He

14    could have just used a hand pump."  Or, "Boy, there was a cell

03:04   15    phone on the ground.  Maybe he was on his cell phone," even

16    though the evidence indicates otherwise.  Should have left the

17    wheel on the wheelbarrow when he was inflating it.  Should have

18    filled the tire in the daytime.  We've got lots of empty

19    finger-pointing here, just kind of theories thrown up into the

03:04   20    air in the hopes that they'll stick.

21         THE COURT:  On this score, can you clarify a couple

22    things for me?

23         MR. CHAMBERS:  Sure.

24         THE COURT:  There was a photo of the bed of the truck

03:05   25    that Mr. Moore was driving and how it would accommodate the

1001

1   size of this wheelbarrow, but it wasn't clear to me whether or

2   not the wheelbarrow itself was ever found in the bed.

3        Was there evidence of that?

4             MR. CHAMBERS:   No.

03:05   5             THE COURT:   Okay.   So it could have been there, but we

6   don't know whether it was or not, the wheelbarrow itself, as

7   opposed to just the wheel?

8             MR. CHAMBERS:   I don't believe the evidence showed

9   either way, Your Honor, no.

03:05   10             THE COURT:   And then I understand there was -- the

11   phone was on the ground.   You know, what we make of that, I

12   suppose that's up to deductions, but in one of your questions,

13   the premise was -- and it was agreed to -- that apparently

14   there had been a check of Mr. Moore's phone records, and there

03:05   15   was no phone record showing that he was on the phone or texting

16   or anything at the time of the incident.   Is that in evidence?

17             MR. CHAMBERS:   It is not in evidence, Your Honor, no.

18             THE COURT:   Okay.

19             MR. CHAMBERS:   Nor has it really been an issue in the

03:05   20   case.

21             THE COURT:   Is it agreed to that that's the case,

22   though?   Did you discover --

23             MR. LASKE:   The -- it's not evidence in the case, but

24   let's put it this way:   I looked at it.   It gave inconclusive

03:06   25   results.   There were timings that didn't seem to match up to

1    what I knew to be the facts.  It appeared that, for whatever

2    reason, the timing on it had text messages during the time when

3    I'm pretty sure Ryan Moore was not capable of sending a text

4    and likely in an ambulance.

03:06   5        So knowing that, even though it did reflect a time that

6    covered this window, I used the discretion not to use it.

7            THE COURT:  All right.  Go ahead, Mr. Chambers.

8            MR. CHAMBERS:  So getting back to these defense

9    smokescreens, it's a lot like blaming a car accident victim for

03:06  10   being on the wrong road.  I mean, that's what this amounts to.

11       We've also heard quite a bit about Ryan and that he should

12   have known better.  And, again, I think this goes back to the

13   Court's questions in the prior slides, is there's just no way.

14   I mean, you've got to use common sense here to fit the facts.

03:06  15   There is no way somebody like Ryan, who's an experienced,

16   educated, handyman, and border patrol agent, who's going to sit

17   there for 30 seconds or a minute and just keep applying

18   pressure to a small-volume tire.  It just doesn't fit.  There's

19   no way somebody with that kind of experience does that and

03:07  20   watches this thing balloon and explode in his face.  It just

21   doesn't make sense.

22       So I think what the evidence has shown here is that these

23   dramatically high pressures, getting there so quickly, where

24   we're at 100 and 110 PSI within a matter of a second or two or

03:07  25   three, that I think it's likely -- and I think the evidence has

1    revealed through the testing -- that there was an explosion

2    that occurred at some point less than what the testing has

3    shown; in other words, something under 123 PSI.  That's the

4    only thing that fits.

03:07    5    You've heard from Mr. Moore.  You can assess his

6    credibility.  But that's really the only thing I can see in

7    this case.  I just don't believe that he would stand there or

8    anybody would stand there with the experience that he's got and

9    just watch this thing go, as we saw in some of the videos.

03:08    10    We also don't know what the gauge said, and I'll get to

11    that in just a moment, but before we leave this slide, I don't

12    think that there should be any comparative fault assessed

13    against Mr. Moore for the reasons that I just explained.

14    I think he acted reasonably, he was experienced doing this,

03:08    15    and I think that this happened faster than all of us realize.

16    If the Court is inclined to place some percentage on

17    Mr. Moore, I'd ask the Court again to use its common sense and

18    judgment in doing so.

19    Let's turn to that gauge.  We've heard quite a bit of

03:08    20    testimony about it.  Here's a photo of it.  It's gone.  It's

21    missing.  We would love to test it.  You heard from

22    Mr. Rondinone who told you he would love the opportunity to

23    take that thing, dig it apart, and find out exactly what

24    happened here.  Was it reading correctly or wasn't it?  What

03:08    25    was it rated to?  How did it work?  What would it show?  What

1   would Mr. Moore have seen?

2      But instead what we have is nothing.  We have absolutely

3   nothing to show for it.  So we filed a motion in limine,

4   Your Honor, asking that the Court draw an inference, an adverse

03:09   5   evidentiary inference, for the willful destruction of the

6   inflater and the hose, and I don't think there's any dispute

7   that this was willful destruction.

8      I don't know, the Court commented early on in the case it

9   was a sliding scale, bad faith being on one end and negligence

03:09   10   being on the other end, but this instruction is asking for

11   willful, and we've got, definitely, evidence of that.

12      We know that the border patrol agents themselves considered

13   this evidence to be important and critical the day after the

14   accident.  We know that they bagged and tagged it after

03:09   15   Mr. Pascua performed his inspection the next day.  And then we

16   have Mr. Pascua a few months later pointing fingers at people

17   who don't even exist.  "It's the CIIT team who told me to throw

18   it away."

19      THE COURT:  How do you read the term "willful" in the

03:10   20   context of this instruction?  Does that mean purposeful?

21      MR. CHAMBERS:  Purposeful.

22      THE COURT:  Volitional or --

23      MR. CHAMBERS:  Purposeful.

24      THE COURT:  Because I have to tell you, Mr. Chambers,

03:10   25   when I look at the array of people that were involved -- and

1   it's likely Pascua was the guy that dropped the ball on this,

2   although there's evidence it was in somebody else's office --

3   none of them seems to have a motive to try to cover up a defect

4   in this thing.  I didn't see anything where I could link it and

5   say, "Well, okay.  If this is defective, it's going to come

6   down on this guy because he had responsibility for making

7   everything in good order, and so, therefore, he had a motive to

8   get rid of this thing that he'd overlooked for so long which

9   caused an injury."  If I had that chain of inferences, then it

10  would be a lot easier for me to say, "Yeah, I'm going to

11  assume" -- I mean, really, the only thing I can get to on this

12  is that your side was harmed by the inability to test this.

13  Because perhaps -- and this is speculation -- if the gauge

14  wasn't -- wasn't working or was not working correctly, you

15  know, it could be argued that Mr. Moore was kind of duped by a

16  gauge that was showing much less pressure than what was

17  actually being put out.  So that's one scenario.  And you

18  weren't given the opportunity to determine that.

19       Okay.  I get that.  I mean, I think that favors you, but

20  I'm a little tied up here on this issue of willful because I

21  don't see any -- I mean, I see volitional.  Somebody threw the

22  bag away, obviously, but it almost seems like it's got to be

23  with the purpose of understanding that there might be evidence

24  here and nonetheless getting rid of it.  I'm not saying bad

25  faith or intention, but something more than just a mistake.

1    MR. CHAMBERS:  Well, I don't think there's any

2  question they considered it evidence, but to your point,

3  Your Honor, I think the distinction in this case is this isn't

4  just a situation where evidence went missing and neither side

03:11    5  has had the opportunity to look at it.  This is a case where

6  we've heard the government put on evidence that said, "I went

7  out there the next day, and this thing was working, the gauge

8  moved, I put my thumb on the end, and it was working perfect."

9  We don't have that opportunity, so I think in the face of that

03:12   10  kind of evidence, I think it is willful.

11    THE COURT:  It's a permissive inference, though.  You

12  acknowledge that?

13    MR. CHAMBERS:  I do acknowledge that.

14    THE COURT:  Yes.  I mean, I don't like -- I don't like

03:12   15  it that your side sort of got the shaft.  I mean, you did get

16  the shaft.  You weren't able to test this thing and have a full

17  understanding of whether it played any part in this, and that's

18  the downside, and it was in the control of border patrol

19  employees, and, as you point out, they did recognize it because

03:12   20  they were told to bag it.

21    MR. CHAMBERS:  Well, not just bag it, but put it in a

22  safe place, we heard from Mr. Martinez.

23    THE COURT:  The evidence seemed to suggest it was held

24  for a while, and then somebody got discombobulated because the

03:12   25  Workman's Comp claim went away, and they thought, "We don't

1   need it anymore."

2       What's your understanding of the evidence on that?

3           MR. CHAMBERS:   There wasn't anything clear on that.

4   That's what I'm saying.   We have a garage mechanic who's kind

03:13   5   of pointing the finger at everybody, and, surprisingly enough,

6   or, interestingly enough, it's the same garage mechanic who

7   performed the inspection the next morning.

8       So what's the harm here, Your Honor?   The law provides,

9   obviously, for economic and noneconomic damages.   We provided

03:13   10  the jury instructions for that.   The amount of damages in this

11  case must include an award for each item of harm, reasonable

12  compensation for each item of harm.

13      So that asks the question.   Did the air compressor cause

14  any harm to Mr. Moore?  Everybody agrees.   There may be a

03:13   15  difference of opinion here and there as to the extent of that

16  harm.   Everybody agrees he was harmed here.   No question.

17      So what are his economic harms?   The parties have

18  stipulated that the past medical expenses or a portion of them

19  is $202,411.41.

03:14   20      In addition to that, we've got Dr. Kohani.   And you heard

21  him testify as to all the work he'd done.   I think it was some

22  20 some-odd visits, multiple procedures, multiple fittings, and

23  he's got total charges that are currently outstanding of 113,

24  but, remember, Ryan also paid out of pocket another 6.

03:14   25          THE COURT:   There's an ambiguity regarding those

1008

1    charges in my mind.   Maybe you can clear this up.   When

2    Dr. Kohani testified, he referred to codes that are commonly

3    used in dental practice, codes for different types of

4    procedures.   The current health insurance does the same thing.

03:14   5    They code almost everything.   But then I heard from Dr. Chess

6    or somebody, somebody testified -- oh, it was the life -- the

7    government's life planner.

