```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   RYAN MOORE,                      )
                                      )
 4        Plaintiff,                  )  No. 15-CV-0075-LAB
                                      )
 5            v.                      )  March 1, 2017
                                      )
 6   UNITED STATES OF AMERICA and DOES )  1:21 p.m.
     I THROUGH 25, INCLUSIVE,         )
 7                                    )  San Diego, California
          Defendants.                )
 8   _____

 9
                     TRANSCRIPT OF BENCH TRIAL - DAY TWO
10              BEFORE THE HONORABLE LARRY ALAN BURNS
                   UNITED STATES DISTRICT JUDGE
11             (Afternoon Session, 1:21 to 3:20 p.m.)

12   APPEARANCES:

13   For the Plaintiff:       GOMEZ TRIAL ATTORNEYS
                              ROBERT J. CHAMBERS
14                            BEN WOHLFEIL
                              655 West Broadway, Suite 1700
15                            San Diego, CA 92101

16   For the Defendant:       TIM L. LASKE
                              GARRETT J. COYLE
17                            ASSISTANT UNITED STATES ATTORNEYS
                              Federal Building, Suite 7516
18                            300 North Los Angeles Street
                              Los Angeles, CA 90012
19

20

21

22   Court Reporter:          Melinda S. Setterman, RPR, CRR
                              District Court Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California, 92101
24                            melinda_setterman@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1                            INDEX

 2
     TESTIMONY:
 3
     WITNESS:            EXAMINATION BY:                PAGE:
 4
     Nancy Markel
 5               Direct Exam by Mr. Chambers................396
                 Cross Exam by Mr. Coyle....................416
 6               Redirect Exam by Mr. Chambers.............436
                 Recross Exam by Mr. Coyle.................439
 7
     Adam Moore
 8               Direct Exam by Mr. Wohlfeil...............444
                 Cross Exam by Mr. Laske...................470
 9
     Doreen Casuto
10               Direct Exam by Mr. Wohlfeil...............472
                 Cross Exam by Mr. Laske...................481
11
12   EXHIBITS:

13    (None marked and/or admitted)

14
15                            *  *  *  *
16
17
18
19
20
21
22
23
24
25
```

```
 1          SAN DIEGO, CALIFORNIA, MARCH 1, 2017, 1:21 P.M.
 2                              *  *  *  *
 3      (Proceedings resume following the lunch recess.)
 4          THE COURT:  All right.  Counsel and the parties are
 5  here.
 6          The plaintiff may call its next witness.
 7          MR CHAMBERS:  Your Honor, we would like to call Nancy
 8  Markel.
 9          THE CLERK:  Can you please raise your right hand.
10      (Oath administered.)
11          THE WITNESS:  I do.
12          THE CLERK:  Thank you.  Please take a seat, and please
13  speak into the microphone at all times.  Can you please state
14  and spell your first and last name for the record.
15          THE WITNESS:  Nancy, N-A-N-C-Y, Markel, M-A-R-K-E-L.
16                          NANCY MARKEL,
17                       DIRECT EXAMINATION
18  BY MR CHAMBERS:
19  Q.  Good afternoon, Dr. Markel.
20  A.  Good afternoon.
21  Q.  You are a neuropsychologist.
22  A.  I am.
23  Q.  Can you tell us how that differs from an ordinary
24  psychologist?
25  A.  Well, we get the same training as a regular psychologist,
```

1    but we then go onto advance training in brain functioning and

2    the relationship between the brain and behavior, and we do more

3    exhaustive training in that testing and interpreting the

4    testing data and in understanding what behavior may be driven

01:23    5    by brain functioning.

6    Q.   What sort of specific experience do you have treating brain

7    injury patients?

8    A.   I did all my post-doctoral hours in neuropsychology, and I

9    worked in that field for many years, and then for 11 years

01:23    10   specifically I worked at Sharp Rehabilitation Center, which is

11   an acute inpatient rehab center as well as an outpatient center

12   for people who have undergone traumatic brain injuries,

13   including brain injuries.

14   Q.   In this case you were tasked with performing a

01:23    15   neuropsychological evaluation of Mr. Moore.

16   A.   That's correct.

17   Q.   And you spent a couple days doing that?

18   A.   Two days.

19   Q.   Do you recall when that was?

01:23    20   A.   I believe it December of 2015, December 1st, December 3rd.

21   Q.   What is a neuropsychological evaluation?

22   A.   Well, depending on the case and the patient and the

23   presenting problems, it usually consists of doing a very

24   careful history taking and record review of -- specific in this

01:23    25   instance, hospital records and other records that were --

|          |    |                                                                 |
|----------|----|-----------------------------------------------------------------|
|          | 1  | MR CHAMBERS:  We lost the mic.                                  |
|          | 2  | THE COURT:  I may have done it.  I think I touched it.          |
|          | 3  | I was trying to clean the screen off.                           |
|          | 4  | I'm sorry, doctor.  Try it now.                                 |
| 01:24    | 5  | THE WITNESS:  Can you hear me?  I can speak loud.               |
|          | 6  | I've emptied a room before.  I have never quieted it.           |
|          | 7  | THE COURT:  Again, I apologize.  I was trying to clean          |
|          | 8  | the dirty screen off and I must have pushed the button.         |
|          | 9  | Go ahead.                                                       |
| 01:24    | 10 | THE WITNESS:  Where was I?                                      |
|          | 11 | BY MR CHAMBERS:                                                 |
|          | 12 | Q.  You were in the midst of explaining what a                  |
|          | 13 | neuropsychological evaluation entails?                          |
|          | 14 | A.  Consists of history taking, record reviews, the performance |
| 01:24    | 15 | and administration of various tests, the scoring of those       |
|          | 16 | tests, the interpretation of those tests.  That is just the     |
|          | 17 | barebones of a neuropsychological evaluation.                   |
|          | 18 | Q.  We'll dig into it here in a minute, but during your history |
|          | 19 | taking and the administration of your tests over the course of  |
| 01:25    | 20 | those two days, did you have validity measures and truthfulness |
|          | 21 | measures and all that built into your testing?                  |
|          | 22 | A.  Yes, imbedded into any comprehensive neuropsychological     |
|          | 23 | evaluation are measures of a person's ability to give good      |
|          | 24 | effort during testing because the one thing you want know when  |
| 01:25    | 25 | you are interpreting the test scores is this a person's valid   |

1    responses to these tasks, or are they trying to exaggerate or

2    feign problems that they may not have.

3        So there is some measures that we call stand-alone

4    measures, that is, that is all their intention is to do looking

01:25    5    at effort, and there are what we call embedded measures, that

6    are measures that are embedded within other forms of a test and

7    parse out whether a person is giving good effort.

8        Those were administered intermittently over the course of

9    the two days.  Mr. Moore passed every single one of them.

01:25   10   Q.  Did you find him to be truthful both on your history and

11   testing?

12   A.  He was very forthcoming.  He was very truthful both in the

13   history taking and the test taking and in discussing his past.

14   I mean, he was volunteering information that I hadn't even know

01:26   15   to ask.  For instance, during the history taking, he informed

16   me of an accident that had occurred several years before, the

17   one that brought him to my office in which he had been -- had

18   to go to trial on that and explained what happened there, so I

19   found him to be a very forthcoming and upstanding in terms of

01:26   20   giving me valid information.

21   Q.  All right.  Well, let's turn to your testing then.  There

22   are binders behind you.  If you would prefer a paper copy of

23   your report, I am happy to bring it up on the screen.

24       Why don't we get it up 135 on the screen, please.

01:26   25   A.  Which binder would I go to?

1    Q.   It should have numbers.   135 is the exhibit number.

2    A.   It was right there.   Sorry.

3    Q.   We can scroll up and down depending on what page you are

4    looking at.

01:27   5    A.   Can I turn the sound off then?   Sorry.

6    Q.   Why don't you tell us what you did.

7    A.   Well, what I've done here is I just started out in my

8    report talking about what brought him to be referred to me and

9    then did a history based on what he was able to tell me, and

01:27   10   then I think from there I went into not just the background of

11   what he could tell me about the accident which led to this

12   evaluation but also about his background information, that is,

13   his family background, history taking, and that sense.

14       And from there I then wanted to go and become more current,

01:27   15   okay, since can the accident what has happened, so he gave me

16   the information regarding his current status, and included in

17   that was a form I had him complete which is called the signs

18   and symptoms form, which allows him to go through various

19   aspects of functioning, cognitive functioning, emotional

01:28   20   functioning, behavioral functioning, pain functioning.   That

21   talks about what he perceived his abilities were before and

22   what they are like after, so you can do a comparison.

23       That has no validity measures on it.   It is just his own

24   self-report and his own perception of his ability or lack of

01:28   25   ability, and it was fairly consistent with everything else I

1    had seen in the records.

2    Q.  All right.  Well, why don't we move to your findings, and

3    then you can kind of supplement and explain how you got there.

4    What were your findings with respect to your neuropsychological

01:28   5    evaluation of Ryan Moore?

6    A.  Well, this was interesting because two days of testing --

7    there were a lot of tests that were administered.  You get a

8    lot of scores.  And at the end of the day when I went through

9    everything and I looked at all the scores, there were just some

01:28   10   very what we call in my world lovely scores.  They were

11   average, above average.  Anybody would be happy to have those

12   scores.

13       But among the scores, there were a couple standouts that I

14   found, okay, now this is unusual because it wasn't what I had

01:29   15   initially expected.  One of the things that Mr. Moore had

16   talked about in terms of some of his own complaints about what

17   he felt his changes were included problems with memory,

18   problems being slower in processing, some problems with word

19   recall.

01:29   20       And when I looked at, for instance, some of the memory

21   scores, they were remarkably strong.  Now, the one thing I had

22   to bear in mind was that Mr. Moore had just been tested one

23   month prior to my evaluation.  Many of the tests that I gave

24   were the same tests that he had been given before.

01:29   25       One month is a very short time between testing and

1   retesting, so we have what we call practice effects, and there

2   are certain areas that we expect will do better because a

3   person has just done the same task a very few weeks ago.

4   Q.   The person that performed the test a month before you, that

01:29   5   was the defense expert?

6   A.   That's correct, Dr. Evans.   Where I could, I tried to use

7   an alternate form, but many of our tests don't provide for that

8   so you are stuck with what you have.

9        Be that said, there were certain consistencies both in my

01:30   10   testing and Dr. Evans' testing that stood out, so one of the

11   areas that showed up to have a strong component of a part of

12   the brain functioning that we know is vulnerable to a brain

13   injury is called processing speed.

14        In the general intelligence tests, there is a certain

01:30   15   aspect of that test that measures processing speed.   It was Mr.

16   Moore's lowest score when he was tested by Dr. Evans, and it

17   was a borderline level score.   I think it came in at the 8th

18   percentile, and his general intelligence was strong average, so

19   that stood out as a very low score.

01:30   20        In my testing it was a little bit better, and that is

21   because of practice effect.   We expect that.   We know in the

22   literature it says people tested and retested on this may do

23   better the second time.   He did, but it was still his lowest

24   score.

01:30   25        And then when you look at a way of measuring, okay, is this

1    lower score something that is unusual, or is it something that

2    could just be a normal variant?  In other words, people have

3    individual differences.  Some days they are better than other

4    days.  Well, one of the measures that measures that said that,

01:31  5    wait a minute, no, this is very unusual.  It happens very

6    rarely in a general normative population.

7        So again, bing, that is a strike.  You are looking at

8    saying, okay, this is telling me that vulnerable area in the

9    brain is weakness for him.

01:31  10       There were several others that stood out, and that is word

11   recall.  He did poorly for Dr. Evans.  He did poorly for me.

12       Another area was attention.  I looked at attention more

13   thoroughly than Dr. Evans did.  I gave some tests that were not

14   administered to Mr. Moore in Evan's evaluation, and there were

01:31  15   problems with visual attention and what we call vigilance.  He

16   was accurate on one test, but he was slow.

17       So that again is telling me, again, in order to be accurate

18   he had to slow down.  He wasn't as speedy as we would have

19   expected.  And he is being compared to people his own age and

01:32  20   his own education.  So this again was a stand out.

21       And one of the most striking things was something that is

22   highly unusual and that is, his memory for stories.  His memory

23   for visual designs was very strong, but the unusual thing was

24   his immediate memory was not as good as his delayed memory.

01:32  25       That is something we don't expect.  We expect, you know,

 1    your immediate memory, if I tell you a story and I ask you to

 2    tell it back to me immediately, I think that is going to be

 3    your best memory.  If I wait, I do a delay, and in the

 4    neuropsychological world that is maybe 30 minutes, we expect

01:32   5    the delay to not be as good as your immediate because time

 6    should decay some of those memory traces.

 7        But his delay was stronger.  Both visually and verbally was

 8    stronger than his immediate.  And I had to ask myself, why

 9    would that be?  And the answer is clear.  It is taking his

01:33  10    brain longer to consolidate information.  Pathways that should

11    have been there that would have been efficient for immediate

12    memory weren't available, so his brain had to use other

13    pathways to get it and consolidate it into memory, and that is

14    why 30 minutes later it is stronger.

01:33  15        So, again, I am seeing consistencies in certain areas.  I

16    am seeing strange results, opposite what we would expect.  And

17    then on top of which I am seeing some emotional and some

18    psychological issues that have a flavor in my clinical

19    experience -- I've been doing this for 35 years -- that the

01:33  20    emotional response that certainly somebody whose undergone the

21    trauma that he's undergone, I expect to have some emotional

22    sequela.

23        I expect maybe some depression, maybe some anxiety, maybe

24    post-traumatic stress disorder, but there was a flavor here

01:33  25    that there was a perception of something that had just a

1    distinct different quality to it.

2        And I am lucky to have lived long enough that we now have

3    imaging studies that now can correlate, hey, what am I getting

4    on testing and what are we seeing in brain imaging?  When I

01:34    5    looked at the brain imaging results, it made perfect sense to

6    me.  The areas of brain that were showing up to be abnormal

7    were consistent with my findings.

8        They were consistent with the areas of the temporal lobe

9    which we know, number one, has to do with areas of word recall.

01:34    10    Okay, we have that on Evans and on mine.  It has to do with

11    emotional functioning, not just the reaction to an event, but

12    the brain's capacity to deal with emotions.  That is an injured

13    part of Mr. Moore's brain, and that explains why the perception

14    of this injury has a flavor for change different than just a

01:34    15    normal reaction of depression.  It is an organic injury.  It is

16    structural in the brain that has been hurt.

17        So on top of everything else, it exchanges the slowness of

18    the processing.  It explains why it takes the brain a little

19    bit longer, and it will also explain why he is fatigued at the

01:35    20    end of the day.  He is putting everything that he has into

21    being a good worker, but at the end of the day he is -- pardon

22    the expression -- wasted.  He's used up all his reserve.

23        He should be a healthy, you know, vibrant man in his close

24    to 40s, and yet at the end of a workday he is wiped out and he

01:35    25    has no energy left to do anything.  On top of which he also has

1    very little motivation.

