1                      United States District Court

2              For the Southern District of California

3
                                        )
4    RYAN MOORE,                        )
                                        )   No. 15-CV-75-LAB
5         Plaintiff,                    )
                                        )   March 2, 2017
6            v.                         )
                                        )   San Diego, California
7    UNITED STATES OF AMERICA and       )
     DOES 1 THROUGH 25, INCLUSIVE,      )
8                                       )   Excerpt of Ryan Moore
          Defendants.                   )   Testimony
9

10                     Trial Day 3 - EXCERPT
                        Transcript of Trial
11             BEFORE THE HONORABLE LARRY ALAN BURNS
                     United States District Judge
12
     APPEARANCES:
13
     For the Plaintiff:        GOMEZ TRIAL ATTORNEYS
14                             ROBERT J. CHAMBERS
                               BEN WOHLFEIL
15                             655 West Broadway, Suite 1700
                               San Diego, CA  92101
16
     For the Defendants:       TIM L. LASKE
17                             GARRETT J. COYLE
                               ASSISTANT UNITED STATES ATTORNEYS
18                             Federal Building, Suite 7516
                               300 North Los Angeles Street
19                             Los Angeles, CA  90012

20

21

22   Court Reporter:           CYNTHIA R. OTT, RDR, CRR
                               District Court Clerk's Office
23                             333 West Broadway, Suite 420
                               San Diego, California, 92101
24

25

1                        I N D E X

2    EXAMINATIONS                                    PAGE

3    RYAN MOORE.........................................
     CROSS EXAMINATION RESUMED BY MR. LASKE..............   3
4    REDIRECT EXAMINATION BY MR. CHAMBERS................  12
     RECROSS EXAMINATION BY MR. LASKE...................  19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                San Diego, California, March 2, 2017

 2                          *   *   *

 3          (Beginning of Excerpt.)

 4          THE COURT:  All right.  Agent Moore, if you want to

 5   come back and have a seat on the stand, unless there's some

 6   different arrangement this morning.  Do you intend to finish

 7   your cross-examination?

 8            MR. LASKE:  Yes, Your Honor.

 9          THE COURT:  All right.  Agent Moore, if you'll come

10   back.  You can bring your water with you, if you want.  You're

11   still under oath.

12          RYAN MOORE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

13                      CROSS EXAMINATION RESUMED

14   BY MR. LASKE:

15   Q.  Good morning, Agent Moore.

16   A.  Good morning.

17   Q.  I think where we last left off, we were talking about the

18   7-Eleven that was near where you lived in Ramona.

19   A.  Okay.

20   Q.  I only have a couple more questions about that and then

21   we'll move to a slightly different topic.  Do you recall using

22   the pressure gauge at the 7-Eleven that one time?

23   A.  I don't recall either way.

24   Q.  And you don't recall if it had a gauge, right?

25   A.  I have no idea.
```

1   Q.   Is that because of the passage of time or you've lost that

2   memory?

3   A.   I can't say either way.

4   Q.   The Chula Vista station is how many miles away from your

5   house in Ramona?

6   A.   Probably around 40.

7   Q.   How long of a commute would that be back in 2013?

8   A.   Well, depends on what shift I was on.

9   Q.   I think you worked Sunday through Thursday, noon to 8, so

10  say on like a Monday, how long would that take you?

11  A.   Probably 45, 50 minutes.

12  Q.   Going in, and then coming home probably a little faster?

13  A.   Still about 45 minutes.

14  Q.   Even at that time of night?

15  A.   What's that?

16  Q.   Even at that time of night?

17  A.   Yeah, if I go the speed limit.

18  Q.   Okay.  You mentioned earlier in your testimony, I think it

19  was end of day Tuesday, you have some experience filling tires,

20  correct?

21  A.   Yes.

22  Q.   And I think you said you'd done it at least 50 times in

23  your lifetime?

24  A.   Yes.

25  Q.   That experience includes inflating wheelbarrow tires?

1   A.   Yes.

2   Q.   How many times?

3   A.   Probably two or three, probably two at the most.

4   Q.   And you believe you're trained in inflating tires based on

5   your experience in inflating tires in the past?

6   A.   Correct.

7   Q.   And in your experience you've only used tire inflators that

8   had the -- that had a lens where inside the lens there was a

9   PSI reading, correct?

10  A.   Can you --

11  Q.   So the lens in this case, it had a glass eye and underneath

12  the eye there was a PSI reading?

13  A.   Uh-huh.

14  Q.   At your depo I asked you and I believe you said, you know,

15  the only ones you've ever used is that kind.   I gave you

16  another example the kind where it has like a dipstick where it

17  pops out, you said you never used that kind.

18  A.   I can't say for sure if either one.   I'm sure I used both.

19  Q.   Okay.   But you have used the one where it did have a glass

20  eye and inside there was a gauge?

21  A.   Yes.

22  Q.   And you used something like that more than once?

23  A.   Yes.

24  Q.   Do you recall if in the past you looked at the PSI gauge

25  when you filled tires?