8              MR. CHAMBERS:   Ms. Engler.

9              THE COURT:   Yeah, Ms. Engler, and I thought I

03:14   10   understood her to say that Dr. Kohani had actually changed the

11   amounts that corresponded to the codes.   Was that the evidence?

12             MR. CHAMBERS:   No, I think if I understood her

13   correctly -- and Mr. Laske can speak to this, but her umbrage

14   with this is that she couldn't tell based on just this document

03:15   15   whether there'd been any manipulation of the CPT codes.

16             THE COURT:   Do you know offhand?

17             MR. CHAMBERS:   I don't know of any, no.

18             THE COURT:   The CPT codes are standards rates, the

19   standard costs.   They look at it industry-wide and come up with

03:15   20   a cost for a particular procedure.

21             MR. CHAMBERS:   That's my understanding.

22             THE COURT:   But you know of no evidence in this case

23   that shows the codes listed by Dr. Kohani had been adjusted

24   upward?

03:15   25             MR. CHAMBERS:   I don't, no.

1       And although we heard from Dr. Chess this morning or this

2   afternoon, and he was critical of a couple of teeth that were

3   pulled, 10 and 11; otherwise, he has absolutely no issue with

4   the billings.  He has no problem with them.  You don't hear any

03:15   5   contrary evidence that any of these things were outrageous or

6   too high.

7       THE COURT:  I thought he did say that.  I thought he

8   said that he thought Kohani's bills were way higher; the cost

9   that he would charge for things were way higher than industry

03:16   10   average.  He used the term a couple times that Kohani charged

11   double what something should cost.

12       MR. CHAMBERS:  He offered no opinion on that, and I

13   pointed out in his deposition where he said he would defer to

14   Dr. Kohani on all the charges.

03:16   15       119,000 and change here, Your Honor, the total past

16   economic lost when you add in $24,000 for the time that

17   Mr. Moore missed from work, and we're looking at a past

18   economic loss of 345,571.

19       THE COURT:  What's the explanation for the

03:16   20   disagreement between the plaintiff and the government on the

21   loss of earnings?  The government has it at about 16,000.

22       MR. CHAMBERS:  Yeah, there was an issue -- I think the

23   way their economist ran it is she did it untaxed.

24       THE COURT:  Oh.

03:16   25       MR. CHAMBERS:  Net income basically, whereas I think

1    our life -- excuse me, or economist, when she testified at her

2    depo, said that this is how she does it and, in her view, is

3    the appropriate way to do it.

4          THE COURT:  Which is correct?  I mean, if it's time

03:17    5    taken off for medical procedures, is it taxed?

6          MR. CHAMBERS:  I don't know the answer to that,

7    Your Honor.  I would defer to her, and we, Mr. Laske and I,

8    stipulated to just put the economic plans in.  I don't know the

9    answer.

03:17    10         THE COURT:  Okay.  So is it attributed to sick leave?

11         MR. CHAMBERS:  He was off of work for three months

12   following the incident, and that's what this is attributable

13   to.

14         THE COURT:  I would assume even if it's sick leave,

03:17    15   they still take out tax, right?

16         MR. CHAMBERS:  I would imagine, but I don't know that

17   for sure.

18         THE COURT:  All right.  In any event, this is the

19   plaintiff's figure on loss of earnings, 24?

03:17    20         MR. CHAMBERS:  Correct.

21         THE COURT:  Okay.

22         MR. CHAMBERS:  And then we've heard quite a bit of

23   evidence on what the future economic loss is going to be.  We

24   heard from Ms. Casuto a couple of days ago and Ms. Engler

03:17    25   today.  Our future care number, which is going to provide for

1    the future dental work that he's going to need, we heard from

2    Dr. Lobatz with some scans, future psychotherapy, and future

3    psychiatric medication.   The total for that is 858,679.

4         Obviously, I'm sure the Court's aware the big dispute

03:18    5    between the government and us is on the future implants in

6    Ryan's mouth.   Dr. Chess feels that these things are good to go

7    for the next 40 years.   Dr. Kohani doesn't think that's the

8    case.   So we've got a total past and future economic loss of

9    $1,204,250.

03:18   10        And as I just alluded to, Your Honor, the big dispute here

11   is the defense is saying there's no need for future dental

12   care.   We heard from Dr. Chess, 99 percent defense work, these

13   teeth are going to last the rest of Ryan's life.   He wasn't

14   able to state a single basis other than his experience, no

03:18   15   literature to support that theory or notion.   And I think,

16   importantly, you'll see here in just a moment, Dr. Chess made

17   the comment today that Ryan's bridge and the teeth that he has

18   in his mouth are just as easy to clean as yours and mine.

19        Now, I think we know from Dr. Kohani, and hearing from

03:19   20   Ryan, that's just not the case.

21        Importantly, Dr. Chess, assuming Ryan does need these

22   implants down the road, he agrees with Dr. Kohani's recommended

23   costs for that.

24        So Dr. Chess clearly has one job, and that's simply to

03:19   25   drive down damages in the case.

03:19    1    Dr. Kohani, on the other hand, treated Ryan for the past
         2    two years.  He did the entire restoration.  He described Ryan's
         3    case as one of the worst he's ever seen, unlike the -- I think
         4    he described it as a walk in the park today or easy-peasy on
         5    the stand, Dr. Chess did.
         6    Again, Mr. -- Dr. Kohani was the one who actually performed
         7    the restoration and reconstruction.  And this is his trial
         8    testimony.  And the reason that Dr. Kohani is recommending the
         9    future replacement is based on a couple of things.  One is that
03:19   10    Ryan's got this bridge, these teeth, that make it very
        11    difficult to get in there and clean them regularly and prevent
        12    disease.  Two, he lacks the tissue.  We heard about the
        13    vestibuloplasty and the tissue that he lost which makes any
        14    kind of infection that much more severe and that much more
03:20   15    important to catch early; however, Ryan, as we've heard, has
        16    numbness all over his mouth, all over the side of his face.  So
        17    unlike you or I who might get a toothache and think, "I should
        18    go to the dentist," Ryan doesn't have that perception, so the
        19    chances of things going on longer than they should before being
03:20   20    caught is a lot higher with somebody like Ryan than maybe you
        21    or me.
        22    THE COURT:  Actually, unlike you.  I'm more like Ryan.
        23    That's the reason I know Dr. Berger because a guy cut my
        24    lingual nerve about 20 years ago.  I have no taste or feeling
03:20   25    in the right side of my mouth.  Dr. Berger put that nerve back

1  together for me, so I have some sense of what it's like to have

2  numbness in your mouth.

3      I say that just as an aside because I think I'm closer to

4  what he may feel than what -- you don't have any numbness, I

03:20  5  take it?

6          MR. CHAMBERS:  I don't, no, Your Honor.  I'll stick to

7  myself next time.  How about that?

8      So what Dr. Kohani's recommending, you know, you're hearing

9  lifetime, lifetime, lifetime.  Basically what he's saying is

03:21  10  that of the 12 implants in Ryan's mouth, half, or six of them,

11  are going to need to be replaced two times over the course of

12  Ryan's 40 years.

13      What are Ryan's noneconomic harms?  And, again, the jury

14  instructions provide for a number of compensable categories

03:21  15  here.  They're listed here.  I'm not going to read them for the

16  Court.

17      So basically this would be compensation for what Ryan's had

18  to endure for the last almost four years now.  It's 1324 days

19  from the time of the incident to today, an awfully long time.

03:21  20  We've heard a lot about his injuries, the incredible

21  lacerations, through and through injuries.  We heard from his

22  brother who literally could see into his mouth in the hospital,

23  the massive facial trauma, loss of teeth, tongue like a snake,

24  salivary glands, traumatic brain injury, facial muscles used

03:22  25  for smiling and chewing.  I can't name how many bones he broke

1    in his face.

2       I think it goes without saying that the injuries are

3    catastrophic here.

4       And what has he had to endure to try and piece himself back

03:22  5    together?  There have been ten surgeries.  I'm not going to

6    stick on this slide too long, Your Honor.   Ten surgeries to

7    date.   He's had to endure hell.

8       You heard from him in terms of what the dental procedures

9    were, rebreaking his jaw, literally drilling screws into your

03:22  10   jawbone, having to wait for that to heal, and then once it's

11   healed, having those cut back open again, gone back in, mess

12   around with them some more, wait for those to heal, and then go

13   back and do more work.

14      This is a long, arduous process and an incredibly painful

03:22  15   one.

16      I think you can probably glean from Mr. Moore's testimony

17   on the stand, he's not a big cry baby.  He's not going to sit

18   up here and tell you how much it hurt.  But I can tell you that

19   hurt like hell.  I mean, just -- you can obviously see from the

03:22  20   operative reports and the testimony that you heard just how

21   painful that must be.

22      So turning back to the jury instruction, what we'd suggest

23   as an appropriate, fair, and reasonable compensation for the

24   past three plus years of physical pain that he's had to endure

03:23  25   is $750,000.

1        Again, there's no dispute that these were horrific injuries

2    that caused an incredible amount of pain and disruption to

3    Mr. Moore's life.

4        Physical impairment.  We heard that there were long

03:23    5    stretches where Mr. Moore was either eating a liquid diet,

6    eating soft foods, was unable to communicate.  We'd suggest

7    $150,000 for physical impairment.

8        Disfigurement.  Aside from the initial gaping wounds, which

9    the Court has seen pictures of, the loss of 16 teeth, he's now

03:23   10    got lasting scars that are obvious to anybody who sees him.

11    He's got droopiness in his mouth and his eye.  And he's got the

12    numbness.  These are grotesque injuries.  These are grotesque

13    scars that he's going to be left with for the rest of his life,

14    and these aren't something that are on your back or on your

03:24   15    thigh that you can hide.  These are front and center.  As soon

16    as somebody meets Mr. Moore, they're going to see this.

17        The inconvenience.  We'd suggest $100,000 for the

18    inconvenience, and this would be for the dozens and dozens of

19    doctors' appointments, the surgeries that he's had to go

03:24   20    through, taking time out of his life to have to try and put

21    himself back together.

22        Humiliation.  We've heard about how humiliating the last

23    three and a half years have been for Mr. Moore.  He gets stared

24    at when he's out at public.  He was turned away at a bar

03:24   25    because the bartender thought he was drunk.  His teeth fall out

1016

1   when he's on a date with a girl when he finally gets up the

2   courage to go back out.  Even criminals are afraid of how he

3   looks.  It's humiliating.  He's a young man who had the future

4   to look forward to.