2         Well, one of the areas of his brain that has been impacted

3    is the frontal lobes, and one of the things we know the frontal

4    lobes orbits is are motivation, and that has been one of his

01:35    5    complaints, that he just doesn't feel motivated to do things.

6         So the combination of my test results linked with what I

7    saw in the results of the imaging that sort of made sense and

8    went hand in hand and it told me the picture of what has gone

9    here and explained everything to me.

01:36    10   Q.   And what was your ultimately diagnosis -- or diagnoses?

11   A.   I used the new DSM-5 diagnostic criteria, and what I

12   diagnosed was a mild cognitive disorder due to traumatic brain

13   injury, and it was associated with other factors that I felt

14   were also part of the brain injury, that is, major depression

01:36    15   which had already been diagnosed and was currently being

16   treated; post-traumatic stress disorder that had already been

17   diagnosed and was being treated; and anxiety disorder that was

18   also being treated.

19        I didn't get into any of the physical injuries.  That is

01:36    20   beyond my scope of expertise.

21   Q.   And how were you able to arrive at that diagnosis with just

22   the few tests that you mentioned being abnormal?

23   A.   Well, I suppose that is one way of looking at it with just

24   a couple tests that are abnormal, but that is not how -- that

01:36    25   is not how the diagnostic criteria work.  You have to meet -- I

01:37

think in my rebuttal report I talked about the exact criteria that he met in terms of that diagnosis, that there was a decline in cognitive functioning that you could see both in neuropsychological testing as well as imaging, so he met those criteria.  So that is the first hoop that you have to jump through to make the diagnosis of a mild cognitive disorder.

Then specific to the traumatic brain injury, we have the history of the injury.  He had a blunt injury to his face, and we also know because of the experience of that it was also, I

01:37

believe, a blast injury.  And we know from our studies of the Iraqi War veterans who are coming up with blast injuries, it has opened up to the whole world of what is happening to a brain that has been exposed to forces.

So he has both I think a blunt as well as blast injury that

01:37

is affected, which is why the external sheering injury that he has in the imaging why it is diffuse.  It is all over the brain.

Q.  And you've spoken with Dr. Lobatz?

A.  Yes, I have.

01:38

Q.  About Ryan's case?

A.  Exactly.

Q.  He has explained to you what you are explaining to us now from a neurologic standpoint?

A.  We shared our data.  I gave him my findings, and he shared

01:38

what the imaging studies was, and they went together.

1    Q.   So what about Ryan's history played into your diagnosis, if

2    anything?

3    A.   Well, up until this injury, from everything that I could

4    tell and from the records that I've seen is that this young man

01:38   5    was on an upward trajectory.   He had been the first in his

6    academy for the Border Patrol.   He ways doing quite well as an

7    agent.   His career goal was to become a criminal investigator,

8    and his trajectory from everything that I could tell was headed

9    straight in that area.   This changed things.

01:38   10   Q.   How did it change them?

11   A.   Well, I don't know what the Border Patrol is like in terms

12   of somebody who's had the kind of injury he's had, but in terms

13   of just the psychological and psychiatric injuries that he has

14   sustained, I don't know that that same trajectory is in his

01:39   15   future.   I think he comes now with a history in which he's been

16   injured.   He's been hurt.

17        One of the things we know about somebody who's had this

18   kind of brain injury is that an injured brain ages.   It ages

19   differently than a normal brain aging.

01:39   20        MR. COYLE:   Objection, Your Honor, to the testimony

21   the job trajectory.   There has been no foundation laid that

22   this witness knows anything about his ability to progress in

23   the Border Patrol.

24        THE COURT:   Sustained.

01:39   25        MR. COYLE:   Motion to strike.

409

```
            1           THE COURT:  Yeah.  The last portion of the answer to
            2   which the objection refers is stricken.
            3           Next question.
            4   BY MR CHAMBERS:
01:39       5   Q.  During your history taking with Mr. Moore, did you discuss
            6   his career?
            7   A.  I asked him about his career and what his current career
            8   was and what his plans were for the future.
            9   Q.  And what did he explain to you in terms of that?
01:39      10   A.  It had been his goal to become a criminal investigator for
           11   maybe another agency and that is what he was working towards.
           12   Q.  And from that information what did you deduce?
           13   A.  My -- again, as a neuropsychologist, I was questioning
           14   whether that was going to be possible if for no other reason
01:40      15   than the possibility of having to go into a job that would
           16   require a lot of new learning would be problematic for him.
           17   Q.  And Ryan is back to work now.  You are aware of that?
           18   A.  Yes, I am.
           19   Q.  And he was back to work at the time of your evaluation?
01:40      20   A.  Yes, he was.
           21   Q.  How in the world can somebody with a mild neurocognitive
           22   disorder due to traumatic brain injury be a functioning Border
           23   Patrol agent?
           24   A.  Good question.  The one thing that I am aware of is that
01:40      25   the job that he is performing is one in which he has been
```

1    working at for many years, so it is not a new job.  It is not a

2    question of doing new learning.

3        The other thing that I am aware of, again, as a citizen not

4    just a neuropsychologist is that I have to say that I have

01:40    5    concerns about him having a gun and having to make split-second

6    decisions.  To my understanding, the kind of job that he is

7    required to do right now is not a field job.  He is basically

8    at a desk working on a computer, which as a citizen makes me

9    feel a little bit more comfortable.

01:41    10       However, even with that, what I am understanding from what

11   I have been told, is that even that is more arduous for him

12   because even when he is working on a computer, if he is going

13   from some other information and has to transfer that to the

14   computer, if he doesn't write it down, he can't remember it.

01:41    15       Again, that is telling us exactly what the test results

16   showed and the imaging is showing is that it is not staying

17   there.  The memory isn't there.

18   Q.  And, again, just so I am clear, you noted deficiencies with

19   Mr. Moore's processing speed in your testing?

01:41    20   A.  Absolutely.

21   Q.  What kind of stuff would that affect?

22   A.  So that requires -- the way it is measured is that it is an

23   associative task in which your learning symbols and certain

24   relationships to other symbols and how quickly you can do it,

01:41    25   and we had different measures of assessing that, and in both

1    measures he was slow.  It wasn't that he was inaccurate.  He

2    was slower than what we would expect.

3        And on a completely different measure where he had to look

4    at items and make decisions as to crossing out a certain item

01:42    5    on a long process of two pages full of numbers and I just want

6    you to cross out sixes, he was very accurate but he was very

7    slow.  That is processing speed.

8        It takes him longer, and that is why, again, if you look at

9    the imaging, it is showing, look, those efficient pathways have

01:42   10    been destroyed, so the brain is trying to work around it, sort

11    of -- I am from New York.  We have a subway system.  We have

12    express trains, and we have local trains.  You can get to the

13    same place if you take a local train as an express train.  It

14    just takes you longer.  That is what he is experiencing.

01:42   15   Q.  And he also had deficiencies in visual attention?

16   A.  Yeah.  That is the vigilance overtime.  It takes him longer

17    to be accurate, and again, that goes back to the processing

18    speed.  They are linked.

19   Q.  And the word recall, is that what you were talking about

01:43   20    before about the stories?

21   A.  Yeah, it -- no, it is a specific test that is looking at

22    being able to remember the names of common objects.  He took

23    that test for both Dr. Evans and for me, and it was one of his

24    lower scores.  Again, that goes right back to the imaging of

01:43   25    the temporal lobe.  That is what we call semantic language.  It

1    is housed in the temporal lobe.  That is where he has some of

2    his damage.

3    Q.   And you reviewed Dr. Evans' report in this case?

4    A.   More than once.

01:43    5    Q.   Okay.  Are there any specific criticisms that you would

6    like to point out?

7    A.   I wrote a whole rebuttal about it, but to be succinct, I

8    thought that Dr. Evans made light of certain of the findings.

9    He ignored some of them.  For instance, he mentions processing

01:43   10    speed, but never goes back there.

11        Uses the working memory score as an example of his great

12    memory but didn't look at the other memory scores and explain

13    in any way why is it his delay is better than his immediate and

14    ignored other factors that were there and just were screaming

01:43   15    to be explained if no other reason but not ignored, including

16    his exclusion that he had PTSD because he doesn't have memory

17    for the event, which is no longer required in the DSM-5.

18        I am sure Dr. Koransky talked about that.  But also not

19    even seeing he has major depression.  He diagnosed him as

01:44   20    having depressive order NOS.  He made the criteria for major

21    depression.  I go through it painstakingly in my rebuttal.

22        So not only from the cognitive end did he not highlight

23    specific areas that were attributable to brain injury but also

24    not understanding that the temporal lobe injury is part of the

01:44   25    emotional injury, not from a reactive stand but from an organic

1    stand.

2    Q.   So you are saying that a lot of what you are seeing in Ryan

3    both from a cognitive standpoint and an emotional standpoint

4    stems from a brain injury?

01:44   5    A.   Yes.

6    Q.   And you have also spoken with Doreen Casuto, who is a

7    life-care planner?

8    A.   I have.

9    Q.   Can I see Exhibit 66, please.

01:44   10    Is this the report that you've seen?

11    A.   Yes.

12    Q.   If we can go to the next page.

13    A.   Yeah.  I see my initials on some of this.

14    Q.   And you have reviewed this report that I am showing you

01:45   15    now, Exhibit 66?

16    A.   Yes.

17    Q.   And you had discussions with Doreen?

18    A.   Yes.

19    Q.   And you read Exhibit 66?

01:45   20    A.   Yes.

21    Q.   And the recommendations that are contained within

22    Exhibit 66 are yours?

23    A.   Absolutely, yes.

24    Q.   Based on the ones attributable to your initials.

01:45   25    A.   The ones with my initials are the ones that I gave my

1    opinion of what was needed.

2    Q.  Did you see any errors in what recommendations ultimately

3    made their way into the life-care plan?

4    A.  No.  I thought it was a very reasonable plan, at least from

01:45  5    the end that I had anything to do with.

6    Q.  You've talked a little bit about this being an organic

7    brain injury centered type of injury.  I am wondering what your

8    thoughts are -- you know, obviously this lawsuit can be

9    stressful.  I am wondering what your thoughts are in terms of

01:46  10   Ryan's longer term prognosis once this lawsuit is over?

11   A.  You know, taking into account that a legal case -- I have

12   not been in the position that Mr. Moore is in, that is, being

13   the person here whose life is being investigated in a legal

14   sense, that certainly that comes with stress.  There is no

01:46  15   question.

16       And that stress makes -- exacerbates other conditions, but

17   that is not to say that once this portion of his life is over

18   -- and it will be over one way or the other -- that his life

19   will go back and have a normal sense again.  He will never be

01:46  20   who he was before this event in June of 2013, not just because

21   of the physical injuries, but again, my expertise is brain

22   injury.

23       It is the brain that I see that has changed, and he will

24   not just be who he was before, and he will not just pick up the

01:46  25   pieces and get on to a life that had been meaningful and a

1    career that had been one that he had chosen, he loved his work,

2    that he will just pick it up and go right forward and happily

3    dance on.  It will not be the same.

4         His brain is not the same.  It will not function the same

01:47    5    from a cognitive end and from an emotional end.  He will need

6    treatment.  He will need therapy.  He will need a course of at

7    least some cognitive rehabilitation to teach him the best

8    strategies we can for making his brain work more efficiently,

9    and he will also be aware that as he ages, his aging will

01:47   10    affect the way the brain functions.  It will decline

11    differently than it might have declined had he not had this

12    injury.

13         So the whole aspect of who he is as a person, because who

14    are we as people?  We're our cognitions, we're our physical

01:47   15    sense, and we're our emotional sense.  All of those factors of

16    our functioning come from here, inside here, and it affects our

17    work life, our recreational life, our social life, our

18    relationships with others.  That is who we are.

19         Well, that has changed for him, and he is -- for lack of a

01:48   20    better term, he is going to have to reinvent himself, and he

21    will need help to do that, and that is not to say that we won't

22    do everything we can to make it as a constructive and

23    purposeful life.

24         But to just think cavalierly that he will just be fine once

01:48   25    this is behind him is naive, and actually it is a false -- it

1      is a false statement.

2               MR CHAMBERS:  Thank you, Dr. Markel.  I don't have

3      anything further.

4               THE COURT:  Cross-examination.

01:49  5         THE WITNESS:  Is there -- may I get some water?

6      Sorry.  Thank you.

7               MR. COYLE:  No problem.

8                        CROSS-EXAMINATION

9      BY MR. COYLE:

01:49  10  Q.  Good afternoon.  Dr. Markel, is that how you pronounce it?

11     A.  Markel, Markel, so long as it is not Marco.

12     Q.  Okay.  Good afternoon.

13     A.  Good afternoon.

14     Q.  Let's talk quickly about your qualifications.  You are not

01:49  15  board certified by the American Board of Professional

16     Psychology, are you?

17     A.  No.  I was -- show my age, which is when I got started,

18     that was really just coming up on the board.  What qualified

19     you as a neuropsychologist and being able to label yourself was

01:49  20  what we called being a member of Division 40 of the American

21     Psychological Association.  In order to become a member of

22     that, you had to show what your training, experience, and

23     education was.

24         It was a conference that was known as the USIN Conference,

01:49  25  and in order to qualify for becoming a member of Division 40,

1    which is clinical neuropsychology, you submitted all of your

2    criteria, all your background, everything that you needed, and

3    they decided whether or not you qualified.

4        Back then that was the standard.  If I were 20 years

01:50   5    younger, I would go through board certification.  At this point

6    in my career it is not necessary.

7    Q.   You are a neuropsychologist not a psychiatrist?

8    A.   That's correct.

9    Q.   So you can't prescribe medication?

01:50   10   A.   That's correct.

11   Q.   And so you have not treated Agent Moore?

12   A.   No, I have not.

13   Q.   Okay.  Let's talk about your opinions.  Now, you have two

14   main opinions in this case.  One is about Agent Moore's

01:50   15   cognitive function, and the other is about his emotional

16   function; right?

17   A.   Well, I have an opinion regarding that, but I defer also to

18   Dr. Koransky who was brought on as the expert to deal with the

19   emotional functioning.

01:50   20   Q.   Okay.  So let's talk about -- well, first, it is because

21   you believe Agent Moore has those cognitive and emotional

22   problems that you think he is going to need future

23   neuropsychological, psychotherapeutic, and psychiatric

24   treatment; right?

01:50   25   A.   Correct.

1    Q.   And if he didn't have the problems, he wouldn't need the

2    future treatment; right?

3    A.   I would assume so.

4    Q.   Okay.  Let's now get into Agent Moore's cognitive function.

01:51   5    Your opinion is that the accident with the tire caused Agent

6    Moore to suffer a decline in cognitive function?

7    A.   In certain areas.

8    Q.   Specifically four areas of weakness; right?

9    A.   Correct.

01:51   10   Q.   And those are -- I am quoting from page 29 of your report,

11   which is Exhibit 135 -- processing speed, visual attention,

12   word recall, and specific areas of executive functioning?