```
 1   A.   I can't recall if I did or not.
 2   Q.   And you don't recall if you would ever fill the tire when
 3   you filled it up to see if it needed more air?
 4   A.   If -- I'm a little confused.
 5   Q.   When you would fill the tire, some people eyeball it, some
 6   people look at the gauge, some people may even, like, squeeze
 7   the tire or put their foot on it, would you do any of those
 8   things?
 9   A.   I --
10          MR. CHAMBERS:  Objection, vague.
11          THE COURT:  Do you understand what he's asking you?
12          THE WITNESS:  Yes.
13          THE COURT:  You may answer.  Objection is overruled.
14          THE WITNESS:  I've -- I've done all of the above
15   you've mentioned.
16   BY MR. LASKE:
17   Q.   Do you recall how you would determine when to stop
18   inflating a tire, so not the day of the accident but in the
19   past?
20   A.   Specifically, I wouldn't have a routine.  I mean, I would
21   do all three of the points you mentioned earlier.
22   Q.   So you would find a way to fill the tire, you'd eyeball it,
23   or you'd look at the gauge?
24   A.   Yes.
25   Q.   And the tire inflator at the station, you had used that
```

1   before, correct?

2   A.   That specific one, I'm not sure, but, yes.

3   Q.   The filling station?

4   A.   Yes.

5   Q.   And that's the one that's near the garages by the ATVs?

6   A.   Yes.

7   Q.   I would like to direct your attention to Exhibit 142, page

8   one.  So in this photograph, if you look just to the right of

9   the sign that says notice, a little bit down there is

10  a -- looks like a handheld gauge, the size of maybe this pencil

11  or pen.

12      You had never seen that before, had you?

13  A.   Are you talking about that day or?

14  Q.   That particular gauge, you had not seen that before on the

15  fence?

16  A.   No.

17  Q.   And no one you worked with had ever mentioned to you before

18  that that gauge was on that fence?

19  A.   No.

20  Q.   And how many times had you used the tire fill station prior

21  to the accident, that specific one, by the garage and ATVs?

22  A.   Probably like, I would say 10 times or so.

23  Q.   And when you inflated the tires sometimes you would hear

24  the air compressor running, correct?

25  A.   I would imagine.

1    Q.   Do you remember that or?

2    A.   Specifically, no.

3    Q.   Why would you say you would imagine?

4    A.   Just if it's running and I'm taking air out of a -- what's

5    producing the air.

6    Q.   I understand.  And you had been to that filling station

7    during daylight hours, correct?

8    A.   Yes.

9    Q.   So sometimes you would fill up at night, sometimes it would

10   be during the day?

11   A.   Yes.

12   Q.   And on occasion you had seen the fence actually opened,

13   unlocked and opened, right?

14   A.   Yes.

15   Q.   Because during daytime hours, if it's Monday through

16   Friday, the garage people sometimes work there, right?

17   A.   Yes.

18   Q.   And you used this filling station that we're all talking

19   about for both your personal vehicle and your government

20   vehicle?

21   A.   Yes.

22   Q.   And in the past you hadn't asked for help to fill a tire,

23   correct?

24   A.   No.

25   Q.   Specifically at that station?

1    A.   No.

2    Q.   And isn't it true at your deposition you said it didn't

3    seem that complicated?

4    A.   As in?

5    Q.   Isn't it true when I asked you if you'd ever asked for help

6    to inflate a tire and you said, no, it didn't seem that

7    complicated?

8    A.   Yeah, I agree with that.

9    Q.   And isn't it true that you did not previously have any

10   issues with the filling station?

11   A.   No, I did not.

12   Q.   And you did not previously have any issues with the tire

13   inflator, whichever one happened to be hooked up that day?

14   A.   No.

15   Q.   And you never had any prior issues where you could not see

16   the PSI reading, correct?

17   A.   I can't say yes or no on that.

18   Q.   Is it because you don't remember?

19   A.   Yeah, I mean, I don't remember.

20   Q.   Your deposition was taken back in November 13th, 2015, and

21   I guess I just want to ask an initial question, is it you don't

22   remember today or you don't think you ever remembered?

23   A.   With?

24   Q.   For that particular question, if you had ever looked at the

25   PSI readings.