03:25   5   Anxiety.  We've heard a lot about anxiety.  I don't think

6   there's really any dispute between the defense psychologist and

7   the plaintiff's psychologist.  He's anxious.  He's got anxiety.

8   He's on medication for it.  He's anxious about his future, his

9   career, and his work and his trajectory.  He's anxious

03:25   10   socially.  Will he ever get married?  Will he ever have kids?

11   Will he ever have the dreams that he had before?  Will he ever

12   be the same?

13   He's worried about what the next procedure might hold, and

14   has been for the last three years.  Surgery after surgery.

03:25   15   What's coming next?  Is this it?  We'd also suggest 250,000 for

16   the emotional distress, Your Honor.

17   You've heard from Dr. Koransky and Dr. Markel and, I think,

18   from the defense psychologist as well that Mr. Moore suffers

19   from a deep severe depression resulting from this.  He's angry.

03:25   20   Little things set him off that never used to.  Friends

21   canceling or changing plans sends him through the roof.

22   And then we heard from Dr. Koransky that he thought

23   Mr. Moore had a partial PTSD, and I know there's a dispute on

24   that.  I think it's probably a definition without distinction

03:26   25   or however that phrase goes, but I do think it's important to

note Dr. Evans, who we heard from yesterday, I believe, doesn't

think that you can have PTSD if you don't remember the actual

event.  Dr. Koransky differs with that.  He gave a few

examples.

03:26       He gave the example of a woman who maybe passes out at a

party and is raped who wakes up to find out what horrific

circumstance happened to her while she was out.  And he brought

up an example of a soldier overseas whose Humvee is blown up by

an IED who may not remember the actual explosion but sure as

03:26  heck has problems afterwards and traumatic reminders and all of

those things.

       And Dr. Koransky talked about -- his words were the

omnipresent reminders that Mr. Moore sees on a daily basis.

People ask him about it.  He looks in the mirror.  There's

03:27  things all around him that bring these memories back.

       Mental suffering.  Another $250,000, Your Honor, is what we

would suggest.

            THE COURT:  I'm not sure how, you know -- I mean, I

have conception of how these things differ, but how's mental

03:27  suffering different from emotional distress?  And don't both

involve a sense of anxiety and humiliation?  I mean, it seems

like we're parsing the same factor and ascribing a

quarter million dollars to it multiple times.

            MR. CHAMBERS:  No, these are actually from the jury

03:27  instruction, Your Honor.  They're separate, compensable items

1    of damages.   These aren't me trying to conjure something up.

2         THE COURT:   So how does the jury instruction

3    distinguish, for example, between emotional distress and mental

4    suffering?

03:27   5         MR. CHAMBERS:   I think the emotional distress is what

6    I just touched on, the depression, the PTSD.

7         The mental suffering, which is what I'm getting into, I

8    think is more of how Ryan's felt bottling this up, keeping

9    things inside, you know, fear of showing weakness to others,

03:28  10    sort of that internal struggle that he's had to endure for the

11    last three-plus years, the lost memories, the lapses in

12    memories.   I think that all comes under mental suffering as

13    opposed to emotional distress.

14         He talked a lot about the mental suffering, the slowness at

03:28  15    work, memory issues with forgetfulness, has to write everything

16    down.   I think that all falls under mental suffering.

17         And finally loss of enjoyment of life.   We've heard quite a

18    bit about that.

19         He talks about being isolated.   This is a guy who used to

03:28  20    be out all the time, friends around, out at ball games, social

21    events, hiking, being active, and now he goes to his safe place

22    and he sits at home.   Doesn't play sports anymore.   Has a very

23    limited social life.   Doesn't really go out.   He's a young guy.

24         So, Your Honor, we think that fair and reasonable

03:29  25    compensation for all that Mr. Moore has had to endure from the

1   time of this incident up until now, the last almost four years,

2   is $3 million.

3       And then what does the future hold?  Mr. Laske suggested in

4   opening that this was not a lifelong injury.  I disagree.  I

03:29  5   think that is exactly what this is.  I think this is something

6   that is going to impact and affect Mr. Moore for the rest of

7   his years.

8       If we look at the life expectancy tables, which, again,

9   there's no dispute about -- these are from the jury

03:29  10  instructions -- you'll see that someone of Mr. Moore's age has

11  a statistical life expectancy of another 39 and a half years

12  from today.  So a fairly lengthy time.

13      So I just wanted to briefly touch on the brain injury

14  portion of this.  I think really only two of these are in

03:30  15  dispute, and that's the neurocognitive disorder and the PTSD.

16  I already touched on the PTSD.  Dr. Markel differs with how she

17  scored things.  I don't think that bears repeating.

18      But everybody agrees that he sustained a brain injury.

19  There are objective findings that show there's a brain injury

03:30  20  here.

21      So what the did Mr. Moore like to do before?  This was a

22  guy who was out, who was at the gym.  We heard how much he

23  liked to go play softball from his brother.  It was one of his

24  favorite hobbies.  He loved to go deepsea fishing, loved to be

03:30  25  outdoors and go camping.  In fact, the Court will recall his

03:30

03:31

03:31

03:31

03:31

03:31

1 last memory before this happened is a camping trip with his
2 brother he took up to Northern California.  It was a favorite
3 pastime of his.  His social life, he was out, again, virtually
4 every weekend.  Huge Packers fan.  Would go watch games with
5 his friends.  His nephew was the highlight in his life, would
6 take him all over the place, on hikes, to ball games, just
7 rumble around, wrestling in the house, he traveled.  And I
8 think, most importantly, this injury happened at a really
9 unique point in Mr. Moore's life.  He had been with the border
10 patrol for sometime.  He'd put some roots down here in
11 San Diego.  He purchased his first home just a few month before
12 this happened.  He was looking to start a family, go out, find
13 a wife, have some children, and kind of start into what most
14 men dream of.
15     But, unfortunately, that was taken from him.
16     What Ryan's left with now is he's depressed, he's angry, he
17 has difficulty remembering things.  You heard even shopping
18 lists are difficult.  He goes up and down stairs several times
19 forgetting why he went there.  He doesn't find happiness in
20 anything, really.
21     That's a huge, huge distinction from the Chucky that we
22 knew beforehand.
23     He doesn't socialize anymore.  He's fatigued and
24 unmotivated.
25     Obviously, I've talked about the disfigurement.  I think

1    that is obvious.

2        Isolation.   He lives like he's an 80-year-old shut-in.

3    Feels like he wants to disappear.   You heard from his mom that

4    he doesn't travel home anymore.   He doesn't want to see his old

5    friends, his college buddies, people he grew up with, doesn't

6    want to talk about this, doesn't want them to see him like

7    this, doesn't want to show weakness to them.

8        And then obviously the physical pain.   He's been through

9    the wringer in terms of surgeries.   He's got constant chronic

10   pain throughout his face and throughout his jaw.   That's not

11   something that's going to go away.

12       This is a life that changed in the blink of an eye.

13       So what we would suggest as fair and reasonable

14   compensation for the next 39 and a half years of Mr. Moore's

15   life is $2 million to compensate him for all of the things that

16   you see there and all of the things that were taken from him on

17   the night of his injury.

18       We've also heard from the defense that, "Hey, Mr. Moore's

19   going to be fine.   Just get this lawsuit out of the way.   He

20   doesn't need anymore psychotherapy.   The meds will come off.

21   He'll be back to his old self in no time."

22       We've heard from the experts that that's not exactly how

23   this works.   I created this slide.   We've got three things at

24   play in Mr. Moore's case.   We've got the physical pain, we've

25   got cognitive deficiencies, and we've got emotional distress.

1      The defense would have us believe we can just pull a little

2  tiny part out of the emotional distress portion and it fixes

3  everything, and that's just not how it works.

4      These three things that Mr. Moore suffers from work in

03:33   5  concert with one another, and it spreads out and impacts all

6  areas of his life.

7      Taking the lawsuit away, you heard from him.  You heard

8  from his brother.  You heard from the experts.  That's not

9  going to change anything.  Yes, it's a stressor, certainly.

03:33   10  Perhaps that stress goes away, but it's not going to fix all

11  the things that you see here.

12      There's also been quite a bit of testimony, Your Honor,

13  that "Gees, Mr. Moore must be fine.  He's back to work with a

14  badge and a gun.  How bad off can he be?"

03:34   15      Well, I think we've heard from Ryan just the kind of guy

16  that he is.  This is a guy that started a paper route when he

17  was 10 years old and has worked consistently ever since, the

18  last 25 plus years.

19      You heard from his mom who instilled a strong work ethic in

03:34   20  him and his brother from the time that they were toddlers.

21      He was a leader.  He worked and put himself through

22  college.  He wanted to be the best at everything he did whether

23  it was baseball or being a border patrol agent.  He was first

24  in his class at the border patrol academy.

03:34   25      The reason he went back to work, in his own words, he

needed to go back both financially, and he wanted to feel like

himself again.  He felt like he had to.  He wanted to be

productive.  He sure as heck didn't want to show weakness to

anybody, be some guy who's laid up on his couch just popping

pain pills all day.  He went back.  Because that's what his mom

taught him to do, and that's what he's been doing since he was

10 years old.

He's been honest with every doctor he's seen, and he was

honest with you here.  And he's seeking just one thing in this

lawsuit.  And that's fair and reasonable compensation for the

catastrophic injuries and the implications from those injuries

in his life.

Thank you, Your Honor.

THE COURT:  All right.  Thank you, Mr. Chambers.

MR. LASKE:  Good afternoon, Your Honor.

I also would like to thank everyone with the court.  I

appreciate the time and everyone's diligence in this case.

Counsel has been professional.  There may have been moments

where maybe we were not on the same page, but that happens, and

so I understand.

Obviously, the government appreciates every day of Ryan

Moore's service with it, and that's not the question that we

see before us as we will go forward with closing.

I also would like to thank my colleague, Garrett Coyle,

agency counsel who is in the back, the paralegal assisting us,

as well as the patrol agent in charge, Dan Parks, because this is his station.

You've heard a lot of testimony in this case, Your Honor, damage experts, but the first thing the Court has to do is determine liability.

This is maybe one that's not as common as others we see. I'll admit the ones that I've seen in the past, liability is usually pointed one way or the other, but the damages were usually the part that was uncertain.

And I think in this case there are some damages that are uncertain, but there were some, especially initially, that are not.