13   A.   Correct.

14   Q.   And before we talk about the specific cognitive tests that

01:51   15   you gave Agent Moore, when you are assessing a patient's

16   cognitive function, do you also consider how the patient is

17   actually functioning in the real world?

18   A.   Yes.

19   Q.   Is that important to your assessment, would you say?

01:51   20   A.   Yes.

21   Q.   Do you consider, for example, what the patient is doing for

22   work?

23   A.   Correct.

24   Q.   What is your understanding of what Agent Moore is doing for

01:51   25   work?

```
     1   A.   My understanding at the present time is he is more of an
     2   analyst and he is sitting at an office with a computer.
     3   Q.   So you have no understanding that he is out on a task
     4   force, carrying a gun, executing warrants, making arrests?
01:52 5   A.   As of my knowledge at the present time he hasn't been doing
     6   that for quite a while.
     7   Q.   If he were doing those things, would that affect your
     8   opinion at all?
     9   A.   I think I said earlier that as a citizen I might be
01:52 10  concerned about the carrying of a gun, and I don't know what
    11   the Border Patrol's standard is or criteria are for the safety
    12   of that, but I would defer to them in deciding whether somebody
    13   was safe.
    14   Q.   I don't mean your opinion as a citizen but your opinion as
01:52 15  an expert witness assessing Agent Moore's cognitive function,
    16   would that affect -- if he were performing all those tasks
    17   without complaint, would that affect your opinion at all?
    18   A.   What I would do is I would also defer to his treaters to
    19   know because they would know him better on a daily or a work
01:52 20  more available record to know what is appropriate, so there are
    21   two prongs to my answer to you which is, one, his treaters
    22   would be probably a better source of that information.  The
    23   Border Patrol also would be a better source of that
    24   information, and I can just tell you as a neuropsychologist I
01:53 25  would have concerns.
```

1    Q.   Do you have any opinion about whether those kinds of tasks,

2    carrying a gun, deciding whether to fire that gun, arresting

3    people, participating in raids, do those kinds of tasks involve

4    the use of cognitive skills like processing speed, visual

01:53    5    attention, memory, and executive functioning?

6    A.   Exactly, which is why I have concerns.

7    Q.   Would you agree also that driving a car involves the use of

8    cognitive skills, like processing speed, visual attention,

9    memory, and executive functioning?

01:53    10    A.   Sometimes it depends on what the driving is involved.  It

11    can impact all of those.

12    Q.   If it is driving that involves surveillance of another

13    vehicle, would that involve those skills?

14    A.   You know, there is a specialization in driving evaluations

01:53    15    for people who have had brain injuries, and there are actually

16    experts in that, so I would defer to those experts.

17    Q.   Okay.  Are you aware of any reports about Agent Moore's

18    driving records since the accident?

19    A.   Yes, I am.

01:54    20    Q.   What is that specifically?

21    A.   There was an incident back that he was arrested for DUI.

22    Q.   Anything besides that?

23    A.   There was an incident that occurred back in 2009 before the

24    accident.

01:54    25    Q.   I am talking since the accident.

1    A.   Since the accident, I am not aware of any.

2    Q.   Let's talk now about the cognitive testing.  You talked

3    about it on direct examination, and let's talk about the four

4    areas of weakness that you say you found.

01:54    5         Now, when you say weakness, that is different from saying

6    he was actually impaired in those areas; correct?

7    A.   Well, actually, I think the processing speed showed some

8    impairment, and I think the word recall is an area of

9    impairment.

01:54    10   Q.   The other two areas, there is a difference between weakness

11   and impairment?

12   A.   Not necessarily because if I am remembering -- again, I

13   don't have my report in front of me -- but I remember the

14   specific areas of executive dysfunction.  There was one area

01:55    15   that was I think below average or right on the borderline of

16   below average or impaired.

17        And I think the world recall was in the same area.  The

18   processing speed was more impaired for Dr. Evans than it was

19   for me, but that was because of the practice effect.

01:55    20   Q.   Well, doctor, isn't it true that out of the more than 100

21   tests that you gave Agent Moore, only one of his scores

22   actually fell in the impaired range?

23   A.   You know, Dr. Evans used that same kind of analysis to take

24   a look at some of Mr. Moore's scores saying that --

01:55    25   Q.   Thank you, doctor.  Can you just please answer first?

1   A.   I'm sorry.   What was your question?

2   Q.   Out of the more than 100 cognitive tests that you gave

3   Agent Moore, only one of his scores actually fell in the

4   impaired range?

01:55   5   A.   And would you point out to me which one you are talking

6   about?

7   Q.   We'll get into that later, but does that sound incorrect to

8   you?

9   A.   I know there were four areas, so I am not sure that only

01:55   10   one fell in the impaired area, so that is all that I am

11   questioning on.

12   Q.   So you don't know?

13   A.   I don't remember.

14   Q.   Let's talk about processing speed.   Now, in the tests that

01:56   15   you are giving Agent Moore to measure his processing speed,

16   essentially you ask the patient to perform a task that requires

17   him to do some sort of mental processing; right?

18   A.   Specific process, yes.

19   Q.   And then the patient has to respond manually; correct?

01:56   20   A.   Correct.

21   Q.   Like with his hands?

22   A.   It is a visual-motor task.

23   Q.   So yes?

24   A.   Meaning your eyes and your hand, and you are doing it

01:56   25   against the clock.

1    Q.   So your tests aren't measuring pure processing speed, pure

2    mental processing speed but also physical responses?

3    A.   Correct.

4    Q.   And, in fact, Agent Moore performed well on some of the

01:56   5    processing speed tests you gave him?

6    A.   He did?

7    Q.   You are disputing that he did?

8    A.   I am asking you because I don't recall any that he did that

9    were measuring processioning speed.

01:56   10   Q.   Let me direct you to page 24 of your report, which is

11   Exhibit 135.  It will come up on the screen.  This is the

12   D-KEFS motor speed test, and Agent Moore scored a scaled score

13   of 11.  A scaled score of ten is in the 50th percentile?

14   A.   That's called motor speed.  That is not processing speed.

01:57   15   Q.   That doesn't involve any processing speed?

16   A.   It is all per motor.  There was nothing that his brain had

17   to process to perform that.  He didn't have to mitigate

18   anything inside the brain to do anything.  All he had to do

19   there was trace a line, over a dotted line.

01:57   20   Q.   That requires no cognitive --

21   A.   It is pure motor.  It has nothing to do with an associative

22   process that goes on between the motor and some other brain

23   function which is what the processing speed tests measure, so

24   it is not measuring the same thing.

01:58   25   Q.   You also gave Agent Moore other timed tests; correct?

1    A.   Yes.

2    Q.   And since they were timed, they would also tell you

3    something about his processing speed abilities, even if that

4    wasn't their primary purpose, right?

01:58    5    A.   They could be, yes.

6    Q.   So, for example, you gave Mr. Moore, on page 23 of your

7    report, WAIS-4 arithmetic test?

8    A.   Yes.

9    Q.   And on that test, Mr. Moore has 30 seconds to answer each

01:58    10   question; right?

11   A.   Yes.

12   Q.   And it is a purely verbal test.  There is no manual

13   component to that one; right?

14   A.   Correct.

01:58    15   Q.   And on that test Mr. Moore scored at the 84th percentile;

16   correct?

17   A.   Right.

18   Q.   That is the high average range; right?

19   A.   Yes.  But that is not --

01:58    20   Q.   You also gave --

21   A.   Excuse me.  But if you are trying to make the point that

22   that is processing speed, it is not.

23   Q.   Thank you, doctor.  I am just asking you the question.

24   A.   Okay.

01:58    25   Q.   You also gave Agent Moore a visuospatial matrix reasoning

1    test on page 23 of your report.

2    A.   It is covering it, but --

3    Q.   I'll pull it up here.

4    A.   There it is.

01:59   5    Q.   And that is also a time test; correct?

6    A.   I don't think matrix reasoning is.

7    Q.   You are testifying it is not a timed test?

8    A.   Locked design, which is in that same area, is timed, and

9    visual puzzles is timed, but I don't think matrix reasoning is.

01:59   10   He gets as much time as he wants.

11   Q.   Okay.  Let's talk about visual attention.  On page 22 of

12   your report, you gave Agent Moore the WMS-4 visual working

13   memory test; correct?

14   A.   Correct.

01:59   15   Q.   And visual working memory is a measure of visual attention;

16   correct?

17   A.   Partially.

18   Q.   And Mr. Moore scored in the 79th percentile on the test?

19   A.   Correct.

02:00   20   Q.   That is the high average range?

21   A.   Correct.

22   Q.   Let's talk about word recall, the third area of weakness

23   that you said you found in Agent Moore.  On page 24 of your

24   report, you gave Agent Moore the California verbal learning

02:00   25   test?

1   A.   That's correct.

2   Q.   In fact, that is the only word recall test you gave to

3   Agent Moore; right?

4   A.   That's right.

02:00   5   Q.   And essentially with that test, you read the patient

6   16 words, and then you test to see how many of those words the

7   patient can remember?

8   A.   Correct.

9   Q.   And then the results are reported in this right column what

02:00   10   are called Z scores?

11   A.   Well, some of them are Z scores, and some are T scores, but

12   yes.

13   Q.   I see.  With the Z scores, looks to be all but the first of

14   those scores; right?

02:00   15   A.   Yes.

16   Q.   A score of zero means that the patient is right at the 50th

17   percentile; correct?

18   A.   That's right.

19   Q.   And a score of one means that they are one standard

02:01   20   deviation above the median?

21   A.   The mean.

22   Q.   The mean.  Okay.  And a score of minus one or negative one

23   means the patient scored one standard deviation below?

24   A.   Correct.

02:01   25   Q.   One standard deviation is about 15th percentile points?

```
       1   A.   16th.
       2   Q.   So a score of one means the patient scored in the 65th or
       3   66th?
       4   A.   I'm sorry.  Score, if you are one standard deviation above
02:01  5   the mean, you are 84th percentile.
       6   Q.   One standard --
       7   A.   It goes 16 points upward or down.  So 50 -- I'm sorry.  Go
       8   ahead.  I'm sorry.  I was thinking something else.
       9       One standard deviation -- go ahead -- is up or down
02:01 10   15 points.
      11   Q.   So, again, if the patient scores in the 65th percentile --
      12   or scores --
      13   A.   No.
      14   Q.   -- scores a one, that would be approximately 65th or 66th
02:01 15   percentile?
      16   A.   Correct.
      17   Q.   Now, none of Agent Moore's scores on this California verbal
      18   learning tests were impaired, were they?
      19   A.   No.
02:01 20   Q.   In fact, all 24 of his scores were at or above the 35th
      21   percentile?
      22   A.   Correct.
      23   Q.   Now, let's talk about the fourth area of weakness that you
      24   say --
02:02 25   A.   This is not an area of weakness that I said he had, so if
```

           1   you are trying to imply --

           2           THE COURT:  Excuse me, doctor.

           3           THE WITNESS:  Sorry.

           4           THE COURT:  Don't volunteer anything.  He'll ask you a

02:02      5   question.  Answer his questions.

           6           Go ahead.  Next question.

           7   BY MR. COYLE:

           8   Q.  Let's talk now about the fourth area of weakness you said

           9   Agent Moore showed executive functioning.  You gave Agent Moore

02:02     10   22 tests that were dedicated to measuring executive

          11   functioning?

          12   A.  I didn't count them, but it is possible.

          13   Q.  Does that sound; right?

          14   A.  It is probably within the ballpark.

02:02     15   Q.  All right.  I am going to show you page 26 of your report,

          16   Exhibit 135 again.

          17   A.  Yes.

          18   Q.  These are the results from the executive functioning tests

          19   you gave, and the results are reported in what is known as a

02:02     20   scaled score; correct?

          21   A.  Yes.

          22   Q.  I think we mentioned it before but a scaled score of ten is

          23   right in the middle at the 50th percentile, right?

          24   A.  Average, yes.

02:03     25   Q.  And a score of seven or higher is considered not impaired?

```
         1    A.   Seven is right at the cutoff.

         2    Q.   And above --

         3    A.   So eight -- between 8 and 12 is considered average.

         4    Anything below eight is going below average.

02:03    5    Q.   And seven is not considered impaired; correct?

         6    A.   It is considered below average.

         7    Q.   I understand that.  I am asking about impaired.

         8    A.   No.

         9    Q.   And Agent Moore's scaled scores were seven or higher on 21

02:03   10    of the 22 executive functioning tests you gave --

        11    A.   Correct.

        12    Q.   -- correct?

        13         You also gave Agent Moore other tests that indirectly

        14    measure executive functioning, even if that wasn't the primary

02:03   15    purpose; correct?

        16    A.   Well, some people would say some of the measure executive

        17    functioning indirectly.  I am not sure I do.

        18    Q.   Okay.  Well, you gave him, for example, the WAIS-4 test on

        19    page 23 of your report?

02:03   20    A.   That's the similarities test.  It is verbal abstract

        21    reasoning.

        22    Q.   Does that test measure executive functioning?

        23    A.   Not from my standpoint.  That is measuring the kind of

        24    abstract thinking.

02:04   25    Q.   I understand.
```

1  A.   Some people do.   Some neuropsychologists do.   I don't

2  particularly find it a good example of executive functioning.

3  Q.   And on that test Agent Moore scored at the 50th percentile?

4  A.   Correct.

02:04  5  Q.   And you also gave him the WAIS-4 matrix reasoning test on

6  page 23 of your report?

7  A.   Yes.

8  Q.   And that test measures executive function?

9  A.   Again, some people use that as a measure of executive

02:04  10  functioning.   I particularly don't find it a test that I would

11  use for executive functioning.   That is why I use other tests.

12  Q.   Agent Moore scored in the 91st percentile on that test?

13  A.   He did.

14  Q.   Now, let's talk about Mr.  -- Agent Moore's reports to you

02:04  15  of memory issues.   Totally apart from the cognitive tests that

16  you gave him, he told you that he's had some memory problems

17  since the accident; correct?

18  A.   Yes.

19  Q.   And those are self-reported.   He told you that.   There is

02:05  20  no other way besides the cognitive tests for you to check that;

21  right?

22  A.   That's right.

23  Q.   Now, your cognitive testing didn't show any systemic memory

24  deficits, did it?

02:05  25  A.   What do you mean by systemic?

1    Q.   In multiple areas, across multiple tests?

2    A.   No.  I think the thing that I pointed out that his delay

3    was better than his immediate.

4    Q.   When you say his delay is better than immediate, you are

02:05    5    talking relatively; correct?

6    A.   Yes.

7    Q.   So he performs -- compared to other people who have taken

8    the tests, he does better on the delayed than the immediate;

9    correct?

02:05    10   A.   That's right.

11   Q.   You are not saying absolutely he is remembering things that

12   he didn't remember before?

13   A.   He is remembering more things than he was able to tell

14   immediately.

02:05    15   Q.   Relative to other people who took the test?

16   A.   Relative to himself.  In other words, if he had a scaled

17   score of 15 immediate and a scaled of 19 after, that is

18   relative to himself.