```
 1   A.   Yeah, I mean I have no idea if I ever have or not.

 2   Q.   Okay.  Would it refresh your memory if I were to show you

 3   part of your deposition transcript?

 4   A.   Go ahead.

 5   Q.   I direct your attention to page 20, 22, line 22 to line 24.

 6   That was page 20, line 22 to 24.

 7   A.   Okay.

 8   Q.   The other entry where I think this question came up was

 9   also page 25, line 24 to page 26, line one.

10          THE COURT:  Mr. Laske, it would be helpful to me if

11   you'd read it.  I have a copy of the transcript so.

12          MR. LASKE:  Sure, Your Honor.  I was just going to

13   refresh his memory first.

14          THE COURT:  Okay.

15          MR. LASKE:  And if it doesn't refresh it, then I might

16   read it.

17          THE COURT:  All right.

18          THE WITNESS:  Which was the one on page 25?

19   BY MR. LASKE:

20   Q.   It was line 24 to page 26, line one.

21   A.   What was that?

22   Q.   So it starts on page 25, line 24, and then it goes to the

23   very next page and it stops at line one.

24      And you don't recall ever having any prior issues with

25   seeing the PSI readings, correct?
```

1   A.  I mean, as this says, it's not that I recall, so it's the

2   same thing I told you earlier.

3   Q.  Okay.  And you had never had any prior issues where the

4   gauge was stuck, correct?

5   A.  Not that I recall.

6   Q.  And you had never had any instances where you felt you

7   couldn't see or where you needed a flashlight?

8   A.  Not that I recall.

9   Q.  And you never complained to anyone about the lighting by

10  the tire fill station?

11  A.  No.

12  Q.  And you never asked anyone for the PSI settings for the air

13  compressors?

14  A.  No.

15  Q.  And you had never seen anyone actually fill a wheelbarrow

16  tire at the station?

17  A.  No.

18  Q.  And you had never heard of anyone having an instance where

19  a tire exploded using that filling station, correct?

20  A.  I had never heard of that, no.

21  Q.  Did you know that if you had any issues with equipment, you

22  could tell someone about it?

23  A.  Sure.

24  Q.  And -- like your supervisor for example?

25  A.  Yes.

1    Q.  But you never told any supervisors you had any issues with

2    the tire filling station that we're talking about?

3    A.  No.

4    Q.  And you previously used the tire filling station without

5    any problems, correct?

6    A.  Correct.

7              MR. LASKE:  Nothing further, Your Honor.

8              THE COURT:  All right.  Redirect.

9              MR. CHAMBERS:  Briefly, Your Honor.

10                        REDIRECT EXAMINATION

11   BY MR. CHAMBERS:

12   Q.  Mr. Moore, just so we're clear, the few times that you'd

13   used this particular tire inflation station before your

14   incident, was that all to fill vehicle tires?

15   A.  Yes.

16   Q.  Did you ever use it to fill anything other than a passenger

17   vehicle tire?

18   A.  No.

19   Q.  And remind me again, were there any restrictions that

20   you're aware of whatsoever as to what sorts of tires you could

21   use those compressors to inflate?

22   A.  No.

23   Q.  I want to go back to just a couple of points that were made

24   yesterday about you being vocal with your mental and your

25   physical issues and limitations.  Why didn't you ever tell

1    anybody at the border patrol about those issues?

2    A.   Because I was embarrassed and feared that something might

3    occur if I mentioned everything I'm going through, and it just

4    would have made another unknown in what's going to happen.

5    Scared what people are going to think or what actions might be

6    after I provided that information, but like I mentioned

7    yesterday, it could be career suicide, but I mean that's what

8    we're here for is to tell the truth.  And I'm sick of keeping

9    everything in and hiding all the damages that I deal with every

10   day.

11   Q.   And conversely, did any of your coworkers at the border

12   patrol or your command staff ever inquire about your mental or

13   psychological issues?

14   A.   Not that I remember.  Everything was always focused on my

15   physical and my mouth and my teeth.  Like I mentioned

16   yesterday, everybody only seems to think it's my teeth that

17   I've always cared about or that's the biggest thing, and that's

18   nothing.

19   Q.   And we heard I think yesterday during the initial parts of

20   your cross-examination that the FBI task force that you're on

21   currently is set to expire within the next month or so?

22   A.   Correct.

23   Q.   And then after that, you're to go back to the Chula Vista

24   station?

25   A.   Correct.