But the thing to think about when you think about liability is the standard.  And the standard isn't necessarily particular to Ryan Moore.  The standard for premises liability is a broader standard.  It's not one individual.  It's, for example, the 25,000 people in the sector over eight stations or maybe just the people who are in Chula Vista station, the several hundred people who work there today, the several hundred more who worked there the year before, and maybe over the years, that's even over a thousand who have worked there over several years or decades.  This has never happened to anyone at that station.  And part of determining whether there was reasonable -- the government was reasonable in keeping its equipment safe for use by its agents, you have to think about

1    that.   That can't be just pushed aside because of one incident

2    at a time.

3        You heard from subject matter experts like William Dana,

4    the area safety manager, for 21 years, someone who was a safety

03:38   5    official at Top Gun, that he's never seen this.   And,

6    especially, he's never seen it with the border patrol.

7        Rolando Pascua, who has been with the garage for 25 years,

8    and he never experienced any issue where either an agent,

9    someone like union representative Ron Zermeno, the area safety

03:38   10   manager, Bill Dana, or anyone ever used any issue with him to

11   put a pressure regulator on the line.

12       You've heard also that there were contractors hired to

13   regularly come and maintain the air compressor.   So the

14   government made an effort to be reasonable in how it was

03:38   15   maintaining its equipment.

16           THE COURT:   I don't think there's really any issue

17   about the compressors themselves.   As I understand the

18   plaintiff's case, on both negligence and premises liability, it

19   comes down to this:   That the evidence shows that there were

03:39   20   different compressors serviced different parts of the compound.

21   Some parts needed greater pressure.   I understand that the

22   shop, for example, with hydraulic lifts, pneumatic tools needed

23   higher PSI to function.

24       But it's also clear to me that there were regulators put on

03:39   25   the line, some of the lines coming out of the compressor, that

1   lowered the PSI, and so, to me, it seems to me the question is

2   was it -- was it overlooked that this line that was intended to

3   service primarily vehicles -- anything from bikes to ATVs to

4   conventional vehicles, border patrol jeeps and all -- should

03:39   5   this line have been regulated?  Was it an oversight not to

6   limit the PSI coming out more to correspond with the purpose

7   that that line was serving?

8        What do you say about that?

9            MR. LASKE:  And first I would say there were a variety

03:40   10   of vehicles, some like ATV tires that were as low as 4 PSI, and

11   people were capable of inflating those on a regular basis

12   without any problem.

13            THE COURT:  But that argues in favor of regulating it

14   to a lower amount of pressure, doesn't it?  The purpose is

03:40   15   we're never going to get higher, say, than -- pick a figure --

16   65 PSI.  I know there was some talk about fuel trucks that went

17   from 95 to 105.  I don't know that there was any evidence that

18   any of those were ever filled.

19            MR. LASKE:  I believe, Your Honor, there was evidence

03:40   20   that there were at least vans, and the vans were rated at about

21   80 PSI.

22            THE COURT:  I'm not sure -- I don't recall that

23   portion of it, but let's even assume 80 PSI.  This was

24   unregulated up to, what, 135, 140 at a minimum?

03:40   25        So the gist of their argument is well, wait a minute.  Put

1    a regulator on this to avoid what is foreseeable, which is

2    overinflation very, very quickly.

3        What do you say to that?

4        MR. LASKE:   Your Honor, there are a number of things

03:41    5    on that facility, and I think the primary thing that's focused

6    on, first, is are we complying with existing regulations and

7    laws.   And there's been no evidence that there was any

8    regulation and law that required a regulator at that facility.

9        Now, there was some evidence pointing to some California

03:41    10    OSHA requirement, but we clearly heard California OSHA doesn't

11    apply.

12        THE COURT:   I get that, but it does inform the

13    decision as to whether it was -- to me, it informs the decision

14    of whether it was dangerous to maintain compressors, you know,

03:41    15    for use in vehicle tires that were extraordinarily high given

16    the standard amount of pressure in vehicle tires.   And here,

17    you know, the standard's wide, I'll acknowledge that.   It goes

18    from four up to, let's say, 50.

19        But why have -- why have an inflater intended to inflate

03:41    20    all the vehicles that fall within this realm of four to 50?

21    Why have one that shoots out at 140?   It seems to me like

22    you're asking for trouble or kind of whistling past the

23    graveyard with that.

24        MR. LASKE:   I think one of the problems that's part of

03:42    25    this case, for better or worse, and, you know, some things may

1    have been mistakes or for whatever reason, but I don't think

2    anyone tested the line after the accident.  No one knows for

3    sure how much pressure was coming out of that line.  That's

4    just a fact that we don't have.

03:42    5    THE COURT:  Wait, wait.  Your expert tested the line,

6    I thought.

7    MR. LASKE:  He did, two years later.

8    THE COURT:  Yeah, with the Ingersoll generator, right?

9    MR. LASKE:  Yes, but we don't know what the system was

03:42   10    set up to that day, and the absence of evidence isn't really

11    something that the plaintiff can use to meet their burden.

12    THE COURT:  Refresh my memory.  I know that there was

13    a different -- or two compressors in there at the time -- by

14    the time everybody got around to it.  One really doesn't have

03:42   15    much relevance here because it wasn't in use at the time.

16    MR. LASKE:  That's correct.

17    THE COURT:  The other one was out of use, but I

18    thought the testimony was at the time of the incident, the

19    minimum PSI would have been around 140, 145, and then

03:43   20    Mr. Deyerl said well, the gauge that showed that was actually

21    registering a little bit over at the time he tested it.  It

22    could have been, I don't know, 30, 30 PSI, less than that, so

23    115, something like that.

24    MR. LASKE:  I mean, the most that we got in

03:43   25    testimony -- and I'm not saying this is the definitive

1    pressure -- was just Rolando Pascua said the day after the

2    accident, he walked up to a tank.  He read the gauge.  It said

3    150.  That doesn't mean that was the setting one way or the

4    other.  That's just all he said.  And he didn't test it.  He

03:43    5    didn't test it to see if that was accurate.  It could have

6    been, it may not have been.

7        THE COURT:  Let's even assume that that's correct or

8    that some lesser figure but over a hundred.  I'm asking you,

9    you know, does that create a dangerous condition given that the

03:43    10   intended use for this particular hub was to inflate tires

11   that -- none of which typically would use 100 PSI, anything

12   close to it?  I mean, maybe half, maybe a third.

13       MR. LASKE:  I mean, the government's view is based on

14   regulations, prior use, prior use over years, at least, and

03:44    15   maybe even decades, that no one had ever been injured by this.

16   Nothing had indicated that this was a safety issue.  No one had

17   expressed concerns.  And there were possibilities of border

18   patrol agents, they had avenues, they could express concerns

19   directly to their union rep, Ron Zermeno.  They could express

03:44    20   concerns to Bill Dana, the area safety manager.  And you heard

21   him testify that happens occasionally.  They could express

22   concerns directly to Rolando Pascua, although it sounded like

23   the most common thing that would come up, if there were

24   complaints, agents would report it to their supervisors and the

03:44    25   VCOs, and that would get communicated to Mr. Pascua.

1    THE COURT:  Our history only goes back to 2010.  Both
2  sides agree that's when this particular hub was installed or
3  went online.
4    MR. LASKE:  I agree that I think Mr. Pascua recalled
5  it that way, but I believe there were agents who testified that
6  they used a tire inflater near that area for a period that was
7  earlier than that.  I don't recall how much earlier, and I'm
8  not going to say it was decades and decades, but I think it
9  exceeded that, maybe even close to potentially some version of
10  eight to ten years before the accident, but --
11    THE COURT:  Do you dispute that it was foreseeable
12  that a tire might explode with such high pressure?
13    MR. LASKE:  Again, this is not -- and I imagine there
14  are some where if you put it on, you hit a button, and it
15  starts, and it goes.  This is one that requires the person
16  inflating the tire to, one, hopefully heed the warning on the
17  tire, but they actually have to depress it down, and they have
18  to depress the handle down, they have to take some action.
19    THE COURT:  Right.
20    MR. LASKE:  So there's some user operator --
21    THE COURT:  There is.  That's a different question
22  that I'm sure you're going to get to on comparative fault, but
23  it seems to me that even Mr. Deyerl, whose Excel spreadsheet
24  was gone into on some detail on cross-examination, acknowledged
25  that very quickly you could get up to the types of PSI we're

talking about for vehicle tires.  I mean, certainly if it's

four, boom, at 30, it was a matter of a second, and, you know,

I'm assuming 45, 60 would be some multiple of a second, so two

seconds, three seconds.

That's very, very quick, and I understand that the

government's not under the Cal OSHA regulations, but I'm also

assuming that the reason regulations like that exist is that

there's a perception that there's danger to putting too much

PSI in a vehicle tire, either immediate danger that it's going

to explode or overinflated tires on the highway may give way

and cause accidents.  I'm assuming there's some rationale,

safety rationale, behind those regulations.

MR. LASKE:  And, Your Honor, I think an important

distinction to make, which I don't know if it came clearly

through Mr. Deyerl's testimony, but I think he was trying to

make it, is the size of the tire does matter.  The one or two

three seconds it took for 30 PSI to get into a wheelbarrow tire

would be different for a bigger tire because it has more mass,

so --

THE COURT:  Sure.

MR. LASKE:  -- with the expectation and the fact that

not a single witness has ever seen a wheelbarrow tire on the

facility, let alone inflated, expecting to inflate a bigger

vehicle tire without your agent standing there forever to get

it up to pressure, I think that also may be one reason why it

1    wasn't regulated down.

2         Also the CBP is entitled to expect that the inflater user

3    will use it reasonably, and up to that point, hundreds or at

4    least the agents that came before you reported they were able

03:47    5    to use it safely for a variety of things, high and low PSI.

6         THE COURT:  It's curious to me -- this is, again,

7    Mr. Laske, just an aside, but it's curious to me that the

8    border patrol wouldn't have a policy forbidding employees from

9    bringing personal items in for inflation.  You know, I worked

03:48   10    for the government for many years before I went on the bench,

11    and I'll give you an example.  Down here at least, they have a

12    gym that government employees can use, assistant U.S. Attorneys

13    can use.  And they make you sign all kinds of waivers and say,

14    "I acknowledge weights can fall on me or I can hurt my muscle

03:48   15    or rip my tendon off my forearm lifting weights, and I absolve

16    and indemnify the government if any of that happens."  It just

17    surprises me that the border patrol wouldn't say, "Look, this

18    is government equipment.  You want to fill up a government

19    vehicle with air, go ahead, but don't bring in your own stuff."

03:48   20    Then we don't have the specter of a wheelbarrow tire, for

21    example, or, you know, raft or something like that, you know,

22    being too quickly inflated because no one would expect those

23    types of items to be there, right?