19   Q.   Those are scaled scores compared to everyone else who took

02:06    20   the test?

21   A.   I am comparing him to the normative population, so in other

22   words, the immediate scores compared to other people his age

23   and his -- I think this one is only age, so he's compared to

24   other people his age.

02:06    25       Then also the delayed is also relative to other people his

```
        1    age, so everything is the same, to age.

        2    Q.   Now, let's talk about the specific memory test that you

        3    gave.   On page 22 of your report you gave the WAIS-4 working

        4    memory test?

02:06   5    A.   Yeah.

        6    Q.   And he scored in the high average range on that test, the

        7    77th percentile?

        8    A.   Correct.

        9    Q.   You also gave him on page 22 of your report, the WMS-4

02:06  10    visual working memory test?

       11    A.   Yes.

       12    Q.   And also he scored in the high average range on that test?

       13    A.   Correct.

       14    Q.   You gave him, on page 25 of your report, the WMS-4 auditory

02:07  15    memory index?

       16    A.   It is two tests.   It is the auditory memory.   It is logical

       17    memory 1 and 2, and these were tests that he had been given a

       18    month previously, but he had the same pattern, which was

       19    stronger scores on the delay than on the immediate.

02:07  20    Q.   And in both of these he was in the very superior range;

       21    correct?

       22    A.   Exactly.

       23    Q.   In fact, he scored in the 99th percentile on one of them

       24    right?

02:07  25    A.   Yes.
```

433

```
         1   Q.   That is the highest possible score you can get?
         2   A.   About, yes.
         3   Q.   You can't score in the 100th percentile; correct?
         4   A.   Correct.
02:07    5   Q.   All right.  Let's talk about what you think was the cause
         6   of these areas of weakness.  Now, you would admit that
         7   depression, anxiety, and stress can affect a person's cognitive
         8   functioning; correct?
         9   A.   Yes.
02:07   10   Q.   Yet you ruled out those alternative causes in this case
        11   because of the pattern that you say you observed in Mr. Moore's
        12   cognitive results; correct?
        13   A.   Yes.
        14   Q.   Specifically you think that Agent Moore's pattern of
02:08   15   results is more consistent with a mild traumatic brain injury
        16   than with emotional problems?
        17   A.   Yes.
        18   Q.   Okay.  Now, we talked about your opinions about Mr. Moore's
        19   cognitive function.  Now, are you deferring to Dr. Koransky on
02:08   20   Mr. Moore's emotional functioning?
        21   A.   No.  I have it in as my diagnoses as well.
        22   Q.   Okay.  So now you think he's got post-traumatic stress
        23   disorder; correct?
        24   A.   I do.
02:08   25   Q.   And the basis for that opinion is his test results on the
```

         1    Trauma Symptom Inventory 2; correct?

         2    A.   Among them, yes.

         3    Q.   And that test relies entirely on the patient's

         4    self-reports; right?

02:08    5    A.   Correct.  It also has validity measures in it.

         6    Q.   It uses suggestive questions; right?

         7    A.   It has statements, not questions, in which the patient

         8    endorses yes or no or a scale.

         9    Q.   Yes.  So it asks, for example, how often in the past six

02:09   10    months you've experienced nervousness?

        11    A.   I don't know if that is one of the items, but something

        12    like that.

        13    Q.   Or how often in the past six months have you experienced

        14    sadness?

02:09   15    A.   Correct.

        16    Q.   What were Agent Moore's validity scale scores on that test?

        17    A.   He -- I'll have to look at my report, but he was -- they

        18    were valid scores.

        19    Q.   Your report doesn't list the actual scores.  What were

02:09   20    they?

        21    A.   If you want, I have my briefcase outside.  I'll get it.

        22    Q.   Do you know what his atypical response score was?

        23    A.   I know that it was a valid measure, so if you want, I'll go

        24    out there and get the exact score.

02:09   25    Q.   Was there any evidence in his psychological testing that

|      |    |                                                                        |
|------|----|------------------------------------------------------------------------|
|      | 1  | suggested he was exaggerating his symptoms?                            |
|      | 2  | A.  In the MMPI-2RF -- and again, I'll go my report to do it --        |
|      | 3  | from memory, there was a question as to whether or not there           |
|      | 4  | were certain responses that could have been exaggeration, but          |
| 02:10 | 5  | it also said if there is a history of medical issues and              |

                  suggested he was exaggerating his symptoms?

                  A.  In the MMPI-2RF -- and again, I'll go my report to do it --
                  from memory, there was a question as to whether or not there
                  were certain responses that could have been exaggeration, but
02:10             it also said if there is a history of medical issues and
                  medical problems that could explain his responses, then they
                  are not forms of exaggeration.

                      It was clear that Mr. Moore's medical records made it clear
                  that he had substantial medical issues and that he was
02:10             endorsing every item correctly based on what his experience and
                  what his history is, so I considered it a valid profile.

                  Q.  So you are saying the MMPI-2 was the only indication of
                  exaggeration in his test results?

                  A.  In my testing, yes.

02:10             Q.  Did you look at any other testing?

                  A.  Well, actually what I did is I took -- I did not give him
                  the MMPI-2RF.  It was given by Dr. Koransky who provided me the
                  raw data, and I rescored it using the Pearson Protocol
                  Computerized Program, so in my report I quote exactly what the
02:11             computerized program said.

                  Q.  Did you also look at Dr. Koransky's raw test data for the
                  other tests that he administered?

                  A.  I did not.

                          MR. COYLE:  I have nothing further.

02:11                     THE COURT:  Redirect.

                        REDIRECT EXAMINATION

BY MR CHAMBERS:

Q.   There is one thing that I don't understand, Dr. Markel.
How can Ryan have the neurocognitive disorder that you found in
your testing if we see so many of his scores average or even
above average?

A.   Thank you for asking.  So that is one of the challenges in
looking at his -- the entire gamut of all the tests and all the
scores that were administered by me, let alone in combination
with Dr. Evans, and the way I reasoned it out and the way I
explained it is that, again, this is a complex organ, and so,
yes, you know, his working memory both visually and auditorily
for example is excellent.  It is truly excellent, as-is his
remembrance of stories.

     But there were certain indications along the way that stand
out as, wait a minute, this is not normal, why is delayed
better than immediate?  Why is it that he has so much sparing?
And that is what you were talking about.  How is it that he has
all these excellent scores and yet you are talking about four
areas that are not right?

     One of the magnificent things about the brain is that it is
a complex organ, and one of the major things of the findings
for Mr. Moore is the fact that he is still functioning
extremely well.  I think Dr. Lobatz said it perfectly well in
what I read of his deposition, which was if any of us had the

437

1    kinds of damage that we see in his imaging study, we wouldn't

2    function as well.

3       So how is he doing it?  And that I think is one of the

4    miracles of the sparing that took place.  Even with all the --

02:12  5    the micro-hemorrhaging that we see that is diffuse in the

6    brain, his brain is still able to do things, and the one thing

7    his brain is still able to do is the work around, which is why

8    it is taking him longer.  That is the key issue here.

9       You know, to tell me that his ability on the addition test

02:13  10   is in the above average range, fine, isn't that wonderful, but

11   that is not processing speed.  That is a specific function of a

12   particular part of the brain that has to listen to a word

13   problem I read to him and solve it mentally without the use of

14   paper and pencil, and that part of his brain is still

02:13  15   functioning.

16      Now, it might have even been better had this injury not

17   happened, but he is a really strong, bright, cognitively, you

18   know, strong person, so his brain is resilient.  That doesn't

19   mean he hasn't been damaged, and that doesn't mean that the

02:13  20   areas that we're finding consistently in Dr. Evans' and my

21   testing are nefarious or that they are not real.  They are

22   real.  They are very real.

23      And they will impact and are impacting his daily

24   functioning, and so just blow that off because he has some

02:14  25   great scores -- you know, before we had imaging that was our

1    child in mild traumatic brain injuries.  How do we convince

2    this is a brain injury, this isn't something exaggerating or

3    somebody having emotional problems.

4        The brilliance of what has happened with our technology is

02:14  5    we now have imaging to say, you know what, there are some

6    people that do not get over a mild traumatic brain injury.

7    Many people do, three to six months they are back to normal.

8    There is a certain sampling of people that do not.  Mr. Moore

9    is one of those people.

02:14  10   Q.  Just one other question, a lot has been made with you and

11   others about these MMPI and other various testing mechanisms

12   that are sent off to scoring to other companies, and then in

13   turn, as I understand it, you receive a score back.  Is that a

14   summary of --

02:14  15   A.  Correct.

16   Q.  These people that you send the scores off to have to idea

17   who the patient is; is that right?

18   A.  The system we use is a computerized scoring program.  You

19   input what the responses are to the items, and they -- the

02:15  20   computer analyzes it and spits back a report to you.  The

21   computer only knows the person's gender, their age, their level

22   of education and whether or not they are married.

23       It knows nothing about their medical history.  That is

24   where you as the neuropsychologist or psychologists have to do

02:15  25   the interpretation and say what makes sense here, and one of

|       |    |                                                                   |
|-------|----|-------------------------------------------------------------------|
|       | 1  | the things that came back and in Mr. Moore's interpretation was   |
|       | 2  | the possibility that this pattern could be exaggerating, but it   |
|       | 3  | also specifically points out if the person's medical history is   |
|       | 4  | such that these responses could be explained by a true medical    |
| 02:15 | 5  | condition, then this is not exaggeration.  This is a valid         |
|       | 6  | response.  That is the case with Mr. Moore.                        |
|       | 7  | MR CHAMBERS:  Thank you, doctor.                                   |
|       | 8  | THE COURT:  Anything else?                                         |
|       | 9  | MR. COYLE:  Your Honor, since the doctor offered to                |
| 02:15 | 10 | get her validity scale scores on the one test, the Trauma         |
|       | 11 | Symptom Inventory 2, would you mind if we asked her to step        |
|       | 12 | outside and grab those and read them?                              |
|       | 13 | THE COURT:  Please do that, doctor.                                |
|       | 14 | THE WITNESS:  Got it.                                              |
| 02:17 | 15 | MR. COYLE:  May I, Your Honor?                                     |
|       | 16 | THE COURT:  You may.                                               |
|       | 17 | RECROSS-EXAMINATION                                                |
|       | 18 | BY MR. COYLE:                                                      |
|       | 19 | Q.  What were Agent Moore's atypical response scores on the        |
| 02:17 | 20 | Trauma Symptom Inventory 2.                                        |
|       | 21 | A.  He has a raw score of eight.                                   |
|       | 22 | Q.  A raw score of eight?                                          |
|       | 23 | A.  A raw score of eight, and the cutoff for being invalid is      |
|       | 24 | 15.                                                                |
| 02:17 | 25 | Q.  And what is Agent Moore's response level score on the same     |

```
      1  test?

      2  A.   Two.

      3          MR. COYLE:  Thank you, doctor.

      4          Nothing further.

02:17 5          THE COURT:  Anything else?

      6          MR CHAMBERS:  No, Your Honor.

      7          THE COURT:  May this witness be excused?

      8          MR CHAMBERS:  Yes.

      9          THE COURT:  All right.  Thank you.

02:17 10         You may stand down.  You are excused as a witness.

     11          Next witness.

     12          MR. WOHLFEIL:  Our next witness is testifying by video

     13  conference.  If we can get him on the phone.

     14          THE COURT:  All right.

02:17 15         MR CHAMBERS:  Your Honor, perhaps while we are waiting

     16  this a good time to read in the discovery responses that we

     17  intend to submit?

     18          THE COURT:  Yeah.  Let me see how long it will take.

     19          Bruno, how long will it take to get this up?  How long

02:18 20  will it take?

     21          A VOICE:  I'll need five minutes.

     22          THE COURT:  Five minutes?

     23          A VOICE:  Yes, sir.

     24          THE COURT:  We can work while you are doing this?

02:18 25         A VOICE:  Yes, absolutely.
```

```
 1              THE COURT:  Can you work while we're continuing?
 2              A VOICE:  Absolutely.
 3              THE COURT:  Okay.  You may read the discovery
 4    responses in at this point.
02:18  5              MR CHAMBERS:  Thank you, Your Honor.
 6              This is from Exhibit 148 request for admission number
 7    five, question, admit that the air hose and nozzle at air
 8    compressor were discarded by Border Patrol employees after
 9    June 24th, 2013.
02:18 10              Would you like me to read the objections too, Your
11    Honor?
12              THE COURT:  No, I understand there is a stipulation,
13    ultimately, to the answer that was given?
14              MR CHAMBERS:  Yes.
02:18 15              MR. LASKE:  We're not standing on the objections.
16              THE COURT:  The objections are withdrawn.  Read the
17    answer.
18              MR CHAMBERS:  Answer, admitted.
19              THE COURT:  All right.  I suppose that we can do this
02:19 20    in the form of a stipulation.  The Government stipulates that
21    sometime after June 15th, 2013 -- is that what the date was?
22              MR CHAMBERS:  We tried to do this beforehand but --
23              MR. LASKE:  Your Honor, the only issue when we
24    discussed it was whether or not we thought these were
02:19 25    ultimately relevant, so as long as we're not waiving our
```

```
      1   relevance objection -- that was the only issue that we thought
      2   if we stipulated that we would be waiving it.
      3             THE COURT:  I assume this is going to go to the
      4   plaintiff argument in favor of spoliation and these are
02:19 5   predicate facts.  I wasn't sure what effect it would given, I
      6   would listen to the evidence but they were entitled to put on
      7   the predicate facts, so these -- at least his first admission
      8   which I can -- I suppose I can treat as just proved, goes to
      9   that purpose, so the air hose and nozzle were lost or
02:20 10  discarded.
     11             MR CHAMBERS:  After June 24th, 2013.
     12             THE COURT:  And the Government has admitted that?
     13             MR CHAMBERS:  Yes, they have.
     14             THE COURT:  I'm sorry.  The date June 24th?
02:20 15            MR CHAMBERS:  June 24, 2013.
     16             THE COURT:  All right.  Next.
     17             MR CHAMBERS:  I am now reading from Exhibit 149,
     18   request for admission number ten, question, admit that you
     19   disposed of the chuck.
02:20 20            THE COURT:  All right.  And do they?
     21             MR CHAMBERS:  Yes, they admit.
     22             THE COURT:  The chuck being the piece that is hooked
     23   on the air hose at the front.
     24             MR CHAMBERS:  Yes.  It is actually defined.  I am
02:20 25  trying to find the definition.
```

```
 1              THE COURT:  Okay.  Is there a date for the disposal of
 2   that, or does it fall under the same date?
 3              MR CHAMBERS:  There is no date on that question, Your
 4   Honor.
02:20  5        THE COURT:  Okay.
 6              MR. LASKE:  And the other question, I think the date
 7   was the date of the accident.
 8              THE COURT:  Yes.
 9              MR. LASKE:  I believe it was --
02:20 10        THE COURT:  I am assuming the chuck was lost or
11   disposed of sometime after June 24th, 2013.
12              MR. LASKE:  Yes, yes.
13              THE COURT:  Okay.  Next.
14              MR. WOHLFEIL:  Captain Moore, hold on one second.
02:21 15        MR CHAMBERS:  We can take the last one up in a moment
16   Your Honor.  We have the witness on.
17              THE COURT:  Okay.
18              MR CHAMBERS:  I have one more.
19              THE COURT:  All right.  Gabby, we'll need to swear --
02:21 20   this is Captain Moore?
21              MR. WOHLFEIL:  Yes, Your Honor.
22              THE COURT:  All right.  Captain Moore, can you hear
23   me?
24        (Witness appearing by video conferencing.)
02:21 25        THE WITNESS:  I sure can.  Yes, sir.
```

```
 1              THE COURT:  All right.  Will you raise your right
 2   hand.
 3              THE WITNESS:  Sir.
 4         (Oath administered.)
 5              THE WITNESS:  I do.
 6              THE COURT:  Okay.  Have a seat, please.  If at any
 7   point during the examination you cannot hear a question, just
 8   ask that it be repeated.  I'll make counsel speak into the mic.
 9              Are you having any difficulty hearing me now?
10              THE WITNESS:  No, sir.  Crystal clear.
11              THE COURT:  All right.  Go ahead.
12                   ADAM MOORE,
13                DIRECT EXAMINATION
14   BY MR. WOHLFEIL:
15   Q.  Very good.  Captain Moore, it looks like you are in uniform
16   today.
17   A.  That is correct, yes, sir.
18   Q.  Are you a captain in US Marine Corps?
19   A.  I am.
20   Q.  Where are you testifying to from?
21   A.  I am from Okinawa, Japan, right now, sir.
22   Q.  You are Ryan's younger brother; is that right?
23   A.  I am, yes, sir.
24   Q.  You are actually the youngest of the siblings?
25   A.  That is correct, yes, sir.
```

02:21 (line 5)
02:21 (line 10)
02:22 (line 15)
02:22 (line 20)
02:22 (line 25)

1    Q.  All right.  Captain Moore, I want to take you right to the

2    night of June 24, 2013.  At that time were you Ryan's emergency

3    contact?