```
 1   Q.  And what would you be doing there?
 2   A.  The same duties I was doing prior to the accident.
 3   Q.  So as opposed to having a desk job like you have currently,
 4   you'd be out in the field doing patrols and whatnot?
 5   A.  Yes.
 6   Q.  How do you feel about the prospects of going back to the
 7   station where this injury occurred and doing those sorts of
 8   things?
 9   A.  Scared, anxious, you know, especially after all this being
10   let out and it's -- that's one of the things that bugs me, you
11   know, when people ask me about the physical or mental
12   limitations I might have with using the gun or doing stuff like
13   that, it's -- it bothers me that I won't be able to make the
14   quick decision that we have to make in that line of employment
15   that it scares me if I can do that still or not, and I'm very
16   frightened to go back.
17           MR. CHAMBERS:  Thank you.  I don't have anything
18   further.
19           THE COURT:  I have a few questions, Agent Moore.
20           Mr. Laske showed you the picture of the stand-alone
21   tire gauge, maybe you've seen them before, I've seen them a
22   hundred times, sometimes they're long and sometimes they're
23   round with just a meter on it, you plug it on there.  In the
24   times that you recall using or inflating tires, have you ever
25   used one of those stand-alone gauges yourself?
```

1            THE WITNESS:  Yes.

2            THE COURT:  Okay.  And you have no recollection of

3   any -- whether you saw it or didn't see it, I mean, everything

4   is a blackout for you regarding two weeks before this incident

5   and, I assume, sometime afterwards?

6            THE WITNESS:  Yes.

7            THE COURT:  Haven't been able to reconstruct any of

8   it?

9            THE WITNESS:  I wish.

10            THE COURT:  Have you discussed with any supervisors at

11   border patrol your anxiety about going back to regular patrol

12   duties?

13            THE WITNESS:  No.

14            THE COURT:  Do you intend to?

15            THE WITNESS:  Well, after today I don't think I'm

16   going to have to, but.

17            THE COURT:  What do you mean by that?

18            THE WITNESS:  Well, just people here in this room are

19   in charge of that station and it's pretty much out in the open

20   now.

21            THE COURT:  Okay.  How long have you harbored anxiety

22   about going back and resuming the patrol duties of -- usual

23   patrol duties of a border patrol agent?

24            THE WITNESS:  Pretty much since my accident.

25            THE COURT:  Okay.  It hasn't gotten any better?

 1          THE WITNESS:  No.

 2          THE COURT:  You have had some active duty since you've

 3   recovered, mostly recovered from the accident?  You've been

 4   involved with the searches on teams that have executed search

 5   warrants and all?

 6          THE WITNESS:  Yes.

 7          THE COURT:  Okay.  And I think you said -- did you say

 8   you'd made two arrests since the time of the accident?

 9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  And that would be physical arrests

11   yourself where you handcuffed people and brought them in and so

12   on?

13          THE WITNESS:  One was arrested at the port that I had

14   an arrest warrant for, so we just had to transport him back to

15   a station and do the processing, and I had a partner with me.

16   And the second one I had to, he was a -- a documented gang

17   member with weapons history.  And I actually approached him and

18   he got in his car and I told him get out of his car and unlock

19   it and he refused to.

20          And I had to try to open the door to get in and it

21   actually broke off, but finally he complied and came out.  And

22   I did put cuffs on him and I asked him in the post interview,

23   I'm like, why didn't you just listen to my commands from the

24   beginning, you know, this could have got bad.

25          And he said well, all I saw were the scars on your

 1   face and I thought you were trying to do it.  And I'm like so

 2   now I've got to worry about these bad criminals worrying about

 3   the scars on my face and even something else to worry about.

 4   And I don't know.

 5          THE COURT:  What was the gist of his statement to you,

 6   that he didn't think you were a border patrol agent, he thought

 7   you were something else?

 8          THE WITNESS:  Because he didn't look at like down here

 9   the badge or anything, he looked at my face and saw the scars,

10   and -- so I mean, I had to worry -- well, now I have to worry

11   about -- and then he -- I also had someone else tell me that

12   just in an interview.  They're like enthralled with my scars.

13          And I just -- my biggest worry is you go back to

14   patrol and you're going hands on all the time and, you know, a

15   lot of the people we confront run from you or want to fight and

16   stuff.  And if I was back there and somebody hit me in the

17   face, I'd -- I'd lose my mind, I think.

18          Just, I've wrestled with my dogs at home and if their

19   paw hits me or something I like instantly I just -- I go from

20   here to here.  And -- I don't want to, part of not going

21   through that again but all the work that's already been done

22   and everything and I just -- I don't know, it's very sensitive,

23   I guess.

24          THE COURT:  How many years do you have in?

25          THE WITNESS:  Almost -- it'll be 11 in June.

1          THE COURT:  And this is neither here nor there

2     regarding your claims in this case, but are you eligible to

3     seek a medical retirement?

4          THE WITNESS:  I don't believe so since the government

5     didn't declare this an on-duty injury.

6          THE COURT:  Did you seek a designation that this was

7     an on-duty injury?

8          THE WITNESS:  No, I tried with the Department of Labor

9     to get it on-duty injury and they denied it, and then I tried

10     to appeal it and they denied it again.  So that's why we're

11     here today.

12          THE COURT:  Okay.  I see.  So you think the position

13     of the United States Border Patrol and the United States

14     Government is that this was -- you were on your own, this was

15     not an on-duty injury?

16          THE WITNESS:  I mean, it was all considered by

17     everybody involved that it was on duty.  Like I said, there was

18     no policy stating we couldn't do that while there or.

19          THE COURT:  What -- what other alternatives do you

20     have besides going into the field and doing field work?  Can

21     they accommodate you with desk type work where you wouldn't be

22     in encounters with people clawing at your face?

23          THE WITNESS:  I'm sure there are options.  I haven't

24     really even talked to anybody about that.

25          THE COURT:  Do you have an intention to do that before