24         MR. LASKE:  And for better or worse, Your Honor, the

03:49   25    border patrol agents, their primary job is to focus on the

1    border.  They're not engineers, they're not mechanics.

2        THE COURT:  So why allow them to have the discretion

3    to bring whatever they want to use on the inflater?  It sounds

4    like they had that and may still have that discretion.

03:49    5        MR. LASKE:  I think -- and I don't know if it came out

6    in testimony, so I don't want to talk on something that didn't

7    come out in testimony.

8        THE COURT:  What came out -- I think there was a

9    stipulation read at the beginning that said there was no

03:49    10   regulation with the border patrol on any of the employees about

11   bringing in personal items and using the inflater on them, that

12   there essentially were no rules when it came to that.

13       MR. LASKE:  I think what I can say, and I think

14   because the Court can take judicial notice based on the

03:49    15   location of where that is and agents coming there and working

16   there 24 hours a day, you can draw the reasonable conclusion

17   that at 3:00 a.m. in the morning, you don't want an agent

18   having to go to a gas station in the middle of the night based

19   on where that is.

03:49    20       THE COURT:  Well, okay, yeah, but that doesn't reach

21   our situation, though, which, you know, invites people -- it

22   doesn't invite, but permits people to bring in, as I said, all

23   manner of things that may not have been intended to be used on

24   a nozzle like this one, right?

03:50    25       MR. LASKE:  And I think the best I can do, Your Honor,

1    is say that station has been there for at least a couple

2    decades, if not longer, and they just didn't have any prior

3    history of doing it, and I think part of what reasonableness

4    takes into account is kind of a history of a station like this.

03:50    5    Did they have any prior history of people bringing in personal

6    items?  And from all accounts, everybody filled up government

7    equipment with the exception of vehicle tires.  I think even

8    the bikes that were discussed, no one implied or even said they

9    were personal bikes.  They were -- because they used to have a

03:50   10    bike unit that would come up and then come down occasionally.

11    So no one expected people to bring anything on, and I don't

12    think there's any testimony in this case that anyone, including

13    the plaintiff, ever brought a personal item on the station's

14    ground, so -- to inflate it.

03:50   15           THE COURT:  What's the government's position on

16    liability here then?  I mean, the plaintiff has taken the

17    position that there's no comparative fault.  You take the

18    position that there's no fault on the part of the government

19    for the way in which this thing was maintained.

03:51   20           MR. LASKE:  I mean, I think the government takes the

21    position that it definitely is primarily Agent Moore's fault.

22        I think we have taken the position -- and to take any other

23    position, I have to go to someone beyond me, but we are taking

24    the position that it isn't our fault, but if the Court were to

03:51   25    find that it was -- and we don't -- and we're not saying one

1035

1   way or the other if that's unreasonable -- we think that at

2   least there should be some taking into account the actions of

3   Mr. Moore.   There should be some taking into account the fact

4   that this thing had been there long enough for enough agents to

03:51   5   use it without any problems.   There was regular maintenance,

6   and the things that were done and the things that just hadn't

7   happened there before.

8        So, like Mr. Chambers, I do agree, the Court, you know, in

9   its infinite wisdom should consider, if it does get to an area

03:51   10   of comparative fault, and weigh the evidence accordingly, but

11   I'm not in a position to concede that point.

12               THE COURT:   Concede the point that the government has

13   any liability, you mean?

14               MR. LASKE:   To concede that point, I do need the

03:52   15   authority.   I can't decide to do that on my own.

16               THE COURT:   Okay.

17               MR. LASKE:   Your Honor, I guess to touch lightly on

18   the subject, and because it's coming up, yes, we are making an

19   argument that we feel like Ryan Moore made some mistakes.   And,

03:52   20   again, it's a lot based on past use by others who did it

21   safely.   Ryan Moore had successfully inflated a tire.   He was

22   able to do that.   He doesn't remember why.   He doesn't remember

23   if he looked at the gauge.   He may have when he inflated it at

24   the 7-Eleven.   He doesn't remember if he eyeballed it, which

03:52   25   would be something that would have been definitely available to

him that evening.  He doesn't know if he felt the tire,

something that also would have been available that evening.  He

doesn't know if he noticed the size of it getting bigger at the

7-Eleven.  That would have been available to him that evening.

He doesn't remember if he heard any sound, but I think in his

testimony, he did say inflating the government vehicle tires,

occasionally he would hear the air compressor cycle on, and he

would hear at least some other noises.

And, unfortunately, the absence of evidence isn't evidence.

The plaintiff could have done some things differently.  And,

again, because it's the plaintiff's burden, the defendant is

pointing it out.

It's not to blame him, but the defendant here is the one

who the plaintiff is asking for the Court to blame.

And so to address these issues, we've pointed out a few

things that were available to him to consider.

He did get to work early.  He said he had a practice at

least in that window of a few months -- I think it was April to

June of that year -- where he would arrive -- or at least he'd

leave his house at 10:30.  He lived 40 miles away.  He would

typically get to work early as a result.  He would change.

This thing, from all accounts, did not take 20 minutes.  It

took a matter of seconds, whether we want to believe it's a

blink of an eye, it's 20 seconds, 26 seconds, a minute.

THE COURT:  What difference would it have made if he'd

1   undertaken to fill the tire before he went on shift rather than

2   afterwards?

3           MR. LASKE:  He would -- one, he'd have the advantage

4   of daylight.  He'd have the advantage of people around, so if

03:54   5   someone saw him, they might actually suggest a different

6   method.  He -- also the gate at that time of day on a Monday at

7   around 11:46 a.m. is open.  I don't know that he would have

8   done this, but he could have potentially walked back there and

9   looked at the compressors.  The compressors, when that gate is

03:54   10  open, you can walk right up to them.  I don't know how well it

11  came through the photographs, but you've seen enough

12  photographs where -- the photograph where you can see the two

13  compressors.  You can see it because the gate isn't locked.

14      So -- and that gate -- and that part of it, the door that

03:55   15  rolls down, is never locked.  The gate that is subsequently

16  further up is after 3:00 p.m., 3:30 p.m., and until 7:00 in the

17  morning when it's opened again.

18          THE COURT:  I mean, I'm not sure what one would glean

19  by looking at the compressors.  There were -- there was a

03:55   20  compressor that had -- capable of producing an equal amount of

21  pressure that Mr. Deyerl used, and it was a DeWalt compressor.

22  I saw it in the photograph.  A yellow one.  It was considerably

23  smaller than the Ingersoll-Rand compressor.  So I'm just not

24  sure that, you know, an average person or average, reasonable

03:55   25  person would glean anything by looking at the compressor.

1   And you're not suggesting that he had some responsibility

2   to go look at the gauge on the compressor before he used the

3   air hose?

4            MR. LASKE:   No, I'm just saying it is a possibility.

03:56  5            THE COURT:   Yeah.   Isn't your best argument,

6   Mr. Laske, on the comparative fault, the testing and how long

7   it took for the tire or the wheel to actually explode?  Isn't

8   that your best argument?

9            MR. LASKE:   It is.   It's the duration.

03:56  10           THE COURT:   If it's the case that it took, you know,

11  at a minimum 26 seconds, then there's a suggestion of

12  inattentiveness.   Really, it doesn't turn on whether the gauge

13  was showing or not showing.   26 seconds of constant filling.

14  That seems to me, you know --

03:56  15           MR. LASKE:   Yes, Your Honor.   We believe both testing

16  show that there probably was a significant period or at least a

17  period where Mr. Moore should have considered the fact that

18  either the gauge was working or not working, considered the

19  fact that for a small tire, he may not have known what the PSIs

03:56  20  were, but he had some understanding that the source was an air

21  compressor.

22           THE COURT:   Your witness, your mechanical engineer,

23  Mr. Deyerl, said there were telltale signs beyond the duration;

24  that one would have seen the expansion of the tire, one would

03:57  25  have noticed, if paying attention, that you could no longer

1    hear the air filling the tire.  Those are common, everyday

2    things.  I acknowledge that.  I've filled lots of tires myself,

3    and you get -- you know, the more air that goes in, the harder

4    it is to hear air going in because maybe none's going in

5    anymore.  He had some observations about not just the feel, but

6    the look of the tire, those things.

7       It seems to me that those are your best arguments on

8    comparative fault that could have been avoided if somebody was

9    doing what people usually do when they fill tires, which is do

10   it incrementally and check.

11        MR. LASKE:  And, Your Honor, even though they did

12   point to various times, none of the testing and none of the

13   evidence in the case is that the tire failed at 120 or even the

14   testing tires failed at 120.

15      Mr. Rondinone's tire failed at 136.  Mr. Deyerl's failed at

16   around 126 PSIs.  And the deposition transcripts, we submitted

17   the ones from the manufacturer, Ames True Temper.  If you were

18   to look at them, the testing that they did, which would include

19   back to the era of the tire that Ryan Moore was using, their

20   testing, they bring it to up 120 PSIs, they hold it for three

21   minutes, and then after three minutes, they add a PSI, and then

22   they add another one, and then they add another one, and even

23   in their testing, the testimony will be that it's never blown

24   at 120.  It's always blown at something above 120.

25        THE COURT:  Is that in the evidence now?  Was that

1    submitted evidence?

2         MR. LASKE:   That was submitted with to objection.

3    That was submitted on Wednesday afternoon, so if you have the

4    opportunity to look at that --

03:58    5         THE COURT:   I will.

6         MR. LASKE:   -- I think that that will also highlight

7    the fact that although we've been drawing the line at 120

8    because we know that's the safety factor that was built in,

9    that someone could go over 90 or above it, but even after that,

03:58   10   the company seemingly, through testing, has shown they probably

11   built in a little more as a safety factor.

12        THE COURT:   How would you -- assuming the Court gets

13   to an evaluation of comparative fault, how would you apportion

14   it in a case like this?  Let's assume that I think the

03:59   15   government has some responsibility because the PSI was

16   overloaded and nobody was really warned about that.

17        On the other hand, you know, as I said, I don't think you

18   get to the wheel failure without some inattention or doing

19   something that's really out of the ordinary in filling tires.

03:59   20   How would you apportion fault in this case?  What's your best

21   judgment on that given the evidence?

22        MR. LASKE:   I think, Your Honor, in this situation,

23   would primarily be Mr. Moore's fault.  If you did find an

24   apportionment, I don't think it's 1 percent/99 percent.  I'm

03:59   25   not necessarily suggesting that, but I think it's an amount

1    that substantially takes into account his contribution to it.