4    A.  I was, yes, sir.

02:22    5    Q.  Did you get a call regarding Ryan that night?

6    A.  Yes, sir.  I received a call around 2200 hours on the 24th,

7    yes, sir.

8    Q.  Is that to report that Ryan had been injured?

9    A.  Yes, sir.  The initial phone call instructed me that Ryan

02:22    10   had been in an accident and that he had received some

11   lacerations and that they requested me to go to the hospital.

12   Q.  And did you go to the hospital immediately?

13   A.  I did.  I went there immediately, arrived there probably

14   approximately 2230, 2300 hours on the 24th.

02:23    15   Q.  Once you arrived there, were you at the hospital every day

16   until Ryan was discharged?

17   A.  Yes, sir.

18   Q.  And did your mother, Debbie, and sister, Carrie, later

19   arrive?

02:23    20        MR. LASKE:  Objection.  These questions have been

21   leading.  A certain amount of leading is okay.

22        THE COURT:  Actually, it is preliminary matters, so

23   overruled at this point, but don't lead once you get to the

24   substantive part of the testimony.  Go ahead.

02:23    25        He asked if your mother and sister were there at some

446

1     point too.

2          THE WITNESS:  Yes, sir.  That is accurate.  My mother

3     came the following day, and my sister came a couple days after

4     that as well.

02:23   5   BY MR. WOHLFEIL:

6     Q.  Captain Moore, did you find your brother Ryan in the

7     hospital?

8     A.  I'm sorry.  Can you repeat that question, sir?

9     Q.  Did you find your brother Ryan in the hospital?

02:23   10   A.  Yes.  Matter of fact, once I arrived there, there was a

11    fairly heavy police presence there.  They were reluctant to let

12    me back in the trauma room.  Obviously that was an unacceptable

13    answer for me.  Eventually I did make my way through into the

14    back into the trauma room to see him.

02:24   15   Q.  Where was Ryan in the trauma room?

16    A.  Ryan was laying on a gurney initially when I walked in

17    there.  He was obviously in some pretty rough shape at that

18    point in time.  There was a large laceration on the left side

19    of his face that came from his temple, all the way down to his

02:24   20   lower part of the jaw.

21         To describe it better, it was almost as if his face was

22    filleted open where initially he was bandaged up, but the blood

23    was soaking through so quickly they had to continuously change

24    out, and at that point once the bandages were off, you could

02:24   25   clearly see through the side of his face into his mouth.  The

|       |    |                                                                                |
|-------|----|--------------------------------------------------------------------------------|
|       | 1  | jaw was gone.  There were no teeth on the inside of his mouth.                  |
|       | 2  | You could see through the lower lip.  There was a large                        |
|       | 3  | laceration there you could see through-and-through.  You could                 |
|       | 4  | see muscle fibers hanging out the side of the jaw.  It was                      |
| 02:24 | 5  | pretty grotesque.                                                              |
|       | 6  | Q.  Did you see injuries to his tongue?                                         |
|       | 7  | A.  I did.  His tongue was shredded.  A better description, I                   |
|       | 8  | guess, it looked almost like a snake, where a snake's tongue                    |
|       | 9  | splits out.  I can't tell you how in many ways it was cut, it                   |
| 02:25 | 10 | was definitely -- I lack better terms, but it was shredded.                     |
|       | 11 | Q.  Was Ryan able to talk?                                                      |
|       | 12 | A.  He did talk to me.  He asked -- matter of fact, excuse my                   |
|       | 13 | language, but he did ask me -- his exact words were, what the                   |
|       | 14 | fuck are you doing here, and my response to him at that point                   |
| 02:25 | 15 | in time, you are missing half your face, and that was the only                  |
|       | 16 | words that were spoken the entire time.                                         |
|       | 17 | Q.  Was his jaw actually moving as he was talking?                              |
|       | 18 | A.  His jaw was not moving.  It was as if somebody were talking                 |
|       | 19 | where there mouth did not move up and down.  Words were just                    |
| 02:25 | 20 | coming out, and it was difficult because he had a -- he had a                   |
|       | 21 | suction that he was holding, a suction tube that he was holding                 |
|       | 22 | initially.  I had grabbed it from him and began sucking up                      |
|       | 23 | whatever -- it was like gravel sound.  I don't know if it was                   |
|       | 24 | bone fragment or teeth or whatever.  It was pretty tough.                       |
| 02:26 | 25 | Q.  At some point did Ryan, did he need help to breathe?                        |

A.   He -- his neck was fairly -- was extremely swollen, and I
know his airway was compromised, and they did do an emergency
tracheotomy on him in order for him to be able to breathe.

Q.   How long after you first saw Ryan did he go into surgery?

02:26    A.   I'd say approximately maybe one hour or so, maybe a little
more.

Q.   So it was probably --

A.   I know they were waiting for all the surgeons to get there.

Q.   Was that early the next morning, June 25, 2013?

02:26    A.   That sounds accurate, yes, sir.

Q.   Do you remember what happened during that surgery?

A.   Was the question what happened during the surgery?

Q.   Do you remember the surgery before and after?

A.   I do, yes, sir.

02:26    Q.   Okay.

A.   This -- I know that initially when he went in after I
talked to the surgeon, I know the main goal at that point was
to try to stabilize him.  I know there were several issues and
concerns that -- excuse me -- lost it there for a second.  I

02:27    apologize.  There were -- the initial concerns at that point,
again, was like I said, to stabilize Ryan, to try and fix part
of his jaw.

     There were concerns with the nerves because the nerves, it
wasn't a clean cut, it was more of a shredded, so they were

02:27    concerned about the feeling on that side of his face that he

1 may or may not have a permanent droop.  I know they mentioned a

2 skull fracture at that point in time, and they were concerned

3 about potential brain swelling.  There was also some issues

4 with his saliva duct.

02:27 5   Again, I am not a physician.  I am just going off of what I

6 recall from them telling me.  And they were concerned that

7 because the duct was so damaged that he may or may not be able

8 to produce any type of saliva in that side of his mouth, and

9 they also did inform me that they were going to be putting him

02:28 10 into an induced coma.

11 Q.  Did you see Ryan after he came out of surgery?

12   MR. LASKE:  Objection, Your Honor.

13   THE WITNESS:  I did, yes, sir.

14   MR. LASKE:  There is no evidence in the record of

02:28 15 induced coma.  I don't think that any doctor testified to that,

16 and I don't think Captain Moore --

17   THE COURT:  Sustained.  There is a lack of foundation.

18 Sustained.

19 BY MR. WOHLFEIL:

02:28 20 Q.  Captain Moore, did you see Ryan when he came out of that

21 first surgery?

22 A.  I did.  I saw him in the intensive care unit, yes, sir.

23 Q.  What did you see?

24 A.  At that point he was unconscious.  He was in a coma.  He

02:28 25 was wrapped up, bandaged up pretty good.  There was a tube that

```
      1   was coming out of the side of his face that my understanding
      2   was draining pus.  There was obviously fluid that was coming
      3   out of there.  Obviously motionless, not conscious.  It was
      4   like -- he was in the intensive care unit, so only two
02:29 5   individuals were allowed in the room at the time obviously
      6   because of the intensive situation that he was in.  Yes, I was
      7   there every single day throughout the time the whole time.
      8         MR. LASKE:  Your Honor, I believe the witness again
      9   mentioned the word coma.  We ask that be stricken from the
02:29 10  record.
      11        THE COURT:  All right.  That is stricken.
      12        You can't elicit hearsay from him.  He can testify to
      13  what he saw and what his own observations are, but a lot of
      14  what he knows, he knows because other people have told him.  I
02:29 15  am assuming he was not in there during any of the surgical
      16  procedures.
      17        MR. WOHLFEIL:  Yes, sir.
      18        THE COURT:  Okay.  Go ahead.
      19  BY MR. WOHLFEIL:
02:29 20  Q.  Captain Moore, where was the breathing tube when you saw
      21  Ryan after the surgery?
      22  A.  The breathing tube was placed in his throat where they did
      23  the tracheotomy on him.
      24  Q.  Did you have a chance to see hardware inside his mouth?
02:29 25  A.  You could if you actually lifted up his mouth, you could
```

1    see his jaw was wired shut at that point, but like I said, the

2    majority of the time he was bandaged up pretty significantly.

3    Obviously there were times they had to, you know, change the

4    dressings, you know, things like that, so you were able to see,

02:30    5    you know, the extent of some of the damage at that point, but

6    like I said, for the majority of the time he was bandaged up

7    pretty heavily.

8    Q.  Were you present when Ryan was woken up in the ICU?

9    A.  I was, as a matter of fact, yes.  When he was woken up

02:30    10   again, it was a traumatic experience due to his reaction.  I

11   never seen anybody woken up out of a coma, so I didn't know

12   what to expect at that point, and when he woke up, it was

13   almost as if somebody had, you know, punched him, and it was

14   kind of fight or flight mentality that he balled up was trying

02:30    15   to push people away.

16        He had to be restrained to the bed.  Two nurses came in

17   held his arms down, and eventually they put restraints on his

18   wrists and attached him to the bed.

19            MR. LASKE:  Your Honor, again, we would move to

02:31    20   strike.

21            THE COURT:  The reference to coma is stricken.

22            MR. WOHLFEIL:  Okay.

23   BY MR. WOHLFEIL:

24   Q.  Captain Moore, you mentioned that you were in the hospital

02:31    25   every day until Ryan was discharged?

1    A.   That is correct.

2    Q.   I want to talk about his time in the hospital.   How was he

3    eating, for example?

4    A.   He had a feeding tube that was going through his nose that

02:31   5    went into his stomach.   That is how he ate for the majority of

6    the time.   Obviously, one of the stipulations prior to release

7    was for him to be able to eat on his own, but for the majority

8    of the time he did have a feeding tube in his nose.

9    Q.   Was he able to talk while he was in the hospital?

02:31   10   A.   No, he was not -- initially he was not able to talk,

11   obviously due to the tracheotomy, so the majority of the time

12   he would write things down on a piece of paper.   That was

13   pretty much the only type of communication he was able to do.

14   Like his mouth was obviously wired shut and with the

02:32   15   tracheotomy obviously he was unable to speak, but he did

16   communicate on a pad of paper and writing with a pen.

17   Q.   What kind of things was he writing down?

18   A.   Well, initially the first couple days, a lot of the -- you

19   know, he was very repetitive.   He just kept asking, what

02:32   20   happened, why am I here, what is going on, you know, things

21   along those lines, which was frustrating due to the fact that

22   he didn't even know why he was even there.   It was obviously

23   concerning to me at that point.

24   Q.   At some point did he request to look at himself in a

02:32   25   mirror?

1    A.   Somebody brought in a hand mirror, and I took it away.

2    Q.   Why?

3    A.   Just because I thought he didn't -- it was the time.  The

4    healing process takes awhile, and he wasn't ready to look at

02:32    5    himself at that point --

6    Q.   That was based on the comments --

7    A.   -- in my opinion.

8    Q.   That was based on the comments that he was writing down?

9    A.   Absolutely, just because, like I said, my opinion his

02:33    10    mental state, where he was at that point.  He wasn't ready for

11    that.

12    Q.   How long was it before he could walk again?

13    A.   Several days, I can't remember off the top of my head.

14    Again, that was one of the stipulations prior to his discharge

02:33    15    was that he did have to walk.  When he did walk, we would help

16    him, and he had to take his tower with him.  I call it a tower.

17    It was IVs and medicines and whole bunch -- monitors, and there

18    is a whole bunch of gadgets on there that he had to take with

19    him everywhere he went.

02:33    20    Q.   Did you see that he was on any medications?

21    A.   Well, he was on several medications.  He was on morphine,

22    Dilaudid, fentanyl, antibiotics.  There is medicine for --

23    anti-inflammatory medicine.  There was a whole -- I call it

24    cocktail of medicines.  There were just so many that I quite

02:34    25    frankly I can't tell you off the top of my head what exactly

1    all of them were.

2    Q.   He was discharged on or about July 10, 2013; is that right?

3    A.   That sounds about right, yes, sir.

4    Q.   How did he get home?

02:34  5    A.   I took him home.  We used my truck, and I had to help him

6    obviously get into my truck, and I had to drive him back to his

7    house in Ramona.

8    Q.   After you dropped him off at the house, what did you do?

9    A.   I went to the grocery store and the pharmacy to get his --

02:34  10   to get his medications just because obviously he was unable to,

11   you know, go out, you know, do that on his own, plus he was in

12   a pretty fragile state at that time.

13   Q.   When you went to get his medication, where did you get his

14   medication?  Was that from the pharmacy?

02:35  15   A.   Correct, the pharmacy in Ramona.

16   Q.   Was that easy to get the medication?

17   A.   Yes and no.  I know there was a lot of questions asking

18   just because of the amount of medication that he was -- that he

19   was prescribed, and allegedly it was a fairly high dose of

02:35  20   narcotics, if you will.  I had to provide my driver's license,

21   identification for the DEA records and whatnot, but I knew that

22   they were reluctant to give me the full amounts of what was

23   prescribed just because it was such a high dose of narcotic

24   medication.