```
1  you go back to regular border patrol duties after the task

2  force expires?

3            THE WITNESS:  Yeah, I mean, I haven't -- it hasn't

4  been set in my mind yet but, you know, in a way it's like well,

5  I want to go out there and maybe try to see if I can do it

6  again, but I don't want to sometimes take that risk where if it

7  doesn't.

8            THE COURT:  Yeah.

9            THE WITNESS:  You know.

10           THE COURT:  Yeah, you'll --

11           THE WITNESS:  It just bugs me because I was up here

12 and that's who I am and I love arresting people and talking to

13 them and all that, and to not be able to do that, and I am not

14 a fan of sitting behind a computer, but it is what it is, I

15 guess.

16           THE COURT:  All right.  Any questions based on the

17 Court's questions?

18           MR. LASKE:  A couple, Your Honor.

19           THE COURT:  Yes, go ahead.

20                       RECROSS EXAMINATION

21 BY MR. LASKE:

22 Q.  Agent Moore, isn't it true that you had a beard at that

23 time of the arrest you were talking about?

24 A.  A beard.

25 Q.  Yes, didn't you have facial hair at the time that you made
```

```
 1   that arrest where you said the person commented about your
 2   scar?
 3   A.   I did not.
 4   Q.   When was that arrest?
 5   A.   I don't recall specifically.
 6   Q.   This year, last year?
 7   A.   No, it was 2015 probably.
 8   Q.   Winter, summer, fall?
 9   A.   I don't recall.
10   Q.   Were you wearing a short-sleeved shirt or were you wearing
11   a jacket?
12   A.   I might have a sweatshirt on.  You might be thinking of
13   another one than I'm talking about.
14   Q.   Okay.  Which one are you talking about?  Were you on a task
15   force at the time or were you on just regular duty?
16   A.   I was on a task force.
17   Q.   This was with the border crime suppression team?
18   A.   Yes.
19   Q.   And can you remind me again what years, what period of time
20   was that?
21   A.   March 2015 to like May or April of '16.
22   Q.   Does that in any way refresh your memory of what period of
23   time that might have happened?
24   A.   Somewhere in there.  I mean, I don't remember the specific
25   date.
```

1   Q.   That's fine.  Every assignment that you've had since your

2   accident, you've chosen those assignments, correct?

3   A.   Chosen as in?

4   Q.   You were consulted and you were asked what assignment and

5   you picked an assignment, in other words, you weren't told to

6   go some place?

7   A.   While on light duty?

8   Q.   Yeah.  You had some choice in which assignment you were

9   taking?

10  A.   I don't agree with that.

11  Q.   All right.  And why don't you agree with that?

12  A.   Because at first I was told I was going to have to go to

13  radio dispatch when I first went back to light duty and I

14  couldn't talk and I had to fight to be put on a desk to help

15  one of our squads out with any record checks and stuff.

16  Q.   Who did you have to fight for that?

17  A.   My command staff at my station.

18  Q.   Do you have a specific name or names?

19  A.   At the time, I know it was -- he's over at Brownfield now,

20  Boone Smith.  They brought me in and gave me a pep talk about

21  working at radio dispatch and it's not a bad thing or anything,