2         THE COURT:   Have you thought about what those

3    quotients are?

4         MR. LASKE:   I'm in a tough position because I don't

04:00   5    work for a private company, and those would require me to ask

6    any number of people to approve me openly stating a liability

7    figure, although I know this is a hypothetical, so I'm slightly

8    uncomfortable doing that.

9         THE COURT:   What's your suggestion if the court gets

04:00   10   to that point?  How would I decide on figures?  What would I

11   look to, I mean, besides the evidence itself?  Is there a

12   formula or instruction that talks about that in your

13   experience?

14        MR. LASKE:   Your Honor, I don't believe there is a

04:00   15   formula.  I mean, honestly I think it's just kind of the way

16   this case worked out and the circumstances, but this just

17   isn't -- I didn't come across a lot of cases in jury verdict

18   research or otherwise where the -- a tire explodes on someone.

19        For better or worse -- and in those cases when it does come

04:00   20   up, it's a company.  It's Ames True Temper that's the

21   defendant.  It's not the United States Border Patrol.

22        And so for me to kind of get to something, one, I don't

23   know that there is a way to just calculate it straight off

24   that, especially in this situation.

04:01   25        THE COURT:   All right.

1          MR. LASKE:  Your Honor, the government acknowledges

2    that initially the plaintiff's injures were severe.  I'm not

3    going to deny what you saw in those initial photos, but I think

4    what also has to be acknowledged is you've seen the plaintiff

04:01    5    the last couple days.  You've seen more recent photos, and all

6    things considered, he has -- definitely does not look like that

7    anymore.

8          I think something else to point out is, you know, in

9    addition to -- and we can all disagree on his level of

04:01   10    recovery, but he has had some level of recovery.

11          His counsel has stipulated with us that he's not seeking

12    any future lost earnings.  He's not taking a dime of future

13    lost earnings, so he's so bad in the future and all these

14    things are so bad that he believes he can still work, that he's

04:02   15    not going to seek a penny of future lost earnings.

16          THE COURT:  There's agreement on the past medical

17    costs with a caveat that the government disputes some of the --

18          MR. LASKE:  Dr. Kohani's dental --

19          THE COURT:  Yes, Dr. Kohani's bills.

04:02   20    What about, do you have an explanation for the difference

21    in past earnings?  Is your economist -- or you had him at 16,

22    the plaintiff has him at 24.

23          MR. LASKE:  Your Honor, under the FTCA, there is some

24    case law that says that you need to deduct for taxes, and we

04:02   25    can look for that case law and make it available to you.  And

1  actually I'm being informed that the case is *Shaw*, S-H-A-W,

2  *versus United States*.  It's a Ninth Circuit case.

3  Unfortunately, I do not know the reporter or the year, but I

4  can get that for you.

04:03   5  THE COURT:  You can send that in and give it to

6  counsel too.

7      But you say *Shaw* says in FTCA cases, the Court has to

8  deduct for taxes from an award of past lost earnings?

9  MR. LASKE:  Yes, Your Honor.

04:03   10  THE COURT:  All right.

11  MR. LASKE:  At least the Court should consider it, but

12  I think the case says the Court should.

13  THE COURT:  If that's not the case, I take it you're

14  in agreement with the plaintiff regarding the amount of past

04:03   15  lost earnings?  The only difference between you is whether

16  taxes should be withheld?

17  MR. LASKE:  We agree on the time period, so yes, if

18  the taxes issue went away.  I am not an economist, but I think

19  their math probably would be accurate.

04:03   20  THE COURT:  I would assume that if I do that, he

21  doesn't get double taxed, right?

22  MR. LASKE:  He shouldn't get double taxed, but I'm not

23  an accountant, so I can't share that.

24  THE COURT:  If the judgment says specifically this

04:03   25  past lost earnings includes a withholding or a deduction for

1    taxes, I wouldn't think IRS would say, "Well, you owe us taxes
2    again on this portion of any award," right?
3            MR. LASKE:  I can't speak on that, but I imagine if
4    that were put in, that definitely would go --
04:04
5            THE COURT:  If you could get me the citation.  You can
6    even email it to chambers and make sure that plaintiff's
7    counsel has a copy of it.  I want to read the case.  *Shaw*
8    *versus the United States?*
9            MR. LASKE:  Yes.
04:04
10           THE COURT:  Do you have a -- you don't have a date or
11   year?
12       Okay.  All right.
13           MR. LASKE:  Your Honor, I think you asked earlier, at
14   least as part of the past costs, "Didn't someone make some
04:04
15   comment about the CPT codes being adjusted?"  And there was
16   someone.  It was Dr. Kohani.  He admitted.  He said this was,
17   to him, a complicated case, so he entered in numbers or the
18   code.  It spit out a number, and he moved the number up.  He
19   admitted that.
04:04
20           THE COURT:  Do we know how much and which ones he
21   adjusted?
22           MR. LASKE:  Unfortunately, he didn't provide any
23   information in any reports.
24           THE COURT:  But you have access to the same codes,
04:04
25   right?

1    MR. LASKE:  We -- I could ask my life care planner to

2  look at it.  We didn't want to present something that hadn't

3  been presented before, and, again, maybe it was a mix-up, but

4  the bill that ultimately was relied on in this case, we believe

04:05    5  we didn't get that until about seven days before the trial.  I

6  could be wrong.  December was a very hectic time, and we got

7  moved at the last second, but at a minimum --

8    THE COURT:  Your recollection is he acknowledged that

9  he adjusted the set amount --

04:05   10    MR. LASKE:  Yeah.

11    THE COURT:  -- based on the codes?

12    MR. LASKE:  I believe he said he entered the codes, it

13  spit out a number.  He said, "This is a very complicated case."

14  He had a lot of people work with him, and he adjusted the

04:05   15  numbers up.  I don't know if he said every number, but I had

16  the understanding that it could potentially have been every

17  number or it could have been some.

18    THE COURT:  Okay.

19    MR. LASKE:  Focusing on -- so that's one of the

04:05   20  primary disagreements with the 119,000.  Obviously, to some

21  extent, we realize that Ryan Moore, based on his injuries,

22  getting new teeth was not unreasonable.  That's not what we're

23  arguing.  We're not arguing that he didn't need teeth, but we

24  do believe that based on the available different dentists

04:06   25  potentially in the area that if Ryan Moore had looked to those

1    people -- and, again, the standard for all of these things,

2    especially in a negligence claim, is reasonableness, even the

3    damages, reasonableness.  You know, you get into a

4    fender-bender with your Honda Civic.  You can't buy a Porsche.

04:06    5    You know.  It's one of those things where he had a right to

6    reasonable care, but was the charges Dr. Kohani was charging --

7    was that reasonable?  And that's what we'd question.

8    Going to future costs, we do have a difference in,

9    primarily, again, Dr. Kohani.

04:06    10    I would say a lot of the other cost are really not

11    variations in costs, as Ms. Engler said.  Different views by

12    different doctors.

13    But once you actually get to the costs -- and I think even

14    Ms. Casuto acknowledged medications, they're not that far

04:06    15    apart, 50 bucks here, maybe a hundred bucks there, but we're

16    not talking about thousands of dollars unless you add it up

17    over a lifetime.  The coupon thing, maybe it's available, maybe

18    it's not.

19    But I think the big cost at the end of the day, when I do

04:07    20    the math, it's -- and I think the economist has done it as

21    well -- it comes out to around 652,000.

22    I think Ms. Engler said 625, so it's between one of those

23    two numbers.

24    I think both Dr. Chess and Dr. Kohani agreed smoking is not

04:07    25    good for Agent Moore.  I think Dr. Kohani said on the stand

once he found out Agent Moore was smoking he said he told him
to stop.  He said, "That's not good.  That's not going to let
you keep the new teeth and maintain them.  It could lead to a
number of bad things, and the bad things will lead to
potentially more surgery or definitely more cost."

The reason we point it out is not to pin any blame on
Agent Moore, but I think with any plaintiff, you have to look
at whether or not they're mitigating their damages.

And if they're doing something that makes things worse for
them, when they have been informed that that's a potential
outcome, and they have some control over that -- because I
don't think there is any evidence that Agent Moore was a
lifetime smoker, that he smoked from a young age.

According to our dentist, Dr. Chess, when he met him in
November of 2015, he wasn't smoking, so I don't know if this is
an on-and-off thing or something that happened later, but it
does seem like it's something that should be accounted for to
the extent that failure to mitigate is an issue.

You know, as it relates to Dr. Kohani -- I'm sorry to go
back to that again -- Dr. Chess testified that, at least for
the past meds, he believed Dr. Kohani pulled two perfectly good
teeth.  Dr. Kohani kind of didn't address it.  He said that,
"The two images that I was using were bad images.  I shouldn't
have used them.  They don't show anything."  And he may have
answered the question.  I don't know that he did.

1    Dr. Chess said imaging, but he didn't just rely on imaging,

2    he said that he saw Agent Moore in November of 2015.  He

3    checked the contacts visually, he checked them with floss.  He

4    did something just beyond looking at an image.

5    THE COURT:  What was the -- what's the cost ascribed

6    to repairing the two teeth that you maintain should not have

7    been pulled?

8    MR. LASKE:  Your Honor, I would have to check the

9    billing records again.  I'm not as familiar because they were

10   more recently produced, but I could get you that number.

11   And as far as the future dental cost, we're not saying

12   zero.  Even Dr. Chess conceded that there is an amount that

13   should go to this, you know.  He suggested that there are ways

14   to clean these teeth, not to suggest that they were easy, but

15   there are ways to clean it.  It's not insurmountable, but the

16   government in their trial brief -- we've pointed out that we

17   agree to $70,000 of future dental care costs.  We just don't

18   think it's 652.

19   So I think everybody agrees.  I think plaintiff pointed it

20   out.  Mild traumatic brain injury.  But, in other words, a

21   concussion, loss of consciousness for less than 30 minutes, the

22   Glasgow Coma Scale, 14 out of 15, and 15 is the best you can

23   do, he has amnesia.  I don't think there's any doubt.  I don't

24   think he's masking it or hiding it.  I think if he could

25   remember, he would, kind of like if the government could

1    produce that air inflater, we would.

2        Because one way or the other, we're not a large company.

3    We're -- and Ryan Moore is our border patrol agent.  We would

4    also like to know what the truth is that day, and,

04:10  5    unfortunately, it just was not preserved, and I think you heard

6    evidence of a series of potentially mistakes or missteps, but

7    they were by people who don't commonly collect evidence.