02:35  25   Q.   After you got the groceries and the medication, did you

                1   return back to Ryan's house?

                2   A.   I did, yes, sir.

                3   Q.   And was there -- did something happen between you and Ryan

                4   at that point?

02:35           5   A.   Yeah, matter of fact, at that point I saw him -- excuse

                6   me -- he was crying in his bed.  He was -- he was in a fetal

                7   position, and he was crying uncontrollably, and it was tough

                8   for me because I never seen him cry like that before in my

                9   entire life.

02:36          10   Q.   How long did that go on?

               11   A.   10 or 15 minutes, quite a lot.

               12   Q.   Did you talk about what was going on with Ryan?

               13   A.   No.  There was no talking.  I just told him I loved him and

               14   held him.

02:36          15   Q.   Okay.  After that point Ryan had additional surgeries; is

               16   that correct?

               17   A.   That is correct, yes, sir.

               18   Q.   Do you play a role in making sure that he got to and from

               19   surgeries?

02:36          20   A.   Yes, sir.  As long as I was available I took him to every

               21   single one.

               22   Q.   Okay.  At some point did you have conversations with Ryan

               23   after the surgeries?

               24   A.   I mean, yeah, I obviously discussed them with him prior to

02:37          25   and afterwards.  They were difficult because every single one

1    was almost like you take two steps forward with the recovery

2    process, and then he would have another surgery, and he it was

3    like he took two steps back.  The tremendous pain and the

4    position that he was in prior to where it was almost like he

02:37   5    was recovering, maybe feeling a little better physically, then

6    he would have another surgery and he would go right back to

7    square one.

8        Being on narcotics, which obviously nobody likes to be on

9    narcotics, makes you feel terrible, and he was just -- it was

02:37   10   frustrating having to see -- kind of replay the same situation

11   over and over again.

12   Q.  Do you remember a surgery in August of 2013, and

13   specifically do you remember -- did Ryan convey you his

14   understanding of what that surgery would be?

02:38   15   A.  Was that the surgery at Sharp Memorial?  Is that off the

16   163?

17   Q.  Yes.

18   A.  Is that the one you are referring to?  Yes.  I took him to

19   that surgery, and again, that was another one of those where

02:38   20   what he had told me what he was anticipating happening and what

21   actually happened were two totally different things.  As a

22   matter of fact when I dropped him off I worked at recruit depot

23   in San Diego so I was fairly close, and so the intent was drop

24   him off for the day surgery and to pick him up at the end of

02:38   25   the day, and it didn't transpire that way.

1    As a matter of fact, he was there for, I believe -- I may

2    be incorrect by speaking this -- I believe he was there for

3    four days.  I think they rebroke his jaw.  They removed the

4    bars from his --

02:38    5              MR. LASKE:  Objection.

6              THE WITNESS:  -- or removed the arch bars from his

7    jaw.

8              MR. LASKE:  The foundation hasn't been laid.

9              THE COURT:  Hold on, captain.

02:39    10             MR. LASKE:  The witness started saying, I think, so at

11   least --

12             THE COURT:  There is a lack of foundation anyway.  He

13   is not the one performing the tests.  Sustained on that basis.

14   BY MR. WOHLFEIL:

02:39    15   Q.  Captain Moore, did you have an opportunity to see Ryan

16   after he was discharged after the August 2013 surgery?

17   A.  Yes, absolutely.  His face was huge.  It was swollen.  He

18   had raccoon eyes, black and blue.  You could tell it was very

19   significant surgery.  It was a major surgery, which was

02:39    20   obviously vastly different than what he anticipated would

21   happen to him when I dropped him off.

22        Like I said the intent was drop him off, day surgery, pick

23   him up couple hours later whenever he was ready to go, but like

24   I said it lasted for four days that he was in the hospital.  It

02:39    25   was an extended period of time that he was not anticipating

1    doing.  And what they actually did to him was not what he had

2    informed me prior to going to the surgery of what he

3    anticipated having done at that point in time.

4    Q.  At that point, without getting into the substance of the

02:40    5    conversations, did you begin a sort of ongoing conversation

6    with Ryan's doctors?

7    A.   I did.  At that point it was concerning to me just because

8    this was not the first time where he had gone in for an

9    operation of what he thought was going to happen and what the

02:40   10    doctors actually did, they were two totally different things,

11    so at that point is when I became more engaged with

12    conversations with his physicians as to the extent and what

13    they were actually going to be doing because one of the common

14    themes that was transpiring from here on out was that what Ryan

02:40   15    thought was happening or going to happen was different than

16    what the doctors were telling me.

17         So again, that was concerning to me because I wanted to

18    make sure that I was tracking so I was able to be there for him

19    and to provide the assistance that he needed in whatever

02:40   20    capacity I could do that for.

21    Q.   Captain Moore, I want to move to a surgery in September of

22    2013.  Just yes or no, do you remember that surgery?

23    A.   Yes, I do.  I believe that was one when they pulled -- they

24    may have pulled teeth out of his mouth, and I think --

02:41   25              MR. LASKE:  Same objection.

459

```
              1              THE WITNESS:  Yes, I do.
              2    BY MR. WOHLFEIL:
              3    Q.  Did you have a chance to see your brother after that
              4    surgery?
02:41         5    A.  I did, yes, sir.
              6    Q.  Did you see that they pulled the tooth?
              7    A.  I did.  And at that point in time, Ryan believed that he
              8    was going to get posts inserted into his mouth, but there were
              9    no posts after that surgery at all.
02:41        10    Q.  Let's move to --
             11    A.  Which is, again, concerning to me because that is what I
             12    had anticipated to see and expect afterwards, but it was not
             13    what happened.
             14    Q.  Let's move to March 2014, did Ryan have a surgery that
02:41        15    month?
             16    A.  Yes, sir.
             17    Q.  And how did he get to and from the surgery?
             18    A.  I drove him to the surgery, as well as I drove him home as
             19    well.
02:42        20    Q.  Following the surgery, did you have a chance to see
             21    differences inside of his mouth?
             22    A.  I did.  That was, in fact, when they actually did put the
             23    metal posts inside his mouth.
             24    Q.  Let's move to June of 2015.  Do you remember a surgery in
02:42        25    June of 2015?
```

1    A.   Yes, sir, I do.  As a matter of fact, that was the last one

2    that I had taken Ryan to prior to moving to Japan.

3    Q.   What was your understanding of Ryan's expectations for that

4    surgery before the surgery?

02:42   5    A.   At that point in time --

6         MR. LASKE:  Your Honor, objection --

7         THE WITNESS:  -- I believe that the doctor's name was

8    Dr. Kohani.

9         THE COURT:  The objection is sustained.  Next

02:42   10   question.

11   BY MR. WOHLFEIL:

12   Q.   Captain Moore, have you noticed any changes or did you

13   notice any changes in Ryan's weight after the incident in June

14   of 2013?

02:42   15   A.   Absolutely.  I mean, Ryan's weight had fluctuated

16   significantly throughout, you know, his surgeries, or -- after

17   his accident.  As a matter of fact, he lost, I don't know the

18   exact amount of weight, I would say upwards of well over

19   25 pounds, even to the point he had to get new clothes.

02:43   20      In fact, I gave him some of my clothes to wear just because

21   of the amount of weight that he lost, and then conversely there

22   were times he would gain the weight back because he wasn't as

23   active physically as he had been prior to the surgeries.

24   Q.   Let's talk about Ryan's physical activities.  What kinds of

02:43   25   things did he enjoy before the accident?

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | A.   Ryan was an active individual.   He played softball.   Matter           |
|       | 2  | of fact, he was on traveling softball teams, went to traveling               |
|       | 3  | softball tournaments.   We would play golf together, go on                   |
|       | 4  | hikes.   Ryan was fit.   He was an in-shape guy.   He was an                  |
| 02:43 | 5  | athlete.   It didn't matter if it was basketball, if it was                  |
|       | 6  | football, if it was soccer, if it was baseball, he was an                    |
|       | 7  | athlete.                                                                      |
|       | 8  | He played sports.   It didn't matter what sport we were                      |
|       | 9  | playing.   He was actually good at it, which was good because it             |
| 02:44 | 10 | gave us a little brotherly competition.                                      |
|       | 11 | Q.   Since the incident, what is your impression of his activity             |
|       | 12 | level?                                                                        |
|       | 13 | A.   Well, since his accident, his activity level has been                   |
|       | 14 | pretty much nonexistent, besides moving and being around his                 |
| 02:44 | 15 | house.   We haven't been out.   We haven't -- I know he hasn't               |
|       | 16 | played softball since then.   Softball was one of the big things             |
|       | 17 | he did.   He doesn't go out for hikes.   He doesn't exercise.   He           |
|       | 18 | doesn't play sports anymore.   So it is significantly -- it is               |
|       | 19 | very -- it is vastly different than what it was prior to the                 |
| 02:44 | 20 | accident.                                                                     |
|       | 21 | Q.   Captain Moore, do you remember an incident in the summer or             |
|       | 22 | fall of 2014 with Ryan at Ryan's house?                                      |
|       | 23 | A.   I'm sorry.   Can you repeat the question, please?                        |
|       | 24 | Q.   Yes.   Captain Moore, do you remember an incident with Ryan             |
| 02:45 | 25 | at Ryan's house in the summer or fall of 2014?                               |

1    A.   I do.  At that point in time I know Ryan had built a fire

2    pit around -- at his house, and we were doing -- assisting him

3    in helping him finish - do some finishing touches on it, and he

4    fell in the middle of the fireplace -- I'm sorry -- the fire

02:45   5    pit.  He fell right in the middle of the fire pit and had

6    jumped up.

7         I don't know, he jumped up but obviously collected himself,

8    got up, and kind of moved on nonchalantly as if nothing

9    happened, which was concerning to me.  He completely -- it was

02:45   10   almost as if he lost his balance.  We call it like he got hit

11   by a sniper in the Marine Corps, but out of nowhere he fell in

12   the middle of the fire pit, and again, like I said, nothing

13   like that had ever happened before.

14   Q.   Let's talk about Ryan's social activities.  You touched on

02:46   15   it a little bit, but before the incident did you have an

16   opportunity for Ryan to socialize out at, for example, bars,

17   restaurants?

18   A.   Yes, absolutely.  As a matter of fact, we would get

19   together several times a month where we would try to visit

02:46   20   local brewery, meet up for lunch, go to baseball games.  He

21   would come over to my house.  I would go over to his house.

22   You know, we would -- matter of fact, we would go to football

23   games, went to college bowl games.  We probably would get

24   together at least two or three times a month.

02:46   25   Q.   And how often have you done that since the incident?

463

1    A.   Well, since his accident there is only one time, and it

2    actually turned into a disaster trying to get him to go out and

3    do something like that.  We -- it took awhile of some kind of

4    convincing to get him to leave the house just because he was --

02:46  5    he was embarrassed about the way he looked.

6        And so convincing him to leave his house, I was trying to

7    help him out to try to get him back to some normal lifestyle to

8    get him out to be a part of society, meet people and talk to

9    people, and just get out where we convinced him to finally go

02:47  10   up to LA for a weekend to go see the Dodgers play the Milwaukee

11   Brewers.

12       And actually kind of backfired on me a little bit because

13   we went there, got a hotel, checked into the hotel.  Before the

14   game and went to a bar, and when we went to the bar, we ordered

02:47  15   first round of beers, order a round of beers.  Second round,

16   Ryan says, hey, I got it, I'll take the second round.  Ryan

17   goes up to order the second round of beers and comes back to

18   the table and no beer, says, hey, we have to go and obviously I

19   looked at him quizzically, why do we have to leave?

02:47  20       At that point in time he told me that the bartender cut him

21   off because he was slurring his speech and that he needed to

22   go.  So at that point in time I decided I would have some words

23   with the bartender where I told him, look, we just got here.

24   We just drove up from San Diego.  This is the second beer we

02:48  25   had.  I can assure that you nobody is intoxicated.  The reason

1    you think my brother is slurring his speech is because he has

2    no teeth in his mouth.  Look at his face.  You can see that he

3    had a very serious injury.

4         And that is where the bartender proceeded to say that, hey,

02:48  5    I am the one with the liquor license, I am the one that has to

6    worry about these things, and obviously we left.  At that point

7    in time, like I said, it backfired on me.  At that point what

8    was to be, you know, a coming out if you will to get Ryan out

9    into society kind of backfired just because now his fears were

02:48  10   being realized, were becoming reality of how he was going to be

11   treated and how people out in, you know, normal public would

12   view him and judge him to be quite frank.

13   Q.   Captain Moore, let's talk about Ryan -- the changes you

14   noticed in Ryan emotionally.  Can you describe some things you

02:49  15   know about him from before the incident?

16   A.   Sure.  So, you know, before the incident, Ryan's nickname

17   was chuckles.  He was a guy that always had this big little

18   smirk smile, had this little giggle laugh that was very

19   consistent, like I say going back for 30 some odd years.  Like

02:49  20   I said, that was his nickname, chuckles.  Outgoing individual

21   that likes to go out, socialize, try to meet women, if you

22   will.

23        Since that accident it is not, not, not the same at all.

24   He is reluctant to go out.  He is reluctant to try to engage in

02:49  25   any type of social conversations with people.  He doesn't want

465

1    to go home to see his friends.  He is embarrassed about the way

2    he looks.  He is embarrassed about what has happened to him.

3        Emotionally he has changed where like -- you know, prior to

4    the accident I saw him -- matter of fact I saw him tear up one

02:50   5    time.  That was at my grandfather's funeral.  It was more -- it

6    wasn't like a -- it wasn't like a crying, but you could see he

7    was shedding tears, if you will.

8        Since the accident, you know, I've seen him, you know, not

9    only become emotional but, you know, bawl, on a couple

02:50   10   occasions, that it never happened before in, you know, it

11   obviously concerned me because the guy I never seen cry before

12   in my life I seen him now several times completely bawl, and it

13   is -- he is significantly changed he is definitely not the same

14   person as he was before.

02:50   15   Q.   Captain Moore, the couple times that you've seen your

16   brother bawl, is there anything that triggered it?

17   A.   You know, I don't know --

18            MR. LASKE:  Objection, calls for speculation.

19            THE WITNESS:  -- there were several instances.

02:50   20            THE COURT:  Hold on, captain.

21            MR. LASKE:  Objection, calls for speculation, and

22   there is no foundation for it.

23            THE COURT:  The question is, has he seen what has

24   caused him to cry?