22  yet you look at my mouth, I couldn't talk and why would I go

23  work there.

24  Q.   Any other issues or is it just that one instance?

25  A.   With?

1   Q.   You said not getting assignments that you wanted.

2   A.   I mean, I didn't have many choices while on light duty.

3   Q.   The light duty, did you have a choice -- well, actually,

4   did you ultimately do radio dispatch?

5   A.   I did not.

6   Q.   What ultimately were you doing?

7   A.   I was working for one -- our smuggling interdiction group

8   just in their office doing record checks or any computer work

9   they might need help with.

10  Q.   Did you have any choice about being part of that group?

11  A.   Yeah, I asked to be assigned to that group.

12  Q.   And was that granted or was it initially denied and you had

13  to fight to get it granted?

14  A.   Oh, it was initially denied until I brought a new doctor's

15  note in.

16  Q.   And then it was granted?

17  A.   Yes.

18  Q.   The doctor's note was from which doctor?

19  A.   Vecchione.

20  Q.   As far as any duty injury or medical retirement, those

21  decisions are made in Washington, D.C., correct, through the

22  Department of Labor?

23  A.   I would imagine.  I mean, I really didn't research it to

24  where exactly it comes from.

25  Q.   Do you have any understanding if the decision is actually

1  made here in San Diego as opposed to somewhere out in a

2  different location?

3  A.  I couldn't tell you.

4  Q.  Okay.  So you didn't look into it one way or the other?

5  A.  No.

6  Q.  Have you asked for an extension to remain on the FBI task

7  force?

8  A.  I have not.  The agent or self, I don't think we're allowed

9  to, it has to come from either my supervisor or the task force

10  commander or somebody like that.

11  Q.  If for some reason you're mistaken about that, do you plan

12  on asking for an extension?

13  A.  No, I mean I would like to have an extension, but I never

14  count on -- you can't really count on it.

15  Q.  No, I understand you can't count on it.  But if you have

16  some say, would you at least express that?

17  A.  Oh, yeah.  Yes, I would.

18  Q.  And what is your understanding if you do get an extension,

19  are we talking a month, are we talking six months, a year,

20  three years?

21  A.  I think they can pretty much extend you for the time period

22  they choose.

23          MR. LASKE:  All right.  Nothing further, Your Honor.

24          THE COURT:  Anything else?

25          MR. CHAMBERS:  No, Your Honor.

1          THE COURT:  All right.  Thank you, Agent Moore.  You

2     may stand down.  You're excused as a witness.

3          (The excerpt concluded at 10:59 a.m., March 2, 2017.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COURT REPORTER'S CERTIFICATE

     I, CYNTHIA R. OTT, Official Court Reporter, United States District Court, Southern District of California, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a true, complete and correct partial transcript of the stenographically reported proceedings had in connection with the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

     DATED at San Diego, California, March 10, 2017.


                              _/s/ CYNTHIA R. OTT_
                              CYNTHIA R. OTT, RDR, CRR