8        More importantly, the CIIT group that did commonly collect

9    evidence had never seen a scene like this.  They never

04:11  10   responded to a call like this.  So as far as they knew,

11   explosion with a tire, they grabbed the tire.  I don't know if

12   they could have taken the air inflater and the hose off the

13   line because, as all reports are, it was behind a locked fence.

14   Plus to take it off the line, you would need tools, and you

04:11  15   would need to get beyond the fence to shut off the air.  You

16   couldn't just rip it out.

17          THE COURT:  I thought they came the next day when it

18   would have been daylight hours and the fence would have been

19   unlocked and people would have been available to shut that line

04:11  20   down?

21          MR. LASKE:  So the next day the lead garage mechanic

22   went out there, and one of the CIIT team members went out there

23   as well, but, again, at that time -- and for better or worse, I

24   don't think it was willful -- they did not consider that

04:11  25   evidence.  Now, in hindsight --

1       THE COURT:  No, they considered it evidence.  They

2   just didn't preserve it over the long haul because weren't the

3   instructions to take the hose offline and bag up the chuck?

4       MR. LASKE:  If the Court were to look back at the

04:12   5   record, the person who made that recommendation was not from

6   the CIIT team.  He was someone in charge of the garage VCOs.

7   He was someone in charge of the people who did the fuel pumps

8   and --

9       THE COURT:  Wasn't that Mr. -- I thought that was

04:12   10   Mr. Martinez said --

11       MR. LASKE:  It was Mr. Martinez, who also at the time

12   was a relatively close friend a Ryan Moore's.

13       THE COURT:  Right, but when was that ordered relative

14   to the date of the accident, date and time of the accident?

04:12   15       MR. LASKE:  I think it was after.  I think --

16       THE COURT:  No, I do too.

17       MR. LASKE:  I think it was the day --

18       THE COURT:  Yeah, the next day.

19       MR. LASKE:  Make Martinez ended up being the one

04:12   20   months later looking for it.  So, again, I don't think it was

21   something that falls under "willful" or "purposeful."

22       THE COURT:  Look it.  I don't think there was any

23   skullduggery involved.  That would be a real stretch here, but

24   the real question is, you know, the Court is permitted to draw

04:13   25   an inference here, and the damage that the absence of that has

1      is it's deprived the plaintiff of an opportunity to check the

2      gauge.

3          Now, again, I don't know how far that goes because, you

4      know, either the gauge was working or it wasn't working.  If it

04:13    5      was working, then -- and working, you know, correctly, then

6      maybe Agent Moore was, you know, not paying attention to it.

7      If it wasn't working, then we're back to the question of how

8      long it takes to blow the tire up and the wheel.

9          But, you know, shouldn't some play be given to that in that

04:13   10     it was in the government's control?  In a case like this, that

11     would have been pretty important.  That would have been central

12     evidence to hold onto, right?

13             MR. LASKE:  If the government knew there was a

14     lawsuit, but -- and I'd like to direct the Court's attention to

04:13   15     the complaint.

16             THE COURT:  Well, no, even before that, Martinez

17     recognized the importance of this.  That's why there was an

18     order to bag it and hold it.  I mean, that's a recognition that

19     it's important evidence regardless of what's going to follow,

04:14   20     right?

21             MR. LASKE:  Potentially, but my understanding, based

22     on the people involved, none of them were anyone who would know

23     if there would be a lawsuit coming.  I don't think they were

24     considering at the time a lawsuit and at the time that it was

04:14   25     bagged and put away.

1        THE COURT:  I don't think the latest discovery rules

2   require -- for a spoliation inference or instruction, I don't

3   think the latest discovery rules require a pending lawsuit.

4   They just require an understanding or an acknowledgement a

04:14  5   reasonable person would know that this is likely to be evidence

6   if there is a lawsuit filed or if there is an inquiry.  Isn't

7   that what the standard is now for spoliation?

8        MR. LASKE:  I believe it is very close to that if it

9   isn't that, Your Honor.

04:14  10       What I -- I guess the point I'm trying to make is even

11  though that may be part of the standard, the other part is what

12  was pointed out and I think was brought up in counsel's

13  closing.  Willful.  Willful, purposeful.  And, you know, for

14  this standard, maybe that is unfortunate for the plaintiff, but

04:15  15  I don't believe --

16       THE COURT:  That doesn't mean the same as monovalent

17  or intentional, right?

18       MR. LASKE:  I think there has to be some intent to

19  fall under "willful" or "purposeful."  I don't think it can be

04:15  20  a mistake.

21       THE COURT:  You acknowledge -- no, not just a mistake,

22  but you acknowledged earlier that negligence would suffice.  I

23  know it's a sliding scale.  The more deliberate it is, the more

24  there is a purpose to prevent the other side from having it or

04:15  25  to gain an advantage, the stronger the inference is that should

1   be held against that side, but negligence qualifies at the

2   other end of the scale, right?

3           MR. LASKE:  I don't know if that's -- I guess I would

4   have to take another look, but I haven't considered that.

04:15   5           THE COURT:  I think that's true, Mr. Laske.  I think

6   negligence justifies a permissive inference at least, and

7   that's all the plaintiffs have asked for.  They haven't put it

8   in the form of a mandatory presumption, just a permissive

9   inference.

04:16   10           MR. LASKE:  I think if the Court were to make that

11   inference, I still think that, like you mentioned earlier, the

12   government's biggest argument is it's the duration of it.  Even

13   if it wasn't working, whether it's stuck on a number, it didn't

14   move, it didn't read at all, there was time for Ryan Moore to

04:16   15   realize it.  Most people when they inflate things -- again, we

16   don't have any evidence of it -- for this to even give any

17   reading, you have to put it on an object.  And at a minimum, he

18   would have at least had that moment because it doesn't start

19   the moment you put it on.  It doesn't start until you push it

04:16   20   down with your other hand.  So he has that moment, second or

21   two or more, to look at the gauge.

22       Now, whether he did that, I don't know.  Whether it read

23   something, I don't know.  But he would at least have that

24   moment at a minimum, and so we just think that even if there

04:16   25   was an inference, what is the inference to draw?  It's somewhat

1   speculative, and that's, I guess, a secondary argument to that.

2        Did you have anymore questions, Your Honor?

3        THE COURT:   Not on that subject, but you have not

4   addressed their pain and suffering and future --

04:17   5        MR. LASKE:   I was going to keep going.

6        THE COURT:   Go ahead, please.

7        MR. LASKE:   So I think we were -- or at least I was

8   talking a little bit about the concussion, at least I think

9   that's what the government will concede.   It was at least the

04:17   10  level of a concussion, and he does have amnesia, seemingly

11  short term, but I do understand that the plaintiff is arguing

12  it's longer term.

13       The MRI showed microbleeding, but it is a super sensitive

14  scan, the 3 Tesla MRI, and despite whatever any scan shows, no

04:17   15  single test or scan can replace complete neurological exams.

16       The prognosis for mild traumatic brain injury, can --

17  someone can return to work.   They can function in daily life.

18  There can be no expectation of significant deterioration in

19  years after the injury.   That's speculation.   That's our

04:18   20  position.

21       Dr. Lobatz mentioned vaguely some recent study, but if it

22  was such a key study and if it really does say what he believes

23  it did say, he didn't bring it to court.   He didn't remember

24  its name.   He didn't remember any specifics to give to the

04:18   25  Court and put on the record.   Instead, I'm not doubting his

1  abilities, but it does leave us in a spot where it's hard to

2  confirm.   Plaintiff's real-world functioning shows no cognitive

3  impairment.  He drives.  He lives alone.  Even though they're

4  saying that those are minor things, those are major life things

04:18  5  to be able to handle those functions.  He works as a border

6  patrol agent.  You heard from Supervisor Martin Del Campo

7  surveillance isn't just as easy as turning on the car and

8  driving straight.  You have to pass off, you have to make

9  decisions as to are you going to get close?  Far away?  Are you

04:19  10  going to position yourself between other moving cars who you

11  don't know who's in those other cars?  You have to predict for

12  their unpredictability.  Pedestrians, traffic lights.  And then

13  if you do pass off, you're not with a partner.  You've got to

14  pick up the radio, hold the radio while you're driving, make

04:19  15  the decision, make the call, and make those types of snap

16  decisions.  These are not slow, progressive decisions.

17          THE COURT:  You say "snap decisions."  As I understood

18  the plaintiff's evidence on this, the gist of it was that he's

19  slower at processing things than he was before, so maybe it

04:19  20  forecloses making snap decisions.  The processing, he

21  eventually gets to it, but it's slower.  It's different from

22  the way it was before this accident.

23          MR. LASKE:  And I guess the government's argument is

24  based on his work life that people have observed, they haven't

04:19  25  noticed that, noticed it to a degree that would affect the

1    surveillance.

2        Why would you put someone in the stack with a gun going

3    into someone's house who doesn't want you to go in their house

4    if you didn't think he could process information fast enough to

04:20    5    make important, potentially life-and-death decisions?  Now,

6    maybe that decision never came to pass, but before you knock on

7    that door, you don't know.

8        He was at least on two arrests.  He was, at least according

9    to Jose Martin Del Campo, on eight to ten entries.  I think

04:20    10    more recently it sounds like he's at least been involved with

11    some things that would require someone to use judgment,

12    decision-making, and critical thinking.  None of his

13    supervisors have picked up on this.

14        He says he purposely hasn't self-reported, but even if he

04:20    15    wasn't self-reporting, I guess the plaintiff is asking the

16    Court to consider it a fact where people around him who are

17    doing a job that is very dangerous would ignore any signs of

18    any cognitive impairment themselves, even though they may not

19    know those terms, that they would just passingly ignore what's

04:21    20    going on with an agent who carries a gun and potentially has to

21    be one of their team members.

22        There are no reports of problems.  No coworkers have come

23    up to any of the supervisors to express concern about him.

24        He's able to do things like banking.  He can do his taxes.

04:21    25    Neurological testing showed there was no cognitive impairment.

90 percent of Dr. Evans' result were in the grossly average
range.  Dr. Markel's results were in accord as well.

The memory scores were, in fact, in the superior range, and
Dr. Koransky's scores also normal.

And there was some indication by all of the doctors that
the plaintiff had a tendency to over-report at times.

Emotional and psychiatric issues, post-traumatic stress
disorder.  Dr. Koransky bases his diagnosis on psychiatric
testing, but his validity indices were significantly elevated.
They showed exaggeration.  They made the test results
unreliable.