02:51   25            MR. WOHLFEIL:  Yes, from what he has observed, has

```
      1   anything prompted --
      2         THE COURT:  Based on your observations, have you seen
      3   what prompts him to cry is the question.  The objection is
      4   overruled.  You may answer that.
02:51 5   BY MR. WOHLFEIL:
      6   Q.  Captain Moore, did you hear the question?
      7   A.  Can you repeat it, sir.
      8   Q.  Sure.  You mentioned a couple times where you've seen your
      9   brother Ryan crying, and my question is, could you tell what
02:51 10  was prompting him to do so, if anything?
      11  A.  Yeah.  There were several instances.  One in particular my
      12  sister had come out to visit Ryan after the accident.  It was
      13  probably about a year or so afterwards, and she was trying to
      14  convince him to come home.  Some friends of his were going to
02:51 15  do a fundraiser to try to help Ryan out with some of his
      16  medical bills.
      17      At that point in time my sister Carrie was trying to
      18  convince him saying, hey, you need to come home, you need to
      19  see your friends, they care about you, they love you.  And he
02:52 20  just completely lost it, said you don't understand what I am
      21  going through, nobody understands, I don't want to have to
      22  relive this, and he completely blew up, and again
      23  uncontrollably started crying, to the point where, again, it
      24  wasn't even a cry.  It was a bawl, and it lasted for an
02:52 25  extended period of time, and, again, I just held him, told him
```

```
     1   I love him, and it was all that I could do at that point.

     2   Q.   How long did that emotion in Ryan seem to last?

     3   A.   That particular crying is that what you are specifically

     4   talking about?

02:52 5   Q.   Yes.

     6   A.   15 to 20 minutes at least.

     7   Q.   After that incident involving your brother Ryan and your

     8   sister Carrie -- well, let me ask this question first, where

     9   was Carrie staying at that point?

02:52 10  A.   Well, initially she was staying with Ryan, but after that

    11   incident, Carrie then came and stayed with me at my house in

    12   Oceanside.

    13   Q.   Let's talk about Ryan's -- the differences you have

    14   observed if Ryan's memory before the incident compared to after

02:53 15  the incident.   Describe Ryan's memory from before the incident.

    16   A.   Well, I mean, before the incident Ryan was -- matter of

    17   fact, he was one of those guys that would, you know, kind of

    18   throw things in your face about things you had said or done in

    19   the past.   He seemed to have a, you know, very strong, robust

02:53 20  memory about absolutely everything, whether it was sports,

    21   things that had occurred -- you know, arguments, discussions

    22   you had been, like I said, he remembering.

    23       Since the incident he has a tendency -- he writes things

    24   down now.   Something as small as going to the grocery store

02:53 25  just to pick up two or three items, he'll actually write it
```

1   down.  He has a pen and paper or a pad and paper in his house

2   that he writes things down to remind him of things he needs to

3   do, and it is -- it is vastly different than he was, you know,

4   prior to his accident.

02:54   5   Q.  Were you and Ryan together for a trip in early June of

6   2013?

7   A.  Yeah.  Matter of fact we took a -- we took a tour of

8   northern California.  It was kind of like a brewery tour where

9   we drove north through San Francisco.  The destination was kind

02:54   10   of hit the Redwoods and all the breweries that are north of San

11   Francisco on that route.  We went for approximately ten days to

12   two weeks, yes, sir.

13   Q.  Since the incident on June 24, 2013, have you had a chance

14   to discuss that brew tour with Ryan?

02:54   15   A.  We have.  I know he -- he knows we went on it -- he knows

16   we went on a vacation, but the majority of what we did and what

17   we saw he doesn't remember.  Like he doesn't remember, you

18   know, certain instances where part of the Redwoods we went

19   through --

02:55   20           MR. LASKE:  Objection.

21           THE WITNESS:  -- there was a tree that you can drive

22   through --

23           THE COURT:  Hold on, hold on just a second.  The

24   objection is sustained.  Lack of foundation.

02:55   25   BY MR. WOHLFEIL:

1   Q.   Captain Moore, let's move on.  We've already heard a little

2   bit from Ryan and your mother Debbie about your and Ryan's

3   upbringing in Wisconsin, but can you share a little bit about

4   that, how that impacted you and Ryan and your desire to work?

02:55   5   A.   Sure, absolutely.  So my parents got divorced when young,

6   for a young age for me.  I believe I was 6 or 7, and, you know,

7   work ethic is something that is engrained in us.

8        Matter of fact, we grew up in the suburbs of Milwaukee, and

9   right after my parents got divorced, my mother was working

02:55   10   three jobs, so that was something engrained in us, hey, you

11   know, in order to survive, you work.  So ever since we were

12   12 years old we had a job.  We started off with paper routes.

13   We moved up from there, whether it was working at the grocery

14   store, gas stations, working at the summerfest grounds, we

02:56   15   always had a job.

16        Working is something that is normal to us.  You know, it is

17   something that we believe that is what we need to do to be part

18   of society.  It is not indicative of normalcy but more along

19   the lines that is what we were raised to do, and, you know, it

02:56   20   is something that we've always -- always done, and it is

21   something that we always will do.  It is something that kind of

22   brings closure to, you know, some of the distracting -- kind of

23   helps you with the distractions that are going on around you

24   because it gives you something to concentrate on and get your

02:56   25   mind off the reality of the situations.

1          MR. WOHLFEIL:  Captain Moore, I don't have any other

2     questions.  Thank you very much.

3          THE COURT:  All right.  Cross-examine.

4          MR. LASKE:  Thank you, Your Honor.

5                    CROSS-EXAMINATION

6     BY MR. LASKE:

7     Q.  I guess it is good morning for you, sir, Captain Moore.

8     A.  Yes.  Good morning, sir.

9     Q.  And you've been stationed at the Marine Corps base in Tokyo

10     since the summer of 2015; correct?

11     A.  That is incorrect.  I am actually in Okinawa, Japan.  Tokyo

12     is on the mainland Japan.  Yes, since June 24th, 2015, that is

13     accurate, sir.

14     Q.  So you haven't had a chance to see your brother that often

15     in the last 20 months?

16     A.  That is actually inaccurate.  I speak with him on face time

17     probably once a week, at minimum.  I have also been home

18     several times between then.  So I would say that is inaccurate.

19     Q.  But you don't live with your brother now?

20     A.  That is correct.  I haven't lived with my brother since I

21     was 18 years old.

22     Q.  And you don't work with your brother now?

23     A.  No.  I do not work with my brother.

24     Q.  And are you aware that he drives as part of his task force

25     assignment?

```
      1   A.   That he drives?

      2   Q.   Yes.   Like a government vehicle?

      3   A.   A vehicle?

      4   Q.   Yes.

02:58 5   A.   I would assume so, sure.

      6   Q.   I was just asking one way or another if you knew that.

      7   Sounds like you don't.

      8   A.   Yeah, yes, sir.  We haven't spoken about that, but I assume

      9   that he's drives for his job, yes.

02:58 10  Q.   Are you aware that he carries a gun as part of his task

      11  force assignment?

      12  A.   I am aware of that, yes, sir.

      13        MR. LASKE:  Nothing further, Your Honor.

      14        THE COURT:  Anything else?

02:58 15      MR. WOHLFEIL:  No, Your Honor.

      16        THE COURT:  Okay.  Captain Moore, thank you.  I

      17  appreciate your flexibility and your appearance.

      18        May this gentleman be excused as a witness?

      19        MR. WOHLFEIL:  Yes, Your Honor.

02:58 20      THE COURT:  All right.  You can sign off now, captain.

      21  Thank you.

      22        THE WITNESS:  Thank you, sir.

      23        THE COURT:  Next witness.

      24        MR. WOHLFEIL:  Call Doreen Casuto.

02:58 25      THE COURT:  You get a word in edgewise on those face
```

```
 1   time talks?
 2              MR. MOORE:  Rarely.
 3              THE COURT:  He's an enthusiastic younger brother.
 4              MR. MOORE:  He is.
 5              THE COURT:  You guys kind of look alike.
 6              MR. MOORE:  Yeah.
 7              THE COURT:  I see the family resemblance.  You have
 8   two brothers?
 9              MR. MOORE:  No, just him.  I have an older sister.
10              THE COURT:  A sister too, okay.
11              THE CLERK:  Can you please raise your right hand.
12        (Oath administered.)
13              THE WITNESS:  I do.
14              THE CLERK:  Thank you.  Please take a seat.  Speak
15   into the microphone at all times.  Can you please state and
16   spell your first and last name for the record.
17              THE WITNESS:  Doreen Casuto, D-O-R-E-E-N, C-A-S-U-T-O.
18                      DOREEN CASUTO,
19                    DIRECT EXAMINATION
20   BY MR. WOHLFEIL:
21   Q.  Good afternoon, Ms. Casuto.
22   A.  Good afternoon.
23   Q.  Let's jump right into your assignment in this case.  It was
24   to generate a life-care plan for Ryan Moore; is that correct?
25   A.  That's correct.
```

```
         1    Q.   I understand that you are a certified life-care planner?

         2    A.   Yes.

         3    Q.   Is that true since about 2000?

         4    A.   Correct.

03:00    5    Q.   Can you see Exhibit 66 on the screen if front of you?

         6    A.   Yes.

         7    Q.   Is 66 a copy of your report?

         8    A.   Yes, it is.

         9    Q.   Okay.  We're at page one.  I want to go through it briefly.

03:01   10    Can you describe what we're looking at one page one?

        11    A.   It has Mr. Moore's name, his address, birth date, the date

        12    of his injury, and then the diagnoses which were basically

        13    initially gleaned from the medical records and then from all of

        14    the physicians that I talked to.

03:01   15    Q.   And using your background, training, and experience, did

        16    you compile -- and your communications with Ryan's doctors, did

        17    you compile a life-care plan for Mr. Moore?

        18    A.   Yes, including the experts associated and doing the

        19    research.

03:01   20    Q.   Page two, please.  So we're at page two of your report.  I

        21    see a recommendation in the -- on the top row there, under care

        22    need for rehabilitation, neurologist and physiatrist.  Looks

        23    like that came from Dr. Lobatz?

        24    A.   Correct.

03:02   25    Q.   In the description rationale column, I see what looks to be
```

1    pricing?

2    A.   Yes, and also frequency.

3    Q.   Very good.   What is the -- what is the opinion in that row?

4    A.   So Dr. Lobatz felt twice a year for two years and

03:02    5    thereafter yearly with an initial eval between 250 and 475 and

6    a follow-up 150 to 200.

7    Q.   Very good.   I want to drop down to the row for oral and

8    maxillofacial surgeon.   What is the recommendation and opinion

9    there?

03:02    10    A.   So that was Dr. Machado, and his recommendation was one

11    time a year for five years, initial eval at 200 to 350 and

12    follow-up at 110 to 250 a time.

13    Q.   Very good.   I want to jump down to the row entitled

14    dentist, and I want to combine it with the bottom row entitled

03:02    15    additional treatment.   Both of those appear to be from Dr.

16    Kohani; is that correct?

17    A.   That's correct.

18    Q.   What is the recommendation and opinion there?

19    A.   So initially it was one time a year more than typical for

03:03    20    maintaining surrounding teeth and gums, and then Dr. Kohani in

21    his deposition changed it to three to four times a year rather

22    than twice a year.   Dental exams, 63 to 114 a time.   Cleaning,

23    105 to 114.   And then he said there should be periodontal

24    cleaning with removal and replacement of his prosthetic bridge

03:03    25    at 800 to 1200 a time for every 18 to 24 months.   And then the

1  crown for tooth number 12 is crossed out because Dr. Kohani

2  said that was no longer needed.

3  Q.  And going down to the additional treatment, looks like

4  there is a reference to a veneer?

03:03  5  A.  Correct.  So Dr. Kohani had placed a veneer on the number

6  12 tooth.  I wrote polish meaning polished veneer, not that you

7  polish the veneer as a treatment, so Dr. Kohani's office gave

8  me the price of $2,500 a time, and he recommended it be

9  replaced every 7 to 10 years.

03:04  10  Q.  Very good.  Page three.  I want to do the top three rows.

11  They all appear to relate to Dr. Kohani.  Can you explain those

12  three opinions?

13  A.  So Dr. Kohani said he wanted future replacement of the

14  implants.  It was 50 percent of the initial implants would need

03:04  15  to be replaced in 10 to 15 years.  20 years was crossed out

16  which is what Dr. Kohani initially told me.  He originally said

17  there would be 13 to 14 implants.  There were only 12, so those

18  were only the initial ones and he said only 50 percent, so that

19  would mean six teeth implants were needed.  To remove the

03:04  20  implants it was 550 a tooth.

21     The prep for the implants, which was six not seven needed,

22  included a bone replacement graft at $1,500 each tooth, a

23  biomat-aid osseous tissue at 430 each tooth, and guided tissue

24  regeneration at 1100 each tooth.  The implants itself cost

03:05  25  $5,865 per tooth, and the pain medication after surgery was 50

1  to $100.  Brandy, his billing person, gave me all of those

2  prices.

3      The next one is future replacement of the abutment or

4  crowns on the replacement of the implants, 50 percent, again in

03:05  5  10 to 15 years.  12 meaning six abutments are needed.  The

6  abutment supports are $3,900 each, six needed.  Cross out of

7  the porcelain ceramic.  Then the custom abutment is $1,200 each

8  for six, and then he would need to replace the whole prosthetic

9  bridge at $3,300 the upper and the lower one was 4700 and $400.

03:06  10      Then Dr. Kohani also stated that the replacement of the

11  prosthetic bridge would need to be done two times over his life

12  both the upper and the lower, the upper being 33 hundred and

13  300 -- 33,300 and the lower one being 47,400 both of those two

14  times, and that was again from Brandy.

03:06  15  Q.  Very good.  Ms. Casuto, I think you said 4700 400 for the

16  previous opinion.  It is $47,000?

17  A.  47,400 sorry.

18  Q.  That's okay.  Let's drop to recommendation from

19  psychiatrist.  That came from multiple doctors?

03:06  20  A.  It came from Dr. Koransky, Trenton Moyer his treater, and

21  Dr. Markel, and that was every -- to evaluate and provide

22  treatment.  Do you need me to read that part too?

23  Q.  Yes, please.

24  A.  Provide treatment for symptoms of depression,

03:06  25  post-traumatic stress disorder, PTSD, and adjustments.  And

1    initially it was one every one to three months, from his

2    treater, and then it was an evaluation and monthly visits for

3    six months, and then every three months for five years now and

4    one additional series over life.  Prices for the initial eval

03:07    5    were 350 to 500.  Medication management was 150 to 175, and his

6    treater, Dr. Moyer agreed with that.

7    Q.  Very good.  Let's drop down to the recommendation for a

8    neuroophthalmologist?

9    A.  That was Dr. Lobatz and Dr. Markel, evaluation and

03:07   10    follow-up visit for light sensitivity and visual issues.

11    Evaluation at 635, and follow-up 210.

12    Q.  I want to take the bottom two rows, the recommendations for

13    lab work and diagnostics together.

14    A.  Okay.  First one is the lab work, and it was Trenton Moyer

03:07   15    and also Dr. Lobatz when I looked through my records.  It was

16    one time a year more than typical if on medication, and the

17    price for the CBC is 49 to 85, and the CMP is 69 to 130, and

18    those both include the cost for the blood draw which needs to

19    be included in there, so that is what is included if there.