And plaintiff doesn't meet the DSM-5 diagnostic criteria
for PTSD because he doesn't remember the accident.  I know
there were examples of rape and IEDs, and those are very
horrific things.  But there's just no indication that plaintiff
can't be around some place where he's filling a tire if he
hears a loud bang that that disturbed him.

You heard from Martin Del Campo that to qualify, which he's
capable of doing, he has to fire a gun 72 times, bang, bang,
bang, bang, and I'm assuming that night of the accident, there
was a loud bang.

Plaintiff is not having any intrusive memories of the tire
accident.  There's no indication.  He has never said once in
deposition or in his testimony that he can't go to the station
and go to the area where the accident happened, that that

petrifies him, that he shakes in his bones because of it.

Certainly, he sounds like he has depression, and I think the doctors agree to some level of that. He has some anxiety as well, but it's not 100 percent from the accident. I think like most people's lives, like Dr. Evans was trying to describe, there are multiple factors that can go into anxiety and depression. It's not always linked to one thing.

He had issues that were not from the accident itself, although may have been slightly accident related.

But the Worker's Comp issue, that was a decision made by the Department of Labor in Washington D.C.

Seeing a lot of doctors. That was a circumstance of his road to recovery, which he has completed as far as we've heard.

No one indicates that Dr. Kohani is going to have to go in there or anyone is going to have to go in there and drill anymore rods or do anything that's painful in the near future.

And the lawsuit itself. The lawsuit is stressful. Litigation is stressful. It's managed by medication well enough where he can work. He's been able to show up. Whether he's working his hardest to get himself to work, he's able to do it. And he's not working a job where it's a 9:00 to 5:00 and it's just simple task. He's working a job that requires a number of things, and he's often working ten-hour days, and he's driving some version of a half an hour or so, one way. He also drives within his job.

1    THE COURT:  Let's assume that he doesn't have PTSD.
2  Dr. Evans still determined that he had a diagnosable mental
3  disorder, and he gave me the title for it.  I can't remember
4  what it was.

04:25  5    MR. LASKE:  I don't remember the exact title, but I
6  think it was some level of anxiety and depression.

7    THE COURT:  Yeah, but, nonetheless, one recognized by
8  DSM-5, it may not be the precise one that the other two doctors
9  hit on.

04:25  10    So if that's the case, what's your argument regarding the
11  claimed pain and suffering, physical impairment, going forward
12  damages for the accident?

13    MR. LASKE:  I think, again, some of this is maybe hard
14  to determine.

04:25  15    We did hear a lot of testimony from the plaintiff, but I
16  think it does at least have to be balanced by the fact that all
17  of the experts have had a chance to interact with him have
18  reported some level of overexaggeration.  Now, that's not the
19  same as malingering.  Malingering is saying, "I broke my arm,"
04:25  20  and my arm is perfectly fine.  That's not what we're saying.

21    But we are saying that he's taking something where maybe he
22  is a 2 on a scale of 10, and he's trying to portray it as a 12.
23  Is he a 2?  Is he a 3?  I don't know.

24    But we think that there were certain things that will
04:26  25  hopefully alleviate that.  I think Dr. Evans believes that a

1   lot of it's focused on the lawsuit.  I know they disagree with

2   that, but there are things that have come to pass.  There are

3   times that, you know -- again, one of the things that I think

4   he was primarily concerned with was future surgery.  He doesn't

04:26   5   have any future surgery scheduled, at least there was no

6   testimony of any future surgery scheduled.  He has his teeth.

7   He mentioned something about having to go back to Chula Vista,

8   but we heard testimony from his FBI supervisor that if he

9   applied for an extension, he would back him on that extension.

04:26   10   THE COURT:  What do you say about the specific claims

11   that were serially made under the future damages, pain and

12   suffering, physical pain, physical impairment, disfigurement,

13   inconvenience, humiliation, anxiety, emotional distress, mental

14   suffering, loss of enjoyment of life?  What's the government's

04:27   15   position on those factors?

16   MR. LASKE:  I think -- initially I think we can

17   concede that initially he had a lot of those things, but I

18   think once he started the road to recovery, those lessened.

19   Once he started going back to work, once he started trying

04:27   20   to -- and once he was able to live by himself, once he was able

21   to drive more regularly, once people weren't living with him to

22   help care for him.  I imagine there were days where it was bad,

23   but there were days that it seemingly was better.

24   THE COURT:  Mr. Chambers tied it into the period of

04:27   25   time between the accident and today, some 1300 days and

1    reminded me of some of the testimony about operations,

2    particularly in the upper palate where it had to be grafted,

3    very painful things.  If the government is found to be liable,

4    is the plaintiff entitled to awards for that pain and suffering

04:28    5    in that interim between the accident and today?

6                MR. LASKE:  We wouldn't ignore that fact except for I

7    would put the caveat that a lot of those painful procedures,

8    like the last one with the palate with Dr. Machado, that's

9    around July 2015.

04:28    10                THE COURT:  Right.

11                MR. LASKE:  That's not, you know, February or March

12    2017.

13                THE COURT:  If the government's liable, there should

14    be compensation for that pain and suffering in the interim,

04:28    15    right?

16                MR. LASKE:  I think the pain and suffering exists as

17    an award, and we would leave it to the Court to make its

18    appropriate finding, but yes, we're not taking the unreasonable

19    position that pain and suffering in this case is zero.

04:28    20                THE COURT:  I'm still a little confused about, you

21    know, giving different titles to this -- to awards that

22    essentially capture the same things.  I mean, I can obviously

23    distinguish between physical pain, physical impairment.  I'm

24    not so sure disfigurement.  Yeah, I probably could do that too,

04:29    25    although physical impairment.  But I'm hung up a little bit

1  here on humiliation, anxiety, emotional distress, mental

2  suffering.  All those things, those titles, those words, seem

3  to be different ways of describing the same set of phenomena.

4       MR. LASKE:  I think, Your Honor, in this case, and

04:29  5  maybe there is a distinction between those titles, but in this

6  case, I don't think we've heard any evidence that would draw

7  that distinction for Agent Moore.

8       THE COURT:  So your position is that -- I mean,

9  acknowledging that he may be slower in processing, you don't

04:29  10  think he has any ongoing brain injury that would entitle him to

11  future damages?

12      MR. LASKE:  And I think kind of a telling tale is the

13  fact that the plaintiff themselves have stipulated away future

14  lost earnings.

04:30  15      THE COURT:  All right.  Anything else, Mr. Laske?

16      MR. LASKE:  I think that's it, Your Honor.  Again, I

17  thank everyone for their time, and the United States rests.

18      THE COURT:  Okay.  Thank you, Mr. Laske.

19      You're over your time.  I'll give you five minutes, though,

04:30  20  to reply if you want to take it.

21      MR. LASKE:  Can I just say one quick thing?

22      THE COURT:  Of course, you can.

23      MR. LASKE:  We did find the case.  I guess it's an old

24  one.

04:30  25      THE COURT:  This is *Shaw*?

1    MR. LASKE:   Yeah.   Yes, *Shaw versus The United States,*
2    741 F 2 D, so F.2d --
3    THE COURT:   Wait.   Only a guy that wasn't around when
4    F.2ds were published would call it F 2 D.   F.2d.
04:30    5    MR. LASKE:   F.2d 1202, Ninth Circuit, 1984.
6    THE COURT:   Yeah, I was around then.
7    MR. LASKE:   I went to law school where I had to learn
8    on books.
9    THE COURT:   We'll look at that case.
04:30   10    Mr. Chambers, anything more?
11    MR. CHAMBERS:   Unless the Court has specific
12    questions, I mean, I can address virtually everything he just
13    said, but in the interest of time, I'm happy to answer any
14    questions.
04:31   15    THE COURT:   I don't.   You're over.   If there's any
16    particular point that you think you have some rebuttal evidence
17    or something you should have said, I'm happy to entertain that.
18    As I said, I'm not going to be a meathead about these time
19    limits, and ordinarily I would give plaintiff rebuttal, but
04:31   20    I'll leave it to your good judgment.   If you're satisfied with
21    the presentation that's been made, including the argument, then
22    the matter can be submitted, and I'll render a judgment on
23    Monday.
24    MR. CHAMBERS:   I think the Court's got a pretty good
04:31   25    grasp of the case at this point.

1064

04:31

1    THE COURT:   I hope so.   I've tried to pay careful
2    attention.   I haven't completed my review of all of the things
3    that were submitted, including the deposition excerpts, but I
4    intend to do that over the weekend along with looking at the
5    cases.

6        Okay.   The matter then is now submitted.   The Court will
7    render judgment, at least oral judgment, Monday at 12 -- have
8    you checked your schedule, Mr. Laske?

9        MR. LASKE:   Sorry.   I didn't say that.   I told your
10   clerk, but I didn't have a chance to tell you that I am free.
11   I will be here at 12:15 on Monday.

12       THE COURT:   Okay.   Are you both from Los Angeles?

13       MR. LASKE:   We are.   This happened to be a recusal
14   case.

15       THE COURT:   Okay.   So you're with the U.S. Attorney's
16   office in LA, both of you?

17       MR. LASKE:   Yes, with the Central District.

18       THE COURT:   Oh, okay.   All right.

19       Where have you been staying when you're down here?

20       MR. LASKE:   Different hotels because I guess it was a
21   busy week.

22       THE COURT:   Oh, you were getting bounced.   That's
23   inconvenient.

24       MR. LASKE:   He had the journey to Mission Valley where
25   I think there was flooding.

1          THE COURT:  Well, welcome.  I've been kind of out of

2     touch with the civil division over there.  I thought I knew

3     most of the lawyers.  I just figured you guys were new guys

4     there.  I didn't realize until yesterday, I don't think,

04:32 5     when -- or maybe it was today when you told me you had to check

6     your schedule that you weren't local assistants.  But welcome.

7     I hope you feel you were treated fairly and not hometowned.

8          Okay.  We'll see you Monday then at 12:15.

9          The matter is submitted.  The Court will give an oral

04:33 10    pronouncement of judgment at that time to be followed by

11    written findings of fact and a written judgment.

12          MR. CHAMBERS:  Thank you.

13          THE COURT:  Have a nice weekend all.

14          MR. LASKE:  Have a nice weekend.

15                        ---OOO---

16

17

18

19

20

21

22

23

24

25

1    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        We certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated March 3, 2017, at San Diego, California.

7

8
                     /s/ Dana Peabody
9                    Dana Peabody, RDR, CRR

10
                     /s/ Cynthia R. Ott
11                   Cynthia R. Ott, RDR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25