03:08   20        The diagnostics by Dr. Kohani and Dr. Lobatz are

21    maxillofacial CT, $732 to 1354 every one to two years.  Then

22    there is a possible TMJ MRI.  That is 1425 to 2366, and it is

23    only one time.  MRI of the brain at 2380 to 3626 per time, two

24    to four times over life.

03:08   25    Q.  Let's go to page four, and start with the top

1    recommendation of medications, again, several doctors there.

2    A.   Yes, I have Dr. Koransky, Trenton Moyer, Dr. Lobatz, and

3    Dr. Markel.  And the first one is Zoloft, and it is

4    100 milligrams, and it $10 to $15.  Actually, Mr. Moore is

03:09  5    taking that twice a day not just once.  Lorazepam or Ativan,

6    one milligram 680 to 840 -- 840 -- actually I misspoke.  Zoloft

7    is one time a day.  It is Ativan that he is doing twice a day.

8    Gabapentin, 300 to 600 milligrams, three times a day, and I had

9    written down 100 to 195.  Actually, the actual price you can

03:09  10   either get it with a coupon or without a coupon.  With the

11   coupon it matches what the defense came up, which is the 42.28,

12   but if you don't have a coupon which you can't always get, it

13   is 70 to 160, not the 100 to 195.

14       The other thing is we have a possible additional medication

03:10  15   for depression or anxiety, and that is 100 to 200 right now.

16   He's on Vistaril, 25 milligrams for anxiety.  That is 9.98 to

17   $15 a month.  He is also on Ibuprofen, 800 milligrams, zero to

18   three times a day, and it was 8 to $10 a month.

19   Q.   I see a recommendation for a neuropsychological evaluation

03:10  20   from Dr. Markel.

21   A.   That's correct.  It had possible-probable before when I

22   produced the federal report which was before I talked to Dr.

23   Markel and got Dr. Lobatz in.  It was an evaluation of every

24   five years not one time.  Neuropsych eval is 2500 to 3500 per

03:10  25   time.

1   Q.   Let's take the next two rows together, the recommendation

2   for psychologist and for cognitive remediation.

3   A.   The psychologist was recommended by Dr. Koransky, Dr.

4   Markel, and his treater Mark Marvin -- Dr. Mark Marvin.  It was

03:11   5   treatment for cognitive issues, post-traumatic stress disorder,

6   depressive disorder, anxiety and relationship dysfunction, now

7   50 sessions for the first year, 25 sessions for the second, and

8   repeat that series one to two times over life.  The initial

9   eval is 180 to 450, and treatment is 150 to 280 per session.

03:11   10   And Dr. Marvin did agree as the treater for episodics.

11       Cognitive remediation was Dr. Markel and Dr. Lobatz,

12   cognitive remediation with speech language therapist, two to

13   three times a week for three months, initial evaluations 247 to

14   527, treatment 129 to 199.  Dr. Kohani agreed with it, but he

03:11   15   didn't give me his initials.

16   Q.   Very good.  Let's move to therapeutic self-management pain

17   program.

18   A.   So this is a shortened pain program as compared to the 9 to

19   12 week program, so it is a Sharp pain management program that

03:12   20   meets weekly in group sessions for six weeks, two hours each

21   time, and it includes cognitive behavioral therapy.  It is a

22   relaxation and biofeedback, as well as physical therapy, and

23   qigong, which is a kind of meditation exercise, two hours a

24   week for six weeks.  Initial evaluation is 320 which is a

03:12   25   two-hour evaluation.  The weekly group sessions are 162 a

1    session.  The case conference with the treatment team is 197

2    which is done one time.  After the six-week program there is a

3    re-evaluation at 162 to determine if any additional program is

4    warranted.

03:12    5    Q.   Very good.  I see your category of miscellaneous equipment?

6    A.   That was Dr. Kohani for most of it.  Custom mouthguard he

7    felt was needed, 300 to 500 a time, every one to two years.

8    Hot packs for his pain, 13 to $20 a time, two times per year.

9    Electric razor, 60 to 80 percent -- $80 per time, two times

03:13   10    with replacement heads, 21 to 27, three per year, and that is

11    based on him having the indentations in his face now.

12        Water pick Dr. Kohani felt was really important, 49.99 to

13    69.99, every three to five years, and the tip that you use is

14    14.99, and you replace that four times a year.  The Rotadent

03:13   15    toothbrush is 129.99 per time.  You replace it every three

16    years, and you replace the brush heads at 12.77 a time, every

17    other month.

18    Q.   Finally, I see the recommendation for housekeeper.

19    A.   Right.  So it was a housekeeper handyman.  Now it is only

03:13   20    housekeeper based on my discussion with Mr. Moore.

21    Housekeeper, one to two times a month, not two to four times a

22    punt for four hours per time at 10 to $15 an hour.

23    Q.   Okay.  Thank you, Ms. Casuto, just a couple more questions.

24    Are all of your opinions regarding the pricing that we've just

03:14   25    discussed reasonable for the community?

1   A.   Yes -- yes, it is.

2   Q.   And after you finished your report, which is Exhibit 66,

3   did you send a copy of your report to economist Heather Xitco?

4   A.   Yes, I did.

03:14   5            MR. WOHLFEIL:   Those are all my questions.

6            THE COURT:   Who made the housekeeper recommendation?

7            THE WITNESS:   I did.

8            THE COURT:   Cross-examination.

9            MR. LASKE:   Yes, Your Honor.

03:14   10                    CROSS-EXAMINATION

11   BY MR. LASKE:

12   Q.   Good afternoon, Ms. Casuto -- or Nurse Casuto.   Did you

13   happen to review plaintiff's deposition before creating your

14   May 6th, 2016, report?

03:14   15   A.   Yes, I remember I did.

16   Q.   The opinions about care listed in the life-care plan, that

17   is from plaintiff's experts; correct?

18   A.   No.   It actually had Dr. Machado, Dr. Kohani, Dr. Marvin

19   and Moyer who are all treaters.   They may also be considered

03:15   20   experts, but they are treaters.

21   Q.   So, for example, the dental care is all from doctors,

22   treating dentists or an expert dentists?

23   A.   If you consider them experts, but they are people who have

24   actually been treating him, correct.

03:15   25   Q.   But they are medical professionals in the field?

```
       1   A.   Correct.
       2   Q.   Same thing with imaging and examinations; right?
       3   A.   Examinations?
       4   Q.   Anything about imaging?
03:15  5   A.   Yes, same thing about imaging.  I didn't know what you were
       6   talking about examination.
       7   Q.   I think there may be some future examinations in here.
       8   A.   You mean in terms of doctors or --
       9   Q.   Like psychiatric evaluations, those are the psychiatrists
03:15  10  not you?
       11  A.   Correct.  Those all have initials, so you'll be able to
       12  identify who provided the recommendation.
       13  Q.   And where the only exception is -- we'll show you
       14  Exhibit 66, page four, is the housekeeper and at one time I
03:16  15  guess it was the handyman?
       16  A.   Correct.
       17  Q.   So you mentioned that the plaintiff told you to remove the
       18  cost.  Is that what happened?
       19  A.   No.  What I said when I talked to Mr. Moore in going over
03:16  20  stuff, he said that he was doing more handyman, but the problem
       21  is he found it very difficult to keep up with the housekeeping
       22  based on him working five 10-hour days or sometimes a little
       23  longer, so he doesn't really have the endurance when he comes
       24  back home, so where he used to be able to keep up with
03:16  25  housework, he has not been able to do that since his injury.
```

1    And so we did it one to two times a month so it would be a

2    little bit extra help, but that he would still pick up for

3    himself and stuff like that, but the extra stuff he would have

4    help with.

03:16    5    Q.   So the housekeeper is your opinion then?

6    A.   That is correct.

7    Q.   Okay.  For the other opinions, the ones that are not the

8    housekeeper, if for some reason the other doctors you relied on

9    happen to be incorrect, then would that affect the recommended

03:17    10    care on your life-care plan?

11    A.   If they decided to -- if something came up during trial and

12    they changed their testimony, I talked to 26 -- talked to the

13    doctors 26 times, plus read all of their depositions, and so

14    this is pretty consistent with what they told me and at their

03:17    15    depositions so if they changed it, yes.

16    Q.   I guess -- maybe we're not on the same page.  What I was

17    trying to ask, for example, in this case there are opposing

18    experts, and if the judge finds in favor of one expert than the

19    other, would that affect some of your recommendations?  In

03:17    20    other words, you are relying on these experts, so if it is

21    found that whatever they said doesn't stand up, would that

22    affect the overall costs?

23         MR. WOHLFEIL:  Objection, vague.

24         THE COURT:  Yeah, I think so.  Your opinions are your

03:18    25    opinions regardless of whether I agree with them.

1          THE WITNESS:  Correct, and the doctor's opinions

2    whoever gave me the opinion.

3    BY MR. LASKE:

4    Q.  But the recommended care is based on the doctors?

03:18    5    A.  Yes, plus what I see in the community, you know.  I am a

6    rehab nurse.  I do this all the time, and I am a case manager,

7    so if somebody would have come up with an opinion that sounded

8    really strange, I probably would have talked to whoever it was.

9    Q.  And you are aware that at the time of the initial report

03:18   10    Ryan Moore was on a cross border task force?

11    A.  At the -- do that one again.  I just missed that part.

12    Q.  The initial report was produced around December 2015, and

13    as I think it was early, early or late summer of 2015 he was on

14    a cross border task force.  Were you aware of that?

03:18   15    A.  I thought he was on a drug task force.  That is what I had

16    because when I talked to him just recently I said to him

17    weren't you on a drug task force in El Cajon, and he said yes,

18    and I said, so what are you doing now, so I don't -- they may

19    be synonymous.  I don't know.  That is what he told me.  I

03:19   20    don't know if it is the same.

21    Q.  And are you aware that today he is on an FBI task force?

22    A.  Yes, I am.  He told me he was, right around the time of my

23    depo he must have done that.

24    Q.  But you still believe he needs about $19,000 for a

03:19   25    housekeeper for the rest of his life?

1    A.   Actually, you'll have to talk to Heather.  I can only talk

2    to you about the hourly rate.

3    Q.   Heather?

4    A.   Xitco who is the economist.  I didn't total it up.

03:19    5    Q.   The opinions about many of the costs, they are your own;

6    correct?

7    A.   No.  As I said before, it depends what costs you are

8    talking about, so Dr. Kohani's, all of his costs came from his

9    office, so he provided everything --

03:20    10   Q.   So --

11   A.   -- I used.

12   Q.   For example, if Dr. Kohani's office didn't follow a

13   reasonable and customary cost for the relevant community, would

14   that affect any of your report?

03:20    15   A.   Yes, so I, have as I testified in my deposition, I have

16   other patients that have implants over a broader spectrum and

17   do have the abutments and the prosthetics, so I checked to see

18   if that looked what was in line.  I was actually mentioned in

19   my depo that I was treating with another patient on a prior

03:20    20   doctor that Mr. Moore had seen before.

21   Q.   And we're talking about Dr. Burger; correct?

22   A.   Correct.

23   Q.   Is it your understanding that Dr. Burger and Dr. Kohani do

24   the same exact work or would they work hand in hand?

03:20    25   A.   Well, Dr. Burger does more of the implants parts and Dr.

```
 1    Kohani does that, but Dr. Burger actually overlaps with Dr.

 2    Machado.

 3              THE COURT:  Dr. Burger is a medical doctor, isn't he?

 4              THE WITNESS:  Maxillofacial.

 5              THE COURT:  Dr. Kohani is not.  He is a --

 6              THE WITNESS:  Dentist.

 7              THE COURT:  Right.

 8              MR. LASKE:  Nothing further.

 9              THE COURT:  Anything else?

10              MR. WOHLFEIL:  No, Your Honor.

11              THE COURT:  All right.  May she be excused as a

12    witness?

13              MR. WOHLFEIL:  Yes, Your Honor.

14              THE COURT:  All right.  You are excused as a witness.

15              Do you have another witness ready?

16              MR CHAMBERS:  We have Mr. Moore to finish up, and then

17    I think we'll rest, so whether we want to break now and finish

18    him off.

19              THE COURT:  Yeah, okay.  I have -- we're trying to

20    work out some logistics on another civil case in a week and a

21    half.  They'll call at 3:35, Michael?

22              A VOICE:  Yes, Judge.

23              THE COURT:  We'll be in recess until 3:40, 3:40 and

24    then we'll finish with Mr. Moore -- Agent Moore's testimony.

25              MR CHAMBERS:  Thank you, Your Honor.
```

03:21 (lines 5, 10, 15, 20, 25)

```
 1              THE COURT:  Is the defense ready to go today?
 2              MR. LASKE:  Yes.
 3              THE COURT:  You have witnesses?
 4              MR. LASKE:  There will be a witness, and obviously --
 5              THE COURT:  I hope you are going to get us to 5:00.
 6              MR. LASKE:  Yeah, we'll get to 5:00.
 7              THE COURT:  Tomorrow, as a matter of scheduling, I am
 8    going to ask that you come in a little bit later.  I got to get
 9    this big club off my arm, and they are going to do it at 9:10
10    over at Balboa.  Just to be safe, I would say 10:30 tomorrow
11    rather than 9:00.  Is that -- I hope that doesn't inconvenience
12    you as far as witnesses.
13              MR. LASKE:  Your Honor, based on kind of our scorecard
14    of timing, I think that is perfectly fine.  Once we had -- I
15    know we have a long list, but a lot of the people in the front
16    will go fast.
17              THE COURT:  Okay.  What do you anticipate?  Assuming
18    plaintiff rests today, how long do you think your case-in-chief
19    will take?
20              MR. LASKE:  I think because of scheduling we have I
21    think three witnesses that have to go on Friday, but all of the
22    other 11 from the 14 could probably go tomorrow.
23              THE COURT:  Okay.  Do you think we'll be able to fill
24    up the day tomorrow?
25              MR. LASKE:  Yeah.  We'll be able to fill up the day.
```

488

1              THE COURT:  Okay.  Good.  I'll see you at 3:40 then.

2              MR CHAMBERS:  Thank you, Your Honor.

3              THE COURT:  By the way, plaintiffs are at 8 hours

4    25 minutes.  Defendants are at 2 hours 25 minutes.

5         (Recess ensued from 3:23 to 3:40 p.m.)

6         (See next volume for the rest of proceedings for the day.)

7                          ---oOo---

8                      C-E-R-T-I-F-I-C-A-T-I-O-N

9

10             I hereby certify that I am a duly appointed, qualified

11   and acting official Court Reporter for the United States

12   District Court; that the foregoing is a true and correct

13   transcript of the proceedings had in the aforementioned cause;

14   that said transcript is a true and correct transcription of my

15   stenographic notes; and that the format used herein complies

16   with the rules and requirements of the United States Judicial

17   Conference.

18             DATED:  March 1, 2017, at San Diego, California.

19
                              /s/ Melinda S. Setterman
20                            _____
                              Melinda S. Setterman,
21                            Registered Professional Reporter
                              Certified Realtime Reporter
22

23

24

25